## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

| | | |
|---|---|---|
| **MICHAEL CLOUD** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:20-CV-01277-E** |
| | § | |
| **THE BERT BELL/PETE ROZELLE** | § | **JURY DEMAND** |
| **NFL PLAYER RETIREMENT PLAN** | § | |
| | § | |
| **Defendant** | § | |

---

### PLAINTFF'S MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD

---

NOW COMES Plaintiff, Michael Cloud (hereinafter "**Plaintiff**" or "**Cloud**"), and files his *Motion to Supplement Administrative Record* ("**Motion**") and respectfully shows this Honorable Court as follows:

### I.       INTRODUCTION AND NATURE OF THE ACTION

1.       The National Football League ("**NFL**") is a highly profitable league governing professional football in the United States that garners the attention of millions of fans and viewers each week during the NFL season.  For many years, the ill effects of playing professional football were not known by the athletes who gave their bodies, minds, and mental health to professional football.  In 2002, during the study of former Pittsburgh Steeler Mike Webster's brain, Dr. Bennet Omalu discovered a condition of the brain he termed chronic traumatic encephalopathy ("**CTE**").  CTE has been determined to occur as a result of repeated blows to the head and has been commonly linked to athletes competing in professional football.  Dr. Omalu's research on CTE was published for the first time in 2005.  A 2019 study led by Boston University researchers that was published

in the *Annals of Neurology* studied the brains of 266 deceased football players and found that 223 had CTE.

2. In 2012, more than eighty (80) former NFL players filed various lawsuits against the NFL seeking damages for injuries as a result of concussion-related symptoms. The litigation ultimately merged into multi-district litigation involving claims of thousands of former NFL players. In 2015, a settlement was approved that covered six "Qualifying Diagnos[es]". The conditions that constitute a "Qualifying Diagnosis" under the terms of the settlement agreement are: (1) Level 1.5 Neurocognitive Impairment (as defined by the settlement terms), (2) Level 3 Neurocognitive Impairment (as defined by the settlement terms), (3) Alzheimer's Disease, (4) Death with documented CTE prior to April 22, 2015, (5) Parkinson's Disease, and (6) Amyotrophic Lateral Sclerosis ("**ALS**").

3. Due to the limitations of the NFL concussion settlement, many former NFL players turned to The Bert Bell/Pete Rozelle NFL Player Retirement Plan (hereinafter "**Defendant**" or "**Retirement Plan**") to determine whether players qualified for benefits under the terms of the Retirement Plan. The Retirement Plan is a retirement, disability, and related benefits plan accessible by eligible former professional football players and is an employee pension benefit plan within the mean of 29 U.S.C. § 1002(2) covered under the Employee Retirement Income Security Act of 1974 ("**ERISA**").

4. Plaintiff is a former NFL football player who brings this action under ERISA, 29 U.S.C. §§ 1001 *et seq.*, against the Retirement Plan to recover benefits due to him under the terms of the Retirement Plan, to enforce his rights under the terms of the Retirement Plan, to clarify his rights under the terms of the Retirement Plan, and to enjoin and obtain appropriate equitable relief pertaining to acts that violate ERISA and/or the terms of the Retirement Plan. The Retirement

Plan violated the terms of the plan by failing to reclassify and award Plaintiff "Active Football" benefits under the terms of the Retirement Plan.

## II.    FACTUAL ALLEGATIONS

5.      Plaintiff grew up in Portsmouth, Rhode Island and quickly exceled as an athlete. He attended Portsmouth High School in Portsmouth, Rhode Island where he earned All-American honors as a running back and was recruited by virtually every major college and university to participate as a member of its football team.  Plaintiff selected Boston College as his college of choice and went on to have a stellar career.  At Boston College, as a senior, Plaintiff was named first team All-American and finalist for the Doak Walker Award, an award given to the nation's top running back.  Plaintiff left Boston College with a bachelor's degree in Socioeconomics.

6.      In 1999, Plaintiff was selected by the Kansas City Chiefs in the second (2nd) round of the 1999 NFL Draft with the fifty-fourth (54th) overall selection.  Plaintiff had a seven (7) year career as a running back, kick returner, and special teams player in the NFL playing for three (3) teams, Kansas City Chiefs (1999-2002), New England Patriots (2003, 2005), and the New York Giants (2004-2005).  While playing for the New England Patriots, in 2004, Plaintiff helped the New England Patriots win Super Bowl XXXVIII.  On November 29, 2005, Plaintiff was released by the New England Patriots.

7.      Shortly after retirement, in 2006, Plaintiff requested necessary documents and information from the advisors of the Retirement Plan necessary to seek disability benefits, but did not receive copies of all requested policies and received only partial documentation showing a ten (10) page "Medical Summary" of most of Plaintiff's orthopedic injuries.  However, the documents provided did not include any documentation of concussions or corresponding medical documentation of orthopedic and neurological injuries.  During Plaintiff's NFL career, he

sustained multiple injuries including several concussions, injuries to his back and neck, and had three surgeries including bone grafting and cyst debridement of his left foot first metatarsal, right great toe cyst removal, and right leg fasciotomy with debridement of a necrotic peroneus longus. The muscle necrosis of his peroneus longus required an emergency surgical procedure to save Plaintiff's life, which is evidenced by the following:



8.      Plaintiff has a long history attempting to navigate the complex web of the Retirement Plan in seeking disability benefits.  On October 31, 2004, while playing for the New York Giants, Plaintiff sustained a concussion that caused him great pain and concern.  Despite a concussion, Plaintiff was cleared to practice and compete only forty-eight (48) hours after the concussion.  Shortly thereafter, Plaintiff could not remember basic plays, football schemes, or his duties in such plays and schemes. Many of the plays Plaintiff was asked to perform, he learned in

high school, but had no ability to recall his responsibilities or the requirements of plays. Ultimately, as a result of his failure to perform the basic duties of an NFL running back, Plaintiff was released by the New York Giants prior to the first game of the season.  In 2005, Plaintiff was signed by the New England Patriots for a short period of time.  Plaintiff was, again, unable to recall plays and perform the functions and duties of his job as an NFL running back. During Plaintiff's approximately three (3) weeks with the New England Patriots, the New England Patriots administered a neurological exam on Plaintiff known ImPACT designed by Grant Iverson and the NFL MTBI committee.  Shortly after taking the exam, Plaintiff was released by the New England Patriots.  To this day, Plaintiff still does not have a copy of these neurological exam results despite multiple requests.  Plaintiff has had extreme difficulty obtaining requested medical information.

9.      Shortly thereafter, in addition to memory loss and the inability to perform the functions and duties of his job, Plaintiff started experiencing headaches, vertigo, getting lost, forgetting names and places, and other cognitive issues.  Accordingly, on June 11, 2009, Plaintiff filed his *Application for Disability Benefits* asserting disabling injuries including injuries to his left shoulder, right hip, right mid-foot, right leg compartment numbness and loss of sensation, left rib, and "concussions – vertigo regularly".  On or about July 6, 2009, Plaintiff met with Dr. Michael J. Einbund, an NFL approved doctor, who evaluated Plaintiff only as to the orthopedic aspects of his application. On July 9, 2009, Retirement Plan tabled Plaintiff's request for line-of-duty benefits until Plaintiff submitted for evaluation by "neutral physicians" who are approved by the NFL.  On September 25, 2009, Retirement Plan denied Plaintiff's request for line-of-duty benefits by stating he "does not have a 'substantial disablement' within the meaning of the Retirement Plan," but only analyzed Plaintiff's upper extremities (15% impairment) and lower extremities (35% impairment) for total body impairment of twenty-four percent (24%).  There was no analysis of Plaintiff's

"concussions – vertigo regularly" as addressed on his *Application for Disability Benefits*.  On February 2, 2010, Plaintiff appealed the denial of his request for line-of-duty disability benefits. On May 18, 2010, Retirement Plan granted Plaintiff's appeal and granted his line-of-duty disability benefits in the amount of $3,290.00 per month effective May 1, 2010.

10.     On or about April 13, 2010, Plaintiff met with Dr. George H. Canizares of All Florida Orthopedic Associates, another NFL doctor, and reported that he experienced "depression, migraine headaches, insomnia, … [and] some concussions."  On the same day, April 13, 2010, Plaintiff also met with Dr. Adam S. DiDio where he described a "history of concussions" and vertigo that makes it feel like his "bed spins".  Plaintiff further explained that "[i]n the last 6 or 7 years[,] [headaches] have become more frequent and more intense." In addition to intense headaches, Plaintiff described "some cognitive difficulties", including forgetting names of people he has known for years, often getting lost, having difficulty paying bills, and depression.  Similarly, on October 19, 2010, Plaintiff filed *Employee's Claim Petition* in Minnesota against New York Giants as a result of a "Grade 1 concussion leading to vertigo, dizziness, headaches, and altered attention span."  The Grade 1 concussion mentioned in the Employee's *Claim Petition* is the concussion referenced above that occurred on October 31, 2004 in a game between the New York Giants and the Minnesota Vikings.

11.     On or about June 12, 2011, Plaintiff submitted to medical treatment performed by Primary Behavioral Health Clinics where Plaintiff reported that he experienced neck, lower back, foot, and lower leg pain.  Additionally, such records indicated Plaintiff has "extreme trouble remembering things, is worried and easily annoyed or irritated, has difficulty making decisions, goes blank often and has trouble concentrating."  Harry Cates, a licensed professional counselor working for Lifework's Group, PA, performed a mental residual capacity assessment on Plaintiff

evaluating him from October 10, 2011 to December 21, 2011 and stated Plaintiff was struggling with depressive symptoms, poor concentration and bouts of unpredictable irritability that were "no doubt" related to his physical injuries and concussions sustained while competing in the NFL. Further, Mr. Cates reported that Plaintiff had increased difficulty in coping due to social anxiety and self-consciousness from ongoing changes in his cognitive function.

12.     On January 22, 2013, Dr. Anne Smith of Smith Behavioral Health concluded Plaintiff experienced "major depressive disorder, recurrent, severe without psychotic features." On April 8, 2013, Dr. Don Marler performed a mental residual functional capacity assessment and concluded that Plaintiff's understanding and memory limitations as markedly limited in the ability to understand and remember detailed instructions and the ability to carry out detailed instructions. On May 13, 2014, Mr. Cates again met with and analyzed Plaintiff's cognitive function. Mr. Cates concluded that Plaintiff was limited in his ability to maintain attention and concentration for extended periods and was further concluded that Plaintiff was limited in his ability, amongst others, to remember location and work procedures, understand, remember, and carry out instructions and perform activities on schedule. Accordingly, on June 18, 2014, Daniel Curran, Administrative Law Judge for the Social Security Administration, found Plaintiff to be totally and permanently disabled.

13.     The total and permanent disability benefits ("**T&P Benefits**") program administered under the Retirement Plan is complex and has multiple categories. The categories under the Retirement Plan at issue are:

> Active Football: Subject to the special rules of Section 5.4, Players will qualify for benefits in this category if the disability(ies) results from League football activities, arises while the Player is an Active Player, and causes the Player to be totally and permanently disabled "shortly after" the disability(ies) first arises.

**Inactive A**: Subject to the special rules of Section 5.4, a Player will qualify for benefits in this category if a written application for T&P benefits or similar letter than began the administrative process that resulted in the award of T&P benefits was received within fifteen (15) years after the end of the Player's last Credited Season. This category does not require that the disability arise out of League football activities.

The Retirement Plan also defines "shortly after" and states, in pertinent part, as follows:

"**Shortly After**" **Defined**. A Player who becomes totally and permanently disable no later than six months after a disability(ies) first arises will be conclusively deemed to have become totally and permanently disability "shortly after" the disability(ies) first arises, as that phrase is used in subsections (a) and (b) above, and a Player who becomes totally and permanently disabled more than twelve months after a disability(ies) first arises will be conclusively deemed not to have become totally and permanently disabled "shortly after" the disability(ies) first arises, as that phrase is used in subsections (a) and (b) above. In cases failing within this six- to twelve-month period, the Retirement Board or the Disability Initial Claims Committee will have the right and duty to determine whether "shortly after" standard is satisfied.

14. On July 23, 2014, the Retirement Plan granted Plaintiff T&P Benefits under the Inactive A designation with an effective benefits date of May 1, 2014. The Retirement Board chose to grant Inactive A T&P Benefits instead of the proper benefits under Active Football T&P Benefits. As a result, on February 17, 2016, Plaintiff filed his request for reclassification of his Inactive A T&P Benefits to Active Football T&P Benefits to which his request was summarily denied on March 2, 2016. Subsequently, Plaintiff filed his appeal of denial of his request for reclassification of Inactive A T&P Benefits to Active Football T&P Benefits. Again, on November 23, 2016, Retirement Plan denied Plaintiff's request.

15. The appeal of the reclassification decision is the final step in the administrative process and, thus, Plaintiff's ERISA claim is ripe for consideration. Specifically, Retirement Plan's correspondence dated November 23, 2016 states "[y]ou have the right to bring an action under Section 501(a) of the Employment Retirement Income Security Act of 1974, as amended, within 42 months from the date of this letter, which is May 16, 2020."

16.     Plaintiff satisfies each element necessary to obtain Active Football T&P Benefits. Specifically, Plaintiff was disabled as a result of playing in the NFL, arose while he was an active player competing in the NFL, and Plaintiff was totally and permanently disabled "shortly after" the disability occurred.  In addition to the numerous other medical professionals referenced above, Dr. John Cronin conducted a head trauma evaluation resulting from a helmet to helmet concussion that occurred on October 31, 2004.  Dr. Cronin reported that Plaintiff "sustained at least one, if not several, closed head injuries" that caused him to be "unable to complete basic plays and assignments" while participating as an NFL player in late 2004 and 2005.  Dr. Cronin concluded that Plaintiff has experienced the following cognitive problems "since his injury in 2004": 1) "[m]emory impairment as identified by  a reduced ability to learn or recall information"; 2) "[d]isturbance in executive functioning (i.e., planning, organizing, sequencing, abstracting)"; 3) "[d]isturbance in attention or speed of information processing"; 4) "[i]mpairment in perceptual-motor abilities"; and 5) "[i]mpairment in language (e.g., comprehension, word finding)".

17.     Plaintiff has had to scratch and claw to obtain his medical records from the Retirement Plan, NFL, doctors approved by the NFL, and NFL member teams.  When he first sought to file for disability benefits in 2006, Plaintiff did not have a copy of the plan and was not provided copies of his medical records.  Plaintiff made requests for his full medical file in 2006, 2007, 2008, 2009, 2010, 2012, 2013, 2014, 2015, 2016, 2017, 2018, and 2019.  On or about January 18, 2019, some thirteen (13) years after the initial request, Plaintiff was provided with an 860 page medical file by the Retirement Plan, but the documentation provided still lacked the neurological reports including reports from the NFL MTBI committee and the results of the ImPACT neurological exam administered by the New England Patriots.  As is clear, all of the evidence indicates that Plaintiff has cognitive impairments as a result of a concussion (and a series

of previous concussions) that materially affected Plaintiff's life and have caused, amongst other things, memory loss, headaches, vertigo, irritability, depression, and loss of focus.  Additionally, Plaintiff suffers from a series of orthopedic injuries as described above.  Plaintiff suffers from debilitating orthopedic and neurological injuries stemming from repetitive high velocity impacts to the body and brain sustained while serving as an active player in the NFL.  Other than a few private training sessions on an infrequent basis, Plaintiff has not been employed since he retired from participating in the NFL.

18.     Retirement Plan's denial of Plaintiff's relief was arbitrary and capricious. Retirement Plan does not have unfettered discretion to deny requests for benefits that are supported by evidence.  Retirement Plan's decisions must be supported by substantial evidence that is relevant and reasonable to support its conclusion.  Clearly, the Retirement Plan has ignored relevant evidence supporting the award of the Active Football T&P Benefits.

19.     The decisions of the Retirement Plan are erroneous under any standard, and was an abuse of discretion to the extent the plan documents granted such discretion as confirmed by the mountain of evidence described above.  In addition to the information set forth above, the Retirement Plan's decisions are erroneous for the following reasons, among others, 1) Plaintiff meets the requirements for Active Football T&P Benefits; 2) Retirement Plan's decision relating to Plaintiff's request for Active Football T&P Benefits are not consistent with the plan documents; 3) Retirement Plan's decision is contrary to the purposes and goals of the Retirement Plan , which were designed to provide appropriate disability benefits to retired players who were disabled as a result of competing for NFL member teams in NFL competition; and 4) Retirement Plan refused to consider unanimous medical evidence showing Plaintiff was totally and permanently disabled "shortly after" a concussion that occurred on October 31, 2004.

### III.   CLAIMS ASSERTED BY PLAINTIFF

20.    Plaintiff asserts violations of ERISA under 29 U.S.C. § 1132(a)(1)(B), (a)(3) based on the Retirement Plan wrongfully denying Plaintiff the benefits due to him in accordance with the plan documents including the Active Football T&P Benefit. Plaintiff was totally and permanently disabled "shortly after" a concussion that occurred on October 31, 2004. *See Dkt. 1 at ¶¶ 26-29.*

21.    Plaintiff asserts violations of ERISA under 29 U.S.C. § 1133(2) based on the Retirement Plan's failure to provide Plaintiff's medical documentation to Plaintiff despite requests that began in 2006.  In January 2019, for the first time, Plaintiff was presented with 860 pages of medical records, but is still missing numerous reports and information.  Plaintiff was never granted the opportunity to present a full and complete case for Active Football T&P Benefits due to the Retirement Plan withholding relevant documentation and evidence.  *See Dkt. 1 at ¶¶ 30-33.*

### IV.   LEGAL STANDARD

22.    In *Crosby v. Louisiana Health Service & Indemnity Co.*, the U.S. Court of Appeals for the Fifth Circuit clarified the boundaries of the supplementation of the administrative record. *Crosby v. Louisiana Health Service & Indemnity Co.*, 647 F.3d 258, 263 (5th Cir. 2011). A Court may admit evidence to resolve the merits of a coverage decision if the supplementation of the administrative record "relates to how the administrator has interpreted the plan in the past, or would assist the court in understanding medical terms and procedures." *Id.  Crosby* acknowledges that a Court may also admit evidence to resolve other questions that may arise in an ERISA action:

> For example, in an ERISA action under 29 U.S.C. § 1132(a)(1)(B), a claimant may question the completeness of the administrative record; whether the plan administrator complied with ERISA's procedural regulations; and the existence and extent of a conflict of interest created by a plan administrator's dual role in making benefits determinations and funding the plan. These issues are distinct from the question of whether coverage should have been afforded under the plan. We see no

reason to limit the admissibility of evidence on these matters to that contained in the administrative record, in part, because we can envision situations where evidence resolving these disputes may not be contained in the administrative record.

*Id.; see also Gooden v. Provident Life & Accident Ins. Co.,* 250 F.3d 329, 333 (5th Cir. 2001);

*Schultz v. Metropolitan Life Ins. Co.,* 872 F.2d 676, 680 (5th Cir. 1989) (approving the district

court's use of affidavit evidence offered to show inconsistent treatment of other similar claims by

the plan administrator).

## V.   DISCUSSION AND ARGUMENT

23.     Plaintiff requests that this Honorable Court permit Plaintiff to supplement the

administrative record with information and documentation that expressly addresses the matters

pertinent to this litigation.  Specifically, Plaintiff intends to offer: 1) requests and communications

between Plaintiff and the Retirement Plan requesting medical documentation; 2) expert testimony

and documents to assist this Honorable Court in review of medical terminology and practices

including the language of the Retirement Plan as applied to the circumstances at issue; 3) medical

records in the possession of the Retirement Plan that were not provided to the Plaintiff after

multiple requests; 4) the filings, records, and findings of the Social Security Administration as it

pertains to Plaintiff; and 5) documents and information pertaining to worker's compensation

claims filed by Plaintiff relating to the injuries at issue in this litigation.

24.     **Requests for Information.**  Plaintiff has argued and asserted he was never granted

the opportunity to present a full and complete case for Active Football T&P Benefits due to the

Retirement Plan withholding relevant documentation and evidence.  *See Dkt. 1 at ¶¶ 30-33.*When

he first sought to file for disability benefits in 2006, Plaintiff did not have a copy of the plan and

was not provided copies of his medical records. Plaintiff made requests for his full medical file in

2006, 2007, 2008, 2009, 2010, 2012, 2013, 2014, 2015, 2016, 2017, 2018, and 2019.  *See Dkt. 1*

*at ¶* 22.   Defendant has made it a sport in avoiding requests made by Plaintiff for records and documentation. *Pfifer v. Sedgwick Claims Management Services Inc*., 414 F. Supp. 3d 1024 (S.D. Tex. 2019); *Katherine P. v. Humana Health Plan of Texas, Inc*., 114 F. Supp. 3d 432 (W.D. Tex.). Plaintiff must be able to introduce documents and testimony relating to numerous requests for documents and information in support of his claim under 29 U.S.C. § 1133(2).   Accordingly, Plaintiff respectfully requests that this Honorable Court permit Plaintiff to use and introduce requests and communications between Plaintiff and the Retirement Plan requesting medical documentation.

25.   **Expert Testimony.**  Plaintiff has retained and plans to call Dr. Joseph Wu to assist this Honorable Court in review of medical terminology and practices including the language of the Retirement Plan.  In addition, Plaintiff has seen other medical professionals who have determined that Plaintiff is totally disabled and, thus, would qualify Plaintiff to receive the Active Football T&P Benefit.   Plaintiff intends to offer evidence to address the standards described in the Retirement Plan documents. *Gooden v. Provident Life & Acc. Ins. Co*., 250 F.3d 329 (5th Cir. 2001); *Chapman v. Prudential Life Ins. Co. of America*, 267 F. Supp. 2d 569 (E.D. La. 2003). Accordingly, Plaintiff respectfully requests that this Honorable Court permit Plaintiff to use and introduce expert testimony and documents to assist this Honorable Court in review of medical terminology and practices including the language of the Retirement Plan as applied to the circumstances at issue.

26.   **Medical Records.**  The NFL has a repository of all medical records for professional football players playing for NFL teams.  When Plaintiff sought to file for disability benefits and obtain his medical records, he was directed to the benefits office of the Retirement Plan to obtain his full medical history and records.  The Retirement Plan, however, initially provided only a ten

(10) page "Medical Summary" and, subsequently, produced only 860 pages of medical records. *See Dkt. 1 at ¶¶ 12 & 22.* Then, the Retirement Plan filed only 529 pages of records labeled as CLOUD-AR-001 through CLOUD-AR-529 as the administrative record in this case. *See Dkt. 16.* The Retirement Plan has made it a challenge for Plaintiff to obtain a full set of his medical records so the full spectrum of his medical history could be considered by the Retirement Plan and, now, this Honorable Court. The Retirement Plan has purposely obstructed Plaintiff in an effort to deny his requests. Accordingly, Plaintiff respectfully requests that this Honorable Court permit Plaintiff to use and introduce a full set of known medical records in the possession of the Retirement Plan that were not provided to the Plaintiff after multiple requests.

27. **Social Security Administration.** The Social Security Administration has determined that Plaintiff is totally disabled. The records and findings of the Social Security Administration are pertinent to the evaluation of Plaintiff's claims and the determination that he meets the requirements necessary to receive the Active Football T&P Benefit. It is believed that the Retirement Plan has been provided these documents, but many of the documents do not appear in the administrative record submitted to this Honorable Court. Accordingly, Plaintiff respectfully requests that this Honorable Court permit Plaintiff to use and introduce the filings, records, and findings of the Social Security Administration as it pertains to Plaintiff.

28. **Worker's Compensation Claims.** Plaintiff filed worker's compensation claims relating expressly to injuries at issue in this case. The records and findings of these cases are pertinent to the evaluation of Plaintiff's claims and the determination that he meets the requirements necessary to receive the Active Football T&P Benefit. It is believed that the Retirement Plan has been provided these documents, but many of the documents do not appear in the administrative record submitted to this Honorable Court. Accordingly, Plaintiff respectfully

requests that this Honorable Court permit Plaintiff to use and introduce documents and information pertaining to worker's compensation claims filed by Plaintiff relating to the injuries at issue in this litigation.

29.     The above-referenced information and records are necessary to evaluate and review the claims made by Plaintiff.  These records are vital to Plaintiff's case.  The Retirement Plan has made it extremely difficult to obtain requested information and, in many cases, has not provided requested information.  The Retirement Plan's actions have thwarted Plaintiff's attempts to present a full, complete, and accurate case.  Plaintiff requests that this Honorable Court permit Plaintiff to supplement the administrative record with information and documentation that expressly addresses the matters pertinent to this litigation.

## VI.     PRAYER

WHEREFORE, Plaintiff prays that the *Motion* be granted and Plaintiff be permitted to supplement the administrative record as requested herein.  Plaintiff further prays and requests such other relief, general or special, to which Plaintiff may show himself justly entitled.

Respectfully submitted on this the 11th day of June, 2021.

BARLOW GARSEK & SIMON, LLP
920 Foch Street
Fort Worth, Texas 76107
817.731.4500 (telephone)
817.731.6200 (facsimile)


By:   */s/  Christian Dennie*
**CHRISTIAN DENNIE**
State Bar No. 24045775
cdennie@bgsfirm.com

***ATTORNEY FOR PLAINTIFF***

## CERTIFICATE OF SERVICE

On June 11, 2021, the *Motion to Supplement the Administrative Record* was filed with the Clerk of the Court via CM/ECF, which automatically delivers notice of the filing of the same to all counsel of record.

*/s/ Christian Dennie*
Christian Dennie, *Counsel for Plaintiff*