# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

| | | |
|---|---|---|
| **MICHAEL CLOUD** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:20-CV-01277-E** |
| | § | |
| **THE BERT BELL/PETE ROZELLE** | § | **JURY DEMAND** |
| **NFL PLAYER RETIREMENT PLAN** | § | |
| | § | |
| **Defendant** | § | |

---

## PLAINTFF'S REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD

---

## TABLE OF CONTENTS

TABLE OF AUTHORITES ................................................................................................ 3

I.    SUMMARY OF ARGUMENT .......................................................................... 6

II.   INTRODUCTION AND NATURE OF THE ACTION .................................... 7

III.  FACTUAL ALLEGATIONS ............................................................................. 8

IV.   CLAIMS ASSERTED BY PLAINTIFF ........................................................ 17

V.    LEGAL STANDARD ....................................................................................... 17

VI.   DISCUSSION AND ARGUMENT .................................................................. 18

    A.    The existing administrative record is not complete and, thus, supplementation is needed for a full and fair review of the claims at issue. .............................................. 18

    B.    The administrative record is not limited to the documents produced by Cloud. .... 19

    C.    The Plan failed to provide Cloud with the entirety of his medical records, which are under its control and to which it has access. ............................................................... 21

    D.    The Declaration of Hessam ("Sam") Vincent must not be considered by this Court or, alternatively, Plaintiff should be given the opportunity to depose Mr. Vincent prior to the adjudication of Plaintiff's motion. ............................................................ 25

    E.    The structure of the Plan itself is rife with conflicting interests and evidence of bias. .................................................................................................................................... 26

    F.    The nature of the Plan's terms do not provide former NFL player's with reasonable access to benefits and, further, testimony of medical professionals is necessary to interpret the terminology used in the Plan. .................................................................. 28

    G.    Counsel for Cloud did meet and confer with counsel for Defendant prior to filing the Motion to Supplement the Administrative Record [Dkt. 24] and, thus, complying with all obligations under L.R. 7.1. ............................................................................... 33

    H.    Conclusion ................................................................................................................... 33

VI.   PRAYER ........................................................................................................... 34

CERTIFICATE OF SERVICE ...................................................................................... 35

APPENDIX ....................................................................................................................... 36

# **TABLE OF AUTHORITES**

## **Cases**

*Boyd v. Bert Bell/Pete Rozelle NFL Ret. Plan*, 796 F. Supp. 2d 682 (D. Md. 2011) ................... 30

*Bruce v. Anthem Ins. Cos.*, 307 F.R.D. 465 (N.D. Tex. 2015) ..................................................... 19

*Bryant v. Bert Bell/Pete Rozelle NFL Player Ret. Plan,* No. 1:12-CV-936-MHC (N.D. Ga. Mar. 23, 2015).................................................................................................................................... 30, 31

*Chapman v. Prudential Life Ins. Co. of America*, 267 F. Supp. 2d 569 (E.D. La. 2003) ............ 32

*Corry v. Liberty Life Assur. Co. of Boston*, 499 F.3d 389 (5th Cir. 2007) ................................... 19

*Crosby v. Blue Cross/Blue Shield of La.*, No. 08-693, 2012 U.S. Dist. LEXIS 161936 (E.D. La. 2012)........................................................................................................................................... 19

*Crosby v. Louisiana Health Service & Indemnity Co.*, 647 F.3d 258 (5th Cir. 2011)................. 17

*Durakovic v. Building Serv. 32 B.J. Pension Fund*, 609 F.3d 133 (2d Cir. 2010) ...................... 28

*Edwards v. Junior State of Am. Found.*, Civil Action No. 4:19-CV-140-SDJ, 2021 U.S. Dist. LEXIS 78887 (E.D. Tex. Apr. 23, 2021) ................................................................................. 26

*Gooden v. Provident Life & Acc. Ins. Co.*, 250 F.3d 329 (5th Cir. 2001) ....................... 18, 20, 32

*Katherine P. v. Humana Health Plan of Texas, Inc.*, 114 F. Supp. 3d 432 (W.D. Tex. 2015)..... 20

*Keys v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 493 F. Supp. 3d 1147 (M.D. Fla. 2020) .. 24

*Manuel N. v. Turner Indus. Grp., LLC*, Civil Action No. 14-599-SDD-RLB, 2021 U.S. Dist. LEXIS 60014 (M.D. La. Mar. 29, 2021)................................................................................. 21

*Pfifer v. Sedgwick Claims Management Services Inc.*, 414 F. Supp. 3d 1024, 1032-33 (S.D. Tex. 2019)........................................................................................................................................... 20

*Schiro v. Office Depot, Aetna Life Ins. Co.*, 996 F. Supp. 2d 471 (E.D. La.2014) ...................... 23

*Schully v. Continental Cas. Co.*, 634 F. Supp. 2d 663 (E.D. La. 2009)........................................ 20

*Schultz v. Metropolitan Life Ins. Co.,* 872 F.2d 676 (5th Cir. 1989)……………………………….. 18

*Vega v. Nat'l Life Ins. Servs., Inc.*,188 F.3d 287 (5th Cir. 1999) .................................................. 19

*West v. UNUM Provident*, 275 F. App'x 292 (5th Cir. 2008). ..................................................... 19

*White v. Cyprus Amax Minerals Co.*, Civil Action No. 04-1188, 2005 U.S. Dist. LEXIS 4846 (E.D. La. Mar. 18, 2005).................................................................................................................. 21

**Statutes**

29 C.F.R. § 2560.503-1 ................................................................................................................. 19

29 U.S.C. §§ 1001 *et seq.*......................................................................................................... 8, 23

29 U.S.C. § 1002 ............................................................................................................................ 8

29 U.S.C. § 1104 .......................................................................................................................... 28

29 U.S.C. § 1132 .................................................................................................................... 17, 20

29 U.S.C. § 1133 .......................................................................................................................... 15

**Rules**

Fed. R. Civ. P. 37 ......................................................................................................................... 26

**Articles**

*Chronic Traumatic Encephalopathy in Athletes: Progressive Tauopathy After Repetitive Head Injury. Journal of Neuropathology & Experimental Neurology*. 2009;68(7):709-735............. 30

*Clinicopathological Evaluation of Chronic Traumatic Encephalopathy in Players of American Football*, J.A.M.A. 2017;318(4):360–370. ............................................................................. 30

*Concussions May Prove to Be A Major Headache for the N.F.L. Players' Class Action Suit Places A Bounty on the League*, N.Y. State B.J. 10 (2012) .................................................. 29

*Injury Time-Out: Justifying Workers' Compensation Awards to Retired Athletes with Concussion-Caused Dementia*, 84 Temp. L. Rev. 247, 247-248 (2011) ...................................................... 31

*It's Just A Concussion:" the National Football League's Denial of A Causal Link Between Multiple Concussions and Later-Life Cognitive Decline*, 40 Rutgers L.J. 697, 698 (2009) ................... 28

NOW COMES Plaintiff, Michael Cloud (hereinafter "Plaintiff" or "Cloud"), and files his *Reply in Support of Motion to Supplement Administrative Record* and respectfully shows this Honorable Court as follows:

## I.     SUMMARY OF ARGUMENT

1.     The Bert Bell/Pete Rozelle NFL Player Retirement Plan (hereinafter "Defendant" or "Retirement Plan" or "Plan") argued in its *Response in Opposition to Plaintiff's Motion to Supplement the Administrative Record* [Dkt. 28] that Cloud should not be permitted to supplement the administrative record despite extensive documentation that was not included.  In fact, Defendant presented its arguments in a fashion similar to a motion for summary judgment and requested that the Court essentially adjudicate all of the contested issues in this case at this stage. This is not the correct vehicle to do so and is premature in light of ongoing discovery (much of which is now disputed and will be subsequently presented to this Court).  Cloud argues and asserts 1) the existing administrative record is not complete and, thus, supplementation is needed for a full and fair review of the claims at issue; 2) the administrative record is not limited to the documents produced by Cloud; 3) the Plan failed to provide Cloud with the entirety of his medical records, which are under the control and to which it has access; 4) the *Declaration of Hessam ("Sam") Vincent* must not be considered by this Court or, alternatively, Plaintiff should be given the opportunity to depose Mr. Vincent prior to the adjudication of Plaintiff's motion; 5) the structure of the Plan itself is rife with conflicting interests and evidence of bias; 6) the nature of the Plan's terms do not provide former NFL players with reasonable access to benefits and, further, testimony of medical professionals is necessary to interpret the terminology used in the Plan; and 7) counsel for Cloud did meet and confer with counsel for Defendant prior to filing the *Motion to Supplement the Administrative Record* [Dkt. 24] and, thus, complying with all obligations under

L.R. 7.1. Accordingly, Cloud requests that this Court permit supplementation of the administrative record with the following information: 1) requests and communications between Plaintiff and the Retirement Plan requesting medical documentation; 2) expert testimony and documents to assist this Honorable Court in review of medical terminology and practices including the language of the Retirement Plan as applied to the circumstances at issue; 3) medical records in the possession of the Retirement Plan that were not provided to the Plaintiff after multiple requests; 4) the filings, records, and findings of the Social Security Administration as it pertains to Plaintiff; and 5) documents and information pertaining to worker's compensation claims filed by Plaintiff relating to the injuries at issue in this litigation.

## II.    INTRODUCTION AND NATURE OF THE ACTION

2.      The National Football League ("NFL") is a highly profitable league governing professional football in the United States that garners the attention of millions of fans and viewers each week during the NFL season.  For many years, the ill effects of playing professional football were not known by the athletes who gave their bodies, minds, and mental health to professional football.  In 2002, during the study of former Pittsburgh Steeler Mike Webster's brain, Dr. Bennet Omalu discovered a condition of the brain he termed chronic traumatic encephalopathy ("CTE"). CTE has been determined to occur as a result of repeated blows to the head and has been commonly linked to athletes competing in professional football.  Dr. Omalu's research on CTE was published for the first time in 2005.  A 2019 study led by Boston University researchers that was published in the *Annals of Neurology* studied the brains of 266 deceased football players and found that 223 had CTE.

3.      In 2012, more than eighty (80) former NFL players filed various lawsuits against the NFL seeking damages for injuries as a result of concussion-related symptoms.  The litigation ultimately

merged into multi-district litigation involving claims of thousands of former NFL players.  In 2015, a settlement was approved that covered six "Qualifying Diagnos[es]". The conditions that constitute a "Qualifying Diagnosis" under the terms of the settlement agreement are: (1) Level 1.5 Neurocognitive Impairment (as defined by the settlement terms), (2) Level 3 Neurocognitive Impairment (as defined by the settlement terms), (3) Alzheimer's Disease, (4) Death with documented CTE prior to April 22, 2015, (5) Parkinson's Disease, and (6) Amyotrophic Lateral Sclerosis ("ALS").

4.      Due to the limitations of the NFL concussion settlement, many former NFL players turned to Defendant to determine whether players qualified for benefits under the terms of the Retirement Plan. The Retirement Plan is a retirement, disability, and related benefits plan accessible by eligible former professional football players and is an employee pension benefit plan within the mean of 29 U.S.C. § 1002(2) covered under the Employee Retirement Income Security Act of 1974 ("ERISA").

5.      Plaintiff is a former NFL football player who brings this action under ERISA, 29 U.S.C. §§ 1001 *et seq.*, against the Retirement Plan to recover benefits due to him under the terms of the Retirement Plan, to enforce his rights under the terms of the Retirement Plan, to clarify his rights under the terms of the Retirement Plan, and to enjoin and obtain appropriate equitable relief pertaining to acts that violate ERISA and/or the terms of the Retirement Plan.  The Retirement Plan violated the terms of the plan by failing to reclassify and award Plaintiff "Active Football" benefits under the terms of the Retirement Plan.

### III.      FACTUAL ALLEGATIONS

6.      Plaintiff grew up in Portsmouth, Rhode Island and quickly exceled as an athlete.  He attended Portsmouth High School in Portsmouth, Rhode Island where he earned All-American

honors as a running back and was recruited by virtually every major college and university to participate as a member of its football team.  Plaintiff selected Boston College as his college of choice and went on to have a stellar career.  At Boston College, as a senior, Plaintiff was named first team All-American and finalist for the Doak Walker Award, an award given to the nation's top running back.  Plaintiff left Boston College with a bachelor's degree in Socioeconomics.

7.      In 1999, Plaintiff was selected by the Kansas City Chiefs in the second (2nd) round of the 1999 NFL Draft with the fifty-fourth (54th) overall selection.  Plaintiff had a seven (7) year career as a running back, kick returner, and special teams player in the NFL playing for three (3) teams, Kansas City Chiefs (1999-2002), New England Patriots (2003, 2005), and the New York Giants (2004-2005).  While playing for the New England Patriots, in 2004, Plaintiff helped the New England Patriots win Super Bowl XXXVIII.  On November 29, 2005, Plaintiff was released by the New England Patriots.

8.      Shortly after retirement, in 2006, Plaintiff requested necessary documents and information from the advisors of the Retirement Plan necessary to seek disability benefits, but did not receive copies of all requested policies and received only partial documentation showing a ten (10) page "Medical Summary" of most of Plaintiff's orthopedic injuries.  However, the documents provided did not include any documentation of concussions or corresponding medical documentation of orthopedic and neurological injuries.  During Plaintiff's NFL career, he sustained multiple injuries including several concussions, injuries to his back and neck, and had three surgeries including bone grafting and cyst debridement of his left foot first metatarsal, right great toe cyst removal, and right leg fasciotomy with debridement of a necrotic peroneus longus. The muscle necrosis of his peroneus longus required an emergency surgical procedure to save Plaintiff's life, which is evidenced by the following:



9.     Plaintiff has a long history attempting to navigate the complex web of the Retirement Plan in seeking disability benefits.  On October 31, 2004, while playing for the New York Giants, Plaintiff sustained a concussion that caused him great pain and concern.  Despite a concussion, Plaintiff was cleared to practice and compete only forty-eight (48) hours after the concussion. Shortly thereafter, Plaintiff could not remember basic plays, football schemes, or his duties in such plays and schemes. Many of the plays Plaintiff was asked to perform, he learned in high school, but had no ability to recall his responsibilities or the requirements of plays.  Ultimately, as a result of his failure to perform the basic duties of an NFL running back, Plaintiff was released by the New York Giants prior to the first game of the season.  In 2005, Plaintiff was signed by the New England Patriots for a short period of time.  Plaintiff was, again, unable to recall plays and perform the functions and duties of his job as an NFL running back. During Plaintiff's approximately three

(3) weeks with the New England Patriots, the New England Patriots administered a neurological exam on Plaintiff known ImPACT designed by Grant Iverson and the NFL MTBI committee. Shortly after taking the exam, Plaintiff was released by the New England Patriots.  To this day, Plaintiff still does not have a copy of these neurological exam results despite multiple requests. Plaintiff has had extreme difficulty obtaining requested medical information.

10.     Shortly thereafter, in addition to memory loss and the inability to perform the functions and duties of his job, Plaintiff started experiencing headaches, vertigo, getting lost, forgetting names and places, and other cognitive issues.  Accordingly, on June 11, 2009, Plaintiff filed his *Application for Disability Benefits* asserting disabling injuries including injuries to his left shoulder, right hip, right mid-foot, right leg compartment numbness and loss of sensation, left rib, and "concussions – vertigo regularly".  On or about July 6, 2009, Plaintiff met with Dr. Michael J. Einbund, an NFL approved doctor, who evaluated Plaintiff only as to the orthopedic aspects of his application. On July 9, 2009, Retirement Plan tabled Plaintiff's request for line-of-duty benefits until Plaintiff submitted for evaluation by "neutral physicians" who are approved by the NFL.  On September 25, 2009, Retirement Plan denied Plaintiff's request for line-of-duty benefits by stating he "does not have a 'substantial disablement' within the meaning of the Retirement Plan," but only analyzed Plaintiff's upper extremities (15% impairment) and lower extremities (35% impairment) for total body impairment of twenty-four percent (24%).  There was no analysis of Plaintiff's "concussions – vertigo regularly" as addressed on his *Application for Disability Benefits*.  On February 2, 2010, Plaintiff appealed the denial of his request for line-of-duty disability benefits. On May 18, 2010, Retirement Plan granted Plaintiff's appeal and granted his line-of-duty disability benefits in the amount of $3,290.00 per month effective May 1, 2010.

11.     On or about April 13, 2010, Plaintiff met with Dr. George H. Canizares of All Florida Orthopedic Associates, another NFL doctor, and reported that he experienced "depression, migraine headaches, insomnia, … [and] some concussions."  On the same day, April 13, 2010, Plaintiff also met with Dr. Adam S. DiDio where he described a "history of concussions" and vertigo that makes it feel like his "bed spins".  Plaintiff further explained that "[i]n the last 6 or 7 years[,] [headaches] have become more frequent and more intense." In addition to intense headaches, Plaintiff described "some cognitive difficulties", including forgetting names of people he has known for years, often getting lost, having difficulty paying bills, and depression.  Similarly, on October 19, 2010, Plaintiff filed *Employee's Claim Petition* in Minnesota against New York Giants as a result of a "Grade 1 concussion leading to vertigo, dizziness, headaches, and altered attention span."  The Grade 1 concussion mentioned in the Employee's *Claim Petition* is the concussion referenced above that occurred on October 31, 2004 in a game between the New York Giants and the Minnesota Vikings.

12.     On or about June 12, 2011, Plaintiff submitted to medical treatment performed by Primary Behavioral Health Clinics where Plaintiff reported that he experienced neck, lower back, foot, and lower leg pain.  Additionally, such records indicated Plaintiff has "extreme trouble remembering things, is worried and easily annoyed or irritated, has difficulty making decisions, goes blank often and has trouble concentrating."  Harry Cates, a licensed professional counselor working for Lifework's Group, PA, performed a mental residual capacity assessment on Plaintiff evaluating him from October 10, 2011 to December 21, 2011 and stated Plaintiff was struggling with depressive symptoms, poor concentration and bouts of unpredictable irritability that were "no doubt" related to his physical injuries and concussions sustained while competing in the NFL.

Further, Mr. Cates reported that Plaintiff had increased difficulty in coping due to social anxiety and self-consciousness from ongoing changes in his cognitive function.

13.     On January 22, 2013, Dr. Anne Smith of Smith Behavioral Health concluded Plaintiff experienced "major depressive disorder, recurrent, severe without psychotic features."  On April 8, 2013, Dr. Don Marler performed a mental residual functional capacity assessment and concluded that Plaintiff's understanding and memory limitations as markedly limited in the ability to understand and remember detailed instructions and the ability to carry out detailed instructions. On May 13, 2014, Mr. Cates again met with and analyzed Plaintiff's cognitive function.  Mr. Cates concluded that Plaintiff was limited in his ability to maintain attention and concentration for extended periods and was further concluded that Plaintiff was limited in his ability, amongst others, to remember location and work procedures, understand, remember, and carry out instructions and perform activities on schedule.  Accordingly, on June 18, 2014, Daniel Curran, Administrative Law Judge for the Social Security Administration, found Plaintiff to be totally and permanently disabled.

14.     The total and permanent disability benefits ("T&P Benefits") program administered under the Retirement Plan is complex and has multiple categories.  The categories under the Retirement Plan at issue are:

> Active Football: Subject to the special rules of Section 5.4, Players will qualify for benefits in this category if the disability(ies) results from League football activities, arises while the Player is an Active Player, and causes the Player to be totally and permanently disabled "shortly after" the disability(ies) first arises.

> Inactive A: Subject to the special rules of Section 5.4, a Player will qualify for benefits in this category if a written application for T&P benefits or similar letter than began the administrative process that resulted in the award of T&P benefits was received within fifteen (15) years after the end of the Player's last Credited

Season.  This category does not require that the disability arise out of League football activities.

The Retirement Plan also defines "shortly after" and states, in pertinent part, as follows:

> "Shortly After" Defined.  A Player who becomes totally and permanently disable no later than six months after a disability(ies) first arises will be conclusively deemed to have become totally and permanently disability "shortly after" the disability(ies) first arises, as that phrase is used in subsections (a) and (b) above, and a Player who becomes totally and permanently disabled more than twelve months after a disability(ies) first arises will be conclusively deemed not to have become totally and permanently disabled "shortly after" the disability(ies) first arises, as that phrase is used in subsections (a) and (b) above.  In cases failing within this six- to twelve-month period, the Retirement Board or the Disability Initial Claims Committee will have the right and duty to determine whether "shortly after" standard is satisfied.

15.     On July 23, 2014, the Retirement Plan granted Plaintiff T&P Benefits under the Inactive A designation with an effective benefits date of May 1, 2014.  The Retirement Board chose to grant Inactive A T&P Benefits instead of the proper benefits under Active Football T&P Benefits.  As a result, on February 17, 2016, Plaintiff filed his request for reclassification of his Inactive A T&P Benefits to Active Football T&P Benefits to which his request was summarily denied on March 2, 2016.  Subsequently, Plaintiff filed his appeal of denial of his request for reclassification of Inactive A T&P Benefits to Active Football T&P Benefits.  Again, on November 23, 2016, Retirement Plan denied Plaintiff's request.

16.     The appeal of the reclassification decision is the final step in the administrative process and, thus, Plaintiff's ERISA claim is ripe for consideration.  Specifically, Retirement Plan's correspondence dated November 23, 2016 states "[y]ou have the right to bring an action under Section 501(a) of the Employment Retirement Income Security Act of 1974, as amended, within 42 months from the date of this letter, which is May 16, 2020."

17.     Plaintiff satisfies each element necessary to obtain Active Football T&P Benefits. Specifically, Plaintiff was disabled as a result of playing in the NFL, arose while he was an active player competing in the NFL, and Plaintiff was totally and permanently disabled "shortly after" the disability occurred.  In addition to the numerous other medical professionals referenced above, Dr. John Cronin conducted a head trauma evaluation resulting from a helmet to helmet concussion that occurred on October 31, 2004.  Dr. Cronin reported that Plaintiff "sustained at least one, if not several, closed head injuries" that caused him to be "unable to complete basic plays and assignments" while participating as an NFL player in late 2004 and 2005.  Dr. Cronin concluded that Plaintiff has experienced the following cognitive problems "since his injury in 2004": 1) "[m]emory impairment as identified by  a reduced ability to learn or recall information"; 2) "[d]isturbance in executive functioning (i.e., planning, organizing, sequencing, abstracting)"; 3) "[d]isturbance in attention or speed of information processing"; 4) "[i]mpairment in perceptual-motor abilities"; and 5) "[i]mpairment in language (e.g., comprehension, word finding)".

18.     Plaintiff has had to scratch and claw to obtain his medical records from the Retirement Plan, NFL, doctors approved by the NFL, and NFL member teams.  When he first sought to file for disability benefits in 2006, Plaintiff did not have a copy of the plan and was not provided copies of his medical records.  Plaintiff made requests for his full medical file in 2006, 2007, 2008, 2009, 2010, 2012, 2013, 2014, 2015, 2016, 2017, 2018, and 2019.  On or about January 18, 2019, some thirteen (13) years after the initial request, Plaintiff was provided with an 860 page medical file by the Retirement Plan, but the documentation provided still lacked the neurological reports including reports from the NFL MTBI committee and the results of the ImPACT neurological exam administered by the New England Patriots.  As is clear, all of the evidence indicates that Plaintiff has cognitive impairments as a result of a concussion (and a series of previous concussions) that

materially affected Plaintiff's life and have caused, amongst other things, memory loss, headaches, vertigo, irritability, depression, and loss of focus.  Additionally, Plaintiff suffers from a series of orthopedic injuries as described above.  Plaintiff suffers from debilitating orthopedic and neurological injuries stemming from repetitive high velocity impacts to the body and brain sustained while serving as an active player in the NFL.  Other than a few private training sessions on an infrequent basis, Plaintiff has not been employed since he retired from participating in the NFL.

19.     Retirement Plan's denial of Plaintiff's relief was arbitrary and capricious.  Retirement Plan does not have unfettered discretion to deny requests for benefits that are supported by evidence. Retirement Plan's decisions must be supported by substantial evidence that is relevant and reasonable to support its conclusion.  Clearly, the Retirement Plan has ignored relevant evidence supporting the award of the Active Football T&P Benefits.

20.     The decisions of the Retirement Plan are erroneous under any standard, and was an abuse of discretion to the extent the plan documents granted such discretion as confirmed by the mountain of evidence described above.  In addition to the information set forth above, the Retirement Plan's decisions are erroneous for the following reasons, among others, 1) Plaintiff meets the requirements for Active Football T&P Benefits; 2) Retirement Plan's decision relating to Plaintiff's request for Active Football T&P Benefits are not consistent with the plan documents; 3) Retirement Plan's decision is contrary to the purposes and goals of the Retirement Plan , which were designed to provide appropriate disability benefits to retired players who were disabled as a result of competing for NFL member teams in NFL competition; and 4) Retirement Plan refused to consider unanimous medical evidence showing Plaintiff was totally and permanently disabled "shortly after" a concussion that occurred on October 31, 2004.

## IV.   CLAIMS ASSERTED BY PLAINTIFF

21.    Plaintiff asserts violations of ERISA under 29 U.S.C. § 1132(a)(1)(B), (a)(3) based on the Retirement Plan wrongfully denying Plaintiff the benefits due to him in accordance with the plan documents including the Active Football T&P Benefit. Plaintiff was totally and permanently disabled "shortly after" a concussion that occurred on October 31, 2004. *See Dkt. 1 at ¶¶ 26-29.*

22.    Plaintiff asserts violations of ERISA under 29 U.S.C. § 1133(2) based on the Retirement Plan's failure to provide Plaintiff's medical documentation to Plaintiff despite requests that began in 2006.  In January 2019, for the first time, Plaintiff was presented with 860 pages of medical records, but is still missing numerous reports and information.  Plaintiff was never granted the opportunity to present a full and complete case for Active Football T&P Benefits due to the Retirement Plan withholding relevant documentation and evidence. *See Dkt. 1 at ¶¶ 30-33.*

## V.   LEGAL STANDARD

23.    In *Crosby v. Louisiana Health Service & Indemnity Co*., the U.S. Court of Appeals for the Fifth Circuit clarified the boundaries of the supplementation of the administrative record.  *Crosby v. Louisiana Health Service & Indemnity Co*., 647 F.3d 258, 263 (5th Cir. 2011). A Court may admit evidence to resolve the merits of a coverage decision if the supplementation of the administrative record "relates to how the administrator has interpreted the plan in the past, or would assist the court in understanding medical terms and procedures." *Id*.  *Crosby* acknowledges that a Court may also admit evidence to resolve other questions that may arise in an ERISA action:

> For example, in an ERISA action under 29 U.S.C. § 1132(a)(1)(B), a claimant may question the completeness of the administrative record; whether the plan administrator complied with ERISA's procedural regulations; and the existence and extent of a conflict of interest created by a plan administrator's dual role in making benefits determinations and funding the plan. These issues are distinct from the

question of whether coverage should have been afforded under the plan. We see no reason to limit the admissibility of evidence on these matters to that contained in the administrative record, in part, because we can envision situations where evidence resolving these disputes may not be contained in the administrative record.

*Id.; see also Gooden v. Provident Life & Accident Ins. Co.,* 250 F.3d 329, 333 (5th Cir. 2001); *Schultz v. Metropolitan Life Ins. Co.,* 872 F.2d 676, 680 (5th Cir. 1989) (approving the district court's use of affidavit evidence offered to show inconsistent treatment of other similar claims by the plan administrator).

## VI. <u>DISCUSSION AND ARGUMENT</u>

### A. The existing administrative record is not complete and, thus, supplementation is needed for a full and fair review of the claims at issue.

24. Defendant fundamentally misconstrues the reason Cloud seeks to supplement the administrative. Cloud asks this Court for permission to uncover those parts of the administrative record that the Defendants have chosen not to reveal. This Court should not permit the Plan and its fiduciaries to limit the administrative record to the set of written documents that it chooses to share with Cloud and the Court. Instead, the Court should permit Cloud to supplement the administrative record or require Defendant to produce all relevant information to Cloud's claim so that the Court has the complete set of facts on which to decide this dispute. Cloud seeks to supplement the administrative record with the following information: 1) requests and communications between Plaintiff and the Retirement Plan requesting medical documentation; 2) expert testimony and documents to assist this Honorable Court in review of medical terminology and practices including the language of the Retirement Plan as applied to the circumstances at issue; 3) medical records in the possession of the Retirement Plan that were not provided to the Plaintiff after multiple requests; 4) the filings, records, and findings of the Social Security Administration as it pertains to Plaintiff; and 5) documents and information pertaining to worker's compensation claims filed by Plaintiff relating to the injuries at issue in this litigation.

**B.      The administrative record is not limited to the documents produced by Cloud.**

25.      It is well established that an ERISA administrative record "consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it." *Corry v. Liberty Life Assur. Co. of Boston*, 499 F.3d 389, 398 n. 12 (5th Cir. 2007). There is no standard that an administrative record only includes documents presented as opposed to made available to the fiduciary. Cloud has the right to supplement the administrative record and conduct discovery to determine whether, among other things, the administrative record was complete, whether the insurer complied with ERISA procedural requirements, and whether that Plan had previously afforded coverage for claims. *Bruce v. Anthem Ins. Cos.*, 307 F.R.D. 465, 467 (N.D. Tex. 2015); citing *Crosby v. Blue Cross/Blue Shield of La.*, No. 08-693, 2012 U.S. Dist. LEXIS 161936 at *13 (E.D. La. 2012). In *Defendant's Response in Opposition to Plaintiff's Motion to Supplement the Administrative Record* [Dkt. 28], Defendant even acknowledges the Fifth Circuit's history of permitting discovery.  *Vega v. Nat'l Life Ins. Servs., Inc.*,188 F.3d 287, 299 (5th Cir. 1999) (en banc), and *West v. UNUM Provident*, 275 F. App'x 292, 295 (5th Cir. 2008).

26.      ERISA does not limit the "administrative record" to documents. ERISA requires the Plan to provide Cloud with all "information" relevant to his claim. 29 C.F.R. § 2560.503- 1(h)(2)(iii). ERISA regulations explain that a "document, record, or other information shall be considered 'relevant' to a claimant's claim if such document, record or other information" either was "relied upon" or was "submitted, considered, or generated in the course of making the benefit determination . . . ." *Id.* at § 2560.503-1(m)(8) (emphasis added).

27.      Defendant argues that the Court should decide Cloud's claim "based on the evidence that was in the administrative record when the plan administrator made the claim decision at issue" and

requests that this Court rely on their representations as to the completeness of the record. *See Dkt. 28*. Cloud, however, must be permitted to supplement the record and even seek discovery through depositions to make certain that the Court has all of the evidence necessary to decide the true facts and circumstances of this case. The supplemental documentation provided completes the administrative record as it is known to date[1] and, thus does not expand the administrative record. *See*  29 U.S.C.A. § 1132(a)(1)(B); *see also Gooden v. Provident Life & Acc. Ins. Co.*, 250 F.3d 329, 333-34 (5th Cir. 2001)(recognizing a court may consider evidence outside the administrative record relating to how an administrator has interpreted terms of the plan in other instances, as well as evidence that will assist the Court in understanding the medical terminology or practice related to a claim); *Pfifer v. Sedgwick Claims Management Services Inc*., 414 F. Supp. 3d 1024, 1032-33 (S.D. Tex. 2019)(stating the Court's review is not confined to the administrative record when determining whether an ERISA administrator abused his discretion in interpreting the plan's terms and making a benefit determination.); *Katherine P. v. Humana Health Plan of Texas, Inc.*, 114 F. Supp. 3d 432, 433 (W.D. Tex. 2015)(concluding evidence outside record may be admissible, and thus discoverable, in an ERISA case involving denial of benefits if it is relevant to questions regarding the completeness of the administrative record, whether the plan administrator complied with ERISA's procedural regulations, and the existence and extent of a conflict of interest created by the plan administrator's dual role in making benefits determinations and funding the plan.); *Schully v. Continental Cas. Co*., 634 F. Supp. 2d 663, 680 (E.D. La. 2009)(stating the administrative law judge found that claimant was disabled and eligible to recover social security

---

[1]  Defendant has refused to permit depositions on disputed issues, which is the subject of *Defendant's Motion for Protective Order Precluding Depositions of the Disability Initial Claims Committee Members and Incorporated Brief in Support Thereof* [Dkt. 30].  Cloud will soon respond to the same.

disability benefits, but the administrator failed to consider such decision despite a fair opportunity to do so); *White v. Cyprus Amax Minerals Co.*, Civil Action No. 04-1188, 2005 U.S. Dist. LEXIS 4846 (E.D. La. Mar. 18, 2005)(recognizing the court may consider other evidence related to how an administrator has interpreted terms of the plan in other instances and evidence, including expert opinion, that assists the Court in understanding the medical terminology or practice related to a claim).

28.     Clearly, cases in the Fifth Circuit have permitted review of evidence outside of the administrative record, supplementation of the administrative record, and to conduct discovery on multiple issues.   Accordingly, Cloud requests that this Court permit supplementation of the administrative record with the following information: 1) requests and communications between Plaintiff and the Retirement Plan requesting medical documentation; 2) expert testimony and documents to assist this Honorable Court in review of medical terminology and practices including the language of the Retirement Plan as applied to the circumstances at issue; 3) medical records in the possession of the Retirement Plan that were not provided to the Plaintiff after multiple requests; 4) the filings, records, and findings of the Social Security Administration as it pertains to Plaintiff; and 5) documents and information pertaining to worker's compensation claims filed by Plaintiff relating to the injuries at issue in this litigation.

> ### C.     The Plan failed to provide Cloud with the entirety of his medical records, which are under its control and to which it has access.

29.     Defendant mischaracterizes *Plaintiff's Motion to Supplement the Administrative Record* [Dkt. 24]. Plaintiff seeks to supplement the administrative record for the express purposes of fully participating in the hearing with a full and complete administrative record. The law clearly states a claimant "must" be given a reasonable opportunity to contest whether the administrative record is complete. *Manuel N. v. Turner Indus. Grp., LLC*, Civil Action No. 14-599-SDD-RLB, 2021

U.S. Dist. LEXIS 60014 (M.D. La. Mar. 29, 2021). Defendant attempts to adjudicate the merits of this case through its *Response in Opposition to Plaintiff's Motion to Supplement the Administrative Record [Dkt. 28].* Defendant claims that Cloud never reached out to the Plan to obtain documents and that if he did it surely would have been filed. *See, Dkt. 28 at 17*; *see also*, Vincent Decl. ¶ ¶ 14-20 (Def. Appx. at 3-4). However, in responses to Plaintiff's Interrogatory No. 13, Defendant admits Cloud *did* reach out on several occasions and Cloud further provided additional information in response to Defendant's Interrogatory Nos. 1 & 6. *See Pl. Appx. Exs. 1 & 2.* The parties dispute the contacts made by Cloud requesting his medical records, the administrative file, and other associated documents and information. This is a central issue in this case and a primary reason why the administrative record must be supplemented and additional discovery must be completed. Many of the requests were made via phone calls and others were made in writing. *See Pl. Appx. Ex. 3.* Defendant's position, assertions, and mischaracterizations in its *Response in Opposition to Plaintiff's Motion to Supplement the Administrative Record* [Dkt. 28] exemplifies the subversive and dishonest nature the Plan takes in granting benefits.[2]

30.     Cloud was directed to the Plan to obtain his full and complete medical history after his retirement from the NFL. Cloud was directed to the same, because the NFL has a repository of documents pertaining to injuries, medical records, and data for more than thirty (30) years of players. *See* https://www.headcheckhealth.com/nfl-electronic-health-records-ehr/; https://www.healthcareitnews.com/news/nfl-adopts-ehrs. For reasons unknown, the Plan has continued to deny that there is a repository of information. The Plan misstated Cloud's position throughout its *Response in Opposition to Plaintiff's Motion to Supplement the Administrative*

---

[2] On page 2 of *Response in Opposition to Plaintiff's Motion to Supplement the Administrative Record* [Dkt. 28], Defendant appears to argue that the records referenced and provided by Cloud are a surprise. All of these records were provided in discovery.

*Record* [Dkt. 28], and relying on the declaration testimony of Sam Vincent, which summarily concluded the administrative record "does not omit any additional records provided by Cloud." *See*, Vincent Decl. ¶ ¶ 5-6 (Def. Appx. at 2).

31.     Cloud submitted medical information to be reviewed by the Plan, but not all relevant information was considered by the Plan. The Plan has access to and knowledge of medical information pertinent to Cloud's claims through a repository of player information maintained by the NFL. The missing medical records themselves show the Plan failed to conduct a full and fair review of Cloud's claims as required by ERISA and, thus, the administrative record must be supplemented. Generally, a court determines abuse of discretion in an ERISA case based upon the information known to the plan administrator at the time the decision is made. However, the Plan administrator, as it did here, can abuse its discretion if it fails to obtain necessary information. 29 U.S.C.A. § *1001 et seq.*; *Schiro v. Office Depot, Aetna Life Ins. Co*., 996 F. Supp. 2d 471, 476-77 (E.D. La. 2014).

32.     On January 18, 2019, Cloud received 860 pages of records from the Plan's counsel (*i.e.,* the Groom Law Firm) yet the Plan now argues only 529 pages make up the administrative record. From Cloud's first inquiry, it took nearly 13 years after his original request to obtain the 860 pages of records provided. However, the Plan still failed to provide Cloud with crucial neurological reports from the NFL MTBI Committee and results from the ImPACT neurological exam administered by the New England Patriots.[3] Cloud never before had access to and only just now discovered the existence of much of the information provided by the Groom Law Firm on or about January 18, 2019. *See Dkt. 24* at ¶ 26. Furthermore, a long, arduous history of previous litigation involving denial of benefits of other disabled athletes shows the Plan has made it a practice to do

---

[3] The ImPACT exam is especially pertinent to Cloud's claim in that it provides specific evidence of the injury that arose while he was an active player, but the same was never provided to him.

as much as possible to forego turning over records.   Again, this information has been unaccounted for in the decade since Cloud first requested the documents.  *See Pl. Appx. Ex. 3.* Permitting supplementation will permit Cloud to illuminate all of the relevant information the Plan considered and should have considered, which will enable the Court to review the complete record to determine whether the Defendant wrongly denied Cloud's benefit claim.

33.    Retired NFL players have encountered similar difficulties with respect to the Plan and also with respect to Groom Law Firm. The Groom Law Firm almost exclusively, if not exclusively, represents the Plan including a case involving another retired athlete seeking to recover his disability benefits. *Keys v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 493 F. Supp. 3d 1147 (M.D. Fla. 2020), *appeal dismissed sub nom.*, 2021 WL 2252144 (11th Cir. May 11, 2021). After a minor car accident in 2002, the Plan claimed that the athlete was paid benefits in error, blaming his well-documented football injuries on the fender-bender, and sought to take back over $800,000.00 in disability paid to the athlete over the previous thirty (30) years. *Id.* at 1161. The record shows Groom Law Firm's attorneys drafted a memo regarding the alleged fraud seeking benefits and presented an argument to the Plan before the athlete's claim had reached a final decision, which resulted in the subsequent denial of the athlete's claim. *Id.* at 1158. After protracted litigation, the Court found the Plan had acted arbitrarily and capriciously and remanded the Plan's determination. Similar to *Keys*, the Groom Law Firm's fingerprints are all over the administrative record the firm *itself* provided to Cloud.  *See Pl. Appx. Ex. 3.* Precisely, the Groom Law Firm's attorneys were present at Cloud's denial.  *See Pl. Appx. Ex. 4.*  The Groom Law Firm's involvement with these cases and inherent conflicts has been a long source of consternation of retired NFL players.  *See Pl. Appx. Ex. 5.*  The administrative record presented by the Plan cannot be trusted and must be reviewed in detail with the supplementation provided by Cloud.

34.     Accordingly, Cloud requests that this Court permit supplementation of the administrative record with the following information: 1) requests and communications between Plaintiff and the Retirement Plan requesting medical documentation; 2) expert testimony and documents to assist this Honorable Court in review of medical terminology and practices including the language of the Retirement Plan as applied to the circumstances at issue; 3) medical records in the possession of the Retirement Plan that were not provided to the Plaintiff after multiple requests; 4) the filings, records, and findings of the Social Security Administration as it pertains to Plaintiff; and 5) documents and information pertaining to worker's compensation claims filed by Plaintiff relating to the injuries at issue in this litigation.

### D.     The Declaration of Hessam ("Sam") Vincent must not be considered by this Court or, alternatively, Plaintiff should be given the opportunity to depose Mr. Vincent prior to the adjudication of Plaintiff's motion.

35.     Defendant drafted and argued its *Response in Opposition to Plaintiff's Motion to Supplement the Administrative Record* [Dkt. 28] like a motion for summary judgment and seeks for this Court to essentially rule on the substantive issues of this case.  Defendant even argues that certain facts are uncontested.  Cloud does not agree with Defendant's assertions and objects to use of the *Declaration of Hessam ("Sam") Vincent.*  Cloud objects and asserts that Mr. Vincent's declaration is vague, ambiguous, addresses issues with which he does not have personal knowledge, and constitutes a sham declaration.  For example, Mr. Vincent's declaration does not indicate when he started working for the Plan, does not indicate whether he has knowledge of Cloud's requests, does not indicate whether he every spoke to Cloud or received requests from Cloud, and appears to deny that a repository of information pertaining to NFL player injuries exists.

36.     Frankly, Cloud has never heard of and did not know of the existence of Mr. Vincent. Indeed, Defendant failed to list any individual with knowledge of relevant facts in *Defendant's Rule 26(a)(1) Initial Disclosure* (there has been no supplementation of the same). *See Pl. Appx. Ex. 6.* In fact, *Defendant's Rule 26(a)(1) Initial* Disclosure, Defendant stated "Defendant therefore has no individuals with discoverable information to disclose at this time." *Id.* Obviously, Defendant is using Mr. Vincent's testimony in a one-sided attempt to contradict Cloud's assertions in this case and the central issues to be presented to this Court. Therefore, Cloud objects to the use and admission of Mr. Vincent's testimony due to failure to disclose the identity of Mr. Vincent. Any "evidence" or testimony offered by Mr. Vincent should be stricken and excluded. Fed. R. Civ. P. 37(c), 37(e)(1); *see also Edwards v. Junior State of Am. Found.*, Civil Action No. 4:19-CV-140-SDJ, 2021 U.S. Dist. LEXIS 78887 at *14-20 (E.D. Tex. Apr. 23, 2021).

37.     Counsel for Cloud reached out to counsel for Defendant to request that Mr. Vincent be produced for deposition in light of the disputed positions set forth in this case compared to Mr. Vincent's declaration testimony. *See Pl. Appx. Ex. 7.* Counsel for Defendant declined to present Mr. Vincent for deposition and, frankly, declined to permit the deposition of any other potential witness of Defendant. *Id.* To the extent this Court considers the *Declaration of Hessam ("Sam") Vincent*, Cloud requests that this Court stay any ruling on the *Plaintiff's Motion to Supplement the Administrative Record* [Dkt. 24] until such time that Cloud is permitted to depose Mr. Vincent. Accordingly, Cloud requests that this Court order that Defendant to produce Mr. Vincent for deposition on an agreeable date no later than July 26, 2021 and stay this matter until such time as Mr. Vincent is deposed.

>        **E.       The structure of the Plan itself is rife with conflicting interests and evidence of bias.**

38.     The Plan is funded by the NFL and controlled by interests adverse to those the Plan is designed to benefit (*i.e.,* retired NFL players including and like Cloud). Under the Plan's structure, player benefits are funded by NFL revenue; thus, money going to compensate retired players directly affects the amount of salary available to compensate active players. The structure of the Plan creates an inherent and unavoidable conflict of interest, pitting the interest of NFL owners (hoping to deny benefit claims) against the interests of retired athletes (seeking benefits and compensation for disabilities incurred throughout their employment in the NFL).

39.     Another conflict of interest exists due to the deliberate makeup of the Retirement Board ("Board"). The Board is the Plan administrator and named fiduciary.  It has six (6) voting members—three (3) individuals appointed by the NFL Players Association ("NFLPA") and three (3) individuals appointed by the NFL Management Council. *See Dkt. 28 at 6.* The three (3) individuals appointed by the NFL Management Council represent the interests of team owners. In an attempt to balance the clear bias held by representatives of the owners, three (3) other individuals are selected by the NFLPA. By selecting three (3) individuals representing the NFLPA, the Plan attempts to balance the competing interests in awarding or denying benefits. However, the NFLPA functions to represent only "active" players and, thus, does not represent retired players.  *See* https://abovethelaw.com/2020/09/nflpa-seeks-to-dismiss-case-concerning-changes-to-retiree-benefits/ (stating the NFLPA has no duty to represent the interests of retired NFL players).  The amount of money to be allowed for "active" player salaries decreases as more benefits are paid; as less benefits are awarded, the more money owners have and the more "active" players get paid. Being that active players are directly interested in receiving higher compensation from franchise owners, it only seems reasonable to assume their paid representatives would follow suit.

40.     In addition, the Exclusive Benefit Rule generally requires named fiduciaries (*i.e.,* the Board) to discharge their duties solely in the interest of Plan participants and beneficiaries. A fiduciary must act for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan. 29 U.S.C. § 1104(a)(1)(A)). The fiduciary must prevent any conflicts between its interest and the interests of the Plan participants and must not engage in any self-dealing. *See*, *Durakovic v. Building Serv. 32 B.J. Pension Fund*, 609 F.3d 133, 139 (2d Cir. 2010) (finding a conflict existed in Taft-Hartley plans because representatives of the employers had to fund the trust that paid claims participated in the decision to approve or deny those claims). The Plan has the same structure. Representatives of the NFL teams that fund the Plan also determine whether a player qualifies for benefits. The Plan is riddled with conflicts designed to deny benefits, or the correct benefits, to retired NFL players including Cloud.

> **F.     The nature of the Plan's terms do not provide former NFL player's with reasonable access to benefits and, further, testimony of medical professionals is necessary to interpret the terminology used in the Plan.**

50.     Clinical and neuropathological studies by some of the nation's foremost experts demonstrate that multiple concussions sustained during an NFL player's career cause cognitive problems such as depression and early-onset dementia. Daniel J. Kain, "*It's Just A Concussion:" the National Football League's Denial of A Causal Link Between Multiple Concussions and Later-Life Cognitive Decline*, 40 Rutgers L.J. 697, 698 (2009). Dr. Bennet Omalu, M.D., a forensic pathologist at the University of Pittsburgh, has examined the brain tissue of deceased NFL players Mike Webster, Terry Long, and Andre Waters. *Id*. All three (3) subjects of Dr. Omalu's studies suffered several concussions during their respective NFL careers. *Id*. Before their premature deaths, Mr. Webster, Mr. Long, and Mr. Waters presented clinical symptoms of sharply

deteriorated cognitive function and psychiatric symptoms such as paranoia, panic attacks, and major depression. *Id.* Dr. Omalu concluded CTE triggered by multiple NFL concussions represented a partial cause of their deaths. *Id.* at 699. A peer-reviewed clinical study performed by Dr. Kevin Guskiewicz found that retired players who sustained three (3)  or more concussions in the NFL had a fivefold prevalence of Mild Cognitive Impairment ("MCI") diagnosis in comparison to NFL. retirees without a history of concussions. *Id.* In reaching this finding, Dr. Guskiewicz employed a survey of over 2,550 former NFL players. *Id.* Suffering repeated concussions raises the danger of "second-impact syndrome ("S.I.S."), a potentially fatal condition that occurs when a player returns to competition before the symptoms of a first concussion resolve." *Id.* at 703-704. After sustaining a concussion, "brain cells that are not irreversibly destroyed remain alive, but exist in a vulnerable state." *Id.* Most neurological examinations may not detect concussions. *Id.* Traditional neurological and radiologic procedures, such as C.T.s, M.R.I.s, and E.E.G.s, although helpful in identifying other brain-related concerns, do not help identify the effects of a concussion. *Id.* at 705.

51.     Football-related head trauma can be likened to asbestos exposure in that damage caused by both can take up to 20 to 40 years to manifest. One (1) study found that although the average age of onset for CTE symptoms was 42.8 years, patients as young as 25 and as old as 76 years of age presented CTE symptoms. Joseph M. Hanna, *Concussions May Prove to Be A Major Headache for the N.F.L. Players' Class Action Suit Places A Bounty on the League*, N.Y. State B.J. 10, 16 (2012).  More important, however, this study found that the onset of CTE symptoms occurred, on average, approximately eight (8) years after an athlete had retired. *Id.*

52.     Cloud was denied Active T&P Benefits under the Plan's plain meaning of "changed circumstance" and "shortly after." The Board interprets the changed-circumstances requirement to

mean that a Player must show he has "a new or different impairment from the one that originally qualified [him] for T&P benefits".  *See* AR-519. The Plan's language requires a Player to become totally and permanently disabled no later than one year after a disability first arises as an active football player.

53.     Defendant cites to *Boyd v. Bert Bell/Pete Rozelle NFL Ret. Plan* and *Bryant v. Bert Bell/Pete Rozelle NFL Player Ret. Plan* to show approval of its position by two (2) district courts in other circuits from ten (10) years ago and six (6) years ago, respectively. *Boyd v. Bert Bell/Pete Rozelle NFL Ret. Plan*, 796 F. Supp. 2d 682, 693 (D. Md. 2011); *Bryant v. Bert Bell/Pete Rozelle NFL Player Ret. Plan,* No. 1:12-CV-936-MHC (N.D. Ga. Mar. 23, 2015), *Def. Appx. at 19-20*. These cases are inapposite due to the nature of head injuries and evolving medical information unearthed regarding their effects. Head injuries were simply not in the national zeitgeist as they are now. The public was largely unaware of the wrongs of the NFL and associated groups and entities including the Plan. For example, regarding CTE, the onset of symptoms occurs roughly 8-10 years after multiple mild traumatic brain injuries and presents progressively worsening stages, making an early diagnosis of CTE. difficult. McKee AC, Cantu RC, Nowinski CJ, et al., *Chronic Traumatic Encephalopathy in Athletes: Progressive Tauopathy After Repetitive Head Injury. Journal of Neuropathology & Experimental Neurology.* 2009;68(7):709-735. Public outcry has recently caused the NFL to shift and finally acknowledge brain injuries, although the Plan is yet to follow the same sentiment. This is especially troubling for a benefit fund created to take care of former NFL players after the effects of their playing days have fully taken hold.

54.     The link between football and CTE has become increasingly apparent, especially after a study showed 110 out of 111 deceased former NFL players had a neuropathological diagnosis of CTE in their autopsy. Mez J, Daneshvar DH, Kiernan PT, et al., *Clinicopathological Evaluation*

*of Chronic Traumatic Encephalopathy in Players of American Football*, J.A.M.A. 2017;318(4):360–370. This begs the question if brain injuries are so common today for retired NFL players, and the full effects of the injuries won't manifest themselves for years progressively getting worse with age, how can the "changed circumstances" and "shortly thereafter" provisions not be found arbitrary and capricious? Concussions are undoubtedly one of the most common injuries in the NFL, disabling numerous former NFL players and drastically reducing their quality of life.  Nevertheless, under the Plan, a disabled athlete is likely to have a better chance of receiving an award for Active T&P Benefits from a broken arm or leg. Simply put, the changed circumstances do not reflect the reality NFL players face in their employment. The science behind brain injuries shows that often the injury will not be a "change in physical condition" as the *Bryant* court deemed acceptable but will instead be a slow, torturous decline, with mental ailments constantly progressing.

55.     In 2010, Chris Henry, a wide receiver who had died a year prior in a car accident at the age of 26, was found to have CTE on an autopsy.  http://www.wvuhealthcare.com/newsreleases/news-details.aspx?ID=1515.  Henry's autopsy findings were of significance given that he was the first active player to be diagnosed with CTE who he had never been diagnosed with a concussion in his five (5) seasons in the NFL or during his college career at West Virginia University. The concern was that numerous, lesser blows to the head could lead to CTE in addition to severe helmet-to-helmet hits. Michelle L. Modery, *Injury Time-Out: Justifying Workers' Compensation Awards to Retired Athletes with Concussion-Caused Dementia*, 84 Temp. L. Rev. 247, 247-248 (2011). Thus, the case of Chris Henry and medical findings that accompanied his autopsy again foreclose any acceptable reasoning regarding the "shortly thereafter" language; CTE can arise out of

numerous small blows to the head over time. For the player who suffers those numerous blows, the message is clear from the Plan, your disability is not as worthy as another.

56.     The issues presented in this matter are complicated issues that require medical testimony to address medical terminology.  Cloud has retained and designated world-renowned expert, Dr. Joseph Wu,[4] to testify and review the medical terminology and practices as set forth in the Plan. Such testimony is expressly permitted in the Fifth Circuit.  *Gooden v. Provident Life & Acc. Ins. Co.*, 250 F.3d 329 (5th Cir. 2001); *Chapman v. Prudential Life Ins. Co. of America*, 267 F. Supp. 2d 569 (E.D. La. 2003).  Specifically, Dr. Wu was designated, in pertinent part, as follows:

> Joseph C. Wu, M.D. is a medical doctor who specializes in traumatic brain injuries and the effects traumatic brain injuries have on the brain and in relation to CTE.  Dr. Wu has been retained and specifically employed to provide expert testimony in this case.  Dr. Wu will provide testimony that will assist this Honorable Court in understanding the medical terminology and/or practices related to Plaintiff's claim including, but not limited, testimony that will opine on the medical meaning of the terms used in the Retirement Plan documents including "totally and permanently disabled 'shortly after' the disability(ies) first arises", whether Plaintiff's disabilities resulted from "League football activities", the medical application of "shortly thereafter", and whether Plaintiff presented medical evidence to support reclassification of his medical benefits. Additionally, Dr. Wu is expected to testify in relation to Plaintiff's injuries sustained while employed as a professional football player playing in the National Football League and the results thereof. He will also testify as to neurodiagnostic testing provided to the Plaintiff.  Dr. Wu's opinions are based upon his review of the medical records, treatment or examination of Plaintiff, history taken from Plaintiff and years of experience and medical training as a medical doctor and his specialty focus on traumatic brain injuries and testing.  Dr. Wu confirms and opines that Plaintiff is fully disabled and meets the requirements to obtain Active Football Total and Permanent Disability Benefits under the terms of the retirement plan. Dr. Wu will also address and respond to testimony offered by other witnesses and expert witnesses.

*See Pl. Appx. Ex. 8.*  Dr. Wu's testimony will aid this Court as set forth above.  It is worth noting that Defendant has not objected to or made any assertion that Dr. Wu's analysis was not accurate, trustworthy, or reliable.  Accordingly, Cloud requests that this Court permit supplementation of the administrative record with expert testimony and documents to assist this Court in review of

---

[4] Dr. Wu is a Professor Emeritus at the University of California, Irvine and specializes in brain injuries and evaluation of MRI DTI and PET scans for TBI.  https://www.universityneurocognitiveimaging.org/contact.

medical terminology and practices including the language of the Plan as applied to the circumstances at issue.

**G.**    **Counsel for Cloud did meet and confer with counsel for Defendant prior to filing the Motion to Supplement the Administrative Record [Dkt. 24] and, thus, complying with all obligations under L.R. 7.1.**

57.    Oddly, Defendant seeks for this Court to deny the *Motion to Supplement the Administrative Record* [Dkt. 24] for the alleged and purported failure to confer as set forth in L.R. 7.1.  The *Certificate of Conference* was inadvertently omitted from the *Motion to Supplement the Administrative Record* [Dkt. 24], but was subsequently supplemented at Dkt. 31.  It is disingenuous to assert that counsel for the parties have never discussed the supplementation of the administrative record.  As set forth in the *Certificate of Conference* [Dkt. 31], supplementing the administrative record has been discussed many times dating back to email exchanges on February 24, 2021.  Counsel for Defendant has clearly indicated that Defendant opposed any attempt to supplement the administrative record.  As represented, in calls and emails between counsel, Defendant vehemently opposes Cloud's request to supplement the administrative record as set forth in *Response in Opposition to Plaintiff's Motion to Supplement the Administrative Record* [Dkt. 28].  Cloud complied with obligations as set forth in L.R. 7.1.

**H.**    **Conclusion**

58.    Cloud requests that this Court permit him to supplement the administrative record, so the full and complete record is before the Court.  Like in every other case, Defendant desires to choose and dictate what is to be presented to the Court for review.  Defendant's goal and concern is to limit discovery and limit the record that is presented to this Court without worry as to whether the process presented is fundamentally fair.  For the reasons in *Motion to Supplement the Administrative Record* [Dkt. 24] and as set forth herein, Cloud should be permitted to supplement the administrative record.  Accordingly, Cloud requests that this Court permit supplementation of

the administrative record with the following information: 1) requests and communications between Plaintiff and the Retirement Plan requesting medical documentation; 2) expert testimony and documents to assist this Honorable Court in review of medical terminology and practices including the language of the Retirement Plan as applied to the circumstances at issue; 3) medical records in the possession of the Retirement Plan that were not provided to the Plaintiff after multiple requests; 4) the filings, records, and findings of the Social Security Administration as it pertains to Plaintiff; and 5) documents and information pertaining to worker's compensation claims filed by Plaintiff relating to the injuries at issue in this litigation.

## VI.    PRAYER

WHEREFORE, Plaintiff prays that the *Plaintiff's Motion to Supplement the Administrative Record* [Dkt. 24] be granted and Plaintiff be permitted to supplement the administrative record as requested herein., the *Declaration of Hessam ("Sam") Vincent* be stricken and excluded from the record, and Defendant be ordered to produce Sam Vincent for deposition.  Plaintiff further prays and requests such other relief, general or special, to which Plaintiff may show himself justly entitled.

Respectfully submitted on this the 1st day of July, 2021.

BARLOW GARSEK & SIMON, LLP
920 Foch Street
Fort Worth, Texas 76107
817.731.4500 (telephone)
817.731.6200 (facsimile)

By:   _/s/  Christian Dennie_
      CHRISTIAN DENNIE
      State Bar No. 24045775
      cdennie@bgsfirm.com
      **_ATTORNEY FOR PLAINTIFF_**

## CERTIFICATE OF SERVICE

On July 1, 2021, the _Plaintiff's Reply in Support of Motion to Supplement the Administrative Record_ was filed with the Clerk of the Court via CM/ECF, which automatically delivers notice of the filing of the same to all counsel of record.

_/s/ Christian Dennie_
Christian Dennie, _Counsel for Plaintiff_

## **APPENDIX**