**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **MICHAEL CLOUD** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:20-CV-01277-E** |
| | § | |
| **THE BERT BELL/PETE ROZELLE** | § | |
| **NFL PLAYER RETIREMENT PLAN** | § | |
| | § | |
| **Defendant** | § | |

_____

**PLAINTFF'S REPLY IN SUPPORT OF EMERGENCY MOTION TO COMPEL
COMPLIANCE WITH COURT'S ORDER  [DKT. 38] AND PRODUCTION OF
DOCUMENTS AND RECORDS AND INCORPORATED BRIEF IN SUPPORT
THEREOF**

_____

NOW COMES Plaintiff, Michael Cloud (hereinafter "Plaintiff" or "Cloud"), and files his

*Plaintiff's Reply in Support of Emergency Motion to Compel Compliance with Court's Order [Dkt.*

*38] and Production of Documents and Records and Incorporated Brief in Support Thereof* and

respectfully shows this Honorable Court as follows:

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ 3

I.      INTRODUCTION ................................................................................. 4

II.     TESTIMONY OF A FLAWED SYSTEM AND PROCESS ....................... 5

III.    OUTSTANDING DOCUMENTS AND INFORMATION .......................... 11

IV.     DEPOSITIONS OF BOARD MEMBERS ................................................ 16

V.      PRAYER ................................................................................................. 21

CERTIFICATE OF SERVICE ........................................................................... 22

APPENDIX ....................................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Schultz v. Metropolitan Life Ins. Co.,* 872 F.2d 676 (5th Cir. 1989)………………….………11

*Wildbur v. ARCO Chem. Co.*, 974 F.2d 631 (5th Cir. 1992)……………………………………11

**RULES**

Fed. R. Civ. P. 26 ............................................................................................................ 15

## I.      **INTRODUCTION**

1.      Cloud filed suit against The Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Plan" or "Defendant") related to the Plan's denial of Cloud's request for benefits he is entitled to receive. Cloud has been determined to be disabled by the Social Security Administration based on both neurological and orthopedic conditions stemming from his play in the National Football League ("NFL") from 1999 to 2005.  On October 31, 2004, Cloud was involved in a helmet-to-helmet collision while playing for the New York Giants in a game against the Minnesota Vikings.  Cloud sustained a concussion, but was rushed back to football activities approximately forty-eight (48) hours later.  Due to Cloud's return to football activities before his brain was healed, Cloud's brain was in a vulnerable state and sustained greater injury due to repeated blows to the head.  During the 2005 football season, Cloud was unable to remember basic football players he ran most of his life.  Shortly thereafter, Cloud was totally and permanently disabled and unable to work.

2.      The Plan continues to argue that Cloud is attempting to make this case an "expose" about the NFL and to relitigate the class action concussion litigation.  Quite to the contrary, Cloud has learned and exposed a flawed system that violates ERISA, which led to the denial of disability benefits Cloud is entitled to receive.  The Plan's witnesses admitted that Cloud presented new concussion symptoms, which meet the definition of "changed circumstances" as used in Section 5.7(b) of the Plan document.  Additionally, the Plan's witnesses admitted that Cloud presented evidence that he was unable to remember basic football plays during the 2005 football season and was never able to maintain gainful employment thereafter.   Despite these admissions, the Plan has trudged forward attempting to disparage Cloud and his counsel in its filing to this Honorable Court.

3.      In *Plaintiff's Emergency Motion to Compel Compliance with Court's Order [Dkt. 38] and Production of Documents and Records and Incorporated Brief in Support Thereof* ("Motion")

[Dkt. 41], Cloud requested documents that should have been produced many, many months ago, but were discovered for the first time during the depositions of Sam Vincent, Patrick Reynolds, and Chris Smith.  Additionally, Cloud seeks to depose the Retirement Board of the Plan ("Board") who are the individuals who admittedly decided Cloud's request for reclassification of disability benefits.  Reclassification is governed by Section 5.7(b) of the Plan documents and requires a showing of "changed circumstances".  Cloud met the requirements of Section 5.7(b) of the Plan documents.  Frankly, Cloud argues that this Honorable Court's ruling in the *Order* [Dkt. 38] has already addressed and permitted the discovery requested in the *Motion*.  Accordingly, Cloud requests that this Honorable Court grant the *Motion* [Dkt. 41] as set for therein.

## II.     TESTIMONY OF A FLAWED SYSTEM AND PROCESS

4.      At the time of the filing of the *Motion* [Dkt. 41], Cloud did not have the deposition transcripts of Sam Vincent, Patrick Reynolds, and Chris Smith.  As referenced in the *Motion* [Dkt. 41], Cloud hereby provides citations to the alarming testimony that evidences a flawed system and process that denied Cloud the benefits he is entitled to receive.  Cloud offers the following testimony:

### Sam Vincent

On January 18, 2019, the Plan, through the Groom Law Firm, produced 860 pages of records to Mr. Cloud, but later produced an administrative record consisting of 529 pages and an X-File consisting of approximately 1,500 pages.  Appx. 1 at 62-66:12-3-7.

"Changed circumstance" is not defined by the Plan documents. Appx. 1 at 335:10-12.

Mr. Vincent does not know who came up with the definition of "changed circumstance". Appx. 1 at 336:11-20.

The Board and Committee should have the same definition of "clear and convincing". Appx. 1 at 341:5-9.

The Board and Committee should have the same definition of "changed circumstance". Appx. 1 at 341:10-16, 374:18-22.

Mr. Vincent could not think of anyone to ask about how the definition of "changed circumstance" came to be.  Appx. 1 at 345:10-15.

The Groom Firm prepared summaries to be provided to the Board.  Appx. 1 at 404-405:12-2.

The Committee decision letter dated July 23, 2014 on Mr. Cloud's request for total and permanent disability benefits was not submitted to the Committee prior to being sent to Mr. Cloud.  Appx. 1 at 369:14-18

### Patrick Reynolds

Mr. Reynolds has no legal training.  Appx. 2 at 29:16-17, 31:13-14, 95:18-19.

Mr. Reynolds has no medical training.  Appx. 2 at 29:18-19, 31:15-16, 95:20-22.

Mr. Reynolds has not reviewed medical articles or studies on concussions and associated head injuries. Appx. 2 at 90:11-14 , 96:17-21, 102:9-19, 393-397:18-397:7, 399:6-17, 401:2-11, 402:15-21.

Mr. Reynolds has not gathered any information on head injuries sustained by players who formerly played in the NFL.  Appx. 2 at 101-102:21-4.

Mr. Reynolds has not received any training on head injuries sustained by players who formerly played in the NFL.  Appx. 2 at 102:4-8.

Mr. Reynolds has not conducted any research on head injuries sustained by players who formerly played in the NFL.  Appx. 2 at 102-103:20-1.

Mr. Reynolds has never reviewed any studies on CTE.  Appx. 2 at 182:3-5.

Mr. Reynolds has not reviewed medical articles or studies on orthopedic injuries that are commonly associated with NFL players. Appx. 2 at 90:15-19, 96:17-21, 112:9-16.

Mr. Reynolds has not received any training on orthopedic injuries sustained by players who formerly played in the NFL.  Appx. 2 at 112:17-20.

Mr. Reynolds has not conducted any research on orthopedic injuries sustained by players who formerly played in the NFL.  Appx. 2 at 102-103:20-1.

Mr. Reynolds does not review decision letters before they are sent to a player.  Appx. 2 at 174:3-5.

Mr. Reynolds did not write the decision letter on Mr. Cloud's 2014 request for total and permanent disability benefits.  Appx. 2 at 330:3-6

"Changed circumstances" is referenced in Section 5.7(b) of the Plan documents, but is not defined in the Plan document.  Appx. 2 at 244-245:17-2.

Mr. Reynolds does not know who defined "changed circumstances" in interpretation of the Plan documents.  Appx. 2 at 225-226:15-19, 245:3-9.

Mr. Reynolds defines an "impairment" as a "new injury, a new condition." Appx. 2 at 245:10-11.

Mr. Reynolds agrees that symptoms associated with concussion syndrome can change over time and, specifically notes "[c]onditions do change". Appx. 2 at 247:11-19, 249:13-19.

A "new impairment" is a changed circumstance. Appx. 2 at 309-310:20-1, 339:4-7.

An impairment is a new injury or new condition. Appx. 2 at 339:8-9.

A new condition can be a symptom of concussion syndrome. Appx. 2 at 339:10-12.

Affective disorder can be a new condition. Appx. 2 at 340:4-5, 341:10-14.

Attention and decision problems were presented for the first time in Mr. Cloud's application for reclassification of his disability benefits. Appx. 2 at 341:15-20.

In the application for reclassification of disability benefits in 2016, Mr. Cloud presented additional conditions and impairments. Appx. 2 at 343:10-13.

Severe and significant memory loss is a new and different condition. Appx. 2 at 344:15-19.

Mr. Reynolds cannot recall a single circumstance where a reclassification request was granted related to concussion syndrome. Appx. 2 at 227:13-19.

Mr. Reynolds did not draft an analysis of Mr. Cloud's medical records in review of his disability applications. Appx. 2 at 272:6-8, 272:19-21.

Mr. Reynolds did not make a single change to the 2014 decision letter pertaining to Mr. Cloud's application for disability benefits. Appx. 2 at 330-331:22-2, 335:19-21.

Mr. Reynolds did not review the 2014 decision letter pertaining to Mr. Cloud's application for disability benefits. Appx. 2 at 335-336:22-1.

The Groom Firm prepared the summary of Mr. Cloud's request for reclassification. Appx. 2 at 361-12-21.

Mr. Reynolds does not know why the Groom Firm produced 860 pages of records, but the administrative file contains only 529 pages of records. Appx. 2 at 375-376:16-2.

**<u>Chris Smith</u>**

There is no repository of interpretations of the Plan document. Appx. 3 at 161:10-17, 164:12-15.

Ms. Smith has asked for between 10 and 50 interpretations of the Plan document during her tenure on the Committee. Appx. 3 at 165:14-18.

The Groom Law Firm represented the NFLPA during the November 15-16, 2016 board meeting. Appx. 3 at 176-177:20-10.

Alvaro Anillo, from the Groom Law Firm, advised the Committee.  Appx. 3 at 177:11-14.

Ms. Smith has never written a decision letter granting or denying a disability benefits application.  Appx. 3 at 199:3-5.

Ms. Smith has never reviewed a decision letter granting or denying a disability benefits application before it was sent to a player.  Appx. 3 at 199:6-8.

Ms. Smith does not recall ever making a single change to any decision letter granting or denying a disability benefits application before it was sent to a player.  Appx. 3 at 199:9-11.

Ms. Smith did not write the decision letter on Mr. Cloud's application for disability benefits filed in 2014. Appx. 3 at 199:20-22.

Ms. Smith did not write the decision letter on Mr. Cloud's application for reclassification of disability benefits filed in 2016.  Appx. 3 at 200:5-8.

Ms. Smith did not review the decision letter on Mr. Cloud's application for reclassification of disability benefits filed in 2016 before it was sent to Mr. Cloud.  Appx. 3 at 200:9-12, 271:8-12.

Ms. Smith did not make any changes to the decision letter on Mr. Cloud's application for reclassification of disability benefits filed in 2016 before it was sent to Mr. Cloud.  Appx. 3 at 200:13-17.

Ms. Smith has heard from players approximately 50 times about how damaging it is when disability benefits are wrongly denied.  Appx. 3 at 246:1-13, 247-248:21-11.

Ms. Smith agrees that concussion syndrome can advance over time and has read articles that confirm the same.  Appx. 3 at 256:21-7.

"Changed circumstances" is not defined in the Plan documents.  Appx. 3 at 266:4-6.

Ms. Smith does not know who came up with the definition of "changed circumstances".  Appx. 3 at 266:21-3.

Ms. Smith believes "changed circumstances" means "a new or different injury or illness or impairment." Appx. 3 at 268:14-16.

Ms. Smith agrees "a new impairment can include a concussion symptom." Appx. 3 at 270:7-8, 285:12-16.

Ms. Smith did not tell anyone in the drafting the decision on Mr. Cloud's 2016 reclassification request what she believed to be the definition of "changed circumstances". Appx. 3 at 271:16-20.

Ms. Smith does not recall asking anyone to define "changed circumstances" for her.  Appx. 3 at 273:14-16.

"Clear and convincing" is not defined in the Plan document.  Appx. 3 at 274-275:22-2.

Ms. Smith does not recall asking anyone to define "clear and convincing" for her.  Appx. 3 at 275:3-5.

Ms. Smith is not sure whether she has come up with her own definition of "clear and convincing".  Appx. 3 at 275:9-11.

It would be "helpful" to have a uniform and consistent definition of "clear and convincing" to be applied in all reclassification requests. Appx. 3 at 275-276:21-7.

Ms. Smith did not write, review, or ask for any language to be included in the July 23, 2014 decision letter before it was sent to Mr. Cloud. Appx. 3 at 323-324:7-3, 324:11-15.

Neither of the two people on the Committee provided the discussion or analysis as set forth in the July 23, 2014 decision letter. Appx. 3 at 324:11-20.

Ms. Smith would expect someone that was writing the July 23, 2014 decision letter, a legal letter, to actually discuss the reason with the people who purportedly decided the case. Appx. 3 at 326:9-19.

Ms. Smith believes the Groom Firm wrote the July 23, 2014 decision letter. Appx. 3 at 326:20-22.

Ms. Smith never received a copy of the July 23, 2014 decision letter. Appx. 3 at 328:10-12.

In Mr. Cloud's 2016 application for reclassification of total and permanent disability benefits, the records reflect that Mr. Cloud experienced migraines, clinical depression, significant memory, and attention problems, vertigo, impaired verbal fluency, memory loss, attention, and decision problems, post-concussion syndrome, and affective disorder. Appx. 3 at 330:12-21.

Ms. Smith agrees the listed impairments (new concussion symptoms) include affective disorder, attention and decision problems, and significant memory and attention problems. Appx. 3 at 330-331:22-6, 332:6-9.

A new concussion symptom can qualify as a "changed circumstance".  Appx. 3 at 331:9-12.

It is Ms. Smith's job to apply the terms of the Plan to Mr. Cloud's request.  Appx. 3 at 332:3-5.

Ms. Smith agrees the listed impairments (new concussion symptoms) include affective disorder, attention and decision problems, and significant memory and attention problems and, thus, "these new symptoms could have been changed circumstances." Appx. 3 at 332-333:1-10, 335-336:19-4, 336:9-14.

Ms. Smith agrees Mr. Cloud's new concussion symptoms are considered "changed circumstances" as that term is used in Section 5.7(b) of the Plan document. Appx. 3 at 337:2-5.

Ms. Smith did not read, review, or talk to anyone about the Committee's March 2, 2016 reclassification decision prior to the decision being sent to Mr. Cloud. Appx. 3 at 337:9-22, 338:9-13.

No one talked to Ms. Smith about the contents of the March 2, 2016 reclassification decision. Appx. 3 at 338:18-21.

Ms. Smith did not approve the definition of "changed circumstances" as used in the March 2, 2016 reclassification decision. Appx. 3 at 339:5-14.

The Groom Firm wrote the March 2, 2016 reclassification decision. Appx. 3 at 339-340:15-2.

In Ms. Smith's July 23, 2014 email providing her vote on Mr. Cloud's application for total and permanent disability benefits, she did not provide a detailed analysis of how she came to her decision. Appx. 3 at 354:3-22.

In Ms. Smith's e-ballot on Mr. Cloud's 2016 request for reclassification of disability benefits, Ms. Smith concluded Mr. Cloud presented "no changed circumstances", but today Ms. Smith admits that Mr. Cloud did present "changed circumstances". Appx. 3 at 355-356:9-10.

In Ms. Smith's e-ballot on Mr. Cloud's 2016 request for reclassification of disability benefits, she did not provide a detailed analysis of how she came to her decision. Appx. 3 at 356:11-16.

The Groom Firm prepared summaries of disability cases, but Ms. Smith agrees it is important to review the actual medical records. Appx. 3 at 360-361:21-18.

Ms. Smith admits she may not have read all of Mr. Cloud's file before coming to a decision on his request for reclassification of disability benefits. Appx. 3 at 361-363: 19-9.

5.     The Plan was created for the benefit of retired NFL players so disabled players could obtain and receive disability benefits. Appx. 1 at 167:7-10. The retired NFL players are beneficiaries under the Plan. Appx. 1 at 160:3-6, 162:10-13. The members of the Board are the fiduciaries of the Plan. Appx. 1 at 162-163:14-2, 163:13-15. After deposing both members of the Disability Initial Claims Committee ("Committee"), Mr. Reynolds and Ms. Smith, it became clear that the process used to adjudicate disability application is flawed and not compliant with ERISA

regulations.  As noted above, decision letters written for the Committee by the Groom Law Firm were not reviewed or even seen before providing the same to retired NFL players including Cloud. Ms. Smith admitted she might not have reviewed all of Cloud's medical records.  The disability application process is a sham orchestrated by the Groom Law Firm who advised the Plan, the Board, the Committee, and the National Football League Players Association ("NFLPA") all at the same time.

### III.   OUTSTANDING DOCUMENTS AND INFORMATION

6.     This Honorable Court ruled that Cloud is entitled to conduct discovery on, among other things, whether "Defendant complied with ERISA's procedural regulations."  Dkt. 38.  Cloud seeks to determine whether the Plan has acted consistently in its application of the terms of the Plan relating disability benefits applications submitted by retired NFL players.  *Schultz v. Metropolitan Life Ins. Co.,* 872 F.2d 676, 680 (5th Cir. 1989) (discussing inconsistent of treatment of other similar claims by the plan administrator).  Similarly, Cloud must be permitted to explore whether the Board acted arbitrarily and capriciously in its interpretation of the Plan document. *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 637 (5th Cir. 1992).  During the depositions of Mr. Reynolds and Ms. Smith, Cloud learned that the Plan creates quarterly Director's Reports and Counsel Reports that provide, among other things, statistical data of claims asserted, claims granted and denied, and the allocation of Plan funds.  Mr. Vincent, Mr. Reynolds, and Ms. Smith testified as follows:

#### Sam Vincent

The quarterly director's report addresses the allocation of money by the Plan and the number of players receiving certain benefits. Appx. 1 at 171-173 :22-19.

**Patrick Reynolds**

The Director's Report has a "pie chart with the amount of monies spent on pension, disability, the breakout of the different types of disability, number of claims processed, things of that nature." Appx. 2 at 151-152:10-12.

Statistics regarding claims filed appear in the quarterly Director's Report.  Appx. 2 at 198-199:11-9.

The Director's Report will show the percentage of claims granted and denied.  Appx. 2 at 200:5-20.

The Counsel Report has a report on "any current or prior litigation, any updates on the Plan documents, any amendments that need to be made, any drafts of forms subject to party approval, things like that." Appx. 2 at 154:3-7.

The best place to obtain information on disability and percentages of grants and denials would be the Plan.  Appx. 2 at 393:4-12.

**Chris Smith**

Ms. Smith does not know statistics on how many disability claims have been granted or denied. Appx. 3 at 26:19-22.

The Plan prepares quarterly reports showing how many disability claims are granted or denied.  Appx. 3 at 28-29:15-12, 36:8-15.

There is a Counsel Report prepared quarterly that includes the Director's Report.  Appx. 3 at 29-31:17-7, 33:18-20, 24:1-5, ,242:2-19.

The funding of the Plan is referenced in the quarterly Counsel Report. Appx. 3 at 31:8-20, 33:8-14.

Ms. Smith does not recall the contents of the Director's Report.  Appx. 3 at 36-37:18-11, 37-38:18-2.

The number of appeals that go to the Board is referenced in the Director's Report.  Appx. 3 at 37:12-17.

7.     During the deposition of Mr. Vincent, Cloud again learned of records that have been withheld.  Mr. Vincent specifically noted that the Plan maintains a database of disability claims and is able to run queries to pull relevant information. Mr. Vincent testified as follows:

**<u>Sam Vincent</u>**

Mr. Vincent agrees that there have likely only been 10-15 reclassification requests handled by the Committee. Appx. 1 at 45-46:13-1.

Mr. Vincent could not confirm how many requests for Active Football benefits have been denied. Appx. 1 at 119:8-13, 122:14-18, 138:14-17.

 Mr. Vincent could not confirm how many requests have been made to go from Inactive A benefits to Active Football benefits. Appx. 1 at 128-129:22-6

Mr. Vincent could not confirm how many requests for Inactive A benefits have been denied. Appx. 1 at 140:18-20.

Mr. Vincent could not confirm whether more benefits applications for total and permanent disability have been granted or denied. Appx. 1 at 158:4-8, 159:13-17

The only way to determine whether more total and permanent disability applications have been granted or denied is by going through the database. Appx. 1 at 158-159:21-5.

Mr. Vincent could not confirm the number of reclassifications of total and permanent disability that have been granted. Appx. 1 at 159:18-21.

Mr. Vincent could not confirm the number of reclassification appeals that have been granted. Appx. 1 at 159-160:22-2.

Mr. Vincent could not confirm  how many requests for Active Football benefits related to concussion symptoms or concussion syndrome. Appx. 1 at 170:7-11.

The Benefits Office maintains a database that "keeps track of a case as it goes through" and tracks "approval or denial" to ultimately be put into a "chart" through a "data dump". Appx. 1 at 124-135:20-7.

The database was created sometime after 2010, but likely between 2011 and 2013.  Appx. 1 at 125:10-22, 132-133:18-12.

The database can be produced as an "Excel sheet".  Appx. 1 at 126:1-15.

A query can be run in the database to retrieve requested information. Appx. 1 at 126:17-22.

There is a query that can be run to determine whether Inactive A benefits have been granted.  Appx. 1 at 142:3-11.

The database houses relevant information on "hundreds of applications, not thousands" that have been filed by players' for total and permanent disability benefits.  Appx. 1 at 135:11-17.

The number of reclassification requests from Inactive A to Active Football benefits is not a large number.  Appx. 1 at 145:19-22.

The documentation for reclassification requests from Inactive A to Active Football benefits is not voluminous. Appx. 1 at 146:15-21.

8.    Cloud continues to be vigilant in hopes of securing his medical records. For many, many months, the Plan has refused to admit a repository of medical information exists that contains NFL players' medical records and documents. Finally, in depositions under oath, Mr. Vincent, Mr. Reynolds, and Ms. Smith confirmed there is, in fact, a repository of medical records and documents for NFL players, but claimed not to know how to access the records. Appx. 1 at 234-235:9-5; Appx. 2 at 158:3-9, 159:2-6, 160:12-14, 178:10-14; Appx. 3 at 186:5-8. Ms. Smith testified she referred retired NFL players to the Plan to obtain such records. Nonetheless, the Plan's witnesses confirmed that Cloud is entitled to his medical records and documents:

### Sam Vincent

Mr. Cloud is entitled to all records from Dr. Mandlebaum, a Plan physician. Appx. 1 at 229-230:15-7.

ERISA requires the Plan to turn over all player records to that player. Appx. 1 at 268-269:16-15.

Department of Labor regulations require the Plan to turn over all player records to that player. Appx. 1 at 277:15-19.

Mr. Cloud's medical scans conducted by Dr. Canizares, a Plan physician, were not produced to Mr. Cloud until July 2021. Appx. 1 at 271:16-19, 273:3-10.

### Patrick Reynolds

There is no reason that Mr. Cloud was not provided a full copy of Dr. DiDio's report until 2019. Appx. 2 at 304:10-21.

Mr. Reynolds did not review any medical scans along with Mr. Cloud's applications for disability benefits. Appx. 2 at 316:5-12.

Being that medical scans were not provided to Mr. Cloud; Mr. Cloud was not afforded the opportunity to present medical scans to his medical professionals for review. Appx. 2 at 318:3-7.

**Chris Smith**

If a player is not provided with his medical records, including records of Plan physicians, he cannot take those records to his personal physicians for review. Appx. 3 at 225:9-20, 227:4-8.

The best opportunity for a player to be successful in presentation of his application for disability benefits is to provide a full and extensive medical history.  Appx. 3 at 228:6-12.

Ms. Smith is not aware of any reason why Dr. Canizares', a Plan physician, medical scans of Mr. Cloud were not provided to Mr. Cloud.  Appx. 3 at 315-316:15-14.

Ms. Smith is now aware of any reason Dr. DiDio's, a Plan physician, medical records were not provided to Mr. Cloud until 2019.  Appx. 3 at 316-317:15-4.

Ms. Smith recalls that Mr. Cloud started requesting his records from the Plan in 2006.  Appx. 3 at 366:16-20.

Ms. Smith "hope[s]" that Plan physicians would order medical scans when reviewing neurological and cognitive impairments, but Dr. DiDio, a Plan physician, did not order any scans.  Appx. 3 at 376:9-16.

9.    It appears the Plan is attempting to argue they should win the case and, thus, further discovery is unnecessary.  This is a discovery dispute, not the adjudication of the merits. Cloud is permitted to "obtain discovery regarding any nonprivileged matter that is relevant to any part's claim or defense. . . ." Fed. R. Civ. P. 26(b)(1).  Despite repeated requests for the production of the Director's Report, Counsel Report, the records from the database kept by the Plan, and medical records, the Plan has refused to turnover these relevant and necessary records.  Appx. 1 at 127-130:1-6; Appx. 2 at 199-200:10-3; Appx. 3 at 34-36:12-4.  Also, on multiple occasions, Cloud has emailed and requested the same.  Appx. 4; Appx. 5.  At the time of the filing of this pleading, it has been sixteen (16) days since Cloud originally requested these responsive records that were discovered for the first time in depositions.  The Plan is giving its best effort to attempt to box Cloud into a corner in hopes of concluding the discovery period (currently set to end on August 23, 2021) without having to produce records that are likely against the Plan's interests.  Appx. 3

at 104:8-22.  Accordingly, Cloud requests that this Honorable Court require the production of the above-referenced records and records referenced in the *Motion* [Dkt. 41].

## IV.  DEPOSITIONS OF BOARD MEMBERS

10.    The Plan would have this Honorable Court believe that Mr. Vincent, the corporate representative of the Plan, provided a wealth of information about the Board's decision to deny Cloud's request for disability benefits.  Quite to the contrary, Mr. Vincent provided little, if any, information on the Board's decision and decision-making process.  As noted above and in the *Motion* [Dkt. 41], Cloud believes this Honorable Court has already permitted the discovery being sought and, specifically, permitted discovery as to whether "Defendant complied with ERISA's procedural regulations" as clearly set forth in the *Order* [Dkt. 38].  As noted above, the decision-making process by the Board is heavily flawed and controlled by the Groom Law Firm.  The Board neither drafted their purported decision nor reviewed it prior to being sent to Cloud.  In fact, the written decision drafted by the Groom Law Firm varies substantially from the minutes from the Board meeting where the Board purportedly announced their decision.   Appx. 6 at CLOUD_AR_518-520; Appx. 7 at CLOUD_MIN_005-006 (stating "denied appeal for reclassification to the Active Football category for failure to meet the requirements of Plan section 5.7(b)").

11.    In his deposition, Mr. Vincent confirmed that he was present for (5) minute telephone conversations with the members of the Board who are Katie Blackburn, Dick Cass, Ted Phillips, Sam McCullum, Jeff Van Note, and Robert Smith.  In these conversations, the Groom Law Firm asked only "yes-or-no" questions of the members of the Board rather than asking open-ended questions.  Appx. 1 at 80:8-11.  The Plan has argued extensively that the members of the Board decided Cloud's application for disability benefits, but also seeks to shield them from discovery.

Mr. Vincent, as corporate representative of the Plan, acknowledged that the Groom Law Firm (and ostensibly him) failed to ask numerous questions of the members of the Board in an attempt to gather information about Cloud's application for disability benefits and their purported decision. Specifically, the Plan's witnesses testified as follows:

**<u>Sam Vincent</u>**

It was not asked whether Ms. Blackburn recalled reviewing Mr. Cloud's disability case. Appx. 1 at 26:5-9.

It was not asked whether Ms. Blackburn recalled any discussion or debate as to Mr. Cloud's disability case. Appx. 1 at 27:7-12.

It was not asked what advice Ms. Blackburn received from third-parties pertaining to Mr. Cloud's disability case. Appx. 1 at 29:18-21.

It was not asked whether Ms. Blackburn discussed Mr. Cloud's case with Ms. Smith or Mr. Reynolds. Appx. 1 at 29:14-17.

If Mr. Cloud wanted to know what was discussed for Ms. Blackburn to come to her decision to deny Mr. Cloud's request for benefits, the question would need to be posed to Ms. Blackburn. Appx. 1 at 28:16-21.

It was not asked whether Mr. Cass conducted independent research or what he reviewed in deciding Mr. Cloud's request for benefits. Appx. 1 at 32:5-9.

It was not asked what advice Ms. Cass received from third-parties pertaining to Mr. Cloud's disability case. Appx. 1 at 32:10-13.

It was not asked whether Mr. Cass recalled any discussions he had with his fellow board members pertaining to Mr. Cloud's case. Appx. 1 at 33:9-12, 34:8-11.

It was not asked whether Mr. Phillips recalled any discussions he had with his fellow board members pertaining to Mr. Cloud's case. Appx. 1 at 36:11-14.

It was not asked whether Mr. Phillips spoke to Ms. Smith or Mr. Reynolds about Mr. Cloud's case. Appx. 1 at 36:15-18.

It was not asked whether Ms. Blackburn, Mr. Cass, or Mr. Phillips ever had any notes relating to Mr. Cloud's case. Appx. 1 at 37:6-10.

Board members would keep their own notes of their analysis of medical records and disability applications but do not turn such notes to the Plan. Appx. 1 at 38:6-12.

It was not asked whether Mr. McCullum had any recollection of the medical records presented by Mr. Cloud. Appx. 1 at 40:3-7.

It was not asked whether Mr. McCullum recalled or had any recollection of the injuries, illnesses, and/or ailments that Mr. Cloud presented. Appx. 1 at 40:8-11.

It was not asked whether Mr. McCullum recalled having any conversations with Mr. Reynolds or Ms. Smith about Mr. Cloud's appeal. Appx. 1 at 40:12-15.

It was not asked whether Mr. McCullum recalled having any discussions, conversations or debates with other members of the Board about Mr. Cloud's request for benefits.  Appx. 1 at 40:16-20.

It was not asked whether Mr. Van Note actually reviewed Mr. Cloud's medical records. Appx. 1 at 42:8-10.

It was not asked whether Mr. Van Note recalled having any conversations with Mr. Reynolds or Ms. Smith about Mr. Cloud's appeal. Appx. 1 at 42:11-15

It was not asked whether Mr. Van Note recalled any conversations or communications he had with any other board members about Mr. Cloud's medical records or applications for disability benefits. Appx. 1 at 42:16-21.

It was not asked whether Mr. Smith ever had any notes analyzing Mr. Cloud's request for disability benefits and associated medical records.  Appx. 1 at 44:1-4.

It was not asked whether Mr. Smith had any discussions or debates with other members of the Board about Mr. Cloud's case.  Appx. 1 at 44:13-16.

It was not asked whether Mr. Smith recalled having any conversations with Mr. Reynolds or Ms. Smith about Mr. Cloud's appeal. Appx. 1 at 44:17-21.

It was not asked whether Mr. Smith received any advice from a third-party about Mr. Cloud's request for benefits.  Appx. 1 at 44-45:22-3.

It was not asked whether the members of the Board reviewed Mr. Cloud's lawsuit.  Appx. 1 at 46-47:21-2.

It was not asked if any of the members of the Board personally know or knew Mr. Cloud. Appx. 1 at 48:1-8.

Mr. Vincent did not ask a single question of the Board members during the conversations with them on August 9, 2021.  Appx. 1 at 49:7-9, 50:5-9.

It was never asked if the members of the Board reviewed the decision letter on Mr. Cloud's reclassification request prior to being sent to Mr. Cloud.  Appx. 1 at 84:6-9.

It was never asked if the members of the Board had any input on the decision letter on Mr. Cloud's reclassification request prior to being sent to Mr. Cloud.  Appx. 1 at 84:10-13.

It was never asked whether the members of the Board discussed Mr. Cloud's application prior to casting their vote.  Appx. 1 at 100:16-21.

It was never asked whether the members of the Board provided any information to the Plan prior to drafting the decision letter on Mr. Cloud's reclassification request prior to being sent to Mr. Cloud.  Appx. 1 at 103:2-9.

It was never asked whether the members of the Board provided any input to the Groom Firm prior to drafting the decision letter on Mr. Cloud's reclassification request prior to being sent to Mr. Cloud.  Appx. 1 at 103:10-17.

The members of the Board go into executive session to discuss disability applications, but it was never asked whether the members of the Board discussed Mr. Cloud's request in executive session. Appx. 1 at 182-183:16-3.

There are no emails or correspondence from the members of the Board where they provided any discussion or words to be included in the decision letter on Mr. Cloud's reclassification request.  Appx. 1 at 85-86:20-12.

Mr. Vincent could not confirm whether the members of the Board actually read the decision letter on Mr. Cloud's reclassification request before it was sent to Mr. Cloud.  Appx. 1 at 86:13-19.

The Groom Firm wrote the decision letter on Mr. Cloud's request for reclassification without conferring with the members of the Board on the language to be used in the letter. Appx. 1 at 86-89:20-15, 91:5-10, 92:1-12, 377:815, 377-378:22-3.

Mr. Vincent is unaware of any notes of the members of the Board being provided to the Groom Firm to prepare the decision letter on Mr. Cloud's request for reclassification. Appx. 1 at 381:4-9.

Mr. Vincent is unaware of any conversations the members of the Board had with the Groom Firm to help in the drafting of the decision letter on Mr. Cloud's request for reclassification. Appx. 1 at 381:10-16.

There is no evidence or information that the members of the Board actually reviewed the decision letter on Mr. Cloud's reclassification request prior to being sent to Mr. Cloud. Appx. 1 at 108:13-17, 112:13-16.

There is no evidence to show that the members of the Board reviewed the decision letter on Mr. Cloud's reclassification request after it was sent to Mr. Cloud.  Appx. 1 at 113:5-8.

Ms. Blackburn and Mr. Cass both have legal training. Appx. 1 at 108:18-21.

Board decisions are made during the board meeting and are reflected in minutes. Appx. 1 at 93-94:21-6.

Mr. Vincent does not know what training the members of the Board have received on the Plan documents or neurological issues in former NFL players.  Appx. 1 at 292:16-18, 293:7-13, 294:6-9.

**Patrick Reynolds**

The final decision on Mr. Cloud's request for reclassification was made by the Board. Appx. 2 at 346-347:21-8, 348:5-9.

The people who know what was discussed to come to the final decision would be the members of the Board.  Appx. 2 at 348:13-16.

Mr. Reynolds does not know what the Board did to come to its decision on Mr. Cloud's request for reclassification.  Appx. 2 at 363-364:12-14.

Mr. Reynolds did not attend the November 15-16, 2016 Board meeting and, thus, does not know what was discussed pertaining to Mr. Cloud's request for reclassification.  Appx. 2 at 383-385:14-6.

**Chris Smith**

Ms. Smith did not attend the November 15-16, 2016 Board meeting purportedly addressing Mr. Cloud's reclassification application.  Appx. 3 at 171:1-4.

To determine how the Board arrived at its decision to deny Mr. Cloud's reclassification application, Mr. Cloud would have to discuss the same with the board members individually.  Appx. 3 at 173:174:15-10.

12.     As noted above, the information presented to date evidences serious flaws with the disability benefits process.  The Board purportedly decided Cloud's request for reclassification and purportedly provided the final review.  Without the testimony of the members of the Board, Cloud will not be afforded a clear picture of the decision to deny his request for disability benefits. Mr. Vincent, as corporate representative of the Plan, provided nothing more than conclusions and did not provide insight into the basis of the decision or, specifically, why the decision letter dated November 23, 2016 (Appx. at 6) varied substantially from the basis of denial provided in the minutes from the November 15-16, 2016 Board meeting (Appx. at 7).  The members of the Board must be deposed to permit Cloud to determine, among other things, whether "Defendant complied with ERISA's procedural regulations" as clearly set forth in the *Order* [Dkt. 38].  Accordingly, Cloud requests the opportunity to depose the members of the Board.  In light of the vast differences in resources of the parties, Cloud is totally and permanently disabled, the gamesmanship displayed

by the Plan in discovery, and the failure to abide by this Honorable Court's *Order* [Dkt. 38], Cloud requests that this Honorable Court order the depositions of each of the members of the Board to occur in Dallas, Texas.

### V.    PRAYER

WHEREFORE, Plaintiff prays that 1) the *Motion* be granted, 2) Defendant be ordered to produce Katie Blackburn, Dick Cass, Ted Phillips, Sam McCullum, Jeff Van Note, and Robert Smith to begin such depositions within five (5) days of the filing of this Motion, 3) Defendant be ordered to produce documents responsive to Request for Production Nos. 18, 37, 57, and 58 and Second Request for Production No. 3; and 4) Defendant and the Groom Firm be ordered to pay Cloud's costs, attorney's fees, and expenses associated with the filing of this Motion, pay the costs, attorney's fees, and expenses for the depositions of the members of the Retirement Board, and order that the depositions of the members of the Retirement Board occur in Dallas, Texas.  Plaintiff further prays and requests such other relief, general or special, to which Plaintiff may show himself justly entitled.

Respectfully submitted on this the 20th day of August 2021.

BARLOW GARSEK & SIMON, LLP
920 Foch Street
Fort Worth, Texas 76107
817.731.4500 (telephone)
817.731.6200 (facsimile)

By:    */s/  Christian Dennie*
CHRISTIAN DENNIE
State Bar No. 24045775
cdennie@bgsfirm.com
***ATTORNEY FOR PLAINTIFF***

## <u>CERTIFICATE OF SERVICE</u>

On August 20, 2021, the *Plaintiff's Reply in Support of Motion to Compel Compliance with Court's Order [Dkt. 38] and Production of Documents and Records and Incorporated Brief in Support Thereof* was filed with the Clerk of the Court via CM/ECF, which automatically delivers notice of the filing of the same to all counsel of record.

 */s/ Christian Dennie*
Christian Dennie, *Counsel for Plaintiff*

## <u>APPENDIX</u>

Appendix 1:   Excerpts of the Deposition of Sam Vincent

Appendix 2:   Excerpts of the Deposition of Patrick Reynolds

Appendix 3:   Excerpts of the Deposition of Chris Smith

Appendix 4:   Email from Christian Dennie to Ed Meehan and Michael Junk dated August 6, 2021

Appendix 5:   Email from Christian Dennie to Ed Meehan dated August 16, 2021

Appendix 6:   Denial Letter dated November 23, 2016

Appendix 7:   Minutes from the Bert Bell/Pete Rozelle NFL Player Retirement Plan Board Meeting dated November 15-16, 2016