# APPENDIX 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2        FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION
 3        ---------------------------
          MICHAEL CLOUD,               :
 4                                      :
              Plaintiff,               :
 5                                      :  Civil Action No.:
          vs.                          :
 6                                      :  3:20-CV-01277-E
          THE BERT BELL/PETE ROZELLE :
 7        NFL PLAYER RETIREMENT PLAN,:
                                        :
 8            Defendant.               :
          ---------------------------
 9
10            INDIVIDUAL AND 30(b)(6) DEPOSITION OF
11                    HESSMAN VINCENT
12        DATE:          August 10, 2021
13        TIME:          10:06 a.m. to 8:34 p.m.
14        LOCATION:      Groom Law Group
                         1701 Pennsylvania Avenue
15                       Suite 1200
                         Washington, D.C. 20006
16
17        REPORTED BY:  Felicia A. Newland, CSR
18
19
20
                    Veritext Legal Solutions
21             1250 Eye Street, N.W., Suite 350
                      Washington, D.C. 20005
22
                                              Page 1
```

.

.

16      Q    Mr. Reynolds is no longer on the

17   committee.  Is that correct?

18      A    That's correct.

19      Q    What's his role at the board meetings

20   now that he is no longer on the committee?

21      A    He decides -- he advises the board on

22   board decision, appeal claims.  No longer the

Page 18

Page 20

1    initial claims.

Page 19

Page 21

6 (Pages 18 - 21)

4        So if Patrick Reynolds or Chris Smith
5    was talking to board members about appeals, I would
6    need to talk to the members of the board to ask
7    them whether they received advice from Patrick
8    Reynolds or Chris Smith, correct?
9        A    That is a possibility.  Or you could
10   ask Patrick Reynolds or Chris Smith if they do.
11       Q    If Patrick Reynolds or Chris Reynolds
12   didn't recall whether they talked to the board or
13   not, the best people for me to talk to whether they
14   spoke to Chris Smith or Patrick Reynolds would be
15   the board members.  Is that right?
16       A    That may be the case, yes.

--

Page 24

.
2        Q    So if I had to determine whether
3    Ms. Smith or Mr. Reynolds were providing advice to
4    the board while they were both on the committee, I
5    would have to ask Patrick Reynolds or Chris Smith
6    about that, correct?
7        A    That's correct.
8        Q    And the only other people that would
9    know whether Chris Smith or Patrick Reynolds were
10   providing advice to the board and their specific
11   communications or conversations, would be the board
12   members themselves, correct?
13       A    Yes.  That may be the case.  But as
14   far as I'm --

Page 23

5    understanding for what you mean?  In relation to
6    what?
7        A    Mr. Cloud's appeal.
8        Q    Okay.  So you talked to Ms. Blackburn
9    yesterday specifically about Mr. Cloud's appeal,

Page 25

7 (Pages 22 - 25)

16          If I wanted to know what was
17   discussed for Ms. Blackburn to come to her decision
18   to deny Mr. Cloud's request for benefits, I would
19   have to ask her that question because you didn't
20   ask her, right?
21          A    I did not ask her, that's correct.

Page 26

Page 28

7          Q    Did you ever ask whether
8    Ms. Blackburn had any recollection as to any
9    discussion or debate as to Mr. Cloud's case?
10          A    I don't recall if a question was
11   asked in that manner.  But there was nothing unique
12   that popped out to her about the case.

14          Q    Did you ever ask Ms. Blackburn
15   whether she discussed Mr. Cloud's case with Patrick
16   Reynolds and Chris Smith?
17          A    I did not ask that.
18          Q    Did you user ask Ms. Blackburn what
19   advice she received from third parties about
20   Mr. Cloud's case?
21          A    I did not ask that question.
22          Q    When was the last time you spoke to

Page 27

Page 29

8 (Pages 26 - 29)

.

5      Q    So was there something that was asked
6  about his review and any independent research that
7  he conducted?
8      A    No.  It was nothing along those
9  lines.
10     Q    Okay.  Did you ask Mr. Cass whether
11 he received any advice from a third-party adviser
12 as it pertains to Mr. Cloud's case?
13     A    I did not ask that question.

Page 30

Page 32

9      Q    Did you ask Mr. Cass if he recalled
10 any discussions he had with any fellow board
11 members been Mr. Cloud's case?
12     A    I did not ask that question.

Page 31

Page 33

9 (Pages 30 - 33)

1

6     Q     And there was no discussion that --
7     let me ask it a different way.
8            You did not ask Mr. Cass whether he
9     had any discussions about Mr. Cloud's case with any
10    of the other board members.  Is that correct?
11           A     I did not ask that question.

--
Page 34

11           Q     Did you actually ask him what
12    conversations he had with other members of the
13    board about his decision on Mr. Cloud's claim?
14           A     I did not.
15           Q     Did you ask him whether he spoke to
16    Mr. Reynolds or Ms. Smith in his review of
17    Mr. Cloud's case?
18           A     I did not.

?
Page 36

5     Q     What was Mr. Philip's response to
6     those questions?
7     A     The same as the previous two; no
8     unique knowledge, no notes kept, didn't review
9     outside the meeting's website.
10    Q     Did Mr. Philips recall actually
11    reviewing any of Mr. Cloud's records?
12    A     He doesn't recall the case.

Page 35

6     Q     Did you ask whether they ever kept
7     any notes?
8     A     Not specifically in that manner, no.
9     We asked them if they had any notes, and they do no
10    have any notes.

Page 37

10 (Pages 34 - 37)

.

6      Q    So if a board member was to keep
7    notes of their analysis of medical records and
8    information presented in a disability application,
9    they would keep those personally and independently
10   of the benefits office.  Is that correct?
11      A    That may be the case if they are
12   keeping notes.

Page 38

3      Q    Did Mr. McCullum have any
4    recollection of medical records presented by
5    Mr. Cloud?
6      A    I didn't ask that question
7    specifically.
8      Q    Did Mr. McCullum recall or have any
9    recollection of the injuries, illnesses, ailments,
10   that Mr. Cloud was presenting?
11      A    I didn't ask that question.
12      Q    Did Mr. McCullum recall ever having
13   any conversations with Mr. Reynolds or Ms. Smith
14   about Mr. Cloud's appeal?
15      A    That question was not asked.

Page 40

1

?

Page 39

Page 41

11 (Pages 38 - 41)

1    Q    Did Mr. Smith recall ever having any
2    notes analyzing Mr. Cloud's request for disability
3    benefits and associated medical records?
4        A    I'm not sure of that.

8        Q    Did he confirm to you that he
9    actually did review Mr. Cloud's medical records?
10        A    I did not ask that question.
11        Q    Did you ask Mr. Van Note whether he
12    had any conversations with Mr. Reynolds or
13    Ms. Smith about Mr. Cloud's applications for
14    disability benefits?
15        A    I did not ask that question.
16        Q    Did you ask Mr. Van Note whether he
17    recalled any conversations or communications he had
18    with any other board members about Mr. Cloud's
19    medical records or applications for disability
20    benefits?
21        A    I did not ask that question.

Page 42

13        Q    Did you ask Mr. Smith about any
14    discussions or debates he had with any other
15    members of the board about Mr. Cloud's case?
16        A    I did not ask that question.
17        Q    Did you ask Mr. Smith whether he had
18    any conversations with Mr. Reynolds or Ms. Smith
19    about Mr. Cloud's application and request for
20    benefits?
21        A    I did not ask that question.
22        Q    Did you ask Ms. Smith whether he

Page 44

1    received any advice from any third party about
2    Mr. Cloud's request for benefits?
3        A    I did not ask that question.

13        Q    So I will tell you that from
14    Ms. Smith's deposition, she said she recalled maybe
15    10, maybe 15 reclassification requests that she
16    handled as a member of the committee.
17        Does that sound fair from your
18    knowledge and your recollection?
19        A    Is she stating that as ever under her
20    capacity or in a yearly manner?
21        Q    I believe she said ever.
22        A    That could be a fair assessment.  I

Page 45

12 (Pages 42 - 45)

1   would say it's not common.

 

1        Q    Did you ask any of the board members
2   that were in place at the time of Mr. Cloud's
3   appeal whether they personally know or knew
4   Mr. Cloud?
5        A    I did not ask that question.
6        Q    Did that come up in any of the
7   conversation?
8        A    No.

21            Did you ask any of the board members
22   who were in place at the time of Mr. Cloud's appeal

1   whether they had reviewed Mr. Cloud's lawsuit?
2        A    No, I did not.

 

6            It's my understanding that
7   Ms. Blackburn, Mr. Cass, and Mr. Philips were
8   appointed by the NFL Management Council.  Is that
9   correct?
10       A    That's correct.
11       Q    Sam McCullum and Jeff Van Note and
12   Robert Smith were appointed by the Players
13   Association.  Is that correct?
14       A    That's correct.

7        Q    Did you actually ask the questions of
8   the board members?
9        A    I did not.

.

5        Q    So are you saying that the questions

6    that you said were not asked, were not asked period

7    or you just personally didn't ask them?

8        A    The original questions were not asked

9    by me, and I didn't do any follow-up questions.

Page 50

Page 52

Page 51

14 (Pages 50 - 53)

1    your lips, so I may interrupt you.  So I'm not
2    trying to talk over you, it's just I can't see your
3    mouth, so it's a little bit more difficult.
4         A    I understand.
5         Q    So I apologize because I have done
6    that a few times already.
7              Okay.  Like I said, I just want to
8    make sure I'm understanding what documents you
9    understand those to be.  You recall the X file
10   being approximately 860 pages of record?
11        A    No.  I believe the X file is well
12   over that.  It's 1,500, or so, pages if I'm not
13   mistaken.
14        Q    Okay.  Fair enough.
15             So as we've gone through this, you've
16   indicated that you have looked at the line of
17   questions that are being asked on the 30(b)(6)
18   request, the original complaint filed by Mr. Cloud
19   in this case, the administrative record and the X
20   file that was produced in this lawsuit by the Groom
21   Firm.  Is that correct?
22        A    That's correct.

                                              Page 64

12        Q    When you're referencing the X file,
13   are those the 860 pages of records that were
14   produced through this portal by the Groom Law Firm
15   on January 18, 2019?
16        MR. JUNK:  Mr. Dennie, this is Mike
17   Junk.  I'm sorry.  I just want to clarify, like you
18   said trying to get you through this.  The X file
19   this the Bates prefix used to designate documents
20   that we produced to plaintiff.  So with that
21   understanding, that's what he's referring to.  So
22   I'll just leave it to you.  I apologize.  Go ahead.

                                              Page 62

1         MR. DENNIE:  No, I get the Bates
2    label reference, but I'm just trying to make sure
3    that I'm understanding where they came from.
4    BY MR. DENNIE:
5         Q    So you're looking at Deposition
6    Exhibit 11, which is an e-mail from Hannah Coffman
7    to Michael Cloud on January 18, 2019.  Is that
8    right?
9         A    Yes, it is.
10        Q    And I will submit to you that there
11   were records produced to Mr. Cloud on that date
12   that were 860 pages of records.  Were you involved
13   in providing these records to the Groom Law Firm?
14        A    I don't recall if I assisted.
15        Q    Okay.  I just wanted to make sure --
16   I'm sorry, go ahead.  I didn't mean to cut you off.
17        A    No, that's correct, I don't recall
18   providing something here.
19        Q    I will apologize to you, Mr. Vincent,
20   when we're wearing the masks it's a little bit
21   easier for me to interrupt you because when you
22   pause for a little longer than normal, I can't see

                                              Page 63

1         Q    As it pertains to the 30(b)(6)
2    questions, there was an exhibit that was compiled
3    that contains notes, and potentially other
4    documents, that you reviewed in preparation for
5    answering the 30(b)(6) topics, correct?
6         A    Do you mind repeating that for me?
7         Q    Sure.  No problem.
8              As it pertains to that category
9    number one that I mentioned, your review of the
10   30(b)(6) topics, there's been a binder that was
11   compiled that you reviewed to help you in
12   preparation to answer the 30(b)(6)questions,
13   correct?
14        A    Correct.
15        Q    In the administrative record, I just
16   want to make sure that we're talking about the same
17   thing and we're not speaking separately.  If you
18   will flip for Exhibit 7.  I want you to let me know
19   if Exhibit 7 is what you're referring as the
20   administrative record.
21        A    Yes.  This looks to be the
22   administrative record, Exhibit 7.

                                              Page 65

17 (Pages 62 - 65)

1      Q    Okay.  So Exhibit 7 is Bates labeled
2   CLOUD-AR-0001 through CLOUD-AR-529, correct?
3      A    That is correct.
4      Q    And that's -- when you refer to the
5   administrative record, Exhibit 7 is what you're
6   referring to, correct?
7      A    That's correct.

Page 66

Page 68

Page 67

Page 69

18 (Pages 66 - 69)

8          Q     Is it fair to say all of the

9     questions that were asked of the board members were

10    yes-or-no questions?

11          A     Yes.

22

6       Q    They didn't ask members of the board
7   whether they reviewed the decision letter before it
8   went sent out.  Is that right?
9       A    That was not a line of questions, no.
10      Q    You didn't ask the board whether they
11  provided any input on the decision letter, right?
12      A    That's correct, we didn't ask that
13  question in this line of questioning.
14      Q    You didn't ask if the board made any
15  changes to the decision letter, right?
16      A    We did not ask that question, no.

Page 82

Page 84

17  BY MR. DENNIE:
18      Q    Go to Exhibit 6.
19      A    I'm sorry.  Can you repeat that?
20      Q    Sure.  Take a look at Exhibit 6.
21      A    I have Exhibit 6.  I have the
22  November 23, 2016 letter open.

Page 83

Page 85

22 (Pages 82 - 85)

1    Q    Okay.  This is the decision that was
2  sent out relating to Mr. Cloud's reclassification
3  appeal, correct?
4    A    That is correct.
5    Q    This is the decision made by the
6  board, correct?
7    A    That is correct.
8    Q    Have you seen any e-mails or
9  correspondence from any of the board members where
10  they provided any discussion or words to be
11  included in Deposition Exhibit 6?
12    A    No, not that I'm aware of.
13    Q    As you sit here today, you can't
14  confirm whether any members of the board actually
15  read this decision before it came out, correct?
16    A    Before it was sent to Mr. Cloud?
17    Q    Correct.
18    A    That is correct, I can't confirm
19  that.
20    Q    And you would agree that the Groom
21  Firm wrote this letter, right?
22    A    They assisted the Plan office in

Page 86

1    Q    Okay.  And Linda Johnston is just an
2  administrative assistant.  She didn't provide any
3  of the language set forth in Deposition Exhibit 6,
4  did she?
5    A    Not that I'm aware of, no.
6    Q    Wasn't it the practice in these
7  applications for disability benefits that the Groom
8  Firm would prepare the decision without
9  communicating with the members of the committee?
10    MR. MEEHAN:  Objection.  No
11  foundation.
12    Go ahead.
13    THE WITNESS:  Well, we have -- we're
14  not talking about Exhibit 6 anymore?
15  BY MR. DENNIE:
16    Q    I'm going to -- just follow my
17  question -- my first one is about the committee.
18  So I'll ask it again.
19    As it pertains to decisions for
20  disability benefits that are decided by the
21  committee, the Groom Firm would prepare those
22  written letters without communication with members

Page 88

1  writing the decision letter.
2    Q    Okay.  Tell me who else helped write
3  this letter.  If they assisted, tell me who else
4  wrote it.
5    A    When we received the letter,
6  administration will format the letter, make sure
7  everything is correct and then send it out to the
8  player.
9    Q    Who did that for Mr. Cloud's, as it
10  pertains to Deposition Exhibit 6?
11    A    I wouldn't be able to say for sure,
12  but it may have been Belinda Johnston at the Plan
13  office or executive admin.
14    Q    Linda what?
15    A    Johnston, J-O-H-N-S-T-O-N.
16    Q    Okay.  And you said Linda Johnston is
17  the administrative assistant?
18    A    Yes.  Yes, sir.
19    Q    You would agree from your experience
20  working with lawyers that Deposition Exhibit 6 is
21  clearly prepared by a lawyer, correct?
22    A    Correct.

Page 87

1  of the committee, correct?
2    A    The committee would make a decision
3  and then the decision letters would be created.
4    Q    So my question is little bit
5  different.  But I appreciate your response.  It's a
6  little bit differ, so follow me for a second.
7    The committee makes a decision,
8  right?
9    A    Yes.
10    Q    The Groom Firm writes that decision
11  and puts it into a decision letter, correct?
12    MR. MEEHAN:  Objection to the form.
13  Asked and answered.
14    Go ahead.
15    THE WITNESS:  Correct.
16  BY MR. DENNIE:

Page 89

23 (Pages 86 - 89)

1          You don't have any information or
2  evidence that shows that the members of the board
3  actually reviewed a decision before it was sent to
4  a player, correct?
5          A    I don't have any information that
6  they reviewed the letter before it went to the
7  player, that's correct.
8          Q    And you don't have any information or
9  evidence that shows that the board actually made
10  any additions or changes to a decision letter
11  before it was sent to a player, correct?
12          A    That's correct.

Page 90

Page 92

5          Q    So you would agree that a decision is
6  made by the board, right?
7          A    That's correct.
8          Q    Again, the Groom Firm would write
9  that decision, correct?
10          A    Correct.

n.

Page 91

:
21          Q    Where is the board-level decision
22  provided?

Page 93

24 (Pages 90 - 93)

1     A   At the meeting itself, the final

2   decision is made.

3     Q   Is there any e-Ballot that's

4   conducted by the board?

5     A   It's in the minutes by the board for

6   their decision.

Page 94

Page 95

Page 96

7     Q   Okay.  So if we flip to

8   CLOUD-MIN-006, and I'll just read it to you, so

9   tell me if I'm wrong.  It says, "To:  Michael

10   Cloud.  On review of appeal from earlier decision

11   to award Inactive A total permanent disability

12   benefits, effective May 1, 2014, denied application

13   for reclassification to the Active Football

14   category failure to meet the requirement for Plan

15   section 5.7(b)."

16        Did I read that correctly?

17     A   Yes, you did.

Page 97

25 (Pages 94 - 97)

13    BY MR. DENNIE:

14        Q    As it pertains to Exhibit 19 and

15    those questions, when you were listening to the

16    questions being asked by the Groom Firm, was there

17    ever any discussion about whether the board

18    discussed Mr. Cloud's application prior to casting

19    their vote?

20        A    We did not ask that line of

21    questioning.  There was no response like that.

Page 98

Page 100

1

Page 99

Page 101

26 (Pages 98 - 101)

Page 102

Page 104

2     Q   And I take it, from looking at
3   Deposition Exhibit 19, there was no question asked
4   of the board members specifically what the
5   information they gave to the benefits office about
6   Mr. Cloud's case prior to the drafting of this
7   letter.  Is that correct?
8     A   That's correct, that question was not
9   asked.
10     Q   And correct me if I'm wrong, but
11   there's also no information or -- requested from
12   any of the board members in the conversations that
13   were had yesterday where they were asked any input
14   that was requested of them by the Groom Firm prior
15   to the drafting of Deposition Exhibit 6.  Is that
16   right?
17     A   Yes, that question was not asked.

Page 103

Page 105

27 (Pages 102 - 105)

13        Q    You testified, and correct me if I'm
14   wrong, but there's no evidence or information that
15   the board actually reviewed Exhibit 6 before it was
16   sent out, right?
17        A    That is my understanding, yes.
18        Q    And you would agree that
19   Ms. Blackburn and Mr. Cass both have legal
20   training.  Is that right?
21        A    That's my understanding, yes.

Page 106

Page 108

Page 107

Page 109

28 (Pages 106 - 109)

?

11        Q     So let me ask you a couple of
12    questions and you tell me if I'm wrong.
13            Earlier you testified you were not
14    aware of the board ever reviewing Exhibit 6 before
15    it was sent to Mr. Cloud, correct?
16        A     That's correct.

22

Page 110

Page 112

2            Are you aware or have any evidence
3    that the board reviewed exhibit -- I just butchered
4    my words.  Let me try it again.
5            Are you aware or have any evidence
6    that shows that the board reviewed Exhibit 6 after
7    it was sent out?
8        A     I do not have that evidence, no.

Page 111

Page 113

29 (Pages 110 - 113)

Page 118

Page 120

1

7       Q   Let's go one by one.

8         As it pertains to requests to receive

9  Active A football benefits, do you know the numbers

10  that was granted versus the ones that were denied?

11      A   I do not know the numbers denied.

12  And I can tell you based off of March 2021, how

13  many players are receiving Active football.

Page 119

Page 121

Veritext Legal Solutions
800-336-4000

:

14      Q    Thirty-two players are receiving how

15   many requests for Active A benefits have been

16   denied?

17      A    I don't know have that answer.

18   Football --

20      Q    Are there any spreadsheets or other

21   data that you all keep on total and permanent

22   disability claims that have been granted or denied?

1       A    Historically, there is a database

2    that keeps track of a case as it goes through.  And

3    then once a decision is made, approval or denial,

4    that's acknowledged, it would have to be a -- it's

5    considered a data dump onto a chart and then it has

6    to be configured to provide that type information.

7    A database has not existed for forever --

8       Q    So there is a data -- I'm sorry.  Go

9    ahead.

10      A    I mean if you're looking for from the

11   inception of T&P, I wouldn't say that that sort of

12   database exists.  The database is relatively newer

13   in the sense that since it's after 2000 -- I

14   wouldn't even be able to say the exact year, but

15   it's after 2010, well after 2010.

16      Q    Okay.  So sometime after 2010, a

17   database was created that would show the number of

18   claims that are granted and the number of claims

19   that are denied for total and permanent benefits,

20   correct?

21      A    Yes, if you download the data, that

22   should be retrievable.

1    Q    And that's a document that can be
2  easily produced in a lawsuit, correct?
3           MR. MEEHAN: Well, Objection to form.
4           Can you explain that again,
5  Mr. Vincent.
6           THE WITNESS: Yes.
7           So I wouldn't be able to do it
8  right now. For example, we would he have to go
9  into the database, look at the fields to
10 determine, you know, what the request is. And
11 then from there, it would go into a massive Excel
12 sheet and then it would have to be filtered, for
13 example, approvals and denials. But that would
14 be a method to kind of get it at the end, to have
15 an overall scope.
16 BY MR. DENNIE:
17     Q    But you could run a query in your
18 database and retrieve the requested information,
19 correct?
20          MR. MEEHAN: Objection to the form.
21          THE WITNESS: We should be able to
22 run a query to get that type of information.

Page 126

1           MR. DENNIE: Counsel, was that
2  something that you guys can produce? That's the
3  first time that we heard that, too.
4           MR. MEEHAN: Well, as you know, we
5  think that has nothing whatsoever to do this
6  lawsuit, so you can send a request for it and we
7  will take it under advisement and we'll try to meet
8  and confer with you but as I understand --
9           MR. DENNIE: We already have.
10          MR. MEEHAN: It's no -- there's been
11 no meeting and conferring on that topic. As you
12 just said, that came up a moment ago. That's brand
13 new. We've had no discussion on it at all. But as
14 I understand the witness, he is talking about it is
15 a process that he could follow to create something.
16 And that sounds like a lot of work to me. So I
17 will have to get a better understanding from the
18 witness. And I would like to have that
19 understanding from you off this record as to what
20 the relevance to this case it could possibly have.
21 So that's a discussion that we would need to have.
22          MR. DENNIE: As you know, arbitrary

Page 127

1  and capricious. And I don't know why we're still
2  fighting that. It's the same request that we
3  talked about with the director's report and the
4  counsel report. The reason we don't know about
5  this stuff is because you're not giving us
6  information that's being requested.
7           So you have the data, so you've got
8  to give the data. I mean, here we are in
9  discovery depositions two weeks before the
10 discovery deadline expires and I'm learning about
11 records for the first time. I just ask you to
12 meet your duty under the rule.
13          We'll have to add that to our
14 motion to compel. This is our conferring 37, 57,
15 and 58 of the request. If you have responsive
16 information, you need to produce it. You can get
17 back to me about when it's going to be produced.
18 We've requested the director's and counsel report
19 prior to this deposition. It was not provided,
20 so we're apparently going to have to demand and
21 request more stuff. But you can get back to me.
22          MR. MEEHAN: Okay. Since you want to

Page 128

1  put it on the record, I'll just say briefly what
2  took place just now is not a meet and confer. I do
3  not know whether production of that information is
4  something that will take five minutes or five
5  years. I have no insight on it. Now is not the
6  time for me to have that discussion with
7  Mr. Vincent.
8           The director's and counsel reports,
9  we had no meet and confer of any nature. You
10 made your request, we've communicated that we
11 would get back to you. You filed a motion with
12 no meet and confer on that topic. I don't want
13 to belabor this deposition. We're not going to
14 agree right now.
15          MR. DENNIE: What are you talking
16 about?
17          MR. MEEHAN: I do not wish to belabor
18 this --
19          MR. DENNIE: We talked about it on
20 the 5th.
21          MR. MEEHAN: -- deposition -- we did
22 not.

Page 129

33 (Pages 126 - 129)

1      MR. DENNIE:  Anyway, it doesn't
2  matter.  Let's move on.
3      MR. MEEHAN:  No, sir.
4      MR. DENNIE:  We are wasting time.  I
5  don't want to hear that.
6      MR. MEEHAN:  Sir --
7  BY MR. DENNIE:
8      Q    Mr. Vincent, how long would it take
9  you to run that database query?
10      MR. MEEHAN:  Sir, he is not going to
11  answer that question until I finish my statement.
12  Please don't interpret me.
13      I have said several times I do not
14  wish to belabor this deposition.  We need to meet
15  and confer.  If you wish to ask him questions
16  now, go right ahead.  But we have tried to work
17  with you and you have never stated, to my
18  understanding, why it is relevant to know that
19  the --
20      MR. DENNIE:  I just told you it's not
21  arbitrary and capricious as the application.  And
22  that is an absolute easy one.  So okay, that's

Page 130

1  fine.  We'll move on.  If you don't want to produce
2  the record, we'll take that up with the Court.  We
3  talked about the other one at least four times.
4  BY MR. DENNIE:
5      Q    Mr. Vincent --
6      MR. MEEHAN:  Mr. Dennie, I am not
7  refusing anything.  I am saying to you --
8      MR. DENNIE:  Please stop.
9      MR. MEEHAN:  I am saying to you we
10  have not met and conferred.  Now, go ahead with
11  your deposition.  And we do whatever is
12  appropriate.  Please proceed.
13  BY MR. DENNIE:
14      Q    How long would it take to run the
15  query to determine the total and permanent
16  disability benefits that have been granted or
17  denied?
18      MR. MEEHAN:  From what time period?
19  BY MR. DENNIE:
20      Q    Answer the question.
21      MR. MEEHAN:  Objection to the form.
22  Time period is ambiguous.

Page 131

1      Do your best, sir.
2      THE WITNESS:  If there's a time
3  period provided, you would have to download the
4  information, it goes on through the Excel sheet.
5  And then have to filter out of cases by player.
6  And then, you know, you have to audit to make sure
7  that the correct information was provided.  It
8  would take time.  It would not be -- I wouldn't do
9  it right now and give it to you right now, if
10  that's the question.
11  BY MR. DENNIE:
12      Q    That is not my question.
13      A    No.
14      Q    I just want to know in your
15  experience what time would it take.  So let me go
16  back a step.  And maybe I misunderstood what you
17  your response was.
18      So was this database created in 2010
19  for all claims that have ever been filed or are
20  they only claims going forward from 2010-ish?
21      A    Going forward.  I would be more
22  comfortable saying around 2011 to 2013, just as a

Page 132

1  note.  But yes, it is for claims from the time the
2  system was created forward.
3      Q    Okay.  So the time period we're
4  talking about is somewhere after 2010, maybe 2011,
5  maybe 2012.  Is that correct?
6      A    Yes.  It was a system change, and
7  then we started putting information into that
8  system as the case went on.
9      Q    Okay.  So you understood that when
10  I'm asking you questions, it's from the date the
11  system was created to present, correct?
12      A    Correct.
13      Q    Okay.  So with that in mind, whenever
14  the system was created, whether it was '11, '12,
15  whenever, to the present, running the query to
16  determine what total and permanent benefits have
17  been granted and denied, how long would that take?
18      A    I would need several days just to
19  make sure it's correct information that's given to
20  you.
21      Q    Several days to run a database query
22  that's prepared on an Excel spreadsheet?

Page 133

34 (Pages 130 - 133)

1    A    I just want to make sure --
2        MR. MEEHAN:  Objection to the form.
3    Misstates his testimony.  And, Mr. Dennie, I know
4    you don't realize it, but your tone has changed
5    markedly.  So please show respect in your tone, not
6    just on the written transcript.  Thank you.
7        MR. DENNIE:  Okay.  Please stop.
8    That's not an objection.  I'm just asking the guy a
9    question.  Please stop trying to make me look bad
10   on the transcript for no reason.
11   BY MR. DENNIE:
12       Q    Sir, I am just trying to get an
13   understanding.  I've run many -- when I worked on
14   college campuses, I ran many queries that are
15   similar to what you're talking about that has a lot
16   of information and it certainly never took days.
17   So I'm just trying to get an understanding for why
18   you think that it would take days to run a query to
19   determine whether T&P benefits applications were
20   grant or denied.
21       A    The system uses players by
22   application types under one umbrella.  So if

1    someone applied for line of duty and T&P, for
2    example, we would have to tease that out.  That's
3    where some of the extra work comes in.  It's not,
4    you know, John Smith applies for line of duty and
5    John Smith applied for T&P, then we have just the
6    T&P that goes forward, for example, we would have
7    to do a little teasing out to make sure that we
8    give the correct information.  That's where it
9    would just take some time, just making sure that
10   you have the right information.
11       Q    How many T&P benefits applications
12   have been filed since the database was created?
13       A    I don't have that answer.
14       Q    Give me an estimate.
15       A    I'm not sure honestly.  No idea.
16   Easily hundreds, I mean it's not thousands, since
17   the inception.
18       Q    Okay.  So there have been hundreds of
19   applications, not thousands, that has been filed
20   since the database has began, correct?

.

35 (Pages 134 - 137)

14    Q    And as we sit here today, you can't
15  tell me how many claims that were Active A benefits
16  have been denied.  Is that correct?
17    A    That's correct, I cannot give you the
18  decisions on Active -- well, let's just say total
19  and permanent disability as a whole, since the
20  category is determined by the committee or the
21  board.

18    Q    Can you tell me how many claims for
19  Inactive A benefits have been denied?
20    A    I do not have that answer, no.

Veritext Legal Solutions
800-336-4000

3          Is there a query that can be run to

4   determine whether Inactive A benefits have been

5   granted?

6          A    Yes, there would be a category under

7   total and permanent disability.

8          Q    So in the query in the database, you

9   could take a determination if the player received

10   Inactive A or Active football benefits, correct?

11          A    Yes.

?

19          Q    So the number of reclassification

20   requests from Inactive A to Active football

21   benefits is not a large number, correct?

22          A    I would agree with that, yes.

.

15      Q    There's not a lot of requests out
16   there, as you've acknowledged, so it's not going to
17   be as a voluminous review of documentation to come
18   up with how many reclassification decisions for T&P
19   benefits have been granted or denied.  Is that
20   right?
21      A    That would be a fair statement.  It
22   could be 10, 15, it could be less than a hundred,

1   but it would -- but I don't want to give a
2   definitive number of how many there were.  It's
3   been a some time.

t?

Veritext Legal Solutions
800-336-4000

4      Q     Do you know whether more benefits

5   applications under the T&P umbrella are granted or

6   denied?

7      A     I wouldn't be able to confirm that

8   right now.

21      Q     The only way for us to get those is

22   going to be through that database that you talked

1   about before, correct?

2          MR. MEEHAN:  Objection.  No

3   foundation.

4          THE WITNESS:  That would be

5   information in that database.

13          As we sit here today, you can't tell

14   me whether T&P benefits applications are granted or

15   denied two to one, three to one, four to one, five

16   to one?  You have no clue.  Is that right?

17      A     That's correct.

18      Q     Do you know how many of the T&P

19   reclassifications benefits appeals have been

20   granted?

21      A     I cannot confirm that either.

22      Q     Do you know a percentage of the T&P

1   reclassifications appeals have been granted?

2      A     I do not know that answer.

3      Q     Who are the beneficiaries under the

4   Plan?

5      A     Who are the beneficiaries?  The

6   players.

10      Q    Okay.  So you would agree that the

11   players are the beneficiaries under the Plan,

12   right?

13      A    Yes.

14      Q    Who are the fiduciaries of the Plan?

15      A    Trustees.

16      Q    Who are the trustees?

17      A    At the time of Michael Cloud's case;

18   Katie Blackburn, Ted Philips, Dick Cass, Jeff Van

19   Note, Robert Smith.  Who am I forgetting here?

20      Q    Sam McCullum?

21      A    Sam McCullum.  I apologize.  Yes.

22      Q    So the board members are who you're

1   referring to as the trustees, correct?

2      A    Yes, sir.

13      Do the board members have a fiduciary

14   role or relationship to the players?

15      A    They have a fiduciary role, yes.

22

Veritext Legal Solutions
800-336-4000

Page 166

Page 168

.

7        Q     Would you agree that they have a
8   fiduciary role and the best interest of the
9   players?
10        A     Yes.

Page 169

43 (Pages 166 - 169)

.

7      Q    Of the Active football benefits that

8   have been provided, how many of those are related

9   to concussion symptoms or syndrome?

10      A    I don't have an answer to that at

11   all.

--

22   during the quarterly board meeting, there's

1   have been?

2      A    Maybe with the director of plan book.

3   It goes over the amounts, it may have been the

4   retirement board discussion.  I couldn't confirm

5   where that discussion, what happens.  But that's --

6      Q    So let me -- I didn't really hear the

7   first part.  You said something about a director's

8   plan or something to that effect.  What is that?

9      A    Well, when the director of the Plan

10   Benefit Office reports on the allocation of money

11   that goes out on disability, it is acknowledged who

12   is receiving the benefit -- I'm sorry, the number

13   of players receiving a certain benefit and which

14   ones.

15      Q    Okay.  And for some reason I'm having

16   a little more trouble hearing you right now, so, I

17   mean, if you could speak up a little bit.

18      A    Yeah.

19      Q    And let me tell you what I heard and

20   tell me if I'm wrong.  Did you say that that's

21   something that the director of the Plan stands up

22   and says or is that a document that's presented?

1   acknowledgment of how many players are receiving a

2   benefit and which ones at that time.

3      Q    Would that be in the minutes?

4      A    Would it be in the minutes?  I can't

5   confirm that.  I believe it would be but...

6      Q    Okay.  If you'll flip to Exhibit 12.

7      A    Okay.

8      Q    Do you see that indicated anywhere?

9          MR. MEEHAN:  Hang on one second.  He

10   needs to get the exhibit binder.

11          MR. DENNIE:  Okay.

12          MR. MEEHAN:  It's just a little

13   further down the table.

14          THE WITNESS:  Thank you.

15          MR. MEEHAN:  Okay.  He's got it.

16          THE WITNESS:  No, that is not in the

17   minutes provided to you -- or by you, I should say.

18   BY MR. DENNIE:

19      Q    Those were provided to me, not by me,

20   just so we're clear.

21      A    Okay.

22      Q    So where in the minutes should that

1   That's why where I didn't hear you.

2      A    Both.  There is a document that has

3   the amounts, the number of players, and it's also

4   expressed during the meeting itself.

5      Q    Is that the director's report?

6      A    Yes.  Sorry if I called it director's

7   plan.

8      Q    So the director's -- I'm sorry.  I

9   cut you off.  Can you say that again?

10      A    Yeah.  I called it the director plan

11   book.  It would be the director's report.

12      Q    Okay.  So when you say director's

13   plan book and director's report, those are the same

14   thing, correct?

15      A    Yes, plan director's report.

16      Q    If I heard you correctly, those are

17   prepared quarterly for the board meeting.  Is that

18   right?

19      A    That's correct.

.

44 (Pages 170 - 173)

16         You would agree that there are
17    executive sessions that the board of directors hold
18    to discuss disability applications.  Is that right?
19         A    Yes.  I would say the Players
20    Association meets with themselves, as would council
21    meets with themselves to discuss cases.
22         Q    Did you ask any of the members of the

Page 182

Page 184

1    board about any executive decisions they held as it
2    pertains to Mr. Cloud's application?
3         A    I did not.  And I do not recall

Page 183

Page 185

47 (Pages 182 - 185)

Page 226

Page 228

1

15     Q   You would agree that the Plan office

16   directed Mr. Cloud to see Dr. Mandelbaum, correct?

17     A   For his line of duty examination,

18   yes, sir.

19     Q   So if your counsel e-mailed me and

20   said that Mr. Cloud was directed to Dr. Mandelbaum

21   by someone other than the Plan, that would be

22   incorrect, right?

Page 227

Page 229

58 (Pages 226 - 229)

```
1        A    Correct, Rose Mary Eves was a Plan
2   coordinator -- I'm sorry, worked with the Plan
3   office to schedule examinations.
4        Q    You would agree that Mr. Cloud is
5   entitled to any records from his evaluation from
6   Dr. Mandelbaum, correct?
7        A    Yes, sir.
```

Page 230

Page 231

Page 232

Page 233

59 (Pages 230 - 233)

9          What are the sources of medical
10    records for players who are submitting applications
11    for disability benefits?
12        A    Multiple sources.  If the player has
13    his own personal physicians, they can submit those
14    records any time after football -- before football.
15    And when I say "football," I'm talking about NFL.
16    And any other CFL, anything like that, they can
17    submit those records.  When it comes to NFL, the
18    player can contact the last club that they played
19    for and they should have their most recent team
20    records, as we've been calling them, team records.
21        Q    What else?
22        A    There is a repository, from my

1    understanding, I believe it's called EMR
2    repository.  That came into play after the 2011
3    CBA.  And from my understanding, the players would
4    have had to have been playing in 2011 to be part of
5    that system and forward.
6

Veritext Legal Solutions
800-336-4000

16      Q    And you would agree that ERISA

17  requires the Plan to produce records in its

18  possession or control if requested by a player.  Is

19  that right?

20          MR. MEEHAN:  Objection.  Calls for a

21  legal conclusion.

22          THE WITNESS:  Yes, sir.

Page 266

Page 268

1           MR. DENNIE:  It's in his affidavit,

2   so I guess I could make the same objection.

3   BY MR. DENNIE:

4       Q    You can answer.

5       A    Yes, a request would be given -- if a

6   player requests his records and we have them on

7   file, we would hand them over.

8       Q    And those requested records includes

9   records maintained by your Plan physicians, right?

10      A    Yes, sir.

11      Q    You would expect a player should have

12  access to all of the records from Plan physicians,

13  correct?

14      A    Any record that we have on file, we

15  would hand over to the player, yes, sir.

Page 267

Page 269

68 (Pages 266 - 269)

Page 270

Page 272

:

3        Q    Mr. Cloud requested his records.

4    Some of those were from Plan physicians.  Those

5    scans and records were not produced, correct?

6        A    Those x-ray films were not produced

7    for Mr. Cloud, that's correct.

8        Q    They were produced for the first time

9    in July of 2021, right?

10        A    Yes, sir.

16        Q    Dr. Canizares had some films and

17    scans, right?

18        A    Yes, from his 2011 evaluation, I

19    think.

Page 271

Page 273

69 (Pages 270 - 273)

o

Page 274

Page 276

1

1

15          You would agree that the Department
16   of Labor regulations require the Plan to turn over
17   medical documents that are requested by a player,
18   correct?
19          A    Yes, sir.

Page 275

Page 277

.

16       Q   Are you aware of any training,
17   whether you were there or not, where the board was
18   trained on the Plan document?
19       A   I also cannot confirm.

Page 290

Page 292

:

7       Q   So my question was more -- the second
8   set of questions, and tell me if you didn't
9   understand it, but your awareness of whether you
10   were there or not, that the board was trained on
11   the Plan document?
12       A   Am I aware if they were?  I'm not
13   aware if they were or not.

Page 291

Page 293

74 (Pages 290 - 293)

6        Q    Are you aware of any training that
7    the board received pertaining to neurological
8    issues incurred by former NFL players?
9        A    No, sir.

Page 294

Page 296

Page 295

Page 297

75 (Pages 294 - 297)

1     Q     Just for clarity of the record, in
2    2020, Inactive A benefits were 135,000, and the
3    Active football benefit was 265,000.  Is that
4    correct?
5         A     Yes.
6         Q     What was the difference in the
7    amounts of the Inactive A versus Active football
8    benefits in 2019?
9         A     I believe they were the same amount,
10   sir.
11        Q     So, again, that's 135,000 for
12   Inactive A and 265,000 for Active football
13   benefits?
14        A     Yes, sir.
15        Q     Same question for 2018.
16        A     Same response; 135 for Inactive A,
17   and 265 for Active football.
18        Q     How about 2017?
19        A     Same response, sir.
20        Q     How about 2016?
21        A     I believe it was 120 -- 120,000 for
22   Inactive A.  And I don't recall the exact amount

Page 318

Page 320

1    for Active football, I believe it was 250,000, sir,
2    but I may be off.
3         Q     How about 2015?
4         A     It would have been the same as 2016.
5         Q     So that's 120 for Inactive A and
6    250,000 for Active football benefit?
7         A     Yes.
8         Q     What about 2014?
9         A     Same amount, sir.
10        Q     And just so the record's clear, the
11   amount would be 120,000 for Inactive A and 250,000
12   for Active football benefits, correct?
13        A     Yes, sir.
14        Q     What about 2013?
15        A     I believe it's the same.  But I'm
16   starting to get into territory that I don't have
17   the numbers in front of me, if there were any
18   changes in 2011 CBA that changed the amounts and
19   there was schedule for those amounts.
20        Q     Okay.  So once we get below 2014,
21   you're not certain what the difference between
22   Inactive A and Active football benefits are.  Is

Page 321

12        Q     Do you know what the difference
13   between Inactive A and Active football benefits are
14   from 2021?
15        A     Yes, sir.
16        Q     What's that amount?
17        A     Inactive A is 135,000 a year,
18   Inactive football is 265,000 a year.
19        Q     What was the difference in the two
20   amounts in 2020?
21        A     I believe they were the same amount,
22   sir.

Page 319

81 (Pages 318 - 321)

1  that correct?
2      A    Right.  I believe between 2011 and --
3  between '11 and '15, it was the 120,000 and
4  250,000, and then 2016 had the increase.  Prior to
5  2011, was a different CBA, and I don't recall those
6  amounts, sir.
7      Q    So let me just make sure I have down
8  what I think you're saying.  So from 2011 to 2016,
9  Inactive A benefit is 120,000 and Active football
10  benefits was 250,000, correct?
11      A    I believe that is correct.
12      Q    From 2017 to present, Inactive A
13  benefits is 135,000, and Active football benefits
14  is 265,000, correct?
15      A    For the 2011 -- I believe it was
16  between 2011 and 2015.  In the 2016 year, is the
17  change over increase.  So 2016 to present is the
18  135, 265 amounts.
19      Q    Okay.  So let me go through it again.
20  So from 2011 to 2015 --
21      A    Yes.
22      Q    -- the Inactive A benefit is 120,000

1  and the Active football is 250,000, correct?
2      A    I believe so.
3      Q    So 2016 to present, the Inactive A
4  benefit was 135,000, and the football Active
5  football benefit was 265,000, correct?
6      A    Yes, sir.
7      Q    So if my math serves me correctly,
8  the difference between the two from 2011 to 2021,
9  is $130,000, correct?
10      A    Yes, sir.

Veritext Legal Solutions
800-336-4000

11      Q    Okay.  So what I just heard you say,
12   you didn't come up with the definition of changed
13   circumstances, correct?
14      A    That's correct, sir.
15      Q    You said the parties did, correct?
16      A    Yes, they interpret the Plan rules.
17      Q    Who from the parties sat down and
18   came up with the definition of changed
19   circumstances?
20      A    I'm not sure, sir.

Page 336

7    BY MR. DENNIE:
8       Q    My question was not what you
9   interpret the Plan to be saying.  My question is:
10   Is changed circumstance, as referenced in 5.7(b),
11   defined anywhere in The Plan?
12      A    I do not see that in The Plan,

Page 335

Page 334

Page 337

85 (Pages 334 - 337)

22

5     Q    Would you agree that it's important
6    that the committee and board provide the same
7    definition of clear and convincing in all cases?
8     A    Yes, it needs to be clear and
9    convincing.
10     Q    Would you agree that it's important
11    that the committee and the board provide the same
12    definition of changed circumstance in all cases?
13     A    Between the committee and the board,
14    they should agree.
15     Q    So is that yes?
16     A    Yes, sir.

Veritext Legal Solutions
800-336-4000

Page 342

Page 344

Page 343

1

9    BY MR. DENNIE:
10        Q    So back to my question.  Is there
11   anyone other than the Groom Law Firm who can answer
12   that question?
13        MR. MEEHAN:  Objection to the form.
14        THE WITNESS:  No, sir.  I don't know
15   who you can ask.

Page 345

87 (Pages 342 - 345)

20      Q    Is there any location that you can

21   direct me to where there are written

22   interpretations of how the language in The Plan

Page 350

1   documents have been applied?

2       A    No, sir, I don't have anywhere to

3   point you to.

Page 351

Page 352

Page 353

89 (Pages 350 - 353)

Page 366

Page 368

1

Page 367

13 BY MR. DENNIE:
14  Q You're not aware of that circumstance
15 because the letters are never submitted to the
16 committee prior to being sent to the player,
17 correct?
18  A Correct, sir.

Page 369

14        Q    And you testified earlier, and
15    correct me if I'm wrong, but a new concussion
16    symptom is a change in circumstance, correct?
17            MR. MEEHAN:  Objection.  Misstates
18    testimony.
19            THE WITNESS:  It could be a change of
20    circumstances.  It could.

Page 370

Page 372

1

Page 371

Page 373

94 (Pages 370 - 373)

17     BY MR. DENNIE:

18         Q    Well, I guess what I'm trying to

19     understand, from the Plan perspective, you want the

20     board and the committee to interpret those terms

21     changed circumstance to mean the same thing, right?

22         A    Yes, that's what we would like.

.

20         Q    Sure.

21              Was the March 2nd, 2016 denial of

22     reclassification provided to the committee prior to

1      it being sent out?

2          A    I do not believe so, no.

3          Q    That's just not the policy of the

4      Plan to give the people that decided the case the

5      opportunity to read the written decision before

6      it's sent to the player.  Is that correct?

7          A    Yes.

8          Q    Flip over to Exhibit 6 for me.

9          A    November 23rd, 2016 letter.

10         Q    Is this the decision made by the

11     board on Mr. Cloud's reclassification request?

12         A    Yes, sir.

13         Q    Do you know who wrote this letter?

14         A    I would say I believe this is drafted

15     by Groom Law Group when it came to our Plan office.

22         Q    Was Exhibit 6 submitted to the board

1    for review prior to being sent to Mr. Cloud?

2         A    No, sir, I do not believe that was

3    the case.

.

1

1    BY MR. DENNIE:

2         Q    My question was not about the Groom

3    Law Firm being present at that meeting.

4              My question to you was, whether you

5    were aware of any notes being provided to the Groom

6    Law Firm by the board members to help draft this

7    letter that's marked Exhibit 16?

8         A    No, I'm not aware of any notes

9    provided to the Groom Law Group.

10        Q    Are you aware of any conversations

11   that the board members had with the Groom Law Firm

12   to help them draft this letter that's marked as

13   Exhibit 6?

14             MR. MEEHAN:  Objection.  Asked and

15   answered.

16             THE WITNESS:  No, sir, I'm not.

17   BY MR. DENNIE:

18        Q    Have you reviewed this letter

19   thoroughly?

20        A    I looked at it for this deposition,

21   sir.

22        Q    So obviously I haven't deposed the

1    180-day stops when the committee receives -- let me
2    ask it again.
3            12.6(a) does not say that it has to
4    be received by the Plan office on day 180, correct?
5            MR. MEEHAN:  Objection.  Calls for a
6    legal conclusion.
7            THE WITNESS:  I would say the
8    claimant has 180 days from the time they receive
9    their decision to file an appeal.
10   BY MR. DENNIE:

Page 386

---

1

21       Q    Wouldn't it start from the day
22   following --

Page 388

---

Page 387

---

1        A    No, sir.
2        Q    -- like every other computation of
3    dates that's used in the world?
4            MR. MEEHAN:  Objection.  No
5    foundation.
6            THE WITNESS:  From the day of
7    receipt.  As written in the Plan language,
8    "Claimant will have 180 days from the receipt of an
9    adverse determination."
10   BY MR. DENNIE:

Page 389

98 (Pages 386 - 389)

1

Page 390

1

11    BY MR. DENNIE:
12         Q    Okay.  I just want to be clear.  I'm
13    not -- I understand you're saying this is what the
14    document is.  But I'm saying, do you have a
15    document showing Mr. Cloud's signature stating he
16    received that record on March 4th?
17         A    I do not have that, sir.  I don't
18    have a picture of his signature, sir.
19         Q    Is that a document that you could
20    obtain?
21         A    Honestly, I don't believe so, sir.
22    FedEx does not keep records that long.  I don't

Page 392

1    know how to retrieve a record that old.

Page 391

Page 393

12     Q    Okay.  Can you tell me why Elise

13  Richard of the Plan is communicating with members

14  of the Groom Firm about Mr. Cloud's application in

15  2016?

16     A    This would be part of his appeal, as

17  I understand it.  Groom Law Group was creating

18  appeal summaries, and in this moment when

19  Mr. Cloud -- I'm sorry, Mr. Cloud acknowledged

20  sending in documents with his appeal, those

21  documents seemed to be missing.  So I understand

22  that Elise and Natallia went back to Mr. Cloud

Page 402

Page 404

1

1  asking, "Are there documents you wish to submit

2  with your appeal?"

3

Page 403

Page 405

102 (Pages 402 - 405)

# APPENDIX 2

```
 1            IN THE UNITED STATES DISTRICT COURT
 2    FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION
 3    --------------------------
      MICHAEL CLOUD,                :
 4                                  :
           Plaintiff,              :
 5                                  :   Civil Action No.:
      vs.                           :
 6                                  :   3:20-CV-01277-E
      THE BERT BELL/PETE ROZELLE :
 7    NFL PLAYER RETIREMENT PLAN,:
                                    :
 8         Defendant.               :
      --------------------------
 9
10              DEPOSITION OF CHRISTOPHINE SMITH
11    DATE:          August 5, 2021
12    TIME:          8:01 a.m. to 4:55 p.m.
13    LOCATION:      Groom Law Group
                     1701 Pennsylvania Avenue
14                   Suite 1200
                     Washington, D.C. 20006
15
16    REPORTED BY:  Felicia A. Newland, CSR
17
18
19
20
                     Veritext Legal Solutions
21            1250 Eye Street, N.W., Suite 350
                     Washington, D.C. 20005
22
                                              Page 1
```

1   the role of the commissioner on the board?

2        A    The commissioner acts as the chairman

3   of the retirement board.

4        Q    Does he have a vote?

5        A    No.

Page 22

.

Page 24

Page 23

Page 25

Veritext Legal Solutions
800-336-4000

.

11    Q    What time period did you serve on the
12 committee?
13    A    I have served on the committee since
14 its inception, which I believe was in 2006.  And I
15 still serve on the committee.
16    Q    So you served on the committee from
17 2006 to the present.  Is that correct?
18    A    Correct.
19    Q    Do you know on a statistical basis
20 how many disability claims have been granted versus
21 denied?
22    A    I do not.

Page 26

.

15    Q    Okay.  So if I was trying to
16 determine when benefits were provided and that case
17 granted or denied, where would I find that
18 information?
19    A    You'd probably find that from the
20 Plan Benefit Office.
21    Q    Okay.  Yesterday there was some
22 testimony about quarterly reports prepared by the

Page 28

? 

Page 27

1 claim benefits office?
2    A    Yes, for the retirement board meeting
3 purposes.
4    Q    Have you seen those records?
5    A    Yes.
6    Q    In your experience, are they prepared
7 every quarter?
8    A    Yes.
9    Q    So that's something that the Plan can
10 get its hands on pretty easy I would think,
11 correct?
12    A    I would think so.

17         How do you receive documentation for
18 board meetings?
19    A    They are included in the counsel
20 report.
21    Q    Okay.  Tell me what a counsel report
22 is.

Page 29

8 (Pages 26 - 29)

Veritext Legal Solutions
800-336-4000

1    A    The counsel report is the information
2  that Groom Law Group compiles for the retirement
3  board meeting.
4    Q    So the quarterly report, is that an
5  attachment to the counsel report?
6    A    It is in the counsel report -- a part
7  of the counsel report.
8    Q    And I just want to be clear on how it
9  gets there.  So you're familiar with the Plan or
10 the retirement board -- let me do that another way.
11       So you're familiar with the
12 retirement board -- let me do that again.  Today, I
13 can't talk.  It's something about the air.
14       You're familiar that the retirement
15 board compiles statistical information on whether
16 claims are granted or denied, correct?
17   A    The Claim Benefit Office compiles
18 that information.
19   Q    What did I say?  I said the
20 retirement board?
21   A    Yeah, you did.
22   Q    Okay.  I'm sorry.

1        The Plan Benefit Office compiles
2  granted versus denied disability applications,
3  correct?
4    A    Yes.
5    Q    And that's a document that we should
6  be able to get our hands on pretty easily, correct?
7    A    I would think so.
8    Q    As it relates to funding of the Plan,
9  are there documentation, records, that you have
10 seen that indicates how much funding goes out on a
11 quarterly basis?
12   A    I believe that is in the counsel
13 report as well.
14   Q    So that's also information that's
15 compiled by the retirement -- excuse me.  Let me
16 ask it again.
17       That's also information that's
18 retirement -- that's also information that's
19 compiled by the Benefits Office, correct?
20   A    Yes.

8        Are you saying the information that
9  we just talked about, the granting or denial of
10 benefits claims, the funding of claims, that's not
11 in the counsel report, but it's in a director's
12 report?
13       Is that what you're saying?
14   A    Correct.

18   Q    Okay.  When you say director's
19 report, what director are you referencing?
20   A    The Plan director.

9 (Pages 30 - 33)

1  focused on the deposition today.  I'll respond to
2  you as soon as possible.
3      MR. DENNIE:  Let's go off the record
4  for a second.

7  BY MR. DENNIE:
8      Q   So I want to be clear, I can't ask
9  you too many questions about documents I've never
10  seen, but you and the witness yesterday both
11  confirmed that there are records that discuss the
12  funding of the Plan and whether benefits were
13  granted or denied.  And you said they're in a
14  director's report, correct?
15      A   To the best of my knowledge, yes.
16      Q   Are you aware of what the contents of
17  those director's reports say?
18          Let's start with the last quarterly
19  report that you indicated probably would be in
20  February of this year?
21      A   No, I don't remember.
22      Q   Do you remember the contents of the

Page 36

12      MR. DENNIE:  So I'm going to again
13  request that those reports be provided.  I
14  requested it yesterday.  There are multiple
15  requests for production that have asked for records
16  similar to that, and I believe that was 37, 57, 58,
17  there's probably more.  When are we going to get
18  those documents?  We requested those probably nine
19  months ago.
20      MR. MEEHAN:  If you're directing that
21  to me, you know, send me a request.
22      MR. DENNIE:  We did nine months ago.

Page 34

1      MR. MEEHAN:  Well, send me a request
2  now telling me what you want and why you think
3  you're entitled to it.  And like I said yesterday,
4  we'll take it under advisement and we'll get right
5  back to you.  I want to make sure I know exactly
6  what you want, so if you can put it in writing so
7  there's no confusion.
8      MR. DENNIE:  Well, just to be clear,
9  we're already on the record.  So we're asking for
10  the director's report, the quarterly reports that
11  have been testified to by both of the witnesses
12  that have been withheld that were requested in our
13  first request for production many, many months ago.
14  And discovery is running out and now I'm deposing
15  witnesses and I don't have these report documents.
16  When can I get those?
17          I know you're new to the case, you
18  probably didn't handle that, but your colleague
19  has been in the whole time, so I need to know
20  when we can have them.  Can we have them today?
21      MR. MEEHAN:  I need you to send me a
22  written request on exactly what you want.  I'm

Page 35

1  director's report for any quarter prior to the last
2  report that you reviewed?
3      A   I don't remember.
4      Q   The only way that I'm going to be
5  able to determine what's in those records is by
6  getting the records, because neither you or
7  Mr. Reynolds recalled the contents of the report,
8  other than you know that there's discussion of
9  funding, and there's a discussion of granting and
10  denial of benefits.  Is that right?
11      A   Correct.

Page 37

10 (Pages 34 - 37)

.

8      Q      Who are the beneficiaries under the
9   Plan?
10     A      Who are the beneficiaries under the
11  Plan?
12     Q      Yes, ma'am.
13     A      The players.
14     Q      What was the Plan created to do?
15     A      The Plan was created to provide
16  retirement and disability benefits for the players.

.

7      Q      Are you aware of any steps that the
8   Plan administrator has taken to reduce bias?
9      A      I'm not aware.
10     Q      Are you aware of any steps that the
11  Plan administrator has taken to promote the
12  accuracy of the decisions?
13     A      I'm not aware of any.

1

12  communications about the interpretation of the Plan

13  guidelines with Bethany Marshall and Miki

14  Yaras-Davis oral conversations?

15      A    As I recall, yes.

16      Q    Did they orally ever give you their

17  analysis to certain provisions of the Plan?

18      A    Yes.

19      Q    Okay.  Do you recall what their

20  analysis was?

21      A    No.

1

3       Q    Who on the committee represents the

4  interest of retired NFL players?

5       A    I do.

6       Q    So your duty is to represent the

7  interest of the retired NFL players on the

8  committee, correct?

9       A    Correct.

1

3         So if we go down about halfway down
4   the page, there it says, "NFLPA designated members:
5   Sam McCullum, Jeff Van Note, Robert Smith."
6         Did I read that correctly?
7      A   Correct.
8      Q   So when we were talking a minute ago
9   about the members of the board that owe a duty to
10  the retired players, are those these three
11  individuals?
12     A   Correct.

Page 70

1

Page 72

1

?
Page 71

1

Page 73

19 (Pages 70 - 73)

Page 78

Page 80

Page 79

.

| | | |
|---|---|---|
| 4 | Q | You do not have a law license? |
| 5 | A | No. |
| 6 | Q | You don't have a medical license? |
| 7 | A | No. |
| 8 | | |

Page 81

21 (Pages 78 - 81)

8      Q    Right before we broke to get you a
9  glass of water, you were indicating that if a
10  player called you about their disability benefits
11  application and indicated they had not received
12  their records, you would direct them to the Plan,
13  correct?
14      A    Uh-huh.
15      Q    The Plan being you would direct them
16  back to the benefits office?
17      A    Correct.
18      Q    Is that the kind of standard approach
19  the Players Association, if a player calls and
20  says, "I'm not receiving my records," go to the
21  retirement office to get those?
22      A    Correct.

Page 102

Page 104

Page 103

Page 105

.

9       Q    Have you received any legal training
10   to help you decide and analyze disability claims?
11       A    Now, when you say "legal training,"
12   what do you mean by that?
13       Q    Training about laws and cases.
14       A    You said training about laws or
15   cases?
16       Q    And cases.
17       A    And cases.
18            Not that I recall.

Page 114

Page 116

Page 115

.

Page 117

8      Q    Do you understand when symptoms can
9   occur from head injuries that resulted from playing
10  in the NFL?
11     A    Yes.
12     Q    What do you understand?
13     A    I understand that they can occur
14  right away or they can take a number of years --
15  months or years to manifest, surface.
16

Page 122

Page 124

18     Q    Do you have any reason to dispute
19  that Mr. Cloud has incurred and received head
20  injuries while playing in the NFL?
21     A    No, I don't have any reason to
22  dispute that.

Page 123

Page 125

32 (Pages 122 - 125)

1       Q    Do you have any reason to dispute
2   that Mr. Cloud has had symptoms associated with
3   concussion syndrome while playing in the NFL?
4       A    I don't have any reason to dispute
5   that.
6       Q    You would agree that concussion
7   symptoms can worsen over time?
8       A    Yes, I know that they can worsen over
9   time.

Page 126

.
Page 128

Page 127

Page 129

Veritext Legal Solutions
800-336-4000

?

Page 142

Page 143

Page 144

.

14        Have you read any studies on
15   orthopedic injuries sustained by players who have
16   formerly played in the NFL?
17        A    Not that I recall.
18        Q    Have you read any white papers on
19   orthopedic injuries commonly sustained by NFL
20   players?
21        A    Not that I recall.
22        Q    Have you done any personal research

Page 145

37 (Pages 142 - 145)

1  on orthopedic injuries that are commonly incurred
2  on players who formerly played in the NFL?
3        A    Not that I recall.

.

Page 146

Page 148

Page 147

Page 149

Veritext Legal Solutions
800-336-4000

5      Q    And if you flip to CLOUD-MIN-004, it
6  indicates it's a denial of reclassification request
7  from Mr. Cloud, correct?
8      A    Correct.

Page 158

Page 159

10      Q    Is there a repository of
11  interpretations that are provided to the Plan
12  document?
13      A    A repository of interpretations?
14      Q    Correct.
15      A    You said of the Plan document?
16      Q    Correct.
17      A    Not to my knowledge.

Page 160

Page 161

Veritext Legal Solutions
800-336-4000

12        Are you aware anywhere that someone
13   can go and see what interpretations of the Plan
14   have been applied in years past?
15        A    No, I am not.

Page 162

Page 164

14        Q    Okay.  So in your 15 years on the
15   committee, you have asked for between 10 and 50
16   interpretation requests of Article 5, Deposition
17   Exhibit 1, correct?
18        A    That's correct in that's what I said.

Page 163

Page 165

42 (Pages 162 - 165)

Page 170

1      Q    So is it fair to say you were not

2   present in person or by phone on the November 15th,

3   16th, 2016 meeting?

4      A    That is correct.

Page 171

Page 172

15        You indicated that the board decided

16   Mr. Cloud's appeal, his request for

17   reclassification, correct?

18      A    Correct.

19      Q    The members on the board who made

20   that decision were Katie Blackburn, Dick Cass, Ted

21   Philips, Sam McCullum, Jeff Van Note, and Robert

22   Smith, correct?

Page 173

44 (Pages 170 - 173)

1      A    Correct.

2      Q    If I wanted to know how the board

3   members arrived at their decision to deny

4   Mr. Cloud's appeal, I would need to talk to them

5   individually, correct?

6            MR. MEEHAN:  Objection.  Calls for a

7   legal conclusion.

8            But go ahead and give your answer,

9   ma'am.

10           THE WITNESS:  Yes.

.

Page 174

---

1

.

20           So on the NFLPA side, the

21   representatives, you indicated that Bethany

22   Marshall, Miki Yaras-Davis, and the Groom Law Firm

Page 176

---

.

?

Page 175

---

1   was there representing the Players Association.  Is

2   that correct?

3      A    Correct.

4      Q    And for the Groom Law Firm you

5   indicated that Alvaro Anillo, Doug Ell, Mike Junk,

6   Mike Maricco were there from the Groom Law Firm,

7   correct?

8      A    Maricco.  Correct.

9      Q    Mike Maricco?

10     A    Maricco, yeah.

11     Q    Do the individuals who you listed

12   from the Groom Law Firm also advise the committee?

13     A    Alvaro Anillo would be our adviser

14   for the most part.

Page 177

---

45 (Pages 174 - 177)

.

5      Q     Yesterday you heard Patrick Reynolds
6   confirm that there is a repository of information
7   for medical records for NFL players, correct?
8      A    Correct.
9

Page 186

Page 188

Page 187

Page 189

48 (Pages 186 - 189)

5       As it pertains to Mr. Cloud's 2016
6   reclassification benefits, did you write the
7   decision letter in that case?
8       A   I did not.
9       Q   As it pertains to Mr. Cloud's 2016
10  reclassification for benefits application, did you
11  review a decision letter before it was sent out?
12      A   Not that I recall.
13      Q   As it pertains to Mr. Cloud's 2016
14  reclassification for disability benefits
15  application, did you review the decision letter and
16  make any changes to it before it was sent out?
17      A   Not that I recall.

?

Page 200

---

3       Q   Have you ever written a decision
4   letter?
5       A   No.
6       Q   Do you review the decision letter
7   before it goes out?
8       A   No.
9       Q   Have you ever made any changes to a
10  decision letter before it goes out?
11      A   Not that I recall.

20      Q   Did you write the letter on
21  Mr. Cloud's 2014 T&P benefits application?
22      A   I did not.

Page 199

Page 201

Page 198

51 (Pages 198 - 201)

Page 202

.

Page 204

Page 203

7     Q    As of 7/17/14, were you aware of
8  Mr. Cloud receiving a concussion anywhere other
9  than playing in the NFL?
10     A    Not that I recall.
11     Q    As we sit here today, are you aware
12  of Mr. Cloud receiving a concussion anywhere other
13  than playing in the NFL?
14     A    Not that I recall.
15     Q    Okay.  Were you creating a
16  distinction between the two because you asked me
17  "was I, am I," so is there something that I'm
18  missing?
19     A    No, I just wanted to make sure.  I
20  didn't know if you were talking about while I was
21  receiving his application or now, so that's why I
22  wanted to know so...

Page 205

1      Q   But you're not aware of any
2   circumstance where Mr. Cloud has had another
3   concussion outside of playing in the NFL, isn't
4   that correct?
5      A   Correct.

16      Q   Let's flip over to Exhibit 15,
17   DICC-003.
18      A   I'm good.
19      Q   I'm not asking you to read this word
20   for word because this one's a little bit longer,
21   but some of these notes I'm not able to read super
22   clearly, so I want to make sure I don't misread

1

1   them for you.  Can you just go through like you did
2   with the notes from 2014 and read your notes from
3   February 22nd, 2016?
4      A   Okay.  "Mike A. Cloud, he already had
5   Inactive A.  Again, he had credited seasons '99
6   through '05.  He was a reclassification request for
7   Active Football.  He was approved on his initial
8   Social Security -- initial T&P application by
9   virtue of his Social Security award.
10   Helmet-to-helmet collision on 10/31/04 while
11   playing with the Minnesota Vikings.  Migraines,

1

3      Q   And you would agree the only
4   employment that Mr. Cloud has ever referenced was a
5   month of part-time employment at Equinox.  Is that
6   correct?
7      A   Based on that application, correct.
8      Q   Do you know why he left Equinox?
9      A   If memory serves me correct, from my
10   recent viewing of the application, it was
11   because -- I can't remember.  I do remember seeing
12   something, but I can't remember exactly what it
13   was.
14      Q   Would it surprise you that that was
15   concussion-related symptoms?
16      A   What, the reason why he left?
17      Q   Yes, ma'am.
18      A   Would it surprise me?
19      Q   Correct.

53 (Pages 206 - 209)

3     Q    Do you know why Mr. Cloud's contract
4  was terminated with the Giants in 2005?
5     A    I don't.
6     Q    Do you know that Mr. Cloud couldn't
7  remember basic running back plays that he had been
8  running his entire life?
9     A    Okay.
10    Q    Did you know that?
11    A    I do remember seeing that in review
12  of the file.

k

Page 210

Page 212

17    Q    And, again, in this you note,
18  symptoms such as migraines, clinical depression,
19  memory loss, post-concussion syndrome, and vertigo.
20  Is that correct?
21    A    Correct.

Page 211

Page 213

19  BY MR. DENNIE:

20      Q    Is there any reason that you can

21  think of that the Plan through the retirement

22  office would not provide medical records and scans

Page 222

Page 224

1

1  that were requested by Michael Cloud?

2      A    There was no reason not to be

3  provided.

4      Q    You would agree that it's important

5  for a player to have all their medical records and

6  scans from a Plan neutral, correct?

7      A    If he so desires, yes.  If it is

8  important to him, I agree.

9      Q    Because a player can take those

10  medical records and scans to their own doctor for

11  an analysis, right?

12      A    This is true.

13      Q    And if they don't have the documents,

14  they can't go take them to a doctor of their

15  choice, correct?

16      A    I mean, you can't take what you don't

17  have.

18      Q    So you would agree with me, correct?

19      A    I would agree that if they don't have

20  it, they can't take it.

21      Q    Do you know Dr. Mandelbaum is?

22      A    I know the name.

Page 223

Page 225

57 (Pages 222 - 225)

2  a former Plan physician?

3      A    I do.

4      Q    If Mr. Cloud requested all of his

5  medical records and scans, and some of them were

6  done by Dr. Mandelbaum, is there any reason that

7  the Plan wouldn't provide them to him?

8      A    Not to my knowledge.

.

6      Q    And if someone owes a duty to the

7  players, as you testified earlier, you would agree

8  that for the best opportunity to be successful in a

9  disability application, is going to be provide the

10  most full and extensive medical history that they

11  can provide, correct?

12      A    Correct.

.

:

4      Q    And if they weren't, Michael Cloud

5  cannot use it in a disability benefits application

6  any records he doesn't have, correct?

7      A    Correct, he can't use anything he

8  doesn't have.

17          My question is simply:  What

18  complaints or riches have you heard?

19      A    So, again, if a player is denied his

20  application, oftentimes, we get complaints about

21  that, about the fact that he was denied the

22  process, maybe the doctor, it could be any number

1  of things.

2     Q     And you gave me three.  Correct me if

3  I'm wrong, the three that you recall being

4  complaints that you heard from players:  One,

5  complaints that they were denied benefits; two,

6  complaints about neutral plan physicians; and,

7  three, complaints about disability benefits

8  process.  Is that correct?

9     A     Correct.

10    Q     Are there any others that you recall?

11    A     No.

12    Q     What complaints do you recall about

13  the disability benefits process that you heard?

14    A     It takes too long, having to travel

15  to see the doctor, too many appointments.

16    Q     Anything else?

17    A     That's it.

18    Q     Have you ever heard complaints from

19  players that they have been denied access to their

20  medical records?

21    A     Not that I can recall.

22    Q     So the complaints about the process

1     A     Just what you said, that they

2  don't -- sometimes they don't think that the

3  doctors are neutral.

1  that you mentioned, it takes too long, players have

2  to travel to see a Plan neutral doctor, and there

3  are too many doctor appointments.  Is that correct?

4     A     Correct.

5     Q     Do you recall any others?

6     A     I don't.

7     Q     What complaints have you heard about

8  the neutral plan physicians?

9     A     Didn't spend enough time, too brash,

10  maybe didn't ask enough questions or the questions

11  that the player thought he should ask.

12    Q     What else?

13    A     That's it, that I can think of.

14    Q     Complaints about the doctor, the

15  doctor didn't spend enough time with them, they're

16  too brash, they didn't ask enough questions.  Is

17  that correct?

18    A     That's correct.

19    Q     And have you ever heard players argue

20  that the Plan doctors are not truly neutral?

21    A     Yes.

22    Q     What have you heard about that?

22      Q    So the actual application they submit

1   has been changed?
2       A    Correct.

Veritext Legal Solutions
800-336-4000

.

2      Q    So you don't know who filed them or
3  the subject matter of any of the complaints that
4  you have read that are attached to this counsel
5  report.  Is that correct?
6      A    That's correct.
7      Q    If I understood correctly from
8  yesterday, counsel report is prepared and
9  distributed quarterly, right?
10     A    Correct.
11     Q    So next week you're probably going to
12 get another counsel report, right?
13     A    That is correct.
14     Q    And the last one you received was
15 sometime in February?
16     A    That is correct.
17     Q    Do you remember what was on the
18 February report or attached thereto?
19     A    I do not.

.

22

20     Q    You've already said a couple of times
21 you believe you owe a duty to the players, correct?
22     A    Correct.

62 (Pages 242 - 245)

Veritext Legal Solutions
800-336-4000

1    Q    So you know from your experience
2  working for the Players Association how damaging it
3  is to them when their benefits are denied when they
4  have concussion syndrome, correct?
5         MR. MEEHAN:  Object to the form.
6         You can go ahead.
7  BY MR. DENNIE:
8    Q    You can answer.
9    A    I know what they tell me.
10   Q    And they told you it's really
11 damaging to them, correct?
12   A    I may have been told that a time or
13 two.

16 it.  Okay?
17        You know that a denial of these
18 benefits are damaging to these players, don't you?
19        MR. MEEHAN:  Objection to the form.
20        But, ma'am, make sure he answers

1  to them that their claims were denied when they
2  have serious medical conditions?
3    A    I can't put a specific number, but
4  quite a few.
5    Q    More than a hundred?
6    A    I don't know about more than a
7  hundred.
8    Q    Put an estimate on it.  What do you
9  think?
10   A    I've been there for many years.
11 Fifty maybe.  I don't know.

21   Q    How many times would you say players
22 have come to you and told you how damaging it was

9        THE WITNESS:  It's going to be one or
10   the other.  Social Security awards are the general
11   standard.  And in his case, because he had a Social
12   Security award, it fell under 5.2(b).
13   BY MR. DENNIE:
14        Q    I understand, but I just want to be
15   clear and understanding what you just testified to.
16             Had he not had his Social Security
17   award, based on your experience on the committee
18   for 15 years, and in your review of thousands of
19   applications, you believe he meets the criteria of
20   Section 5.2 also?
21        A    Correct.

5    reclassification application compiles with Section
6    5.1 of Exhibit 1?
7        A    Yes.
8        Q    When Mr. Cloud was granted T&P
9    benefits in 2014, which criteria under 5.2 of
10   Exhibit 1 did he meet?
11       A    5.2(b).

4        Does October 31st, 2004, occur during

5   his playing career?

6        A    Correct.  Yes.

7        Q    We talked earlier, and I believe you

8   agreed, that you were aware and recall Mr. Cloud

9   was having trouble remembering basic football plays

10  after that collision.  Do you recall that?

11       A    I recall.

.

14       Q    You're welcome to read it if you want

15  to, but generally explain to me what your

16  understanding of the "shortly after" definition as

17  shown in 5.3(e) of Exhibit 1 is.

18       A    A player becomes disabled no later

19  than six months after his disability arises -- no

20  earlier, rather, but no later than 12 months

21  afterwards.

.

21       I want you to correct me if I'm

22  wrong, but earlier you testified and agreed that

1   concussion syndrome symptoms can advance over time?

2        A    I did, yes.

3        Q    And you're aware of that because you

4   worked with the Players Association and you even

5   read a few studies or articles, as I recall.  Is

6   that correct?

7        A    Correct.

14       Your notes make reference to

15  Dr. Cronin indicating that the helmet-to-helmet

16  collision on October 31st, 2004, was the event that

17  caused his concussion-related syndrome.  Is that

18  right?

19       A    Yeah, that's correct.

Page 262

.

Page 264

Page 263

.

10  BY MR. DENNIE:
11      Q    If you will flip over to Section
12  5.7(b) of Exhibit 1.
13      A    You said (b)?
14      Q    5.7(b), yes, ma'am.
15      A    I'm there.
16      Q    What do you understand that Section
17  to pertain to?
18      A    Reclassification of T&P benefits.

Page 265

67 (Pages 262 - 265)

.

4      Q    Is changed circumstances defined in
5    the Plan?
6      A    No.
7

21     Q    So do you want to change your answer
22   on who came up with the definition of changed

1

.

5      Q    In your approximately 15 years on the
6    committee, how many reclassification decisions have
7    you been a part of?
8      A    Maybe between 10 and 15.
9      Q    And in the 10 or 15 reclassification
10   decisions that you have been a part of, have you
11   had to determine what changed circumstances means
12   in all 10 or 15 of those cases?
13     A    Yes.
14     Q    What do you think it means?
15     A    It means a new or different injury or
16   illness or impairment.

.

1    circumstances?
2      A    Yes, as a matter of fact I do.  I
3    don't know who came up with the definition.
4

.

Veritext Legal Solutions
800-336-4000

7        THE WITNESS:  I agree that a new
8   impairment can include a concussion symptom, yeah.

Page 270

Page 272

9   earlier you testified that as it pertains to
10   Mr. Cloud's 2016 reclassification decision letter,
11   you didn't read it before it went out, correct?
12        A    That is correct.

:

16        Q    So you certainly didn't tell anyone,
17   "This is what the definition of changed
18   circumstance that I want to include in this
19   decision letter," correct?
20        A    Correct.

Page 271

14        Q    Have you ever asked anyone to define
15   for you what changed circumstances means?
16        A    Not that I recall.

Page 273

69 (Pages 270 - 273)

1 that there be a logical definition of clear and
2 convincing that you would apply to every case?
3      A   Yes, it would be helpful.
4      Q   Because you want uniform consistency
5 on the way that disability benefits applications
6 are being decided, correct?
7      A   It would definitely be helpful.

.

14     Q   You would agree it's important for
15 players to understand that there's uniformity in
16 the way things are being applied across the board
17 in disabled cases, correct?
18     A   I would agree with that, yeah.

22     Q   Is clear and convincing defined

1 anywhere in the Plan?
2      A   No.
3      Q   Has anyone told you what clear and
4 convincing means?
5      A   Not that I recall.

9      Q   Have you come up with your own
10 definition of what clear and convincing means?
11     A   I'm not sure.

21     Q   Don't you think it's important if
22 you're trying to apply a set of facts to the Plan,

?

Page 282

Page 284

1

.
10          Are you disputing that Mr. Cloud is
11   disabled under the terms of Plan?
12       A   I am not.

12          Correct me if I'm wrong, but you
13   testified earlier that a new concussion symptom can
14   qualify as a new impairment, meaning it's a changed
15   circumstance in the terms of the Plan, correct?
16       A   Yes.

.
Page 283

Page 285

72 (Pages 282 - 285)

14        Q    Correct me if I'm wrong, you said
15   that the concussion symptoms that you know of are
16   headaches, dizziness, sleepiness, and vertigo.  Is
17   that correct?
18        A    Correct.

Page 294

Page 296

6        Q    Are there any additional concussion
7   symptoms that you know of?
8        A    Maybe forgetfulness.
9        Q    Anything else?
10        A    Anger.

20        Q    So, for example, forgetfulness, you
21   might forget small things now, but five years from
22   now you may not remember virtually anything.  Is

Page 295

Page 297

1    that a progression of concussion symptoms that
2    you've seen in other disability cases that you've
3    administered on the committee?
4        A    Yes.

20        Based on your role on the committee,
21    and your understanding of concussion symptoms,
22    trouble sleeping may be a symptom?

Page 298

1        Q    Is migraines a common concussion
2    symptom?
3        A    Yes.
4        Q    Is dementia a common concussion
5    symptom?
6        A    Yes.
7        Q    Is failure to maintain verbal fluency
8    a common concussion symptom?
9        A    Yes.
10        Q    Is unpredictability a common
11    concussion symptom?
12        A    Yes.
13        Q    Is irritability a common concussion
14    symptom?
15        A    Yes.
16        Q    Is mood swings a common concussion
17    symptom?
18        A    Yes.

                         ?

Page 300

1        A    I believe so.
2        Q    Is sensitivity to light a common
3    concussion symptom that you have seen?
4        A    Yes.
5        Q    Is paranoia a common concussion
6    symptom that you've seen?
7        A    Yes.
8        Q    Is lack of focus or inability to
9    focus a common concussion symptom that you've seen?
10        A    Yes.
11        Q    Is suicidal thoughts a common
12    concussion symptom that you've seen?
13        A    Yes.
14        Q    Is failure to grasp reality a common
15    concussion symptom that you've seen?
16        A    I believe so.
17        Q    Is failure to maintain an appointment
18    a common concussion symptom?
19        A    Yes.
20        Q    Is depression a common concussion
21    symptom?
22        A    Yes.

Page 299

8        Q    Based on the research that you've
9    read on concussions and common media writings, is
10    it fair to say that over a period of time, these
11    concussion symptoms can get much more severe?
12        A    Yes, it is fair to say that they can
13    get worse.

Page 301

76 (Pages 298 - 301)

21      Q    If you look on CLOUD-AR-108, of
22  Exhibit 7, you will see a discussion of neck, lower

1  back foot, lower leg issues.  Do you see that?
2      A    I see it.
3      Q    Ultimately the conclusion in his file
4  was Mr. Cloud suffered from both neurological and
5  orthopedic ailments.  Is that correct?
6      A    Correct.

17      Q    Have you ever seen a PET scan
18  presented to the committee on a player's
19  application?
20      A   I believe I have.
21      Q    What do you understand a PET scan to
22  be?

Page 306

Page 308

1      A    A scan of the brain.
2      Q    And do you understand or know what
3  that PET scan shows?
4      A    Abnormalities of the brain.

10      Q    When you look at a PET scan, what
11  shows the abnormality?
12      A    The coloring maybe, the shading of
13  the scan of the brain.
14      Q    So let me make sure we're on the same
15  page and saying the same things.
16          So if you've got a scan of the brain
17  or a picture of the brain, there's going to be most
18  likely some sort of cylindrical or circular spot
19  that's a different color which shows there's an
20  abnormality, correct?
21      A    I think that's what it is.

Page 307

Page 309

78 (Pages 306 - 309)

?

5      Q    Okay.  Are you aware of any other

6   circumstance where Mr. Cloud sustained orthopedic

7   injuries outside of playing in the NFL?

8      A    I am not aware.

Page 314

Page 316

```
1     A    Yep.  Yes.
2     Q    Okay.  Is Dr. Canizares still a
3  neutral physician?
4     A    Yes.
5     Q    Is he someone you interface with
6  often?
7     A    No.
8     Q    Is there any reason that x-ray films,
9  scans were not provided to Mr. Cloud when he
10 requested them?  Is there any reason for that?
11    A    You said when he requested them?
12    Q    Yes, ma'am.
13    A    I don't know.  I'm not aware of any
14 reason.
15    Q    If you will flip over to 174, so
16 CLOUD-AR-174 of Exhibit 2.
17    A    I'm here, okay.  You said 174?
18    Q    Yes, ma'am.
19    A    Okay.
20    Q    Does this appear to be a copy of
21 Dr. DiDio's report?
22    A    It does.
```

Page 315

Page 317

```
1     Q    Is there any reason that the full
2  copy of Dr. DiDio's report was not provided to
3  Mr. Cloud until 2019?
4     A    I have no idea.
```

```
15    Q    All right.  Either way, if you flip
16 to AR-172 of Exhibit 2, do you see there that there
17 were various x-rays that were performed on
18 Mr. Cloud?
19    A    Yes.
20    Q    And those were by Dr. Canizares?
21    A    Canizares.
22    Q    Canizares?
```

```
18    Q    And down toward the bottom of 174,
19 there's a reference that Mr. Cloud was forgetting
20 small things like people's names.  Is that correct?
21    A    I see it, yes.
22    Q    Are there any other concussion
```

80 (Pages 314 - 317)

1  symptoms reported back in 2010?
2      A   I see headaches, vertigo.  Bed spins.
3      Q   That's part of vertigo?
4      A   Yeah, I see that now.  Yeah.
5      Q   Okay.
6      A   Repetition.
7      Q   I'm sorry?
8      A   Repetition, repeating himself.
9      Q   Repetition and?
10     A   And then I said "repeating himself."
11     Q   So you're saying repeating himself is
12 a concussion symptom?
13     A   I would think so.
14     Q   Okay.
15     A   I would think it can be.
16     Q   Any others that you recall?
17     A   That's it.
18     Q   So the four concussion symptoms that
19 you see from the 2010 request for line of duty
20 benefits; headaches, vertigo, forgetting names, and
21 repeating himself.  Is that correct?
22     A   Correct.

17     Q   There's a listing of post-concussion
18 syndrome, clinical depression, dementia, migraine,
19 vertigo, impair verbal fluency.  And then if you
20 flip to CLOUD-AR-079, it also list migraine
21 headaches, depression, memory loss, vertigo,
22 insomnia, unpredictable irritability.  Do you see

6      Q   Okay.  So if you would look at
7  CLOUD-AR-175, there's again a reference to the
8  October 31, 2004 concussion, correct?
9      A   I see it.
10     Q   And I read it, and tell me if I'm
11 wrong, "There is clear documentation of a single
12 concussion sustained on October 31, 2004, while
13 playing with the New York Giants."
14         Do you see that?
15     A   I do.
16     Q   Okay.  And that's the head-to-head
17 collision that we talked about a couple of times
18 today, correct?
19     A   That's my assumption, yes.

1  that?
2      A   I do.
3      Q   In addition to the neurological
4  issues associated with concussion syndrome, there's
5  also several orthopedic issues presented in the
6  section titled, "Disabilities and Causes."  Is that
7  correct?
8      A   Correct.
9      Q   There are acute compartment syndrome,
10 plantar fasciitis, nerve injury, bilateral
11 shoulders, bilateral elbow, bilateral wrists,
12 hands, fingers, bilateral feet and toes, bilateral
13 ankles, bilateral knees, bilateral hips, lumbar,
14 cervical, thoracic.  And then if you flip over to
15 CLOUD-AR-097, severe pain in right foot, left great
16 foot, left hip, basic neck, lower back, numbness in
17 right left leg, arms and fingers.
18         Did I get all the orthopedic issues?
19     A   You did.
20     Q   And so those were the bases by which
21 Mr. Cloud presented in his T&P application in 2004?
22     A   That's what it appears to be to me.

1

1

Page 322

Page 324

.

7    Q   Did you write Exhibit 4?
8    A   I did not.
9    Q   Do you know who wrote Exhibit 4?
10   A   I do not.
11   Q   Did you review Exhibit 4 before it
12  was disseminated to Mr. Cloud?
13   A   Not that I recall.

Page 323

Page 325

Veritext Legal Solutions
800-336-4000

# APPENDIX 3

```
 1              IN THE UNITED STATES DISTRICT COURT
 2     FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION
 3     --------------------------
       MICHAEL CLOUD,              :
 4                                 :
           Plaintiff,             :
 5                                 :   Civil Action No.:
       vs.                         :
 6                                 :   3:20-CV-01277-E
       THE BERT BELL/PETE ROZELLE :
 7     NFL PLAYER RETIREMENT PLAN,:
                                   :
 8         Defendant.              :
       --------------------------
 9
10             DEPOSITION OF CHRISTOPHINE SMITH
11     DATE:          August 5, 2021
12     TIME:          8:01 a.m. to 4:55 p.m.
13     LOCATION:      Groom Law Group
                      1701 Pennsylvania Avenue
14                    Suite 1200
                      Washington, D.C. 20006
15
16     REPORTED BY:  Felicia A. Newland, CSR
17
18
19
20
                      Veritext Legal Solutions
21            1250 Eye Street, N.W., Suite 350
                      Washington, D.C. 20005
22
                                              Page 1
```

.

Page 22

1  the role of the commissioner on the board?

2        A    The commissioner acts as the chairman

3  of the retirement board.

4        Q    Does he have a vote?

5        A    No.

Page 24

Page 23

Page 25

7 (Pages 22 - 25)

.

11    Q    What time period did you serve on the
12  committee?
13    A    I have served on the committee since
14  its inception, which I believe was in 2006.  And I
15  still serve on the committee.
16    Q    So you served on the committee from
17  2006 to the present.  Is that correct?
18    A    Correct.
19    Q    Do you know on a statistical basis
20  how many disability claims have been granted versus
21  denied?
22    A    I do not.

Page 26

.

15    Q    Okay.  So if I was trying to
16  determine when benefits were provided and that case
17  granted or denied, where would I find that
18  information?
19    A    You'd probably find that from the
20  Plan Benefit Office.
21    Q    Okay.  Yesterday there was some
22  testimony about quarterly reports prepared by the

Page 28

1  claim benefits office?
2    A    Yes, for the retirement board meeting
3  purposes.
4    Q    Have you seen those records?
5    A    Yes.
6    Q    In your experience, are they prepared
7  every quarter?
8    A    Yes.
9    Q    So that's something that the Plan can
10  get its hands on pretty easy I would think,
11  correct?
12    A    I would think so.

17        How do you receive documentation for
18  board meetings?
19    A    They are included in the counsel
20  report.
21    Q    Okay.  Tell me what a counsel report
22  is.

Page 29

?

Page 27

8 (Pages 26 - 29)

1       A    The counsel report is the information
2   that Groom Law Group compiles for the retirement
3   board meeting.
4       Q    So the quarterly report, is that an
5   attachment to the counsel report?
6       A    It is in the counsel report -- a part
7   of the counsel report.
8       Q    And I just want to be clear on how it
9   gets there.  So you're familiar with the Plan or
10  the retirement board -- let me do that another way.
11          So you're familiar with the
12  retirement board -- let me do that again.  Today, I
13  can't talk.  It's something about the air.
14          You're familiar that the retirement
15  board compiles statistical information on whether
16  claims are granted or denied, correct?
17      A    The Claim Benefit Office compiles
18  that information.
19      Q    What did I say?  I said the
20  retirement board?
21      A    Yeah, you did.
22      Q    Okay.  I'm sorry.

1           The Plan Benefit Office compiles
2   granted versus denied disability applications,
3   correct?
4       A    Yes.
5       Q    And that's a document that we should
6   be able to get our hands on pretty easily, correct?
7       A    I would think so.
8       Q    As it relates to funding of the Plan,
9   are there documentation, records, that you have
10  seen that indicates how much funding goes out on a
11  quarterly basis?
12      A    I believe that is in the counsel
13  report as well.
14      Q    So that's also information that's
15  compiled by the retirement -- excuse me.  Let me
16  ask it again.
17          That's also information that's
18  retirement -- that's also information that's
19  compiled by the Benefits Office, correct?
20      A    Yes.

8           Are you saying the information that
9   we just talked about, the granting or denial of
10  benefits claims, the funding of claims, that's not
11  in the counsel report, but it's in a director's
12  report?
13          Is that what you're saying?
14      A    Correct.

                            .
18      Q    Okay.  When you say director's
19  report, what director are you referencing?
20      A    The Plan director.

1 focused on the deposition today. I'll respond to
2 you as soon as possible.
3          MR. DENNIE: Let's go off the record
4 for a second.

7 BY MR. DENNIE:
8          Q    So I want to be clear, I can't ask
9 you too many questions about documents I've never
10 seen, but you and the witness yesterday both
11 confirmed that there are records that discuss the
12 funding of the Plan and whether benefits were
13 granted or denied. And you said they're in a
14 director's report, correct?
15          A    To the best of my knowledge, yes.
16          Q    Are you aware of what the contents of
17 those director's reports say?
18          Let's start with the last quarterly
19 report that you indicated probably would be in
20 February of this year?
21          A    No, I don't remember.
22          Q    Do you remember the contents of the

12          MR. DENNIE: So I'm going to again
13 request that those reports be provided. I
14 requested it yesterday. There are multiple
15 requests for production that have asked for records
16 similar to that, and I believe that was 37, 57, 58,
17 there's probably more. When are we going to get
18 those documents? We requested those probably nine
19 months ago.
20          MR. MEEHAN: If you're directing that
21 to me, you know, send me a request.
22          MR. DENNIE: We did nine months ago.

Page 34

Page 36

1          MR. MEEHAN: Well, send me a request
2 now telling me what you want and why you think
3 you're entitled to it. And like I said yesterday,
4 we'll take it under advisement and we'll get right
5 back to you. I want to make sure I know exactly
6 what you want, so if you can put it in writing so
7 there's no confusion.
8          MR. DENNIE: Well, just to be clear,
9 we're already on the record. So we're asking for
10 the director's report, the quarterly reports that
11 have been testified to by both of the witnesses
12 that have been withheld that were requested in our
13 first request for production many, many months ago.
14 And discovery is running out and now I'm deposing
15 witnesses and I don't have these report documents.
16 When can I get those?
17          I know you're new to the case, you
18 probably didn't handle that, but your colleague
19 has been in the whole time, so I need to know
20 when we can have them. Can we have them today?
21          MR. MEEHAN: I need you to send me a
22 written request on exactly what you want. I'm

Page 35

1 director's report for any quarter prior to the last
2 report that you reviewed?
3          A    I don't remember.
4          Q    The only way that I'm going to be
5 able to determine what's in those records is by
6 getting the records, because neither you or
7 Mr. Reynolds recalled the contents of the report,
8 other than you know that there's discussion of
9 funding, and there's a discussion of granting and
10 denial of benefits. Is that right?
11          A    Correct.

Page 37

10 (Pages 34 - 37)

.

8      Q    Who are the beneficiaries under the
9   Plan?
10     A    Who are the beneficiaries under the
11  Plan?
12     Q    Yes, ma'am.
13     A    The players.
14     Q    What was the Plan created to do?
15     A    The Plan was created to provide
16  retirement and disability benefits for the players.

Page 38

.

7      Q    Are you aware of any steps that the
8   Plan administrator has taken to reduce bias?
9      A    I'm not aware.
10     Q    Are you aware of any steps that the
11  Plan administrator has taken to promote the
12  accuracy of the decisions?
13     A    I'm not aware of any.

Page 40

1

Page 39

Page 41

11 (Pages 38 - 41)

12   communications about the interpretation of the Plan
13   guidelines with Bethany Marshall and Miki
14   Yaras-Davis oral conversations?
15       A    As I recall, yes.
16       Q    Did they orally ever give you their
17   analysis to certain provisions of the Plan?
18       A    Yes.
19       Q    Okay.  Do you recall what their
20   analysis was?
21       A    No.

1

3       Q    Who on the committee represents the
4   interest of retired NFL players?
5       A    I do.
6       Q    So your duty is to represent the
7   interest of the retired NFL players on the
8   committee, correct?
9       A    Correct.

1

3        So if we go down about halfway down
4    the page, there it says, "NFLPA designated members:
5    Sam McCullum, Jeff Van Note, Robert Smith."
6            Did I read that correctly?
7        A    Correct.
8        Q    So when we were talking a minute ago
9    about the members of the board that owe a duty to
10   the retired players, are those these three
11   individuals?
12       A    Correct.

Page 70

1

Page 72

1

1

?

Page 71

Page 73

Page 78

Page 80

Page 79

Page 81

.

4      Q     You do not have a law license?

5      A     No.

6      Q     You don't have a medical license?

7      A     No.

8

8      Q     Right before we broke to get you a
9   glass of water, you were indicating that if a
10  player called you about their disability benefits
11  application and indicated they had not received
12  their records, you would direct them to the Plan,
13  correct?
14      A     Uh-huh.
15      Q     The Plan being you would direct them
16  back to the benefits office?
17      A     Correct.
18      Q     Is that the kind of standard approach
19  the Players Association, if a player calls and
20  says, "I'm not receiving my records," go to the
21  retirement office to get those?
22      A     Correct.

Page 102

Page 104

Page 103

Page 105

.

9      Q    Have you received any legal training
10  to help you decide and analyze disability claims?
11      A    Now, when you say "legal training,"
12  what do you mean by that?
13      Q    Training about laws and cases.
14      A    You said training about laws or
15  cases?
16      Q    And cases.
17      A    And cases.
18          Not that I recall.

Page 114

Page 116

Page 115

.

Page 117

Veritext Legal Solutions
800-336-4000

8       Q    Do you understand when symptoms can
9    occur from head injuries that resulted from playing
10   in the NFL?
11      A    Yes.
12      Q    What do you understand?
13      A    I understand that they can occur
14   right away or they can take a number of years --
15   months or years to manifest, surface.
16

Page 122

Page 124

Page 123

18      Q    Do you have any reason to dispute
19   that Mr. Cloud has incurred and received head
20   injuries while playing in the NFL?
21      A    No, I don't have any reason to
22   dispute that.

Page 125

32 (Pages 122 - 125)

1      Q    Do you have any reason to dispute
2  that Mr. Cloud has had symptoms associated with
3  concussion syndrome while playing in the NFL?
4      A    I don't have any reason to dispute
5  that.
6      Q    You would agree that concussion
7  symptoms can worsen over time?
8      A    Yes, I know that they can worsen over
9  time.

Page 126

Page 127

.
Page 128

Page 129

Veritext Legal Solutions
800-336-4000

Page 142

?

Page 144

Page 143

.

14          Have you read any studies on
15   orthopedic injuries sustained by players who have
16   formerly played in the NFL?
17          A    Not that I recall.
18          Q    Have you read any white papers on
19   orthopedic injuries commonly sustained by NFL
20   players?
21          A    Not that I recall.
22          Q    Have you done any personal research

Page 145

37 (Pages 142 - 145)

1  on orthopedic injuries that are commonly incurred
2  on players who formerly played in the NFL?
3       A    Not that I recall.

Page 146

Page 147

Page 148

Page 149

Veritext Legal Solutions
800-336-4000

5     Q   And if you flip to CLOUD-MIN-004, it

6  indicates it's a denial of reclassification request

7  from Mr. Cloud, correct?

8     A  Correct.

Page 158

10     Q  Is there a repository of

11  interpretations that are provided to the Plan

12  document?

13     A  A repository of interpretations?

14     Q  Correct.

15     A  You said of the Plan document?

16     Q  Correct.

17     A  Not to my knowledge.

Page 160

Page 159

Page 161

41 (Pages 158 - 161)

.

12        Are you aware anywhere that someone

13   can go and see what interpretations of the Plan

14   have been applied in years past?

15        A    No, I am not.

.

14        Q    Okay.  So in your 15 years on the

15   committee, you have asked for between 10 and 50

16   interpretation requests of Article 5, Deposition

17   Exhibit 1, correct?

18        A    That's correct in that's what I said.

.

Page 170

Page 172

1     Q    So is it fair to say you were not
2   present in person or by phone on the November 15th,
3   16th, 2016 meeting?
4     A    That is correct.

Page 171

15          You indicated that the board decided
16   Mr. Cloud's appeal, his request for
17   reclassification, correct?
18     A    Correct.
19     Q    The members on the board who made
20   that decision were Katie Blackburn, Dick Cass, Ted
21   Philips, Sam McCullum, Jeff Van Note, and Robert
22   Smith, correct?

Page 173

44 (Pages 170 - 173)

1    A    Correct.

2    Q    If I wanted to know how the board

3  members arrived at their decision to deny

4  Mr. Cloud's appeal, I would need to talk to them

5  individually, correct?

6         MR. MEEHAN:  Objection.  Calls for a

7  legal conclusion.

8         But go ahead and give your answer,

9  ma'am.

10         THE WITNESS:  Yes.

Page 174

1

20         So on the NFLPA side, the

21  representatives, you indicated that Bethany

22  Marshall, Miki Yaras-Davis, and the Groom Law Firm

Page 176

.

Page 175

?

1  was there representing the Players Association.  Is

2  that correct?

3    A    Correct.

4    Q    And for the Groom Law Firm you

5  indicated that Alvaro Anillo, Doug Ell, Mike Junk,

6  Mike Maricco were there from the Groom Law Firm,

7  correct?

8    A    Maricco.  Correct.

9    Q    Mike Maricco?

10    A    Maricco, yeah.

11    Q    Do the individuals who you listed

12  from the Groom Law Firm also advise the committee?

13    A    Alvaro Anillo would be our adviser

14  for the most part.

Page 177

45 (Pages 174 - 177)

.

5      Q      Yesterday you heard Patrick Reynolds

6   confirm that there is a repository of information

7   for medical records for NFL players, correct?

8      A    Correct.

9

Page 186

Page 188

Page 187

Page 189

Veritext Legal Solutions
800-336-4000

5          As it pertains to Mr. Cloud's 2016
6   reclassification benefits, did you write the
7   decision letter in that case?
8       A   I did not.
9       Q   As it pertains to Mr. Cloud's 2016
10  reclassification for benefits application, did you
11  review a decision letter before it was sent out?
12      A   Not that I recall.
13      Q   As it pertains to Mr. Cloud's 2016
14  reclassification for disability benefits
15  application, did you review the decision letter and
16  make any changes to it before it was sent out?
17      A   Not that I recall.

?

Page 200

Page 198

3       Q   Have you ever written a decision
4   letter?
5       A   No.
6       Q   Do you review the decision letter
7   before it goes out?
8       A   No.
9       Q   Have you ever made any changes to a
10  decision letter before it goes out?
11      A   Not that I recall.

20      Q   Did you write the letter on
21  Mr. Cloud's 2014 T&P benefits application?
22      A   I did not.

Page 199

Page 201

51 (Pages 198 - 201)

Page 202

Page 204

Page 203

7      Q    As of 7/17/14, were you aware of

8   Mr. Cloud receiving a concussion anywhere other

9   than playing in the NFL?

10     A    Not that I recall.

11     Q    As we sit here today, are you aware

12  of Mr. Cloud receiving a concussion anywhere other

13  than playing in the NFL?

14     A    Not that I recall.

15     Q    Okay.  Were you creating a

16  distinction between the two because you asked me

17  "was I, am I," so is there something that I'm

18  missing?

19     A    No, I just wanted to make sure.  I

20  didn't know if you were talking about while I was

21  receiving his application or now, so that's why I

22  wanted to know so...

Page 205

52 (Pages 202 - 205)

1     Q   But you're not aware of any
2  circumstance where Mr. Cloud has had another
3  concussion outside of playing in the NFL, isn't
4  that correct?
5     A   Correct.

16    Q   Let's flip over to Exhibit 15,
17  DICC-003.
18    A   I'm good.
19    Q   I'm not asking you to read this word
20  for word because this one's a little bit longer,
21  but some of these notes I'm not able to read super
22  clearly, so I want to make sure I don't misread

1

1  them for you.  Can you just go through like you did
2  with the notes from 2014 and read your notes from
3  February 22nd, 2016?
4     A   Okay.  "Mike A. Cloud, he already had
5  Inactive A.  Again, he had credited seasons '99
6  through '05.  He was a reclassification request for
7  Active Football.  He was approved on his initial
8  Social Security -- initial T&P application by
9  virtue of his Social Security award.
10  Helmet-to-helmet collision on 10/31/04 while
11  playing with the Minnesota Vikings.  Migraines,

1

3     Q   And you would agree the only
4  employment that Mr. Cloud has ever referenced was a
5  month of part-time employment at Equinox.  Is that
6  correct?
7     A   Based on that application, correct.
8     Q   Do you know why he left Equinox?
9     A   If memory serves me correct, from my
10  recent viewing of the application, it was
11  because -- I can't remember.  I do remember seeing
12  something, but I can't remember exactly what it
13  was.
14    Q   Would it surprise you that that was
15  concussion-related symptoms?
16    A   What, the reason why he left?
17    Q   Yes, ma'am.
18    A   Would it surprise me?
19    Q   Correct.

53 (Pages 206 - 209)

3     Q    Do you know why Mr. Cloud's contract

4  was terminated with the Giants in 2005?

5     A    I don't.

6     Q    Do you know that Mr. Cloud couldn't

7  remember basic running back plays that he had been

8  running his entire life?

9     A    Okay.

10     Q    Did you know that?

11     A    I do remember seeing that in review

12  of the file.

k

Page 210

17     Q    And, again, in this you note,

18  symptoms such as migraines, clinical depression,

19  memory loss, post-concussion syndrome, and vertigo.

20  Is that correct?

21     A    Correct.

Page 213

Page 211

Page 212

54 (Pages 210 - 213)

Page 222

19  BY MR. DENNIE:
20      Q    Is there any reason that you can
21  think of that the Plan through the retirement
22  office would not provide medical records and scans

Page 224

1

Page 223

1  that were requested by Michael Cloud?
2      A    There was no reason not to be
3  provided.
4      Q    You would agree that it's important
5  for a player to have all their medical records and
6  scans from a Plan neutral, correct?
7      A    If he so desires, yes.  If it is
8  important to him, I agree.
9      Q    Because a player can take those
10  medical records and scans to their own doctor for
11  an analysis, right?
12      A    This is true.
13      Q    And if they don't have the documents,
14  they can't go take them to a doctor of their
15  choice, correct?
16      A    I mean, you can't take what you don't
17  have.
18      Q    So you would agree with me, correct?
19      A    I would agree that if they don't have
20  it, they can't take it.
21      Q    Do you know Dr. Mandelbaum is?
22      A    I know the name.

Page 225

57 (Pages 222 - 225)

2    a former Plan physician?

3        A    I do.

4        Q    If Mr. Cloud requested all of his

5    medical records and scans, and some of them were

6    done by Dr. Mandelbaum, is there any reason that

7    the Plan wouldn't provide them to him?

8        A    Not to my knowledge.

Page 226

.

6        Q    And if someone owes a duty to the

7    players, as you testified earlier, you would agree

8    that for the best opportunity to be successful in a

9    disability application, is going to be provide the

10   most full and extensive medical history that they

11   can provide, correct?

12       A    Correct.

.

Page 228

:

4        Q    And if they weren't, Michael Cloud

5    cannot use it in a disability benefits application

6    any records he doesn't have, correct?

7        A    Correct, he can't use anything he

8    doesn't have.

17           My question is simply:  What

18   complaints or riches have you heard?

19       A    So, again, if a player is denied his

20   application, oftentimes, we get complaints about

21   that, about the fact that he was denied the

22   process, maybe the doctor, it could be any number

Page 229

58 (Pages 226 - 229)

1  of things.

2     Q    And you gave me three.  Correct me if

3  I'm wrong, the three that you recall being

4  complaints that you heard from players:  One,

5  complaints that they were denied benefits; two,

6  complaints about neutral plan physicians; and,

7  three, complaints about disability benefits

8  process.  Is that correct?

9     A    Correct.

10    Q    Are there any others that you recall?

11    A    No.

12    Q    What complaints do you recall about

13  the disability benefits process that you heard?

14    A    It takes too long, having to travel

15  to see the doctor, too many appointments.

16    Q    Anything else?

17    A    That's it.

18    Q    Have you ever heard complaints from

19  players that they have been denied access to their

20  medical records?

21    A    Not that I can recall.

22    Q    So the complaints about the process

Page 230

1     A    Just what you said, that they

2  don't -- sometimes they don't think that the

3  doctors are neutral.

Page 232

1  that you mentioned, it takes too long, players have

2  to travel to see a Plan neutral doctor, and there

3  are too many doctor appointments.  Is that correct?

4     A    Correct.

5     Q    Do you recall any others?

6     A    I don't.

7     Q    What complaints have you heard about

8  the neutral plan physicians?

9     A    Didn't spend enough time, too brash,

10  maybe didn't ask enough questions or the questions

11  that the player thought he should ask.

12    Q    What else?

13    A    That's it, that I can think of.

14    Q    Complaints about the doctor, the

15  doctor didn't spend enough time with them, they're

16  too brash, they didn't ask enough questions.  Is

17  that correct?

18    A    That's correct.

19    Q    And have you ever heard players argue

20  that the Plan doctors are not truly neutral?

21    A    Yes.

22    Q    What have you heard about that?

Page 231

59 (Pages 230 - 233)

Page 234

22      Q     So the actual application they submit

Page 236

1  has been changed?
2      A     Correct.

Page 235

Page 237

Veritext Legal Solutions
800-336-4000

.

2      Q    So you don't know who filed them or

3   the subject matter of any of the complaints that

4   you have read that are attached to this counsel

5   report.  Is that correct?

6      A    That's correct.

7      Q    If I understood correctly from

8   yesterday, counsel report is prepared and

9   distributed quarterly, right?

10     A    Correct.

11     Q    So next week you're probably going to

12  get another counsel report, right?

13     A    That is correct.

14     Q    And the last one you received was

15  sometime in February?

16     A    That is correct.

17     Q    Do you remember what was on the

18  February report or attached thereto?

19     A    I do not.

Page 242

22

.

Page 244

Page 243

20     Q    You've already said a couple of times

21  you believe you owe a duty to the players, correct?

22     A    Correct.

Page 245

1     Q    So you know from your experience
2  working for the Players Association how damaging it
3  is to them when their benefits are denied when they
4  have concussion syndrome, correct?
5          MR. MEEHAN:  Object to the form.
6          You can go ahead.
7  BY MR. DENNIE:
8     Q    You can answer.
9     A    I know what they tell me.
10    Q    And they told you it's really
11 damaging to them, correct?
12    A    I may have been told that a time or
13 two.

16 it.  Okay?
17         You know that a denial of these
18 benefits are damaging to these players, don't you?
19         MR. MEEHAN:  Objection to the form.
20         But, ma'am, make sure he answers

Page 246

1  to them that their claims were denied when they
2  have serious medical conditions?
3     A    I can't put a specific number, but
4  quite a few.
5     Q    More than a hundred?
6     A    I don't know about more than a
7  hundred.
8     Q    Put an estimate on it.  What do you
9  think?
10    A    I've been there for many years.
11 Fifty maybe.  I don't know.

Page 248

21    Q    How many times would you say players
22 have come to you and told you how damaging it was

Page 247

Page 249

63 (Pages 246 - 249)

9       THE WITNESS:  It's going to be one or

10  the other.  Social Security awards are the general

11  standard.  And in his case, because he had a Social

12  Security award, it fell under 5.2(b).

13  BY MR. DENNIE:

14      Q  I understand, but I just want to be

15  clear and understanding what you just testified to.

16      Had he not had his Social Security

17  award, based on your experience on the committee

18  for 15 years, and in your review of thousands of

19  applications, you believe he meets the criteria of

20  Section 5.2 also?

21      A  Correct.

Page 250

Page 252

5  reclassification application compiles with Section

6  5.1 of Exhibit 1?

7      A  Yes.

8      Q  When Mr. Cloud was granted T&P

9  benefits in 2014, which criteria under 5.2 of

10  Exhibit 1 did he meet?

11      A  5.2(b).

Page 251

Page 253

64 (Pages 250 - 253)

4       Does October 31st, 2004, occur during

5   his playing career?

6       A    Correct.  Yes.

7       Q    We talked earlier, and I believe you

8   agreed, that you were aware and recall Mr. Cloud

9   was having trouble remembering basic football plays

10  after that collision.  Do you recall that?

11      A    I recall.

.

14      Q    You're welcome to read it if you want

15  to, but generally explain to me what your

16  understanding of the "shortly after" definition as

17  shown in 5.3(e) of Exhibit 1 is.

18      A    A player becomes disabled no later

19  than six months after his disability arises -- no

20  earlier, rather, but no later than 12 months

21  afterwards.

.

21      I want you to correct me if I'm

22  wrong, but earlier you testified and agreed that

1   concussion syndrome symptoms can advance over time?

2       A    I did, yes.

3       Q    And you're aware of that because you

4   worked with the Players Association and you even

5   read a few studies or articles, as I recall.  Is

6   that correct?

7       A    Correct.

14      Your notes make reference to

15  Dr. Cronin indicating that the helmet-to-helmet

16  collision on October 31st, 2004, was the event that

17  caused his concussion-related syndrome.  Is that

18  right?

19      A    Yeah, that's correct.

Page 262

.

Page 264

Page 263

10  BY MR. DENNIE:

11      Q    If you will flip over to Section

12  5.7(b) of Exhibit 1.

13      A    You said (b)?

14      Q    5.7(b), yes, ma'am.

15      A    I'm there.

16      Q    What do you understand that Section

17  to pertain to?

18      A    Reclassification of T&P benefits.

Page 265

.

4      Q    Is changed circumstances defined in
5   the Plan?
6      A    No.
7

21      Q    So do you want to change your answer
22   on who came up with the definition of changed

1

.

5      Q    In your approximately 15 years on the
6   committee, how many reclassification decisions have
7   you been a part of?
8      A    Maybe between 10 and 15.
9      Q    And in the 10 or 15 reclassification
10   decisions that you have been a part of, have you
11   had to determine what changed circumstances means
12   in all 10 or 15 of those cases?
13      A    Yes.
14      Q    What do you think it means?
15      A    It means a new or different injury or
16   illness or impairment.

.

1   circumstances?
2      A    Yes, as a matter of fact I do.  I
3   don't know who came up with the definition.
4

.

Veritext Legal Solutions
800-336-4000

.

7        THE WITNESS:  I agree that a new

8   impairment can include a concussion symptom, yeah.

 9   earlier you testified that as it pertains to

10   Mr. Cloud's 2016 reclassification decision letter,

11   you didn't read it before it went out, correct?

12        A    That is correct.


                       :

16        Q    So you certainly didn't tell anyone,

17   "This is what the definition of changed

18   circumstance that I want to include in this

19   decision letter," correct?

20        A    Correct.

14        Q    Have you ever asked anyone to define

15   for you what changed circumstances means?

16        A    Not that I recall.

Veritext Legal Solutions
800-336-4000

1  that there be a logical definition of clear and
2  convincing that you would apply to every case?
3      A   Yes, it would be helpful.
4      Q   Because you want uniform consistency
5  on the way that disability benefits applications
6  are being decided, correct?
7      A   It would definitely be helpful.

.

14      Q   You would agree it's important for
15  players to understand that there's uniformity in
16  the way things are being applied across the board
17  in disabled cases, correct?
18      A   I would agree with that, yeah.

22      Q   Is clear and convincing defined

1  anywhere in the Plan?
2      A   No.
3      Q   Has anyone told you what clear and
4  convincing means?
5      A   Not that I recall.

9      Q   Have you come up with your own
10  definition of what clear and convincing means?
11      A   I'm not sure.

21      Q   Don't you think it's important if
22  you're trying to apply a set of facts to the Plan,

?

Page 282

Page 284

1

.
10          Are you disputing that Mr. Cloud is
11   disabled under the terms of Plan?
12       A   I am not.

12          Correct me if I'm wrong, but you
13   testified earlier that a new concussion symptom can
14   qualify as a new impairment, meaning it's a changed
15   circumstance in the terms of the Plan, correct?
16       A   Yes.

.
Page 283

Page 285

14      Q    Correct me if I'm wrong, you said
15   that the concussion symptoms that you know of are
16   headaches, dizziness, sleepiness, and vertigo.  Is
17   that correct?
18      A    Correct.

Page 294

Page 296

6       Q    Are there any additional concussion
7    symptoms that you know of?
8       A    Maybe forgetfulness.
9       Q    Anything else?
10      A    Anger.

20      Q    So, for example, forgetfulness, you
21   might forget small things now, but five years from
22   now you may not remember virtually anything.  Is

Page 295

Page 297

75 (Pages 294 - 297)

1  that a progression of concussion symptoms that
2  you've seen in other disability cases that you've
3  administered on the committee?
4      A   Yes.

20          Based on your role on the committee,
21  and your understanding of concussion symptoms,
22  trouble sleeping may be a symptom?

Page 298

1      Q   Is migraines a common concussion
2  symptom?
3      A   Yes.
4      Q   Is dementia a common concussion
5  symptom?
6      A   Yes.
7      Q   Is failure to maintain verbal fluency
8  a common concussion symptom?
9      A   Yes.
10      Q   Is unpredictability a common
11  concussion symptom?
12      A   Yes.
13      Q   Is irritability a common concussion
14  symptom?
15      A   Yes.
16      Q   Is mood swings a common concussion
17  symptom?
18      A   Yes.

?

Page 300

1      A   I believe so.
2      Q   Is sensitivity to light a common
3  concussion symptom that you have seen?
4      A   Yes.
5      Q   Is paranoia a common concussion
6  symptom that you've seen?
7      A   Yes.
8      Q   Is lack of focus or inability to
9  focus a common concussion symptom that you've seen?
10      A   Yes.
11      Q   Is suicidal thoughts a common
12  concussion symptom that you've seen?
13      A   Yes.
14      Q   Is failure to grasp reality a common
15  concussion symptom that you've seen?
16      A   I believe so.
17      Q   Is failure to maintain an appointment
18  a common concussion symptom?
19      A   Yes.
20      Q   Is depression a common concussion
21  symptom?
22      A   Yes.

Page 299

8      Q   Based on the research that you've
9  read on concussions and common media writings, is
10  it fair to say that over a period of time, these
11  concussion symptoms can get much more severe?
12      A   Yes, it is fair to say that they can
13  get worse.

Page 301

76 (Pages 298 - 301)

21     Q    If you look on CLOUD-AR-108, of
22  Exhibit 7, you will see a discussion of neck, lower

1  back foot, lower leg issues.  Do you see that?
2     A    I see it.
3     Q    Ultimately the conclusion in his file
4  was Mr. Cloud suffered from both neurological and
5  orthopedic ailments.  Is that correct?
6     A    Correct.

Veritext Legal Solutions
800-336-4000

17    Q    Have you ever seen a PET scan

18   presented to the committee on a player's

19   application?

20    A    I believe I have.

21    Q    What do you understand a PET scan to

22   be?

Page 306                                                    Page 308

1    A    A scan of the brain.

2    Q    And do you understand or know what

3   that PET scan shows?

4    A    Abnormalities of the brain.

10    Q    When you look at a PET scan, what

11   shows the abnormality?

12    A    The coloring maybe, the shading of

13   the scan of the brain.

14    Q    So let me make sure we're on the same

15   page and saying the same things.

16        So if you've got a scan of the brain

17   or a picture of the brain, there's going to be most

18   likely some sort of cylindrical or circular spot

19   that's a different color which shows there's an

20   abnormality, correct?

21    A    I think that's what it is.

Page 307                                                    Page 309

78 (Pages 306 - 309)

?

5      Q    Okay.  Are you aware of any other

6   circumstance where Mr. Cloud sustained orthopedic

7   injuries outside of playing in the NFL?

8      A    I am not aware.

1     A    Yep.  Yes.
2     Q    Okay.  Is Dr. Canizares still a
3  neutral physician?
4     A    Yes.
5     Q    Is he someone you interface with
6  often?
7     A    No.
8     Q    Is there any reason that x-ray films,
9  scans were not provided to Mr. Cloud when he
10  requested them?  Is there any reason for that?
11     A    You said when he requested them?
12     Q    Yes, ma'am.
13     A    I don't know.  I'm not aware of any
14  reason.
15     Q    If you will flip over to 174, so
16  CLOUD-AR-174 of Exhibit 2.
17     A    I'm here, okay.  You said 174?
18     Q    Yes, ma'am.
19     A    Okay.
20     Q    Does this appear to be a copy of
21  Dr. DiDio's report?
22     A    It does.

Page 314

Page 316

1     Q    Is there any reason that the full
2  copy of Dr. DiDio's report was not provided to
3  Mr. Cloud until 2019?
4     A    I have no idea.

15     Q    All right.  Either way, if you flip
16  to AR-172 of Exhibit 2, do you see there that there
17  were various x-rays that were performed on
18  Mr. Cloud?
19     A    Yes.
20     Q    And those were by Dr. Canizares?
21     A    Canizares.
22     Q    Canizares?

Page 315

18     Q    And down toward the bottom of 174,
19  there's a reference that Mr. Cloud was forgetting
20  small things like people's names.  Is that correct?
21     A    I see it, yes.
22     Q    Are there any other concussion

Page 317

80 (Pages 314 - 317)

1  symptoms reported back in 2010?

2      A   I see headaches, vertigo.  Bed spins.

3      Q   That's part of vertigo?

4      A   Yeah, I see that now.  Yeah.

5      Q   Okay.

6      A   Repetition.

7      Q   I'm sorry?

8      A   Repetition, repeating himself.

9      Q   Repetition and?

10     A   And then I said "repeating himself."

11     Q   So you're saying repeating himself is

12  a concussion symptom?

13     A   I would think so.

14     Q   Okay.

15     A   I would think it can be.

16     Q   Any others that you recall?

17     A   That's it.

18     Q   So the four concussion symptoms that

19  you see from the 2010 request for line of duty

20  benefits; headaches, vertigo, forgetting names, and

21  repeating himself.  Is that correct?

22     A   Correct.

Page 318

17     Q   There's a listing of post-concussion

18  syndrome, clinical depression, dementia, migraine,

19  vertigo, impair verbal fluency.  And then if you

20  flip to CLOUD-AR-079, it also list migraine

21  headaches, depression, memory loss, vertigo,

22  insomnia, unpredictable irritability.  Do you see

Page 320

6      Q   Okay.  So if you would look at

7  CLOUD-AR-175, there's again a reference to the

8  October 31, 2004 concussion, correct?

9      A   I see it.

10     Q   And I read it, and tell me if I'm

11  wrong, "There is clear documentation of a single

12  concussion sustained on October 31, 2004, while

13  playing with the New York Giants."

14         Do you see that?

15     A   I do.

16     Q   Okay.  And that's the head-to-head

17  collision that we talked about a couple of times

18  today, correct?

19     A   That's my assumption, yes.

Page 319

1  that?

2      A   I do.

3      Q   In addition to the neurological

4  issues associated with concussion syndrome, there's

5  also several orthopedic issues presented in the

6  section titled, "Disabilities and Causes."  Is that

7  correct?

8      A   Correct.

9      Q   There are acute compartment syndrome,

10  plantar fasciitis, nerve injury, bilateral

11  shoulders, bilateral elbow, bilateral wrists,

12  hands, fingers, bilateral feet and toes, bilateral

13  ankles, bilateral knees, bilateral hips, lumbar,

14  cervical, thoracic.  And then if you flip over to

15  CLOUD-AR-097, severe pain in right foot, left great

16  foot, left hip, basic neck, lower back, numbness in

17  right left leg, arms and fingers.

18         Did I get all the orthopedic issues?

19     A   You did.

20     Q   And so those were the bases by which

21  Mr. Cloud presented in his T&P application in 2004?

22     A   That's what it appears to be to me.

Page 321

81 (Pages 318 - 321)

1

Page 322

1

Page 324

.

7       Q    Did you write Exhibit 4?

8       A    I did not.

9       Q    Do you know who wrote Exhibit 4?

10      A    I do not.

11      Q    Did you review Exhibit 4 before it

12   was disseminated to Mr. Cloud?

13      A    Not that I recall.

Page 323

Page 325

# APPENDIX 4

| | |
|---|---|
| **From:** | Christian Dennie |
| **To:** | Michael L. Junk; Edward J. Meehan |
| **Subject:** | Cloud v. Bert Bell |
| **Date:** | Friday, August 6, 2021 8:37:09 AM |

Gentlemen,

I enjoyed meeting you all over the course of the last few days. Thank you for hosting the depositions. I will get you my receipts from travel in the next few days.

As we discussed during the depositions, I believe many, many records have not been produced that are responsive to our discovery requests that were propounded many, many months ago. I learned during the depositions that there are Director's Reports and Counsel Reports made on a quarterly basis that reference funding for the Plan, distribution of benefits, and statistics for grants and denials. These are documents responsive to RFP 37, 57, and 58. These reports may say other things, but those are areas that were referenced by the deponent. I understand the Counsel Reports may have some attorney-client information, but contain other information that would not fit into that box. The attorney-client information can be redacted. At a minimum, I need these documents produced by noon on Monday so I have sufficient time to review them in advance of Mr. Vincent's deposition. Being that Mr. Vincent will likely give me more information about other documents that have not been produced, I request that you go back through our 1st and 2nd RFP and give me all documents that are responsive. Otherwise, we will have to seek to compel responsive information, which I prefer not to do.

I am following up again on Dr. Mandelbaum's records. When will they be produced?

At the end of the deposition, you mentioned you would assist us in locating the IMPACT exam conducted on Mr. Cloud by the New England Patriots. If you can provide that, we would greatly appreciate it.

As you know, we were able to obtain a lot of favorable information during the depositions. It's not too late to get back on Judge Ferguson's calendar for mediation and abide by the court's order. As we discussed after the deposition, the Plan has a lot of risk in this case that it has never had to address. No one has ever been able to look behind the curtain as we have been granted the opportunity to do. What's going on behind the curtain does not look good for the Plan. We are going to continue to depose the relevant people and will continue to find information that supports the illegality of the Plan. We are going to seek to compel the production of the Board members for deposition (as we discussed and you confirmed disagreement). I feel confident we will be able to obtain even more valuable information in those depositions. With that said, you can eliminate your risk and end the roadmap I am developing for all future claims filed by other players by getting this resolved and giving Mr. Cloud what he is owed. Otherwise, as I mentioned with the NCAA as an example, when you push the envelope and try to get rulings from court's, sometimes it doesn't work out the way you wanted. A bad precedent will lead to even more litigation and worse results. The Plan (and associated bodies) made mistakes here. With all that said, let me know when you want to talk. We are always open. If, on the other hand, you prefer to litigate and permit Mr. Cloud to fully develop the facts, we have no problem moving forward.

I look forward to hearing from you. Have a good day and good weekend.

Christian Dennie, FCIArb
Barlow Garsek & Simon, LLP
1207 S. White Chapel Blvd., Ste. 150B
Southlake, TX 76092
817.731.4500 (Telephone)
817.731.6200 (Facsimile)

Email: cdennie@bgsfirm.com
Web Site: http://www.bgsfirm.com
Blog: http://www.bgsfirm.com/blog

Principal office is located at 920 Foch Street, Fort Worth, TX 76107.

# APPENDIX 5

| From: | Christian Dennie |
|---|---|
| To: | Meehan, Edward J. (EMeehan@groom.com); Lee Ann Burks |
| Cc: | Junk, Michael L. (mjunk@groom.com); Lee Ann Burks; "Christian Dennie (CDennie@bgsfirm.com)" |
| Subject: | RE: Civil Action No.: 3:20-CV-01277-E: Cloud v. Bert Bell/Pete Rozelle NFL Player Retirement Plan |
| Date: | Monday, August 16, 2021 8:43:00 AM |

Mr. Meehan,

Good morning. I hope you had a nice and relaxing weekend.

As I have mentioned in multiple emails, calls, and in-person discussions, I do not desire to fight over discovery. The documents that we are requesting should have been produced long ago. Frankly, I would have expected to see these documents produced along with initial disclosures. Nonetheless, I would still prefer not to have to address these missing documents with the Court. It benefits both sides to reach a resolution on the outstanding discovery.

Our position is simple. Rule 26(b)(1) of the Federal Rules of Civil Procedure allows Plaintiff to "obtain discovery regarding any nonprivileged matter that is relevant to any part's claim or defense. . . ." The outstanding discovery at issue "is reasonably calculated to lead to the discovery of admissible evidence." The 5th Circuit addressed issues similar to this in Crosby and permitted to discovery. In Schultz, the 5th Circuit addressed evidence of "inconsistent treatment" of similar claims by an ERISA plan. Following this line of cases, the Court, on July 22, 2021, ordered that Plaintiff was permitted to conduct discovery as follows:

Plaintiff may conduct discovery on the following subjects: (1) requests and communications between Plaintiff and Defendant requesting medical documentation; (2) any medical records in possession of Defendant that have not been provided to Plaintiff; and (3) such other information that is relevant to the completeness of the Administrative Record in this case and/or whether Defendant complied with ERISA's procedural regulations.

We are seeking discovery of the Director's reports (prepared quarterly), Counsel's reports (prepared quarterly), and the database of claims that were granted or denied for T&P benefits and whether the athlete received Inactive A or Active Football benefits. This discovery is relevant and responsive to RFPs. In addition to being relevant and reasonably calculated to lead to the discovery of admissible evidence, the production of these records is necessary to evaluate 1) inconsistent treatment by the Plan of similar claims; 2) to determine with the Plan complied with ERISA's procedural regulations; and 3) to evaluate whether the Plan acted arbitrarily and capriciously in denying Plaintiff's claim. As your witnesses have noted, the members of the Board are fiduciaries and the Plan was designed for players like Plaintiff as the beneficiaries. We must have this information to explore disputed matters. As I have previously noted, Plaintiff was denied the opportunity to question witnesses based on these records. We learned for the first time of the existence of such records during the depositions.

You noted in an email that I don't know the contents of the Director's reports (prepared quarterly), Counsel's reports (prepared quarterly), and the database of claims. You are correct that I have never seen these documents. They have been withheld from production. Your witnesses, however, testified that the director's reports and counsel's reports have information about funding for the Plan, distribution of benefits, and statistics for grants and denials. As to the database, Mr. Vincent testified that queries can be run to produce T&P applications that show what was granted or denied, whether Inactive A or Active Football benefits were awarded, and possibly the basis for the decision to grant Inactive A or Active Football benefits. This is information that we need.

Again, I am happy to discuss these issues with you in an effort to resolve this dispute.

Christian Dennie, FCIArb
Barlow Garsek & Simon, LLP
920 Foch Street
Fort Worth, TX 76107
817.731.4500 (telephone)
817.731.6200 (facsimile)

Southlake Office: 1207 S. White Chapel, Ste. 150B; Southlake, Texas 76092

Email: cdennie@bgsfirm.com
Website: http://www.bgsfirm.com
Blog: http://www.bgsfirm.com/blog

CONFIDENTIALITY NOTICE: The information contained in this e-mail message is intended only for the use of the individual or entity to whom it is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. Any and all such rights of privilege, privacy, and non-disclosure are hereby claimed and are expressly not waived. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution, use, or copying of this message is strictly prohibited. If you have received this message in error, please notify us immediately by e-mail and delete the original message. Unauthorized interception of this e-mail is a violation of federal criminal law. This communication does not reflect an intention by the sender or the sender's client or principal to conduct a transaction or make any agreement by electronic means. Nothing contained in this message or in any attachment shall satisfy the requirements for a writing, and nothing contained herein shall constitute a contract or electronic signature under the Electronic Signatures in Global and National Commerce Act, any version of the Uniform Electronic Transactions Act or any other statute governing electronic transactions.

To comply with United States Treasury Regulations, we advise you that any discussion of Federal tax issues in this e-mail was not intended or written to be used, and cannot be used by you, (i) to avoid any penalties imposed under the Internal Revenue Code, or (ii) to promote, market or recommend to another party any transaction or matter addressed herein.

# APPENDIX 6



200 St. Paul Street, Suite 2420
Baltimore, Maryland 21202
Phone  800.638.3186
Fax  410.783.0041

November 23, 2016

Mr. Michael Cloud
120 Mont Blanc Drive
Heath, Texas 75032

Re:   **Bert Bell/Pete Rozelle NFL Player Retirement Plan—Final Decision on Review**

Dear Mr. Cloud:

At its November 16, 2016 meeting the Retirement Board of the Bert Bell/Pete Rozelle NFL Player Retirement Plan ("Plan") considered your appeal from the Disability Initial Claims Committee's ("Committee") decision denying your request for reclassification of your total and permanent disability ("T&P") benefits to the Active Football category.  We regret to inform you that the Retirement Board denied your appeal for the reasons described below.

**Discussion**

The Plan received your original application for T&P benefits on July 1, 2014.  As you know, the Committee found you to be totally and permanently disabled by virtue of your Social Security Administration ("SSA") disability award, and it awarded you Inactive A T&P benefits, effective May 1, 2014.  The basis for the Committee's decision was explained to you in a letter dated July 23, 2014.  You did not appeal that decision.

By letter received February 17, 2016, your representative, Jennifer Cloud, requested that your Inactive A benefits be reclassified to the Active Football category.  She stated that you "became disabled in 2005, while playing for the New York Giants due to cumulative mental disorder," and she submitted a copy of your SSA file and other records.

The Committee denied your request for reclassification by letter dated March 2, 2016.

By letter received September 2, 2016, Ms. Cloud appealed the Committee's decision to the Retirement Board.  With the appeal, she stated that your SSA award resulted from a severe mental disorder stemming from multiple concussions, and she argued that your disability arose shortly after your October 2004 head trauma.  Ms. Cloud submitted additional medical records with her appeal, such as a report from psychologist Dr. John Cronin dated February 2, 2012.

MYGOALLINE.COM

CLOUD-AR-518

Mr. Michael Cloud
November 23, 2016
Page 2

At its November 16, 2016 meeting, the Retirement Board reviewed your request for reclassification and determined that it must be denied. Section 5.7(b) governs requests for reclassification such as yours. It permits reclassification only where a Player "shows by evidence found by the Retirement Board… to be clear and convincing that, because of changed circumstances, the Player satisfies the conditions of eligibility for a benefit under a different category of T&P benefits." The Retirement Board interprets Section 5.7(b)'s "changed circumstances" requirement to mean a new or different impairment from the one that originally qualified you for T&P benefits. Because you seek reclassification to Active Football, you would have to clearly and convincingly show that (1) you have a new or different impairment (Section 5.7(b)), (2) that new or different impairment arose while you were an Active Player (Section 5.3(a)), and (3) it caused you to be totally and permanently disabled "shortly after" it first (Section 5.3(a)). Under Section 5.3(e) of the Plan, you satisfy the "shortly after" requirement if you became totally and permanently disabled within six months of when your disabling condition or impairment first arose. Conversely, you do not meet the "shortly after" requirement if you became totally and permanently disabled more than twelve months after the condition or impairment arose. The Retirement Board has "the right and duty to determine whether the 'shortly after' standard is satisfied" for any claim of total and permanent disability falling within this six to twelve month period.

The Retirement Board reviewed your 2014 application for T&P benefits and noted that it was based on a combination of orthopedic, neurological, and cognitive impairments, such as post-concussion syndrome, clinical depression, dementia pugilistica, migraine, vertigo, impaired verbal fluency, acute compartment syndrome, plantar fasciitis, cluneal nerve injury, and multiple orthopedic impairments. The Retirement Board also noted that your request for reclassification is based on what you call "severe" mental impairments, but those are the same impairments listed in your 2014 application, and they formed the basis of your award of Inactive A T&P benefits (and your SSA award). Thus, the Retirement Board determined that you have not met Section 5.7(b)'s reclassification requirements because you have not clearly and convincingly shown that you are totally and permanently disabled by a new or different impairment. The Retirement Board also determined that, even if your request for reclassification were based on a new or different impairment, the medical evidence you submitted does not show that you meet the requirements for the Active Football category. The evidence you submitted does not show that you are totally and permanently disabled, and it all falls well outside any conceivable "shortly after" period required for Active Football benefits. The Retirement Board noted that, for the Active Football category, it is not enough that your disability first arise during your NFL career; it must also become totally and permanently disabling "shortly after" it first arises.

CLOUD-AR-519

Mr. Michael Cloud
November 23, 2016
Page 3

In any event, the Retirement Board also determined that your appeal was untimely under Section 12.6(a).  The Retirement Board noted that (1) according to Plan records, you received the decision letter on March 4, 2016; (2) that decision letter advised you of the 180-day appeal deadline (which expired on August 31, 2016); and (3) the Plan did not receive your appeal until September 2, 2016, two days after the 180-day deadline expired.

For these reasons, the Retirement Board concluded that it cannot honor your request to reclassify your existing Inactive benefits to the Active Football category.  For this reason, the Retirement Board denied your appeal.

**Appeal Rights**

You should regard this letter as a final decision on review within the meaning of Section 503 of the Employee Retirement Income Security Act of 1974, as amended, and the regulations issued thereunder by the Department of Labor.  You are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to your claim for benefits.  You have the right to bring an action under Section 502(a) of the Employee Retirement Income Security Act of 1974, as amended, within 42 months from the date of this letter, which is May 16, 2020.

Please call the NFL Player Benefits Office if you have any questions.

Sincerely,

*Michael B Miller*

Michael B. Miller
Plan Director

Enclosure

cc: Jennifer Cloud

# APPENDIX 7

**BERT BELL/PETE ROZELLE NFL PLAYER RETIREMENT PLAN**
**RETIREMENT BOARD MEETING MINUTES**

November 15-16, 2016
Atlanta, Georgia

A meeting of the Retirement Board of the Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Retirement Plan" or "Plan") was held in Atlanta, Georgia on November 15-16, 2016. The following individuals attended:

**Retirement Board:**

Management Council designated members:

Katie Blackburn
Dick Cass
Ted Philips

NFLPA designated members:

Sam McCullum
Jeff Van Note
Robert Smith

Commissioner's Delegate:

Harold Henderson

**Additional Attendees:**

| | | |
|---|---|---|
| Gerald Abrams (by telephone) | Eric Field | Heather McPhee |
| Alvaro Anillo | Chris Flohr | Mike Miller |
| Audrey Askew (by telephone) | Bruce Gould | Lashay Rose |
| Hoby Brenner | Eric Harnish | Craig Svendsen |
| Mike Casey | Mike Junk | Sam Vincent |
| Andre Collins | Kristen Kirk | Adora Williams |
| Tom DePaso | Larry Lamade | Michele Yaras-Davis |
| Jack Donlan | Alex LeBlanc | |
| Stacey Eisenstein | Belinda Lerner | |
| Doug Ell | Mike Maricco | |
| Larry Ferazani | Bethany Marshall | |

All present could hear each other and be heard. Unless otherwise noted, all actions were unanimous.

1



**Individual Player Cases**

The Retirement Board took the following actions (unless otherwise noted, all actions were unanimous):

A.   **BENEFIT CONTINUATION**

REDACTED

B.   **MISCELLANEOUS BENEFITS**

REDACTED

2.   **Michael Cloud** On review of appeal from earlier decision to award Inactive A total and permanent disability benefits effective May 1, 2014, denied appeal for reclassification to the Active Football category for failure to meet the requirements of Plan section 5.7(b).

REDACTED

C.   **Credited Seasons**



7