UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

**********************************************************

MICHAEL CLOUD,

     Plaintiff,

VS.

                         CASE NO.  3:20-cv-01277-S

THE BERT BELL/PETE ROZELLE
NFL PLAYER RETIREMENT PLAN,

     Defendant.


**********************************************************

TRANSCRIPT OF MOTION TO COMPEL
HEARD BEFORE THE HONORABLE KAREN GREN SCHOLER
UNITED STATES DISTRICT JUDGE

AUGUST 25, 2021

**********************************************************


APPEARANCES:

FOR THE PLAINTIFF:          Mr. Christian Dennie
                        BARLOW GARSEK & SIMON, LLP
                        920 Foch
                        Fort Worth, Texas 76107
                        cdennie@bgsfirm.com


FOR THE DEFENDANT:         Mr. Edward J. Meehan
                        GROOM LAW GROUP
                        1701 Pennsylvania Avenue
                        N.W.
                        Washington, D.C. 20006
                        emeehan@groom.com

1                    A P P E A R A N C E S
                          (Continued)
2

3   FOR THE DEFENDANT:              Mr. Nolan Knight
                                    MUNSCH HARDT KOPF & HARR, PC
4                                   3800 Lincoln Plaza
                                    500 North Akard Street
5                                   Dallas, Texas 75201
                                    nknight@munsch.com
6

7   Official Court Reporter:        Thu Bui, CSR, RMR, CRR
                                    1100 Commerce Street, #1654
8                                   Dallas, Texas 75242
                                    (214) 753-2354
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24         Proceedings recorded by mechanical stenography,

25   transcript produced via computer

<u>I N D E X</u>

                                                    <u>PAGE</u>

Appearances............................     1

Proceedings............................     4

Adjournment............................    91

Reporter's Certificate.................    92

<u>**P R O C E E D I N G S**</u>

(Call to order of the court.)

THE COURT:  This is Civil Action

Number 3:20-cv-01277-S, Cloud v. The Bert Bell/Pete Rozelle NFL

Player Retirement Plan.

Counsel, please state your appearance.  Let's

start with the Plaintiff.

MR. DENNIE:  Christian Dennie at Barlow Garsek & Simon,

and I'm accompanied by Holden Cammack, a law clerk in our firm.

THE COURT:  Okay.  On behalf of Defendant.

MR. MEEHAN:  Good afternoon, Your Honor.  Edward

Meehan, and with me is Nolan Knight.

THE COURT:  Okay.  And you're taking the lead today,

right?

MR. MEEHAN:  Yes, Your Honor.

THE COURT:  So why don't you pull the microphone close

to you.

So before the Court today is ECF Number 41,

Michael Cloud's motion to compel.  The Court has the motion,

which is extensive.  It's titled Plaintiff's Emergency Motion

to Compel Compliance with Court's Order and Production of

Documents and Records and Incorporated Brief in Support

Thereof.  It's ECF Number 41.  ECF -- Defendant's opposition

titled Defendant's Opposition to Plaintiff's Emergency Motion

to Compel Compliance with Court's Order and Production of

1    Documents and Records, this is filed as ECF Document Number 46.

2    And then the Plaintiff's reply titled Plaintiff's Reply in

3    Support of Emergency Motion to Compel Compliance with Court's

4    Order and Production of Documents and Records and Incorporated

5    Brief in Support Thereof.  It's filed as

6    ECF Document Number 50.  There are appendices and documents

7    attached and those have been reviewed by the Court as well.

8    All those are before the Court.

9                   And so at this time it's your motion, Mr.

10   Dennie.  Go ahead.

11        MR. DENNIE:  Thank you, Your Honor.  I appreciate your

12   time today.  And I will admit to you from time to time when I

13   have a mic, my voice drops down.

14        THE COURT:  Pull the mic really close to you.

15        MR. DENNIE:  'Cause I think I'm being too loud.  So if

16   I get too quiet, just let me know.  Okay?

17        THE COURT:  Pull it close to you 'cause you're almost

18   too quiet.

19        MR. DENNIE:  How about now?

20        THE COURT:  That's better.

21        MR. DENNIE:  If I could, I'll just give you a little

22   bit of background on factual issues and kind of where we are

23   and then launch into what we're here to discuss.

24                   So Michael Cloud is a former NFL football

25   player.  He is a graduate of Boston College.  He was drafted in

1    the second round by the Kansas City Chiefs in 1999.  He played

2    for three teams in the NFL between 1999 and 2005, three teams

3    being the Chiefs, the Patriots, and the Giants.  Winning a

4    Super Bowl with the Patriots that was following the 2003

5    season, Super Bowl played in 2004.

6              What the real crux of this case and where it

7    starts is Mr. Cloud was playing running back for the New York

8    Giants on October 31st, 2004, in a game against the Minnesota

9    Vikings in Minnesota.  He was running left on a hand-off, gains

10   about 11 yards in the fourth quarter, has a helmet-to-helmet

11   collision that knocks him backwards to the ground.  He couldn't

12   get up, a teammate helped him to his feet and then walked him

13   back to the huddle, then he went down.

14             Now, part of the thing with this case is we

15   think in terms of what things are like now.  Things were very

16   different in 2004.  A helmet-to-helmet collision was not a

17   penalty.  Now it's an ejection.  A concussion that he received

18   has a five-step process to return to play now.  Then, there was

19   no such process.

20             Mr. Cloud returned to football activities

21   48 hours after his concussion and sustained further injury to

22   the point to where in 2005 when he returned to play, he could

23   not remember basic running back plays he'd been running since

24   he was seven years old.  Things like sweeps, dives, where to

25   line up.  No clue.  Quarterbacks had to whisper in his ear what

1    he needed to do.

2              After the 2005 season, that concluded Mr.

3    Cloud's play in the NFL.  He never worked again.  He attempted

4    to serve as a personal trainer.  He had a couple of spot

5    personal training sessions here and there but could never

6    regain any type of employment.  And that's not just from

7    concussions he received, but also from orthopedic injuries.

8              He had a number of major orthopedic injuries,

9    one of which, as you've probably seen in the pleading, a big,

10   large piece of muscle had to be removed from his shin in a

11   surgery due to an infection he received while playing with the

12   Patriots.

13             So that kind of brings us to where the facts

14   are of the case.  What we get to is a process that has been

15   heavily disputed, fought about, congressional hearings, and

16   that's the opportunity in how players obtain disability

17   benefits.  This has been an ongoing struggle, an ongoing battle

18   for players for many years.

19             Mr. Meehan's firm developed the plan document

20   in 1993, and they stayed on course ever since representing the

21   Plan, representing Committee, representing the Board,

22   representing the NFL Players Association all at the same time.

23   And this is all in our brief.  It's all cited with testimony.

24             So in 2009, Mr. Cloud applied for benefits for

25   the first time.  He was initially denied benefits but was later

1    granted what are called line of duty benefits, which is a much

2    lower-level benefit.  In 2004, he came back and asked for a

3    total and permanent disability benefits, which is a much higher

4    level.  He received some total and permanent disability

5    benefits.

6              In 2006, he came -- or excuse me -- 2016, he

7    came back and requested reclassification of those benefits to

8    what are called active football benefits under the terms of the

9    Plan in Article 5.  That's what this dispute is about.  It is

10   the reclassification decision in the plan, which is

11   Section 5.7(b) of the plan.  It requires the player to

12   establish by clear and convincing evidence a changed

13   circumstance.  Neither clear and convincing evidence or changed

14   circumstance is defined in the plan.

15             What was eerie and odd and completely appalling

16   is none of the people that have provided deposition testimony

17   can tell me where the changed circumstances language came from,

18   including Chris Smith who has been on the Committee since its

19   inception in 2006.  The next thing that's appalling in this

20   process, the Committee and the Board ultimately rendered

21   decisions and a written letter is provided.  They never see the

22   letter.  They never comment on the letter.  They don't write

23   the letter.  They don't make any changes to the letter.  And

24   never see it before it goes to the player.

25             And in Ms. Smith's case, she said she never saw

1    the letters that she supposedly granted or -- granted or denied

2    in this case.  Never saw them anytime before the preparation

3    for this deposition that we talked about.

4              So, so far what we've done is we've deposed

5    three people.  This Court on July 22nd gave us authority to

6    depose Chris Smith and Patrick Reynolds, both of whom are on

7    the Disability Initial Claims Committee.  They have an acronym

8    and they call it something, but I call it the "Committee."

9              So those two people have been deposed.  I've

10   cited to you in our -- in our reply brief 'cause at the time we

11   filed our initial brief we didn't have the transcripts.  But we

12   cited to you all of this odd, weirdness that occurred.

13             And I'll be frank with you, Your Honor, I'm a

14   sports and entertainment attorney.  I'm not a full-time ERISA

15   lawyer.  I'm not going to run into Mr. Meehan in another case.

16   I'm a sports and entertainment attorney.  Like you were before

17   you were on the bench, I'm a AAA arbitrator that handles a lot

18   of sports and entertainment cases.  I've seen a lot.  I've

19   represented panels.  I've represented committees.  I've

20   represented boards.

21             I have never been in a circumstance where I've

22   seen people that decide a case, in theory decide the case, not

23   ever see their decision.  Never read it.  Never have a copy of

24   it.  Don't really know what's in it.  Testify that they didn't

25   give the definition of changed circumstance that's in the -- in

1    the document.  That's not what they said.  Nobody asked them if

2    that was the definition they would apply.

3              And, in fact, in their deposition they said --

4    and specifically Ms. Smith -- said Mr. Cloud did meet the

5    definition of changed circumstance as used in Section 5.7(b) of

6    the plan.

7              So we've got this process that is extremely

8    odd.  People that really don't know what is going on.  Mr.

9    Reynolds, I believe by calculation, is about 26 when he got on

10   to the Committee and was fresh out of college, a couple of

11   years at the NFL.

12             So we get to this point and now we're to the

13   point of Mr. Cloud has appealed the denial of his

14   reclassification request made by the Board -- or by the

15   Committee, I should say.  He's appealed that to the Board.  The

16   Board consist of three people appointed by the NFL Management

17   Council, which are all -- three individuals that work for NFL

18   teams and then three people that are appointed by the NFL PA,

19   the union for the players, which are all former NFL players.

20             There are some minutes in this case that show

21   that the decision they made to deny Mr. Cloud his

22   reclassification benefits was based on he didn't meet the

23   changed circumstances language --

24        THE COURT:  All right.  Let me stop you.

25        MR. DENNIE:  Yes, ma'am.

1          THE COURT:  Don't lose your train of thought, okay?

2          MR. DENNIE:  Okay.

3          THE COURT:  So who was on the committee --

4          MR. DENNIE:  Yeah.  Sure.

5          THE COURT:  -- that denied -- what I'm talking about,

6    we're floating a lot of the dates out here -- 2016.  We're

7    talking about --

8          MR. DENNIE:  Okay.  Correct.

9          THE COURT:  -- the 2016 reclassification.

10          MR. DENNIE:  Yeah.  The committee -- the committee

11    members were the same in '14 and '16.

12          THE COURT:  Okay.  Who were on the committee?  How many

13    people?

14          MR. DENNIE:  Two.

15          THE COURT:  And who were they?

16          MR. DENNIE:  Patrick Reynolds and Chris Smith.

17          THE COURT:  They were the only --

18          MR. DENNIE:  Only two people.

19          THE COURT:  Only two people.

20                Okay.  And then it goes to the Board, and

21    you've identified six people.

22          MR. DENNIE:  Correct.  And those are --

23          THE COURT:  Those are the six that were on the Board

24    that agreed with the Committee?

25          MR. DENNIE:  At that time.  Those people are different

1    now --

2          THE COURT:  All right.

3          MR. DENNIE:  -- but the six that we're seeking to

4    depose are those people --

5          THE COURT:  That's what I'm asking.

6          MR. DENNIE:  Yes.

7          THE COURT:  Okay.

8          MR. DENNIE:  Yeah.  Katie Blackburn --

9          THE COURT:  All right.  And so only two people in the

10   committee, according to you, didn't see the decision, a copy of

11   the decision, didn't know the definitions of the documents, and

12   really didn't see any of the medical records, right?

13         MR. DENNIE:  I didn't say the medical records.  They

14   don't recall what they saw.  What -- what Ms. Smith testified

15   to was she may not have read all of Mr. Cloud's medical records

16   before making a decision.

17         THE COURT:  Okay.  I think I saw that.  But then the

18   Committee, what they do is -- then it goes to the Board?

19         MR. DENNIE:  Correct.

20         THE COURT:  And that's called an appeal to the Board?

21         MR. DENNIE:  Appeal of the reclassification, yes,

22   ma'am.

23         THE COURT:  Okay.  And they're the six individuals that

24   you choose to depose?

25         MR. DENNIE:  Those are the ones we're requesting.

1          THE COURT:  All right.  And this is a very narrow

2     question I'm going to ask you.

3               I'm going to ask you, Mr. Meehan, to listen up.

4               But what is the Board supposed to do?  Are they

5     supposed to take a fresh look?  Is it a de novo review of what

6     the Committee did?  Or is it just -- you know, what's the

7     standard of the Board's review of the Committee?  Do you know.

8          MR. DENNIE:  Your Honor, my understanding is

9     Section 5.7(b) of the plan does not state one way or another.

10    But based on, you know, what I understand from getting through

11    this process is they essentially give a de novo review.  They

12    start over and look at the records on their own.

13         THE COURT:  Mr. Meehan?

14         MR. MEEHAN:  Yes, Your Honor, I agree with that.  The

15    Board's practice is to take a fresh look or a de novo review.

16         THE COURT:  Okay.  So, you know, analogizing to the

17    Court, you know -- if the court of appeals takes a de novo

18    review of what I do or what I do takes a de novo review of what

19    a magistrate judge does, that means you take a fresh look and

20    basically start all over and make your own decision.  So are we

21    in agreement what de novo review means?

22         MR. MEEHAN:  Yes, ma'am.

23         THE COURT:  As far as the Board.

24         MR. MEEHAN:  As far as the Board, yes.

25         THE COURT:  Is that defined anywhere on their standard

1 of review?

2    MR. MEEHAN:  I do not know offhand.  I'm sorry.

3    THE COURT:  You don't know -- now, is it true what he

4 said, that your law firm created the plan, has been involved in

5 the plan since 1993?

6    MR. MEEHAN:  My understanding is that lawyers at my law

7 firm were principal drafters, but I am not personally familiar

8 with that process.

9    THE COURT:  Okay.  All right.  But you're familiar with

10 the plan, right?

11    MR. MEEHAN:  Yes.

12    THE COURT:  Very?

13    MR. MEEHAN:  Yes.

14    THE COURT:  And you can't tell me right now what the

15 standard of review of the Board to the Committee is?

16    MR. MEEHAN:  My understanding is the practice is as

17 we've described, but I cannot at the moment cite a provision of

18 the plan that speaks directly to that issue.

19    THE COURT:  Do you think it exist, seriously?  'Cause

20 I'm going to go look for it.  You can save me some work.

21    MR. DENNIE:  It does not.

22    MR. MEEHAN:  I would be happy to look for it, but

23 offhand I don't -- I don't know of a provision on that point.

24 I think it's more a practice that has --

25    THE COURT:  So it's a practice that everybody assumes

1  is a de novo review, but there's nothing in the plan that tells

2  the board members what they should be doing?

3         MR. MEEHAN:  I can't say yes or no, Your Honor -- I

4  apologize -- without having to look at the plan, but I believe

5  that that is correct.

6         THE COURT:  And the practice of the Board -- and you're

7  real familiar with generally.  I'm not talking about Michael

8  Cloud's case, but I will be talking.  It's supposed to be -- I

9  mean, it's only fair, isn't it, that they just take a fresh

10 look?  And they're supposed to appeal -- something that's this

11 important, they're supposed to look at everything, right, de

12 novo?

13        MR. MEEHAN:  Your Honor, what -- as the Court said,

14 whether it's, quote, only fair, end quote, what I do understand

15 is that it is the practice to --

16        THE COURT:  It is the practice.  Okay.

17        MR. MEEHAN:  Yes.

18        THE COURT:  So it wouldn't be the practice if they just

19 rubber stamped it?

20        MR. MEEHAN:  That is correct.  And my understanding is

21 that they do not simply rubber stamp.

22        THE COURT:  Okay.

23        MR. MEEHAN:  They take an independent assessment.

24        THE COURT:  Okay.  Thank you.

25             Go back to what you were discussing before.

1    Okay.  So a committee of two people reviewed Mr. Cloud's -- I

2    may be getting some of this terminology wrong, but request for

3    reclassification, right?

4              MR. DENNIE:  Yes, Your Honor.

5              THE COURT:  That was denied?

6              MR. DENNIE:  Correct.

7              THE COURT:  You deposed those two people and they

8    testified as they testified, and then it's appealed to the

9    Board.  Continue.

10             MR. DENNIE:  Okay.  So then you go to the Board.  The

11   Board reviews the same set of documents, in theory.  And

12   where --

13             THE COURT:  Well, we don't -- we don't know that.

14             MR. DENNIE:  That's --

15             THE COURT:  'Cause nobody in this room has been able to

16   tell me what the Board's obligations are when they review the

17   Committee's decisionmaking.  But go on.

18             MR. DENNIE:  It is not in the plan, to my knowledge.

19             THE COURT:  Okay.

20             MR. DENNIE:  I reviewed the plan -- I haven't been able

21   to ask them the question yet.  And, frankly, the three people

22   that have been deposed, the two committee members and the

23   corporate representative, can tell me nothing about what the

24   Board did in this case.  So what I'm looking --

25             THE COURT:  And I think you represented in your

1    materials that it's the Plaintiff's position that the

2    Committee and, because you deposed them, and possibly the

3    Board, didn't have access to all of Michael Cloud's medical

4    records?

5            MR. DENNIE:  That's correct.  That's our position for

6    certain.  And kind of dovetailing off of that, if you recall --

7            THE COURT:  All right.  So --

8            MR. DENNIE:  Yeah.

9            THE COURT:  -- we have a reclassification that's

10   dependent on an analysis of many things, including whether or

11   not there's brain injury to Michael Cloud.  You agree?

12           MR. DENNIE:  Correct.

13           THE COURT:  You agree, Mr. Meehan?

14           MR. MEEHAN:  That the basis of his reclassification was

15   brain injury?

16           THE COURT:  No, no.  The Board's supposed to review and

17   analyze whether or not there was a brain injury to Michael

18   Cloud.

19           MR. MEEHAN:  Your Honor, I would say the Board --

20           THE COURT:  I'm not talking about the Board.  The

21   Committee.

22           MR. MEEHAN:  It would be the same for -- for both.  But

23   the Committee -- the Committee is to review the application for

24   benefits and to make a determination as to whether, based on

25   the information presented, the applicant is entitled to

1    benefits.

2           THE COURT:  Is it undisputed that not all of the

3    medical records were presented to the Committee or the Board

4    that -- that relate to Michael Cloud and his physical condition

5    or damage from playing in the NFL?

6           MR. MEEHAN:  No.  That is disputed, Your Honor.

7           THE COURT:  That is disputed?

8           MR. MEEHAN:  Yes.

9           THE COURT:  You're saying they have everything?

10          MR. MEEHAN:  I have to answer it a little bit

11   differently rather than a yes or no, is -- is that the way the

12   process -- and I'll be brief 'cause I know my turn is yet to

13   come.  But the way the process works is the applicant is

14   allowed and encouraged to present, in essence, anything the

15   applicant believes.

16          THE COURT:  I understand that.  My question is:  It's

17   undisputed that whether the applicant presented the medical

18   documents, or you got it from some other means, that not all of

19   the medical records were before the Committee or the Board?

20          MR. MEEHAN:  No.  That is -- that is disputed.  There

21   is an allegation --

22          THE COURT:  But there are other medical records out

23   there?

24          MR. MEEHAN:  There's an allegation that there's one

25   specific medical record out there.  We do not know whether it

1    exists, but we recognize there's an allegation of it.  Neither

2    the Committee nor the Board ever reviewed it and has never seen

3    it and does not have it and does not have access to it.  And we

4    don't know whether it exists, but we know the Plaintiff says it

5    does.

6              THE COURT:  So the Plan's position is that Michael

7    Cloud have all the -- the Committee or the -- and/or the Board

8    have all the medical records of Michael Cloud before it?

9              MR. MEEHAN:  The Defendant's position is that Plaintiff

10   has alleged that there's one medical record that no one has

11   seen that exists.  That medical record, we don't know whether

12   it exists.  And it was never reviewed and never presented.  And

13   as a matter of law --

14             THE COURT:  I'm just trying to get to a simple point.

15             MR. MEEHAN:  Well, what I'm getting at is --

16             THE COURT:  What I'm -- excuse me.

17             MR. MEEHAN:  Sorry.

18             THE COURT:  Reading all the papers in this case, there

19   appears that there is a possibility and probability that there

20   are medical records that are out there that were never before,

21   rightly or wrongly, before the Committee or the Board.  I'm

22   just trying to establish what we can say is undisputed.

23                  Are you disputing, or are you saying you don't

24   know that there's other medical records that were present in

25   2016 other than one document?

1          MR. MEEHAN:  I -- I am saying that there is one medical

2     document that has been described as existing.  I believe there

3     are other facts to suggest that there is no such document, but

4     in any event, it was never presented to the Committee or the

5     Board and therefore could not be considered.

6          THE COURT:  Okay.  So you are disputing that -- despite

7     all these other doctor visits that are outlined in the

8     Plaintiff's briefing and pleadings, you're disputing that those

9     medical records even exist.

10         MR. MEEHAN:  I am -- I am actually trying to be even

11    more precise.  There are a lot of broad statements in the

12    Plaintiff's papers.  When you look at the specifics, there is

13    one and only one medical record that is alleged to exist

14    that -- that was not presented.

15         THE COURT:  And which one is that?

16         MR. MEEHAN:  That's the -- the allegation that at some

17    point in 2005 while Plaintiff was playing for the New England

18    Patriots, the team conducted what is known as an impact exam,

19    which is a -- an examination of an individual concerning the

20    effects of concussions.  So there's an allegation that the

21    Patriots conducted that exam in 2005 at some point.  There are

22    reasons, which I can get to, to question whether that really

23    occurred.  But in any event, that exam, if it existed or

24    exists, was never presented and therefore never considered.

25    And as a matter of law, we would say it was not our duty to

1    obtain it.

2         THE COURT:  So my effort to try to get you to answer

3    the direct question has just been kind of a waste of time on my

4    part.  There have been medical visits that are outlined in the

5    Plaintiff's pleadings.  They talk about doctor visits,

6    multiple.  And my common sense and life experiences is that

7    every time I go to a doctor, the doctor makes record of it.

8    Probably more records than we even want.

9              So you're saying that there's only one record

10   that's out there that you don't dispute exist?

11        MR. MEEHAN:  No, Your Honor.  And I'm sorry to belabor

12   this, and I don't mean to try the Court's patience.  But all

13   medical records known to the Plan have been turned over to

14   Mr. Cloud.  There is one record, the Patriots' impact exam,

15   which the Plaintiff says exists.  We have no knowledge as to

16   whether it --

17        THE COURT:  Can you agree with me that if Mr. Cloud

18   went and visited all these doctors, that he -- that his lawyer

19   says he visited, that those would have created medical records

20   that were not before the Plan -- I'm sorry -- before the

21   Committee or the Board?

22        MR. MEEHAN:  No, Your Honor, I can't.  My understanding

23   is all those records were turned over to Mr. Cloud.  So to

24   the -- to the extent they existed, they would have been

25   considered.

1       THE COURT:  I'm not saying what's in -- in the

2   possession of the Committee or the Plan or the Board.  I'm just

3   saying that if Mr. Cloud went to see a doctor yesterday, there

4   would be medical records that were created that are out there

5   that are not before the -- that were not before the Committee

6   or the Board, correct?  That's all I'm trying to do.  There are

7   some medical records that are out there that the Committee or

8   the Board or your law firm didn't have the benefit of.

9       MR. MEEHAN:  I don't believe that to be true, Your

10  Honor.

11      THE COURT:  Okay.  So -- all right.

12      MR. MEEHAN:  That's not based on the information that I

13  have.  There are allegations but no support for it.

14      THE COURT:  All right.  Go ahead.

15          So it is disputed that there are no medical

16  records, that they don't have, that wasn't presented that

17  relate to all the things that you are saying, other than one

18  document that may or may not exist relating to the 2005

19  New England Patriots' impact exam.

20          You can continue.

21      MR. DENNIE:  So, Your Honor, I'll just follow up on

22  that point for a second, then I'll jump back.

23      THE COURT:  Okay.

24      MR. DENNIE:  If I may.

25      THE COURT:  Go ahead.

1       MR. DENNIE:  So the impact exam that was done on

2  Mr. Cloud in 2005 by the Patriots, the interesting part about

3  that is it was developed by a doctor named Grant Iverson, who

4  is also involved in creating the concussion standards from the

5  Third Circuit concussion case.  So, I mean, it's -- it's all

6  weaved in there.  But one of the major points of this case is

7  the fact that there's an NFL repository of documents.

8       If you read earlier filings in this case, the

9  Groom law firm fought tooth and nail indicating there is no

10  repository.  Well, then you depose Patrick Reynolds who, for

11  most of the time he was on the Committee, worked for the NFL,

12  he says, sure, there's a repository.  Then you depose Chris

13  Smith who works for the NFL Players Association and she says,

14  oh, yeah, sure, there's a repository.  And then you depose the

15  corporate representative who works for the Plan office and he

16  goes, oh, yeah, it's called the EMR repository.  So there's a

17  repository of information.

18       And all sports have this, where they compile

19  electronic records so when you go from one team to the other,

20  they can just transfer with a button so everybody knows how

21  these highly-skilled athletes have been trained, have been

22  hurt.  You know, whatever the issues are, it's all there.

23       THE COURT:  Okay.  But Mr. Meehan is disputing that

24  this impact exam by the Patriots in 2005 -- I mean, he's

25  casting a lot of doubt it even exist.  What do you say about

1    that?

2           MR. DENNIE:  I think that's -- that is extremely sad

3    and unfortunate to say that Michael Cloud made up that he was

4    having concussion-related symptoms and issues in 2005 to the

5    point to where he just created that he sat for a 2005 impact

6    exam.

7           THE COURT:  Okay.

8           MR. DENNIE:  We can't find the record.  We don't know

9    where it went.  We have no idea.  We've asked for it.  We tried

10   to get it from the Patriots.  We tried to get it from them.

11   Where is it?  We don't know.

12          THE COURT:  Okay.

13          MR. DENNIE:  But he sat for the exam and then later he

14   got cut for not remembering a play.  So I don't know why they

15   take the position.  They said some critical things about that

16   in the filing to this Court in opposition which, again, I think

17   is sad.

18          THE COURT:  Do you have anything that corroborates

19   that, besides his word, that Mr. Cloud sat for the impact exam?

20          MR. DENNIE:  We don't have a document, Your Honor.

21   Only -- only thing we can point to is Mr. Cloud's testimony --

22          THE COURT:  Okay.

23          MR. DENNIE:  -- that he sat for the impact exam.

24          THE COURT:  Okay.  Well, why don't you continue.

25          MR. DENNIE:  Okay.  So going back to the Board level.

1    The Board level is considering Section 5.7(b) of the plan

2    document the same way the Committee did and making a decision

3    on that.  We believe there were highly questionable issues at

4    the Board level, like there were at the Committee level.  But

5    what we -- where we're really getting into an issue is if you

6    look at the minutes, which we put in -- I believe it's

7    Appendix 7 of our reply brief.  The minutes reference that

8    Mr. Cloud didn't meet the requirements of 5.7(b).

9              If you look at Appendix 6, which is their

10   opinion letter, it goes into all these other things.  It

11   doesn't mention anything else in the minutes but has all this

12   other stuff in the letter.

13             So when I'm talking to Sam Vincent, who's the

14   corporate representative, and asked him, Who drafted that?

15   Groom firm.  Did any of the members of the Board actually

16   review this before it was sent?  No.

17             Somebody completely different, not on the

18   Board, not the Groom firm, but another employee of the Plan

19   signs the letter.  Did he write it?  No.  Did anybody on the

20   Board make any comments?  Are there any other comments in

21   addition to what's in the minutes as to how they arrived at

22   this alleged decision?  No.

23             So this is part of the issue that we have in

24   this case.  The true corporate representative that should have

25   been deposed in this lawsuit, from the Groom firm.  And I don't

1    throw stones at the lawyers.  I'm not hyperbolic.  That's just

2    not my style.  But all the information in this case in

3    preparation of the corporate rep is the Groom firm.  They

4    provided -- prepared him a 132-page binder that he was

5    literally reading from in the deposition.

6                    And I get to a point to where nobody knows

7    what the Board did.  The two committee members, they weren't at

8    the board meeting.  They didn't have any conversations with the

9    Board, according to them.  Mr. Vincent, who was at the board

10   meeting, can't determine what they did, how they did, did they

11   meet in executive session, did they announce it, their decision

12   in open -- openly in the board meeting.  None of that.

13                   The only people that can tell us what happened

14   in the board meeting, and all three of those witnesses

15   testified to the same, is those board members.  Those six that

16   we've identified -- three from the NFL side, three from the

17   players association side.  Those are the only people that know

18   how they came to a decision on Mr. Cloud's case.

19                   And, remember, we already have an admission

20   from the committee members saying Mr. Cloud did meet the terms

21   of changed circumstances as used in Section 5.7(b), and my

22   definition is different than what appears in this letter that I

23   never saw, didn't write, and didn't make any changes to.

24                   So we're in this vortex here where the

25   controlling party of the information is the Groom firm.

1  They're trying to shield the board members who are probably

2  going to testify similarly to what the committee members said

3  about their decision, they didn't really do much.  And we can't

4  get that information 'cause they're blocking it.  They're

5  blocking any opportunity for us to get the information that we

6  need to make a determination on how they got to that decision.

7  And they want to cite you the cases that say look at the letter

8  that was written, look at the letter that was written.

9         The problem is we already have testimony that

10 the very people that allegedly made the decision did not review

11 or have access to the letter that was sent to Mr. Cloud.  And

12 I'll be honest with you, I have advised panels in the sports

13 industry, major industry groups.  I written orders.  But there

14 is not a -- not a single chance, ever, that I would write an

15 order without taking their comments, sending it to them for

16 review, and having them provide their own analysis.  That's not

17 a law firm's job, but that's what happened here at every level.

18         So we're in this -- this space where all the

19 information is the Groom firm.  None of these people know

20 anything.  But I haven't had the -- at least that I deposed so

21 far.  I haven't had that opportunity to go and depose those

22 board members, and that's critical, critical to determining if

23 they met their requirements under ERISA, whether they gave a

24 full and fair review, whether they acted arbitrary and

25 capriciously, whether there's inconsistent review.  Those are

1    the key issues.

2                    And our position, Your Honor, is on July 22nd

3    in Docket Number 38, you've already ruled on that.  You've

4    given us the opportunity to determine whether they complied

5    with ERISA regulations.  You've already made that

6    determination.  You didn't say it's only written discovery or

7    you can't have deposition.  You said we're entitled to seek

8    discovery on those issues.

9                    And based on my reading of your order, it's

10   very close to what was decided in the *Vega* and *Crosby* cases,

11   which are the two major Fifth Circuit cases on ERISA discovery.

12   And neither of those cases talked about whether it was written

13   or oral depositions as to what we could get.

14                    These are huge issues for Michael Cloud.  This

15   is a disabled, total and permanently disabled gentleman that

16   played in an era before concussions were recognized.  The NFL

17   didn't recognize concussions as a disability, stating injury

18   until 2009.  And that came -- if you've seen the movie

19   *Concussion* -- that came after Bennett Omalu studied Mike

20   Webster's brain and created or came up with the term "CTE."

21   And also as an aside, by the way, the Plan also denied

22   Mr. Webster's claim for benefits before the Fourth Circuit

23   overturned some decisions.

24                    This is a standard game plan for them, is to --

25   to deny, deny, deny people that are disabled that are entitled

1    to the benefits.  And the important thing to understand is, who

2    are the beneficiaries of the plan?  The NFL players.  Michael

3    Cloud, beneficiary of the plan.  Who are the fiduciaries?  The

4    board members.  Those are the people.

5              So all this conversation that we're probably

6    going to hear about us requesting a counsel report and how

7    that's attorney-client privilege, I'll pump the brakes on that.

8    If you look at the case law, the actual client that the Groom

9    firm was representing were the beneficiaries of the plan, not

10   the board members.  So whatever advice they gave them on the

11   administration of claim, they're trying to apply that to the

12   wrong people.

13             And I'll cite you to the *Wildbur* case, which is

14   a big Fifth Circuit case.  974 F.2d 631.  A very recent case

15   out of the Northern District in 2020 which also involves a NFL

16   plan.  *Advanced Physicians v. Connecticut General Life*

17   *Insurance*, 431 F.3d 857.

18             THE COURT:  What are these cases that you're citing?

19   What proposition are they supposed to support?

20             MR. DENNIE:  Say that one more time, Judge.  I'm sorry.

21             THE COURT:  Why are you citing these cases?

22             MR. DENNIE:  Because the -- what you're probably going

23   to hear is them make arguments that certain things that we're

24   going to need to get into are attorney-client communication.

25   Those cases say that attorney-client communications with the

1    plan fiduciaries are not privileged because the true

2    relationship is with the beneficiaries, not the plan

3    fiduciaries.

4              So all this advice and all this process -- and

5    you have to understand the Groom firm creates the plan, they

6    advise the Committee, they advise the Board, they advise the

7    Plan office, they advise the NFL Players Association, they make

8    changes to the plan.  They provide advice on Committee and

9    Board decisions and they litigate the cases.  Inherent conflict

10   which, frankly, we're going to be moving for disqualification

11   here shortly anyway.  But these are the issues that we're

12   trying to hide the process here.

13             And they've done pretty well at hiding it in

14   the past, and that's why you see them citing other cases.  This

15   case is not like those others.  No one else has known that

16   these decisions were written by the Groom firm without the

17   Board actually ever seeing it, without the Committee actually

18   seeing it, without the Committee approving these decisions,

19   without the Board approving these decisions.

20             This is a completely new landscape.  All their

21   past case law is off the rails.  It's not there because the

22   facts and circumstances that have been pulled out in these

23   depositions have explained what this process really is.  And

24   it's alarm and appalling.  Never seen anything like this.  And

25   I represent all kinds of organizations and groups in this

1    industry and never seen anything like this.

2                So when -- when you look at the grand scheme of

3    things and -- and where this is -- and we've cited to you and

4    provided you excerpts of their testimony.  Take a look at it.

5    You will be alarmed with some of the things that they were

6    admitting to and agreeing with.

7                So going back to, again, why it is important to

8    talk to board members.  In addition to the fact that, yes, they

9    are the fiduciaries of the plan, they did decide the

10   reclassification final decision.  But look at what has been

11   filed by the Defendants themselves -- or what we have -- what

12   they have responded to in discovery.  They say things like the

13   Retirement Board provided a full and fair review, thus

14   providing the review by a retirement board the named fiduciary

15   of The Bert Bell plan that took into account all comments,

16   documents, and additional information submitted by the

17   Plaintiff.

18               So they're wanting us to take it as gospel

19   after learning that the members of the Board didn't actually

20   see the letter they want us to rely on.  But they're pointing

21   us back to the Groom firm's own letter that they wrote without

22   approval of the Board.

23               And if you look at a response to request for

24   production, the Retirement Board is the only body that isn't

25   material to the case because the Retirement Board's decision on

1    Plaintiff's February 2016 request for reclassification -- it

2    was them that decided it.  So, again, they're saying, no, go to

3    the Board.

4              We've deposed three people trying to get

5    information on what the Board did.  Committee said we don't

6    know, you got to go ask the board members.  Sam Vincent, the

7    corporate representative, I don't know what they did.  You have

8    to ask the board members.  Well, now they're blocking what all

9    their witnesses have already told us we need to go do.

10             These are the people who decided the case.  Two

11   of them are lawyers, which is different than the Committee who

12   has no medical and no legal training whatsoever.  Now,

13   Ms. Smith did testify that she ran across some concussion

14   studies in her job.  But both of those two admit, you know,

15   they don't have any training.  They may get some updates or

16   refreshers when the plan changes from the Groom firm, but they

17   don't -- they don't even think it's necessary to have any

18   knowledge of concussion in their review.

19             It's extremely important we have the

20   opportunity to talk to these people because they're the ones

21   that had to provide the full and fair review under ERISA.

22   They're the ones that couldn't act arbitrarily and

23   capriciously.  They're the ones that can't provide inconsistent

24   review.  Those are the things that we're going to ultimately

25   have to show you, which I believe we will based on what we've

1    already heard.  But the people that made the decision are the

2    board members.  That's why we need them.

3                    We cited to you the cases --

4           THE COURT:  I don't have the Board decision in front of

5    me, the actual document.  Who signs off on the Board decision?

6    Do they all sign off or...

7           MR. DENNIE:  No one from the Board signed off on it,

8    Your Honor.

9           THE COURT:  There was no signature?

10          MR. DENNIE:  No, nobody from the Board.  Michael B.

11   Miller, the plan director, signed it.

12          THE COURT:  So there's no chair of the Board or no...

13          MR. DENNIE:  No.

14          THE COURT:  That you're aware of?

15          MR. DENNIE:  No.

16          THE COURT:  So I didn't overlook that.  It's not there.

17          MR. DENNIE:  Yeah.  Mr. Miller is another --

18          THE COURT:  What is it that you are -- I know that you

19   told me off the record, before this hearing progressed on the

20   record, that you exchanged multiple e-mails with the Plan's

21   counsel, and that was since the motion was filed.  At this

22   point, what is it that you are seeking?

23          MR. DENNIE:  As it pertains --

24          THE COURT:  I think it's laid out -- is it any

25   different than what you laid out in the Plaintiff's reply --

1          MR. DENNIE:  Sure.

2          THE COURT:  -- on the -- hold on.  I'll read it to you.

3                    In the prayer for relief, that you're seeking

4     -- tell me if there's anything different -- that you're seeking

5     the depositions of Katie Blackburn, Dick Cass, Ted Phillips,

6     Sam McCullum, Jeff Van Note, and Robert Smith to begin such

7     depositions within five days, and that Defendant be ordered to

8     produce documents responsive -- we really haven't talked about

9     that -- Request for Production Numbers 18, 37, 57, 58, and

10    second Request for Production Number 3, and then you ask for

11    attorney's fees and expenses and cost.

12                    So what -- what is it that you're asking for

13    today now that you've had --

14          MR. DENNIE:  The only --

15          THE COURT:  -- exchanges with opposing counsel?

16          MR. DENNIE:  And to be clear, Your Honor, we did talk

17    before as well.  They did say they would revisit the board

18    member --

19          THE COURT:  And you represented to the Court that you

20    were given some documents --

21          MR. DENNIE:  Correct.

22          THE COURT:  -- today.  And you can...

23          MR. DENNIE:  Yes.  So the only thing that has changed

24    based on what we've previously submitted is they did submit

25    12 pages of records, which are pie charts.  And this is what

1    we're -- what we're dealing with here.

2                    During the deposition, I asked questions about

3    -- all three of them -- how many claims were filed, how many

4    were granted, how were any denied, where do we find that

5    information.  The director's report, the counsel's report.

6    Both Mr. [sic] Smith and Ms. [sic] Reynolds referred to those

7    two documents.  When are they prepared?  Quarterly for the

8    board meeting.  So these are things the Board reviews.

9                    During Mr. Vincent's deposition when we were

10   asking questions about certain records and how decisions were

11   made going towards trying to determine if they were arbitrary

12   and capricious decision, whether a full and fair review was

13   granted, whether anything was inconsistently decided, he

14   brought up, oh, we have a database where we log all of that.

15                   And I asked him, Do you have the ability to

16   make queries?

17                   And he said, Yeah, we can run queries for total

18   and permanent disability.  We can determine whether someone

19   received active football benefits or inactive benefits or

20   denied.  We can run query on that.

21                   I said, Well, if you run a query, how far back

22   can you go?

23                   Well, only since the system was created, which

24   I think was between 2011 and '13.

25                   I asked him, Well, how many --

1          THE COURT:  Okay.  Well, I think you're kind of...

2          MR. DENNIE:  I'm trying to...

3          THE COURT:  I think you're trying to explain the pie

4     charts that were given to you as opposed to answering the

5     Court's question which is, what is it that you want today?

6          MR. DENNIE:  Nothing's changed.

7          THE COURT:  Okay.

8          MR. DENNIE:  Other than we got these 12 pages.  I was

9     just trying to explain what else is out there that's not in

10    these 12 pages of pie chart.

11         THE COURT:  Okay.  So you are still seeking the same

12    relief that's set forth in the prayer for relief in the reply,

13    correct?

14         MR. DENNIE:  Yes, Your Honor.  You brought up -- I

15    believe we were not on the record at that point, but they have

16    filed a summary judgment since then.  We were hoping to also

17    address response deadline because we believe this discovery

18    that we're requesting here, we need this to, one, because we're

19    entitled to it.  But --

20         THE COURT:  I'll get to that.  What about -- we talked

21    a lot about the depositions that you want.  You want to comment

22    any further on the request for production documents that you

23    are seeking?

24         MR. DENNIE:  Yeah.  The request for production are in

25    two categories.  That's the -- what I was talking about -- the

1    director's report, counsel's report, plan database where you

2    can run queries, which Mr. Vincent testified there are

3    hundreds, not thousands, of what they can spit out into an

4    Excel spreadsheet that shows whether claims were granted,

5    denied, what benefits were granted and, you know, what time

6    periods so we can try to make a determination whether there was

7    an inconsistent review.

8              Counsel's report, director's report, as I

9    mentioned, are documents that all of their witnesses have

10   referred to is what I need to see.  And they're prepared

11   quarterly.  So it's not like this is a document that's prepared

12   365 times a day -- I mean, a year.  It's a quarterly report

13   that's presented to the Board at the board meeting.

14             So that's --

15   THE COURT:  So you're asking for a quarterly report?

16   MR. DENNIE:  Yeah.  There's two of them.

17   THE COURT:  Okay.

18   MR. DENNIE:  Counsel's report and a director's report,

19   which Ms. Smith said that the counsel's report addresses things

20   that are not just legal in nature.  Again, as I mentioned

21   before, we still take the position that the advice that they

22   provide is not privileged.  But, you know, those -- those are

23   the three documents that we are looking for on that side.

24             The medical records.  He was -- Mr. Cloud was

25   sent to three plan doctors.  We received for the first time

1    ever documents from Dr. Canizares on July 29, 2021.  There are

2    some outstanding documents to Dr. Mandelbaum -- from

3    Dr. Mandelbaum, who was another plan physician.  They initially

4    took the position that Mr. Cloud saw him at the direction of a

5    team after we presented them with a document confirming they

6    agreed that he is a plan physician.  We haven't seen those

7    documents.

8              We also believe that we should have access to

9    the medical repository of records that all the witnesses have

10   testified to.  Each of them said they didn't know how to access

11   it.  But Ms. Smith testified she would refer Mr. Cloud to the

12   Plan to get those records and, frankly, that's what Mr. Cloud's

13   testimony would be, that he called the players association and

14   the players association told him to call the Plan office to get

15   his medical records because he was a retired player.  And that

16   the Plan office told him and his now ex-wife, you know, we'll

17   get you the records.  And that's a part of the issue in this

18   case as well.

19             The first time in January 2019, Mr. Cloud gets

20   an e-mail from the Groom -- Groom firm providing 860 pages of

21   records.  If you look at the administrative record, it's 529

22   pages.  Then in this lawsuit, in addition to -- to the

23   administrative records, the Groom firm presented 1500 pages of

24   ex file records.  So we keep getting different records that

25   they're saying weren't in the administrative record, but we

1  keep getting new records.  Why weren't they in the

2  administrative records?  Nobody can answer that question,

3  either.

4              So there's a lot of things out there that are

5  prohibiting us from putting on the full facts in this case.

6  It's pretty simple though, ultimately.  Mr. Cloud's disabled.

7  He meets the definition of Section 5.7(b).  He was not provided

8  a full and fair review.  They're going to try to rely on what

9  the Board did and say, see, they met the ERISA regulation by

10 presenting this letter here that we prepared.  And we went.

11 That's the position they're trying to take in this case.  So

12 they're attempting to foreclose our ability to get the

13 information we need.

14             And I've already deposed three people without

15 key documents that I should have received, frankly, in response

16 to initial disclosures.  And now I'm trying to get those so I

17 can depose these board members.

18         THE COURT:  Okay.  Anything else that's not already in

19 your papers?

20         MR. DENNIE:  Yeah.  The only other thing, as I said,

21 Your Honor -- you may want to take this up later -- is, you

22 know, we -- if this case is going to be restructured from a

23 timing standpoint, we would want that --

24         THE COURT:  Okay.  Let's make sure we do that before

25 you leave the room today, okay?

1          MR. DENNIE:  I just want to make sure that if you're

2     going to grant us depositions, we get the opportunity to take

3     those before having to respond to the summary judgment.

4          THE COURT:  Thank you.

5          MR. DENNIE:  Thank you.

6          THE COURT:  We've gone about an hour, but I can keep

7     going.  But we can take a break if either lawyers need it.

8          MR. MEEHAN:  Personally, I'm happy to go straight

9     through as long as Your Honor wants.

10          THE COURT:  Okay.  Are you okay, Mr. Dennie?

11          MR. DENNIE:  I'm fine, Your Honor.

12          THE COURT:  Let's keep going.  Go ahead.

13          MR. MEEHAN:  Your Honor, we --

14          THE COURT:  And, remember, we're here on a motion to

15     compel.  Go ahead.

16          MR. MEEHAN:  I understand.  Your Honor, we do agree on

17     one thing.  I say Plaintiff and Defendant, we do agree on one

18     thing.  And as best I took it, this is my quote from

19     Plaintiff's counsel that this is, quote, a completely new

20     landscape, end quote.  We absolutely 100 percent agree.

21               What is happening in this case has never

22     happened before, ever, to our knowledge in any case involving a

23     review of a benefits decision.  What Plaintiff is asking Your

24     Honor to do, four square, violates blackletter, en banc

25     opinions of the Fifth Circuit.  If Your Honor goes down the

1     path that Plaintiff is asking the Court to go, it is reversible

2     error.  What the Court has already permitted is beyond what the

3     Fifth Circuit has allowed.

4               We cooperated -- well, I would say, one, we

5     attempted to persuade Your Honor not to order those

6     depositions.  Your Honor ordered them and so we complied.  We

7     produced the two committee members.  We went beyond that in an

8     effort to try to avoid where we are today, arguments that are

9     really conclusory in nature, very few specifics about failings

10    in the process.

11              When we received a notice for a

12    51-topic 30(b)(6) deposition, we engaged in communications

13    designed to clarify what Plaintiff wanted.  We did not come to

14    Your Honor to block that deposition.  We had hoped that by

15    participating in that deposition that we would be addressing

16    Plaintiff's concerns to the best of our ability and to be able

17    to come back on a record and show to Your Honor that we have

18    attempted to cooperate.

19              What -- what Your Honor's hearing is an awful

20    lot of adjectives, an awful lot of conclusory statements.  The

21    facts here are that there are over 1200 -- I think close to

22    1300 pages of deposition transcripts from three witnesses.  It

23    is remarkable that these depositions each generated on or about

24    in excess of 400 pages.

25              We -- and I -- and I handle -- I don't know if

1   the Court's aware, I handled, I defended each of those

2   depositions.  And although there were some colloquy, I tried to

3   be off the record as much as possible.  Not a single question

4   did I instruct any witness not to answer.

5              I did note at the outset of the first

6   deposition, Mr. Reynolds' deposition, that Your Honor had

7   entered the -- the order in July 22nd, Docket 38, which

8   identified three and only three areas of discovery, and I

9   asserted a standing objection to going outside those three

10  areas.  Not -- respectfully, Your Honor, not conceding that

11  those three areas were proper, but we had a court order in

12  front of us and we had no choice but to comply with it at that

13  point as we thought in an effort to try to resolve things in a

14  cooperative way.  And Plaintiff's counsel made quite clear he

15  was not restricting himself to Your Honor's Document 38,

16  July 22nd, '21, order.  He was going to ask anything he wanted.

17  And he did.

18             If the Court reviews those transcripts, the

19  breadth of the topics.  And, yes, references to Mr. Webster and

20  suicide notes and how does it make you feel to deny someone's

21  claim and an outburst from Mr. Cloud off the record which was

22  then brought on to the record in part.  These were highly

23  theatrical, highly emotional and completely new landscape

24  discovery.

25             Because the answer to -- to why we're here is

1  on Page 15 in Plaintiff's reply on the motion to compel.  And

2  -- and I can read it.  There's just a sentence in there I

3  wanted to bring out.

4       THE COURT:  I got it in front of me.  Go ahead.

5       MR. MEEHAN:  Okay.  Page 15, Paragraph Number 9, third

6  sentence.

7       THE COURT:  Well, my Page 15 is different than yours.

8  So go ahead and read it to me.

9       MR. MEEHAN:  All right.  Sorry.  Yeah.  So typed

10  Page 15 in the reply.  Third sentence reads:  "Cloud is

11  permitted to obtain discovery regarding any nonprivileged

12  matter that is relevant to any parties [sic] claim or

13  defense..."

14       There was a typo there on parties, but that's

15  what we all know was -- was meant to say.

16       That's wrong.  That's wrong.  Blackletter law,

17  Fifth Circuit.  That's wrong.  That is pertaining to a -- a

18  more general tort case or something else where discovery is

19  very broad in the Fifth Circuit.  And counsel cited the *Vega*

20  and *Crosby* cases.  Yes, those are excellent cases to read.

21  *Vega* and *Crosby* say that this sentence I just quoted is wrong.

22  And when I say "wrong," what I mean is that's a general rule of

23  discovery.  It doesn't apply here.

24       Where we are, this Court is sitting, in

25  essence, as a court of review, almost as if this were a court

1    of appeals.  And the focus of the case is on the administrative

2    record.  What is inside the administrative record is what the

3    Court reviews to determine did the decisionmaker here have a

4    rational basis for the conclusion that was reached?

5              *Vega* and *Crosby* are crystal clear that you

6    don't go outside of that.  And *Crosby* -- and this is at 647

7    F.2d -- I'm sorry, F.3d 258 and the jump cite comes to 261 --

8    makes it clear that -- and this is a quote.  "Although a court

9    is afforded broad discretion when deciding discovery matters,

10   the court abuses its discretion when its decision is based on

11   an erroneous view of the law."

12             And, Your Honor, I'm saying this, I mean, this

13   with great respect to all.  This is the path the Court is being

14   led down to, is to make a decision on discovery based on an

15   erroneous view of the law.  In the Fifth Circuit, as *Crosby*

16   says at Page 262, continuing to 263, is that the precedent in

17   the Fifth Circuit -- and they're referring to *Vega*, which I'll

18   quote in a moment.  "With respect to material factual

19   determinations -- those that resolve factual controversies

20   related to the merits of the claim" -- which is what this is

21   all about, supposedly that the wrong classification was put in

22   place and a different approach and a different conclusion to

23   the breach.  That's an argument on the merits.

24             The Court may not consider evidence that was

25   not part of the administrative record with very few exceptions.

1    That comes, then, back from the *Vega* case which was the en banc

2    decision where this whole issue of what discovery is allowed in

3    this type of administrative review case.  And *Vega* was crystal

4    clear.

5            Let me give you the -- I should give you the

6    page, cite here for a moment.  This is 188 F.3d 287 is where it

7    starts.  And if we jump over to 298.

8            "We hold today that the administrative record

9    consists of relevant information made available to the

10   administrator" -- that's the plan here -- "prior to the

11   complainant's filing of a lawsuit and in a manner that gives

12   the administrator a fair opportunity to consider it."

13           That's why I was trying to take such pains --

14   THE COURT:  What are the exceptions?

15   MR. MEEHAN:  There are.  If -- and I'll do this from

16   memory without grabbing the quote.  Interpretation of a plan

17   term.

18   THE COURT:  Well, that's been brought up today.  Okay.

19   Keep going.  Next exception?

20   MR. MEEHAN:  Well, I would suggest we -- we should

21   focus on whether any discovery goes to that issue because it

22   does not.

23   THE COURT:  Okay.  But keep going on the exceptions.

24   MR. MEEHAN:  If -- if the Court requires expert medical

25   testimony to understand terminology.

1          THE COURT:  Right.  Okay.

2          MR. MEEHAN:  The Court has already rejected that in the

3     past.  And then if -- there are a few exceptions.  There are

4     also issues where a plaintiff can contest whether the

5     complete -- administrative record is complete.

6          THE COURT:  And I think that's being done here.  Okay.

7          MR. MEEHAN:  Your Honor allowed discovery on that

8     point.  We would suggest to the Court that discovery is not --

9          THE COURT:  So there's two potential --

10         MR. MEEHAN:  -- permitted on that --

11         THE COURT:  Are there at least two potential exceptions

12    to the general rule that you're citing, which the Court is

13    aware of, in *Vega* and others that at least -- and I agree with

14    you that there's been a lot of conclusory statements made by

15    your opposition, okay?  I'm in agreement with that.  But there

16    are some kernels in there that -- including the couple of

17    exceptions that you threw out.  I don't think you cited all the

18    exceptions, but they were the two that I was looking at.

19         MR. MEEHAN:  Well, Your Honor --

20         THE COURT:  And so you're saying that the two people on

21    the committee level didn't know anything about -- well, I

22    haven't read the whole deposition.  So you -- and you haven't

23    really been able to do a sur-reply to the reply.  But it seems

24    like they're saying they didn't look at anything, they weren't

25    given this and that, you know.  At least the Plaintiff's

1   counsel is arguing at least two of the exceptions apply.

2          Are there any other exceptions?

3          MR. MEEHAN:  Well, it -- there are no other exceptions

4   that would apply.  And, Your Honor, we don't agree those do.

5          THE COURT:  Okay.  Any other exceptions that -- I'm not

6   asking whether you agree that they apply 'cause I know what

7   your position on any exception applying.  But any exceptions?

8          MR. MEEHAN:  There are -- there are exceptions, Your

9   Honor.  It is our review --

10          THE COURT:  Can you tell me what they are?

11          MR. MEEHAN:  There had been suggestions that issues

12   about compliance with ERISA procedures can be looked into.

13          THE COURT:  Okay.

14          MR. MEEHAN:  And that's all that I can recall at the

15   moment --

16          THE COURT:  Okay.

17          MR. MEEHAN:  -- Your Honor.

18          THE COURT:  Continue.  Thank you.

19          MR. MEEHAN:  Just very briefly, Your Honor.

20          THE COURT:  And I think the third exception that you

21   just threw out is another one that, at least the Plaintiff's

22   counsel is alleging, may be worthy of discovery, but okay.

23          MR. MEEHAN:  Your Honor -- Your Honor --

24          THE COURT:  I'm not saying I agree with him.  I'm just

25   identifying the issues that you're saying as a general rule no

1    but there's some exceptions, and you threw out some exceptions

2    off the top of your head.  I've got them written down up here.

3    And three of them that I can identify, there's allegations that

4    they may be applicable in this case.  But you continue.

5          MR. MEEHAN:  There are conclusory assertions.  And the

6    point there, Your Honor, is I would urge the Court to require

7    Plaintiff to be specific.  If we're pursuing a failing of an

8    ERISA requirement, can we specify it?  Because our efforts off

9    the record, on the record interchanges with counsel have been

10   completely unsuccessful in having Plaintiff identify a single

11   shortcoming under ERISA or -- or the applicable regulations.

12          So for example -- and I'll come back to the

13   point that I was going to make here in just a moment, but to

14   follow this.  For example, to say that no board member is a

15   doctor, we concede it.  No need for discovery.  But that's not

16   an ERISA violation.  No committee member is a doctor, concede

17   it.

18          THE COURT:  Is it an issue in your eyes if committee

19   members or board members, we don't know, never see the decision

20   or a copy of their decision before they sign off on it or even

21   know or understand what definitions are to be applied or what

22   they mean?  Is that...

23          MR. MEEHAN:  Your Honor, that's a hypothetical

24   question.

25          THE COURT:  No.  That was read to me from deposition

1    testimony, or excerpted.

2           MR. MEEHAN:  That's not what the deposition say.

3           THE COURT:  What did the deponents say?  Did any of the

4    deponents say that they read or saw their decision before they

5    signed off on it?

6           MR. MEEHAN:  Neither of the committee members testified

7    that they -- that they read the decision letter before it went

8    out.  That part is correct.

9           THE COURT:  What about they even saw a copy or had

10   input into it?

11          MR. MEEHAN:  They both testified that the decision

12   letter reflected their decision.  They did not choose the words

13   they made the decision.  And there are --

14          THE COURT:  Did they make the decision before the

15   decision was memorialized?

16          MR. MEEHAN:  Yes.

17          THE COURT:  Was there testimony to that effect?

18          MR. MEEHAN:  Yes.  And they testified they did.  These

19   committee members made the decision at that level and then

20   it -- and then the decision was put in letter form, according

21   to the witnesses, by an employee of the plan benefits office.

22          THE COURT:  Did --

23          MR. MEEHAN:  Following standard practice.

24          THE COURT:  Did the -- did one of the deponents admit

25   that Mr. Cloud meets the definition of changed circumstances.

1    MR. MEEHAN:  No.  Ms. Smith, after being asked a long

2    series of hypothetical questions, which do not accurately state

3    the facts concerning Mr. Cloud, answered in the hypothetical.

4         THE COURT:  Okay.

5         MR. MEEHAN:  To the effect of, okay, everything you're

6    saying, counsel -- and these are not her words.  This is my

7    translation.  If everything you're saying is true, that may.

8    That may.  It was a hypothetical.  And then she went on to add

9    why the claim was denied notwithstanding all of those

10   assumptions.

11        THE COURT:  Okay.

12        MR. MEEHAN:  This is what I'm getting at.  The

13   conclusions being argued from these transcripts cannot -- and,

14   Your Honor, please don't -- please don't just take my

15   conclusions, either.  I am giving them in good faith, and I --

16   I have to trust that counsel for Plaintiff is doing the same.

17   But rather than rely upon our interpretations or our memories,

18   the transcript themselves need to be looked at.

19             Ms. Smith did not admit that, and she -- none

20   of the witnesses -- wait.  I'm sorry.  'Cause I may be

21   interrupting Your Honor.  I was going to go to the other

22   points, if that's okay.

23        THE COURT:  Well, is there a definition of changed

24   circumstances or clear and convincing evidence?

25        MR. MEEHAN:  Changed circumstances is defined in at

1    least two -- two cases.

2          THE COURT:  No.  I meant in the plan.

3          MR. MEEHAN:  At that time in the plan, I believe there

4    was no specific definition.  It was left to...

5          THE COURT:  Whatever they felt like?

6          MR. MEEHAN:  No, not at all, Your Honor.  What it was

7    left to was many years of practice and the -- the ordinary

8    definitions of those terms.  What the witnesses all testified

9    to is they had an understanding of what it meant.

10         THE COURT:  Okay.  But bottom line is there was no

11   definition, right?

12         MR. MEEHAN:  No, I would not agree with that, Your

13   Honor.  The bottom line was --

14         THE COURT:  In the plan, it was not defined?

15         MR. MEEHAN:  There is -- there is no defined term in

16   the plan but there were 15, 16, 17 years of practice --

17         THE COURT:  I understand.

18         MR. MEEHAN:  -- which is another way to define the

19   term.

20         THE COURT:  I'm going to be the decisionmaker on the

21   case, and I'm looking for specific information.  I'm not trying

22   to play devil's advocate.  Okay?  So I know how you're going to

23   say, but that's not relevant or but, you know, we have years of

24   practice.  But I just want to make sure --

25         MR. MEEHAN:  Well, Your Honor --

1          THE COURT:  -- that there is no definition in the plan

2     of clear and convincing evidence or changed circumstances.

3          MR. MEEHAN:  At that time there was not.  And, Your

4     Honor, what I'm --

5          THE COURT:  Is there now?

6          MR. MEEHAN:  Pardon me?

7          THE COURT:  Is there now?  You keep saying "at that

8     time."  That implies that there is a definition now.

9          MR. MEEHAN:  I believe there has been one.  But --

10          THE COURT:  On both those terms?

11          MR. MEEHAN:  At this time -- at this time in question

12     there was not in the plan.

13          THE COURT:  Okay.  So at one point -- let's take each

14     term by itself.  There was a -- there was no definition of

15     changed circumstance in the plan?

16          MR. MEEHAN:  As a defined term in the plan, no.

17          THE COURT:  There is now a definition of changed

18     circumstance in the plan?

19          MR. MEEHAN:  I would have to look to determine that,

20     Your Honor.

21          THE COURT:  I thought you just told me.

22          MR. MEEHAN:  I'm speaking only to the time when

23     Mr. Cloud's decision was made.

24          THE COURT:  Okay.  I thought you just represented to

25     the Court 'cause you keep being very careful, as lawyers need

1    to be, that at the time of Mr. Cloud's hearing, whatever you

2    call, review, there was no definition.  But you keep saying "at

3    that time," and what that implies to the Court is subsequent to

4    it there was a definition.  Do you know if there was a --

5    there's a definition subsequent to -- "at the time" I guess

6    would be 2016?

7          MR. MEEHAN:  Right.  2014 through 2016 -- well, 2016 in

8    this case, yes.

9          THE COURT:  Right.  So is there a definition since

10   2016?  That's only five years ago.

11         MR. MEEHAN:  I can't -- I can't say that.  I believe

12   the Plan follows the definitions that are memorialized in the

13   two Maryland cases that are cited in our papers.

14         THE COURT:  Okay.  So you don't know if that's -- it's

15   in there right now?

16         MR. MEEHAN:  I do not.

17         THE COURT:  Okay.  Or any definition?  You just think

18   it might be?

19         MR. MEEHAN:  No.  I'm stating nothing on that point,

20   Your Honor.

21         THE COURT:  Okay.  What about clear and convincing

22   evidence?  At the time, 2016, there was no definition of that?

23         MR. MEEHAN:  It was not a defined term beyond -- beyond

24   the normal usage.

25         THE COURT:  No.  A defined in the term.  I mean, I

1    can -- I just might -- is that something that's been produced

2    in this case, the actual plan?  'Cause I can go look it up.

3              MR. MEEHAN:  Yes.

4              THE COURT:  'Cause I think it will be faster for me to

5    look it up than get a straight answer from you.

6              MR. MEEHAN:  Your Honor, I'm sorry.  I don't mean to

7    quibble, and I don't know why the Court would think I'm not

8    giving you a straight answer.

9              THE COURT:  I am asking for what is defined in writing

10   in the plan.  Is changed circumstance in writing in the plan in

11   2016; you said no.  Is clear and convincing evidence as defined

12   in the plan in black and white in 2016; you said no.  But now

13   you're saying, oh no, maybe.

14             MR. MEEHAN:  No.

15             THE COURT:  Neither of those were defined in the plan?

16             MR. MEEHAN:  In 2016 neither of those terms --

17             THE COURT:  Okay.

18             MR. MEEHAN:  -- were defined in the plan.

19             THE COURT:  Let's start with clear and convincing

20   evidence.  Has that term since been changed in the plan?

21             MR. MEEHAN:  I don't know.

22             THE COURT:  And same thing with changed circumstances.

23             MR. MEEHAN:  As defined in the plan, I don't know.

24             THE COURT:  Okay.

25             MR. MEEHAN:  Your Honor --

1      THE COURT:  You can continue.

2      MR. MEEHAN:  Your Honor, again, testimony, it was

3 described that all of the witnesses acknowledged that there was

4 a repository.  Each of the witnesses acknowledged that under

5 the 2011 collective bargaining agreement, that there was to be

6 created a medical repository.  Each of the witnesses -- and

7 again, my memory, you'll check the transcripts -- indicated

8 that they did not know the extent to which such a repository

9 had been fully implemented.

10           Mr. Vincent, who had the most knowledge on the

11 topic, indicated that the repository was in process of being

12 created, had limits, not necessarily all teams were subscribing

13 to it.  And that his understanding, no team created a

14 repository for medical information for any player who was no

15 longer active.  And that as of the time the repository was

16 being created, there would be historical data but only for

17 active players.  So there is -- based on that information,

18 there is no reason to suggest that -- that there is anything in

19 this repository that relates to Mr. Cloud because he went

20 inactive after the 2005 season.

21      THE COURT:  Did the Plan look for any information in

22 the repository for Mr. Cloud?

23      MR. MEEHAN:  No.  The Plan has no access to it.

24      THE COURT:  Who has access to it?

25      MR. MEEHAN:  It's -- it's being -- it's run by the

1    League.  It is not the Plan's repository.

2         THE COURT:  The Plan has no access to it whatsoever,

3    even -- you can't -- you never requested?  Nothing?  You have

4    no access to it, period?  That's what you're representing on

5    the record?

6         MR. MEEHAN:  That is my understanding, based on the

7    depositions and the discussions that occurred.

8         THE COURT:  All right.  Continue.

9         MR. MEEHAN:  Your Honor, the -- the Groom firm did

10   write the decision in 2016 concerning Mr. Cloud.  The Groom

11   firm as plan counsel, just as corporate counsel would be in any

12   normal instance, attends the boards meetings.  The Board made

13   its deliberations reflected in the minutes which are, of

14   course, fairly cursory as minutes typically are.

15             Counsel expanded by providing the appropriate

16   plan provisions so that all of that would be available for the,

17   in this case, the applicant to see and gave the appropriate

18   detail laying out the three reasons why the reclassification

19   was denied.  It's not unusual.  And that's what happened.  And

20   everyone agrees on that.  There is no violation of ERISA

21   regulations for plan counsel to write the decision letter after

22   the Board has made the decision.

23             And the reason I'm citing this is this idea --

24   Your Honor, it's crystal clear that the Court is very

25   sympathetic to Mr. Cloud and is troubled by some of the

1    assertions that are being made.  But I'm trying to keep us

2    focused, Your Honor, on the -- the rule of law and not to make

3    the reversible error --

4          THE COURT:  The Court is not sympathetic or

5    unsympathetic.  I would like to get to the bottom of this.  I'd

6    like to know what the full picture is.  The Court would like to

7    know what went into the Committee's decisions and the Board's

8    decisions.

9          MR. MEEHAN:  Your Honor --

10          THE COURT:  I -- you know, within the bounds of what is

11    appropriate.  I think there's a light that needs to be shined

12    on this.  And you-all need to tell me -- you know, you guys are

13    telling me polar opposites, and so I'm going to be asking for

14    supplemental briefing with the depositions attached.

15                You told me -- you told me that this is

16    thousands of pages of depositions.  I don't intend to go

17    through every single page, but you certainly can pull that --

18    those pages that are relevant to what's being argued today.  So

19    I will go look at it.

20          MR. MEEHAN:  Thank you, Your Honor.

21          THE COURT:  But to imply that the Court's going to make

22    a decision because of sympathy is just something that I haven't

23    done and will not do.

24          MR. MEEHAN:  But, Your Honor --

25          THE COURT:  So...

1        MR. MEEHAN:  I'm sorry.  I didn't mean to interrupt.

2        THE COURT:  And he is a sympathetic -- as anybody with

3   brain damage would be, but that has nothing to do with my

4   decision.

5        MR. MEEHAN:  And, Your Honor, he was accepted in 2014

6   as totally and permanently disabled by the Plan and awarded

7   benefits and that -- that continues today.  The issue is not is

8   he totally and permanently disabled as the plan would define

9   it, but does he meet the criteria in the plan to move to a

10  different level.  That's all.

11       THE COURT:  Understood.

12       MR. MEEHAN:  So, Your Honor, this issue -- and I take

13  it the Court is trying to understand the basis of the decision

14  that the Board made and to decline -- to move Mr. Cloud to

15  active football, and that's what -- that's what Plaintiff is

16  seeking by these depositions.

17            The problem there, from a --

18       THE COURT:  You don't think the Plaintiff is just

19  attempting to find out if the Plaintiff had a reasonable

20  opportunity whose claim has been denied for full and fair

21  review?

22       MR. MEEHAN:  Well, that's already demonstrated by the

23  administrator of record, Your Honor.  That's the issue here,

24  is...

25       THE COURT:  No.  That's what's before the Court, is

1    whether or not the Plaintiff has -- was afforded a reasonable

2    opportunity, his claim for benefit was denied for a full and

3    fair review, right?

4            MR. MEEHAN:  And the -- and the way the court --

5            THE COURT:  By the Board?

6            MR. MEEHAN:  And -- correct.  And the way the court in

7    this circuit resolves that question is by reviewing the

8    administrative record and what opportunity, if any, was

9    provided to the claimant to present information.

10               The documents in the administrative --

11           THE COURT:  Are you aware of the *Dimry* case that was

12   just decided a couple of weeks ago?

13           MR. MEEHAN:  Yes, I am aware of it.

14           THE COURT:  Did you argue that?

15           MR. MEEHAN:  I argued it at the Ninth Circuit, yes.

16           THE COURT:  Okay.  And you lost, didn't you?

17           MR. MEEHAN:  On -- on a specific ground, yes.

18           THE COURT:  The Court -- are you aware of the *Dimry*

19   case?

20           MR. DENNIE:  Yes, Your Honor.

21           THE COURT:  Okay.  So the plan --

22           MR. MEEHAN:  The ground in *Dimry*, Your Honor, was not

23   related in any way to any issue in front of this Court.

24           THE COURT:  Do you think *Dimry* may be relevant to the

25   Plaintiff's claim which invokes the same procedural provision

1   that the Plan wrongly denied him benefits due in accordance

2   with the plan documents?

3   MR. MEEHAN:  No.  Your Honor, in -- in *Dimry*, the Ninth

4   Circuit concluded that after there had been two remands -- and

5   at the second remand the Plan presented all of the information

6   in the record to a physician to review -- that the Ninth

7   Circuit concluded that before the Board could render its final

8   decision once that doctor reviewed everything, the Plan should

9   have given to the -- the claimant in that case an opportunity

10  to review the doctor's report.

11              The Plan's position was that the doctor

12  reviewed all of the issues that had been identified by the --

13  by the claimant, and so with that, in the Plan's view, was an

14  unnecessary extra step.  The Ninth Circuit disagreed, and it

15  was remanded on that basis.

16  THE COURT:  Okay.  The Ninth Circuit is clearly not

17  binding case law to this Court, but I just found it kind of

18  interesting that this was just decided -- actually, I found

19  this case, not even my law clerks did, on August 10th.  So I

20  just found that pretty interesting.

21  MR. MEEHAN:  It's in the -- it's an opinion not for

22  publication, Your Honor.

23  THE COURT:  Well, but I still found it.  Okay?  And,

24  you know, I can look at other circuits and courts for, you

25  know, persuasion.

1          MR. MEEHAN:  Of course.  And, Your Honor --

2          THE COURT:  It's not binding.

3          MR. MEEHAN:  -- what I'm getting at is this issue of

4     Plaintiff is trying to inquire into the basis of the decision.

5     What I am saying is the decision rises or falls on the

6     administrative record.  And --

7          THE COURT:  Unless one of those exceptions apply,

8     right?

9          MR. MEEHAN:  Well, unless one of those exceptions

10    apply.

11         THE COURT:  Okay.

12         MR. MEEHAN:  But that's where the *Borelli* case from the

13    Eastern District of Texas --

14         THE COURT:  Also not binding but tell me about that.

15         MR. MEEHAN:  Correct, not binding.  2005 WL 8160870 at

16    Asterisk 2 is talking about how an individual in that case

17    whose name was *Borelli*, his "Notice of deposition... states

18    that he seeks to depose a corporate representative about 'the

19    basis for the denial of Plaintiff's claim for long-term

20    disability benefits.'  His notice does not indicate that he

21    seeks to discover evidence, admissible or otherwise, about plan

22    interpretation, or any other issue on which the Fifth Circuit

23    has permitted plaintiffs to supplement the administrative

24    record.  Because Borelli seeks to depose a corporate

25    representative about a question which the Court may not

1    consider in determining whether the Plan administrator abused

2    its discretion, this motion is hereby DENIED."

3              That's what's happening here.  The Plaintiff

4    wants to depose each and every member of the -- of the board on

5    the basis for their decision.  And I know that because that is

6    a direct quote from the emergency motion, that the -- quote,

7    the only people who know the basis of the decision to decline

8    benefits to Cloud, et cetera, are the Board.  And that's why he

9    wants to take the deposition.  And, again, all those

10   accusations about, quote, hiding the ball and shielding Cloud

11   from the facts of the case.  That's at the emergency motion,

12   Paragraph 28.

13             What the *Borelli* case is pointing out is

14   consistent with the Fifth Circuit law.  It is an error of law

15   to allow those depositions because they are going to a subject

16   that is not within one of the exceptions.

17             If we cannot persuade this Court on the

18   administrative record that we acted rationally, if the Court

19   looks at that and -- and determines that the Plaintiff has

20   shown that we acted arbitrarily or capriciously, that's all the

21   Court needs for a decision.  And that's -- Your Honor, I have

22   to ask because there were some references off the record to the

23   effect that the Court is contemplating holding a trial here.

24   There is no trial in this case.  It is summary judgment, up or

25   down.

1        THE COURT:  I know that's what your position is.  And

2   my references were when I was talking to you about was a

3   scheduling order that was moving the trial date and all the

4   deadlines to it.  So, yes, you made it very clear from your

5   very first pleading that you think you should win based on a

6   dispositive motion, and I disagreed with you so far.  But I

7   have not reached the merits of the summary judgment motion yet,

8   okay?  We're here on a discovery issue.  You may very well have

9   a trial if you don't make it past this summary judgment.  I

10  mean, if you -- if the summary judgment is denied.  I don't

11  know.  I haven't looked at the merits of that yet.

12       MR. MEEHAN:  Your Honor, that's -- that's --

13       THE COURT:  So...

14       MR. MEEHAN:  -- that's the area --

15       THE COURT:  But I'll be focusing on these exceptions.

16       MR. MEEHAN:  Okay.

17       THE COURT:  So what else do you have to say that's not

18  in -- in your pleadings?

19       MR. MEEHAN:  Okay.

20       THE COURT:  Because I probably won't be making a

21  decision today 'cause I've got more reading to do.

22       MR. MEEHAN:  Thank you, Your Honor.  Just a few more

23  items, if I may.

24       THE COURT:  Go ahead.

25       MR. MEEHAN:  Thank you.  And I appreciate the Court's

1    indulgence.

2         THE COURT:  It's not my indulgence.  I'm very

3    interested in this, and I really want to hear what you have to

4    say.

5         MR. MEEHAN:  Thank you, Your Honor.  It is an

6    interesting area.

7         THE COURT:  Especially if both of you are agreeing that

8    this is uncharted waters.  I wish I didn't have a mask on.  I'm

9    smiling right here, so...

10        MR. MEEHAN:  Well, I understand that.

11        THE COURT:  Let's continue.

12        MR. MEEHAN:  I know the Court understands.  We agree

13   it's, as you put it, uncharted waters or -- or completely new

14   landscape, as Plaintiff's counsel put it, but for different

15   reasons.

16             So the point here is discovery must fit within

17   an exception because, as *Vega* said on the same page I was

18   quoting earlier, "We will not permit the district court or our

19   own panels to consider evidence introduced to resolve factual

20   disputes with respect to the merits of the claim when that

21   evidence was not in the administrative record."  Which is why I

22   say we rise or fall on the administrative record.

23             If the Court looks at the record and concludes

24   that there's evidence in there that was not adequately

25   considered by the Board --

1          THE COURT:  Or the administrative record was not

2     complete or whether the Defendant complied with ERISA's

3     procedural regulations and any of the exceptions.  Right, I get

4     that.

5          MR. MEEHAN:  But in that regard, Your Honor, we already

6     know all that we need to know and so much more without any

7     further depositions.  What we know from the administrative

8     record is there were repeated opportunities for Mr. Cloud to

9     present anything and everything he wanted.  And I -- I heard

10     earlier today that efforts were made to obtain the impact study

11     from the Patriots.  I have not seen a subpoena.  This case has

12     been around for -- since May of '20, if I recall correctly.  I

13     haven't seen a subpoena.

14          THE COURT:  Has the Plan or anyone on its behalf or the

15     Committee ever requested documents from the repository?  You

16     said that you --

17          MR. MEEHAN:  In this case, or ever?

18          THE COURT:  Ever.

19          MR. MEEHAN:  To my -- in this case, no.  And to my

20     knowledge, no in any case.

21          THE COURT:  Can you make that request?  Can you make

22     that request in -- with respect to Mr. Cloud from the

23     repository?

24          MR. MEEHAN:  Is Your Honor ordering us to do that?

25          THE COURT:  No.  I'm just asking the question.

1      MR. MEEHAN:  We have not made that request, and we have

2  no plans to do so.

3      THE COURT:  Okay.

4      MR. MEEHAN:  And the Fifth Circuit again in *Vega* is

5  clear.  We have no duty to -- to reach out, to identify

6  information from third-parties or to conduct --

7      THE COURT:  What do you do in a situation where you got

8  a brain damaged, or very damaged -- physically damaged player

9  who is convinced, rightly or wrongly, that there's medical

10  records out there, who has repeatedly asked -- I'm just

11  assuming this is all true.  I understand it may not be.

12  okay? -- who has asked everybody possible to give him the

13  medical records, franchises, the doctors, whatever?  I mean, he

14  hadn't gotten them.  And then he's not allowed to have that be

15  considered because he can't get it before the Plan, Committee,

16  or Board.

17      MR. MEEHAN:  What --

18      THE COURT:  What happens in a situation like that?

19  Just everybody shrugs their shoulders and say, well, he didn't

20  get it?  We can't get it 'cause we're not going to ask the

21  repository.  We're not going to ask -- I think there was a

22  document that one of your -- is it Mr. Junk?

23      MR. MEEHAN:  Yes, Michael Junk.

24      THE COURT:  That he filed that says, you know, what are

25  we?  We're not -- they might have something in the franchises,

1   but that's not us.

2            So what is a player to do if there's medical

3   records directly on point?  I'm not saying in this case that

4   there is 'cause you -- that's -- that's a disputed item right

5   now, according to you.  One side is saying -- the Plaintiff is

6   saying that there's at least the impact exam from 2005 that

7   he's been trying to get that still can't get, and you got

8   serious doubt whether it even exist.  That's what you told the

9   Court.

10           MR. MEEHAN:  May I explain why?

11           THE COURT:  No.  I'm getting to a question here.  So

12   what's a player to do in a situation like that?

13           MR. MEEHAN:  Well, if Your Honor can forgive me,

14   then -- I'm reluctant to advise someone else who's not my

15   client, but I will say in the abstract.

16           THE COURT:  In the abstract.

17           MR. MEEHAN:  Okay.  Efforts were made, was what we

18   heard today, to get it from the Patriots.  Rule 45, Federal

19   Rules of Civil Procedure has a mechanism to issue a subpoena in

20   a lawsuit that exist.  We have not seen a subpoena.

21           THE COURT:  Oh, you mean in this case?

22           MR. MEEHAN:  In this case.

23           THE COURT:  But I'm talking about -- my question -- I'm

24   sorry.  I was talking about before the Committee or the Board.

25           MR. MEEHAN:  What -- what the Committee, the Board, the

1    Plan overall does is to implement the terms of the plan.  So --

2    so there are ways to advise players that if they believe there

3    are team records -- I believe each of the witnesses testified

4    to this effect -- that they can go to the head trainer of their

5    last team who should have whatever records are available.  So

6    in this instance, Mr. Cloud could have gone to the Giants.

7        THE COURT:  But the Plan makes no -- I know you said

8    that they have no duty, but the Plan has not made -- cannot and

9    does not make any effort to facilitate that?

10       MR. MEEHAN:  Getting the --

11       THE COURT:  Getting it from franchises?

12       MR. MEEHAN:  Correct.

13       THE COURT:  Okay.

14       MR. MEEHAN:  Because if the Plan does that for one

15   individual and not for the next individual, the second

16   individual that claim that he or she was somehow treated

17   differently, and so that --

18       THE COURT:  Which is why I'm asking if you've ever done

19   that before, and your answer is no, right?

20       MR. MEEHAN:  My answer is no.  I believe it's never

21   been done.

22       THE COURT:  Okay.

23       MR. MEEHAN:  But that's my understanding.

24            And so, Your Honor, director reports and

25   counsel reports, speak briefly about those.  The director

1    reports, each of the witnesses refer to them when they were

2    asked questions along the lines of how many players are in this

3    category of active football, how many players are in the

4    category of inactive A, which is where Mr. Cloud currently is.

5    So both are totally and permanently disabled, but the -- the

6    levels of compensation are different and the criteria for each

7    are different.

8                The witnesses through the 30(b)(6) where I,

9    among others, educated Mr. Vincent over the space of many, many

10   hours in multiple days about facts so that he could be able to

11   testify.  And, yes, we put together a -- a thick notebook with

12   everything that we thought would be useful to him to provide

13   all of that information.  And we gave a copy to counsel so he'd

14   have all of that which --

15               THE COURT:  I don't have a problem with that.

16               MR. MEEHAN:  Okay.  Thank you, Your Honor.  'Cause we

17   did that to try to make sure he was fully informed as best we

18   could.

19               But the director's reports came up because when

20   they were asked about, well, how many claims do you get and how

21   many are approved, how many are denied, questions to that

22   nature, the witnesses were, obviously, not able to off the top

23   of their heads.  We prepped them only for the current period

24   'cause there were topics in the -- in the 51 in the 30(b)(6)

25   that talk about the present tense.  How many are in this

1    category, how many are in that category.  But then when the

2    questions became historical, what about 2016, what about 2012,

3    things of that nature, the witnesses says, of course, I don't

4    know because we didn't prep them on that.

5                So they mention director reports have those

6    statistics.  What we did today is we excerpted those pages from

7    the director's reports going back to 2014, which is when the

8    initial application here was -- was submitted, and we provided

9    those to counsel.  So they come from the director's reports.

10   All those statistics are there.

11               The counsel reports do not contain statistics.

12   The witnesses explained that in addition to director reports,

13   there are counsel reports.  Those go to matters in litigation,

14   by and large, and the fiduciary exceptions does not apply

15   there.  The firm is providing legal advice on matters in

16   litigation, by and large.  Those counsel reports, we believe,

17   are privileged and do not speak to the statistical issues that

18   the Plaintiff was asking about, so we don't think they are

19   relevant just because the witness mention that this is one of

20   the ways in which the law firm provides advice to the Committee

21   or the Board.

22               The queries of the database -- there is a

23   database which Mr. Vincent spoke about.  And he was a little

24   unclear on exactly how long it had been in existence and how

25   broad the information.  Queries of sorts can be run.  So if you

1    want to -- if you want to say, well, I want to know how many

2    claims there were in a particular year and how many were, you

3    know, denied or -- or approved, you can get a computer to

4    generate some numbers.  But as I believe Mr. Vincent explained,

5    a human being needs to go through all of those and figure out,

6    well, were they total and permanent?  Which -- which

7    classification?  Are any of them inactive A or active football?

8    Which are the two at issue here.  And so I believe Mr. Vincent

9    made clear that this was a multiday exercise.

10             It's never been made clear to us how any of

11   that information could possibly be of value.  So we are

12   concerned about doing, basically, a search for a needle in a

13   haystack.  If the issue is very broadly put, well, somehow Mr.

14   Cloud was discriminated against, well, Your Honor will see in

15   some of the e-mail traffic, which is a bit of the iceberg

16   between us, where I was only saying, well, the only thing I

17   heard --

18             THE COURT:  I don't have the e-mail traffic, right?

19             MR. MEEHAN:  Yes.  Some e-mail traffic is attached to

20   our appendix to our opposition.

21             THE COURT:  Some of it.  I know that you have continued

22   to work with each other, which is a good thing.

23             MR. MEEHAN:  Right.  We have tried.

24             THE COURT:  All right.  Continue.

25             MR. MEEHAN:  So, Your Honor, what -- what I'm getting

1    at is in that e-mail traffic, which is attached to the

2    opposition, you'll see I raised the point that in the

3    depositions the only issue at one point where I thought counsel

4    was suggesting there were some discrimination was he was asking

5    witnesses questions, do you know Mr. Cloud's ethnicity.  And so

6    I -- I asked him.  I said, Well, are you suggesting there were

7    some sort of racial discrimination?  Is that what you're

8    suggesting?

9              And I didn't get a clear answer, but I surmised

10   that that was not it.  And all the conversations we had went

11   more to, well, it's arbitrary and capricious.  But what does

12   that mean here.

13             There are approximately, as I understand it, a

14   thousand claims every year now, and the Board reviews hundreds

15   of these claims every year.  So are we to now go back over 5,

16   6, 10, 12 years and pull every claim and determine was it

17   approved, was it denied and -- and do what?  Synthesize those

18   or produce thousands of pages of medical records, extracting

19   all the names and saying -

20             THE COURT:  Well --

21             MR. MEEHAN:  What I'm getting at is, where does this

22   go?

23             THE COURT:  Just to -- just to save time.  The Court is

24   not inclined -- I am focusing on this Plaintiff in this case.

25   And I think there was discussion in the papers about -- I think

1    it was in the context of arbitrary and capricious and, you

2    know, being able to do discovery to see if there should be a

3    motion for leave to amend pleadings.  And at this time I'm not

4    really sympathetic to that argument.  I'm using the word

5    "sympathetic" in quotes there.  That sounds like beyond where

6    discovery should go.

7              So if you want to quit while you're ahead on

8    that, you need to move on.

9         MR. MEEHAN:  Thank you for your guidance, Your Honor.

10   Yes, on that particular point.

11             The reference to medical records that may be

12   outstanding, the Plan has none.  Dr. Canizares, the issue

13   with -- with him -- and, again, Mr. Vincent testified about

14   this, is...

15        THE COURT:  As an officer of the Court --

16        MR. MEEHAN:  Yes.

17        THE COURT:  -- you're stating right now the Plan has no

18   medical records that you haven't already produced in connection

19   with this litigation on Michael Cloud to the Plaintiff's

20   lawyer, period?

21        MR. MEEHAN:  Correct.  Period.

22        THE COURT:  Okay.  And that the Plan has no documents

23   that it can access or have a superior right of control on

24   Michael Cloud?

25        MR. MEEHAN:  Yes.

1        THE COURT:  Okay.

2        MR. MEEHAN:  Including, but not limited to, this

3   medical repository or any impact study that the Patriots did.

4        THE COURT:  All right.  So you are representing in

5   court today you absolutely have given over every single medical

6   record that the Plan has or can access with respect to Michael

7   Cloud?

8        MR. MEEHAN:  I have been so assured repeatedly.  Yes,

9   Your Honor.

10        THE COURT:  Okay.  That's what I need to know.

11        MR. MEEHAN:  Yes.  Briefly --

12        THE COURT:  And --

13        MR. MEEHAN:  Sorry.

14        THE COURT:  Let me ask you to finalize that topic.  Has

15   there ever been -- you're an officer of the court and I take

16   your word for it, period.  But you also said, I've been

17   repeatedly assured of that.  Will you check into whether or not

18   you can file an affidavit by somebody whose job it was to look

19   for that and say we have looked for any and all medical records

20   in our possession, custody, or control?  You can look at the

21   rules of what's required.  And I think that means also any kind

22   of right to compel.  You put that in an affidavit and file it

23   as a supplement to your response, which you have leave to do

24   right now --

25        MR. MEEHAN:  Yes, Your Honor.

1          THE COURT:  -- to the motion to compel.  I think

2    that'll put an end to one line of questions and inquiry and

3    something I was curious about.

4          MR. MEEHAN:  Yes, Your Honor.  I will --

5          THE COURT:  I know you can look into it and you can't

6    make the representation, but the Court would find that very

7    helpful.

8          MR. MEEHAN:  And, Your Honor, thank you for that

9    opportunity.  I'd be happy to do it.  I would just note

10   briefly, Document 36, which was filed July 20 of '21, is a

11   declaration of Mr. Vincent which I believe goes to those

12   points, but I'll look at it with more care to see if there's

13   anything that we --

14         THE COURT:  Was that before or after the deposition?

15         MR. MEEHAN:  Before the deposition.

16         THE COURT:  Okay.  I think it's a very cloudy area

17   right now.  So an affidavit or something -- or the person whose

18   job it was to look for it, signing off on it, I think that

19   would be helpful.

20         MR. MEEHAN:  Yes, Your Honor.  We -- we will --

21         THE COURT:  Okay.

22         MR. MEEHAN:  -- be happy to do it.  Your Honor, from

23   a --

24         THE COURT:  Continue.

25         MR. MEEHAN:  I suspect we'll get to time periods for

1    followup papers, so I'll leave that for the moment to decide.

2         THE COURT:  Yes.

3         MR. MEEHAN:  The impact study.  If I may, this is --

4    this is one of the reasons why I think it's very, very

5    important.

6         THE COURT:  You talk about the impact exam?

7         MR. MEEHAN:  Oh.  Impact exam.  I guess sometimes it's

8    referred to as impact study, but impact exam.

9         THE COURT:  You're talking about the one involving

10   Michael Cloud in 2005 by the Patriots, if it exists, right?

11   Okay.

12        MR. MEEHAN:  Yes.  Allegedly so.

13        THE COURT:  Okay.

14        MR. MEEHAN:  So -- and I only say that, you know, with

15   care.  I'm not saying it didn't happen.  I'm just saying we --

16   we are not conceding it did and --

17        THE COURT:  I understand.

18        MR. MEEHAN:  Okay.  So the -- it's an example of why

19   it's so important to be specific rather than, you know, be

20   appalling and horrible and other such adjectives and to focus

21   very specifically on what's going on here, is from the player

22   records that are in the administrative record already.  If you

23   look at the administrative record, you will see that the

24   complaint is wrong when it says Mr. Cloud played for the

25   Patriots in 2005 for three weeks.  He played for them for six

1  weeks.  Why is that important?  Here's why.

2              He was with the Giants through the end of the

3  2004 season.  He went to the Giants -- back to the Giants

4  May of 2005 when spring games began.  Cut by the Giants,

5  September 4, 2005.  Picked up by the Patriots, November 4,

6  2005.

7              And -- and I don't mean to belabor this, but

8  this really goes to the heart of the discovery issues, which is

9  November 4, 2005, is already 12 months after the 10-31-04

10  collision which is the basis of the complaint that supposedly

11  made Mr. Cloud experience all of his issues.  And under the

12  plan, that shortly after definition, that's crystal clear.  If

13  you're totally and permanently disabled as a result of and it

14  takes more than 12 months to manifest itself, the Plan cannot,

15  no matter how sympathetic your situation may be, cannot put you

16  on active football because it has to happen within 12 months.

17              So Plaintiff says, well, he was only with the

18  Patriots for three weeks, couldn't remember plays, and they cut

19  him after they did an impact exam.  He stayed with the Patriots

20  until the 13th of December.  He was cut twice.  He was cut

21  after three weeks because they had other players in the depth

22  chart and they didn't wish to retain him.  Two days later, they

23  brought him back because one of the guys they were counting on

24  got injured.

25              He stayed and he played through December 13th.

1    That would mean this impact exam had to have been conducted on

2    the 12th of December.  Why do I say that?  Because he played in

3    the game on December 11th.  He's cut on December 13th.  So if

4    the impact exam is December 12th and they conclude based on

5    that it's time to cut him, it doesn't add up.  And then he's

6    later then picked up by the Giants on December 27th, I believe,

7    and plays on December 31.  How that relates again?  The shortly

8    after definition.

9              Regardless, the Plan does not contest Mr. Cloud

10   being disabled.  The Plan accepted that because he qualified

11   because the Social Security Administration found him to be

12   disabled effective December 31, 2008.

13             So he meets inactive A.  But no matter what --

14   we can argue about changed circumstances, we can argue about

15   anything.  But shortly after is a black-and-white, brick wall

16   deadline of 12 months.  And the complaint says October 31, '04

17   he was -- the helmet-to-helmet, you heard counsel talk about

18   it.  And immediately thereafter, he's disabled and he couldn't

19   remember plays.

20             He plied his trade, was paid by two

21   professional football teams into the end of 2005.  That's more

22   than 12 months later.  And the Committee, when they were

23   deposed, ultimate -- and this is in the decision letter, same

24   thing in the Board.  They ultimately said in addition to

25   everything else we have that's of concern, you cannot under any

1    definition meet shortly after.

2                  And, Your Honor, there's one other issue that's

3    going on in this case that is ripe to discuss.  Plaintiff is

4    now, through its amended -- its initial disclosures, and is

5    arguing an entirely new theory of -- of harm that supposedly

6    takes place after October 31st of 2004 and is seeking discovery

7    of all other issues that may relate to this later date.  None

8    of that is in this case.

9              THE COURT:  Okay.

10             MR. MEEHAN:  So...

11             THE COURT:  Anything else?

12                  I'll tell you what, we've now gone two hours.

13   Why don't we all take a ten-minute break.  You can both look

14   over your notes and decide if there's anything else that you

15   would like to present to the Court by way of oral argument when

16   we get back.  If there -- and please don't be repetitive.  And

17   try not to be.  You know, I'm not going to make a decision

18   today.  Okay?

19                  And then, also, kind of crystallize in your

20   mind as to what it is that you would like the opportunity to

21   brief the Court further, which includes multiple references to

22   deposition transcripts.  It's almost like the two of you were

23   at two different depositions, or shall we say six different

24   depositions.

25                  So when I come back -- I'll give you an

1    opportunity to take your break.  Right now it's 4:33.  How

2    about a quarter to 5:00 we reconvene in here?  You take your

3    breaks down the hall, get, in your mind, what else you want to

4    argue to the Court that's not already in the papers that you

5    haven't already argued, and then we'll wrap it up.  Okay?

6           MR. MEEHAN:  Thank you, Your Honor.

7           THE COURT:  Let's take a brief recess.

8           SECURITY OFFICER:  All rise.

9                      (Court in recess.)

10           THE COURT:  Counsel, we're back after our short break.

11              Mr. Meehan, anything further as far as argument

12    today?

13           MR. MEEHAN:  No, Your Honor.  Thank you very much.

14           THE COURT:  Okay.  Anything that you want to say in

15    reply to the response to argument today?

16           MR. DENNIE:  Thank you, Your Honor.  And I'll be very

17    brief.

18           THE COURT:  Okay.  Famous last words by lawyers.  I'm

19    going to hold you to this.  Let's do it.

20           MR. DENNIE:  I'm going to do my best.

21              So at the very end of discussion there, there

22    was a conversation about the shortly after language.

23           THE COURT:  The six weeks versus three weeks, that one?

24           MR. DENNIE:  Well, it was actually after that, about

25    how there's no meeting of the definition of shortly after

1    because the injury occurred --

2         THE COURT:  Okay.

3         MR. DENNIE:  -- October 31st, 2004.  And I just want to

4    be clear on something 'cause counsel asked -- we had this same

5    conversation last week, and I pointed him to the same thing

6    that I would point you-all to, Appendix 6, which is the

7    decision letter of the Board that we're talking about here

8    today, November 23rd, 2016.  This is what the Groom law firm

9    wrote.  As Mr. Meehan said, they wrote this.

10             "She stated that you 'became disabled' in 2005

11   while playing for the New York Giants due to cumulative mental

12   disorder."

13             So the point I'm trying to make here -- and I

14   know they were trying to argue the merits on that one, but this

15   is their own letter where we're saying the application

16   references 2005.  And it is a circumstance where he had the

17   injury -- the basis, the underlying injury occurred in 2004,

18   October 31st.  But he returned to play within 48 hours and

19   continued taking those hits which ultimately resulted in an

20   impact exam conducted by the New England Patriots.  Whether

21   it's three weeks or four or five or six, it wasn't very long.

22   It was a very short period of time.

23             So my request on that issue, Your Honor, is if

24   that is not clear to the Court that we're making the comment

25   and statement that the injury, the main injury occurred on

1    the -- in 2004 but continue for multiple cumulative hits, that

2    we be permitted to amend on that issue.

3           THE COURT:  Amend what?

4           MR. DENNIE:  The complaint, to make it clear what we're

5    saying.  I mean, it's all spelled out in the facts, but we want

6    to be able to make it clear --

7           THE COURT:  Okay.  Well...

8           MR. DENNIE:  And we've been --

9           THE COURT:  So you're essentially doing a motion for

10   leave to amend, and we'll take that up later.  Anything further

11   with respect to the motion to compel?

12          MR. DENNIE:  Okay.  So the -- the other issue I wanted

13   to point out.  There was a lot of discussion, Your Honor,

14   about, you know, blackletter law and the Fifth Circuit has said

15   this and you can't do anything more.  I want to be clear, Your

16   Honor.  As I pointed out earlier, you stuck pretty tight to the

17   language that appears in *Crosby* in your order to us on

18   July 22nd.

19                The *Vega* court discussed review of the

20   administrative record, review of how the administrator has

21   interpreted the plan in the past, and review of information

22   that would assist the Court in understanding medical terms and

23   information.  That's what *Vega* said.

24                *Crosby* followed and expanded that because it

25   specifically says, quote, *Vega* does not, however, prohibit the

1    admission of evidence to resolve other questions that may be

2    raised in an ERISA action.  And it goes on to say, quote, A

3    claimant may question the completeness of the administrative

4    record, one; two, whether the plan administrator complied with

5    ERISA procedural regulations; and, three, the existence and

6    extent of a conflict of interest created by a plan

7    administrator's dual role making benefits determinations and

8    funding the plan.

9              Then the case goes on and says we see no reason

10   to limit the admissibility of evidence on these matters to that

11   contained in the administrative record in part because we can

12   envision situations where evidence resolving these disputes may

13   not be contained in the administrative record.

14             It's essentially what your order says.  So this

15   is not blackletter law, we're going to overturn you if you

16   grant the discovery that's being requested.  The discovery here

17   is extremely important.

18        THE COURT:  Okay.  You're getting into argument.  What

19   else?

20        MR. DENNIE:  The only other thing I would add is --

21        THE COURT:  I meant repetitive argument.

22        MR. DENNIE:  Yeah.  I won't belabor that point.  The

23   only other thing that I wanted to address was the reference to

24   the database being thousands of claims per year.  There are a

25   bunch of different types of claims that can be submitted.

1    Mr. Vincent specifically indicated he could run a query for

2    total and permanent disability, which is a much smaller

3    category.

4              We don't want to know if someone had a pension

5    issue or some other issue that presented to the Plan.  We don't

6    care about that.  We want to know the information on total and

7    permanent disability.  That's what we want.  That's where we

8    would get the information to help us understand if there was

9    inconsistency in the application, which is a component of

10   arbitrary and capriciousness and full and fair review.  That's

11   what we're after in this case, nothing more, nothing less.

12             We just want the information so we can go after

13   those very standards that the Fifth Circuit has set out.

14        THE COURT:  Okay.  Anything else?

15        MR. DENNIE:  That's it.  Thank you.

16        THE COURT:  Anything further in reply to the reply?

17        MR. MEEHAN:  No, because I know we're going to have

18   that opportunity in the supplemental filing --

19        THE COURT:  Yes, you will.

20        MR. MEEHAN:  -- so I won't do that.  I did have one

21   question.

22        THE COURT:  Yes.

23        MR. MEEHAN:  Perhaps the Court is following, but I now

24   understand from Plaintiff's counsel that this query they want

25   run of the database is limited to total and permanent

1  disability claims, but what does that mean?  I'm not following.

2              We would generate a list, I guess names

3  redacted so we protect people's information and say there were

4  300 or 200 or 4 or 11,000 or whatever the number is.  Is that

5  what we would be asked to do?  And to -- to what end would that

6  help anyone?

7          MR. DENNIE:  May I answer?

8          THE COURT:  No.  We're done.  We're done with the

9  argument on the motion to compel.  I'll go off the record and

10  bring up scheduling items.

11              Let's go off the record.

12                  (Off the record.)

13          THE COURT:  Let's go back on the record.

14              Counsel, the Court will entertain supplemental

15  briefing on the issue of the motion to compel and some issues

16  that were raised during this hearing and some not.  But what

17  the Court is particularly interested in is as follows:  I would

18  like each side to address the exceptions to allow discovery in

19  ERISA case under -- the two exceptions under *Vega* and the three

20  in *Crosby*.  From the Plaintiff's side, obviously, you touched

21  on at the very end what would allow discovery and what that is.

22  And on the Plan side, why none of the exceptions articulated in

23  *Vega* and *Crosby* apply here.  Okay?

24              Also, with respect to the Plaintiff, the Court

25  would ask you to identify with specificity the procedural --

1    ERISA procedural regulations that you claim were not complied

2    with, with specificity.

3              In addition, both sides today referenced

4    depositions that were recently taken and transcripts that were

5    received even more recently.  Some of this was set forth and

6    attached to the reply.  And, quite frankly, the Court has no

7    intention to read 9,000 pages of depositions; however, probably

8    should get -- we'll discuss format later -- an actual set of

9    the deposition.  So not that I want to double-check everything

10   that you say, but I will.

11             If you're using portions of the deposition to

12   support or respond to what was said during this hearing

13   relative to the motion to compel -- because I think it's tied

14   to the -- a lot of the motion to compel, which was filed after

15   the three depositions were taken, were in response to answers

16   that were received or not received, allegedly, in connection

17   with the depositions.

18             So if you could be very specific, build it into

19   your pleading and provide the Court -- you can decide between

20   the two of you, you know, providing the Court with a copy that

21   we can search.  But when you are saying that a certain

22   deposition supports your position, identify it by page, line or

23   whatever to make it easily searchable by the Court and quote

24   from it.  Okay?

25             Those are the areas that I would like

1    supplemental briefing on.

2              Let's go off the record.

3                   (Off the record.)

4         THE COURT:  Let's go back on the record.

5              So with respect to the supplemental briefing,

6    you-all can submit, if you choose, if there's anything more

7    that you like the Court to consider.  Supplemental briefing, we

8    discussed maybe an affidavit, all that can be by Friday, the

9    10th of September.  The sooner the better but that's the

10   deadline.

11             Off the record.

12                  (Off the record.)

13        THE COURT:  Let's go on the record.

14             Counsel, with respect to the current scheduling

15   order on this case, which sets trial on December 8th, is it, or

16   6th?

17        MR. DENNIE:  The three-week docket starts on the 6th.

18        THE COURT:  You will not be reached at that time.

19             Let's go off the record.

20                  (Off the record.)

21        THE COURT:  On the record.

22             The Court is aware that a motion for summary

23   judgment has been filed on behalf of the Defendant.  The

24   response time will be the three weeks from the date it was

25   filed is set aside.  And, again, a new deadline will be set

1    forth on that by the Court.  It'll be a minimum of three weeks

2    after the Court rules on this, but it may be longer.  All

3    right?  So as far as responsive documents to the summary

4    judgment, that is a waste of time at this time.  So that's on

5    the record.

6              MR. MEEHAN:  Your Honor, may I?

7              THE COURT:  On record?

8              MR. MEEHAN:  Yes.

9              THE COURT:  Go ahead.

10             MR. MEEHAN:  We're on the record, yes?

11             THE COURT:  Yes.

12             MR. MEEHAN:  May I -- I think I appreciate where the

13   Court is going, and I think I'm following it.  But it would be

14   helpful, I suggest, in the context of determining what, if any,

15   discovery the Court believes should go forward, both to

16   consider this concept of the exceptions in the Fifth Circuit

17   and whether any apply but also whether any is needed under

18   Rule 56 to address summary judgment.  Because even --

19             THE COURT:  So what are you asking me?

20             MR. MEEHAN:  Well, what -- I guess what I'm asking is

21   that -- is that rather than suspend the time to respond to

22   summary judgment, that a date be placed for a response.  And as

23   part of the response, Plaintiff can identify that --

24             THE COURT:  No, I'm not inclined to do that.

25             MR. MEEHAN:  Okay.

1          THE COURT:  I'm going to stick with what I said.

2          MR. MEEHAN:  Okay.  I just wanted to raise the Rule 56

3     procedure, but I understand that the Court is not going --

4          THE COURT:  No.  The Plaintiff either on the record, I

5     believe you did, but it might have been off the record, moved

6     orally for extended time to file a response to the motion for

7     summary judgment, and that oral motion is granted.

8               As far as the deadline, the Court will get back

9     to you with a deadline after the Court makes a ruling on this

10    discovery.  But it will be no sooner than three weeks after the

11    Court makes a ruling, but it could be longer.

12              Off the record.

13                   (Off the record.)

14         THE COURT:  Back on the record.

15              Since the trial date is lifted, there are

16    deadlines that we discussed earlier.  Obviously, deadlines for

17    pretrial material, close of discovery, possibly supplementing

18    the administrative record and so on, these will be revisited

19    after the Court decides the matter before the Court.  So we've

20    got a little bit of work to do.  You-all have about two and a

21    half weeks to do it and then it will get in line with

22    everything else the Court has on its plate.  I hope to get to

23    it soon, but we'll see.  Okay?

24              Off the record.

25                   (Off the record.)

1          THE COURT:  On the record.

2               If counsel for Defendant finds, in light of

3     what is before the Court right now and discovery that was had

4     and for any reason that counsel would like to have a new

5     summary judgment, amended summary judgment, leave is granted

6     right now for that.

7               And so everything's lifted right now.  So we

8     have a pending motion for summary judgment.  There's no

9     deadline yet because there's homework assignments for you-all,

10    and then I'll have a homework assignment.  The Court will

11    either go ahead and put it back on the schedule -- and you can

12    stand by your original motion for summary judgment, or you have

13    leave to file a new summary judgment.  You can get back to us

14    how much time you need on that.

15          MR. MEEHAN:  Okay.

16          THE COURT:  Leave is granted --

17          MR. MEEHAN:  Thank you, Your Honor.

18          THE COURT:  -- if that happens.

19          MR. MEEHAN:  Thank you, Your Honor.

20          THE COURT:  Off the record.

21                    (Off the record.)

22          THE COURT:  Back on the record.

23               It's the Court's anticipation that we'll be

24    issuing a brand-new scheduling order with input from the

25    lawyers once we get past this discovery issue, or set of

1    issues.  Everybody understand?

2              MR. DENNIE:  Yes, Your Honor.

3              MR. MEEHAN:  Yes, Your Honor.

4              THE COURT:  Off the record.

5                        (Off the record.)

6              THE COURT:  Counsel, is there anything else that you

7    would like to say or need to say on the record on behalf of

8    your client?  Plaintiff?

9              MR. DENNIE:  No, Your Honor.  Thank you for your time.

10             THE COURT:  On behalf of the Plan?

11             MR. MEEHAN:  No, Your Honor.  Thank you.

12             THE COURT:  If you want to talk to my court reporter

13   about transcript for today, she's here; otherwise, you-all stay

14   safe and we'll see you next time.

15             SECURITY OFFICER:  All rise.

16             (WHEREUPON, the proceedings were adjourned.)

17                        * * * *

18

19

20

21

22

23

24

25

1          REPORTER'S CERTIFICATE

2               I, Thu Bui, CRR, RMR, Official Court Reporter,
   United States District Court, Northern District of Texas, do
3  hereby certify that the foregoing is a true and correct
   transcript, to the best of my ability and understanding, from
4  the record of the proceedings in the above-entitled and
   numbered matter.

5

6                              _____/s/ Thu Bui_____
                               Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25