**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **MICHAEL CLOUD** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:20-CV-01277-E** |
| | § | |
| **THE BERT BELL/PETE ROZELLE** | § | |
| **NFL PLAYER RETIREMENT PLAN** | § | |
| | § | |
| **Defendant** | § | |

---

**PLAINTIFF'S OPPOSED MOTION FOR LEAVE TO FILE
FIRST AMENDED COMPLAINT AND BRIEF IN SUPPORT**

---

Plaintiff Michael Cloud ( "**Plaintiff**" or "**Cloud**") files this *Opposed Motion for Leave to File First Amended Complaint and Brief in Support* ("**Motion**") and in support thereof would respectfully show the court as follows:

## I.   **INTRODUCTION**

1.      Cloud filed suit against The Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "**Plan**" or "**Defendant**") related to the Plan's denial of Cloud's request for disability benefits he is entitled to receive.  Cloud has been determined to be disabled by the Social Security Administration based on both neurological and orthopedic conditions stemming from his play in the National Football League ("**NFL**") from 1999 to 2005.  On October 31, 2004, Cloud was involved in a helmet-to-helmet collision while playing for the New York Giants in a game against the Minnesota Vikings.  Cloud sustained a concussion, but returned to football activities approximately forty-eight (48) hours later.  Due to Cloud's return to football activities before his brain was healed, Cloud's brain was in a vulnerable state and sustained greater injury due to

repeated blows to the head.  During the 2005 football season, Cloud was unable to remember basic football players he ran most of his life.  Shortly thereafter, Cloud was totally and permanently disabled and unable to work.

## II.     LEGAL STANDARD

2.      Rule 15(a)(2) of the Federal Rule of Civil Procedure provides that a party may only amend it pleadings with the opposing party's consent or the court's leave, but courts should "freely give leave to amend when justice so requires."  *See* Fed. R. Civ. P. 15(a)(2); *see also Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005).  Denial of leave to amend is disfavored; and a district judge should grant leave absent a substantial reason to deny.  *See, e.g., Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1464 (5th Cir. 1995) (stating leave is freely given); *McClellon v. Lone Star Gas Co.,* 66 F.3d 98, 103 (5th Cir. 1995) (holding courts should freely grant leave to amend).  In *Foman v. Davis*, the United States Supreme Court stated, in pertinent part, as follows:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits…. [T]he leave sought should, as the rules require, be 'freely given.'  Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason…is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the [Federal Rules of Civil Procedure].

*Foman v.* Davis, 371 U.S. 178, 182 (1962).  The decision to grant leave is within the discretion of the Court, but Rule 15(a) of the Federal Rule of Civil Procedure evinces a bias in favor of granting leave to amend.  *See Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 872 (5th Cir. 2000).

3.      In exercising its discretion, this Honorable Court should be guided by the underlying purpose of allowing amendments to facilitate a decision on the merits.  *Johnson v.*

*City of Shelby,* 574 U.S. 10, 12 (2014) (stating Rule 15(a)(2) of the Federal Rule of Civil Procedure requires courts to "freely give leave [to amend a pleading]" being that the federal rules "effectively abolish the restrictive theory of pleadings doctrine"). The policy in favor of allowing amendments is extremely liberal. *Stripling v. Jordan Prod. Co*., 234 F.3d 863, 872 (5th Cir. 2000) (*citing* Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962); *Leffall v. Dallas Indep. Sch. Dist*., 28 F.3d 521, 524 (5th Cir. 1994); *Martin's Herend Imports, Inc. v. Diamond & Gem Trading U.S. Am. Co*., 195 F.3d 765, 770 (5th Cir. 1999); *Dussouy v. Gulf Coast Inv. Corp*., 660 F.2d 594, 597-98 (5th Cir. 1981)). Rule 15(a) of the Federal Rules of Civil Procedure "evinces a bias in favor of granting leave to amend." *Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 425 (5th Cir. 2004). A District Court needs "a 'substantial reason' to deny a party's request for leave to amend." *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014).

### III.     LEGAL STANDARD

4.      Cloud filed his *Original Complaint* [Dkt. 1] on May 15, 2020, but Defendant did not file its *Answer to Plaintiff's Complaint* [Dkt. 21] until February 24, 2021. Throughout this dispute, the parties have been embroiled in discovery disputes one after another, which delayed Cloud in obtaining necessary information to determine whether amendments were necessary. Now, Cloud has taken the depositions of two (2) members of the Disability Initial Claims Committee ("**Committee**") and the Rule 30(b)(6) witness ("**Defendant's Witnesses**"). In these depositions, Cloud learned of alarming irregularities that Cloud argues rise to the level of breaches of fiduciary duties. Prior to the depositions in this case, Defendant's Witnesses have not been deposed in any of the many other ERISA disputes involving Defendant's denial of benefits designed for disabled former NFL players. In *Plaintiff's Reply in Support of Emergency*

*Motion to Compel Compliance with Court's Order [Dkt. 38] and Production of Documents and Records and Incorporated Brief in Support Thereof* [Dkt. 50], Cloud set forth testimony of Defendant's Witnesses that provides the initial basis for asserting breach of fiduciary duty claims against Defendant and such testimony and attachments are incorporated herein by reference. Accordingly, Cloud files this *Motion* requesting that this Honorable Court grant authority for Cloud to amend his complaint in the form of the *First Amended Complaint* setting forth a new cause of action against Defendant based on information and evidence gathered in discovery. Cloud had no other way to discover this information prior to the depositions of Defendant's Witnesses. Defendant has done everything in its power to restrict discovery in this case. Without this Honorable Court's order, Defendant would have continued to deny Plaintiff's attempts to gather information in support of his claims.

5.      In addition to setting forth a new cause of action, Cloud "cleans up" and provides additional facts and information supporting his claims for relief. In Section IV of the *First Amended Complaint*, Cloud cites to information and documentation that was discovered and obtained during discovery from Defendant's and from third-parties through medical authorizations. During the hearing on *Plaintiff's Emergency Motion to Compel Compliance with Court's Order [Dkt. 38] and Production of Documents and Records and Incorporated Brief in Support Thereof* [Dkt. 41], counsel for Defendant's argued that Cloud does not meet the definition of "shortly after" as defined in the Retirement Plan at Section 5.3(e), because Cloud's helmet-to-helmet collision causing a concussion occurred on October 31, 2004 and Cloud played a partial season during the 2005 NFL season for the New England Patriots and New York Giants. As is clear throughout the *Original Complaint* [Dkt. 1], Cloud openly acknowledges that he returned to play during the 2005 season, but was unable to remember basic football plays. In Cloud's

application for reclassification filed on or about February 14, 2016, Cloud's representative stated:

> During the [s]pring '05, Mr. Cloud signed a two[-]year contract with the NY Giants worth over $2.6 million, but was cut due to his inability to remember the most basic plays and football assignments. **Months into the 2005 season[,] Mr. Cloud was again acquired by the NE Patriots and then again by the NY Giants, but was consequently cut due to these cumulative mental disorders**.

Appx. 1 at p. 1 (emphasis added). On November 23, 2016, the Groom Law Firm purportedly writing on behalf of the Retirement Board of the The Bert Bell/Pete Rozelle NFL Player Retirement Plan ("**Board**") wrote Cloud "**became disabled in 2005, while playing for the New York Giants due to cumulative mental disorder**", but concluded that Cloud did not meet the requirements of Section 5.7(b) of the Plan. Appx. 2 at p. 1 (emphasis added).

6.    Cloud seeks to amend by and through the *First Amended Complaint* to set forth what Cloud and the Board (written by the Groom Law Firm) knew and addressed in 2016, so there is no confusion as to the claims being asserted. Cloud had a debilitating concussion from a helmet-to-helmet collision on October 31, 2004 and returned to football activities forty-eight (48) hours after the collision, which caused Cloud to suffer further injury before his brain was properly healed. During the 2005 NFL season, Cloud was unable to remember basic football plays and was cut by two (2) NFL teams. The cumulative injuries sustained by Cloud as a result of the helmet-to-helmet collision on October 31, 2004 (and orthopedic injuries) and subsequent injuries resulted in a total and permanent disability. Cloud was totally and permanently disabled "shortly after" the conclusion of the 2005 NFL football season. Subsequent to concluding his play in the NFL following the 2005 NFL season, Cloud has been unable to maintain gainful employment.

7.    Rule 15(a) of the Federal Rules of Civil Procedure provides the opportunity for Cloud to "freely amend" his pleadings being that there is "a bias in favor of granting leave to amend". As stated in *Foman v. Davis*, Cloud should be afforded the opportunity to "test his

claims on the merits". The parties are currently waiting on a ruling from this Honorable Court permitting additional discovery requested by Cloud. There is currently no trial setting and all deadlines have been abated. This Honorable Court confirmed during the hearing on August 25, 2021 that a new scheduling order will be prepared and a new trial date will be provided. There is no prejudice in granting Cloud the opportunity to amend his petition by and through the *First Amended Complaint.*

8.      The basis for amendment derives from information gathered in discovery that Defendant was working diligently to hide. Without the depositions of Defendant's Witnesses (ordered by this Honorable Court), Cloud would not have discovered the rampant violations of the Plan documents. The depositions of Defendant's Witnesses took place on August 4, 5, and 10. Cloud was hoping to also have the taken the depositions of the members of the Board prior to seeking to amend, but this Honorable Court has yet to rule on such request being that Defendant objected to providing the same. Permitting Cloud to amend his pleadings by and through the *First Amended Complaint* does not constitute undue delay, bad faith, or dilatory motive. There is no "substantial reason" to deny Cloud's request to amend his pleadings by and through the *First Amended Complaint.*

9.      Plaintiff files this *Motion* for the reasons set forth herein. Cloud respectfully requests that this Honorable Court grant him leave to file and amend his pleadings by and through the *First Amended Complaint.* In accordance with L.R. 15-1, the *First Amended Complaint* is attached hereto as *Exhibit A.*

## **PRAYER**

WHEREFORE, premises considered, Plaintiff Michael Cloud respectfully requests that this Honorable Court grant the *Motion*, permit Plaintiff Michael Cloud to amend his complaint

by and through the *First Amended Complaint*, and direct the clerk to file the *First Amended*

*Complaint* among the papers of this Honorable Court.  Plaintiff Michael Cloud further prays for

all and such other relief to which he may be entitled in law or equity.

     Respectfully submitted on this the 31st day of August 2021.

> BARLOW GARSEK & SIMON, LLP
> 920 Foch Street
> Fort Worth, Texas 76107
> 817.731.4500 (telephone)
> 817.731.6200 (facsimile)
>
> By: */s/   Christian Dennie*
>     CHRISTIAN DENNIE
>     State Bar No. 24045775
>     cdennie@bgsfirm.com
>     ***ATTORNEY FOR PLAINTIFF***

## CERTIFICATE OF SERVICE

     I certify that on August 31, 2021, I served the foregoing *Plaintiff's Opposed Motion for Leave to File Amended Complaint* on Defendant's attorney of record by the court's ECF electronic filing system.

>   */s/ Christian Dennie*
> Christian Dennie, *Counsel for Plaintiff*

## CERTIFICATE OF CONFERENCE

     On August 25, 2021, the undersigned discussed the filing of the *Motion* with counsel for Defendant both during the hearing on the record and subsequent to the hearing. Defendant's counsel indicated that Defendant is opposed to this *Motion* or relief sought herein; therefore, this *Motion* is submitted to the court for determination.

>   */s/ Christian Dennie*
> Christian Dennie, *Counsel for Plaintiff*

# EXHIBIT "A"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **MICHAEL CLOUD** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:20-CV-01277-E** |
| | § | |
| **THE BERT BELL/PETE ROZELLE** | § | **JURY DEMAND** |
| **NFL PLAYER RETIREMENT PLAN** | § | |
| | § | |
| **Defendant** | § | |

---

### FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY

---

NOW COMES, Plaintiff, Michael Cloud (hereinafter "**Plaintiff**" or "**Cloud**") and files this, his *First Amended Complaint and Demand for Trial by Jury* complaining of the acts of The Bert Bell/Pete Rozelle NFL Player Retirement Plan (hereinafter "**Defendant**" or "**Retirement Plan**"), respectfully shows this Honorable Court as follows:

### I.   INTRODUCTION AND NATURE OF THE ACTION

1.     The National Football League ("**NFL**") is a highly profitable league governing professional football in the United States that garners the attention of millions of fans and viewers each week during the NFL season.  For many years, the ill effects of playing professional football were not known by the athletes who gave their bodies, minds, and mental health to professional football.  In 2002, during the study of former Pittsburgh Steeler Mike Webster's brain, Dr. Bennet Omalu discovered a condition of the brain he termed chronic traumatic encephalopathy ("**CTE**").  CTE has been determined to occur as a result of repeated blows to the head and has been commonly linked to athletes competing in professional football.  Dr. Omalu's research on CTE was published for the first time in 2005.  A 2019 study led by Boston University researchers that was published

in the *Annals of Neurology* studied the brains of 266 deceased football players and found that 223 had CTE.

2.      In 2012, more than eighty (80) former NFL players filed various lawsuits against the NFL seeking damages for injuries as a result of concussion-related symptoms.  The litigation ultimately merged into multi-district litigation involving claims of thousands of former NFL players.  In 2015, a settlement was approved that covered six "Qualifying Diagnos[es]".  The conditions that constitute a "Qualifying Diagnosis" under the terms of the settlement agreement are: (1) Level 1.5 Neurocognitive Impairment (as defined by the settlement terms), (2) Level 3 Neurocognitive Impairment (as defined by the settlement terms), (3) Alzheimer's Disease, (4) Death with documented CTE prior to April 22, 2015, (5) Parkinson's Disease, and (6) Amyotrophic Lateral Sclerosis ("**ALS**").

3.      Due to the limitations of the NFL concussion settlement, many former NFL players turned to the Retirement Plan to determine whether players qualified for benefits under the terms of the Retirement Plan. The Retirement Plan is a retirement, disability, and related benefits plan accessible by eligible former NFL football players and is an employee pension benefit plan within the mean of 29 U.S.C. § 1002(2) covered under the Employee Retirement Income Security Act of 1974 ("**ERISA**").

4.      Plaintiff is a former NFL football player who brings this action under ERISA, 29 U.S.C. §§ 1001 *et seq.*, against the Retirement Plan to recover benefits due to him under the terms of the Retirement Plan, to enforce his rights under the terms of the Retirement Plan, to clarify his rights under the terms of the Retirement Plan, and to enjoin and obtain appropriate equitable relief pertaining to acts that violate ERISA and/or the terms of the Retirement Plan.  The Retirement

Plan violated the terms of the plan by failing to reclassify and award Plaintiff "Active Football" benefits under the terms of the Retirement Plan.

## II.  JURISDICTION AND VENUE

5.      This Honorable Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States and pursuant to 29 U.S.C. § 1132(e)(1), which provides for federal jurisdiction of actions brought under Title 1 of ERISA.

6.      This Honorable Court has personal jurisdiction over Defendant because Defendant transacts business in, and have significant contacts with, this District, and because ERISA provides for nationwide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

7.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), and 28 U.S.C. § 1391(b) and (c) because some of the breaches and violations giving rise to the claims occurred in this District.

## III.  PARTIES

8.      Plaintiff, Michael Cloud, is a former professional football player and meets the definition of "Player" and "Vested Player" as set for in the documents creating the Retirement Plan.  Plaintiff played a total of seven (7) seasons in the NFL and, thus, is considered a "Participant" under the terms of the Retirement Plan, as defined by 29 U.S.C. § 1002(7), a "Vested Player" as defined by the Retirement Plan as Plaintiff earned greater than five (5) "Credited Seasons" in the NFL.  Plaintiff resides in Heath, Rockwall County, Texas.

9.      Defendant, the Bert Bell/Pete Rozelle NFL Player Retirement Plan, is an employee pension benefit plan, as defined by 29 U.S.C. § 1002(2) covered under ERISA, created for the benefit of former employees of the NFL member teams.  The Retirement Plan is administered by

a board of six (6) individuals that is composed of three (3) individuals selected by the NFLPA and three (3) individuals (3) selected by the NFL Management Council.

## IV.   FACTUAL ALLEGATIONS

10.     Plaintiff grew up in Portsmouth, Rhode Island and quickly excelled as an athlete. He attended Portsmouth High School in Portsmouth, Rhode Island where he earned All-American honors as a running back and was recruited by virtually every major college and university to participate as a member of its football team.  Plaintiff selected Boston College as his college of choice and went on to have a stellar career.  At Boston College, as a senior, Plaintiff received the Golden Eagle Award (an award given to the top male citizen, leader, scholar, and athlete) and was named first team All-American and a finalist for the Doak Walker Award, an award given to the nation's top running back.   Plaintiff left Boston College with a bachelor's degree in Socioeconomics.

11.     In 1999, Plaintiff was selected by the Kansas City Chiefs in the second (2nd) round of the 1999 NFL Draft with the fifty-fourth (54th) overall selection.  Plaintiff had a seven (7) year career as a running back, kick returner, and special teams player in the NFL playing for three (3) teams, Kansas City Chiefs (1999-2002), New England Patriots (2003, 2005), and the New York Giants (2004-2005).  In 2003, Plaintiff lead the New England Patriots in rushing touchdowns with five (5). While playing for the New England Patriots, in 2003, Plaintiff helped the New England Patriots win Super Bowl XXXVIII played on February 1, 2004.  In 2004, Plaintiff joined the New York Giants, but was released prior to the beginning of the 2005 season.  In November 2005, Plaintiff was signed by the New England Patriots and participated in six (6) games before being waived and having his contract terminated.  In late December 2005, Plaintiff was again signed by the New York Giants at a base compensation rate of $540,000.00, but was released after only one (1) game.  When being released by both the New York Giants and New England Patriots, it was

cited that Plaintiff was unable to remember basic plays commonly performed by NFL running backs.  Plaintiff never played in NFL again.

12.     After being released by the New York Giants, Plaintiff was unable to work due to orthopedic and neurological ailments and injuries.  After concluding his NFL career, Plaintiff was experiencing extensive and substantial pain from injuries sustained while playing in the NFL, thus Plaintiff contacted the National Football League Players Association ("**NFLPA**") to discuss the process to obtain disability benefits.  Plaintiff was directed to the Retirement Plan to obtain the necessary medical documentation and information to move forward with seeking disability benefits.  In 2006, Plaintiff requested necessary documents and information from the advisors of the Retirement Plan necessary to seek disability benefits, but did not receive copies of all requested policies and received only partial documentation showing a ten (10) page "Medical Summary" of most of Plaintiff's orthopedic injuries.  However, the documents provided did not include any documentation of concussions or corresponding medical documentation of orthopedic and neurological injuries.

13.     During Plaintiff's NFL career, he sustained multiple injuries including, but not limited to, several concussions, injuries to his head, brain, shoulders, knees, back, hands, arms, elbows, wrists, fingers, thumbs, legs, feet, toes, buttocks, teeth, jaw, hips, chest ribs, musculoskeletal system, and neck, and had three surgeries including bone grafting and cyst debridement of his left foot first metatarsal, right great toe cyst removal, and right leg fasciotomy with debridement of a necrotic peroneus longus. The muscle necrosis of his peroneus longus required an emergency surgical procedure to save Plaintiff's life.  The partial surgical notes of Dr. Bertram Zarins provide as follows:

> Lateral compartment showed bulging of the muscle and areas of black old hematoma, which was evacuated. The peroneus longs muscle was entirely avulsed

from the proximal origin and had no vascular or nerve supple at all. It appeared to be completely avascular and appeared to be undergoing early necrosis. It was attached to the tendon distally. The surrounding muscle of the peroneus breves appeared to have signs of injury and had questionable viability.

\*\*\*

Working in the anterior aspect of the anterior compartment, long Metzenbaum scissors were used to divide the deep fascia overlying the anterior compartment from just below the knee down to the ankle.

\*\*\*

Old hematoma was evacuated. The muscle had questionable viability except for the peroneus longs, which had definite necrosis and was completely avascular and easily flipped out into the wood, being completed detached proximally….

A photograph of the injury is as follows:



Multiple doctors opined that the above-referenced injury was a permanent disability.  On July 6, 2009, Dr. Michael J. Einbund opined that the July 30, 2003 operation resulting from a July 2003 injury caused Plaintiff to "never be able to regain his ability to play professional football…[and] was the cause of his permanent disability."  On July 29, 2009, Dr. Bert R. Mandelbaum noted the

injury to Plaintiff's right leg occurred while playing for the New England Patriots in 2003 and caused Plaintiff to experience an "inability to perform and as a consequence had to retire."  On January 21, 2010, Dr. Zvi Kalisky, a physician hired by the New England Patriots, opined that the injury on July 23, 2003 "is a major cause of the work restriction" and the "cause of patient's failure to return to football since 2005 is the right leg injury of July 23, 2003."

14.     On October 31, 2004, while playing for the New York Giants against the Minnesota Vikings in Minneapolis, Minnesota, Plaintiff sustained a concussion from a high-speed helmet-to-helmet collision.  A defensive back for the Minnesota Vikings launched his body laterally and lowered his head colliding with Plaintiff knocking both players to the ground violently.  In a report prepared by Dr. Nathaniel W. Nelson, an expert for the New York Giants in a worker's compensation case, the helmet-to-helmet collision was described as follows:

> Review of the game film provided by Mr. Williams confirms that Mr. Cloud (jersey number '30') was playing as a running back for the New York Giants in the Metrodome against the Minnesota Vikings on October 31, 2004.  The play associated with Mr. Cloud's injury is depicted at mark 2:33:53 of the game film. At the start of the play, Kurt Warner (jersey number '13') is observed in the position of quarterback, and Mr. Cloud is in the position of running back, the ball set on the Giants' 31-yard-line. Warner takes the snap from center and pitches the football to Mr. Cloud at mark 2:33:55 of the game film. Cloud then carries the ball in his right arm and runs to the left of the offensive line. He sustains initial contact with a Vikings player (jersey number '27') at the Giants' 43-yard-line at mark 2:33:58. Mr. Cloud appears to sustain a helmet-to-helmet collision with the Vikings player, striking the right side of the helmet. As a result, Mr. Cloud is knocked to the ground, lands on his right side, and then rolls on the turf, holding the ball in his left arm and resting his back against the body of Vikings player #27 (mark 2:33:59). Cloud continues to lie on the ground briefly at 2:34:00 and 2:34:01, and his eyes appear to be open. He independently releases the football from his left hand at 2:34:01 and transitions to a sitting position. At mark 2:34:02, New York Giants teammate David Diehl (jersey number '66') can be seen reaching for Mr. Cloud's left hand and assisting Mr. Cloud to his feet (mark 2:34:03). Mr. Cloud can be seen walking back to the huddle at 2:34:05. He can be seen reaching for his mouth guard with his right hand while walking at 2:34:06. After a break for instant replay, at 2:34:21, Mr. Cloud can be seen kneeling on the right knee near teammates who are standing nearby, and a referee calls time-out. After a commercial break, a commentator states that Mr. Cloud had injured himself on the play and that a teammate (Tiki

Barber) had taken his place. Mr. Cloud does not appear to participate in play for the remainder of the game.

Plaintiff received a blow to the right side of his head that caused Plaintiff to fall to the ground abruptly. After the game, Plaintiff did not know where he was, what happened, or how he returned to New York following the game. A screenshot of the collision is as follows:



Despite a concussion, Plaintiff was cleared to return to football activities approximately forty-eight (48) hours after the concussion. Plaintiff reported headaches, dizziness, and vertigo after the helmet-to-helmet collision, but was allowed and told to return to play.

15.     When Plaintiff returned to football activities only approximately forty-eight (48) hours after sustaining a debilitating concussion, Plaintiff participated in high-speed full contact drills in practice and high-impact collisions to his body, head, and brain in NFL practices and games. These high impact collisions jostled Plaintiff's brain before he was fully recovered. By permitting Plaintiff to quickly return to the field of play, Plaintiff suffered from second-impact syndrome, commonly known as S.I.S. After sustaining a concussion, brain cells that are not irreversibly destroyed remain alive, but exist in a vulnerable state. S.I.S. occurs when a player returns to competition before the symptoms from the first concussion resolve and can be fatal. Plaintiff's brain was in a vulnerable state after the concussion on October 31, 2004.

16.     Shortly thereafter, Plaintiff could not remember basic plays, football schemes, or his duties in such plays and schemes.  During the 2005 season, Plaintiff, a smart and savvy NFL veteran, could not recall basic plays he learned in high school.  Plaintiff had no ability to recall his responsibilities or the requirements for plays he ran in the NFL for many years.  Ultimately, as a result of his failure to perform the basic duties of an NFL running back, Plaintiff was released by the New York Giants prior to the first game of the 2005 season.  In November 2005, Plaintiff was signed by the New England Patriots for a short period of time.  Plaintiff was, again, unable to recall plays and was unable to perform the functions and duties of his job as an NFL running back.  Plaintiff played sparingly in six (6) games for the New England Patriots.  During his tenure with the the New England Patriots, the New England Patriots' training staff administered a neurological exam on Plaintiff known as the ImPACT exam designed by Grant Iverson and the NFL MTBI Committee.  It was reported to Plaintiff that the New England Patriots were concerned with Plaintiff's forgetfulness and taking numerous blows to the head in practices and games and, thus, the New England Patriots required Plaintiff to sit for the ImPACT exam.  The ImPACT exam is a computerized test that administers a series of game-like activities that measures reaction time, memory, and processing speed and is supposed to provide an accurate understanding of the subject's brain function and health.  Plaintiff was led into a room at the New England Patriots' practice facility by the training staff to take the ImPACT exam on a computer.  Shortly after taking the exam, Plaintiff was released by the New England Patriots.  To this day, Plaintiff still does not have a copy of these neurological exam results despite multiple requests.  Plaintiff has had extreme difficulty obtaining requested medical information.

17.     In 2007, Plaintiff fell behind on his mortgage payments on his home in Rhode Island.  In 2007 and 2008, with representatives of BankNewport, Plaintiff called the Retirement

Plan to discuss disability benefits and even access to his 401(k) savings account to help pay his mortgage.  Due to his inability to obtain gainful employment, in 2008, Plaintiff's home in Rhode Island went into foreclosure.

18.     Numerous studies have been conducted on the effects of concussion in the short- and long-term health of NFL players. In 2008, the University of Michigan's Institute for Social Research conducted a study commissioned by the NFL on the health of retired players, with over 1,000 former NFL players taking part. The results of the study, which were released in 2009, reported that "Alzheimer's disease or similar memory-related diseases appear to have been diagnosed in the league's former players vastly more often than in the national population – including a rate of 19 times the normal rate for men ages 30 through 49."  The NFL, however, responded by claiming the study was incomplete and attempted to distance itself from the findings by arguing additional findings were needed.

19.     Shortly after the results of the above-referenced study were publicly released, Representative John Conyers, Jr., Chairman of the House Judiciary Committee, called hearings to discuss the impact of head injuries sustained by NFL players.  In the first hearing before the House Judiciary Committee, Representative Maxine Waters stated "I believe you are an $8 billion organization that has failed in your responsibility to the players. We all know it's a dangerous sport. Players are always going to get injured. The only question is, are you going to pay for it? I know that you dearly want to hold on to your profits. I think it's the responsibility of Congress to look at your antitrust exemption and take it away."

20.     In January 2010, the House Judiciary Committee held further hearings on the impact of head injuries sustained by NFL players.  Representative John Conyers, Jr. noted "until recently, the NFL had minimized and disputed evidence linking head injuries to mental impairment

in the future." Representative Linda Sanchez further criticized the NFL when she said "I find it really ridiculous that he's saying that concussions don't cause long-term cognitive problems. I think most people you ask on the street would figure that repeated blows to the head aren't good for you." She further commented that "[i]t seems to me that the N.F.L. has literally been dragging its feet on this issue until the past few years. Why did it take 15 years?" Similarly, Representative Anthony Weiner stated "[y]ou're in charge of the brains of these players" and "you have years of an infected system here, and your job is…to mop [it] up."

21.     The NFL did not recognize concussions as a long term and debilitating injury until in or about 2009. Concussion protocols were not put in place in the NFL until in or around 2009. Today, the NFL treats helmet-to-helmet collisions much differently than when Plaintiff was involved in a helmet-to-helmet collision on October 31, 2004. NFL Rule 12, Section 2, Article 8 states it is a foul for a defensive player to lower his helmet to make a tackle and will result in an ejection. Additionally, unlike Plaintiff, today's NFL player who sustains a concussion does not return to football activities within forty-eight (48) of sustaining a concussion. Presently, when a player has a diagnosed concussion, he must meet a five-step protocol prior to returning to play, which includes (Step 1) symptom limited activity, (Step 2) aerobic exercise, (Step 3) football specific exercise, (Step 4) club-based non-contact training drills, and (Step 5) full football activity/clearance. No such process was followed in 2004 when Plaintiff sustained a concussion from the helmet-to-helmet collision. The decision to permit Plaintiff to return to football activities so quickly after sustaining a concussion and before healing resulted in long-term cognitive impairments due in large part to blows to the head he sustained after the concussion on October 31, 2004.

22.    In addition to memory loss and the inability to perform the functions and duties of his job, Plaintiff started experiencing greater and more consistent headaches, vertigo, getting lost, forgetting names and places, and other cognitive issues.  Accordingly, on June 11, 2009, at age thirty-three (33), Plaintiff filed his *Application for Disability Benefits* asserting disabling injuries including injuries to his left shoulder, right hip, right mid-foot, right leg compartment numbness and loss of sensation, left rib, and "concussions – vertigo regularly".  On or about July 6, 2009, Plaintiff met with Dr. Michael J. Einbund, an NFL approved doctor, who evaluated Plaintiff only as to the orthopedic aspects of his application and, specifically, Plaintiff's lower right leg.  Dr. Eibund concluded that Plaintiff's lower right leg impairment to be WPI twenty percent (20%). On July 9, 2009, Retirement Plan tabled Plaintiff's request for line-of-duty benefits until Plaintiff submitted for evaluation by "neutral physicians" who are approved by the Retirement Plan.  On September 25, 2009, Retirement Plan denied Plaintiff's request for line-of-duty benefits by stating he "does not have a 'substantial disablement' within the meaning of the Retirement Plan," but only analyzed Plaintiff's upper extremities (15% impairment) and lower extremities (35% impairment) for total body impairment of twenty-four percent (24%).  Plaintiff's request for line-of-duty benefits was denied as follows:

> At its September 24, 2009 meeting, the Disability Initial Claims Committee ("Committee") of the Bert Bell/Pete Rozelle NFL Player Retirement Plan ("Plan") considered your application for line-of-duty ("LOO") disability benefits. We regret to inform you that the Committee denied your application for LOD benefits.
>
> ***
>
> For orthopedic impairments, using the American Medical Association Guides to the Evaluation of Permanent Impairment, (Fifth Edition, Chicago IL) ("AMA Guides"), is (a) a 38% or greater loss of use of the entire lower extremity; (b) a 23% or greater loss of use of the entire upper extremity; (c) an impairment to the cervical or thoracic spine that results in a 25% or greater whole body impairment; (d) an impairment to the lumbar spine that results in a 20% or greater whole body impairment; or (e) any combination of lower extremity, upper extremity, and spine

impairments that results in a 25% or greater whole body impairment. In accordance with the AMA Guides, up to three percentage points may be added for excess pain in each category above ((a) through (e)).

\*\*\*

The Committee denied your application for LOD benefits because it determined that you do not have a substantial disablement within the meaning of Plan section 6.4. Specifically, the Committee noted that Plan neutral physician, Bert Mandelbaum, M.D., rated the loss of use of your entire upper extremity at 15%, your entire lower extremity at 35%, and your combined whole-body impairment at 24%.

There was no analysis of Plaintiff's "concussions – vertigo regularly" as addressed on his *Application for Disability Benefits*.  On February 2, 2010, Plaintiff appealed the denial of his request for line-of-duty disability benefits.

23.    On or about April 13, 2010, Plaintiff met with Dr. George H. Canizares of All Florida Orthopedic Associates, another NFL doctor, and reported that he experienced "depression, migraine headaches, insomnia, … [and] some concussions."  On the same day, April 13, 2010, Plaintiff also met with Dr. Adam S. DiDio where he described a "history of concussions" and vertigo that makes it feel like his "bed spins".  Plaintiff further explained that "[i]n the last 6 or 7 years[,] [headaches] have become more frequent and more intense." In addition to intense headaches, Plaintiff described "some cognitive difficulties", including forgetting names of people he has known for years, often getting lost, having difficulty paying bills, and depression.

24.    On May 18, 2010, the Retirement Plan granted Plaintiff's appeal and granted his line-of-duty disability benefits in the amount of $3,290.00 per month effective May 1, 2010.  The line-of-duty benefits was the lowest monetary compensable disability category and had much less monetary value than the Active Football total and permanent disability benefits that paid approximately $22,080.00 per month.

25.     On October 19, 2010, Plaintiff filed *Employee's Claim Petition* in Minnesota against New York Giants as a result of a "Grade 1 concussion leading to vertigo, dizziness, headaches, and altered attention span."  The Grade 1 concussion mentioned in the Employee's *Claim Petition* is the concussion referenced above that occurred on October 31, 2004 in a game between the New York Giants and the Minnesota Vikings.

26.     On or about June 12, 2011, Plaintiff submitted to medical treatment performed by Primary Behavioral Health Clinics where Plaintiff reported that he experienced neck, lower back, foot, and lower leg pain.  Additionally, such records indicated Plaintiff has "extreme trouble remembering things, is worried and easily annoyed or irritated, has difficulty making decisions, goes blank often and has trouble concentrating."  Harry Cates, a licensed professional counselor working for Lifework's Group, PA, performed a mental residual capacity assessment on Plaintiff evaluating him from October 10, 2011 to December 21, 2011 and stated Plaintiff was struggling with depressive symptoms, poor concentration and bouts of unpredictable irritability that were "no doubt" related to his physical injuries and concussions sustained while competing in the NFL. Further, Mr. Cates reported that Plaintiff had increased difficulty in coping due to social anxiety and self-consciousness from ongoing changes in his cognitive function.

27.     Plaintiff, next, met with and was evaluated by Dr. John Cronin.  On February 2, 2012,  Dr. Cronin reported as follows:

> Dr. Nelson further reported that Mr. Cloud's account of the 2004 injury appears to be a helmet-to-helmet collision in which he was struck in the right posterior region. Significant physical and cognitive problems occurred immediately after this collision and Mr. Cloud experienced 'confusion, disorientation and dizziness as a result of the impact'.  He was able to walk from the field with assistance (but does not recall doing so) and remained sidelined for the remainder of the game.  Mr. Cloud does not recall how he returned home in New York, nor does he recall his level of performance for the remaining games for that season.  Dr. Nelson notes that when Mr. Cloud attempted to regain his playing status the following spring, he

was unable to complete basic plays and assignments and subsequently was released by two teams and ultimately 'retired' from the NFL.

\*\*\*

Research criteria for mild neurocognitive disorder: A. The presence of two (or more) of the following impairments in cognitive functioning, lasting most of the time for a period of at least 2 weeks (as reported by the individual or a reliable informant):

1) Memory impairment as identified by a reduced ability to learn or recall information

2) Disturbance in executive functioning (i.e., planning, organizing, sequencing, abstracting)

3) Disturbance in attention or speed of information processing

4) Impairment in perceptual-motor abilities

5) Impairment in language (e.g., comprehension, word finding)

While our "gold standard" in diagnostics indicates that Mr. Cloud need only qualify with two of the five symptoms, **and he has all five of the symptoms**, he has obviously been experiencing these problems since his injury in 2004 which obviously is in excess of two weeks duration.

\*\*\*

While Mr. Cloud is not in a nursing home with 24 hour care, he certainly is hardly 'cured' or unimpaired. He graduated from Boston College, he didn't just attend, and he didn't 'retire' from the NFL, they cut him.

28.     On January 22, 2013, Dr. Anne Smith of Smith Behavioral Health concluded Plaintiff experienced "major depressive disorder, recurrent, severe without psychotic features." On April 8, 2013, Dr. Don Marler performed a mental residual functional capacity assessment and concluded that Plaintiff's understanding and memory limitations as markedly limited in the ability to understand and remember detailed instructions and the ability to carry out detailed instructions.

29.     On May 13, 2014, Mr. Cates again met with and analyzed Plaintiff's cognitive function. Mr. Cates concluded that Plaintiff was limited in his ability to maintain attention and

concentration for extended periods and, further, concluded that Plaintiff was limited in his ability, amongst others, to remember location and work procedures, understand, remember, and carry out instructions and perform activities on schedule.

30.     On June 18, 2014, Daniel Curran, Administrative Law Judge for the Social Security Administration, found Plaintiff to be totally and permanently disabled as a result of both orthopedic and neurological conditions.

31.     The total and permanent disability benefits ("**T&P Benefits**") program administered under the Retirement Plan is complex and has multiple categories.  The categories under the Retirement Plan, as set forth in Section 5.3(a) and 5.3(c), respectively, at issue are:

> Active Football: Subject to the special rules of Section 5.4, Players will qualify for benefits in this category if the disability(ies) results from League football activities, arises while the Player is an Active Player, and causes the Player to be totally and permanently disabled "shortly after" the disability(ies) first arises.

> Inactive A: Subject to the special rules of Section 5.4, a Player will qualify for benefits in this category if a written application for T&P benefits or similar letter than began the administrative process that resulted in the award of T&P benefits was received within fifteen (15) years after the end of the Player's last Credited Season.  This category does not require that the disability arise out of League football activities.

The Retirement Plan also defines "shortly after", as used in Section 5.3(a), in Section 5.3(e) and states, in pertinent part, as follows:

> "Shortly After" Defined.  A Player who becomes totally and permanently disable no later than six months after a disability(ies) first arises will be conclusively deemed to have become totally and permanently disability "shortly after" the disability(ies) first arises, as that phrase is used in subsections (a) and (b) above, and a Player who becomes totally and permanently disabled more than twelve months after a disability(ies) first arises will be conclusively deemed not to have become totally and permanently disabled "shortly after" the disability(ies) first arises, as that phrase is used in subsections (a) and (b) above.  In cases failing within this six- to twelve-month period, the Retirement Board or the Disability Initial Claims Committee will have the right and duty to determine whether "shortly after" standard is satisfied.

32.    On or about June 1, 2014, Plaintiff filed his request for T&P Benefits.  Plaintiff reported the symptoms of cognitive impairment as shown in Dr. Didio's report dated April 13, 2010 with the addition of post-concussion syndrome, clinical depression, dementia pugilistica, and migraine headaches. On July 23, 2014, the Retirement Plan granted Plaintiff T&P Benefits under the Inactive A designation with an effective benefits date of May 1, 2014.  The Retirement Board chose to grant Inactive A T&P Benefits instead of the proper benefits under Active Football T&P Benefits.

33.    On February 14, 2016, Plaintiff filed his request for reclassification of his Inactive A T&P Benefits to Active Football T&P Benefits.   When seeking reclassification, Section 5.7(b) of the Retirement Plan requires the following:

> Reclassification.  A Player who is awarded T&P benefits will be deemed to continue to be eligible only for the category of benefits for which he first qualifies, unless the Player shows by evidence found by the Retirement Board or the Disability Initial Claims Committee to be clear and convincing that, because of changed circumstances, the Player satisfies the conditions of eligibility for a benefit under a different category of T&P benefits….

Plaintiff presented the symptoms as referenced on June 1, 2014 with the addition of significant memory and attention problems, attention and decision problems, and affective disorder.  All of these symptoms are commonly associated with post-concussion syndrome and, certainly, were reported and experienced by Plaintiff.  It is commonplace for symptoms of this kind to grow and become more advanced as time progresses.   Additionally, Plaintiff's application for reclassification states, in pertinent part, as follows:

> During the [s]pring '05, Mr. Cloud signed a two[-]year contract with the NY Giants worth over $2.6 million, but was cut due to his inability to remember the most basic plays and football assignments.  Months into the 2005 season[,] Mr. Cloud was again acquired by the NE Patriots and then again by the NY Giants, but was consequently cut due to these cumulative mental disorders.

Plaintiff's symptoms as reported at the time of the initial debilitating injury on October 31, 2004 significantly progressed and grew much more substantial with time. The cumulative nature of hits received after the October 31, 2004 concussion caused great impairment and danger for Plaintiff. On March 2, 2016, the Committee, in a decision letter written by the Groom Law Firm without the assistance of the Committee, summarily denied Plaintiff's request despite showing a continued growth of post-concussion syndrome including new concussion symptoms. Subsequently, on September 1, 2016, Plaintiff timely filed his appeal of denial of his request for reclassification of Inactive A T&P Benefits to Active Football T&P Benefits. Again, on November 23, 2016, Retirement Plan denied Plaintiff's request. Despite acknowledging in its decision letter dated November 23, 2016, written by the Groom Law Firm without the assistance of the Retirement Board, that Plaintiff "became disabled in 2005, while playing for the New York Giants due to cumulative mental disorder", the Retirement Board went on to conclude that Plaintiff did not meet the requirements of Section 5.7(b) of the Retirement Plan.

34.     The appeal of the reclassification decision was the final step in the administrative process and, thus, Plaintiff's ERISA claim is ripe for consideration. Specifically, Retirement Plan's correspondence dated November 23, 2016 states "[y]ou have the right to bring an action under Section 501(a) of the Employment Retirement Income Security Act of 1974, as amended, within 42 months from the date of this letter, which is May 16, 2020."

35.     Plaintiff satisfied each element necessary to obtain Active Football T&P Benefits and for reclassification. Specifically, Plaintiff was disabled as a result of playing in the NFL and Plaintiff was totally and permanently disabled "shortly after" the disability occurred. In addition to the numerous other medical professionals referenced above, Dr. John Cronin conducted a head trauma evaluation resulting from a helmet-to-helmet concussion that occurred on October 31,

2004.  Dr. Cronin reported that Plaintiff "sustained at least one, if not several, closed head injuries" that caused him to be "unable to complete basic plays and assignments" while participating as an NFL player in late 2004 and 2005.  Dr. Cronin concluded that Plaintiff has experienced the following cognitive problems "since his injury in 2004": 1) "[m]emory impairment as identified by  a reduced ability to learn or recall information"; 2) "[d]isturbance in executive functioning (i.e., planning, organizing, sequencing, abstracting)"; 3) "[d]isturbance in attention or speed of information processing"; 4) "[i]mpairment in perceptual-motor abilities"; and 5) "[i]mpairment in language (e.g., comprehension, word finding)".  Plaintiff attempted to play professional football following his concussion on October 31, 2004, which resulted in numerous and repeated blows to the head while Plaintiff's brain was in a vulnerable state.  During the 2005 NFL season, Plaintiff was experiencing numerous cognitive impairments and ailments.  Plaintiff was totally and permanently disabled following the conclusion of the 2005 NFL season.

36.    Plaintiff has a long history of attempting to navigate the complex web of the Retirement Plan in an effort to obtain disability benefits.  Plaintiff has had to scratch and claw to obtain his medical records from the Retirement Plan, doctors approved by the Retirement Plan, and NFL member teams.  When he first sought to file for disability benefits in 2006, Plaintiff did not have a copy of the Retirement Plan documents and was not provided copies of his medical records.  Plaintiff made requests for his full medical file in 2006, 2007, 2008, 2009, 2010, 2012, 2013, 2014, 2015, 2016, 2017, 2018, and 2019.  On or about January 18, 2019, some thirteen (13) years after the initial request, Plaintiff was provided with an 860-page medical file by the Groom Law Firm, but the documentation provided still lacked the neurological reports including reports from the NFL MTBI committee and the results of the ImPACT neurological exam administered by the New England Patriots.  In litigation, the Groom Law Firm presented what they call the

"administrative record" totaling only 529 pages, but later produced another approximately 1,500 pages of records attributed to Plaintiff.  For the first time in July 2021, the Groom Law Firm produced previously withheld medical documents and scans conducted by Dr. Canivares, a Retirement Plan physician, that were never previously provided to Plaintiff.

      37.     Many of the complaints made by Plaintiff have been made by other retired NFL players going back many years.  On September 18, 2007, the Commerce Committee of the United States Senate held a hearing regarding oversight of the NFL retirement system. During the hearing, numerous players testified regarding their views of the Retirement Plan and its breaches of fiduciary duties.  Daryl Johnston (former player for the Dallas Cowboys and sports broadcaster) testified and provided a prepared statement, which include the following:

> The NFL Retirement Board, not the NFLPA, determines disability claims. Representatives are appointed by the NFL owners and the NFL Players Association. There is no one on the board looking out for the interests of former players. This six-member board votes unanimously almost every time. The Groom law firm who established the pension fund in the 1993 Collective Bargaining Agreement also serves as counsel to defend the distribution of disability payments. They have earned $3.15 million for defending claims in the past year – about one-sixth of what the Plan says it pays out in disability benefits. This is an obvious conflict of interest.

Brent Boyd, another former NFL player, also testified:

> The most disgusting number is this. They're taking $3.1 million out of our own pension fund to pay Doug Ell and Groom law firm to fight us, with our own money, and to alter and change the plan, and turn it into a jungle of red tape.

> * * *

> Doug Ell and Groom Law can manipulate the legal process, but they can't fool the distinguished members of this Commerce committee.

> * * *

> Shortly after that, my Viking medical files disappeared. Out of the blue, you know, it has to be, the NFL destroyed these files to remove the pesky contemporaneous notes that would prove my claim instantly, and then to allow the Path & Groom

Law's experts at manipulating ERISA.

* * *

It's high time to expose the corruption of the NFL Disability Board, especially with Groom Law Group's absolute power . . . .

* * *

Upon filing my claim, I was told by Miki Yaras-Davis of the NFLPA not to bother filing, her exact words were 'the owners will never open that can of worms' by granting a claim for concussions.

Shortly after that, my Vikings medical files mysteriously 'disappeared'. The courts were never made aware of this. Medical files are sacred to a player, we were not ever allowed in the same room with them. We had to trust that after our career the NFL would store the files and present them in the event of a claim.

In essence, they destroyed the evidence that would have easily proven my claim. The 9th Circuit would mistakenly hold that against ME, not them, and said without any contemporaneous notes the Disability Board could send me from one doctor to another.

There were contemporaneous notes, I believe Groom Law destroyed them to clear their path for manipulation of the process.

Eugene Morris, another former NFL player, also provided his views:

If [a player] has the tenacity to sue, then The Groom Law Group reaps the true 'benefits' of this system – litigation to the tune of almost $20 million over the last 6 years against retired Players pursuing their rights. Yet, when questioned about the make up of the 'legal team' in question, Mr. Ell says: 'Oh we try to keep the lawyers down to an absolute minimum.' And those 'few guys' make millions.

* * *

By law, you cannot change the terms of a Plan that contains ERISA guidelines. Yet that is exactly what the NFLPA did at Groom's suggestion. Groom claims that, 'they (Groom), do not make decisions regarding benefits,' yet Doctor Alfred J. Tria, the first neutral Medical Advisory Physician (MAP), states in the Public Record, that Groom chastised him for qualifying a Player under Line of Duty. In 1989, I was the first Player qualified by Dr. Tria under Line of Duty Disability. I was sent to Dr. Tria due to a deadlock of the retirement board pursuant to the Plan's terms. The Owner-Members rejected the qualification even though it was final and binding on the retirement board, which violated the Plan's Terms.

* * *

The evidence points to the Groom Law Group as the principal architect and administrator of the attempt to control the disability process on behalf of the two collective bargaining units.

38.     The Retirement Plan, through the Committee and Retirement Board, has failed to recognize the long-term and growing effects of concussions experienced by players who played in the NFL.   Former member of the Retirement Board and former NFL player Dave Duerson was open about his disagreement as to the long-term effects of concussions and granting of disability benefits.  Tragically, on February 11, 2017, Mr. Duerson later felt the effects of his own post-concussion syndrome and committed suicide.  Prior to committing suicide, Mr. Duerson requested that his brain be studied.  On or about May 2, 2011, Boston University confirmed that Mr. Duerson suffered from CTE and, as a result, his family later filed suit against the NFL (and others) arguing Mr. Duerson "played through the documented and undocumented concussions and their associated symptoms because he, like the rest of the N.F.L. players at the time, was not told of the consequences."

39.     The Retirement Board even denied the claims presented by Mike Webster (the first individual known to have CTE) by stating Mr. Webster did not "become totally and permanently disabled 'shortly after' he ceased to play NFL football" and, thus, concluded Mr. Webster was not entitled to Active Football T&P Benefits.  After retirement from playing in the NFL, Mr. Webster experienced amnesia, dementia, depression, and multiple orthopedic ailments and injuries.  The Retirement Plan has a history of denying disability benefits to retired NFL players who are entitled to such benefits.  The Committee and the Retirement Board apply the language of the Retirement Plan to the detriment of retired NFL players.

40.     The evidence presented indicates that Plaintiff has neurological and cognitive impairments as a result of a concussion that occurred on October 31, 2004 and subsequent repeated

blows to the head while his brain was in a vulnerable state. The concussion that occurred on October 31, 2004 and subsequent repeated blows to the head have materially affected Plaintiff's life and have caused, among other things, memory loss, headaches, vertigo, irritability, depression, and loss of focus. Additionally, Plaintiff suffers from a series of orthopedic injuries, which physicians have confirmed also constitute a permanent disability. Plaintiff suffers from debilitating orthopedic and neurological injuries stemming from repetitive high velocity impacts to the body and head sustained while serving as an active player in the NFL. Other than a few private training sessions on an infrequent basis, Plaintiff has not been employed since being cut by the New York Giants in December 2005.

41.     Retirement Plan's denial of Plaintiff's relief was arbitrary and capricious. Retirement Plan does not have unfettered discretion to deny requests for benefits that are supported by evidence. Retirement Plan's decisions must be supported by substantial evidence that is relevant and reasonable to support its conclusion. Clearly, the Retirement Plan has ignored relevant evidence supporting the award of the Active Football T&P Benefits. Admittedly, neither the Committee or the Retirement Board ever reviewed decision letters denying benefits to Plaintiff. Those decision letters were written by the Groom Law Firm without discussion with or input from the Committee or Retirement Board. In fact, the Committee confirmed that "changed circumstances" is not defined in the Retirement Plan, including in Section 5.7(b), but they understand "changed circumstances" to mean "a new or different impairment from the one originally qualified you for T&P benefits." No one has been able to confirm who actually created this definition, but both of the members of the Committee agree new concussion symptoms qualify as a "new or different impairment" and would qualify as a "changed circumstance". Chris Smith, a member of the Committee, agreed that Plaintiff's new concussion symptoms qualify as a

"changed circumstance" even though Ms. Smith admitted she "may not" have actually read all of Plaintiff's medical records. According to the minutes from the November 15-16, 2016 Retirement Board meeting, the Retirement Board purportedly concluded that Plaintiff's appeal was denied for "failure to meet the requirements of Plan section 5.7(b)." Interestingly, however, the Groom Law Firm cited numerous provisions it believed were not met by Plaintiff despite not conferring with the Retirement Board prior to drafting the November 23, 2016 decision letter.

42. The decisions of the Retirement Plan are erroneous under any standard. In addition to the information set forth above, the Retirement Plan's decisions are erroneous for the following reasons, among others, 1) Plaintiff meets the requirements for Active Football T&P Benefits; 2) Retirement Plan's decision relating to Plaintiff's request for Active Football T&P Benefits are not consistent with the Retirement Plan documents; 3) Retirement Plan's decision is contrary to the purposes and goals of the Retirement Plan, which were designed to provide appropriate disability benefits to retired players (the beneficiaries of the Plan) who were disabled as a result of competing for NFL member teams in NFL competition; 4) the Retirement Plan's refusal to award the Active Football T&P Benefits is void; 5) Plaintiff is entitled to receive Active Football T&P Benefits being that he established and met the terms of the Section 5.7(b) of the Retirement Plan documents by showing a "changed circumstance" by clear and convincing evidence; 6) Plaintiff is entitled to receive Active Football T&P Benefits being that Plaintiff sustained injuries that caused him to be totally and permanently disabled while Plaintiff was an active football player; 7) Plaintiff had a debilitating concussion from a helmet-to-helmet collision on October 31, 2004 and was returned to football activities forty-eight (48) hours after the collision, which caused Plaintiff to suffer further injury before his brain was properly healed. During the 2005 NFL season, Plaintiff was unable to remember basic football plays and was cut by two (2) NFL teams. The cumulative

injuries sustained by Plaintiff as a result of the helmet-to-helmet collision on October 31, 2004 (and orthopedic injuries) and subsequent injuries resulted in the disabilities sustained by Plaintiff. Plaintiff was totally and permanently disabled "shortly after" the disabilities arose at the conclusion of the 2005 NFL football season; 8) Defendant is obligated to credit and pay Plaintiff within the terms of the Active Football T&P Benefits with a commencement date "shortly after" the conclusion of the 2005 NFL season without regard to any limitation set forth in the Retirement Plan documents; 9) Defendant did not afford Plaintiff a full and fair review; 10) Defendant inconsistently applied the terms of the Retirement Plan; 11) Retirement Plan did not provide Plaintiff with his medical records and information despite multiple requests; and 12) Defendant breached its fiduciary duties owed to Plaintiff in violation of ERISA.

43.    For the reasons set forth above and below, Plaintiff has been damaged as a result of the acts and omissions of the Retirement Plan.

## V.    CAUSES OF ACTION

**Count I: Violations of ERISA, 29 U.S.C. § 1132(a)(1)(B), (a)(3)**

44.    Plaintiff repeats, realleges, and incorporates by reference Paragraphs 1-41 of this *First Amended Complaint* as though fully set forth herein.

45.    Retirement Plan is an "employee pension benefit plan" within the meaning set forth in ERISA.  Plaintiff has exhausted all of his administrative remedies under the terms of the plan documents and, thus, has satisfied all prerequisites to maintain this action.

46.    Retirement Plan has wrongfully denied Plaintiff the benefits due to him in accordance with the Retirement Plan documents including the Active Football T&P Benefit. Cumulative injuries sustained by Plaintiff as a result of the helmet-to-helmet collision on October 31, 2004 (and orthopedic injuries) and subsequent injuries resulted in Plaintiff being totally and

permanently disabled.   Plaintiff was totally and permanently disabled "shortly after" the disabilities arose following the conclusion of the 2005 NFL football season.  Retirement Plan has failed to act in compliance with the language of the plan documents governing the Retirement Plan in violation of ERISA, 29 U.S.C. § 1132(a)(1)(B), (a)(3).  The actions taken by the Retirement Plan were wrongful, willful and in bad faith.

47.     Plaintiff has accrued pension benefits that Retirement Plan has refused to recognize, which entitle Plaintiff to retroactive credits and payments and placing Plaintiff in the same position he would have been in if the Retirement Plan would have granted the relief requested by Plaintiff in his 2016 filings (*i.e.*, reclassification from Inactive A T&P Benefits to Active Football T&P Benefits).

**Count II: Violations of ERISA, 29 U.S.C. § 1133(2)**

48.     Plaintiff repeats, realleges, and incorporates by reference Paragraphs 1-45 of this *First Amended Complaint* as though fully set forth herein.

49.     Retirement Plan is an "employee pension benefit plan" within the meaning set forth in ERISA.  Plaintiff has exhausted all of his administrative remedies under the terms of the plan documents and, thus, has satisfied all prerequisites to maintain this action.

50.     Despite numerous requests beginning in 2006, Plaintiff was not provided with his full history of medical documentation.  In January 2019, for the first time, Plaintiff was presented with 860 pages of medical records by the Groom Law Firm, but still is missing pertinent neurological tests, examinations, and medical records.  Despite claiming the "administrative record" is only 529 pages, the Retirement Plan, through the Groom Law Firm, has produced over 1,500 pages of records in this litigation.  On July 29, 2021, for the first time, the Groom Law Firm produced records from a Retirement Plan physician, Dr. Canivares, that were never provided to

Plaintiff. Accordingly, Plaintiff was never granted the opportunity to present his full and complete case for Active Football T&P Benefits due to the Retirement Plan (and its advisors and counsel) withholding relevant records. As such, Plaintiff was denied a full and fair review by the Retirement Plan and its associated Board and Committee.

51.     Plaintiff has accrued pension benefits that Retirement Plan has refused to recognize, which entitle Plaintiff to retroactive credits and payments and placing Plaintiff in the same position he would have been in if the Retirement Plan would have granted the relief requested by Plaintiff in his 2016 filings (*i.e.*, reclassification from Inactive A T&P Benefits to Active Football T&P Benefits).

**Count III:     Violations of ERISA, 29 U.S.C. §§ 1102, 1104, 1106(a), (b), 1109, 1132(a)(3) (Breach of Fiduciary Duty)**

52.     Plaintiff repeats, realleges, and incorporates by reference Paragraphs 1-49 of this *First Amended Complaint* as though fully set forth herein.

53.     Retirement Plan is an "employee pension benefit plan" within the meaning set forth in ERISA. Plaintiff has exhausted all of his administrative remedies under the terms of the plan documents and, thus, has satisfied all prerequisites to maintain this action.

54.     The Retirement Board of the Retirement Plan are the fiduciaries of the Retirement Plan. Retired NFL football players, including Plaintiff, are the beneficiaries of the Retirement Plan. The members of the Committee and the members of the Retirement Board owe fiduciary duties to Plaintiff.

55.     As a beneficiary of the Retirement Plan, Plaintiff is entitled to review documents and information about the Retirement Plan including grants and denials of claims, funds allocated, and the basis for decisions to grant or deny disability claims. Plaintiff has been denied access to such information and documents.

56.     ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(a), provides that a fiduciary shall discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of (i) providing benefits to participants and their beneficiaries, and (ii) defraying reasonable expenses of administering the plan.

57.     ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), mandates that a fiduciary's actions with respect to a plan must be performed "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

58.     ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), requires a fiduciary to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [Title I] or Title IV." Typically, the fiduciary must act according to the plan documents, its amendments and other formally issued plan documents. Fiduciaries can be liable to plan participants and beneficiaries for failing to train those individuals who perform ministerial duties, such as customer service representatives.  If the fiduciary owes a duty to participants and beneficiaries, it must ensure that the duty is met through non-fiduciaries either by training or supervising those who perform ministerial functions.

59.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), provides that a participant, beneficiary or fiduciary may bring a civil action to "(A) ... enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

60.     The Retirement Plan fiduciaries failed to comply with ERISA training and supervision regulations with respect to delegation of duties to Plan representatives, which damaged

Plan beneficiaries and participants. The Retirement Plan's corporate representative, Sam Vincent, revealed material uncertainties about the origin of the definition of the term "changed circumstance" as used in Section 5.7(b) of the Retirement Plan. The Retirement Plan's witnesses admitted that Plaintiff presented new concussion symptoms, which meet the definition of "changed circumstances" as used in Section 5.7(b) of the Retirement Plan. Ms. Smith indicated she "may not" have actually reviewed Plaintiff's medical records prior to deciding to deny his request for disability benefits. Additionally, the Retirement Plan's witnesses admitted that Cloud presented evidence that he could not remember basic football plays during the 2005 football season and was never able to maintain gainful employment thereafter. "Changed circumstance" is not defined by the Retirement Plan documents. The Retirement Board and Committee should have the same definition of "clear and convincing" and "changed circumstance." Mr. Vincent could not think of anyone to ask about how the definition of "changed circumstance" came about. The Groom Firm prepared summaries to be provided to the Committee and Board. The Committee decision letter dated July 23, 2014, on Plaintiff's request for total and permanent disability benefits, was not submitted to the Committee before being sent to Plaintiff and, thus, not reviewed by the Committee prior to providing the same to Plaintiff. Similarly, the decision purportedly rendered by the Retirement Board, on November 23, 2016, was not drafted by the Retirement Board or reviewed prior to being sent to Plaintiff. The purported decision of the Retirement Board differs substantially from the basis indicated in the minutes of the Retirement Board meeting held on November 15-16, 2016. The purported decision of the Retirement Board was drafted by the Groom Law Firm.

61.   The Committee and Retirement Board have a duty to act solely in the interest of the Retirement Plan's participants (*i.e.*, Plaintiff). The Committee and Retirement Board ceded

authority to the Groom Law Firm to draft, manipulate, and administer the Retirement Plan. Members of the Committee have no idea where, when, and how language that is not defined in the Retirement Plan was defined.  Chris Smith, a member of the Committee, conceded that Plaintiff did establish "changed circumstances", but still denied Plaintiff's request for reclassification despite admitting she "may not" have actually read Plaintiff's medical records and documents. The Retirement Plan's paid evaluators disregarded Plaintiff's evidence to deny his claim for benefits.  The Committee and Retirement Board do not receive training on neurological and orthopedic injuries commonly sustained by NFL players, but are supposed to apply the terms of the Retirement Plan without sufficient knowledge to understand the claims being presented.  The Retirement Board rubberstamps decisions by the Committee.  The terms of the Retirement Plan are applied inconsistently. Disabled players are being denied benefits they are entitled to receive. The Retirement Board has permitted funds designed for retired and disabled players to be re-routed to third-parties clamoring to deny benefits.

62.     ERISA § 406(A), 29 U.S.C. § 1106(a) provides ERISA's definition of "party in interest", found at ERISA § 3(14), 29 U.S.C. § 1002(14), was designed to encompass "those entities that a fiduciary might be inclined to favor at the expense of the plan's beneficiaries."  The term "party in interest" broadly includes (1) fiduciaries; (2) plan employees; (3) employers whose employees are covered by the plan; (4) service providers; (5) employee organizations whose members are covered by the plan; (6) owners of more than fifty percent of the stock of these employers and employer organizations; (7) relatives of fiduciaries; (8) majority stockholders; and (9) others who own ten percent or more of entities that are themselves parties in interest.  Lawyers who provide legal services to the plan can also be parties in interest.

63.     ERISA § 406(b), 29 U.S.C. § 1106(b) expressly prohibits self-dealing by a fiduciary. The provisions of ERISA § 406 prohibit certain transactions between a plan and a party in interest or between a plan and a fiduciary. Groom Law Firm is a party in interest to the Retirement Plan.

64.     29 U.S.C. § 1106(a) states, a fiduciary, with respect to a plan, shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect: (C) furnishing of goods, services, or facilities between the plan and a party in interest or (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan. Fiduciaries must ultimately rely on their own independent judgment in coming to conclusion on the evaluation of plan documents. Reports should be reviewed and independently assessed by the fiduciaries themselves.

65.     Groom Law Firm drafted the Retirement Plan and Plan presented information and summaries to the Committee and Retirement Board relative to Plaintiff's requests for disability benefits. The Retirement Plan has produced no evidence displaying the Retirement Board had any meaningful review of Plaintiff's claim, instead rubberstamping forgone conclusions generated by the Groom Law Firm. Moreover, the Retirement Plan has breached its duty by failing to investigate the circumstances surrounding Groom Law Firm. Groom Law Firm directly benefits from claim denials through extending litigation and defending Retirement Plan decisions. The Retirement Plan permitted the Groom Law Firm to charge exorbitant fees and redirect funds that were supposed to benefit retired NFL players.

66.     Plaintiff has accrued pension benefits that Retirement Plan has refused to recognize, which entitle Plaintiff to retroactive credits and payments and placing Plaintiff in the same position he would have been in if the Retirement Plan would have granted the relief requested by Plaintiff

in his 2016 filings (*i.e.*, reclassification from Inactive A T&P Benefits to Active Football T&P Benefits).

## VI.  CONDITIONS PRECEDENT

67.    All conditions precedent to the relief being sought by Plaintiff, in this suit, have been performed or have occurred.

## VII.  ATTORNEY FEES and INTEREST

68.    As a result of Defendant's actions as complained of herein, Plaintiff has been forced to retain the law firm of Barlow Garsek & Simon, LLP to represent him.  Accordingly, Plaintiff is entitled to and is seeking compensation for reasonable and necessary attorneys' fees incurred and to be incurred in bringing this suit pursuant to all applicable law, including *inter alia* in accordance with ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1).

69.    Plaintiff is also entitled to and is seeking to recover pre-judgment and post-judgment interest as allowed by law.

## VIII.  JURY DEMAND

70.    Plaintiff demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

## X.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that Defendant be cited to appear and answer, and that upon hearing of this cause, be granted judgment against Defendant as follows:

1.    Declaring that 1) Plaintiff meets the requirements for Active Football T&P Benefits; 2) Retirement Plan's decision relating to Plaintiff's request for Active Football T&P Benefits are not consistent with the Retirement Plan documents; 3) Retirement Plan's decision is contrary to the purposes and goals of the Retirement Plan , which were designed to provide appropriate disability benefits to retired players (the beneficiaries of the Plan) who were disabled as a result of competing

for NFL member teams in NFL competition; 4) the Retirement Plan's refusal to award the Active Football T&P Benefits is void; 5) Plaintiff is entitled to receive Active Football T&P Benefits being that he established and met the terms of the Section 5.7(b) of the Retirement Plan documents by showing a "changed circumstance" by clear and convincing evidence; 6) Plaintiff is entitled to receive Active Football T&P Benefits being that Plaintiff sustained injuries that caused him to be totally and permanently disabled while Plaintiff was an active football player; 7) Plaintiff had a debilitating concussion from a helmet-to-helmet collision on October 31, 2004 and was returned to football activities forty-eight (48) hours after the collision, which caused Plaintiff to suffer further injury before his brain was properly healed. During the 2005 NFL season, Plaintiff was unable to remember basic football plays and was cut by two (2) NFL teams. The cumulative injuries sustained by Plaintiff as a result of the helmet-to-helmet collision on October 31, 2004 (and orthopedic injuries) and subsequent injuries resulted in the disabilities sustained by Plaintiff. Plaintiff was totally and permanently disabled "shortly after" the disabilities arose at the conclusion of the 2005 NFL football season; 8) Defendant is obligated to credit and pay Plaintiff within the terms of the Active Football T&P Benefits with a commencement date "shortly after" the conclusion of the 2005 NFL season without regard to any limitation set forth in the Retirement Plan documents; 9) Defendant did not afford Plaintiff a full and fair review; 10) Defendant inconsistently applied the terms of the Retirement Plan; 11) Retirement Plan did not provide Plaintiff with his medical records and information despite multiple requests; and 12) Defendant breached its fiduciary duties owed to Plaintiff in violation of ERISA including, but not limited to, 29 U.S.C. §§ 1104, 1109, and 1132.

2.    A preliminary and permanent injunction enjoining Defendant from reducing the benefits payable as described above;

3.    A judgment awarding the Plaintiff retroactive credits and payments as described above, and placing Plaintiff in the same position in which he would have been if the Retirement Plan would have granted him Active Football T&P Benefits upon filing of his 2016 filing (*i.e.*, reclassification from Inactive A T&P Benefits to Active Football T&P Benefits);

4.    A judgment awarding Plaintiff all amounts of Active Football T&P Benefits minus the difference of the amounts of the Inactive A T&P Benefits up to the date of judgement and ordering Defendant to pay Active Football T&P Benefits from the date of the judgment forward;

5.    A judgment awarding Plaintiff damages resulting from the Retirement Plan's breach of fiduciary duties;

6.    An award of reasonable and necessary attorneys' fees pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1) and/or ordering the payment of reasonable fees and expenses of this action to Plaintiff's counsel;

7.      Pre-judgment and post-judgment interest at the maximum rate allowed by law; and

8.      Such other and further relief, general or special, at law or in equity, to which Plaintiff may show itself justly entitled pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and pursuant to Rule 54(c) of the Federal Rules of Civil Procedure or otherwise.

Respectfully submitted on this the 31st day of August, 2021.

BARLOW GARSEK & SIMON, LLP
920 Foch Street
Fort Worth, Texas 76107
817.731.4500 (telephone)
817.731.6200 (facsimile)

By:      */s/ Christian Dennie*
**CHRISTIAN DENNIE**
State Bar No. 24045775
cdennie@bgsfirm.com

***ATTORNEY FOR PLAINTIFF***

## CERTIFICATE OF SERVICE

On August 31, 2021, the *Plaintiff's First Amended Complaint* was filed with the Clerk of the Court via CM/ECF, which automatically delivers notice of the filing of the same to all counsel of record.

*/s/ Christian Dennie*
Christian Dennie, *Counsel for Plaintiff*