**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **MICHAEL CLOUD,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. 3:20-CV-01277-E** |
| | § | |
| **THE BERT BELL/PETE ROZELLE** | § | |
| **NFL PLAYER RETIREMENT PLAN,** | § | |
| | § | |
| *Defendant.* | § | |

---

## MOTION TO DISQUALIFY THE GROOM LAW GROUP AND BRIEF IN SUPPORT

---

NOW COMES Plaintiff Michael Cloud (hereinafter "Plaintiff" or "Cloud") and files his *Motion to Disqualify The Groom Law Group and Brief in Support* ("Motion"), and respectfully shows this Honorable Court as follows.

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................ 5

II.   FACTS ...................................................................................................... 6

A.    The Plan, It's Structure, and Groom's Multi-Decade Role in Running It............................. 6

B.    Senate Testimony Against Groom........................................................................ 8

C.    Groom's Material Role as to Player Claims in Other Lawsuits. ........................................ 11

1.    Tyrone Keys. ........................................................................................... 11

2.    Charles Dimry………………………………………………………………………21

i.    Dimry I. ............................................................................................... 22

ii.   On Remand to the Plan, Groom Causes it to Defy the Judgment. ...................................... 23

ii.   Dimry II. .............................................................................................. 25

D.    Groom's Material Role in the Underlying Facts in this Dispute........................................ 29

1.    Player Medical Files. .................................................................................. 30

2.    Case and Medical Summaries............................................................................ 32

3.    Interpretations. ...................................................................................... 32

4.    Clear and Convincing .................................................................................. 33

5.    Changed Circumstances. ................................................................................ 33

6.    Participation. ........................................................................................ 35

7.    2014 Decision Letter. ................................................................................. 36

8.    2016 Committee Decision Letter. ....................................................................... 37

9.    2016 Board Decision Letter. ........................................................................... 38

E.    Vincent as a Strawman Corporate Representative for the Plan............................................ 39

III.  DISQUALIFICATION OF A LAWYER AS A WITNESS................................................................ 44

A.    The Local Rules, Model Rules, and Texas Rule of Professional Responsibility. ......................... 44

B.    Standards for Disqualification of Lawyer as Witness. ................................................. 46

C.    ERISA Fiduciary Exception to Attorney-Client Privilege. .............................................. 47

IV.   ARGUMENT IN SUPPORT OF DISQUALIFICATION ................................................................. 49

V.    PRAYER ................................................................................................ 51

CERTIFICATE OF SERVICE .................................................................................... 52

CERTIFICATE OF CONFERENCE ................................................................................. 52

APPENDIX .................................................................................................. 53

## **TABLE OF AUTHORITIES**

**CASES**

*Advanced Physicians, S.C. v. Connecticut Gen. Life Ins. Co*., 431 F. Supp. 3d 857 (N.D. Tex. 2020)........................................................................................................................ 48

*Bland v. Fiatallis North America, Inc*., 401 F.3d 779 (7th Cir. 2005)......................................... 48

*Bombardier Aerospace Emp. Welfare Benefits Plan v. Ferrer, Poirot & Wansbrough*, 354 F.3d 348 (5th Cir. 2003) ............................................................................................................ 19

*Brazos River Auth. v. GE Ionics, Inc*., 469 F.3d 416 (5th Cir. 2006) .......................................... 40

*Carpenters' Local Union No. 964 Pension Fund v. Silverman*, No. 93 CIV. 8787(RPP), 1995 WL 378539 (S.D.N.Y. June 26, 1995)..................................................................................... 20

*Demer v. IBM Corp. LTD Plan*, 835 F.3d 893 (9th Cir. 2016)..................................................... 23

*Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 16-CV-01413-JD, 2018 WL 1258147 (N.D. Cal. Mar. 12, 2018) ..................................................................................................... 21

*Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 855 Fed.Appx. 332 (9th Cir. Aug. 10 2021)...................................................................................................................... 28, 29

*FDIC v. U.S. Fire Ins. Co*., 50 F.3d 1304 (5th Cir. 1995) .......................................... 44, 45, 46,47

*Harris Trust and Savings Bank v. Salomon Smith Barney, Inc*., 530 U.S. 238, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000) ....................................................................................................... 19

*In re Am. Airlines, Inc*., 972 F.2d 605 (5th Cir. 1992).......................................................... 44, 46

*In re Dresser Industries*, 972 F.2d 540 (5th Cir. 1992) ............................................................... 44

*In re Duke Invs., Ltd*., 454 B.R. 414 (Bankr. S.D. Tex. 2011) .................................................... 47

*In re Long Island Lighting Co*., 129 F.3d 268 (2d Cir. 1997) ..................................................... 48

*In re Sanders*, 153 S.W.3d 54, 57 (Tex. 2004) ........................................................................... 46

*Keys v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*, 493 F. Supp. 3d 1147 (M.D. Fla. 2020)...................................................................................................................................... 11

*Martin v. Feilen*, 965 F.2d 660 (8th Cir.1992) ........................................................................... 20

*In re ProEducation*, 587 F.3d 296 (5th Cir. 2009) ....................................................................... 45

*Reich v. Lancaster*, 55 F.3d 1034 (5th Cir.1995)........................................................... 21

*Schloegel v. Boswell*, 994 F.2d 266 (5th Cir.1993) ...................................................... 20

*Solis v. Food Employers Labor Relations Association*, 644 F.3d 221 (4th Cir. 2011)................. 48

*Tittle v. Enron (In re Enron Corp. Sec. Deriv. & ERISA Litig.)*, 284 F.Supp.2d 511
   (S.D.Tex.2003) .......................................................................................... 20

*U.S. v. Evans*, 796 F.2d 264 (9th Cir. 1986) ............................................................ 48

*U.S. v. Jicarilla Apache Nation*, 564 U.S. 162, 131 S.Ct. 2313, 180 L.Ed.2d 187 (2011)........... 48

*U.S. v. Mett*, 178 F.3d 1058 (9th Cir. 1999) ............................................................ 48

*Useden v. Acker*, 947 F.2d 1563 (11th Cir. 1991) ....................................................... 18

*Washington-Baltimore Newspaper Guild, Local 35 v. Washington Star Co.*, 543 F.Supp. 906
   (D.D.C. 1982)....................................................................................... 47, 48

*Wildbur v. ARCO Chemical Company*, 974 F.2d 631 (5th Cir. 1992) ................................. 47, 48

*Woods v. Covington Cty. Bank*, 537 F.2d 804 (5th Cir. 1976) ............................................ 44, 45

**STATUTES**
29 U.S.C. § 502............................................................................................ 19

29 U.S.C. §§ 1001.......................................................................................... 5, 15

29 U.S.C. § 1102.......................................................................................... 20

29 U.S.C. §1133............................................................................................ 15

**OTHER AUTHORITIES**
Tex. Disciplinary R. Prof'l Conduct 3.08(a)........................................................ 45, 46

## I.  <u>INTRODUCTION</u>

Cloud is a former player in the National Football League ("<u>NFL</u>") and suffered severe injuries as a result of playing in the NFL. He is a participant in the Bert Bell/Pete Rozelle NFL Player Retirement Plan ("<u>Plan</u>"), which is an employee pension benefit plan governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 *et seq*., and ostensibly administered by a six-member Retirement Board ("<u>Board</u>") and a two-member Disability Initial Claims Committee ("<u>Committee</u>" or "<u>DICC</u>"). The Plan administers a total and permanent disability benefits ("<u>T&P Benefits</u>") program that provides different benefits under different categories, including "Active Football" and "Inactive A". The benefits under "Active Football" are greater than the benefits under "Inactive A".

In 2014, the Plan granted Cloud T&P Benefits under Inactive A. In 2016, Cloud requested reclassification to T&P Benefits under Active Football, which was summarily denied by the Committee, and his appeal similarly was denied by the Board.

Cloud subsequently discovered what many have alleged over the years since the inception of the Plan. The Groom Law Group ("<u>Groom</u>") does not just represent the Plan in litigation. Groom created the Plan *<u>and</u>* administers the Plan. Groom maintains possession of player medical records, instructs the Board and Committee on key undefined terms in the Plan, instructs the Board and Committee on issues utilized in making claims decisions under the Plan, possesses material information not held by any member of the Board or Committee or other personnel associated with the Plan, cherry-picks and spoon feeds incomplete claims information to the Board and Committee, provides its own biased summaries of claims to the Board and Committee, unilaterally prepares and includes its own analyses in decision letters denying claims, treats litigation as part of the claims process that players must pursue, represents the Plan in that litigation against players, and (in at least one case) knowingly participates in Plan violations of federal rulings and judgments

against the Plan resulting in further litigation.

At a minimum, Groom is a material witness in this lawsuit, and is likely to become a party defendant. Under governing case law and rules of ethics, Groom is disqualified from further representation of the Plan in this proceeding. The Court should formally disqualify Groom and allow Cloud an opportunity to seek additional discovery from Groom on matters of material importance to his claims, including the extent of Groom's administration of the Plan and handling of Cloud's claims.

## II.   FACTS

### A.   The Plan, It's Structure, and Groom's Multi-Decade Role in Running It.

In 1993, the Plan was created for the benefit of retired NFL players so disabled players could obtain and receive disability benefits. [Appx. 2 at 419:3-9.] The retired NFL players are beneficiaries under the Plan. [Appx. 4 at 160:3-6 – 162:13.] The members of the Board and Committee are the fiduciaries of the Plan. [Appx. 4 at 162:14 – 163:15.] The Board was at all relevant times composed of six members: Katie Blackburn, Dick Cass, Ted Phillips, Sam McCullum, Jeff Van Note, and Robert Smith. [Appx. 4 at 162:16-21, 302:1-7.] The Committee was at all relevant times composed of two members: Patrick Reynolds ("Reynolds") and Chris Smith ("Smith"). [Appx. 3 at 327:3-10.]

The T&P Benefits program administered under the Plan has multiple categories, including the following at issue:

Active Football: Subject to the special rules of Section 5.4, Players will qualify for benefits in this category if the **disability(ies) results from League football activities**, arises while the Player is an Active Player, and causes the Player to be **totally and permanently disabled "shortly after" the disability(ies) first arises**.

Inactive A: Subject to the special rules of Section 5.4, a Player will qualify for benefits in this category if a written application for T&P benefits or similar letter than began the administrative process that resulted in the award of T&P benefits was received within

fifteen (15) years after the end of the Player's last Credited Season. **This category does not require that the disability arise out of League football activities**.

[Appx. 1 at Section 5.3(a), (c)] (bold emphases added). For purposes of "Active Football" (defined above), the Plan defines "shortly after" as follows:

> "Shortly After" Defined. A Player who becomes totally and permanently disable no later than **six months** after a disability(ies) first arises will be **conclusively deemed** to have become totally and permanently disability "shortly after" the disability(ies) first arises, as that phrase is used in subsections (a) and (b) above, and a Player who becomes totally and permanently disabled **more than twelve months** after a disability(ies) first arises will be **conclusively deemed** not to have become totally and permanently disabled "shortly after" the disability(ies) first arises, as that phrase is used in subsections (a) and (b) above. In cases failing **within this six- to twelve-month period, the Retirement Board or the Disability Initial Claims Committee will have the right and duty to determine** whether "shortly after" standard is satisfied.

[Appx. 1 at Section 5.3(e)] (bold emphases added). Players may move between these two categories through a process of Reclassification:

> "A Player who is awarded T&P benefits will be deemed to continue to be eligible only for the category of benefits for which he first qualifies, unless the Player shows by evidence found by the Retirement Board or the Disability Initial Claims Committee to be **clear and convincing** that, because of **changed circumstances**, the Player satisfies the conditions of eligibility for a benefit under a different category of T&P benefits."

[Appx. 1 at Section 5.7(b)] (bold emphases added).

The Plan was created by Groom over 25 years ago and, since that time, the Plan has relied upon and paid Groom for its services rendered to the Plan. [Appx. 4 at 191:6-10.] Even though in 2010 the Plan was found to be underfunded,[1] the Plan pays Groom millions of dollars per year to essentially maintain its operations (in 2019, the Plan paid Groom $4,668,195.00). [Appx. 2 at

---

[1] *Boyd v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*, 796 F.Supp.2d 682, 690 (D.Md.2011).

418:9-12.] Groom is not simply legal counsel to the Plan.[2] The Board only meets for two days on a quarterly basis. Groom essentially does all the legwork for the Plan and its handling of player participant claims, and its dual involvement in this process and any subsequent litigation sheds further light on the concerns expressed by the many players who testified before Congress about the Plan and Groom. Groom's resistance to discovery in this case has been unable to conceal a long record of its actual role within the Plan, including testimony before the United States Senate, evidence discovered in other lawsuits, and testimony of its corporate representative and two members of the Committee in this case – all of which reveals that to a material extent the Plan, Board, and Committee are puppets and Groom is their puppet master. Groom maintains exclusive control over the Plan's operations and decisions with respect to participant/beneficiary claims – and did so as to Cloud's claims at issue in this case.

## B.      Senate Testimony Against Groom.

Groom's role in the Plan has been a longstanding issue for NFL players. On September 18, 2007, the Commerce Committee of the United States Senate held a hearing regarding oversight of the NFL retirement system. [Appx. 5.] During the hearing, numerous players testified regarding their views of the Plan. Groom was a frequent target of the players' criticism.

Daryl Johnston (former player for the Dallas Cowboys and sports broadcaster) testified and provided a prepared statement, which include the following:

> "The NFL Retirement Board, not the NFLPA, determines disability claims. Representatives are appointed by the NFL owners and the NFL Players Association. There is no one on the board looking out for the interests of former players. This six-member board votes unanimously almost every time. **The Groom law firm** who established the pension fund in the 1993 Collective Bargaining Agreement also serves as counsel to defend the distribution of disability payments.

---

[2] Not only does Groom run the Plan, but it also willingly wades into various conflicts of interest by representing the Player Benefits Office, the Board, the Committee, and the National Football League Players Association ("NFLPA"). [Appx. 3 at 343:21 – 346:13; Appx. 4 at 191:11 – 192:8.]

They have earned $3.15 million for defending claims in the past year – about one-sixth of what the Plan says it pays out in disability benefits. **This is an obvious conflict of interest**."

[Appx. 5 at p. 11] (bold emphases added).

Brent Boyd, another former NFL player, also testified:

"The most disgusting number is this. They're taking $3.1 million out of our own pension fund **to pay Doug Ell and Groom law firm to fight us, with our own money, and to alter and change the plan, and turn it into a jungle of red tape**."

[Appx. 5 at p. 24] (bold emphases added).

* * *

"**Doug Ell and Groom Law can manipulate the legal process**, but they can't fool the distinguished members of this Commerce committee."

* * *

[Appx. 5 at p. 28] (bold emphases added).

* * *

Shortly after that, my Viking medical files disappeared. Out of the blue, you know, it has to be, the NFL destroyed these files to remove the pesky contemporaneous notes that would prove my claim instantly, and then to allow the Path & **Groom Law's experts at manipulating ERISA**.

* * *

[Appx. 5 at p. 25.] (bold emphases added).

* * *

"It's high time to expose the corruption of the NFL Disability Board, **especially with Groom Law Group's absolute power** . . . ."

* * *

[Appx. 5 at p. 29.]

Upon filing my claim, I was told by **Miki Yaras-Davis** of the NFLPA not to bother filing, her exact words were 'the owners will never open that can of worms' by granting a claim for concussions.

Shortly after that, **my Vikings medical files mysteriously 'disappeared'**. The courts were never made aware of this. Medical files are sacred to a player, we were not ever allowed in the same room with them. We had to trust that after our career the NFL would store the files and present them in the event of a claim.

In essence, they destroyed the evidence that would have easily proven my claim.

The 9th Circuit would mistakenly hold that against ME, not them, and said without any contemporaneous notes the Disability Board could send me from one doctor to another.

**There were contemporaneous notes, I believe Groom Law destroyed them to clear their path for manipulation of the process**.

\* \* \*

[Appx. 5 at p. 31.]

Eugene Morris, another former NFL player, also provided his views:

\* \* \*

"If [a player] has the tenacity to sue, **then The Groom Law Group reaps the true 'benefits' of this system** – litigation to the tune of almost $20 million over the last 6 years against retired Players pursuing their rights. Yet, when questioned about the make up of the 'legal team' in question, **Mr. Ell says: 'Oh we try to keep the lawyers down to an absolute minimum.' And those 'few guys' make millions**."

\* \* \*

"By law, **you cannot change the terms of a Plan that contains ERISA guidelines. Yet that is exactly what the NFLPA did at Groom's suggestion**. **Groom** claims that, 'they (**Groom**), do not make decisions regarding benefits,' yet Doctor Alfred J. Tria, the first neutral Medical Advisory Physician (MAP), states in the Public Record, that **Groom chastised him for qualifying a Player under Line of Duty**. In 1989, I was the first Player qualified by Dr. Tria under Line of Duty Disability. I was sent to Dr. Tria due to a deadlock of the retirement board pursuant to the Plan's terms. The Owner-Members rejected the qualification even though it was final and binding on the retirement board, which violated the Plan's Terms."

[Appx. 5 at p. 86] (bold emphases added).

\* \* \*

"The evidence points to the **Groom Law Group as the principal architect and administrator of the attempt to control the disability process** on behalf of the two collective bargaining units."

[Appx. 5 at p. 89] (bold emphases added).

Certainly, one would expect that Groom will discount the testimony of many former players as the rants of disgruntled participants in the Plan. Yet over a decade later, in multiple cases, the evidence substantiates Groom's above-described role and tactics with respect to the Plan

and its beneficiaries, and reveals that nothing has changed in Groom's "playbook." Groom maintains a financial incentive for its complete control over the Plan at the expense of the players.

## C.   Groom's Material Role as to Player Claims in Other Lawsuits.

In or about the same time period as Groom's handling of Cloud's claim, the Plan was handling claims by other players. In at least two of those cases, federal courts found similar improper conduct in which Groom played a material role.

### 1.   Tyrone Keys.

Tyrone Keys played in the NFL from 1983 until 1989, when he elected to retire due to football injuries to his back, knees, and shoulder. [Appx. 6 at p. 3.] As detailed below, Keys sought benefits under the Plan, but the actions of Groom caused the Board to arbitrarily and capriciously deny him those benefits. *See Keys v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*, 493 F. Supp. 3d 1147, 1176 (M.D. Fla. 2020) ("the Board arbitrarily ignored evidence, rendering its decision to reduce and terminate Keys' disability benefits arbitrary and capricious"). Groom reviewed and selectively presented portions of Keys' medical records in a summary memorandum that argued that it had conclusive evidence Keys was guilty of fraud and advocated that denial and retroactive reclassification would be appropriate. Though Keys did not seek to disqualify Groom, he did point to Groom's role in the Plan process as a basis for a structural conflict given its dual role and interest in the Plan denying claims that it would later defend in litigation.

Keys and the Plan filed cross-motions for summary judgment. *See id*. at 1152. In Keys' motion for summary judgment [Appx. 6 at pp. 6-10], he presented the Court with the following evidence and argument, in part:

> "As the Record and this litigation reveals, the **Groom Law Group, Chartered (Groom)** serves as counsel for the Plans during the administrative claims process and is also litigation counsel when denied appeals are litigated. Although the complete claim file is made available to each Board member prior to the quarterly

Board meetings, due to the number and complexity of the claims, and the volume of information they must consider for each claim, **Board members rely upon summaries and presentations from their counsel**. The summaries are typically provided to Board members a few days to a week before the quarterly meetings.

### 1. The 2017 Miami Memorandum from Groom

The falsehood that Keys defrauded the Plans' administrators when he submitted his Initial Benefits Application in 2003 was first hatched within the corridors of 1701 Pennsylvania Ave. (**Groom's** Washington D.C. address) after J. Christopher Deem, counsel for Keys, submitted an appeal dated April 11, 2016, seeking Inactive A benefits for Keys (formerly Football Degenerative benefits) for the period between December 2011 and November 2013. (AR 02522-02523). Keys was paid Inactive B benefits during that time period. (AR 02313-02314).

After reviewing Keys' Social Security disability file, **Doug Ell, Alvaro Anillo, and Jeanne Wilson, all attorneys with Groom**, prepared a twelve-page summary that was sent to the Retirement Board six days before the Board's February 21-22, 2017 quarterly meeting in Miami ('**Groom** Memorandum') (AR 03453-03464). Although the issue on appeal was whether Keys was entitled to additional benefits between 2011 and 2013, the thrust of Appendix A to the **Groom** Memorandum included accusations that: 1) Keys withheld information about receiving workers' compensation benefits in 1991; 2) Keys did not provide the full medical report of a Dr. Chet Janecki dated August 1, 2003 ('August 2003 Janecki Report'), which was found within Keys' Social Security disability file; 3) Keys' Social Security disability award hinged upon information that was allegedly made suspect by the August 2003 Janecki Report; and 4) Keys engaged in forum shopping regarding his Social Security disability claim (AR 03456-03459).

The primary focus of the **Groom** Memorandum was the August 2003 Janecki Report (AR 04370-04373). In that report, Dr. Janecki indicated that Keys suffered from a number of different conditions that were caused or aggravated by a car accident (rear-end collision), which occurred in May 2002. *Id*. Seizing upon the August 2003 Janecki Report, **Groom** then wrote in bold letters in Appendix A to the Memorandum, '**The Omitted Information is Inconsistent with the Conclusions Made in the Plan's 2004 T&P Determination**.' (AR 03456). According to **Groom**, the neutral physician examinations and reports of the Plan-appointed physicians, Dr. Harlan Selesnick and Dr. David Apple, **both of whom found Keys disabled due to injuries caused by his NFL career**, were rendered 'invalid' by the August 2003 Janecki Report. (AR 03457). Furthermore, according to **Groom**, the August 2003 Janecki Report revealed that Keys' statement on his application that all the conditions for which he was claiming disability were 'the direct result of football, unfortunately' was a misrepresentation. (AR 03456).

### 2. The Suspension of Keys' Benefits: The February 2017 Meeting in Miami

As a result of the **Groom** Memorandum, the Board suspended Keys' T&P disability benefits at its February 22, 2017, meeting in Miami. (AR 03486; 03494-03498). In March, 2017, Keys was asked to respond to **Alvaro Anillo at Groom** regarding eleven inconsistencies that **Groom** alleged were within the 2000-plus pages of documents that were part of the claim file. (AR 03534-03538). Dr. Gay Culverhouse, former President of the Tampa Bay Buccaneers (1991-1994) and an advocate for player safety, responded on Keys' behalf and engaged in a dialogue with **Anillo** regarding the alleged inconsistencies. (AR 03499-03807).

### 3. Dr. Culverhouse's Response

Dr. Culverhouse provided an eighty-page response on May 1, 2017, which included a summary of Keys' work history for NFL Charities and his compensation received for that role, a thirteen-page summary of his medical treatment from January 1, 2000 until April 6, 2017, and various tax returns and supporting data. (AR 03706-03786).

### 4. The August 2017 Chicago Overview and Memorandum From Groom

After further dialogue between **Anillo** and Dr. Culverhouse, **Groom** provided an Overview to the Retirement Board prior to its August 16-17, 2017 meeting in Chicago that rested upon an internal **Groom** memorandum from **Jeanne Wilson to Doug Ell and Alvaro Anillo** (the Overview is AR 03996; the Memorandum is AR 04002-04004). In the Overview, circulated five days before the meeting, **Groom** advised the Board as follows:

> 'Tab 11 contains a memo describing recent developments relating to Tyrone Keys, and recently received documents. Keys admits he was injured in a car accident on May 7, 2002. This is significant because the extensive medical care for the injuries that were the basis for Keys' Football Degenerative T&P benefits commenced on May 10, 2002, just three days after the accident. Keys also provided, for the first time, a 2003 IME report evaluating injuries from the car accident. The IME report attributes Keys' extensive medical treatment to the car accident. You may recall that Keys wrote on his application for disability, submitted in the fall of 2003, 'All Injuries were the direct result of Pro Football, unfortunately.' *We now have conclusive evidence that representation was false.*" (emphasis added).

> Keys has received a total of $1,220,662 in disability payments. If the Board were to retroactively reclassify Keys' disability benefits from Football Degenerative to (now) Inactive B, he would owe $831,488.28.' (AR 03996).

### 5. Groom's Presentation and the Vote in Chicago, August 2017

The Board minutes summarize **Groom attorney Doug Ell's** presentation to the Board in Chicago in August, 2017, as well as the Board's decision:

> 'Mr. Ell described recent developments relating to Tyrone Keys, and documents that have recently been provided to the Plan. Mr. Ell described a number of features in this complex case. He noted the Plan now had evidence of fraud. He highlighted that when Mr. Keys applied for total and permanent disability benefits in September of 2003, Mr. Keys wrote that 'all injuries were the direct result of pro football unfortunately.' Mr. Ell stated that the Plan now knows that Keys was in a car accident on May 7, 2002, that three days later he began extensive medical care, and that the report for that IME stated that all of his injuries were 'casually related' to the car accident. Mr. Ell stated that the Plan had received, through Mr. Keys' Social Security file, a full copy of the report by Dr. Janecki in 2003, also attributing all of Mr. Keys' impairments to the car accident. Mr. Ell stated that Mr. Keys' 2003 application only included the last page of Dr. Janecki's report listing the impairments, and failed to provide the first three pages indicating that the injuries were the result of a car: accident. Mr. Ell discussed other troubling inconsistencies in the record. The Board voted unanimously to permanently suspend Tyrone Keys' disability benefits because of fraud, so as to recover a part of the past overdue payments, and to write him a letter outlining the evidence and providing him with the right to appeal.' (AR 04030).

The Board, swayed by the conclusions made within the presentation and memorandum from **Groom**, decided that Keys had committed fraud and, as a result, had been overpaid $831,488.28 because his benefits had been misclassified beginning in January 2004 as Football Degenerative/Inactive A instead of Inactive/Inactive B (AR 04045-04048). The alleged overpayment would have come from the Disability Plans, since a finding of Football Degenerative T&P disability benefits triggers supplemental benefit payments from the Disability Plans. (Section 3.1 of the 2001 Disability Plan, AR 00254). Plan Director, Michael Miller, sent notice of the Board's decision, dated August 30, 2017, to Keys. Keys was advised that he had a right to appeal the Board's decision. (AR 04045-04054).

### 6. Keys' Appeal

Keys, through Dr. Culverhouse, timely appealed the Board's August 2017 decision. In his appeal, Keys provided thirteen exhibits and argued that his medical records fully supported his claim that the four conditions he listed as disabling impairments in his Initial Benefits Application in the fall of 2003 were caused by playing in the NFL. (AR 04249-04379).

### 7. The Board's Final Decision: Miami, February 2018

> The Board denied Keys' appeal. The Board affirmed its prior decision that Keys had committed fraud and that, as a result, he had been overpaid $831,488.28 because his benefits had been misclassified beginning in January 2004 as Football Degenerative/Inactive A instead of Inactive/Inactive B. (AR 05277-05287). Plan Director Michael Miller notified Keys of the Board's decision by letter dated February 26, 2018. *Id*."

[Appx. 6 at pp. 6-10.] In other words, Groom took an active lead role in shaping the Plan's decision. Keys further demonstrated that Groom's actions resulted in the Board setting aside its fiduciary and statutory obligations [Appx. 6 at pp. 15-16, 21-23], and he presented the Court with the following argument regarding Groom's self-serving advocacy in favor of baseless findings against Keys:

> "In their Memorandum in February 2017, **Groom** advised the Board that the absence of the August 2003 Janecki Report concerning the 2002 auto accident rendered Dr. Selesnick's IME and report invalid, which in turn, according to **Groom**, also rendered the subsequent IME and report by Dr. Apple invalid. (AR 03457). The Board members acquiesced. In the final denial, the Board asserted that 'by concealing the fact of the accident from the Plan, you precluded the Plan's neutral physicians from properly evaluating the cause of your alleged total and permanent disability.' (AR 05281).
>
> Mindful that the Board members were obligated to conduct a full and fair fiduciary review rather than simply rubber-stamp the conclusions of **Groom**, **Groom** should have recommended that the Board members review Keys' Initial Benefits Application, Dr. Janecki's August 2003 and September 2003 reports, Dr. Selesnick's report, Dr. Apple's report, Dr. Howard Hochman's March 2003 IME report, and the earlier medical reports from Dr. Unger in order to determine for themselves whether the independent medical examinations and reports from the Plans' neutral physicians were rendered invalid by the absence of the August 2003 Janecki Report (Hochman's IME report is AR 04375-04379 and is attached as Exhibit 3).
>
> The full and fair fiduciary review requirement of ERISA is a critical part of the Act's purpose: the protection of benefits promised to employees. 29 §U.S.C. 1001. At its core, ERISA's full and fair fiduciary review requirement means that the evidence be considered in its entirety ('fully'), with an even hand ('fairly'). 29 U.S.C. §1133(2). Had **Groom** provided a complete picture to the Board, the Board would have determined that the examinations and reports of Dr. Selesnick and Dr. Apple were not invalid."

\* \* \*

"As detailed here and in the Record, because of the manner in which NFL benefit appeals are reviewed and decided (two-day meetings occurring four times a year), coupled with the significant number of claims and the volume of documents that apply to each claim, the Retirement Board members rely heavily upon summaries and presentations that are provided by **Groom**, the Plans' counsel. **Groom acts as both plan counsel during the administrative claims process and as litigation counsel. Groom is paid hourly fees for their litigation services.** (See **Exhibit 4**, Defendants' Response to Plaintiff's First Request for Admissions, Response 14).[3] That dual role of acting as the Plans' counsel during the administrative claims process and litigation counsel creates a structural conflict of interest. An employer or an insurance carrier that handles the dual roles of deciding and paying ERISA benefit claims operates under a recognized structural conflict of interest because of the financial gain they can incur by denying claims. *Glenn*, 128 S. Ct. at 2348-2350. **In this case, Groom operated under a structural conflict because Groom has a financial incentive to persuade the Plans' administrators to deny certain claims because that opens the door for potential litigation that can be lucrative for the firm. In this case, that structural conflict of interest appears to have significantly impacted how this claim was presented to the Board in 2017 and 2018, which in turn, had a significant impact upon the final decision made by the Board**.

Although evidence of this conflict exists throughout the Record, the Overview and Memorandum prepared for the Chicago meeting and **Groom's** presentation at that meeting, during which the Board determined Keys had committed fraud and the Disability Plan should be refunded almost a million dollars, provides a palpable example of the conflict. **Groom appears to have been motivated not so much to aid the Board members in discharging their statutory obligation to conduct a full and meaningful review of the denied claim, but rather to steer the administrative claim towards litigation**."

\* \* \*

"Five days before the Chicago meeting, **Groom** advised the Board as follows:

'……………You may recall that Keys wrote on his application for disability, submitted in the fall of 2003, 'All Injuries were the direct result of Pro Football, unfortunately.' **We now have conclusive evidence that representation was false.'** (emphasis added).

---

[3] A footnote is included in this excerpt which reads "[t]he 2017 Form 5500 filed with the U.S. Department of Labor by the Retirement Plan, of which this Court may take judicial notice, indicates that the Plan paid the **Groom Law Group** $3,630,297 for that fiscal year. The relevant excerpts of the 5500 filing are attached as Exhibit 5. The information on what the Plan paid **Groom** is on the final page of Exhibit 5."

Keys has received a total of $1,220,662 in disability payments. If the Board were to retroactively reclassify Keys' disability benefits from Football Degenerative to (now) Inactive B, he would owe $831,488.28." (AR 03996).

Keys' Initial Benefits Application in which he listed the four conditions for which he was claiming disability remained embedded within the claim file. The application was not attached to the Overview nor the Memorandum, nor did **Groom** recommend to Board members within the Overview or Memorandum that they review Keys' application in light of the August 2003 Janecki Report. Nor, according to the Record, were the four impairing conditions that Keys' listed in his Initial Benefits Application described to the Board in **Groom**'s presentation at the quarterly meeting (AR 04030). Instead, **Groom** informed the Board that Keys represented that 'all of his injuries were due to football.' Keys did not. Instead, in his Initial Benefits Application for disability benefits, **Keys represented that the four conditions that he listed in his application were all caused by playing NFL football**. **Groom** never explained this critical distinction to the Board. Instead, **Groom** simply advised the Board that the Plan had 'conclusive evidence' that Keys' representations were 'false.'

**Groom** also failed to provide Dr. Hochman's IME report with their Chicago Overview. Had Groom provided the 2003 IME report, or had the conclusions of the 2003 IME at least been summarized, the Board would have known that Dr. Hochman concluded that by March 2003 Keys had no permanent injury related to the car accident. (Exhibit 3; AR 04378). Instead, **Groom**'s summary of Dr. Hochman's IME was that Keys underwent 'extensive' medical treatment as a result of the car accident, creating the inference that he sustained permanent injury as a result of the auto accident. (AR 04030).

Nor did **Groom** remind the Board that according to Dr. Unger, the Board-appointed orthopedic expert who examined Keys on several occasions, as of 1991, over 25 years before the Board's meeting in Chicago, Keys had a 50-59% permanent loss of use of his back as a result of playing in the NFL; a 30-49% permanent loss of use of his shoulder as result of playing in the NFL; and a 60-79% permanent loss of use of both knees as a result of playing in the NFL (AR 00432-00433). Nor did **Groom** remind the Board that before Keys applied for T&P disability benefits in September 2003, Dr. Janecki provided a report dated September 4, 2003, which indicated that Keys' degenerative condition in his left knee, premature cervical spondylosis, and significant lumbar spondylosis were caused by his NFL career. (AR 04374). No plan documents or terms were included with **Groom**'s Chicago Overview and Memorandum."

[Appx. 6 at pp. 15-16, 21-23] (bold emphases added.)

Groom responded that "Keys' portrayal of [Groom] as the author of his misfortune is

scurrilous" and argued that Groom's "motivations are irrelevant to whether the Board's decision should be upheld." [Appx. 7 at p. 7.] Groom made no effort to address its material role in advocating for denial of Keys' claim. Groom simply denied the existence of a *structural conflict*,[4] stated "the Board had access to Keys' entire file . . . and the Board therefore had ample opportunity to review the entire record before (and after) the August 2017 meeting" (suggesting that the Board, in fact, may not have done so), and described itself as a mere *advisor* to the Plan. [Appx. 7 at p. 7.] Groom argued "[a]n ERISA fiduciary can (and most do) engage and rely on consultants and advisors" and cited *Useden v. Acker*, 947 F.2d 1563, 1577-78 (11th Cir. 1991) (discussing role that advisors, such as attorneys, permissibly have with ERISA plans). [Appx. 7 at p. 7.]

 Groom did not address its role as a material witness or its potential liability as a fiduciary and/or non-fiduciary – likely because Keys' counsel did not expressly raise these issues.

---

[4] Groom argued "[t]he relevant question is whether **the fiduciary** has a structural conflict" and "every court to consider the question has held that the Board has no conflict as a matter of law." [Appx. 7 at p. 7.] (Citations omitted). In this regard, in a ruling on a discovery dispute in Dimry II (*see infra* at p. 19) where Groom refused to produce evidence of the Plan's financial payments to Plan-selected physicians, the Court there conducted an initial analysis of a structural conflict:

 "The Plan is funded by the NFL owners. It does not, however, have a structural conflict of interest as a matter of law because it is a multi-employer benefit trust fund maintained under the Taft–Hartley Act. *See Anderson v. Suburban Teamsters of Northern Illinois Pension Fund Bd. Of Trustees*, 588 F.3d 641, 648 (9th Cir. 2009). 'The various participating employers—not the Trustees—fund the Plan. The Trustees have no personal economic interest in the decision to grant or deny benefits. Additionally, the Board of Trustees consists of both employer and employee representatives, who determine employee eligibility under the Plan. Both sides are at the table.' *Id*.; *see also Boyd v. Bert Bell/Pete Rozelle NFL Retirement Plan*, 796 F.Supp.2d 682, 690-91 (D. Md. 2011) (finding that the Bert Bell/Pete Rozelle Plan does not have a structural conflict of interest).

*Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 16-CV-01413-JD, 2020 WL 1865192 at *1 (N.D. Cal. April 14, 2020). **However, the outcome of this analysis would change if Groom, in fact, is shown to have taken on a role as a fiduciary, maintained a financial interest in the outcome, and actually benefited from it in accordance with its actual conduct**.

---

Nonetheless, Groom's reliance on *Useden* was misplaced. That case speaks to minimal traditional involvement by Plan counsel, not anything near the role taken by Groom with respect to the Plan. *See id; see also Harris Trust and Savings Bank v. Salomon Smith Barney, Inc*., 530 U.S. 238, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000) (right of action under ERISA against a non-fiduciary party in interest). The Fifth Circuit also has addressed the nature of Groom's position that legal counsel should be deemed only a mere *advisor*:

> \* \* \*
>
> "Because it is not a signatory of the Plan, insists the law firm, it owes no fiduciary duty to the Plan, and thus no cause of action can be maintained against it under § 502(a)(3). We disagree."
>
> \* \* \*
>
> "[E]ven though, in the instant litigation, the law firm is not a 'party in interest,' as that term is defined by ERISA, the Supreme Court's reasoning in *Harris Trust* influences us to conclude today that § 502(a)(3) authorizes a cause of action against a **non-fiduciary**, non-'party in interest' attorney-at-law when he holds disputed settlement funds on behalf of a plan-participant client who is a traditional ERISA party. As *Harris Trust* makes clear, an entity need not be acting under a duty imposed by one of ERISA's substantive provisions to be subject to liability under § 502(a)(3).
>
> \* \* \*

*Bombardier Aerospace Emp. Welfare Benefits Plan v. Ferrer, Poirot & Wansbrough*, 354 F.3d 348, 351 (5th Cir. 2003), *abrogated on other grounds by ACS Recovery Servs., Inc. v. Griffin*, 723 F.3d 518, 523 (5th Cir. 2013),  (citations and footnotes omitted) (bold emphasis added) (to recover for paid medical expenses, plan sued beneficiary's law firm which held settlement proceeds on behalf of beneficiary). Even further, a law firm may also be a ***fiduciary*** if it goes beyond a traditional advisory function:

> "Even though generally a lawyer or accountant providing services to a plan is a party in interest and not a fiduciary, it has been recognized that **at times a professional consultant or advisor may go beyond his normal, traditional advisory function and, because of his special expertise and influence, in effect exercise the discretionary authority or control over the management or administration of an ERISA plan to the point that he has assumed the fiduciary obligations and has transmuted into a fiduciary as defined under**

ERISA, 29 U.S.C. § 1102(21)(A). *Mertens*, 508 U.S. at 262, 113 S.Ct. 2063 ("professional service providers ... become liable for damages only when they cross the line from advisor to fiduciary"). *See also Schloegel v. Boswell*, 994 F.2d 266, 271 (5th Cir.1993), *cert. denied*, 510 U.S. 964, 114 S.Ct. 440, 126 L.Ed.2d 374 (1993); *Reich v. Lancaster*, 55 F.3d 1034, 1047–49 (5th Cir.1995); *Martin v. Feilen*, 965 F.2d 660 (8th Cir.1992) (finding that two partners in an accounting firm who recommended a complex series of transactions, structured deals, provided advice, and had expertise not shared among other corporate insiders exercised effective control over the plan's assets and were ERISA fiduciaries), *cert. denied*, 506 U.S. 1054, 113 S.Ct. 979, 122 L.Ed.2d 133 (1993); *Carpenters' Local Union No. 964 Pension Fund v. Silverman*, No. 93 CIV. 8787(RPP), 1995 WL 378539 (S.D.N.Y. June 26, 1995) (finding a law firm was a fiduciary under ERISA where plan trustees depended on lawyers' expertise for a real estate investment, lawyers played a role in investment decisions, and one partner was a plan trustee)."

*Tittle v. Enron (In re Enron Corp. Sec. Deriv. & ERISA Litig.)*, 284 F.Supp.2d 511, 572 (S.D. Tex.2003) (bold emphasis added). "[A] person or entity may be deemed a fiduciary either by assumption of the fiduciary obligations (the functional or de facto method) or by express designation by the ERISA plan documents." *Id*. at 543. **Though Keys did not raise issues of Groom's potential liability, Cloud does so by this Motion**.

Returning to the events in the Keys case, on October 2, 2020, the Court issued a ruling on the cross-motions for summary judgment and granted relief to Keys and denied Groom and the Plan in all respects. *See Keys v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*, 493 F. Supp. 3d 1147 (M.D. Fla. 2020). The Court discussed Groom's extensive involvement in the Board's decision [*See Keys*, 493 F. Supp. 3d at 1158-61] and ruled that "the Board arbitrarily ignored evidence", "[t]he Board's decision that Keys' disability resulted from the car accident was not reasonable", and "the Board acted arbitrarily and capriciously in **cherry-picking evidence**, not investigating further when faced with conflicting evidence and not considering key relevant information. Thus, the Board's decision was unreasonable." *Keys*, 493 F. Supp. 3d at 1176 (bold emphasis added).

The Court also addressed the question of whether "a structural conflict of interest arose

from Groom Law Group's role as both Plan counsel during the administrative process and as litigation counsel[,]" but noted that "[b]ecause the Court determines that the Plans' decision was not reasonable, it need not determine whether the Plans' decision was arbitrary and capricious due to a conflict of interest." [*Keys*, 493 F. Supp. 3d at 1158, fn.17; 1167, fn.27.] On October 20, 2020, a judgment was entered in favor of Keys. [Appx. 8.]

As is evident in the *Keys* case, Groom did not simply advise the Board as to procedural issues under the Plan or legal matters related to their obligations as fiduciaries under the Plan. Groom actively campaigned against Keys, dissuading any fact-finding effort by employing rhetoric of "conclusive evidence" that he committed fraud, and did so against a backdrop of narrowly-tailored selections from the evidence that it provided to the Board (*i.e.*, "cherry-picking evidence"). These were not only the actions of a material witness, but one of a law firm advancing its own financial interests and, in doing so, becoming a fiduciary in breach of its obligations under the law. Even more illuminating, at the same time as the *Keys* case, Groom simultaneously engaged in *even more egregious* conduct in yet another case.

### 2.    Charles Dimry

Charles Dimry was a cornerback in the NFL and played for several teams over a twelve-year career. *See Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 16-CV-01413-JD, 2018 WL 1258147 at *1 (N.D. Cal. Mar. 12, 2018) ("Dimry I"); *see also* [Appx. 9 Dkt. 34-1 at 2.] Like many NFL veterans, he left the game with a number of physical injuries. *See id.* As detailed below, Dimry sought benefits under the Plan, but the actions of Groom caused the Board to abuse its discretion in the denial of his benefits. *See Dimry I*, 2018 WL 1258147 at *4.

i.    **Dimry I.**

Dimry, as a player participant in the Plan, applied for T&P Benefits in 2014. *See Dimry I*, 2018 WL 1258147 at \*1. On February 5, 2015, the Committee (Reynolds and Smith) voted by **mail ballot** to deny Dimry's application. *See Dimry I*, 2018 WL 1258147 at \*2; [Appx. 9 Dkt. 34-2 at pp. 28-29.] Minutes for the Committee vote give no indication that they discussed or considered any of the medical reports Dimry submitted, or did anything to weigh or evaluate the record as a whole. *Id*. On the same day, even though the Committee voted by **mail ballot**, the Plan somehow prepared and sent Dimry a denial letter purportedly prepared and signed by the Committee's Benefits Coordinator Sam Vincent ("Vincent"), which stated, *inter alia*, the various specific grounds for the Committee's denial (even though none of that information was in the Committee's minutes). *See Dimry I*, 2018 WL 1258147 at \*2; [Appx. 9 Dkt. 34-2 at p. 32.] Based upon Vincent's testimony that he wrote none of the letters in our case, it is likely that Groom wrote this denial letter to Dimry. [Appx. 4 81:13-18, 84:17 – 87:18, 153:10-14, 377:8-21.]

Dimry appealed within the Plan and asked for information related to his application and denial of his application, including Dr. Meier's relationship with the Plan. *See Dimry I*, 2018 WL 1258147 at \*2; [Appx. 9 Dkt. 34-2 at pp. 35-37.] The Plan did not respond, but retained Dr. James Chen to physically examine Dimry. Dr. Chen determined Dimry could work. *See Dimry I*, 2018 WL 1258147 at \*2. The Board voted to deny the appeal, "but the minutes again do not show that the Board gave any consideration to Dimry's medical submissions, or engaged in an evaluation of the record as a whole." *Id*. at \*2; [Appx. 9 Dkt. 34-2 at p. 168-170.] Another denial letter was sent based upon the findings of "the Plan's neutral physicians" over other medical evidence. *See Dimry I*, 2018 WL 1258147 at \*2; [Appx. 9 Dkt. 34-2 at p. 173.]

Dimry filed a lawsuit against the Plan (represented by Groom). In March 2018, the district

court granted judgment in Mr. Dimry's favor finding the Board abused its discretion because the Board's denial of Mr. Dimry's benefits claim was "based upon an unreasonable bias in favor of Plan-selected physicians" in part because the Plan paid Dr. Meier $188,683 in direct compensation over a one-year period, raising a financial conflict under *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893 (9th Cir. 2016). *See Dimry I*, 2018 WL 1258147 at *4. The Court remanded the matter back to the Board for re-evaluation of Dimry's T&P Benefits claim. *Id.* at *5.

### ii.    On Remand to the Plan, Groom Causes it to Defy the Judgment.

Even though Groom represented the Plan in Dimry I, it presided over and controlled the Plan's subsequent conduct that defiantly ignored Judge Donato's ruling. Rather than conduct the required full and fair review with Dimry's involvement, the Plan remained silent, communicated nothing to Dimry, and doubled-down on its unreasonable bias in favor of a Plan-selected physician. The Board held its May 15-16, 2018 meeting, which was attended by Vincent, Reynolds, and **three Groom lawyers**: Alvaro Anillo, Doug Ell, and Michael Junk (who was lead counsel in Dimry I and is lead counsel in this case). [Appx. 9 Dkt. 34-1 at p. 28.] The Board's meeting minutes reflected the following as to Dimry's appeal:

> "On consideration pursuant to a court-ordered remand, tabled application for Inactive A total and permanent disability benefits for further review and clarification **by the Plan's Medical Director**."

[Appx. 9 Dkt. 34-1 at p. 33] (Bold emphasis added). In other words, **three Groom lawyers** attended a Board meeting in which (Groom likely advised and) the Plan made the decision to knowingly violate the judgment in Dimry I and refer review of the claim *to its own Medical Director* – Dr. Allen Jackson (whom at that time the Plan paid a "stipend" of $16,000.00 per month). [Appx. 9 Dkt. 34-4 at pp. 11-15; Appx. 10 at 3:22 – 4:9.]

The Board waited two months to take any further action. On July 17, 2018, Vincent emailed

Dr. Jackson and presented an attached .pdf file entitled "Charles Dimry Clarification Questions" ("Questions") for Dr. Jackson to review and address. [Appx. 9 Dkt. 34-1 at p. 36]. The "Questions" .pdf file was a letter signed by Vincent, but clearly not prepared by Vincent as it was on identical letterhead and nearly identical formatting as the letter prepared by Groom in our case. [Appx. 9 Dkt. 34-1 at p. 37]. Question No. 10 even defiantly asked Dr. Jackson to provide an opinion as to whether the Board improperly relied on the reports of Drs. Meier and Chen – a matter already settled by Judge Donato in Dimry I. [Appx. 9 Dkt. 34-1 at p. 38]. Again, based upon Vincent's testimony that he wrote none of the letters in our case, it is likely that Groom prepared these questions for the Plan's medical director. [Appx. 4 at 81:13-18, 84:17 – 87:18, 153:10-14, 377:8-21.]

The following month, the Board held an August 21-22, 2018 meeting, again attended by Vincent, Reynolds, and **three Groom lawyers**: Alvaro Anillo, Doug Ell, and Michael Junk (lead counsel in Dimry I and this case). [Appx. 9 Dkt. 34-2 at p. 182.] The Board summarily denied Dimry's appeal using the same unreasonable bias in favor of a Plan-selected physicians. The Board meeting minutes reflect:

> "[o]n reconsideration of prior record . . . pursuant to court-ordered remand, denied application for Inactive A total and permanent disability benefits for failure to meet the requirements of Plan sections 5.1 and 5.2."

[Appx. 9 Dkt. 34-2 at p. 187] (bold emphasis added). On August 27, 2018, the Board sent another denial letter, signed by Michael B. Miller (but probably also written by Groom as explained below). [Appx. 9 Dkt. 34-1 at p. 44.] Despite Dimry I and the federal court judgment against the Plan, the Plan's denial letter told Dimry "**[the Board] strongly disagrees with Judge Donato's** *suggestion* that Plan neutral physicians are 'financially conflicted' or incentivized 'to shade reports and conclusions' in a way that undercuts Player applications . . ." and the letter goes on for more

than a page disputing Judge Donato's ruling, analyzing "structural conflicts", and essentially announcing its decision to defy the judgment. [Appx. 9 Dkt. 34-1 at p. 45-47] (bold and italicized emphases added). The letter is signed by Plan Director Michael Miller, but there can be no doubt **Groom wrote it**.[5]

  ii.  **Dimry II.**

As a result of the Plan's violation of Dimry I, Dimry was forced to file a second lawsuit against the Plan. *See Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 19-CV-05360-JSC, 487 F.Supp.3d 807 (N.D. Cal. Sep. 15, 2020) ("Dimry II"). The parties filed cross-motions for summary judgment. *See id*. at 809.

At the hearing on the motions, Judge Corley immediately questioned the Plan's post-*Dimry I* decision to deny the claim based upon a physician "even more tied to the Plan" than Drs. Meier and Chen. [Appx. 10 at 5:3-6.] Groom lawyer Michael Junk responded that there was "**additional evidence . . . that disproves the premise of Judge Donato's holding**" [Appx. 10 at 5:23 – 6:4; 6:11-19] and the Plan's Medical Director (with his $16,000/month "stipend") was "equally unbiased." [Appx. 9 Dkt. 34-4 at p. 15; Appx. 10 at 3:22 – 4:9; 6:6-10] (bold emphasis added).

The Court asked Mr. Junk why the Plan did not give Dimry an opportunity to point out to the Board that the Plan's Medical Director provided some support for Dimry's claim before the

---

[5] In our case, Vincent testified about the Plan's 2016 denial letter to Cloud:

  Q.  Is this the decision made by the board on Mr. Cloud's reclassification request?
  A.  Yes, sir.
  Q.  Do you know who wrote this letter?
  A.  I would say I believe this is drafted by Groom Law Group when it came to our Plan office.
  Q.  So this letter was signed by Michael B. Miller, correct?
  A.  Yes, sir.

[Appx. 4 at 377:10-18.]

Plan denied it. Mr. Junk responded: "**[t]hat's what we have essentially here now, Your Honor, with this second round of litigation. We're seeing his response**." [Appx. 10 at 10:20 – 11:18] (bold emphasis added). In other words, Groom confirmed what Keys alleged eight months earlier:

> "Groom appears to have been motivated not so much to aid the Board members in discharging their statutory obligation to conduct a full and meaningful review of the denied claim, **but rather to steer the administrative claim towards litigation**."

[*See supra* at p. 13, Appx. 6 at 22] (bold emphasis added).

The Court continued: "the Board seemed to be saying, 'Well, since [Dimry] doesn't have the major [disease], his subjective complaints of pain aren't supported.' But [the Plan's Medical Director] didn't say that." [Appx. 10 at 15:9-20.]

Mr. Junk provided the Court with excuses for the Board's failure to even follow the analysis of its own Plan-selected physician – its own Medical Director. [Appx. 10 at 15:21 – 19:8.] Mr. Junk even ignored the Plan's own Medical Director when he argued that "[Dimry] may have some pain. **He may not**." [Appx. 10 at 21:2] (bold emphasis added).

Done with Groom's noncompliance with the judgment in *Dimry I* and baseless arguments in *Dimry II*, the Court stated "No, no. Even Dr. Jackson acknowledged [Dimry] does have pain." [Appx. 10 at 21:20-24.] The Court concluded the hearing. [Appx. 10 at 22:13.]

Thereafter, the Court in *Dimry II* entered judgment in favor of Dimry and against the Plan. [Appx. 11.] In the Court's opinion, it explained the obvious extent of the Plan's abuse of discretion:

> "Mr. Dimry complains that he was excluded from the Board's review of his claim following remand in violation of the requirement that there be 'a meaningful dialogue between ERISA plan administrators and their beneficiaries,' and that the Plan give a 'full and fair review' to an appeal of an adverse benefits determination. A full and fair review requires, among other things, an opportunity for the claimant 'to submit written comments, documents, records, and other information relating to the claim for benefits,'; providing the claimant with reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits; and taking 'into account all comments, documents, records, and

other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.' For plans providing disability benefits, such as the one at issue here, a full and fair review also requires that before the plan can issue an adverse benefit determination on review on a disability benefit claim, the plan must provide the claimant 'with any new or additional evidence considered, relied upon, or generated by the plan ... in connection with the claim; such evidence must be provided as soon as possible and sufficiently in advance of the date on which the notice of adverse benefit determination on review is required to be provided ... to give the claimant a reasonable opportunity to respond prior to that date.'

The Board did not fully and fairly review Mr. Dimry's appeal of its adverse benefits decision following Dimry I. The Board does not dispute Mr. Dimry's statement that the first communication the Board had with Mr. Dimry following the entry of judgment in Dimry I was its letter denying Mr. Dimry's appeal. Nor does it dispute Mr. Dimry's argument that the Board did not advise him that it had asked Dr. Jackson to review the appeal, or that it had received a report from Dr. Jackson, or that following that report it sent Dr. Jackson a list of questions, or that in response to those questions Dr. Jackson issued a second report. By conducting its second review of Mr. Dimry's appeal in secret, the Board deprived Mr. Dimry of the opportunity to respond to the new evidence upon which the Board relied and perhaps provide evidence of his own—an opportunity required by ERISA's regulations."

*Dimry II*, 487 F.Supp.3d at 813-14 (citations omitted).

\* \* \*

"Despite Dr. Jackson having advised the Board that objective evidence would not necessarily exist to corroborate Mr. Dimry's claimed pain as such 'pain is not always predictable and/or directly correlates with the severity of the degenerative change,' the Board denied Mr. Dimry's benefits' claim because the objective evidence did not support his pain complaints. (SAR 49 (denial letter noting that Mr. Dimry's 'pain is completely subjective and inherently unquantifiable' and required the 'available evidence [to] corroborate[ ] [your] complaints.').) Indeed, despite Dr. Jackson's conclusion that pain from degenerative disc is not quantifiable or predictable, the Board concluded that it would expect to see 'major degenerative disc disease, degenerative facet joint disease' and other objective findings."

\* \* \*

*Id*. at 816 (citations omitted).

\* \* \*

**"The Board's glaring procedural error of conducting its review of Mr. Dimry's**

**appeal in secret and then, after denying his appeal, refusing even then to engage in a meaningful dialogue and instead telling Mr. Dimry to file a lawsuit is reason alone to find that the Board abused its discretion.**"

\* \* \*

*Id*. at 819 (bold emphasis added).

\* \* \*

"The matter is REMANDED to the Board for further proceedings consistent with this Order. On remand, **the Board is reminded of its obligation to provide Mr. Dimry a full and fair opportunity to participate in the process**."

\* \* \*

*Id*. at 820-21 (bold emphasis added). Incredibly, Groom *again* caused the Plan to appeal. A little

over two weeks ago, the Ninth Circuit affirmed the Court in Dimry II:

\* \* \*

"the Plan's actions on remand, following Dimry I, violated the requirement of 'meaningful dialogue between ERISA plan administrators and their beneficiaries.' **Dimry and his counsel were in the dark during the entirety of the remand process**. The Plan did not notify Dimry that the remand process had begun or indicate how the process would take place. The Plan concluded that the record required supplementation but did not inform Dimry that it intended to reopen the record for reports from Dr. Allen Jackson, the Plan's Medical Director, or allow Dimry the opportunity to respond to those reports. We therefore affirm the district court's finding that the Plan denied Dimry a full and fair review under ERISA."

\* \* \*

"**the Plan excluded Dimry from dialogue about Dr. Jackson's reports and told Dimry to revise his lawsuit rather than discuss the changes with the Plan**."

\* \* \*

*Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 855 Fed. Appx. 332, 333-34 (9th Cir. Aug.

10 2021) (citations omitted and bold emphases added).

All of the foregoing actions by the Plan, the Board, and the Committee, and Groom's claims

handling and litigation tactics took place at the same time that they were (mis)handling Cloud's

claim for T&P Benefits. As the evidence and testimony reveals, Groom has learned nothing from

its conduct in *Keys*, *Dimry I*, and *Dimry II*, continue to control the Plan and the outcomes of its claims processes for its own financial interests, and exceeds the scope of traditional legal representation to an extent that it is a *de facto* fiduciary under the Plan. As detailed below, the evidence shows that Groom orchestrated the denial of Cloud's claim in a manner consistent with its normal course of conduct displayed in *Keys*, *Dimry I*, and *Dimry II*.

**D.      Groom's Material Role in the Underlying Facts in this Dispute.**

Cloud had a seven (7) year career as a running back, kick returner, and special teams player in the NFL playing for three (3) teams, Kansas City Chiefs (1999-2002), New England Patriots (2003, 2005), and the New York Giants (2004-2005). *See Cloud Motion to Compel* [Dkt. 41 at p. 5, ¶ 6.] Naturally, Cloud suffered extensive injuries during his playing career and, as with Keys, Dimry, and many others, has a long history attempting to navigate the complex web of the Plan in seeking disability benefits. *See id.* at p. 6, ¶ 7, p. 7, ¶ 8.

Cloud applied for T&P Benefits and, on July 23, 2014, the Plan granted him T&P Benefits under the Inactive A designation with an effective benefits date of May 1, 2014. [Appx. 12 at p. 3.] On February 17, 2016, Cloud filed his request for reclassification to Active Football T&P Benefits. [Appx. 12 at p. 4.] On March 2, 2016, Cloud's request for reclassification was summarily denied. [Appx. 12 at p. 4.] Cloud filed an appeal to the Board. On November 23, 2016, the Plan denied Cloud's appeal. [Appx. 13 at p. 3.]

Cloud filed this lawsuit on May 15, 2020. Groom, on behalf of the Plan, consistently presented an incomplete administrative file and resisted discovery. [Dkts. 28-36, 41, 46-47.] Groom refused to present any members of the Board or Committee for deposition and filed a Motion for Protective Order. [Dkt. 30.] After this Court's Order denying the Plan's Motion [Dkt. 37], the Plan only produced the two members of the Committee for deposition on August 4-5, 2021

and a purported Rule 30(b)(6) corporate representative of the Plan August 10, 2021. [Appx. 2, 3, 4.]:

- Patrick Reynolds, as co-member of the DICC (August 4, 2021) [Appx. 2.]

- Chris Smith, as co-member of the DICC (August 5, 2021) [Appx. 3.]

- Sam Vincent, as Rule 30(b)(6) corporate representative of the Plan (August 10, 2021) [Appx. 4.]

After counsel for Cloud took the above depositions, it appears the Plan (and Groom) were not trying to hide what the deponents knew. Instead, the Plan (and Groom) were trying to hide what the deponents *did not know*. As set forth below, each of their testimonies demonstrates an absence of knowledge of material parts of how the Plan works, how Cloud's claims were denied, and an unusual number of references to Groom as being either the sole source of related information or a direct participant in the recommendations and/or decisions with respect to the disability decisions as to Cloud. These include the following, among others.

1.    **Player Medical Files.**  At all material times, Groom – not the Plan – possessed and had access to Cloud's medical records. Cloud made requests for his full medical file in 2006, 2007, 2008, 2009, 2010, 2012, 2013, 2014, 2015, 2016, 2017, 2018, and 2019 – *i.e.*, for over a decade. [Dkt. 24 at p. 9, ¶ 17.] In fact, even though retired players are directed to the Plan to get their medical records, Vincent (as the Plan's corporate representative) testified the Plan does not have access to a player's medical records. [Appx. 4 at 240:9 – 242:17.] Smith also testified when players ask for medical records she directs them to the NFLPA's legal department [Appx. 3 at 187:10-17] and Reynolds similarly revealed no knowledge of how medical records are maintained. [Appx. 2 at 158:3 –159:6, 160:12 – 161:5; 264:7-11.]

Vincent testified that medical records are supposed to be made available to players through

an EMR repository, but the Plan does not have access to it due to privacy issues and he could not recall anyone with the Plan directing Cloud to seek medical records from the EMR repository. [Appx. 4 at 234:9 – 237:19, 240:9-14, 241:12-16.] **Vincent testified he has never seen the EMR repository and is "not well versed in it" and his only conversations with Groom about the EMR repository took place the day before his August 10, 2021 deposition**. [Appx. 4 at 237:12-14, 239:17 – 240:8.] However, Vincent also testified that the Plan has its "own repository, a digital file" for claims records [Appx. 4 at 412:10 – 415:18], but that Groom first reviews and redacts information from medical records before sending any of it to a player applicants. [Appx. 4 at 413:2-7.]

In the Plan's effort to resist supplementation of the administrative record in this proceeding, Groom filed a purported June 28, 2021 Declaration of Vincent (more than a month before his deposition and any discussions with Groom about the EMR repository) in which he stated he supervises the preparation and presentation of all materials to the Committee and Board, confirmed the entire administrative record consists of only 529 pages which represent the entire file presented to the Committee and Board, confirmed it did not omit any of Cloud's medical information, and denied having access to any additional application-related documents other than what Cloud or neutral-physicians provide the Plan. [Dkt. 29 at pp. 2-3, ¶ 4, 7-9; *Cloud Motion to Compel* [Dkt. 41] at p. 26, ¶ 38.] In sum, Vincent disclaimed any material knowledge of the EMR repository and had not even discussed it with Groom at the time of his Declaration, and verified that the entire administrative file reviewed by the Committee and Board consisted of only 529 pages.

In truth, it was not the Plan, Board, Committee, or EMR repository that possessed all of Cloud's administrative file and pertinent medical records. It was Groom. After some 13 years of Cloud requesting his file and medical records, Groom finally granted him access to some of his

medical files. [Appx. 2 at 374:14 – 376:4.] Specifically, on or about January 18, 2019, Groom

provided Cloud with an 860-page medical file, which is 331 more pages than the 529 pages of files

that Groom filed as the administrative record in this case (labeled as CLOUD-AR-001 through

CLOUD-AR-529) [Dkt. 16], and purportedly provided the Committee [Appx. 2 at 375:10 – 376:4;

Appx. 3 at 365:18 – 369:13.] Even later in this proceeding, Groom produced an X-File consisting

of approximately 1,500 pages – almost three times more documents than what Groom purportedly

provided to the Committee, Board, and this Court. [Appx. 4 at 59:20 – 64:13; 411:5-14.]

   **2.** **Case and Medical Summaries.** Not only did Groom possess and access Cloud's

medical records, but Groom prepared a case summary on Cloud's case for the DICC, which were

relied upon by Smith who reviewed the actual file "to the best of [her] ability." [Appx. 3 at 361:4

– 362:11.] Reynolds acknowledged Groom prepares case summaries [Appx. 2 at 89:15 – 90:4],

but could not recall whether one was done for Cloud's initial case (he never does his own

summaries of any claim file). [Appx. 2 at 362:11-20, 368:22 – 369:5.]

   Groom also prepared a summary of Cloud's request for reclassification and submitted it to

the Board to "assist" it in analyzing its decision regarding the reclassification appeal. [Appx. 2 at

360:8 – 362:20; Appx. 4 at 404:12 – 405:6.]

   In light of the Plan, Board, and Committee having no access to the EMR repository or other

medical records not provided by Cloud, the net effect is Groom's acting as the primary (or sole)

source of medical information and summaries in the Plan's assessment of player claims.

   **3**. **Interpretations**. Key specific terms are set forth in the Plan that dictate the

outcome of the claims process, but the Plan, as prepared by Groom, does not define many of those

terms. [See, generally, Appx. 1.] Instead, either (1) the Board and Committee operate without any

guiding interpretation of these crucial terms, (2) the Board and Committee fabricate definitions,

and/or (3) Groom provides its own undocumented interpretation on a case-by-case basis – either directly to the Board/Committee or for inclusion in the decision letters unilaterally drafted and served by Groom on player participants in the Plan (see *4. Participation*, below).

Specifically, "clear and convincing" evidence of a "changed circumstance" is required for reclassification under the Plan, which terms are undefined in the Plan prepared and amended by Groom. [Appx. 1 at Section 5.7(b), Appx. 3 at 265:19 – 271:7; 274:22 –276:7; 382:18-22.]

4.      **Clear and Convincing**.  Vincent testified that "clear and convincing" is not defined in the Plan [Appx. 4 at 340:3-5] and he has no knowledge of any definition of "clear and convincing" other than "just plain English" [Appx. 4 at 340:6-9], but acknowledges it would be important for the Board and Committee to operate under the same definition of "clear and convincing." [Appx. 4 at 341:5-9.] Smith also testified it would be "helpful" to know a definition in administering the Plan. [Appx. 3 at 275:21 – 276:7.] Reynolds also testified that if "clear and convincing" is not defined in the Plan, then he cannot recall a definition [Appx. 2 at 216:8-13.] Smith also testified that "clear and convincing" is not defined in the Plan [Appx. 3 at 274:22 – 275:2], she does not recall asking anyone for a definition or creating her own definition [Appx. 3 at 275:6-11], and she has no knowledge of where to go for any definition of "clear and convincing" [Appx. 3 at 276:19 – 277:3.] Vincent also never did any research to determine who, if anyone, came up with a definition for "clear and convincing." [Appx. 4 at 348:20 – 349:1], but testified that the Board or Committee interprets the Plan and asks Groom for assistance. [Appx. 4 at 258:21 – 260:1; 336:15 – 337:12.]

5.      **Changed Circumstances.**  Vincent testified that "changed circumstance" is not defined in the Plan [Appx. 4 at 335:8-13.] Smith also testified that "changed circumstance" is not defined in the Plan [Appx. 3 at 266:4-6.] Vincent testified he has no knowledge of any definition

of "changed circumstance" other than "a new or different condition" [Appx. 4 at 335:14-17; 372:4-13.] Smith also testified she thinks it means "new or different injury or illness or impairment" [Appx. 3 at 268:9-16], but she has no knowledge of who came up with that definition. [Appx. 3 at 267:4-13.] Smith does not recall asking anyone to define "changed circumstances" for her. [Appx. 3 at 273:14-16.] Vincent testified he does not know anyone who knows how it was defined [Appx. 4 at 335:15-17] and does not know who came up with that definition other than the Board or Committee. [Appx. 4 at 335:20 – 337:12.] Reynolds also testified that the definition of "changed circumstance" is important and the role of the Committee members was to interpret the terms undefined in the Plan, but that "changed circumstances" is defined in the decision letter that he did not write or read. [Appx. 2 at 209:13 – 210:6; 216:8-21.] Vincent never did any research to determine who, if anyone, came up with a definition for "changed circumstance" [Appx. 4 at 348:4:17], but testified that the Board or Committee interprets the Plan and asks Groom for assistance. [Appx. 4 at 258:21 – 260:1; 336:15 – 337:12.] Reynolds also testified that nobody has given him a definition of "changed circumstance" and it is not defined in the Plan [Appx. 2 at 209:6-8; 244:17 – 245:2], he has no knowledge of any definition of "changed circumstance" or who defined it other than the practice of the Board or Committee was to use "a new or different impairment" [Appx. 2 at 224:15 – 226:15; 245:3-11.] Smith testified Groom advised on plan interpretation, but maintains no repository for reference by future committee members. [Appx. 3 at 160:4 – 165:4.]

The absence of any definition or basis to ensure any consistency in the interpretations of key terms that remain undefined in the Plan enables Groom to dictate the definition of each term (and the Plan, Board, and Committee to defer to Groom) on a case-by-case basis. Combined with Groom's control of the medical records and administrative file, and creating of subjective

summaries of each for consideration by the Board and Committee, it is clear that Groom has a monopoly as to all necessary information and power over Plan interpretations required for the Plan, Board, and Committee to make decisions on player claims, including Cloud's claims.

6.    **Participation**.   Groom created the Plan without key definitions for alleged implementation by a Committee with no legal or medical training. [Appx. 2 at 29:16-19, 31:13-16, 95:18-22, Appx. 3 at 119:21 – 120:6.] The absence of tools for the Board or Committee to fully implement and execute the Plan for the benefit of the participant players reflects Groom's actual role in the Plan. Likewise, the evidence shows that Groom's actual participation in the decision-making process related to player claims exceeded the role of the Board and Committee in denying player claims (including as to Cloud).

The administration of a disability claim starts with an e-mail from someone in the Player Benefits Office and multiple Groom lawyers are copied. [Appx. 3 at 183:4 – 185:17.] Every other week, Smith and Reynolds would discuss disability applications over the phone with Groom. [Appx. 3 at 150:12 – 152:10; 154:9 – 161:9.] Groom even participated in periodic doctor meetings. [Appx. 3 at 152:16 – 154:8.] Groom's role in preparing and issuing decision letters defies logic and any standard of good faith practice. For example, as a member of the Committee, Smith has never written a decision letter granting or denying a disability benefits application. [Appx. 3 at 199:3-5]. Smith has never reviewed a decision letter granting or denying a disability benefits application before it was sent to a player. [Appx. 3 at 199:6-8.] Smith does not recall ever making a single change to any decision letter granting or denying a disability benefits application before it was sent to a player. [Appx. 3 at 199:9-11.] Similarly, Reynolds does not review decision letters before they are sent to a player. [Appx. 2 at 174:3-5.] At the Board level, there is no place where members of the Board report in writing how they came to a decision. [Appx. 4 at 94:11-14.]

Nobody ever reads any of the letters prepared and sent by Groom on behalf of the Board or DICC. [Appx. 4 at 88:6 – 92:12.] Groom maintained the same control over the Plan and claims handling process as to Cloud.

7.     **2014 Decision Letter**.

As to the Committee's initial decision in 2014, neither of the two people on the Committee provided the discussion or analysis as set forth in the July 23, 2014 decision letter. [Appx. 3 at 324:11-20.] In Smith's July 23, 2014 email providing her vote on Cloud's application for T&P Benefits, she did not provide a detailed analysis of how she came to her decision. [Appx. 3 at 354:3-22.] Reynolds did not draft an analysis of Cloud's medical records in review of his disability applications. [Appx. 2 at 272:6-8, 272:19-21.] Reynolds did not write the decision letter on Cloud's 2014 request for T&P Benefits. [Appx. 2 at 330:3-6.] Smith did not write the decision letter on Cloud's application for disability benefits filed in 2014. [Appx. 3 at 199:20-22.] Reynolds did not make a single change to the 2014 decision letter. [Appx. 2 at 330-331:22-2, 335:19-21.] Reynolds did not review the 2014 decision letter pertaining to Cloud's application for T&P Benefits. [Appx. 2 at 335-336:22-1.]

Smith believes Groom wrote the July 23, 2014 decision letter. [Appx. 3 at 326:20-22.] The Committee decision letter dated July 23, 2014 on Cloud's request for T&P Benefits was not submitted to the Committee prior to being sent to Cloud. [Appx. 4 at 369:14-18.] Smith never received a copy of the July 23, 2014 decision letter. [Appx. 3 at 328:10-12]. Smith did not write, review, or ask for any language to be included in the July 23, 2014 decision letter before it was sent to Cloud. [Appx. 3 at 323-324:7-3, 324:11-15]. Smith would expect someone that was writing the July 23, 2014 decision letter, a legal letter, to actually discuss the reason with the people who purportedly decided the case. [Appx. 3 at 326:9-19].

8.    **2016 Committee Decision Letter.**

Neither Reynolds nor Smith (the two people on the DICC) even read the DICC's March 2, 2016 reclassification denial letter before it was transmitted [Appx. 12, Appx. 3 at 271:8-12.] Smith did not write the decision letter on Cloud's 2016 application for reclassification of T&P Benefits. [Appx. 3 at 200:5-8]. Similarly, Smith did not make any changes to the decision letter on Cloud's 2016 application for reclassification of T&P Benefits before it was sent to Cloud. [Appx. 3 at 200:13-17]. Smith did not review the decision letter on Cloud's application for reclassification of T&P Benefits filed in 2016 before it was sent to Cloud. [Appx. 3 at 200:9-12, 271:8-12]. They did not even receive a copy. [Appx. 3 at 328:10-12.] Not only did they not receive a copy, but Smith was surprised to learn that the NFLPA did not receive a copy. [Appx. 3 at 328:19 – 329:20.] Smith did not tell anyone in the drafting of the decision on Cloud's 2016 reclassification request what she believed to be the definition of "changed circumstances". [Appx. 3 at 271:16-20.] Whoever wrote the letter did not receive any defined use of "changed circumstance" as written in the letter, and Smith testified that the letter was not written by Paul Scott (its signatory), the letter appears to have been written by a lawyer, and Groom probably wrote it. [Appx. 3 at 323:3 – 327:4; 338:7 – 341:15.] Vincent, in fact, testified that Groom indeed prepared it. [Appx. 4 at 84:17-20; 86:8 – 88:5.]

Smith did not read, review, or talk to anyone about the Committee's March 2, 2016 reclassification decision prior to the decision being sent to Cloud. [Appx. 3 at 337:9-22, 338:9-13.] No one talked to Smith about the contents of the March 2, 2016 reclassification decision. [Appx. 3 at 338:18-21.] Smith did not approve the definition of "changed circumstances" as used in the March 2, 2016 reclassification decision. [Appx. 3 at 339:5-14.] Groom wrote the March 2, 2016 reclassification decision. [Appx. 3 at 339-340:15-2.] In Smith's e-ballot on Cloud's 2016 request for reclassification of disability benefits, she did not provide a detailed analysis of how she

came to her decision. [Appx. 3 at 356:11-16.] Smith concluded Cloud presented "no changed circumstances", but today Smith admits that Cloud did present "changed circumstances". [Appx. 3 at 355-356:9-10.] Smith admits she may not have read all of Cloud's file before coming to a decision on his request for reclassification of disability benefits. [Appx. 3 at 361-363: 19-9.]

      9.    **2016 Board Decision Letter.**

As members of the Committee, neither Reynolds nor Smith attended the November 15-16, 2016 meeting of the Board where Cloud's appeal was denied. [Appx. 13, Appx. 2 at 383-385:14-6; Appx. 3 at 171:1-4.] However, Vincent attended the November 15-16, 2016 meeting of the Board, but does not even recall Cloud's name being mentioned. [Appx. 4 at 98:10 – 99:10.] Notably, <u>four</u> lawyers from Groom (Alvaro Anillo, Doug Ell, Mike Junk, and Mike Maricco) attended the November 15-16, 2016 meeting of the Board. [Appx. 3 at 174:19 – 178:5.] During that same meeting, Groom simultaneously represented the NFLPA and advised the Board and Committee. [Appx. 3 at 176:20 – 177:14. ]

Vincent testified there are no emails or correspondence from the members of the Board where they provided any discussion or words to be included in the decision letter on Cloud's reclassification request. [Appx. 4 at 85-86:20-12.] Vincent is unaware of any notes of the members of the Board being provided to Groom to prepare the decision letter on Cloud's request for reclassification. [Appx. 4 at 381:4-9.] Vincent is unaware of any conversations the members of the Board had with Groom to help in the drafting of the decision letter on Cloud's request for reclassification. [Appx. 4 at 381:10-16.]

Vincent also testified there is much more detail in the November 23, 2016 denial letter than in the Board meeting minutes, even though the denial letter purports to be the analysis of the Board. [Appx. 4 at 108:4-11.] Vincent acknowledged the none of the Board provided input for the letter

[Appx. 4 380:2 – 381:16], and could not confirm whether the Board reviewed the November 23, 2016 denial letter before it was sent to Cloud. [Appx. 4 108:13-17; 112:13-16; 394:12-19.] Vincent believes the letter was prepared by Groom without conferring with the members of the Board. [Appx. 4 at 86-89:20-15, 91:5-10, 92:1-12, 377:815, 377-378:22-3].

The entire circumstances surrounding the 2014 and 2016 decisions purportedly by the Board and Committee reflect that Groom maintained control over both the flow of necessary information and the final decision letters with supporting analysis – with no substantive reasoning or input from either the Board or Committee.

**E.      Vincent as a Strawman Corporate Representative for the Plan.**

The Plan, via Groom, designated Vincent as its corporate representative for deposition testimony on 51 topics pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure. [Appx. 4 at 71:18-21]. Pursuant to the Rule 30(b)(6), the Plan was obligated to provide a witness representative on all 51 topics. The Plan also had a duty to educate the witness on any issues not previously within his personal knowledge. The Fifth Circuit has summarized these obligations as follows:

* * *

"Rule 30(b)(6) is designed 'to avoid the possibility that several officers and managing agents might be deposed in turn, with each disclaiming personal knowledge of facts that are clearly known to persons within the organization and thus to the organization itself.' Therefore, **the deponent ''must** make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by [the party noticing the deposition] and to **prepare those persons in order that they can answer fully, completely, unevasively, the questions posed ... as to the relevant subject matters**.'' '[T]he duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to that designee or to matters in which that designee was personally involved.' **The deponent must prepare the designee to the extent matters are reasonably available, whether from documents, past employees, or other sources**.

'Obviously it is not literally possible to take the deposition of a corporation; instead, ... **the information sought must be obtained from natural persons who**

**can speak for the corporation.**' Thus, a rule 30(b)(6) designee does not give his personal opinions, but presents the corporation's 'position' on the topic. *Taylor*, 166 F.R.D. at 361. When a corporation produces an employee pursuant to a rule 30(b)(6) notice, it represents that the employee has the authority to speak on behalf of the corporation with respect to the areas within the notice of deposition. This extends not only to facts, but also to subjective beliefs and opinions. If it becomes obvious that the deposition representative designated by the corporation is deficient, the corporation is obligated to provide a substitute.

\* \* \*

If the designated 'agent is not knowledgeable about relevant facts, and the principal has failed to designate an available, knowledgeable, and readily identifiable witness, then the appearance is, for all practical purposes, no appearance at all.' *Resolution Trust*, 985 F.2d at 197. In *Resolution Trust* we affirmed sanctions against a party that possessed documents that plainly identified a witness as having personal knowledge of the subject of the deposition but did not furnish those documents or designate the witness until after it had designated two other witnesses with no personal knowledge. *Id.*"

\* \* \*

*Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 432-33 (5th Cir. 2006) (footnotes omitted) (bold emphases added).

The day before Vincent's deposition, Groom posed sterile questions in a "yes-or-no" format to the members of the Board (clearly not designed to elicit any information on the topics) and received no substantive responses sufficient to educate Vincent on the 51 topics, Vincent asked no questions of any of the members of the Board, and then Groom (not the Plan) prepared Vincent for his deposition as a corporate representative of the Plan [Appx. 4 at 48:21 – 53:16; 78:2 – 83:13.]. The Plan's "preparation" of Vincent did not comply with its obligation under the Rule. This failure indicates one of two things: either (1) the Plan simply refused to provide Vincent with information required under the Rule, or (2) the Plan does not have anyone knowledgeable about material issues related to its denial of Cloud's claim. In either case, the inevitable question is who prepared Vincent for his deposition as a corporate representative of the Plan?

Vincent testified that he was present during Groom's five (5) minute telephone conversations with the members of the Board (Katie Blackburn, Dick Cass, Ted Phillips, Sam McCullum, Jeff Van Note, and Robert Smith). In these conversations, Groom asked only "yes-or-no" questions of the members of the Board rather than asking open-ended questions. [Appx. 4 at 80:8-11]. Vincent did not ask a single question of the Board members during the conversations with them on August 9, 2021. [Appx. 4 at 49:7-9, 50:5-9.]

While Groom attempts to prevent the Board's testimony, Groom and Vincent failed to ask obvious questions of the members of the Board about Cloud's application for disability benefits and their purported decision – because Groom possesses all the information and knows that it played the primary role in the denial of Cloud's claim, not the Plan, the Board, or the Committee. Questions not posed to the members of the Board include:

- whether Blackburn recalled reviewing Cloud's disability case. [Appx. 4 at 26:5-9];

- whether Blackburn recalled any discussion or debate as to Cloud's disability case. [Appx. 4 at 27:7-12];

- what advice Blackburn received from third-parties pertaining to Cloud's disability case. [Appx. 4 at 29:18-21];

- whether Blackburn discussed Cloud's case with Smith or Reynolds. [Appx. 4 at 29:14-17];

- whether Cass conducted independent research or what he reviewed in deciding Mr. Cloud's request for benefits. [Appx. 4 at 32:5-9];

- what advice Cass received from third-parties pertaining to Cloud's disability case. [Appx. 4 at 32:10-13];

- whether Cass recalled any discussions he had with his fellow board members pertaining to Cloud's case. [Appx. 4 at 33:9-12, 34:8-11];

- whether Phillips recalled any discussions he had with his fellow board members pertaining to Mr. Cloud's case. [Appx. 4 at 36:11-14];

- whether Phillips spoke to Smith or Reynolds about Cloud's case. [Appx. 4 at 36:15-

18];

- whether Blackburn, Cass, or Phillips ever had any notes relating to Cloud's case. [Appx. 4 at 37:6-10];

- whether McCullum had any recollection of the medical records presented by Mr. Cloud. [Appx. 4 at 40:3-7];

- whether McCullum recalled or had any recollection of the injuries, illnesses, and/or ailments that Cloud presented. [Appx. 4 at 40:8-11];

- whether McCullum recalled having any conversations with Mr. Reynolds or Ms. Smith about Mr. Cloud's appeal. [Appx. 4 at 40:12-15];

- whether McCullum recalled having any discussions, conversations or debates with other members of the Board about Cloud's request for benefits. [Appx. 4 at 40:16-20];

- whether Van Note actually reviewed Cloud's medical records. [Appx. 4 at 42:8-10];

- whether Van Note recalled having any conversations with Reynolds or Smith about Cloud's appeal. [Appx. 4 at 42:11-15];

- whether Van Note recalled any conversations or communications he had with any other board members about Cloud's medical records or applications for disability benefits. [Appx. 4 at 42:16-21];

- whether Smith ever had any notes analyzing Cloud's request for disability benefits and associated medical records. [Appx. 4 at 44:1-4];

- whether Smith had any discussions or debates with other members of the Board about Cloud's case. [Appx. 4 at 44:13-16];

- whether Smith recalled having any conversations with Reynolds or Smith about Cloud's appeal. [Appx. 4 at 44:17-21];

- whether Smith received any advice from a third-party about Cloud's request for benefits. [Appx. 4 at 44-45:22-3];

- whether the members of the Board reviewed Cloud's lawsuit. [Appx. 4 at 46-47:21-2];

- if any of the members of the Board personally know or knew Cloud. [Appx. 4 at 48:1-8];

- if the members of the Board reviewed the decision letter on Cloud's reclassification request prior to being sent to Cloud. [Appx. 4 at 84:6-9];

- if the members of the Board had any input on the decision letter on Cloud's reclassification request prior to being sent to Cloud. [Appx. 4 at 84:10-13];

- whether the members of the Board discussed Cloud's application prior to casting their vote. [Appx. 4 at 100:16-21];

- whether the members of the Board provided any information to the Plan prior to drafting the decision letter on Cloud's reclassification request prior to being sent to Cloud. [Appx. 4 at 103:2-9];

- whether the members of the Board provided any input to the Groom Firm prior to drafting the decision letter on Cloud's reclassification request prior to being sent to Mr. Cloud. [Appx. 4 at 103:10-17];

- The members of the Board go into executive session to discuss disability applications, but it was never asked whether the members of the Board discussed Cloud's request in executive session. [Appx. 4 at 182-183:16-3].

As evident from Vincent's testimony, nobody within the Plan provided Vincent any meaningful information on any of the 51 topics.

In truth, only Groom provided a controlled scope of information to Vincent as the Plan's representative, and Groom prepared and compiled it into a binder purportedly addressing all 51 topics behind 51 tabs ("Groom Binder"). [Appx. 4 at 55:6 – 60:5.] Vincent materially referenced and relied on information in the Groom Binder during his deposition, which Groom created for Vincent's review and preparation the day before his deposition. [Appx. 4 at 147:21 – 158:2.] At some point, Groom even removed the Groom Binder from the deposition and returned it to Vincent, perhaps adding or modifying information therein. [Appx. 4 at 143:10-15.]

After strenuous objection by Cloud's counsel regarding Vincent's manner of testifying from the Groom Binder, Groom admitted that it "**did provide input**" as to the Groom Binder and that it "**was a collaborative process between [Groom] and [Vincent]**" [Appx. 4 at 155:9-11] – not any member of the Board or other resource within the Plan. Vincent acknowledged that he

"**worked with Groom on these responses**" [Appx. 4 at 156:8-20], and Groom stated on the record "**we have educated the witness [Vincent]**." [Appx. 4 at 157:6 – 158:2.] In substance, Groom acted as the corporate representative of the Plan and used Vincent as its medium for testimony on the 51 topics.

In sum, the both the Board and the Committee played a relatively trivial role in the denial of Cloud's claim. Instead, Groom took the lead just as it did in *Keys*, *Dimry I*, and *Dimry II*. As a result, Groom is a material witness in this lawsuit, and is likely to become a party defendant. Under governing case law and rules of ethics, Groom is disqualified from further representation of the Plan in this proceeding.

## III.    DISQUALIFICATION OF A LAWYER AS A WITNESS

In the Fifth Circuit, a motion to disqualify is a substantive motion "affecting the rights of the parties" and is thus "determined by applying standards developed under federal law." *In re Am. Airlines, Inc.*, 972 F.2d 605, 610 (5th Cir. 1992) (quoting *In re Dresser Industries*, 972 F.2d 540, 543 (5th Cir. 1992)). The Fifth Circuit has directed courts to carefully "consider '[a]ll the facts particular to [the] case . . . in the context of the relevant ethical criteria and with meticulous deference to the litigant's rights.'" *Id*. at 300 (quoting *U.S. Fire*, 50 F.3d at 1314.); *Woods v. Covington Cty. Bank*, 537 F.2d 804, 810 (5th Cir. 1976) ("A court should be conscious of its responsibility to preserve a reasonable balance between the need to ensure ethical conduct on the part of lawyers appearing before it and other social interests, which include the litigant's right to freely chosen counsel.").

### A.    The Local Rules, Model Rules, and Texas Rule of Professional Responsibility.

When deciding a motion to disqualify, a court first looks to that court's specific local rules.

*See U.S. Fire*, 50 F.3d at 1312. In the Northern District of Texas, "[a] presiding judge, after giving opportunity to show cause to the contrary, may take any appropriate disciplinary action against a member of the bar for . . . (3) unethical behavior . . . ." L.R. 83.8(b). The term "unethical behavior" means "conduct undertaken in or related to a civil action in this court that violates the Texas Disciplinary Rules of Professional Conduct." L.R. 83.8(e); *see also* L.R. 83.9 (c) ("Attorneys Not Admitted to Practice Before this Court") ("[b]y appearing in any case, an attorney becomes subject to the rules of this court.").

District courts, however, are not limited to their local rules in deciding a motion to disqualify. *See Am. Airlines*, 972 F.2d at 610. In fact, in reviewing motions to disqualify, courts must also "consider the ethical rules announced by the national profession in light of the public interest and the litigants' rights." *Id*. To this aim, the Fifth Circuit has acknowledged that the ABA Model Rules of Professional Conduct (the "Model Rules") are the "national standards to consider in reviewing motions to disqualify." *In re ProEducation*, 587 F.3d 296, 299 (5th Cir. 2009). Therefore, the Court should consider both the Model Rules and the Texas Rules. However, the scope of an attorney disqualification inquiry goes beyond the ABA Canons, Ethical Considerations, and Disciplinary Rules. *See Woods v. Covington County Bank*, 537 F.2d 804, 810 (5th Cir. 1976) ("A court should be conscious of its responsibility to preserve a reasonable balance between the need to ensure ethical conduct on the part of lawyers appearing before it and other social interests, which include the litigant's right to freely chosen counsel.").

Model Rule 3.7(a) states "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness . . .." (three inapplicable exceptions omitted).[6]

---

[6] It is immaterial that this proceeding may be tried to the Court as opposed to a jury. Texas, like almost every state, applies the lawyer as witness rule to non-jury trials. If the rule was based solely on the concern of the improper impact on juries by the dual roles of advocate and witness, then the lawyer as witness rule would be limited to jury trials. This is not so.

Texas Rule of Professional Responsibility 3.08(a) states that "a lawyer shall not accept or continue employment as an advocate before a tribunal in a contemplated or pending adjudicatory proceeding if the lawyer knows or believes that the lawyer is or may be a witness necessary to establish an essential fact on behalf of the lawyer's client . . . ." *Id.* (five inapplicable exceptions omitted). Disqualification is appropriate if the lawyer's testimony is "necessary to establish an essential fact[.]" *See In re Sanders*, 153 S.W.3d 54, 57 (Tex. 2004) (quoting Tex. Disciplinary R. Prof'l Conduct 3.08(a)). Thus, "the party requesting disqualification must demonstrate that the opposing lawyer's dual roles as attorney and witness will cause the party actual prejudice[.]" *Id.*

### B.    Standards for Disqualification of Lawyer as Witness.

"The proscription against an attorney serving as both an advocate and a witness in the same litigation is a long-standing ethical rule." *FDIC v. U.S. Fire Ins. Co*., 50 F.3d 1304, 1311 (5th Cir. 1995). The Fifth Circuit has explained the background and basis of the proscription against an attorney serving as both an advocate and a witness in the same litigation:

> Its origin may be traced to the common law principle of evidence that neither a party nor his agent is competent as a witness on the party's behalf.  During the nineteenth century, the prohibition against lawyer-witnesses became a matter of professional ethics. Bar associations in the United States included the rule among their earliest standards of professional behavior.  Over the years, various reasons have been offered for an ethical prohibition against advocates testifying.  The Model Code proposes four justifications for the rule: (1) the lawyer may be a less effective witness because he is more easily impeachable for interest; (2) opposing counsel may be inhibited in challenging the credibility of a lawyer who also appears as an advocate; (3) a lawyer-witness must argue his own credibility; and (4), while the role of a witness is to objectively relate facts, the role of an advocate is to advance his client's cause.  Another rationale commonly advanced for the rule focuses on the appearance of impropriety that may be created when a lawyer testifies on behalf of his client.  For one or more of the foregoing reasons, the general prohibition against the lawyer-witness remains a prescript reiterated in many contemporary ethical canons.

*Id*. In *U.S. Fire*, the Court disqualified a lawyer because the opposing party intended to call him as a witness at trial on a point that could have voided an insurance policy at issue in the suit. *See id*. at 1317. Despite consent from the lawyer's client as to the dual role, the Court reasoned that disqualification was necessary because there would be "a tangible and unavoidable scrambling of roles" that would compromise the lawyer's effectiveness. *See id*.; *see also In re Duke Invs., Ltd*., 454 B.R. 414, 425–26 (Bankr. S.D. Tex. 2011) (concluding "[b]ecause the Fifth Circuit has held that the client-consent exception does not automatically resolve the Motion to Disqualify in the nonmovant's favor, and because this Court is bound by Fifth Circuit precedent, even though Amegy unequivocally consents to Stohner's continued representation despite possible substantially adverse testimony, any decision by this Court denying the Motion should preferably be made on some other basis.").

## C.    ERISA Fiduciary Exception to Attorney-Client Privilege.

In the event Groom attempts to hide behind the attorney-client privilege as a basis to oppose its disqualification and required appearance to testify as a witness at trial, in the context of ERISA, a fiduciary (and its lawyer) may not assert attorney-client privilege to impede the testimony of a lawyer witness. As explained here in the Northern District of Texas:

> "The fiduciary exception to the attorney-client privilege derives from the law of trusts. Courts have held that 'when a trustee obtains legal advice relating to the exercise of fiduciary duties ...[,] the trustee cannot withhold attorney-client communications from the beneficiary of the trust." *U.S. v. Jicarilla Apache Nation*, 564 U.S. 162, 165, 131 S.Ct. 2313, 180 L.Ed.2d 187 (2011). Like several other circuits, the Fifth Circuit has adopted the fiduciary exception in the ERISA context. *See Wildbur v. ARCO Chemical Company*, 974 F.2d 631 (5th Cir. 1992). In *Wildbur*, the court held that 'an ERISA fiduciary cannot assert the attorney-client privilege against a plan beneficiary about legal advice dealing with plan administration.' *Id*. at 645 (citing *Washington-Baltimore Newspaper Guild, Local 35 v. Washington Star Co*., 543 F.Supp. 906, 909 (D.D.C. 1982)). The *Wildbur* court based this holding on two rationales: first, '[a]n ERISA plan is a separate legal entity from its sponsor ..., and a plan's administrator owes a fiduciary duty to the plan's beneficiaries, not its sponsor', *id*.; and second, '[w]hen an attorney advises

a plan administrator or other fiduciary concerning plan administration, the attorney's clients are the plan beneficiaries for whom the fiduciary acts, not the plan administrator.' *Id*. (citing *Washington Star Co*., 543 F.Supp. at 909).

Other courts that have applied the fiduciary exception in the ERISA context have explicitly noted that the 'exception is rooted in two distinct rationales.' *U.S. v. Mett*, 178 F.3d 1058, 1063 (9th Cir. 1999); *Solis v. Food Employers Labor Relations Association*, 644 F.3d 221, 227 (4th Cir. 2011) ('[C]ourts have relied on one of two related rationales.'); *see also Jicarilla Apache Nation*, 564 U.S. at 190, 131 S.Ct. 2313 (2011) (Sotomayor, J., dissenting) ('The majority correctly identifies the two rationales courts have articulated for applying the fiduciary exception ...'). Under one rationale, 'some courts have held that the exception derives from an ERISA trustee's duty to disclose to plan beneficiaries all information regarding plan administration.' 2 Mett, 178 F.3d at 1063 (citing *In re Long Island Lighting Co*., 129 F.3d 268, 271-72 (2d Cir. 1997)); *Bland v. Fiatallis North America, Inc*., 401 F.3d 779, 787-88 (7th Cir. 2005). 'Viewed in this light, the fiduciary exception can be understood as an instance of the attorney-client privilege giving way in the face of a competing legal principle.' Mett, 178 F.3d at 1063.

Other courts have focused instead on the role of the trustee and have endorsed the notion that, 'as a representative for the beneficiaries of the trust which he is administering, the trustee is not the real client in the sense that he is personally being served.'' *Id*. (quoting *U.S. v. Evans*, 796 F.2d 264, 265-66 (9th Cir. 1986)); *Washington Star Co*., 543 F. Supp. at 909. 'Understood in this fashion, the fiduciary exception is not an 'exception' to the attorney-client privilege at all. Rather, it merely reflects the fact that, at least as to advice regarding plan administration, a trustee is not 'the real client' and thus never enjoyed the privilege in the first place.' *Mett*, 178 F.3d at 1063 (citing *Evans*, 796 F.2d at 265-66).

The law regarding the fiduciary exception in the ERISA context has developed in cases presenting two different factual scenarios: (1) cases in which an ERISA plan participant brought suit against an ERISA plan fiduciary, *see, e.g., Wildbur*, 974 F.2d 631, and; (2) cases in which the federal government instigated an enforcement action or compliance investigation against an ERISA plan fiduciary to protect the interests of the plan's participants, *see, e.g., Food Employers*, 644 F.3d 221; *Mett*, 178 F.3d at 1064 n.9. In both scenarios, courts have relied on the duty rationale, the client rationale, or a combination of the two, and held that ERISA fiduciaries are precluded from asserting the attorney-client privilege under the fiduciary exception."

*Advanced Physicians, S.C. v. Connecticut Gen. Life Ins. Co*., 431 F. Supp. 3d 857, 860 (N.D. Tex.

2020). Thus, irrespective of the timing of Groom's disqualification, Groom will be required to

produce all communications between it and any person or entity related to its services provided to

or on behalf of the Plan and all associated work product and internal communications and memoranda (at a minimum) related to Cloud's case.

## IV.    ARGUMENT IN SUPPORT OF DISQUALIFICATION

Groom's role within the Plan may be disputed, but it is indisputable. It is undisputed that Groom created the Plan and indisputable that Groom essentially has run the Plan for over 25 years and has been a constant direct obstacle to and drawn the ire of Plan participants for much of that time period. Members of the Board and DICC come and go (each knowing very little about how the Plan truly operates), but Groom has remained the only constant fixture of the Plan.

Cloud intends to call numerous Groom lawyers to testify at trial in this matter – whether as party (fiduciary or non-fiduciary) or non-party witnesses. The identities of Groom witnesses beyond those identified below is difficult to ascertain at this stage in light of the multi-decade involvement of Groom throughout the entire existence of the Plan, the scope of the administrative structure within Groom's offices for the handling of thousands of claims (including Cloud's claim) resulting in millions of dollars of fees paid by the Plan to Groom each year, and the resistance of Groom to disclose details as to all of the foregoing even as to only Cloud's claims.

Vincent, as the purported corporate representative of the Board was unable to testify to an overwhelming number of issues without direct input from Groom (as opposed to the Rule 30(b)(6) requirement that information be provided by another person within the Plan). Even Groom's limited questioning of the Board reveals that the scope of knowledge held by its members is similarly limited. Neither of the current members of the Committee (Reynolds and Smith) knew the mechanics of their own Committee, definitions of key terms in the Plan, or any explanation as to why Groom writes all of the decision letters without sharing the contents with anyone on the Committee, the Board, or the Plan. Just as many former players testified over a decade ago, all

roads lead to and end at the front door of Groom. Groom should be required to reveal what is inside.

Even setting aside the prospect of Groom becoming a party defendant in this case, it is clear that Groom is ethically prohibited from acting as an advocate for the Plan against Cloud – particularly when Groom is undoubtedly a material and necessary witness to establish essential facts of Cloud's claims and both Groom and the Plan are fiduciaries to Cloud. If Groom remained counsel for the Plan, it is inevitable that Groom would be required to engage in "a tangible and unavoidable scrambling of roles" that would compromise Groom's position as an advocate on behalf of the Plan (and as Cloud's fiduciary). By this Motion, Cloud has demonstrated that Groom's dual roles as attorney and witness will cause Cloud actual prejudice if Groom is allowed to continue acting as the Plan's counsel in this proceeding.

Groom (its lawyers and staff) including Michael L. Junk, Edward Meehan, Douglas W. Ell, Alvaro Anillo, Mike Maricco, Natallia Maroz, Hannah Coffman, and all other personnel with knowledge are the only witnesses who can provide certain material testimony on critical issues regarding (1) handling of the claims for T&P Benefits of Cloud and similar procedures and definitions used in handling of contemporaneous claims by other players, and (2) formation, operational structure, actions and omissions, and actual policies of the Plan, including without limitation the following more specific issues:

- Groom's internal logistical and administrative structure in facilitating Plan operations;

- Groom's billing practices in facilitating Plan operations;

- Groom's role in the Plan's finances;

- Creation, drafting, and intent and interpretation of key terms in the Plan in application to player participant claims;

- Collection, maintenance, and dissemination of medical records and related player files;

- Collection, maintenance, and dissemination of claims administrative files;

- Collection, maintenance, and dissemination of documents and information between and among the Board, the Committee, NFLPA, the Players Benefits Office, and related participants in the facilitation of the Plan;

- Drafting, analysis, reasoning, and supporting documents, information, actions and omissions related to the July 23, 2014 decision letter;

- Drafting, analysis, reasoning, and supporting documents, information, actions and omissions related to the March 2, 2016 decision letter; and

- Drafting, analysis, reasoning, and supporting documents, information, actions and omissions related to the November 23, 2016 decision letter.

The Court must consider the ethical rules announced by the national profession in light of the public interest and the rights of the Plan as a fiduciary to Cloud as its beneficiary. The Court has a responsibility to preserve a reasonable balance between the need to ensure ethical conduct on the part of Groom and other social interests, which include the roles of the Plan and Groom *as Cloud's fiduciary*. In the Northern District of Texas, unethical behavior means conduct undertaken in or related to a civil action in this court that violates the Texas Disciplinary Rules of Professional Conduct. This Court, after giving opportunity to show cause to the contrary, may take any appropriate disciplinary action against Groom – which includes disqualification.

## V.    PRAYER

WHEREFORE, Plaintiff prays that 1) this Motion be granted, 2) The Groom Law Group be ordered disqualified from representing the Plan, the Board, the Committee, or any of their constituent parts or personnel; and 3) the Plan and the Groom Firm be ordered to pay Cloud's costs, attorney's fees, and expenses associated with the filing of this Motion. Cloud further prays

and requests such other relief, general or special, to which Cloud may show himself justly entitled.

Respectfully submitted on this the 2nd day of September, 2021.

> BARLOW GARSEK & SIMON, LLP
> 920 Foch Street
> Fort Worth, Texas 76107
> 817.731.4500
> 817.731.6200 (facsimile)
>
> /s/ *Christian Dennie*
> Christian Dennie
> Texas Bar No. 24045775
> cdennie@bgsfirm.com
>
> COUNSELS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

On September 2, 2021, Plaintiff's Motion to Disqualify The Groom Law Group was filed with the Clerk of the Court via CM/ECF, which automatically delivers notice of the filing of the same to all counsel of record.

> /s/ *Christian Dennie*
> Christian Dennie

## CERTIFICATE OF CONFERENCE

On August 25, 2021, at the hearing on Plaintiff's Emergency Motion to Compel [Dkt. 41] and in person, I discussed the disputed matters with counsel for Defendant. The parties were unable to resolve this dispute. Accordingly, judicial intervention is necessary.

> /s/ *Christian Dennie*
> Christian Dennie

## APPENDIX

Appendix 1:   The Plan

Appendix 2:   Patrick Reynold Deposition Excerpts

Appendix 3:   Christophine Smith Deposition Excerpts

Appendix 4:   Sam Vincent Deposition Excerpts

Appendix 5:   Senate Hearing Transcript dated September 18, 2007

Appendix 6:   Plaintiff Tyrone Keys Motion for Summary Judgment and Memorandum of Law

Appendix 7:   Defendant Bert Bell/Pete Rozelle NFL Player Retirement Plan Memorandum in Opposition to Plaintiff / Counter-Defendant Tyrone Keys' Motion for Summary Judgment

Appendix 8:   Judgment in Favor of Plaintiff Tyrone Keys dated October 2, 2020

Appendix 9:   Charles Dimry - Declaration of Michael L. Junk in Support of Defendants' Motion for Judgment on the Administrative Record dated June 25, 2020

Appendix 10: Charles Dimry – Hearing Transcript

Appendix 11: Charles Dimry – Judgment dated September 15, 2020

Appendix 12: March 2, 2016 Committee Denial

Appendix 13: November 23, 2016 Board Denial