# APPENDIX 1

```
1              IN THE UNITED STATES DISTRICT COURT
2       FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION
3       ---------------------------
        MICHAEL CLOUD,                :
4                                     :
            Plaintiff,                :
5                                     :  Civil Action No.:
        vs.                           :
6                                     :  3:20-CV-01277-E
        THE BERT BELL/PETE ROZELLE :
7       NFL PLAYER RETIREMENT PLAN,:
                                      :
8           Defendant.                :
        ---------------------------
9
10           INDIVIDUAL AND 30(b)(6) DEPOSITION OF
11                     HESSMAN VINCENT
12      DATE:          August 10, 2021
13      TIME:          10:06 a.m. to 8:34 p.m.
14      LOCATION:      Groom Law Group
                       1701 Pennsylvania Avenue
15                     Suite 1200
                       Washington, D.C. 20006
16
17      REPORTED BY:  Felicia A. Newland, CSR
18
19
20
                       Veritext Legal Solutions
21            1250 Eye Street, N.W., Suite 350
                       Washington, D.C. 20005
22
```

Page 1

.

.

16      Q    Mr. Reynolds is no longer on the
17   committee.  Is that correct?
18      A    That's correct.
19      Q    What's his role at the board meetings
20   now that he is no longer on the committee?
21      A    He decides -- he advises the board on
22   board decision, appeal claims.  No longer the

Page 18

Page 20

1    initial claims.

Page 19

Page 21

4      So if Patrick Reynolds or Chris Smith
5  was talking to board members about appeals, I would
6  need to talk to the members of the board to ask
7  them whether they received advice from Patrick
8  Reynolds or Chris Smith, correct?
9      A    That is a possibility.  Or you could
10  ask Patrick Reynolds or Chris Smith if they do.
11      Q    If Patrick Reynolds or Chris Reynolds
12  didn't recall whether they talked to the board or
13  not, the best people for me to talk to whether they
14  spoke to Chris Smith or Patrick Reynolds would be
15  the board members.  Is that right?
16      A    That may be the case, yes.

                                                      --

Page 24

---

2      Q    So if I had to determine whether
3  Ms. Smith or Mr. Reynolds were providing advice to
4  the board while they were both on the committee, I
5  would have to ask Patrick Reynolds or Chris Smith
6  about that, correct?
7      A    That's correct.
8      Q    And the only other people that would
9  know whether Chris Smith or Patrick Reynolds were
10  providing advice to the board and their specific
11  communications or conversations, would be the board
12  members themselves, correct?
13      A    Yes.  That may be the case.  But as
14  far as I'm --

Page 23

---

5  understanding for what you mean?  In relation to
6  what?
7      A    Mr. Cloud's appeal.
8      Q    Okay.  So you talked to Ms. Blackburn
9  yesterday specifically about Mr. Cloud's appeal,

Page 25

---

7 (Pages 22 - 25)

5        Q    Did she ever recall reviewing
6   Mr. Cloud's case?
7        A    I don't recall if we asked her the
8   question in that manner, but she did decide on
9   Mr. Cloud case.

16            If I wanted to know what was
17   discussed for Ms. Blackburn to come to her decision
18   to deny Mr. Cloud's request for benefits, I would
19   have to ask her that question because you didn't
20   ask her, right?
21        A    I did not ask her, that's correct.

7        Q    Did you ever ask whether
8   Ms. Blackburn had any recollection as to any
9   discussion or debate as to Mr. Cloud's case?
10        A    I don't recall if a question was
11   asked in that manner.  But there was nothing unique
12   that popped out to her about the case.

14        Q    Did you ever ask Ms. Blackburn
15   whether she discussed Mr. Cloud's case with Patrick
16   Reynolds and Chris Smith?
17        A    I did not ask that.
18        Q    Did you user ask Ms. Blackburn what
19   advice she received from third parties about
20   Mr. Cloud's case?
21        A    I did not ask that question.

.

5      Q    So was there something that was asked
6   about his review and any independent research that
7   he conducted?
8      A    No.  It was nothing along those
9   lines.
10      Q    Okay.  Did you ask Mr. Cass whether
11   he received any advice from a third-party adviser
12   as it pertains to Mr. Cloud's case?
13      A    I did not ask that question.

9      Q    Did you ask Mr. Cass if he recalled
10   any discussions he had with any fellow board
11   members been Mr. Cloud's case?
12      A    I did not ask that question.

Veritext Legal Solutions
800-336-4000

1

6    Q    And there was no discussion that --
7  let me ask it a different way.
8         You did not ask Mr. Cass whether he
9  had any discussions about Mr. Cloud's case with any
10 of the other board members.  Is that correct?
11    A   I did not ask that question.

11    Q    Did you actually ask him what
12 conversations he had with other members of the
13 board about his decision on Mr. Cloud's claim?
14    A   I did not.
15    Q    Did you ask him whether he spoke to
16 Mr. Reynolds or Ms. Smith in his review of
17 Mr. Cloud's case?
18    A   I did not.

--
Page 34

?
Page 36

5    Q    What was Mr. Philip's response to
6  those questions?
7    A    The same as the previous two; no
8  unique knowledge, no notes kept, didn't review
9  outside the meeting's website.
10    Q    Did Mr. Philips recall actually
11 reviewing any of Mr. Cloud's records?
12    A    He doesn't recall the case.

6    Q    Did you ask whether they ever kept
7  any notes?
8    A    Not specifically in that manner, no.
9  We asked them if they had any notes, and they do no
10 have any notes.

Page 35

Page 37

10 (Pages 34 - 37)

6      Q    So if a board member was to keep
7  notes of their analysis of medical records and
8  information presented in a disability application,
9  they would keep those personally and independently
10 of the benefits office.  Is that correct?
11     A    That may be the case if they are
12 keeping notes.

3      Q    Did Mr. McCullum have any
4  recollection of medical records presented by
5  Mr. Cloud?
6      A    I didn't ask that question
7  specifically.
8      Q    Did Mr. McCullum recall or have any
9  recollection of the injuries, illnesses, ailments,
10 that Mr. Cloud was presenting?
11     A    I didn't ask that question.
12     Q    Did Mr. McCullum recall ever having
13 any conversations with Mr. Reynolds or Ms. Smith
14 about Mr. Cloud's appeal?
15     A    That question was not asked.
16     Q    Did Mr. McCullum have any
17 recollection of any discussion, conversations or
18 debates between him and other members of the board
19 relating to Mr. Cloud's request for benefits?
20     A    That question was not asked.

1      Q      Did Mr. Smith recall ever having any
2    notes analyzing Mr. Cloud's request for disability
3    benefits and associated medical records?
4           A    I'm not sure of that.

8      Q      Did he confirm to you that he
9    actually did review Mr. Cloud's medical records?
10          A    I did not ask that question.
11          Q    Did you ask Mr. Van Note whether he
12    had any conversations with Mr. Reynolds or
13    Ms. Smith about Mr. Cloud's applications for
14    disability benefits?
15          A    I did not ask that question.
16          Q    Did you ask Mr. Van Note whether he
17    recalled any conversations or communications he had
18    with any other board members about Mr. Cloud's
19    medical records or applications for disability
20    benefits?
21          A    I did not ask that question.

Page 42

13          Q      Did you ask Mr. Smith about any
14    discussions or debates he had with any other
15    members of the board about Mr. Cloud's case?
16          A    I did not ask that question.
17          Q    Did you ask Mr. Smith whether he had
18    any conversations with Mr. Reynolds or Ms. Smith
19    about Mr. Cloud's application and request for
20    benefits?
21          A    I did not ask that question.
22          Q    Did you ask Ms. Smith whether he

Page 44

1    received any advice from any third party about
2    Mr. Cloud's request for benefits?
3           A    I did not ask that question.

13          Q      So I will tell you that from
14    Ms. Smith's deposition, she said she recalled maybe
15    10, maybe 15 reclassification requests that she
16    handled as a member of the committee.
17               Does that sound fair from your
18    knowledge and your recollection?
19          A    Is she stating that as ever under her
20    capacity or in a yearly manner?
21          Q    I believe she said ever.
22          A    That could be a fair assessment.  I

Page 45

12 (Pages 42 - 45)

1    would say it's not common.

21           Did you ask any of the board members
22    who were in place at the time of Mr. Cloud's appeal

1    whether they had reviewed Mr. Cloud's lawsuit?
2           A    No, I did not.

6              It's my understanding that
7    Ms. Blackburn, Mr. Cass, and Mr. Philips were
8    appointed by the NFL Management Council.  Is that
9    correct?
10          A    That's correct.
11          Q    Sam McCullum and Jeff Van Note and
12   Robert Smith were appointed by the Players
13   Association.  Is that correct?
14          A    That's correct.

1           Q    Did you ask any of the board members
2    that were in place at the time of Mr. Cloud's
3    appeal whether they personally know or knew
4    Mr. Cloud?
5           A    I did not ask that question.
6           Q    Did that come up in any of the
7    conversation?
8           A    No.

7           Q    Did you actually ask the questions of
8    the board members?
9           A    I did not.

Veritext Legal Solutions
800-336-4000

.

5        Q    So are you saying that the questions
6    that you said were not asked, were not asked period
7    or you just personally didn't ask them?
8        A    The original questions were not asked
9    by me, and I didn't do any follow-up questions.

Page 50

Page 52

Page 51

14 (Pages 50 - 53)

1    your lips, so I may interrupt you.  So I'm not
2    trying to talk over you, it's just I can't see your
3    mouth, so it's a little bit more difficult.
4        A    I understand.
5        Q    So I apologize because I have done
6    that a few times already.
7            Okay.  Like I said, I just want to
8    make sure I'm understanding what documents you
9    understand those to be.  You recall the X file
10   being approximately 860 pages of record?
11       A    No.  I believe the X file is well
12   over that.  It's 1,500, or so, pages if I'm not
13   mistaken.
14       Q    Okay.  Fair enough.
15           So as we've gone through this, you've
16   indicated that you have looked at the line of
17   questions that are being asked on the 30(b)(6)
18   request, the original complaint filed by Mr. Cloud
19   in this case, the administrative record and the X
20   file that was produced in this lawsuit by the Groom
21   Firm.  Is that correct?
22       A    That's correct.

Page 62

12       Q    When you're referencing the X file,
13   are those the 860 pages of records that were
14   produced through this portal by the Groom Law Firm
15   on January 18, 2019?
16           MR. JUNK:  Mr. Dennie, this is Mike
17   Junk.  I'm sorry.  I just want to clarify, like you
18   said trying to get you through this.  The X file
19   this the Bates prefix used to designate documents
20   that we produced to plaintiff.  So with that
21   understanding, that's what he's referring to.  So
22   I'll just leave it to you.  I apologize.  Go ahead.

Page 62

1        Q    As it pertains to the 30(b)(6)
2    questions, there was an exhibit that was compiled
3    that contains notes, and potentially other
4    documents, that you reviewed in preparation for
5    answering the 30(b)(6) topics, correct?
6        A    Do you mind repeating that for me?
7        Q    Sure.  No problem.
8            As it pertains to that category
9    number one that I mentioned, your review of the
10   30(b)(6) topics, there's been a binder that was
11   compiled that you reviewed to help you in
12   preparation to answer the 30(b)(6)questions,
13   correct?
14       A    Correct.
15       Q    In the administrative record, I just
16   want to make sure that we're talking about the same
17   thing and we're not speaking separately.  If you
18   will flip for Exhibit 7.  I want you to let me know
19   if Exhibit 7 is what you're referring as the
20   administrative record.
21       A    Yes.  This looks to be the
22   administrative record, Exhibit 7.

Page 65

1            MR. DENNIE:  No, I get the Bates
2    label reference, but I'm just trying to make sure
3    that I'm understanding where they came from.
4    BY MR. DENNIE:
5        Q    So you're looking at Deposition
6    Exhibit 11, which is an e-mail from Hannah Coffman
7    to Michael Cloud on January 18, 2019.  Is that
8    right?
9        A    Yes, it is.
10       Q    And I will submit to you that there
11   were records produced to Mr. Cloud on that date
12   that were 860 pages of records.  Were you involved
13   in providing these records to the Groom Law Firm?
14       A    I don't recall if I assisted.
15       Q    Okay.  I just wanted to make sure --
16   I'm sorry, go ahead.  I didn't mean to cut you off.
17       A    No, that's correct, I don't recall
18   providing something here.
19       Q    I will apologize to you, Mr. Vincent,
20   when we're wearing the masks it's a little bit
21   easier for me to interrupt you because when you
22   pause for a little longer than normal, I can't see

Page 63

17 (Pages 62 - 65)

1       Q    Okay.  So Exhibit 7 is Bates labeled
2   CLOUD-AR-0001 through CLOUD-AR-529, correct?
3       A    That is correct.
4       Q    And that's -- when you refer to the
5   administrative record, Exhibit 7 is what you're
6   referring to, correct?
7       A    That's correct.

Page 66

Page 68

.

Page 67

Page 69

18 (Pages 66 - 69)

8        Q    Is it fair to say all of the

9    questions that were asked of the board members were

10    yes-or-no questions?

11        A    Yes.

22

Veritext Legal Solutions
800-336-4000

6      Q   They didn't ask members of the board
7    whether they reviewed the decision letter before it
8    went sent out.  Is that right?
9      A   That was not a line of questions, no.
10      Q   You didn't ask the board whether they
11    provided any input on the decision letter, right?
12      A   That's correct, we didn't ask that
13    question in this line of questioning.
14      Q   You didn't ask if the board made any
15    changes to the decision letter, right?
16      A   We did not ask that question, no.

Page 84

Page 82

17    BY MR. DENNIE:
18      Q   Go to Exhibit 6.
19      A   I'm sorry.  Can you repeat that?
20      Q   Sure.  Take a look at Exhibit 6.
21      A   I have Exhibit 6.  I have the
22    November 23, 2016 letter open.

Page 83

Page 85

22 (Pages 82 - 85)

1    Q    Okay. This is the decision that was
2  sent out relating to Mr. Cloud's reclassification
3  appeal, correct?
4    A    That is correct.
5    Q    This is the decision made by the
6  board, correct?
7    A    That is correct.
8    Q    Have you seen any e-mails or
9  correspondence from any of the board members where
10 they provided any discussion or words to be
11 included in Deposition Exhibit 6?
12   A    No, not that I'm aware of.
13   Q    As you sit here today, you can't
14 confirm whether any members of the board actually
15 read this decision before it came out, correct?
16   A    Before it was sent to Mr. Cloud?
17   Q    Correct.
18   A    That is correct, I can't confirm
19 that.
20   Q    And you would agree that the Groom
21 Firm wrote this letter, right?
22   A    They assisted the Plan office in

Page 86

1    Q    Okay. And Linda Johnston is just an
2  administrative assistant. She didn't provide any
3  of the language set forth in Deposition Exhibit 6,
4  did she?
5    A    Not that I'm aware of, no.
6    Q    Wasn't it the practice in these
7  applications for disability benefits that the Groom
8  Firm would prepare the decision without
9  communicating with the members of the committee?
10       MR. MEEHAN: Objection. No
11 foundation.
12       Go ahead.
13       THE WITNESS: Well, we have -- we're
14 not talking about Exhibit 6 anymore?
15 BY MR. DENNIE:
16   Q    I'm going to -- just follow my
17 question -- my first one is about the committee.
18 So I'll ask it again.
19       As it pertains to decisions for
20 disability benefits that are decided by the
21 committee, the Groom Firm would prepare those
22 written letters without communication with members

Page 88

1  writing the decision letter.
2    Q    Okay. Tell me who else helped write
3  this letter. If they assisted, tell me who else
4  wrote it.
5    A    When we received the letter,
6  administration will format the letter, make sure
7  everything is correct and then send it out to the
8  player.
9    Q    Who did that for Mr. Cloud's, as it
10 pertains to Deposition Exhibit 6?
11   A    I wouldn't be able to say for sure,
12 but it may have been Belinda Johnston at the Plan
13 office or executive admin.
14   Q    Linda what?
15   A    Johnston, J-O-H-N-S-T-O-N.
16   Q    Okay. And you said Linda Johnston is
17 the administrative assistant?
18   A    Yes. Yes, sir.
19   Q    You would agree from your experience
20 working with lawyers that Deposition Exhibit 6 is
21 clearly prepared by a lawyer, correct?
22   A    Correct.

Page 87

1  of the committee, correct?
2    A    The committee would make a decision
3  and then the decision letters would be created.
4    Q    So my question is little bit
5  different. But I appreciate your response. It's a
6  little bit differ, so follow me for a second.
7        The committee makes a decision,
8  right?
9    A    Yes.
10   Q    The Groom Firm writes that decision
11 and puts it into a decision letter, correct?
12       MR. MEEHAN: Objection to the form.
13 Asked and answered.
14       Go ahead.
15       THE WITNESS: Correct.
16 BY MR. DENNIE:

Page 89

23 (Pages 86 - 89)

1        You don't have any information or

2  evidence that shows that the members of the board

3  actually reviewed a decision before it was sent to

4  a player, correct?

5       A   I don't have any information that

6  they reviewed the letter before it went to the

7  player, that's correct.

8       Q   And you don't have any information or

9  evidence that shows that the board actually made

10  any additions or changes to a decision letter

11  before it was sent to a player, correct?

12       A   That's correct.

Page 90

---

5       Q   So you would agree that a decision is

6  made by the board, right?

7       A   That's correct.

8       Q   Again, the Groom Firm would write

9  that decision, correct?

10      A   Correct.

n.

Page 91

---

Page 92

---

:

21      Q   Where is the board-level decision

22  provided?

Page 93

24 (Pages 90 - 93)

1        A    At the meeting itself, the final

2    decision is made.

3        Q    Is there any e-Ballot that's

4    conducted by the board?

5        A    It's in the minutes by the board for

6    their decision.

7        Q    Okay.  So if we flip to

8    CLOUD-MIN-006, and I'll just read it to you, so

9    tell me if I'm wrong.  It says, "To:  Michael

10   Cloud.  On review of appeal from earlier decision

11   to award Inactive A total permanent disability

12   benefits, effective May 1, 2014, denied application

13   for reclassification to the Active Football

14   category failure to meet the requirement for Plan

15   section 5.7(b)."

16           Did I read that correctly?

17       A    Yes, you did.

13    BY MR. DENNIE:

14        Q    As it pertains to Exhibit 19 and

15    those questions, when you were listening to the

16    questions being asked by the Groom Firm, was there

17    ever any discussion about whether the board

18    discussed Mr. Cloud's application prior to casting

19    their vote?

20        A    We did not ask that line of

21    questioning.  There was no response like that.

Page 98

Page 100

1

Page 99

Page 101

26 (Pages 98 - 101)

2     Q   And I take it, from looking at

3   Deposition Exhibit 19, there was no question asked

4   of the board members specifically what the

5   information they gave to the benefits office about

6   Mr. Cloud's case prior to the drafting of this

7   letter.  Is that correct?

8     A   That's correct, that question was not

9   asked.

10     Q   And correct me if I'm wrong, but

11   there's also no information or -- requested from

12   any of the board members in the conversations that

13   were had yesterday where they were asked any input

14   that was requested of them by the Groom Firm prior

15   to the drafting of Deposition Exhibit 6.  Is that

16   right?

17     A   Yes, that question was not asked.

Veritext Legal Solutions
800-336-4000

13     Q     You testified, and correct me if I'm
14   wrong, but there's no evidence or information that
15   the board actually reviewed Exhibit 6 before it was
16   sent out, right?
17     A     That is my understanding, yes.
18     Q     And you would agree that
19   Ms. Blackburn and Mr. Cass both have legal
20   training.  Is that right?
21     A     That's my understanding, yes.

Page 106

Page 108

Page 107

Page 109

28 (Pages 106 - 109)

?

11      Q    So let me ask you a couple of

12   questions and you tell me if I'm wrong.

13           Earlier you testified you were not

14   aware of the board ever reviewing Exhibit 6 before

15   it was sent to Mr. Cloud, correct?

16      A    That's correct.

22

Page 110

Page 112

2            Are you aware or have any evidence

3    that the board reviewed exhibit -- I just butchered

4    my words.  Let me try it again.

5            Are you aware or have any evidence

6    that shows that the board reviewed Exhibit 6 after

7    it was sent out?

8       A    I do not have that evidence, no.

Page 111

Page 113

29 (Pages 110 - 113)

Page 118

Page 120

1

7       Q    Let's go one by one.

8              As it pertains to requests to receive

9    Active A football benefits, do you know the numbers

10   that was granted versus the ones that were denied?

11         A    I do not know the numbers denied.

12   And I can tell you based off of March 2021, how

13   many players are receiving Active football.

Page 119

Page 121

:

14    Q    Thirty-two players are receiving how

15    many requests for Active A benefits have been

16    denied?

17        A    I don't know have that answer.

18    Football --

Page 122

20        Q    Are there any spreadsheets or other

21    data that you all keep on total and permanent

22    disability claims that have been granted or denied?

Page 124

1        A    Historically, there is a database

2    that keeps track of a case as it goes through.  And

3    then once a decision is made, approval or denial,

4    that's acknowledged, it would have to be a -- it's

5    considered a data dump onto a chart and then it has

6    to be configured to provide that type information.

7    A database has not existed for forever --

8        Q    So there is a data -- I'm sorry.  Go

9    ahead.

10        A    I mean if you're looking for from the

11    inception of T&P, I wouldn't say that that sort of

12    database exists.  The database is relatively newer

13    in the sense that since it's after 2000 -- I

14    wouldn't even be able to say the exact year, but

15    it's after 2010, well after 2010.

16        Q    Okay.  So sometime after 2010, a

17    database was created that would show the number of

18    claims that are granted and the number of claims

19    that are denied for total and permanent benefits,

20    correct?

21        A    Yes, if you download the data, that

22    should be retrievable.

Page 123                                              Page 125

32 (Pages 122 - 125)

1      Q      And that's a document that can be
2    easily produced in a lawsuit, correct?
3            MR. MEEHAN: Well, Objection to form.
4            Can you explain that again,
5    Mr. Vincent.
6            THE WITNESS: Yes.
7            So I wouldn't be able to do it
8    right now. For example, we would he have to go
9    into the database, look at the fields to
10   determine, you know, what the request is. And
11   then from there, it would go into a massive Excel
12   sheet and then it would have to be filtered, for
13   example, approvals and denials. But that would
14   be a method to kind of get it at the end, to have
15   an overall scope.
16   BY MR. DENNIE:
17     Q      But you could run a query in your
18   database and retrieve the requested information,
19   correct?
20           MR. MEEHAN: Objection to the form.
21           THE WITNESS: We should be able to
22   run a query to get that type of information.

Page 126

1            MR. DENNIE: Counsel, was that
2    something that you guys can produce? That's the
3    first time that we heard that, too.
4            MR. MEEHAN: Well, as you know, we
5    think that has nothing whatsoever to do this
6    lawsuit, so you can send a request for it and we
7    will take it under advisement and we'll try to meet
8    and confer with you but as I understand --
9            MR. DENNIE: We already have.
10           MR. MEEHAN: It's no -- there's been
11   no meeting and conferring on that topic. As you
12   just said, that came up a moment ago. That's brand
13   new. We've had no discussion on it at all. But as
14   I understand the witness, he is talking about it is
15   a process that he could follow to create something.
16   And that sounds like a lot of work to me. So I
17   will have to get a better understanding from the
18   witness. And I would like to have that
19   understanding from you off this record as to what
20   the relevance to this case it could possibly have.
21   So that's a discussion that we would need to have.
22           MR. DENNIE: As you know, arbitrary

Page 127

1    and capricious. And I don't know why we're still
2    fighting that. It's the same request that we
3    talked about with the director's report and the
4    counsel report. The reason we don't know about
5    this stuff is because you're not giving us
6    information that's being requested.
7            So you have the data, so you've got
8    to give the data. I mean, here we are in
9    discovery depositions two weeks before the
10   discovery deadline expires and I'm learning about
11   records for the first time. I just ask you to
12   meet your duty under the rule.
13           We'll have to add that to our
14   motion to compel. This is our conferring 37, 57,
15   and 58 of the request. If you have responsive
16   information, you need to produce it. You can get
17   back to me about when it's going to be produced.
18   We've requested the director's and counsel report
19   prior to this deposition. It was not provided,
20   so we're apparently going to have to demand and
21   request more stuff. But you can get back to me.
22           MR. MEEHAN: Okay. Since you want to

Page 128

1    put it on the record, I'll just say briefly what
2    took place just now is not a meet and confer. I do
3    not know whether production of that information is
4    something that will take five minutes or five
5    years. I have no insight on it. Now is not the
6    time for me to have that discussion with
7    Mr. Vincent.
8            The director's and counsel reports,
9    we had no meet and confer of any nature. You
10   made your request, we've communicated that we
11   would get back to you. You filed a motion with
12   no meet and confer on that topic. I don't want
13   to belabor this deposition. We're not going to
14   agree right now.
15           MR. DENNIE: What are you talking
16   about?
17           MR. MEEHAN: I do not wish to belabor
18   this --
19           MR. DENNIE: We talked about it on
20   the 5th.
21           MR. MEEHAN: -- deposition -- we did
22   not.

Page 129

33 (Pages 126 - 129)

1    MR. DENNIE:  Anyway, it doesn't
2  matter.  Let's move on.
3    MR. MEEHAN:  No, sir.
4    MR. DENNIE:  We are wasting time.  I
5  don't want to hear that.
6    MR. MEEHAN:  Sir --
7  BY MR. DENNIE:
8    Q    Mr. Vincent, how long would it take
9  you to run that database query?
10    MR. MEEHAN:  Sir, he is not going to
11  answer that question until I finish my statement.
12  Please don't interpret me.
13    I have said several times I do not
14  wish to belabor this deposition.  We need to meet
15  and confer.  If you wish to ask him questions
16  now, go right ahead.  But we have tried to work
17  with you and you have never stated, to my
18  understanding, why it is relevant to know that
19  the --
20    MR. DENNIE:  I just told you it's not
21  arbitrary and capricious as the application.  And
22  that is an absolute easy one.  So okay, that's

Page 130

1  fine.  We'll move on.  If you don't want to produce
2  the record, we'll take that up with the Court.  We
3  talked about the other one at least four times.
4  BY MR. DENNIE:
5    Q    Mr. Vincent --
6    MR. MEEHAN:  Mr. Dennie, I am not
7  refusing anything.  I am saying to you --
8    MR. DENNIE:  Please stop.
9    MR. MEEHAN:  I am saying to you we
10  have not met and conferred.  Now, go ahead with
11  your deposition.  And we do whatever is
12  appropriate.  Please proceed.
13  BY MR. DENNIE:
14    Q    How long would it take to run the
15  query to determine the total and permanent
16  disability benefits that have been granted or
17  denied?
18    MR. MEEHAN:  From what time period?
19  BY MR. DENNIE:
20    Q    Answer the question.
21    MR. MEEHAN:  Objection to the form.
22  Time period is ambiguous.

Page 131

1    Do your best, sir.
2    THE WITNESS:  If there's a time
3  period provided, you would have to download the
4  information, it goes on through the Excel sheet.
5  And then have to filter out of cases by player.
6  And then, you know, you have to audit to make sure
7  that the correct information was provided.  It
8  would take time.  It would not be -- I wouldn't do
9  it right now and give it to you right now, if
10  that's the question.
11  BY MR. DENNIE:
12    Q    That is not my question.
13    A    No.
14    Q    I just want to know in your
15  experience what time would it take.  So let me go
16  back a step.  And maybe I misunderstood what you
17  your response was.
18    So was this database created in 2010
19  for all claims that have ever been filed or are
20  they only claims going forward from 2010-ish?
21    A    Going forward.  I would be more
22  comfortable saying around 2011 to 2013, just as a

Page 132

1  note.  But yes, it is for claims from the time the
2  system was created forward.
3    Q    Okay.  So the time period we're
4  talking about is somewhere after 2010, maybe 2011,
5  maybe 2012.  Is that correct?
6    A    Yes.  It was a system change, and
7  then we started putting information into that
8  system as the case went on.
9    Q    Okay.  So you understood that when
10  I'm asking you questions, it's from the date the
11  system was created to present, correct?
12    A    Correct.
13    Q    Okay.  So with that in mind, whenever
14  the system was created, whether it was '11, '12,
15  whenever, to the present, running the query to
16  determine what total and permanent benefits have
17  been granted and denied, how long would that take?
18    A    I would need several days just to
19  make sure it's correct information that's given to
20  you.
21    Q    Several days to run a database query
22  that's prepared on an Excel spreadsheet?

Page 133

34 (Pages 130 - 133)

| | |
|---|---|
| 1    A    I just want to make sure -- | |
| 2         MR. MEEHAN:  Objection to the form. | |
| 3    Misstates his testimony.  And, Mr. Dennie, I know | |
| 4    you don't realize it, but your tone has changed | |
| 5    markedly.  So please show respect in your tone, not | |
| 6    just on the written transcript.  Thank you. | |
| 7         MR. DENNIE:  Okay.  Please stop. | |
| 8    That's not an objection.  I'm just asking the guy a | |
| 9    question.  Please stop trying to make me look bad | |
| 10   on the transcript for no reason. | |
| 11   BY MR. DENNIE: | |
| 12   Q    Sir, I am just trying to get an | |
| 13   understanding.  I've run many -- when I worked on | |
| 14   college campuses, I ran many queries that are | |
| 15   similar to what you're talking about that has a lot | |
| 16   of information and it certainly never took days. | |
| 17   So I'm just trying to get an understanding for why | |
| 18   you think that it would take days to run a query to | |
| 19   determine whether T&P benefits applications were | |
| 20   grant or denied. | |
| 21   A    The system uses players by | |
| 22   application types under one umbrella.  So if | |

Page 134                                                                    Page 136

| | |
|---|---|
| 1    someone applied for line of duty and T&P, for | |
| 2    example, we would have to tease that out.  That's | |
| 3    where some of the extra work comes in.  It's not, | |
| 4    you know, John Smith applies for line of duty and | |
| 5    John Smith applied for T&P, then we have just the | |
| 6    T&P that goes forward, for example, we would have | |
| 7    to do a little teasing out to make sure that we | |
| 8    give the correct information.  That's where it | |
| 9    would just take some time, just making sure that | |
| 10   you have the right information. | |
| 11   Q    How many T&P benefits applications | |
| 12   have been filed since the database was created? | |
| 13   A    I don't have that answer. | |
| 14   Q    Give me an estimate. | |
| 15   A    I'm not sure honestly.  No idea. | |
| 16   Easily hundreds, I mean it's not thousands, since | |
| 17   the inception. | |
| 18   Q    Okay.  So there have been hundreds of | |
| 19   applications, not thousands, that has been filed | |
| 20   since the database has began, correct? | |

Page 135                                                                    Page 137

35 (Pages 134 - 137)

14      Q    And as we sit here today, you can't
15   tell me how many claims that were Active A benefits
16   have been denied.  Is that correct?
17      A    That's correct, I cannot give you the
18   decisions on Active -- well, let's just say total
19   and permanent disability as a whole, since the
20   category is determined by the committee or the
21   board.

Page 138

18      Q    Can you tell me how many claims for
19   Inactive A benefits have been denied?
20      A    I do not have that answer, no.

Page 140

Page 139

Page 141

36 (Pages 138 - 141)

3          Is there a query that can be run to
4    determine whether Inactive A benefits have been
5    granted?
6          A    Yes, there would be a category under
7    total and permanent disability.
8          Q    So in the query in the database, you
9    could take a determination if the player received
10   Inactive A or Active football benefits, correct?
11         A    Yes.

Page 142

Page 144

?

Page 143

19         Q    So the number of reclassification
20   requests from Inactive A to Active football
21   benefits is not a large number, correct?
22         A    I would agree with that, yes.

Page 145

37 (Pages 142 - 145)

15      Q    There's not a lot of requests out

16   there, as you've acknowledged, so it's not going to

17   be as a voluminous review of documentation to come

18   up with how many reclassification decisions for T&P

19   benefits have been granted or denied.  Is that

20   right?

21      A    That would be a fair statement.  It

22   could be 10, 15, it could be less than a hundred,

Page 146

1    but it would -- but I don't want to give a

2    definitive number of how many there were.  It's

3    been a some time.

t?

Page 147

Page 148

Page 149

38 (Pages 146 - 149)

1    reclassifications appeals have been granted?

2        A    I do not know that answer.

3        Q    Who are the beneficiaries under the

4    Plan?

5        A    Who are the beneficiaries?  The

6    players.

4        Q    Do you know whether more benefits

5    applications under the T&P umbrella are granted or

6    denied?

7        A    I wouldn't be able to confirm that

8    right now.

21        Q    The only way for us to get those is

22    going to be through that database that you talked

about before, correct?

1    about before, correct?

2            MR. MEEHAN:  Objection.  No

3    foundation.

4            THE WITNESS:  That would be

5    information in that database.

13            As we sit here today, you can't tell

14    me whether T&P benefits applications are granted or

15    denied two to one, three to one, four to one, five

16    to one?  You have no clue.  Is that right?

17        A    That's correct.

18        Q    Do you know how many of the T&P

19    reclassifications benefits appeals have been

20    granted?

21        A    I cannot confirm that either.

22        Q    Do you know a percentage of the T&P

10      Q     Okay.  So you would agree that the
11  players are the beneficiaries under the Plan,
12  right?
13      A     Yes.
14      Q     Who are the fiduciaries of the Plan?
15      A     Trustees.
16      Q     Who are the trustees?
17      A     At the time of Michael Cloud's case;
18  Katie Blackburn, Ted Philips, Dick Cass, Jeff Van
19  Note, Robert Smith.  Who am I forgetting here?
20      Q     Sam McCullum?
21      A     Sam McCullum.  I apologize.  Yes.
22      Q     So the board members are who you're

1  referring to as the trustees, correct?
2      A     Yes, sir.

13          Do the board members have a fiduciary
14  role or relationship to the players?
15      A     They have a fiduciary role, yes.

22

Veritext Legal Solutions
800-336-4000

Page 166

Page 168

.

7       Q    Would you agree that they have a
8    fiduciary role and the best interest of the
9    players?
10        A    Yes.

Page 169

43 (Pages 166 - 169)

.

7       Q    Of the Active football benefits that

8   have been provided, how many of those are related

9   to concussion symptoms or syndrome?

10      A   I don't have an answer to that at

11  all.

--

22  during the quarterly board meeting, there's

Page 170

1  acknowledgment of how many players are receiving a

2  benefit and which ones at that time.

3      Q   Would that be in the minutes?

4      A   Would it be in the minutes?  I can't

5  confirm that.  I believe it would be but...

6      Q   Okay.  If you'll flip to Exhibit 12.

7      A   Okay.

8      Q   Do you see that indicated anywhere?

9      MR. MEEHAN:  Hang on one second.  He

10  needs to get the exhibit binder.

11      MR. DENNIE:  Okay.

12      MR. MEEHAN:  It's just a little

13  further down the table.

14      THE WITNESS:  Thank you.

15      MR. MEEHAN:  Okay.  He's got it.

16      THE WITNESS:  No, that is not in the

17  minutes provided to you -- or by you, I should say.

18  BY MR. DENNIE:

19      Q   Those were provided to me, not by me,

20  just so we're clear.

21      A   Okay.

22      Q   So where in the minutes should that

Page 171

1  have been?

2      A   Maybe with the director of plan book.

3  It goes over the amounts, it may have been the

4  retirement board discussion.  I couldn't confirm

5  where that discussion, what happens.  But that's --

6      Q   So let me -- I didn't really hear the

7  first part.  You said something about a director's

8  plan or something to that effect.  What is that?

9      A   Well, when the director of the Plan

10  Benefit Office reports on the allocation of money

11  that goes out on disability, it is acknowledged who

12  is receiving the benefit -- I'm sorry, the number

13  of players receiving a certain benefit and which

14  ones.

15      Q   Okay.  And for some reason I'm having

16  a little more trouble hearing you right now, so, I

17  mean, if you could speak up a little bit.

18      A   Yeah.

19      Q   And let me tell you what I heard and

20  tell me if I'm wrong.  Did you say that that's

21  something that the director of the Plan stands up

22  and says or is that a document that's presented?

Page 172

1  That's why where I didn't hear you.

2      A   Both.  There is a document that has

3  the amounts, the number of players, and it's also

4  expressed during the meeting itself.

5      Q   Is that the director's report?

6      A   Yes.  Sorry if I called it director's

7  plan.

8      Q   So the director's -- I'm sorry.  I

9  cut you off.  Can you say that again?

10      A   Yeah.  I called it the director plan

11  book.  It would be the director's report.

12      Q   Okay.  So when you say director's

13  plan book and director's report, those are the same

14  thing, correct?

15      A   Yes, plan director's report.

16      Q   If I heard you correctly, those are

17  prepared quarterly for the board meeting.  Is that

18  right?

19      A   That's correct.

.

Page 173

44 (Pages 170 - 173)

16          You would agree that there are

17    executive sessions that the board of directors hold

18    to discuss disability applications.  Is that right?

19          A   Yes.  I would say the Players

20    Association meets with themselves, as would council

21    meets with themselves to discuss cases.

22          Q   Did you ask any of the members of the

1    board about any executive decisions they held as it

2    pertains to Mr. Cloud's application?

3          A   I did not.  And I do not recall

Veritext Legal Solutions
800-336-4000

Page 226

Page 228

1

15      Q    You would agree that the Plan office
16   directed Mr. Cloud to see Dr. Mandelbaum, correct?
17      A    For his line of duty examination,
18   yes, sir.
19      Q    So if your counsel e-mailed me and
20   said that Mr. Cloud was directed to Dr. Mandelbaum
21   by someone other than the Plan, that would be
22   incorrect, right?

Page 227

Page 229

58 (Pages 226 - 229)

1          A    Correct, Rose Mary Eves was a Plan
2    coordinator -- I'm sorry, worked with the Plan
3    office to schedule examinations.
4          Q    You would agree that Mr. Cloud is
5    entitled to any records from his evaluation from
6    Dr. Mandelbaum, correct?
7          A    Yes, sir.

Page 230

Page 232

Page 231

Page 233

 9             What are the sources of medical
10    records for players who are submitting applications
11    for disability benefits?
12        A    Multiple sources.  If the player has
13    his own personal physicians, they can submit those
14    records any time after football -- before football.
15    And when I say "football," I'm talking about NFL.
16    And any other CFL, anything like that, they can
17    submit those records.  When it comes to NFL, the
18    player can contact the last club that they played
19    for and they should have their most recent team
20    records, as we've been calling them, team records.
21        Q    What else?
22        A    There is a repository, from my

Page 234

 1    understanding, I believe it's called EMR
 2    repository.  That came into play after the 2011
 3    CBA.  And from my understanding, the players would
 4    have had to have been playing in 2011 to be part of
 5    that system and forward.
 6

Page 235

Page 236

Page 237

60 (Pages 234 - 237)

16      Q    And you would agree that ERISA

17   requires the Plan to produce records in its

18   possession or control if requested by a player.  Is

19   that right?

20          MR. MEEHAN:  Objection.  Calls for a

21   legal conclusion.

22          THE WITNESS:  Yes, sir.

Page 266

Page 268

1          MR. DENNIE:  It's in his affidavit,

2   so I guess I could make the same objection.

3   BY MR. DENNIE:

4      Q    You can answer.

5      A    Yes, a request would be given -- if a

6   player requests his records and we have them on

7   file, we would hand them over.

8      Q    And those requested records includes

9   records maintained by your Plan physicians, right?

10     A    Yes, sir.

11     Q    You would expect a player should have

12   access to all of the records from Plan physicians,

13   correct?

14     A    Any record that we have on file, we

15   would hand over to the player, yes, sir.

Page 267

Page 269

68 (Pages 266 - 269)

Page 270

Page 272

        :

3     Q   Mr. Cloud requested his records.

4   Some of those were from Plan physicians.  Those

5   scans and records were not produced, correct?

6     A   Those x-ray films were not produced

7   for Mr. Cloud, that's correct.

8     Q   They were produced for the first time

9   in July of 2021, right?

10    A   Yes, sir.

16     Q   Dr. Canizares had some films and

17  scans, right?

18     A   Yes, from his 2011 evaluation, I

19  think.

Page 271

Page 273

69 (Pages 270 - 273)

o

Page 274

Page 276

1

1

15        You would agree that the Department
16   of Labor regulations require the Plan to turn over
17   medical documents that are requested by a player,
18   correct?
19        A    Yes, sir.

Page 275

Page 277

.

16        Q    Are you aware of any training,
17   whether you were there or not, where the board was
18   trained on the Plan document?
19        A    I also cannot confirm.

:

7        Q    So my question was more -- the second
8   set of questions, and tell me if you didn't
9   understand it, but your awareness of whether you
10   were there or not, that the board was trained on
11   the Plan document?
12        A    Am I aware if they were?  I'm not
13   aware if they were or not.

Veritext Legal Solutions
800-336-4000

6        Q    Are you aware of any training that

7    the board received pertaining to neurological

8    issues incurred by former NFL players?

9        A    No, sir.

Page 294

Page 296

Page 295

Page 297

1    Q    Just for clarity of the record, in
2    2020, Inactive A benefits were 135,000, and the
3    Active football benefit was 265,000.  Is that
4    correct?
5    A    Yes.
6    Q    What was the difference in the
7    amounts of the Inactive A versus Active football
8    benefits in 2019?
9    A    I believe they were the same amount,
10   sir.
11   Q    So, again, that's 135,000 for
12   Inactive A and 265,000 for Active football
13   benefits?
14   A    Yes, sir.
15   Q    Same question for 2018.
16   A    Same response; 135 for Inactive A,
17   and 265 for Active football.
18   Q    How about 2017?
19   A    Same response, sir.
20   Q    How about 2016?
21   A    I believe it was 120 -- 120,000 for
22   Inactive A.  And I don't recall the exact amount

Page 318

Page 320

1    for Active football, I believe it was 250,000, sir,
2    but I may be off.
3    Q    How about 2015?
4    A    It would have been the same as 2016.
5    Q    So that's 120 for Inactive A and
6    250,000 for Active football benefit?
7    A    Yes.
8    Q    What about 2014?
9    A    Same amount, sir.
10   Q    And just so the record's clear, the
11   amount would be 120,000 for Inactive A and 250,000
12   for Active football benefits, correct?
13   A    Yes, sir.
14   Q    What about 2013?
15   A    I believe it's the same.  But I'm
16   starting to get into territory that I don't have
17   the numbers in front of me, if there were any
18   changes in 2011 CBA that changed the amounts and
19   there was schedule for those amounts.
20   Q    Okay.  So once we get below 2014,
21   you're not certain what the difference between
22   Inactive A and Active football benefits are.  Is

12   Q    Do you know what the difference
13   between Inactive A and Active football benefits are
14   from 2021?
15   A    Yes, sir.
16   Q    What's that amount?
17   A    Inactive A is 135,000 a year,
18   Inactive football is 265,000 a year.
19   Q    What was the difference in the two
20   amounts in 2020?
21   A    I believe they were the same amount,
22   sir.

Page 319

Page 321

81 (Pages 318 - 321)

1   that correct?

2      A   Right.  I believe between 2011 and --

3   between '11 and '15, it was the 120,000 and

4   250,000, and then 2016 had the increase.  Prior to

5   2011, was a different CBA, and I don't recall those

6   amounts, sir.

7      Q   So let me just make sure I have down

8   what I think you're saying.  So from 2011 to 2016,

9   Inactive A benefit is 120,000 and Active football

10   benefits was 250,000, correct?

11      A   I believe that is correct.

12      Q   From 2017 to present, Inactive A

13   benefits is 135,000, and Active football benefits

14   is 265,000, correct?

15      A   For the 2011 -- I believe it was

16   between 2011 and 2015.  In the 2016 year, is the

17   change over increase.  So 2016 to present is the

18   135, 265 amounts.

19      Q   Okay.  So let me go through it again.

20   So from 2011 to 2015 --

21      A   Yes.

22      Q   -- the Inactive A benefit is 120,000

1   and the Active football is 250,000, correct?

2      A   I believe so.

3      Q   So 2016 to present, the Inactive A

4   benefit was 135,000, and the football Active

5   football benefit was 265,000, correct?

6      A   Yes, sir.

7      Q   So if my math serves me correctly,

8   the difference between the two from 2011 to 2021,

9   is $130,000, correct?

10     A   Yes, sir.

11     Q   Okay. So what I just heard you say,
12 you didn't come up with the definition of changed
13 circumstances, correct?
14     A   That's correct, sir.
15     Q   You said the parties did, correct?
16     A   Yes, they interpret the Plan rules.
17     Q   Who from the parties sat down and
18 came up with the definition of changed
19 circumstances?
20     A   I'm not sure, sir.

Page 334

Page 336

7   BY MR. DENNIE:
8     Q   My question was not what you
9 interpret the Plan to be saying. My question is:
10 Is changed circumstance, as referenced in 5.7(b),
11 defined anywhere in The Plan?
12     A   I do not see that in The Plan,

Page 335

Page 337

85 (Pages 334 - 337)

22

5        Q    Would you agree that it's important
6    that the committee and board provide the same
7    definition of clear and convincing in all cases?
8        A    Yes, it needs to be clear and
9    convincing.
10       Q    Would you agree that it's important
11   that the committee and the board provide the same
12   definition of changed circumstance in all cases?
13       A    Between the committee and the board,
14   they should agree.
15       Q    So is that yes?
16       A    Yes, sir.

Page 342

Page 344

Page 343

1

9      BY MR. DENNIE:
10          Q     So back to my question.  Is there
11     anyone other than the Groom Law Firm who can answer
12     that question?
13              MR. MEEHAN:  Objection to the form.
14              THE WITNESS:  No, sir.  I don't know
15     who you can ask.

Page 345

87 (Pages 342 - 345)

20      Q    Is there any location that you can
21   direct me to where there are written
22   interpretations of how the language in The Plan

Page 350

1   documents have been applied?
2      A    No, sir, I don't have anywhere to
3   point you to.

Page 351

Page 352

Page 353

89 (Pages 350 - 353)

Page 366

Page 368

1

Page 367

13    BY MR. DENNIE:
14       Q   You're not aware of that circumstance
15    because the letters are never submitted to the
16    committee prior to being sent to the player,
17    correct?
18       A   Correct, sir.

Page 369

Veritext Legal Solutions
800-336-4000

14        Q    And you testified earlier, and
15    correct me if I'm wrong, but a new concussion
16    symptom is a change in circumstance, correct?
17              MR. MEEHAN:  Objection.  Misstates
18    testimony.
19              THE WITNESS:  It could be a change of
20    circumstances.  It could.

,
Page 370

Page 372

1

Page 371

Page 373

17    BY MR. DENNIE:

18        Q    Well, I guess what I'm trying to

19    understand, from the Plan perspective, you want the

20    board and the committee to interpret those terms

21    changed circumstance to mean the same thing, right?

22        A    Yes, that's what we would like.

Page 374

.

20        Q    Sure.

21            Was the March 2nd, 2016 denial of

22    reclassification provided to the committee prior to

Page 376

Page 375

1    it being sent out?

2        A    I do not believe so, no.

3        Q    That's just not the policy of the

4    Plan to give the people that decided the case the

5    opportunity to read the written decision before

6    it's sent to the player.  Is that correct?

7        A    Yes.

8        Q    Flip over to Exhibit 6 for me.

9        A    November 23rd, 2016 letter.

10        Q    Is this the decision made by the

11    board on Mr. Cloud's reclassification request?

12        A    Yes, sir.

13        Q    Do you know who wrote this letter?

14        A    I would say I believe this is drafted

15    by Groom Law Group when it came to our Plan office.

22        Q    Was Exhibit 6 submitted to the board

Page 377

95 (Pages 374 - 377)

1   for review prior to being sent to Mr. Cloud?

2        A    No, sir, I do not believe that was

3   the case.

Page 378

.

Page 380

1

1    BY MR. DENNIE:

2        Q    My question was not about the Groom

3   Law Firm being present at that meeting.

4            My question to you was, whether you

5   were aware of any notes being provided to the Groom

6   Law Firm by the board members to help draft this

7   letter that's marked Exhibit 16?

8        A    No, I'm not aware of any notes

9   provided to the Groom Law Group.

10       Q    Are you aware of any conversations

11  that the board members had with the Groom Law Firm

12  to help them draft this letter that's marked as

13  Exhibit 6?

14           MR. MEEHAN:  Objection.  Asked and

15  answered.

16           THE WITNESS:  No, sir, I'm not.

17  BY MR. DENNIE:

18       Q    Have you reviewed this letter

19  thoroughly?

20       A    I looked at it for this deposition,

21  sir.

22       Q    So obviously I haven't deposed the

Page 379

Page 381

Veritext Legal Solutions
800-336-4000

1   180-day stops when the committee receives -- let me
2   ask it again.
3        12.6(a) does not say that it has to
4   be received by the Plan office on day 180, correct?
5        MR. MEEHAN:  Objection.  Calls for a
6   legal conclusion.
7        THE WITNESS:  I would say the
8   claimant has 180 days from the time they receive
9   their decision to file an appeal.
10  BY MR. DENNIE:

1

21       Q    Wouldn't it start from the day
22  following --

1        A    No, sir.
2        Q    -- like every other computation of
3   dates that's used in the world?
4        MR. MEEHAN:  Objection.  No
5   foundation.
6        THE WITNESS:  From the day of
7   receipt.  As written in the Plan language,
8   "Claimant will have 180 days from the receipt of an
9   adverse determination."
10  BY MR. DENNIE:

1

Page 390

1

11    BY MR. DENNIE:
12        Q    Okay.  I just want to be clear.  I'm
13    not -- I understand you're saying this is what the
14    document is.  But I'm saying, do you have a
15    document showing Mr. Cloud's signature stating he
16    received that record on March 4th?
17        A    I do not have that, sir.  I don't
18    have a picture of his signature, sir.
19        Q    Is that a document that you could
20    obtain?
21        A    Honestly, I don't believe so, sir.
22    FedEx does not keep records that long.  I don't

Page 392

1    know how to retrieve a record that old.

Page 391

Page 393

99 (Pages 390 - 393)

Page 402

12      Q    Okay.  Can you tell me why Elise
13  Richard of the Plan is communicating with members
14  of the Groom Firm about Mr. Cloud's application in
15  2016?
16      A    This would be part of his appeal, as
17  I understand it.  Groom Law Group was creating
18  appeal summaries, and in this moment when
19  Mr. Cloud -- I'm sorry, Mr. Cloud acknowledged
20  sending in documents with his appeal, those
21  documents seemed to be missing.  So I understand
22  that Elise and Natallia went back to Mr. Cloud

Page 404

1

Page 403

1  asking, "Are there documents you wish to submit
2  with your appeal?"
3

Page 405

102 (Pages 402 - 405)

# APPENDIX 2

```
 1              IN THE UNITED STATES DISTRICT COURT
 2        FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION
 3        ---------------------------
          MICHAEL CLOUD,              :
 4                                    :
              Plaintiff,              :
 5                                    :   Civil Action No.:
          vs.                         :
 6                                    :   3:20-CV-01277-E
          THE BERT BELL/PETE ROZELLE  :
 7        NFL PLAYER RETIREMENT PLAN, :
                                      :
 8            Defendant.              :
          ---------------------------
 9
10                DEPOSITION OF PATRICK C. REYNOLDS
11        DATE:          August 4, 2021
12        TIME:          9:11 a.m. to 5:26 p.m.
13        LOCATION:      Groom Law Group
                         1701 Pennsylvania Avenue
14                       Suite 1200
                         Washington, D.C. 20006
15
16        REPORTED BY:  Felicia A. Newland, CSR
17
18
19
20                   Veritext Legal Solutions
                1250 Eye Street, N.W., Suite 350
21                   Washington, D.C. 20005
22


                                             Page 1
```

Page 26

Page 28

1

| 16 | Q | Do you have any legal training? |
| 17 | A | I don't. |
| 18 | Q | Do you have any medical training? |
| 19 | A | No. |

Page 27

Page 29

Page 30

?

Page 32

1

13     Q     You don't have a legal license?

14     A     I do not.

15     Q     You don't have a medical license?

16     A     No.

Page 31

Page 33

9 (Pages 30 - 33)

Page 74

?

Page 76

1

6         Q   So you were consistently employed

7     with the NFL from 2009 until 2017, when you left to

8     go work for PRM Consulting, correct?

9         A   Correct.

Page 75

Page 77

20 (Pages 74 - 77)

s
Page 86

Page 88

1

1

11        Q    In those documents that you have
12    access to through this portal or website, have you
13    ever seen any memos prepared by the Groom Law Firm?
14        A    I have.
15        Q    Okay.  What is the nature and reason
16    for the Groom Law Firm to prepare memos?
17        A    It's a summary of the case.

Page 87

Page 89

1

11         Q   In your training to be on the
12   committee, did you ever review any medical articles
13   on concussions and associated head injuries?
14         A  I did not, no.
15         Q   In your training to be on the
16   committee, did you ever review any orthopedic
17   injuries that are commonly associated with NFL
18   players?
19         A   Not that I can recall, no.

Page 90

1

.
Page 92

Page 91

1

Page 93

Veritext Legal Solutions
800-336-4000

.

17          Q    You don't review medical journal
18    articles or other medical analysis for orthopedic
19    injuries commonly associated with NFL players,
20    correct?
21          A    Correct.

Page 94

Page 96

18          Q    You have no legal training, correct?
19          A    I do not.
20          Q    You have no medical training,
21    correct?
22          A    I do not.

Page 95

Page 97

25 (Pages 94 - 97)

Page 98

Page 100

Page 99

```
21        Q    So, I mean, is the answer that you
22   haven't gathered any information on head injuries
```
Page 101

26 (Pages 98 - 101)

1  incurred by players who have formerly played in the
2  NFL?
3      A   Personally?  No, I have not.
4      Q   You told me before you haven't
5  received any training about head injuries incurred
6  by players who had formerly played in the NFL,
7  correct?
8      A   Correct.
9      Q   Have you read any white papers on
10  head injuries incurred by players who have formerly
11  played in the NFL?
12      A   I can't recall, no.
13      Q   I believe you testified before, but
14  correct me if I'm wrong, because the language is
15  little bit different, you haven't reviewed any
16  studies performed as it relates to head injuries
17  incurred by players who formerly played in the NFL,
18  correct?
19      A   Not that I can recall, correct.
20      Q   Have you personally conducted any
21  research on head injuries that were incurred by NFL
22  players at any time?

Page 102

1

.

Page 104

1      A   I have not.
2

8      Q   You would agree that you held a
9  pretty important role in determining whether
10  someone was entitled to disability benefits based
11  on head injuries, correct?
12      A   That's correct.

Page 103

Page 105

27 (Pages 102 - 105)

1

Page 110

9        Q    Have you reviewed any studies on
10    orthopedic injuries commonly incurred by players
11    who played in the NFL?
12        A    Not that I can recall.
13        Q    Have you reviewed any white papers on
14    orthopedic injuries that are commonly incurred by
15    players who formerly played in the NFL?
16        A    Not that I can recall.
17        Q    Have you received any training on
18    orthopedic injuries incurred by players who
19    formerly played in the NFL?
20        A    Not that I can recall.

Page 112

1

Page 111

22

Page 113

Veritext Legal Solutions
800-336-4000

Page 114

Page 116

```
 4       Q    Were you on the committee
 5   consistently from sometime in 2013 until
 6   approximately January 2021?
 7       A    Yes.
 8       Q    During your time on the committee,
 9   with whom did you serve?
10       A    Chris Smith.
11       Q    Was Ms. Smith on the committee the
12   entire time you were on the committee?
13       A    She was.
```

Page 115

```
17       Q    Who appointed you?
18       A    The Management Council of the NFL.
```

?

Page 117

30 (Pages 114 - 117)

 9        Q    You were appointed to serve on the
10     committee by the Management Council, correct?
11        A    Correct.

Page 122

Page 124

1

Page 123

Page 125

32 (Pages 122 - 125)

1        And you said the Player Benefits
2    Office provides some statistics.  Can you give me a
3    better understanding of what that is?
4        A    So the report that I'm recalling has
5    a pie chart with the amount of monies spent on
6    pension, disability, the breakout of the different
7    types of disability, number of claims processed,
8    things of that nature.
9        Q    So you said that was in a form of a
10   pie chart?
11       A    Yeah, that's the one I'm thinking of
12   right now.

Page 150

.

Page 152

1

1

10       A    Not specifically, no.  The Plan
11   director, for example, has a report, which shows
12   some statistics on a quarterly basis; monies spent,
13   claims processed, things like that.
14       Q    When you say the director, who are
15   you referencing specifically?
16       A    The current director is Mike Miller.
17       Q    What is Mike Miller's title
18   specifically, if you know?
19       A    I believe he's director of --
20   director of the Player Benefits Office.  I don't
21   know his specific title.
22       Q    Okay.  Fair enough.

Page 151

Page 153

Veritext Legal Solutions
800-336-4000

1

3      A    They provide updates in their counsel
4   report of any current or prior litigation, any
5   updates to the Plan documents, any amendments that
6   need to be made, any drafts of forms subject to
7   party approval, things like that.
8      Q    So is it your understanding that the
9   Groom Law Firm is who drafted the Plan document?
10      A    I believe that they were the primary
11   drafter of the document, yes.

1

3          Okay. Is there a repository of

4     medical information that the NFL keeps on players?

5          A Not that the NFL keeps, no. There is

6     an electronic medical records site that players

7     have access to, but that's outside of my knowledge.

8     I -- I don't -- I don't think that the NFL

9     maintains it necessarily.

12          Q    You know there is a repository of

13     information, correct?

14          A    That's correct.

2          Q    And the reason that there is such a

3     repository of information is so when a player goes

4     from Team A to Team B, the records can be accessed

5     and transferred easily, correct?

6          A    That seems to make sense, yes.

7          Q    And you said you worked with the NBA

8     and the NHL.  They have similar platforms, correct?

9          A    I don't know that.

1

the NFL owes to players,

?

22       retired players?

1

6        Q    But I believe you testified that a

7    decision would be rendered and sent via e-mail,

8    correct?

9        A    Yes, that's correct.

17       Q    As an employee of the NFL, do you

18   have any duty to retired players?

19       A    As part of my job function?

20       Q    Yes, sir.

21       A    Yes.

43 (Pages 166 - 169)

.

3          Q    Do you review the decision letter
4     before it's sent out?
5          A    Typically, no.

Page 174

1

Page 175

Page 176

.

Page 177

45 (Pages 174 - 177)

9        Q    Yeah.

10              So we've established that you're

11    aware that there's a medical repository of

12    information where the teams compile information and

13    put it in a platform, correct?

14        A    That's correct.

.

Veritext Legal Solutions
800-336-4000

3        Q    Have you reviewed any studies about
4    CTE?
5        A    I can't recall that I have.

Page 182

1

Page 184

Page 183

Page 185

47 (Pages 182 - 185)

.

11        Q    How many disability claims have been

12   presented to you during your time on the committee?

13        A    I don't have a specific number.

14        Q    Give me an estimate.

15        A    Roughly a thousand a year.

16        Q    You said there are various statistics

17   that are presented at these board meetings.  Do you

18   have the statistics on what percentage of claims

19   are granted?

20        A    I don't.  I have access to the

21   statistics.  I believe they're on the Plan

22   director's report.

1        Q    Okay.  So the Plan director's report?

2        A    I believe so.  I may be -- the number

3   of claims that come through and the number of

4   claims that are decided is on that.  I believe it

5   includes percentage of approvals and denials, but I

6   might be mistaken.

7        Q    How often does the Plan director

8   report come out?

9        A    Quarterly, for the board meetings.

10        MR. DENNIE:  Is that something that

11   you all can give us since -- I mean, I don't have

12   our request here, but that's certainly responsive

13   to probably more than one of our requests for

14   production.

15        MR. MEEHAN:  I'll take it under

16   advisement and circle back to you.

17        MR. DENNIE:  Let me know as soon as

18   you can.  We're running out of time for discovery.

19        MR. MEEHAN:  If you can direct us to

20   a particular request you've made, that would be

21   helpful.  You can do that offline when you have an

22   opportunity.

1        MR. DENNIE:  Yeah, I don't have them,

2   but that's a certainly responsive document or

3   documents.

4   BY MR. DENNIE:

5        Q    All right.  So you believe that you

6   presided over approximately a thousand disability

7   applications a year during your tenure, correct?

8        A    I think that's fair, yeah,

9   thereabouts.

10        Q    Where we would find the percentage of

11   claims that were granted, would be in the Plan

12   director's report that's done quarterly.  Is that

13   correct?

14        A    I believe so.

15        Q    And the same question as to the

16   claims that were denied.  There would be a

17   percentage of claims denied showing the Plan

18   director's report that gets prepared quarterly.  Is

19   that correct?

20        A    I believe -- I believe so.  That may

21   not be the case.  It may just show the number of

22   claims.

22        I missed part of it.

51 (Pages 198 - 201)

1

Page 202

Page 204

Page 203

22          Q    What's the time period for

Page 205

1    neurological symptoms to show for concussion

2    syndrome?

3        A    I do not -- I don't know.

1

8          Q     Have you ever seen a definition of
9     "clear" and "convincing" as it pertains to a
10    disability benefits application?
11         A     If it's not a defined term in the
12    Plan document, I cannot recall there being a
13    definition.

Page 214

Page 216

1

Page 215

Page 217

Page 218

21    BY MR. DENNIE:

22    Q   So earlier, you told me that you were

Page 220

1   aware that concussion syndrome and associated

2   ailments can occur instantly and it can occur down

3   the road, correct?

4    A   That's my understanding.

17    Q   Active football T&P benefits are

18   benefits that occur from injuries while playing

19   professional football, correct?

20    A   Yes.  As a result of NFL Football,

21   yes.

22

Page 219

17    Q   In your eight years or so on the

18   committee, are you aware of any player who had

19   concussions while competing, but had symptoms that

20   showed up five, six, seven, eight years later

21   receiving active football T&P benefits?

22    A   I can't recall.

Page 221

56 (Pages 218 - 221)

1       Q    So it's important that I understand.
2   You're saying that's no or you just don't recall
3   any case?
4       A    I don't recall.  It may have
5   happened, it may not have happened.
6       Q    Where would we be able to obtain that
7   information?
8       A    I'm not sure.  The Player Benefits
9   Office is the administrator of disability and
10  retirement claims, so they have access to all the
11  records.

Page 222

1

Page 224

Page 223

.
15      Q    So who defined this language "changed
16  circumstances" as a new injury?
17      A    It was put into practice by the
18  initial claims committee and by the board.  I'm not
19  sure that any specific person came up with the
20  definition on their own.
21      Q    So as we sit here today, you don't
22  know who came up with that language?

Page 225

57 (Pages 222 - 225)

1          A   I don't know.

2          Q   Was it in place prior to you serving

3   on the committee?

4          A   I can't recall.

5          Q   Were you a part of creating this

6   definition that you now say exists of a new injury

7   for reclassification for those cases?

8          A   I can't recall.

9          Q   Who would know who defined that?

10         A   I don't know.

11         Q   You don't have a clue who would know

12   where we would find how that term came to be

13   defined?

14         A   I don't know.  The Plan's been around

15   for a long time.

16         Q   Do you know when the changed

17   circumstance language first appeared in the Plan

18   documents?

19         A   I don't know.

Page 226

13         Q   In your time on the committee, can

14   you recall a single circumstance where a

15   reclassification request was granted for a football

16   player who showed some signs of concussion

17   syndrome, but later had many, many more signs,

18   five, six, seven, eight years down the road?

19         A   I can't recall.

Page 227

Page 228

Page 229

1       THE WITNESS:  Well, I will read it.
2    "An Eligible Player whose application for total and
3    permanent disability ("T&P") benefits is received
4    before January 1, 2015, who is determined by the
5    Retirement Board or the Initial Claims Committee to
6    be totally and permanently disabled, will receive a
7    monthly T&P benefit."
8        And I left some out, but that's --
9    generally that's what I understand it to mean.
10   BY MR. DENNIE:
11       Q    Do you understand Mr. Cloud to meet
12   the requirements of Section 5.1?
13       A    Yes.  Without seeing his specific
14   situation, but yes.
15       Q    I'm sorry.  You said without
16   something?
17       A    Yes.  Yes, he meets that definition.
18       Q    Okay.  Do you know in what way
19   Mr. Cloud was able to show that he was
20   permanently -- totally and permanently disabled --
21   do you know in what way Mr. Cloud was able to show
22   he was totally and permanently disabled?

1       A    From my review before today, he
2    submitted a Social Security work letter.
3        Q    Okay.  What section applies to that?
4        A    Section 5.2(b).
5        Q    You don't have to read the whole
6    thing, but if you know based on looking at it, what
7    is the requirements to meet Section 5.2(b)?
8        A    That a player is not currently
9    receiving his pension, he's an eligible player, and
10   he's receiving a disability benefit through the
11   Social Security Administration.
12       Q    And is your understanding that
13   Mr. Cloud was considered by the Social Security
14   Administration to be totally and permanently
15   disabled?
16       A    That's my understanding.

1

Page 234

15      Q    From your knowledge, and you've read
16  back through the files, is there any evidence that
17  Mr. Cloud received concussions or other head
18  injuries anywhere other than playing in the NFL?
19      A    Not that I recall.

Page 236

Page 235

5      Q    So you don't have any reason to
6  dispute that the concussion syndrome that Mr. Cloud
7  experiences is from his playing in the NFL,
8  correct?
9      A    Without looking into the specifics,
10  again, the details here, I don't believe so.  I
11  don't recall though.
12      Q    And my question was a little bit
13  different.
14      A    Okay.
15      Q    You don't have anything to dispute
16  that, that you're aware of?
17      A    I do not have --
18      MR. MEEHAN:  Objection.  Lacks
19  foundation.
20      Go ahead.
21      THE WITNESS:  I do not, no.
22

Page 237

60 (Pages 234 - 237)

|  |  |
|---|---|
|  | 1   while playing in the NFL to receive Active Football |
|  | 2   benefits if he has a delayed onset of symptoms for |
|  | 3   four, five, six, seven, eight years?  Is it |
|  | 4   possible? |
|  | 5         MR. MEEHAN:  Objection.  Incomplete |
|  | 6   hypothetical. |
|  | 7         Go ahead and answer. |
|  | 8         THE WITNESS:  It's a hypothetical |
|  | 9   situation. |
|  | 10  BY MR. DENNIE: |
|  | 11       Q    It is not. |

Page 238 | Page 240

.

18   BY MR. DENNIE:
19       Q    Anyway, so you were on the committee
20   for eight years.  I'm asking your experience.  This
21   is not a hypothetical.  In your experience, is it
22   possible for a player who receives concussions

Page 239 | Page 241

61 (Pages 238 - 241)

17          Q     In Section 5.7(b) of Exhibit 1, is

18    also where we see the changed circumstances

19    language.  Do you see that?

20          A    I do.

21          Q     Do you see where it is defined

22    anywhere?

1          A     Yeah, again, it's not a capitalized

2    term, so I would have to assume it's not defined.

3          Q     Now that you've had an opportunity to

4    review this, does that refresh your memory on who

5    defined the term "changed circumstances"?

6          A     I don't know who defined the term,

7    but the practice that has been in place for the

8    committee and for the board is that a changed

9    circumstance is a new or different impairment.

10          Q     What do you mean by "impairment"?

11          A     A new injury, a new condition.

Page 246

6       BY MR. DENNIE:
7           Q   I'm not asking you to opine on
8       medical terminology.  I'm asking you a simple
9       question based on your experience, and you have
10      said you've reviewed thousands of cases, okay?
11              In your experience in reviewing these
12      cases where concussion syndrome has been indicated
13      as the reason for the need for benefits, you would
14      agree that the symptoms change over time, correct?
15              MR. MEEHAN:  Objection.  Asked and
16      answered.  Same objection.
17      BY MR. DENNIE:
18          Q   You can answer.
19          A   Conditions do change, yes.

Page 247

Page 248

10      BY MR. DENNIE:
11          Q   Anyways, so let's focus on the
12      question.
13              In your experience on the committee
14      reviewing thousands of records of medical
15      documentation, which I would assume because you've
16      said many of them are concussion cases, those
17      symptoms can be much worse later down the road,
18      correct?
19          A   Conditions do change, sure.  Yes.

?

Page 249

63 (Pages 246 - 249)

.

6          Q    Do you ever do a write-up or analysis

7     of the medical records yourself?

8               A    I do not.

19              Do you do a written analysis of the

20    medical records that are presented?

21              A    I do not.

Page 270

Page 272

1

1

.

9          Q    And by granting Inactive A benefits,

10    you're agreeing that Mr. Cloud meets the disability

11    requirement per the Plan documents, correct?

12              A    That's correct.

Page 271

Page 273

3       Q    I would have to ask the members of

4    the board what they did to make their

5    determination, correct?

6       A    That's correct.

1       Q    I believe you said vertigo and memory

2    loss are symptoms that you know.  Is that correct?

3       A    That's correct.

4       Q    As we sit here after going through

5    today, do you recall any additional symptoms that

6    you would consider concussion syndrome symptoms?

7       A    No.

8       Q    How about trouble sleeping?

9       A    Yes, it may be.  I'm not a medical

10   professional or --

11      Q    I'm not asking you as a medical

12   professional, but you review thousands of

13   applications and you've seen thousands of medical

14   records, correct?

15      A    That's correct.

16      Q    Have you seen trouble sleeping as one

17   of the symptoms associated with concussion

18   syndrome?

19      A    I've seen it alleged in applications

20   sure, yes.

21      Q    I take it you've also seen vertigo

22   and memory loss because you cited those yourself,

1  correct?

2      A    Correct.

3      Q    How about forgetting simple things?

4  Forgetfulness?

5      A    Yes, memory loss and forgetfulness.

6      Q    So, for example, if Mr. Cloud

7  couldn't remember a simple running back sweep play,

8  would that be something that would fall into a

9  concussion syndrome symptom?

10         MR. MEEHAN:  Objection.  Lacks

11  foundation.  Calls for expert testimony.

12         Go ahead.

13  BY MR. DENNIE:

14      Q    You can answer.

15      A    If he's forgetting what he needs to

16  do for his job, I think it may, but I don't know.

17      Q    Well, I don't want to assume.

18         Do you know what a sweep play is in

19  football?

20      A    I do.

21      Q    I take it for anybody that's ever

22  watched football, that's one of the most common

Page 282

1  running plays there is, right?

2      A    It's common.

3      Q    So for a running back, if he's played

4  running back his entire life, to forget one of the

5  very most common plays in his job, that would be a

6  fair thing to think of as a concussion-related

7  symptom, correct?

8         MR. MEEHAN:  Objection.  Lacks

9  foundation.

10         THE WITNESS:  It may be.  I don't

11  know.

12  BY MR. DENNIE:

13      Q    What about headaches, is that a

14  common neurological symptom for concussion

15  syndrome?

16         MR. MEEHAN:  Same objection.

17         THE WITNESS:  It may be.  I don't

18  know.

19  BY MR. DENNIE:

20      Q    I want to be clear, I'm asking on the

21  premise that you reviewed thousands of

22  applications, thousands of medical records, and

Page 283

1  you're the one charged with determining these

2  claims, correct?

3      A    I am.  In my job of determining the

4  claims, I am relying on medical experts to tell me

5  whether or not a player is disabled.  And my job is

6  just to administer the terms of the Plan based on

7  the evaluations of those medical professionals.

8      Q    Okay.  So in your experience with all

9  of that information for -- headaches are a common

10  symptom that you see presented as concussion

11  syndrome?

12      A    It's a common allegation on

13  applications, yes.

14      Q    Is sensitivity to light a common

15  symptom presented for concussion syndrome?

16      A    Yes.

17      Q    Is paranoia a common symptom for

18  concussion syndrome that's presented to you?

19      A    It may be.  I don't know.

20      Q    You've never seen paranoia?

21      A    I don't know that I recall a player

22  saying it's because of concussion syndrome.  I know

Page 284

1  that the player can put on the application symptoms

2  of disability, but I can't say for certain that

3  they're specifically relating to concussions.

4      Q    Is lack of focus a symptom of

5  concussion syndrome that's commonly submitted for

6  disability benefits?

7      A    It may be, yes.

8      Q    Is suicidal thoughts a common symptom

9  of concussion syndrome that's presented in

10  disability applications?

11      A    You said common -- they can be

12  submitted on disability applications, yes.

13      Q    How about failure to grasp reality,

14  is that a common symptom that's presented through

15  concussion syndrome on disability applications?

16      A    Again, not necessarily related to

17  concussions, but I've seen it on applications,

18  sure.

19      Q    How about failure to maintain

20  employment, is that a byproduct that you have seen

21  commonly on disability applications pertaining to

22  concussion syndrome?

Page 285

72 (Pages 282 - 285)

1      A    They wouldn't be applying for total
2  and permanent disability if they could maintain
3  employment.
4      Q    Right.
5      A    But I don't know that's specifically
6  relating to concussion symptoms.
7      Q    How about depression, is that a
8  commonly presented symptom of concussion syndrome
9  that you have seen presented in disability
10 applications?
11     A    I've seen depression on disability
12 applications.
13     Q    How about migraine headaches, are
14 those commonly associated symptoms of concussion
15 syndrome that you've seen in disability
16 applications?
17     A    I've seen it on disability
18 applications.
19     Q    How about dementia or pre-dementia,
20 are those common symptoms that you've seen
21 associated with concussion syndrome presented on
22 disability applications?

Page 286

1  is that a common symptom of concussion syndrome
2  that's been presented on disability applications?
3      A    Again, maybe not related to
4  concussion syndrome, but it's been presented on
5  disability applications.
6      Q    How about moods swings, is mood
7  swings a common symptom of concussion syndrome
8  that's been presented on disability applications?
9      A    Same answer.
10     Q    Is that yes?
11     A    Same answer as the last time.  Maybe
12 not related to concussion syndrome, but I've seen
13 it presented on disability applications.

Page 288

1      A    Again, maybe not related to
2  concussion syndrome, but I've seen it on disability
3  applications, yes.
4      Q    What other ways would dementia be
5  presented?
6      A    Family history.
7      Q    They can get disability based on
8  family history?
9      A    Yes, they would.  It does not need to
10 be tied back to NFL Football.
11     Q    So that would be the Inactive
12 Nonfootball-type disability benefits, correct?
13     A    It --
14     Q    Or it could be Active Nonfootball?
15     A    That's hypothetical, but it's
16 possible, sure.
17     Q    How about trouble maintaining verbal
18 fluency, has that been a topic that you've seen
19 presented in concussion applications?
20     A    I've seen it presented on disability
21 applications, yes.
22     Q    How about unpredictable irritability,

Page 287

Page 289

73 (Pages 286 - 289)

18        Q    Can injuries to shoulders, elbows,

19   wrists, feet, ankles, knees, hips, can all those

20   things qualify as permanent disabilities?

21        A    Orthopedic injuries can, yes, qualify

22   for total and permanent disability, sure.

Page 292

20        BY MR. DENNIE:

21        Q    You would agree that concussions have

22   been a huge issue in the NFL for now over ten

Page 290

1    years, as more information has become available,

2    correct?

3            MR. MEEHAN:  Objection to the form.

4    Asked and answered.

5            THE WITNESS:  Head injuries are

6    important, and are, yes, something that we need to

7    be made aware of.

8    BY MR. DENNIE:

?

Page 291

Page 293

74 (Pages 290 - 293)

10          Q    So based on what you recall from

11    reviewing your record, were you aware of anything

12    or any time where Mr. Cloud was injured other than

13    his time playing in the NFL?

14          A    Not that I'm aware of.

Page 294

Page 296

Page 295

Page 297

10      Q    When you reviewed this neurological
11  report from Dr. DiDio, did you receive a full copy
12  of the report?
13      A    I can't -- I can't say specifically.
14      Q    Is there any reason that Mr. Cloud
15  wouldn't have ever been provided a full copy of his
16  report until 2019?
17      A    That Mr. Cloud be provided a full
18  copy of this report?
19      Q    Right.
20      A    No, there should not be any reason
21  for that.

Page 302

Page 304

1

12  BY MR. DENNIE:
13      Q    You assume.
14          And in looking at Dr. DiDio's report,
15  do you see that Mr. Cloud complained of vertigo and
16  headaches?
17      A    Yes, I see that.
18      Q    And you see at the bottom of 174 on
19  Exhibit 2, where Mr. Cloud mentions that he started
20  forgetting small things, correct?
21      A    I see that, yes.
22      Q    So now you've recently reviewed all

Page 303

Page 305

77 (Pages 302 - 305)

Veritext Legal Solutions
800-336-4000

1

12        Q    Okay.  So we just talked about the
13    line of duty benefits back in 2010, correct?
14        A    Correct.
15        Q    And there were some references to
16    small memory loss, there were some references to
17    vertigo, there were some headaches, correct?
18        A    Yes, correct.

19    BY MR. DENNIE:
20        Q    So is an impairment, a new one, a
21    change in circumstance?
22        A    A new impairment may be a changed

1    circumstance, yes.

.

5        Q    And now with Exhibit 3, we're seeing
6    for the first time migraines, post-concussion
7    syndrome, clinical depression, impaired verbal
8    fluency, and dementia pugilistica.  Do you see
9    that?
10       A    I do.
11       Q    You would agree that those weren't
12   previously listed on the application for Exhibit 2,
13   correct?
14       A    I did not see the application in
15   Exhibit 2, but I --
16       Q    I apologize.  I said "application."
17   But in the medical records --
18       A    In the medical records, in
19   Dr. DiDio's report, no, I did not see that.

Page 310

Page 312

3        Q    So Items 7 through 21 on Exhibit 3,
4    CLOUD-AR-096, includes everything from shoulder,
5    elbow, wrists, hands, fingers, toes, feet, ankles,
6    knees, hips, lumbar, cervical and thoracic spine,
7    acute compartment syndrome, plantar fasciitis, and
8    a nerve injury, correct?
9        A    It does, yes.
10       Q    So many of these are newer injuries,
11   correct -- or newer symptoms, correct?
12       A    As compared to the line of duty
13   application?
14       Q    Correct.
15       A    Yes.
16       Q    And many of them are listed in both,
17   correct?
18       A    I don't see the application for line
19   of duty, but --
20       Q    And if I said "application," that's
21   my fault.  I'm saying the medical reports that are
22   behind Exhibit 2, correct?

Page 311

Page 313

79 (Pages 310 - 313)

.

5        Q    Okay.  In your review of anything
6    submitted as it pertains to Mr. Cloud's Exhibit 3
7    total and permanent disability benefits
8    application, did you review any medical scans?
9        A    Not that I recall.
10       Q    Were there any medical scans that
11   were contained in the administrative file?
12       A    Not that I recall, no.

Page 314

Page 316

18       Q And you know from reading it that it
19   takes into account both neurological and orthopedic
20   injuries, correct?
21       A Yes, it appears so.

Page 315

Page 317

80 (Pages 314 - 317)

3        Q    And if he wasn't provided with his
4    records, including his medical scans, he wouldn't
5    be able to provide them to his own medical
6    professionals, correct?
7        A    That's logical.

.

12       Q    Okay.  Is there any reason for the
13   first time Mr. Cloud's medical scans from
14   Dr. Canizares were presented on July 29, 2021?
15       A    Doctor who?  I'm sorry.
16       Q    I apologize if I said his name
17   incorrectly, but he's the one that did the --
18       A    Oh, Canizares?
19       Q    Yes, however you say that.
20       A    Can you repeat your question?  I'm
21   sorry.
22       Q    Is there any reason that Mr. Cloud's

1    scans from Dr. Canizares would not be presented
2    until July 29 of 2021?
3        A    Presented to whom?
4        Q    Mr. Cloud.
5        A    No, there should be no reason if he
6    requested those.
7        Q    Do you know a Dr. Mandelbaum?
8        A    I don't know him personally, no.
9        Q    Do you know that he was a Plan
10   neutral?
11       A    I believe so.  I -- I can't recall
12   the terms of when he left, but I'm familiar with
13   the name just generally.
14       Q    If he did scans of Mr. Cloud, is
15   there any reason those documents wouldn't be
16   provided to Mr. Cloud?
17       A    If they were ordered by the Plan, no,
18   and he requested them, no, he should have access to
19   those records.

.

9          Q     They were not in the line of duty

10    claim, correct?

11          A     I'm sorry.  Again, I didn't see the

12    line of duty application, but --

13          Q     But you have the medical reports.

14          A     Medical reports, right, mention, I

15    believe, vertigo and headaches, we determined, and

16    forgetfulness.

17          Q     And you would agree that down there

18    in the disabilities and causes, there are new

19    symptoms?

20          A     It appears so, yes.

21          Q     And we've discussed before symptoms

22    can be impairments, correct?

Page 322                                          Page 324

1          A     I mean, they could be,

2     hypothetically.

Page 323                                          Page 325

82 (Pages 322 - 325)

.

11        Q    So you would agree a new impairment

12    would be an impaired verbal fluency, for example?

13             MR. MEEHAN:  Objection to the form.

14    BY MR. DENNIE:

15        Q    It's your word.  It's literally the

16    same verbiage.

17        A    Yes.  So a new impairment -- this is

18    the first time we're seeing this impairment in

19    Mr. Cloud's --

Page 326

Page 328

.

9     BY MR. DENNIE:

10        Q    You would agree that impaired verbal

11    fluency is an impairment, correct?

12             MR. MEEHAN:  Objection to the form.

13             THE WITNESS:  I would agree that it's

14    an impairment, yes.

15    BY MR. DENNIE:

Page 327

Page 329

Veritext Legal Solutions
800-336-4000

1

3        Q    I believe you testified earlier, but
4    I want to confirm, you did not write Exhibit 4,
5    correct?
6        A    That's correct.

22       Q    So we'll flip to CLOUD-AR-284 in

1    Exhibit 4.  And let me know when you're there.
2        A    Yes, I'm here.

84 (Pages 330 - 333)

Veritext Legal Solutions
800-336-4000

1    at this document?

2        A    I don't recall.

3        Q    Do you know anybody that provided

4    advice to you as it pertains to Exhibit 3?

5        A    No.

6        Q    Do you know whether Elton Banks

7    provided any advice to you?

8        A    No.

9        Q    So other than your conclusion that

10   Mr. Cloud didn't meet the terms of shortly after,

11   as defined in the Plan, you can't give us any more

12   details on how you arrived at that conclusion.  Is

13   that correct?

14       A    Yeah, that's correct.

15       Q    All right.  Go to 5, please.

16       A    Okay.

17         (Reynolds Deposition Exhibit Number 5

18           marked for identification.)

19   BY MR. DENNIE:

20       Q    What is Exhibit 5?

21       A    It is a request for reclassification.

22   It also contains a new application request dated

Page 336

1    February 14th, 2016.

2

19       Q    Did you make a single change to this

20   document?

21       A    Not that I recall.

22       Q    Do you know whether you even looked

Page 335

Page 337

Page 334

85 (Pages 334 - 337)

4        Q    How about affective disorder, is that
5    a new condition?
6            A    It may be.

22

.

4        Q    So earlier, you testified that a
5    change in circumstance can occur with a new
6    impairment.  Do you recall that?
7            A    Yes.
8        Q    What do you define as an impairment?
9            A    A new injury or a new condition.
10       Q    Okay.  And a new condition can be a
11   symptom of concussion syndrome, correct?
12           A    It possibly could.

1

10       Q    You would agree that affective
11   disorder, which is a clinically defined condition,
12   is a new impairment or condition that does not
13   appear in Exhibit 3, correct?
14           A    It's a new allegation, sure.
15       Q    "Attention and decision problems," do
16   you see that?
17           A    I do.
18       Q    Is that included in Exhibit 3
19   anywhere?
20           A    Not on the application form, no.

.

15          Q    Now it's severe, significant memory

16    loss, correct?

17          A    Okay.  Yes.

18          Q    That's different, right?

19          A    Yes.

Page 342

Page 344

.

10          Q    And then now on Exhibit 5, two years

11    later, there are now even additional conditions and

12    impairments that are referenced, correct?

13          A    They're alleged, but yes.

Page 343

Page 345

87 (Pages 342 - 345)

:

5  Q You, yourself, did not make the

6  decision that is shown in Deposition Exhibit 6,

7  right?

8    A No.  This was a final decision made

9  by the retirement board.

13  Q The people that voted on the decision

14  made by the retirement board are going to be the

15  people that know what was discussed, correct?

16    A I assume so, yes.

20  BY MR. DENNIE:

21    Q So who made the decision on

22  Mr. Cloud's reclassification request, the ultimate

1  decision?

2    A The final decision on his

3  reclassification request was made by the retirement

4  board.

5    Q I'm sorry.  I didn't hear you.

6    A I'm sorry.  The final decision of his

7  reclassification request was made by the retirement

8  board.

9

1  Q Did you read Mr. Cloud's Social
2 Security benefits application -- excuse me.
3  Did you -- I'm reading "application"
4 on the page and said it.  I'm sorry.
5  Did you read Mr. Cloud's decision
6 from the Social Security Administration?
7  A I did, yes.
8  Q And did you read that in your prep
9 and review for today?
10  A Yes, I looked at it.
11  Q You would agree -- and I can point
12 you to it if you didn't see it.  It starts at
13 CLOUD-AR-299, Exhibit 7.
14  A 299, Exhibit 7.  Okay.
15  Q And you would agree in here it lists
16 out both orthopedic and neurological conditions,
17 correct?
18  A Yes, it does.

Page 354

Page 356

Page 355

Page 357

Veritext Legal Solutions
800-336-4000

Page 358

--

Page 360

1

Page 359

12        Q    Flip to 484, CLOUD-AR-484, of Exhibit

13   7.

14        A    Okay.

15        Q    What is this document?

16        A    This is a summary of the player's

17   request for reclassification.  It was presented to

18   the board at that same meeting.

19        Q    Do you know who prepared this

20   document?

21        A    I believe it was Groom Law Group.

Page 361

1      Q    I don't disagree with you, but I
2  don't know what they did or didn't do.
3      A    Yeah, I don't either.
4      Q    And the only way for me to figure
5  that out is to talk to the people that made these
6  decisions, correct?
7          MR. MEEHAN:  Objection.  Asked and
8  answered and legal conclusion.  I believe that's
9  the fourth time you've asked that.
10  BY MR. DENNIE:
11      Q    We're talking about specific
12  documents and what they reviewed.
13      A    I don't know how the -- how the board
14  came to their decision.

Page 364

12          If the committee decides against
13  granting Mr. Cloud's reclassification request, does
14  the board conduct its own independent review?
15      A    Yes, they do.
16      Q    Are you aware of anything they did?
17      A    I am not, no.
18      Q    Are you aware of whether they just
19  rubber-stamped the decision of the committee and
20  said denied and moved on?
21      A    I don't believe that they would
22  fulfill their fiduciary duties if they did that.

Page 363

(

Page 365

1

1    after his applications were filed?

2         A    I don't know.

9    BY MR. DENNIE:

10        Q    Can you flip to Exhibit 11?

11        A    Okay.

12        Q    It's marked as CLOUD_193.

13        A    Got it.

14        Q    Why was it that Hannah Coffman of the

15   Groom Law Firm was the one that presented Mr. Cloud

16   with access to his files?

17        A    I don't know.  She's the

18   administrative assistant, so I assume that was

19   within her duties.

20        Q    Why didn't the Plan just give him his

21   files?

22        A    I don't know.

1         Q    How did the Groom Law Firm get ahold

2    of Mr. Cloud's files?

3         A    I don't know.

4         Q    Are you aware of Mr. Cloud giving any

5    authority to the Groom Law Firm to hold his medical

6    documents?

7         A    Not to my knowledge.  I don't know.

16        Q    Do you have any reason to understand

17   why on January 18th, 2019 the Groom Law Firm

18   produced 860 pages of records?

19        A    I do not, no.

20        Q    Do you know why there was an

21   approximately 330-page difference in the number of

22   records that was submitted to Mr. Cloud three years

1    Q   Were you in attendance for this
2  meeting?
3    A   It appears that I was not.
4    Q   I know you said you weren't in
5  attendance, so I just want to make sure we're on
6  the same page.  And when you're saying you weren't
7  in attendance, you weren't in person, correct?
8    A   Correct.
9    Q   Did you appear by phone by chance?
10   A   Not to my recollection.
11   Q   So earlier when we were talking about
12 the board's decision of Mr. Cloud's 2016
13 reclassification decision, and you said you
14 believed you were there, these minutes reflect
15 apparently you were not, correct?
16   A   That's correct.
17   Q   So you have absolutely no idea what
18 happened at the November 15th, 16th, 2016 board
19 meeting, correct?
20   A   Aside from what I read in these
21 meeting minutes and the counsel report, no, I don't
22 know what took place.  No.

Page 384

1    Q   So if I asked you what was said about
2  Mr. Cloud's case, you wouldn't have a clue,
3  correct?
4    A   I do not know.
5    Q   Is that correct?
6    A   Yes, that's correct.

14   Q   I just want to flip over to Exhibit
15 12, CLOUD_MIN_005.
16   A   Okay.
17   Q   Are you there?
18   A   I am.
19   Q   What do you understand this to be?
20   A   These appear to be the meeting
21 minutes for the November 2016 Retirement Board
22 meeting.

Page 383

Page 385

97 (Pages 382 - 385)

19      Q    Do you know how much money is used to
20   fund the Plan?
21          A    No, I don't.
22          Q    I know we talked earlier about how

1

1   much money was paid out in a given year by the
2   Plan.  Now that we've gone through all of this, and
3   you've refreshed your memory, do you know how much
4   money has been paid out in any given year?
5          A    No, I don't.
6          Q    Do you know if funds are not used to
7   pay disability benefits, what happens to them?
8          A    No, I don't.
9          Q    Are you involved in any way in what
10   expenses are paid by the Plan?
11          A    No, I'm not.

98 (Pages 386 - 389)

Veritext Legal Solutions
800-336-4000

Page 390

Page 392

Page 391

4        So earlier, we were talking about

5    disability claims and percentages and things like

6    that. And you said you don't have them, correct?

7        A That's correct. I don't maintain

8    that.

9        Q So the best place to get that

10    information would be from the Plan directly,

11    correct?

12        A Yes, I believe so.

18        Q    Have you ever reviewed research or

19    studies that showed that three out of ten former

20    NFL players resigned early due to neurodegenerative

21    disease?

22        A    Not to my recollection, no.

Page 393

99 (Pages 390 - 393)

1    Q   Have you ever been educated on that
2  topic?
3    A   Not to my recollection, no.
4    Q   Have you ever read any of
5  Dr. Bennet Omalu's research on CTE?
6    A   Not to my recollection, no.
7    Q   Have you ever been educated on
8  Dr. Bennet Omalu's research on CTE?
9    A   Not to my recollection, no.
10   Q   Did you read the 2019 study led by
11 Boston University in Annals of Neurology?
12   A   Under what? I'm sorry.
13   Q   Annals of Neurology?
14   A   Not to my recollection, no.
15   Q   Have you ever read a study that
16 indicates three or more concussions have a fivefold
17 prevalence of mild cognitive impairment?
18   A   Not to my recollection.
19   Q   Do you know what mild cognitive
20 impairment is?
21   A   It's -- the medical diagnosis of it,
22 I assume, you're asking?

Page 394

1    Q   I'm not asking you to be a medical
2  doctor or have a great in-depth knowledge of
3  everything associated with it, but what I'm asking
4  is are you familiar with that term?
5    A   I am familiar with the term, yes.
6    Q   Do you know generally what it means?
7    A   Generally, yes.
8    Q   What do you understand it to mean?
9    A   The inability to focus, memory
10 issues, things of that nature.
11   Q   Do you know what Second Impact
12 Syndrome is?
13   A   No, I don't.
14   Q   For a player who's submitting
15 applications for disability benefits, do you
16 believe it's important for a CTE scan to be
17 conducted on them?
18   A   Not necessarily. It may be.
19   Q   Why not?
20   A   The player is encouraged to submit
21 his documents as he requests that scans take place,
22 but if he's not alleging that, then, no, it

Page 395

1  shouldn't take place.
2    Q   But you would agree that the Plan and
3  the committee itself has the ability to request
4  that the player go see a neutral physician, right?
5    A   Yes, I agree.
6    Q   And if they do go see a neurologist,
7  would you expect that the neurologist would order a
8  CTE scan?
9        MR. MEEHAN: Objection. No
10 foundation.
11       THE WITNESS: I wouldn't expect a
12 neurologist to do anything. He's the neurologist,
13 so he can do what he wants to to come up with his
14 determination of whether or not a player is
15 disabled or not.
16 BY MR. DENNIE:
17   Q   Okay. Well, I understand you're
18 saying, "Hey, neurologist, do your thing." But I
19 decide a lot of cases, too, maybe not in this
20 world, but you see documents come in and you go,
21 "Why didn't they do this?"
22       Do you ever have a circumstance where

Page 396

1  you review a neurological report and say, "He
2  didn't even have him sit for a CTE"? Sorry. I
3  just butchered that again.
4        Do you ever look at a neurological
5  report from a doctor and say, "He didn't even have
6  him sit for a CTE exam"?
7    A   Not to my recollection, no.
8    Q   Do you think it's important for
9  athletes who are suffering from concussion syndrome
10 to be seen by a neurologist that submits them to an
11 MRI?
12       MR. MEEHAN: Objection. Speculation.
13       THE WITNESS: It's up to the
14 neurologist. I'm not sure.
15 BY MR. DENNIE:
16   Q   Same question as it pertains to EEGs.
17 Do you believe that those are important for you to
18 review on the committee deciding disability
19 benefits applications?
20   A   I don't believe so.
21       MR. MEEHAN: Same objection to all of
22 these questions.

Page 397

100 (Pages 394 - 397)

Page 398

6        Q    Have you reviewed any studies that

7    indicate the average onset of CTE symptoms is 42.8

8    years?

9        A    Not to my recollection, I have not.

10        Q    We talked about this a little before,

11    but have you seen studies that have indicated that

12    CTE symptoms may not show up for eight to ten years

13    after retirement?

14        A    No, not to my recollection.

15        Q    Are you saying those don't exist or

16    you just haven't read it?

17        A    I haven't read it.

Page 399

Page 400

1    BY MR. DENNIE:

2        Q    Have you ever reviewed the 2019

3    study, "Chronic Traumatic Encephalopathy in

4    Athletes:  Progressive Tauopathy After Repetitive

5    Head Injuries"?

6        A    Not to my recollection.

7        Q    Have you reviewed the 2017 study,

8    "Clinicopathological Evaluation of Chronic

9    Traumatic Encephalopathy in Players of American

10    Football"?

11        A    Not to my recollection.

Page 401

101 (Pages 398 - 401)

14        Q    Sure.

15            We've gone through all these very

16    important studies that people in the sports world,

17    and specifically in football, have looked at and

18    discussed in great detail as it pertains to

19    concussion syndrome.  You have indicated you have

20    not reviewed any of them, correct?

21        A    I can't recall that I have, no.

Veritext Legal Solutions
800-336-4000

Page 418

Page 420

     .

2     BY MR. DENNIE:

3     Q   But you would agree that the purpose

4  of the Plan, as it pertains to disability benefits,

5  is to fund disabled players, right?

6      That's the purpose?

7     A   The purpose is that -- yes, that

8  disabled players receive monies that they are

9  entitled to based on the terms of the Plan, yes.

Page 419

Page 421

Veritext Legal Solutions
800-336-4000

1    Cloud, Michael v. The Bert Bell/Pete Rozelle NFL Player
2    Patrick Charles Reynolds (#4745148)
3                    ACKNOWLEDGEMENT OF DEPONENT
4        I, Patrick Charles Reynolds, do hereby declare that I
5    have read the foregoing transcript, I have made any
6    corrections, additions, or changes I deemed necessary as
7    noted above to be appended hereto, and that the same is
8    a true, correct and complete transcript of the testimony
9    given by me.
10
11   _____          9/3/2021
12   Patrick Charles Reynolds                          Date
13   *If notary is required
14                       SUBSCRIBED AND SWORN TO BEFORE ME THIS
15                       _____ DAY OF _____, 20___.
16
17
18                       _____
19                       NOTARY PUBLIC
20
21
22
23
24
25

                                                    Page 430

# APPENDIX 3

```
 1            IN THE UNITED STATES DISTRICT COURT
 2    FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION
 3    --------------------------
      MICHAEL CLOUD,              :
 4                               :
           Plaintiff,            :
 5                               :  Civil Action No.:
      vs.                         :
 6                               :  3:20-CV-01277-E
      THE BERT BELL/PETE ROZELLE :
 7    NFL PLAYER RETIREMENT PLAN,:
                                 :
 8         Defendant.            :
      --------------------------
 9
10            DEPOSITION OF CHRISTOPHINE SMITH
11    DATE:         August 5, 2021
12    TIME:         8:01 a.m. to 4:55 p.m.
13    LOCATION:     Groom Law Group
                    1701 Pennsylvania Avenue
14                  Suite 1200
                    Washington, D.C. 20006
15
16    REPORTED BY:  Felicia A. Newland, CSR
17
18
19
20
                    Veritext Legal Solutions
21          1250 Eye Street, N.W., Suite 350
                    Washington, D.C. 20005
22
```

Page 1

1  the role of the commissioner on the board?

2      A    The commissioner acts as the chairman

3  of the retirement board.

4      Q    Does he have a vote?

5      A    No.

Page 22

.

Page 24

Page 23

Page 25

.

11      Q    What time period did you serve on the

12 committee?

13      A    I have served on the committee since

14 its inception, which I believe was in 2006.  And I

15 still serve on the committee.

16      Q    So you served on the committee from

17 2006 to the present.  Is that correct?

18      A    Correct.

19      Q    Do you know on a statistical basis

20 how many disability claims have been granted versus

21 denied?

22      A    I do not.

Page 26

.

15      Q    Okay.  So if I was trying to

16 determine when benefits were provided and that case

17 granted or denied, where would I find that

18 information?

19      A    You'd probably find that from the

20 Plan Benefit Office.

21      Q    Okay.  Yesterday there was some

22 testimony about quarterly reports prepared by the

Page 28

?

Page 27

1 claim benefits office?

2      A    Yes, for the retirement board meeting

3 purposes.

4      Q    Have you seen those records?

5      A    Yes.

6      Q    In your experience, are they prepared

7 every quarter?

8      A    Yes.

9      Q    So that's something that the Plan can

10 get its hands on pretty easy I would think,

11 correct?

12      A    I would think so.

17           How do you receive documentation for

18 board meetings?

19      A    They are included in the counsel

20 report.

21      Q    Okay.  Tell me what a counsel report

22 is.

Page 29

8 (Pages 26 - 29)

1        A     The counsel report is the information
2    that Groom Law Group compiles for the retirement
3    board meeting.
4        Q     So the quarterly report, is that an
5    attachment to the counsel report?
6        A     It is in the counsel report -- a part
7    of the counsel report.
8        Q     And I just want to be clear on how it
9    gets there.  So you're familiar with the Plan or
10   the retirement board -- let me do that another way.
11            So you're familiar with the
12   retirement board -- let me do that again.  Today, I
13   can't talk.  It's something about the air.
14            You're familiar that the retirement
15   board compiles statistical information on whether
16   claims are granted or denied, correct?
17       A     The Claim Benefit Office compiles
18   that information.
19       Q     What did I say?  I said the
20   retirement board?
21       A     Yeah, you did.
22       Q     Okay.  I'm sorry.

1            The Plan Benefit Office compiles
2    granted versus denied disability applications,
3    correct?
4        A     Yes.
5        Q     And that's a document that we should
6    be able to get our hands on pretty easily, correct?
7        A     I would think so.
8        Q     As it relates to funding of the Plan,
9    are there documentation, records, that you have
10   seen that indicates how much funding goes out on a
11   quarterly basis?
12       A     I believe that is in the counsel
13   report as well.
14       Q     So that's also information that's
15   compiled by the retirement -- excuse me.  Let me
16   ask it again.
17            That's also information that's
18   retirement -- that's also information that's
19   compiled by the Benefits Office, correct?
20       A     Yes.

8            Are you saying the information that
9    we just talked about, the granting or denial of
10   benefits claims, the funding of claims, that's not
11   in the counsel report, but it's in a director's
12   report?
13            Is that what you're saying?
14       A     Correct.

18       Q     Okay.  When you say director's
19   report, what director are you referencing?
20       A     The Plan director.

9 (Pages 30 - 33)

1  focused on the deposition today.  I'll respond to
2  you as soon as possible.

7  BY MR. DENNIE:
8      Q     So I want to be clear, I can't ask
9  you too many questions about documents I've never
10  seen, but you and the witness yesterday both
11  confirmed that there are records that discuss the
12  funding of the Plan and whether benefits were
13  granted or denied.  And you said they're in a
14  director's report, correct?
15      A     To the best of my knowledge, yes.
16      Q     Are you aware of what the contents of
17  those director's reports say?
18          Let's start with the last quarterly
19  report that you indicated probably would be in
20  February of this year?
21      A     No, I don't remember.
22      Q     Do you remember the contents of the

12          MR. DENNIE:  So I'm going to again
13  request that those reports be provided.  I
14  requested it yesterday.  There are multiple
15  requests for production that have asked for records
16  similar to that, and I believe that was 37, 57, 58,
17  there's probably more.  When are we going to get
18  those documents?  We requested those probably nine
19  months ago.
20          MR. MEEHAN:  If you're directing that
21  to me, you know, send me a request.
22          MR. DENNIE:  We did nine months ago.

Page 34

Page 36

1          MR. MEEHAN:  Well, send me a request
2  now telling me what you want and why you think
3  you're entitled to it.  And like I said yesterday,
4  we'll take it under advisement and we'll get right
5  back to you.  I want to make sure I know exactly
6  what you want, so if you can put it in writing so
7  there's no confusion.
8          MR. DENNIE:  Well, just to be clear,
9  we're already on the record.  So we're asking for
10  the director's report, the quarterly reports that
11  have been testified to by both of the witnesses
12  that have been withheld that were requested in our
13  first request for production many, many months ago.
14  And discovery is running out and now I'm deposing
15  witnesses and I don't have these report documents.
16  When can I get those?
17          I know you're new to the case, you
18  probably didn't handle that, but your colleague
19  has been in the whole time, so I need to know
20  when we can have them.  Can we have them today?
21          MR. MEEHAN:  I need you to send me a
22  written request on exactly what you want.  I'm

Page 35

1  director's report for any quarter prior to the last
2  report that you reviewed?
3      A     I don't remember.
4      Q     The only way that I'm going to be
5  able to determine what's in those records is by
6  getting the records, because neither you or
7  Mr. Reynolds recalled the contents of the report,
8  other than you know that there's discussion of
9  funding, and there's a discussion of granting and
10  denial of benefits.  Is that right?
11      A     Correct.
12      Q     Do you know how many claims go to
13  appeal to the board on a percentage basis?
14      A     I don't know.
15      Q     Is that included within the
16  director's report?
17      A     I would think so.
18      Q     If I asked you the same questions
19  about whether you recall the contents of the
20  director's report related to appeals of disability
21  benefits applications, would you give me the same
22  answer, that you don't recall the contents of any

Page 37

10 (Pages 34 - 37)

1   director's reports?

2          A     I'm sure I would.

8          Q     Who are the beneficiaries under the
9   Plan?
10         A     Who are the beneficiaries under the
11  Plan?
12         Q     Yes, ma'am.
13         A     The players.
14         Q     What was the Plan created to do?
15         A     The Plan was created to provide
16  retirement and disability benefits for the players.

Page 38

7          Q     Are you aware of any steps that the
8   Plan administrator has taken to reduce bias?
9          A     I'm not aware.
10         Q     Are you aware of any steps that the
11  Plan administrator has taken to promote the
12  accuracy of the decisions?
13         A     I'm not aware of any.

Page 40

Page 39

Page 41

11 (Pages 38 - 41)

12  communications about the interpretation of the Plan

13  guidelines with Bethany Marshall and Miki

14  Yaras-Davis oral conversations?

15      A    As I recall, yes.

16      Q    Did they orally ever give you their

17  analysis to certain provisions of the Plan?

18      A    Yes.

19      Q    Okay.  Do you recall what their

20  analysis was?

21      A    No.

1

3      Q    Who on the committee represents the

4  interest of retired NFL players?

5      A    I do.

6      Q    So your duty is to represent the

7  interest of the retired NFL players on the

8  committee, correct?

9      A    Correct.

10      Q Who on the board represents the

11  interest of retired NFL players?

12      A The NFLPA designee.

13      Q Okay. So it's your understanding

14  that the NFLPA designees have a duty to retired

15  players in their role on the board?

16      A Correct.

1

3        So if we go down about halfway down
4    the page, there it says, "NFLPA designated members:
5    Sam McCullum, Jeff Van Note, Robert Smith."
6            Did I read that correctly?
7        A    Correct.
8        Q    So when we were talking a minute ago
9    about the members of the board that owe a duty to
10   the retired players, are those these three
11   individuals?
12       A    Correct.

Page 70

1

Page 72

1

?

Page 71

1

Page 73

Veritext Legal Solutions
800-336-4000

Page 78

Page 80

Page 79

.
4       Q    You do not have a law license?
5       A    No.
6       Q    You don't have a medical license?
7       A    No.
8

Page 81

Veritext Legal Solutions
800-336-4000

8      Q     Right before we broke to get you a

9   glass of water, you were indicating that if a

10   player called you about their disability benefits

11   application and indicated they had not received

12   their records, you would direct them to the Plan,

13   correct?

14      A     Uh-huh.

15      Q     The Plan being you would direct them

16   back to the benefits office?

17      A     Correct.

18      Q     Is that the kind of standard approach

19   the Players Association, if a player calls and

20   says, "I'm not receiving my records," go to the

21   retirement office to get those?

22      A     Correct.

Page 102

Page 103

Page 104

Page 105

Veritext Legal Solutions
800-336-4000

.

  9    Q    Have you received any legal training

10  to help you decide and analyze disability claims?

11     A    Now, when you say "legal training,"

12  what do you mean by that?

13     Q    Training about laws and cases.

14     A    You said training about laws or

15  cases?

16     Q    And cases.

17     A    And cases.

18         Not that I recall.

Page 114

Page 116

Page 115

Page 117

8      Q    Do you understand when symptoms can
9  occur from head injuries that resulted from playing
10  in the NFL?
11      A    Yes.
12      Q    What do you understand?
13      A   I understand that they can occur
14  right away or they can take a number of years --
15  months or years to manifest, surface.
16

Page 122

Page 124

Page 123

.

18      Q    Do you have any reason to dispute
19  that Mr. Cloud has incurred and received head
20  injuries while playing in the NFL?
21      A    No, I don't have any reason to
22  dispute that.

Page 125

32 (Pages 122 - 125)

1      Q     Do you have any reason to dispute
2 that Mr. Cloud has had symptoms associated with
3 concussion syndrome while playing in the NFL?
4      A    I don't have any reason to dispute
5 that.
6      Q     You would agree that concussion
7 symptoms can worsen over time?
8      A    Yes, I know that they can worsen over
9 time.

Page 126

Page 128

Page 127

Page 129

33 (Pages 126 - 129)

Page 142

?

Page 144

Page 143

.

14          Have you read any studies on
15 orthopedic injuries sustained by players who have
16 formerly played in the NFL?
17       A   Not that I recall.
18       Q   Have you read any white papers on
19 orthopedic injuries commonly sustained by NFL
20 players?
21       A   Not that I recall.
22       Q   Have you done any personal research

Page 145

37 (Pages 142 - 145)

1  on orthopedic injuries that are commonly incurred
2  on players who formerly played in the NFL?
3      A    Not that I recall.

.

Page 146

Page 147

Page 148

Page 149

Veritext Legal Solutions
800-336-4000

5       Q    And if you flip to CLOUD-MIN-004, it

6   indicates it's a denial of reclassification request

7   from Mr. Cloud, correct?

8       A    Correct.

.

10      Q    Is there a repository of

11   interpretations that are provided to the Plan

12   document?

13      A    A repository of interpretations?

14      Q    Correct.

15      A    You said of the Plan document?

16      Q    Correct.

17      A    Not to my knowledge.

.

12          Are you aware anywhere that someone
13    can go and see what interpretations of the Plan
14    have been applied in years past?
15          A    No, I am not.

Page 162

Page 164

.

14          Q    Okay.  So in your 15 years on the
15    committee, you have asked for between 10 and 50
16    interpretation requests of Article 5, Deposition
17    Exhibit 1, correct?
18          A    That's correct in that's what I said.

.

Page 163

Page 165

42 (Pages 162 - 165)

Page 170

Page 172

```
1      Q    So is it fair to say you were not
2   present in person or by phone on the November 15th,
3   16th, 2016 meeting?
4      A    That is correct.
```

Page 171

```
15         You indicated that the board decided
16   Mr. Cloud's appeal, his request for
17   reclassification, correct?
18      A    Correct.
19      Q    The members on the board who made
20   that decision were Katie Blackburn, Dick Cass, Ted
21   Philips, Sam McCullum, Jeff Van Note, and Robert
22   Smith, correct?
```

Page 173

44 (Pages 170 - 173)

1      A    Correct.

2      Q    If I wanted to know how the board

3   members arrived at their decision to deny

4   Mr. Cloud's appeal, I would need to talk to them

5   individually, correct?

6           MR. MEEHAN:  Objection.  Calls for a

7   legal conclusion.

8           But go ahead and give your answer,

9   ma'am.

10          THE WITNESS:  Yes.

.

Page 174

1

.

20          So on the NFLPA side, the

21   representatives, you indicated that Bethany

22   Marshall, Miki Yaras-Davis, and the Groom Law Firm

Page 176

?

Page 175

1   was there representing the Players Association.  Is

2   that correct?

3      A    Correct.

4      Q    And for the Groom Law Firm you

5   indicated that Alvaro Anillo, Doug Ell, Mike Junk,

6   Mike Maricco were there from the Groom Law Firm,

7   correct?

8      A    Maricco.  Correct.

9      Q    Mike Maricco?

10     A    Maricco, yeah.

11     Q    Do the individuals who you listed

12   from the Groom Law Firm also advise the committee?

13     A    Alvaro Anillo would be our adviser

14   for the most part.

Page 177

45 (Pages 174 - 177)

.

5     Q    Yesterday you heard Patrick Reynolds

6  confirm that there is a repository of information

7  for medical records for NFL players, correct?

8     A   Correct.

9

Page 186

Page 188

Page 187

Page 189

48 (Pages 186 - 189)

5          As it pertains to Mr. Cloud's 2016
6    reclassification benefits, did you write the
7    decision letter in that case?
8          A    I did not.
9          Q    As it pertains to Mr. Cloud's 2016
10   reclassification for benefits application, did you
11   review a decision letter before it was sent out?
12         A    Not that I recall.
13         Q    As it pertains to Mr. Cloud's 2016
14   reclassification for disability benefits
15   application, did you review the decision letter and
16   make any changes to it before it was sent out?
17         A    Not that I recall.

?

Page 200

Page 198

---

3          Q    Have you ever written a decision
4    letter?
5          A    No.
6          Q    Do you review the decision letter
7    before it goes out?
8          A    No.
9          Q    Have you ever made any changes to a
10   decision letter before it goes out?
11         A    Not that I recall.

20         Q    Did you write the letter on
21   Mr. Cloud's 2014 T&P benefits application?
22         A    I did not.

Page 199

Page 201

51 (Pages 198 - 201)

Page 202

.

Page 204

Page 203

7      Q    As of 7/17/14, were you aware of
8  Mr. Cloud receiving a concussion anywhere other
9  than playing in the NFL?
10      A    Not that I recall.
11      Q    As we sit here today, are you aware
12  of Mr. Cloud receiving a concussion anywhere other
13  than playing in the NFL?
14      A    Not that I recall.
15      Q    Okay.  Were you creating a
16  distinction between the two because you asked me
17  "was I, am I," so is there something that I'm
18  missing?
19      A    No, I just wanted to make sure.  I
20  didn't know if you were talking about while I was
21  receiving his application or now, so that's why I
22  wanted to know so...

Page 205

52 (Pages 202 - 205)

1     Q    But you're not aware of any
2   circumstance where Mr. Cloud has had another
3   concussion outside of playing in the NFL, isn't
4   that correct?
5     A    Correct.

16     Q    Let's flip over to Exhibit 15,
17   DICC-003.
18     A    I'm good.
19     Q    I'm not asking you to read this word
20   for word because this one's a little bit longer,
21   but some of these notes I'm not able to read super
22   clearly, so I want to make sure I don't misread

Page 206

1

Page 208

1   them for you.  Can you just go through like you did
2   with the notes from 2014 and read your notes from
3   February 22nd, 2016?
4     A    Okay.  "Mike A. Cloud, he already had
5   Inactive A.  Again, he had credited seasons '99
6   through '05.  He was a reclassification request for
7   Active Football.  He was approved on his initial
8   Social Security -- initial T&P application by
9   virtue of his Social Security award.
10   Helmet-to-helmet collision on 10/31/04 while
11   playing with the Minnesota Vikings.  Migraines,

Page 207

1

3     Q    And you would agree the only
4   employment that Mr. Cloud has ever referenced was a
5   month of part-time employment at Equinox.  Is that
6   correct?
7     A    Based on that application, correct.
8     Q    Do you know why he left Equinox?
9     A    If memory serves me correct, from my
10   recent viewing of the application, it was
11   because -- I can't remember.  I do remember seeing
12   something, but I can't remember exactly what it
13   was.
14     Q    Would it surprise you that that was
15   concussion-related symptoms?
16     A    What, the reason why he left?
17     Q    Yes, ma'am.
18     A    Would it surprise me?
19     Q    Correct.

Page 209

53 (Pages 206 - 209)

3      Q    Do you know why Mr. Cloud's contract
4   was terminated with the Giants in 2005?
5      A    I don't.
6      Q    Do you know that Mr. Cloud couldn't
7   remember basic running back plays that he had been
8   running his entire life?
9      A    Okay.
10     Q    Did you know that?
11     A    I do remember seeing that in review
12   of the file.

k

Page 210

Page 212

Page 211

17     Q    And, again, in this you note,
18   symptoms such as migraines, clinical depression,
19   memory loss, post-concussion syndrome, and vertigo.
20   Is that correct?
21     A    Correct.

Page 213

54 (Pages 210 - 213)

19  BY MR. DENNIE:

20      Q    Is there any reason that you can

21  think of that the Plan through the retirement

22  office would not provide medical records and scans

Page 222

Page 224

1

1  that were requested by Michael Cloud?

2      A    There was no reason not to be

3  provided.

4      Q    You would agree that it's important

5  for a player to have all their medical records and

6  scans from a Plan neutral, correct?

7      A    If he so desires, yes.  If it is

8  important to him, I agree.

9      Q    Because a player can take those

10  medical records and scans to their own doctor for

11  an analysis, right?

12      A    This is true.

13      Q    And if they don't have the documents,

14  they can't go take them to a doctor of their

15  choice, correct?

16      A    I mean, you can't take what you don't

17  have.

18      Q    So you would agree with me, correct?

19      A    I would agree that if they don't have

20  it, they can't take it.

21      Q    Do you know Dr. Mandelbaum is?

22      A    I know the name.

Page 223

Page 225

57 (Pages 222 - 225)

2   a former Plan physician?

3       A   I do.

4       Q   If Mr. Cloud requested all of his

5   medical records and scans, and some of them were

6   done by Dr. Mandelbaum, is there any reason that

7   the Plan wouldn't provide them to him?

8       A   Not to my knowledge.

Page 226

.

6       Q   And if someone owes a duty to the

7   players, as you testified earlier, you would agree

8   that for the best opportunity to be successful in a

9   disability application, is going to be provide the

10  most full and extensive medical history that they

11  can provide, correct?

12      A   Correct.

.

Page 228

:

4       Q   And if they weren't, Michael Cloud

5   cannot use it in a disability benefits application

6   any records he doesn't have, correct?

7       A   Correct, he can't use anything he

8   doesn't have.

17          My question is simply:  What

18  complaints or riches have you heard?

19      A   So, again, if a player is denied his

20  application, oftentimes, we get complaints about

21  that, about the fact that he was denied the

22  process, maybe the doctor, it could be any number

Page 229

58 (Pages 226 - 229)

1   of things.
2       Q     And you gave me three.  Correct me if
3   I'm wrong, the three that you recall being
4   complaints that you heard from players:  One,
5   complaints that they were denied benefits; two,
6   complaints about neutral plan physicians; and,
7   three, complaints about disability benefits
8   process.  Is that correct?
9       A     Correct.
10      Q     Are there any others that you recall?
11      A     No.
12      Q     What complaints do you recall about
13  the disability benefits process that you heard?
14      A     It takes too long, having to travel
15  to see the doctor, too many appointments.
16      Q     Anything else?
17      A     That's it.
18      Q     Have you ever heard complaints from
19  players that they have been denied access to their
20  medical records?
21      A     Not that I can recall.
22      Q     So the complaints about the process

Page 230

1       A     Just what you said, that they
2   don't -- sometimes they don't think that the
3   doctors are neutral.

Page 232

1   that you mentioned, it takes too long, players have
2   to travel to see a Plan neutral doctor, and there
3   are too many doctor appointments.  Is that correct?
4       A     Correct.
5       Q     Do you recall any others?
6       A     I don't.
7       Q     What complaints have you heard about
8   the neutral plan physicians?
9       A     Didn't spend enough time, too brash,
10  maybe didn't ask enough questions or the questions
11  that the player thought he should ask.
12      Q     What else?
13      A     That's it, that I can think of.
14      Q     Complaints about the doctor, the
15  doctor didn't spend enough time with them, they're
16  too brash, they didn't ask enough questions.  Is
17  that correct?
18      A     That's correct.
19      Q     And have you ever heard players argue
20  that the Plan doctors are not truly neutral?
21      A     Yes.
22      Q     What have you heard about that?

Page 231

59 (Pages 230 - 233)

22    Q   So the actual application they submit

1  has been changed?

2    A   Correct.

Veritext Legal Solutions
800-336-4000

.

2      Q    So you don't know who filed them or
3  the subject matter of any of the complaints that
4  you have read that are attached to this counsel
5  report.  Is that correct?
6      A    That's correct.
7      Q    If I understood correctly from
8  yesterday, counsel report is prepared and
9  distributed quarterly, right?
10      A    Correct.
11      Q    So next week you're probably going to
12  get another counsel report, right?
13      A    That is correct.
14      Q    And the last one you received was
15  sometime in February?
16      A    That is correct.
17      Q    Do you remember what was on the
18  February report or attached thereto?
19      A    I do not.

Page 242

.

22

Page 244

Page 243

20      Q    You've already said a couple of times
21  you believe you owe a duty to the players, correct?
22      A    Correct.

Page 245

62 (Pages 242 - 245)

1     Q    So you know from your experience
2  working for the Players Association how damaging it
3  is to them when their benefits are denied when they
4  have concussion syndrome, correct?
5         MR. MEEHAN:  Object to the form.
6         You can go ahead.
7  BY MR. DENNIE:
8     Q    You can answer.
9     A    I know what they tell me.
10     Q    And they told you it's really
11  damaging to them, correct?
12     A    I may have been told that a time or
13  two.

16  it.  Okay?
17         You know that a denial of these
18  benefits are damaging to these players, don't you?
19         MR. MEEHAN:  Objection to the form.
20         But, ma'am, make sure he answers

1  to them that their claims were denied when they
2  have serious medical conditions?
3     A    I can't put a specific number, but
4  quite a few.
5     Q    More than a hundred?
6     A    I don't know about more than a
7  hundred.
8     Q    Put an estimate on it.  What do you
9  think?
10     A    I've been there for many years.
11  Fifty maybe.  I don't know.

16     Q  Who, again, is the Plan created for?
17     A  For the players.
18     Q  The benefits of the Plan are created
19  for who?
20     A  The players.

21     Q    How many times would you say players
22  have come to you and told you how damaging it was

 9        THE WITNESS:  It's going to be one or

10   the other.  Social Security awards are the general

11   standard.  And in his case, because he had a Social

12   Security award, it fell under 5.2(b).

13   BY MR. DENNIE:

14        Q    I understand, but I just want to be

15   clear and understanding what you just testified to.

16             Had he not had his Social Security

17   award, based on your experience on the committee

18   for 15 years, and in your review of thousands of

19   applications, you believe he meets the criteria of

20   Section 5.2 also?

21        A    Correct.

 5   reclassification application compiles with Section

 6   5.1 of Exhibit 1?

 7        A    Yes.

 8        Q    When Mr. Cloud was granted T&P

 9   benefits in 2014, which criteria under 5.2 of

10   Exhibit 1 did he meet?

11        A    5.2(b).

 4         Does October 31st, 2004, occur during
 5   his playing career?
 6         A    Correct.  Yes.
 7         Q    We talked earlier, and I believe you
 8   agreed, that you were aware and recall Mr. Cloud
 9   was having trouble remembering basic football plays
10   after that collision.  Do you recall that?
11         A    I recall.

                                    .
14         Q    You're welcome to read it if you want
15   to, but generally explain to me what your
16   understanding of the "shortly after" definition as
17   shown in 5.3(e) of Exhibit 1 is.
18         A    A player becomes disabled no later
19   than six months after his disability arises -- no
20   earlier, rather, but no later than 12 months
21   afterwards.

                                    .
21         I want you to correct me if I'm
22   wrong, but earlier you testified and agreed that

 1   concussion syndrome symptoms can advance over time?
 2         A    I did, yes.
 3         Q    And you're aware of that because you
 4   worked with the Players Association and you even
 5   read a few studies or articles, as I recall.  Is
 6   that correct?
 7         A    Correct.

14         Your notes make reference to
15   Dr. Cronin indicating that the helmet-to-helmet
16   collision on October 31st, 2004, was the event that
17   caused his concussion-related syndrome.  Is that
18   right?
19         A    Yeah, that's correct.

Veritext Legal Solutions
800-336-4000

Page 262

.

Page 264

Page 263

.

10  BY MR. DENNIE:

11      Q    If you will flip over to Section

12  5.7(b) of Exhibit 1.

13      A    You said (b)?

14      Q    5.7(b), yes, ma'am.

15      A    I'm there.

16      Q    What do you understand that Section

17  to pertain to?

18      A    Reclassification of T&P benefits.

Page 265

.

4       Q    Is changed circumstances defined in
5   the Plan?
6       A    No.
7

21      Q    So do you want to change your answer
22   on who came up with the definition of changed

Page 266

1   circumstances?
2       A    Yes, as a matter of fact I do.  I
3   don't know who came up with the definition.
4

Page 267

1

.

5       Q    In your approximately 15 years on the
6   committee, how many reclassification decisions have
7   you been a part of?
8       A    Maybe between 10 and 15.
9       Q    And in the 10 or 15 reclassification
10  decisions that you have been a part of, have you
11  had to determine what changed circumstances means
12  in all 10 or 15 of those cases?
13      A    Yes.
14      Q    What do you think it means?
15      A    It means a new or different injury or
16  illness or impairment.

.

Page 268

.

Page 269

68 (Pages 266 - 269)

7         THE WITNESS:  I agree that a new
8    impairment can include a concussion symptom, yeah.

8         Q Okay. Correct me if I'm wrong,
9    earlier you testified that as it pertains to
10   Mr. Cloud's 2016 reclassification decision letter,
11   you didn't read it before it went out, correct?
12        A    That is correct.

                    :
16        Q    So you certainly didn't tell anyone,
17   "This is what the definition of changed
18   circumstance that I want to include in this
19   decision letter," correct?
20        A    Correct.

14        Q    Have you ever asked anyone to define
15   for you what changed circumstances means?
16        A    Not that I recall.

Veritext Legal Solutions
800-336-4000

1  that there be a logical definition of clear and
2  convincing that you would apply to every case?
3       A   Yes, it would be helpful.
4       Q   Because you want uniform consistency
5  on the way that disability benefits applications
6  are being decided, correct?
7       A   It would definitely be helpful.

.

14      Q   You would agree it's important for
15  players to understand that there's uniformity in
16  the way things are being applied across the board
17  in disabled cases, correct?
18      A   I would agree with that, yeah.

22      Q   Is clear and convincing defined

1  anywhere in the Plan?
2       A   No.
3       Q   Has anyone told you what clear and
4  convincing means?
5       A   Not that I recall.

9       Q   Have you come up with your own
10  definition of what clear and convincing means?
11      A   I'm not sure.

21      Q   Don't you think it's important if
22  you're trying to apply a set of facts to the Plan,

?

Page 282

1

.

10          Are you disputing that Mr. Cloud is
11   disabled under the terms of Plan?
12        A   I am not.

.
Page 283

Page 284

12          Correct me if I'm wrong, but you
13   testified earlier that a new concussion symptom can
14   qualify as a new impairment, meaning it's a changed
15   circumstance in the terms of the Plan, correct?
16        A   Yes.

Page 285

72 (Pages 282 - 285)

14        Q    Correct me if I'm wrong, you said
15  that the concussion symptoms that you know of are
16  headaches, dizziness, sleepiness, and vertigo.  Is
17  that correct?
18        A    Correct.

Page 294

Page 296

6        Q    Are there any additional concussion
7  symptoms that you know of?
8        A    Maybe forgetfulness.
9        Q    Anything else?
10        A    Anger.

20        Q    So, for example, forgetfulness, you
21  might forget small things now, but five years from
22  now you may not remember virtually anything.  Is

Page 295

Page 297

75 (Pages 294 - 297)

1    that a progression of concussion symptoms that
2    you've seen in other disability cases that you've
3    administered on the committee?
4         A    Yes.

20         Based on your role on the committee,
21    and your understanding of concussion symptoms,
22    trouble sleeping may be a symptom?

Page 298

1         Q    Is migraines a common concussion
2    symptom?
3         A    Yes.
4         Q    Is dementia a common concussion
5    symptom?
6         A    Yes.
7         Q    Is failure to maintain verbal fluency
8    a common concussion symptom?
9         A    Yes.
10        Q    Is unpredictability a common
11    concussion symptom?
12        A    Yes.
13        Q    Is irritability a common concussion
14    symptom?
15        A    Yes.
16        Q    Is mood swings a common concussion
17    symptom?
18        A    Yes.

?

Page 300

1         A    I believe so.
2         Q    Is sensitivity to light a common
3    concussion symptom that you have seen?
4         A    Yes.
5         Q    Is paranoia a common concussion
6    symptom that you've seen?
7         A    Yes.
8         Q    Is lack of focus or inability to
9    focus a common concussion symptom that you've seen?
10        A    Yes.
11        Q    Is suicidal thoughts a common
12    concussion symptom that you've seen?
13        A    Yes.
14        Q    Is failure to grasp reality a common
15    concussion symptom that you've seen?
16        A    I believe so.
17        Q    Is failure to maintain an appointment
18    a common concussion symptom?
19        A    Yes.
20        Q    Is depression a common concussion
21    symptom?
22        A    Yes.

Page 299

8         Q    Based on the research that you've
9    read on concussions and common media writings, is
10    it fair to say that over a period of time, these
11    concussion symptoms can get much more severe?
12        A    Yes, it is fair to say that they can
13    get worse.

Page 301

76 (Pages 298 - 301)

21     Q    If you look on CLOUD-AR-108, of
22  Exhibit 7, you will see a discussion of neck, lower

1  back foot, lower leg issues.  Do you see that?
2     A    I see it.
3     Q    Ultimately the conclusion in his file
4  was Mr. Cloud suffered from both neurological and
5  orthopedic ailments.  Is that correct?
6     A    Correct.

17      Q    Have you ever seen a PET scan
18   presented to the committee on a player's
19   application?
20      A    I believe I have.
21      Q    What do you understand a PET scan to
22   be?

Page 306

Page 308

1      A    A scan of the brain.
2      Q    And do you understand or know what
3   that PET scan shows?
4      A    Abnormalities of the brain.

10      Q    When you look at a PET scan, what
11   shows the abnormality?
12      A    The coloring maybe, the shading of
13   the scan of the brain.
14      Q    So let me make sure we're on the same
15   page and saying the same things.
16           So if you've got a scan of the brain
17   or a picture of the brain, there's going to be most
18   likely some sort of cylindrical or circular spot
19   that's a different color which shows there's an
20   abnormality, correct?
21      A    I think that's what it is.

Page 307

Page 309

78 (Pages 306 - 309)

?

Page 310

Page 312

Page 311

5      Q    Okay.  Are you aware of any other

6   circumstance where Mr. Cloud sustained orthopedic

7   injuries outside of playing in the NFL?

8      A    I am not aware.

Page 313

79 (Pages 310 - 313)

1      A    Yep.  Yes.
2      Q    Okay.  Is Dr. Canizares still a
3  neutral physician?
4      A    Yes.
5      Q    Is he someone you interface with
6  often?
7      A    No.
8      Q    Is there any reason that x-ray films,
9  scans were not provided to Mr. Cloud when he
10  requested them?  Is there any reason for that?
11     A    You said when he requested them?
12     Q    Yes, ma'am.
13     A    I don't know.  I'm not aware of any
14  reason.
15     Q    If you will flip over to 174, so
16  CLOUD-AR-174 of Exhibit 2.
17     A    I'm here, okay.  You said 174?
18     Q    Yes, ma'am.
19     A    Okay.
20     Q    Does this appear to be a copy of
21  Dr. DiDio's report?
22     A    It does.

Page 314

1      Q    Is there any reason that the full
2  copy of Dr. DiDio's report was not provided to
3  Mr. Cloud until 2019?
4      A    I have no idea.

15     Q    All right.  Either way, if you flip
16  to AR-172 of Exhibit 2, do you see there that there
17  were various x-rays that were performed on
18  Mr. Cloud?
19     A    Yes.
20     Q    And those were by Dr. Canizares?
21     A    Canizares.
22     Q    Canizares?

Page 315

18     Q    And down toward the bottom of 174,
19  there's a reference that Mr. Cloud was forgetting
20  small things like people's names.  Is that correct?
21     A    I see it, yes.
22     Q    Are there any other concussion

Page 316

Page 317

80 (Pages 314 - 317)

1 symptoms reported back in 2010?

2     A   I see headaches, vertigo.  Bed spins.

3     Q   That's part of vertigo?

4     A   Yeah, I see that now.  Yeah.

5     Q   Okay.

6     A   Repetition.

7     Q   I'm sorry?

8     A   Repetition, repeating himself.

9     Q   Repetition and?

10     A   And then I said "repeating himself."

11     Q   So you're saying repeating himself is

12 a concussion symptom?

13     A   I would think so.

14     Q   Okay.

15     A   I would think it can be.

16     Q   Any others that you recall?

17     A   That's it.

18     Q   So the four concussion symptoms that

19 you see from the 2010 request for line of duty

20 benefits; headaches, vertigo, forgetting names, and

21 repeating himself.  Is that correct?

22     A   Correct.

Page 318

17     Q   There's a listing of post-concussion

18 syndrome, clinical depression, dementia, migraine,

19 vertigo, impair verbal fluency.  And then if you

20 flip to CLOUD-AR-079, it also list migraine

21 headaches, depression, memory loss, vertigo,

22 insomnia, unpredictable irritability.  Do you see

Page 320

.

6     Q   Okay.  So if you would look at

7 CLOUD-AR-175, there's again a reference to the

8 October 31, 2004 concussion, correct?

9     A   I see it.

10     Q   And I read it, and tell me if I'm

11 wrong, "There is clear documentation of a single

12 concussion sustained on October 31, 2004, while

13 playing with the New York Giants."

14         Do you see that?

15     A   I do.

16     Q   Okay.  And that's the head-to-head

17 collision that we talked about a couple of times

18 today, correct?

19     A   That's my assumption, yes.

Page 319

1 that?

2     A   I do.

3     Q   In addition to the neurological

4 issues associated with concussion syndrome, there's

5 also several orthopedic issues presented in the

6 section titled, "Disabilities and Causes."  Is that

7 correct?

8     A   Correct.

9     Q   There are acute compartment syndrome,

10 plantar fasciitis, nerve injury, bilateral

11 shoulders, bilateral elbow, bilateral wrists,

12 hands, fingers, bilateral feet and toes, bilateral

13 ankles, bilateral knees, bilateral hips, lumbar,

14 cervical, thoracic.  And then if you flip over to

15 CLOUD-AR-097, severe pain in right foot, left great

16 foot, left hip, basic neck, lower back, numbness in

17 right left leg, arms and fingers.

18         Did I get all the orthopedic issues?

19     A   You did.

20     Q   And so those were the bases by which

21 Mr. Cloud presented in his T&P application in 2004?

22     A   That's what it appears to be to me.

Page 321

81 (Pages 318 - 321)

1

.

11    Q   As it pertains to the nuts and bolts

12  and the specific wording and language used in

13  Exhibit 4, you were certainly not the person who

14  provided it, correct?

15    A   That is true.

16    Q   And if Mr. Reynolds testified he

17  wasn't the one who provided it either, neither the

18  two people on the committee provided the discussion

19  and analysis shown in Exhibit 4.  Is that correct?

20    A   That is correct.

21    Q   Don't you think it's important for

22  whoever wrote this letter to actually discuss this

.

7    Q   Did you write Exhibit 4?

8    A   I did not.

9    Q   Do you know who wrote Exhibit 4?

10    A   I do not.

11    Q   Did you review Exhibit 4 before it

12  was disseminated to Mr. Cloud?

13    A   Not that I recall.

9     Q     So when I said instead of describe, I
10    said description, because it was correct in the
11    sentence.  So for someone to write a legal letter
12    like this, you would expect that they would get the
13    description of the information that they are
14    providing from the people that actually came up
15    with the decision, right?
16    A     One would think so.
17    Q     Okay.  And in this case that wasn't
18    done?
19    A     That's correct.
20    Q     Do you believe this letter was
21    written by the Groom Firm?
22    A     I believe it could have been, yes.

Page 326

10    Q     Looking at Exhibit 4, did you ever
11    receive a copy of Exhibit 4?
12    A     Not that I recall.

Page 328

Page 327

Page 329

12    Q    Under "Disabilities and Causes" that
13  starts on CLOUD-AR-290, it lists migraines,
14  clinical depression, significant memory and
15  attention problems, vertigo, impaired verbal
16  fluency. Then we flip over to the continuation, it
17  says, migraines, clinical depression, memory loss,
18  attention and decision problems, impaired verbal
19  fluency, post-concussion syndrome, vertigo,
20  affective disorder. Do you see that?
21  A I do.
22    Q    Do you agree that there are new

1  Mr. Cloud's request for reclassification, right?
2    A    Correct.
3    Q    And it was your job to apply the
4  terms of the Plan to Mr. Cloud's request, right?
5    A    Correct.
6    Q    We've listed off three new symptoms
7  of concussions that you have agreed are new,
8  correct?
9    A    Correct.
10    Q    Those new concussion symptoms equal a
11  changed circumstance as set forth in the Plan,
12  correct?
13        MR. MEEHAN:  Same objection.
14        Go ahead.
15        THE WITNESS:  It looks that way,
16  correct.
17  BY MR. DENNIE:
18    Q    I'm going to go back to what I asked
19  you earlier.  After reviewing all of this
20  information, listening to Mr. Reynolds testify,
21  listening to Mr. Cloud talk, and answering
22  questions all day, do you now believe that

1  concussion symptoms listed on Exhibit 5?
2    A    There are.
3    Q    Those include; affective disorder,
4  attention and decision problems, and significant
5  memory and attention problems, correct?
6    A    Correct.

9        You testified earlier that a new
10  concussion symptom can qualify as a changed
11  circumstance, correct?
12    A    Correct.

1  Mr. Cloud did, in fact, qualify for
2  reclassification in 2016?
3        MR. MEEHAN:  Objection.  Asked and
4  answered.  And Mr. Cloud's remarks are not on the
5  record, so -- they have been described to some
6  extent on the record, but they are not part of the
7  record.
8        So go ahead, please.
9        THE WITNESS:  I believe that these
10  new symptoms could have been changed circumstances.

1 answered.
2         Go ahead.
3         THE WITNESS:  I think I agree that
4 they can be changed circumstances.




9      Q    You actually agree that they are
10 changed circumstances?
11         MR. MEEHAN:  Objection to the form.
12         Go ahead.
13         THE WITNESS:  They are changes to his
14 original application, yes.
15 BY MR. DENNIE:







22

1 BY MR. DENNIE:
2      Q    You would agree that these changed
3 symptoms are a changed circumstance as set forth in
4 5.7(b) of Exhibit 1, wouldn't you?
5      A    Yes, they are changed circumstances.
6




9         To be clear, you denied Mr. Cloud's
10 application for reclassification, correct?
11      A    Correct.
12      Q    Did you write the reclassification
13 decision of Mr. Cloud?
14      A    You mean the letter?
15      Q    Correct.
16      A    No, I did not.
17      Q    Did you review your reclassification
18 decision for Mr. Cloud before it went out?
19      A    Not that I recall.
20      Q    Did you talk to anyone about the
21 reclassification decision before it went out?
22      A    Not that I recall.

19      Q    You also agreed that his new
20 concussion symptoms are changed circumstances,
21 right?
22         MR. MEEHAN:  Objection.  Asked and

1      A    I don't know who, but someone here at

2    Groom.

3

9      Q   Is CLOUD-AR-478 through CLOUD-AR-482

10    as shown in Exhibit 7, the decision rendered by the

11    committee on Mr. Cloud's reclassification

12    application?

13      A    Yes.

.

18      Q   This letter was written by someone,

19    but they never talked to you about what to put in

20    the letter, did they?

21      A    Not that I recall.

22      Q    So their deposition of changed

.

5      Q    So whoever wrote this came up with

6    their own definition of changed circumstance was

7    not approved by you, correct?

8      A    I don't recall talking to anyone

9    about the wording of the letter.

10      Q    And just to be clear, I asked you a

11    little bit different question.

12            You didn't approve their definition

13    of changed circumstance.  Is that right?

14      A    Not that I recall.

15      Q    You've seen legal letters before,

16    right?

17      A    Yes.

18      Q    You would agree this certainly

19    appears to be written by a lawyer, doesn't it?

20      A    Yes.

21      Q    And who would be the lawyer that

22    would write a letter on behalf of the committee?

1

Page 346

?

Page 348

1

Page 347

17      Q     Okay.  So going back to our
18   discussion earlier, you would agree that a treating
19   medical professional has indicated that Mr. Cloud's
20   major injury occurred on October 31, 2004, which is
21   the game we talked about between the Giants and the
22   Minnesota Vikings.  Is that right?

Page 349

88 (Pages 346 - 349)

1     A    Correct.

2     Q    It also references him being cut by

3  two teams because he couldn't remember plays.  Is

4  that correct?

5     A    Correct.

6     Q    Based on your notes and your

7  recollection and review of the file, you would

8  agree those two teams are the New York Giants and

9  the New England Patriots, correct?

10    A    Correct.

.

Page 350

1  that's a common progression of concussion syndrome,

2  right?

3     A    One more time, please.

4     Q    Sure.

5         Based on your experience on the

6  committee, review of medical studies and review of

7  thousands of pages of medical records, you would

8  agree that the progression of concussion syndrome

9  that Mr. Cloud has exhibited is common?

10    A    You said is common?

11    Q    Yes, ma'am.

12    A    It does happen, yes.

13    Q    And you've seen that?

14    A    I'm sorry?

15    Q    You've seen that?

16    A    I've seen it documented and referred

17  to, yes.

18    Q    Okay.  And in this circumstance, it

19  was documented and referred to in Mr. Cloud's case,

20  right?

21    A    Yes.

Page 352

6     Q    This report by Dr. Cronin references

7  that Mr. Cloud started experiencing neurological

8  issues shortly after the October 31, 2004 collision

9  in the game between the Giants and the Vikings.  Is

10  that right?

11        MR. MEEHAN:  Objection to the form.

12        Go ahead.

13        THE WITNESS:  It does infer that,

14  yes.

15  BY MR. DENNIE:

16    Q    And then the report goes on to

17  reference since that time the neurological symptoms

18  have continued to progress.  Is that correct?

19    A    Correct.

20    Q    Based on your experience on the

21  committee reviewing medical studies and review of

22  thousands of medical records, you would agree

Page 351

Page 353

89 (Pages 350 - 353)

3      Q    Is this e-mail from you dated
4  July 23rd, 2014, what you're considering your
5  e-mail ballot pertaining to Mr. Cloud's request for
6  T&P benefits?
7      A    Correct.
8      Q    I mean, is this all you submit when
9  you vote on a case?
10     A    If I'm responding to Patrick's
11 e-mail, yes.
12     Q    Is there ever a situation where you
13 provide more detailed analysis about how you came
14 to your decision?
15     A    If we disagree on a case, then I
16 would include it -- I might include it in the
17 e-mail.
18     Q    But as it pertains to Mr. Cloud's
19 case, you didn't provide any detail analysis about
20 how you arrived at your decision on his 2014 T&P
21 request for benefits, correct?
22     A    Correct.

1      A    I do.
2      Q    If we go to the far right it says,
3  "Decision."  And underneath decision it says, "No
4  changed circumstances," correct?
5      A    Correct.
6      Q    Earlier today you testified that
7  there were, in fact, changed circumstances,
8  correct?
9      A    I said it looked like there could
10 have been, yes.
11     Q    As it pertains to Mr. Cloud's 2016
12 reclassification request, you're not aware of
13 providing any additional analysis than what we see
14 in CLOUD-AR-473 through 475 of Exhibit 7.  Is that
15 right?
16     A    I don't recall doing anything, yes.

t.
9      Q    Will you go to CLOUD-AR-473 through
10 475 of Exhibit 7?
11     A    I'm here.
12     Q    As it pertains to Mr. Cloud's 2016
13 reclassification request, is this the e-Ballot that
14 we've been discussing earlier today?
15     A    Yes.
16     Q    And if you flip over to CLOUD-AR-475,
17 is this a portion of the spreadsheet that you
18 prepared?
19     A    Yes.
20     Q    If we look down below where it says
21 "REDACTED," it says, "Miscellaneous Benefit, Cloud,
22 Michael."  Do you see that?

1

.

21    Q    It mentions on 1204, "Thank you!  The
22    case summaries that are missing for me are and

Page 358

Page 360

1    Michael Cloud" after the redaction.  Do you see
2    that?
3        A    Uh-huh.  I do.
4        Q    Did the Groom Firm write up a memo
5    analyzing Mr. Cloud's case?
6        A    They did case summaries.  I'm pretty
7    sure back then they had started doing the case
8    summaries.
9        Q    Why do they do case summaries?
10        A    To summarize the cases for those that
11    are reviewing it, to kind of give those of us who
12    review it an idea of what we will find within the
13    depths of the case, or the paperwork rather, the
14    file, the administrative records.
15        Q    You would agree that it's important
16    that you actually review the medical records, not
17    the case summary, correct?
18        A    Yes.
19        Q    And you feel certain that you
20    reviewed Mr. Cloud's entire file prior to comes to
21    a decision?
22        A    I feel certain that I reviewed his

Page 359

Page 361

91 (Pages 358 - 361)

1  file to the best of my ability.  So I don't know if
2  I ended up being distracted and put it down and
3  didn't go back to it or skipped a page or two, but
4  I feel certain that I did read most of it to the
5  best of my ability.
6      Q    Do you ever recall a time where you
7  just relied on the case summary and did not read
8  the entire file?
9      A    I don't recall that.
10     Q    Could that have happened?
11     A    Anything can happen.
12     Q    You would agree it's important for
13  you to read the entire case file to come to a
14  decision, right?
15     A    I do agree, it is important.
16     Q    We talked about this earlier a little
17  bit, it's extremely important for the player
18  seeking benefits, right?
19     A    That is correct.
20     Q    And you hold the duty to the retired
21  NFL players who are seeking benefits and you know
22  that it's vastly important that you review the

Page 362

1  medical file in total before rendering a decision,
2  right?
3      A    I do.
4      Q    But you would admit sometimes you may
5  not read the entire file?
6      A    I'm human.
7      Q    Is that yes?
8      A    Like I said, anything can happen,
9  so...

Page 363

Page 364

1

Page 365

Veritext Legal Solutions
800-336-4000

16      Q   Do you understand that Mr. Cloud
17   first starting making a request for his records for
18   the first time in 2006?
19      A   I do recall seeing that in the
20   administrative record.

e

Page 366

Page 368

.

Page 367

Page 369

Veritext Legal Solutions
800-336-4000

1

9    Q    If you're directing Mr. Cloud to go
10  see Dr. DiDio so he can be evaluated for
11  neurological issues, wouldn't you expect the doctor
12  to order some sort of scans?
13        A    I would hope that he would, yes.
14        Q    And you saw Dr. DiDio's report in
15  Exhibit 7, there were no scans ordered, correct?
16        A    As I recall, correct.
17

Page 374

Page 376

Page 375

Page 377

Veritext Legal Solutions
800-336-4000

:
3     Q    Based on your experience seeing
4  thousands of cases and thousands of records, you've
5  seen many circumstances where the onset of
6  concussion-related symptoms don't take place for
7  eight to ten years, right?
8     A    I have seen cases where they don't
9  take place right away, yes.
10    Q    Some may be delayed up to eight to
11  ten years?
12    A    So the research says, yes.

Page 378

.

Page 380

Page 379

s

Page 381

18      Q     You would agree that the Groom Law
19  Firm drafted the Plan?
20      A     Drafted the Plan?
21      Q     Yes, ma'am.
22      A     Yes.

Page 382

Page 383

Page 384

Page 385

Veritext Legal Solutions
800-336-4000

1                A C K N O W L E D G E M E N T   O F

2                        D E P O N E N T

3

4     I, CHRISTOPHINE SMITH, do hereby acknowledge I have

5     read and examined the foregoing pages of testimony,

6     and the same is a true, correct and complete

7     transcription of the testimony given by me, and any

8     changes or corrections, if any, appear in the

9     attached errata sheet signed by me.

10

11

12

13

14    9. 2. 21                    Christophine Smith
      _____                 _____

      Date                        CHRISTOPHINE SMITH

15

16

17

18

19

20

21

22

                                          Page 391

```
 1   Michael Cloud vs. The Bert Bell/Pete Rozelle NFL

 2   Player Retirement Plan

 3                     CHRISTOPHINE SMITH

 4   INSTRUCTIONS TO THE WITNESS:

 5        Please read your deposition over carefully and

 6   make any necessary corrections.  You should state

 7   the reason in the appropriate space on the errata

 8   sheet for any corrections that are made.

 9        After doing so, please sign the errata sheet

10   and date it.

11        You are signing same subject to the changes you

12   have noted on the errata sheet, which will be

13   attached to your deposition.

14        It is imperative that you return the original

15   errata sheet to the deposing attorney within thirty

16   (30) days of receipt of the deposition transcript by

17   you.  If you fail to do so, the deposition

18   transcript may be deemed to be accurate and may be

19   used in court.

20

21

22
```

Page 392

```
 1    Veritext Legal Solutions
      1250 Eye Street, N.W., Suite 350
 2    Washington, DC 20005
      (202) 857-DEPO
 3

 4              E R R A T A   S H E E T
 5    Case Name:   Michael Cloud vs. The Bert Bell/Pete
      Rozelle NFL Player Retirement Plan
 6

      Witness Name:  CHRISTOPHINE SMITH
 7

      Deposition Date:  August 5, 2021
 8

      Page No.  Line No.    Change/Reason for Change
 9    4:4-- "Josephine" should be "Christophine" / correcting name of deponent
      12:13-- "Boswell, B-O-S-W-E-L-L" should be "Doswell, D-O-S-W-E-L-L" / correcting name of deponent
10    54:14-- "yet" should be "yesterday" / word correction
      64:9-- "mine" should be "mind" / word correction
11    97:14-- "support" should be "report" / word correction
      98:8-- "about playing" should be "about applying" / word correction
12    106:12-- "I not." should be "I am not." / missing word
      107:16-- "up in" should be "of" / word correction
13    138:8-- "reading it" should be "reading about it" / missing word
      186:11-- "that my knowledge" should be "to my knowledge" / word correction
14    203:5-- "credit seasons" should be "credited seasons" / word correction
      203:13-- "disable" should be "disabled" / word correction
15    204:12-- "deem his" should be "deem him" / word correction
      205:21-- "receiving his" should be "reviewing his" / word correction
16    290:16-- "they actually" should be "they've actually" / word correction
      355:5-- "applied more" should be "applied for" / word correction
17

18

19

20

21   _Christophine Smith_                    _9. 2. 21_
      Signature                               Date
22

                                             Page 393
```

# APPENDIX 4

| | |
|---|---|
| **From:** | Christian Dennie |
| **To:** | Michael L. Junk; Edward J. Meehan |
| **Subject:** | Cloud v. Bert Bell |
| **Date:** | Friday, August 6, 2021 8:37:09 AM |

Gentlemen,

I enjoyed meeting you all over the course of the last few days. Thank you for hosting the depositions. I will get you my receipts from travel in the next few days.

As we discussed during the depositions, I believe many, many records have not been produced that are responsive to our discovery requests that were propounded many, many months ago. I learned during the depositions that there are Director's Reports and Counsel Reports made on a quarterly basis that reference funding for the Plan, distribution of benefits, and statistics for grants and denials. These are documents responsive to RFP 37, 57, and 58. These reports may say other things, but those are areas that were referenced by the deponent. I understand the Counsel Reports may have some attorney-client information, but contain other information that would not fit into that box. The attorney-client information can be redacted. At a minimum, I need these documents produced by noon on Monday so I have sufficient time to review them in advance of Mr. Vincent's deposition. Being that Mr. Vincent will likely give me more information about other documents that have not been produced, I request that you go back through our 1st and 2nd RFP and give me all documents that are responsive. Otherwise, we will have to seek to compel responsive information, which I prefer not to do.

I am following up again on Dr. Mandelbaum's records. When will they be produced?

At the end of the deposition, you mentioned you would assist us in locating the IMPACT exam conducted on Mr. Cloud by the New England Patriots. If you can provide that, we would greatly appreciate it.

As you know, we were able to obtain a lot of favorable information during the depositions. It's not too late to get back on Judge Ferguson's calendar for mediation and abide by the court's order. As we discussed after the deposition, the Plan has a lot of risk in this case that it has never had to address. No one has ever been able to look behind the curtain as we have been granted the opportunity to do. What's going on behind the curtain does not look good for the Plan. We are going to continue to depose the relevant people and will continue to find information that supports the illegality of the Plan. We are going to seek to compel the production of the Board members for deposition (as we discussed and you confirmed disagreement). I feel confident we will be able to obtain even more valuable information in those depositions. With that said, you can eliminate your risk and end the roadmap I am developing for all future claims filed by other players by getting this resolved and giving Mr. Cloud what he is owed. Otherwise, as I mentioned with the NCAA as an example, when you push the envelope and try to get rulings from court's, sometimes it doesn't work out the way you wanted. A bad precedent will lead to even more litigation and worse results. The Plan (and associated bodies) made mistakes here. With all that said, let me know when you want to talk. We are always open. If, on the other hand, you prefer to litigate and permit Mr. Cloud to fully develop the facts, we have no problem moving forward.

I look forward to hearing from you. Have a good day and good weekend.

Christian Dennie, FCIArb
Barlow Garsek & Simon, LLP
1207 S. White Chapel Blvd., Ste. 150B
Southlake, TX 76092
817.731.4500 (Telephone)
817.731.6200 (Facsimile)

Email: cdennie@bgsfirm.com
Web Site: http://www.bgsfirm.com
Blog: http://www.bgsfirm.com/blog

Principal office is located at 920 Foch Street, Fort Worth, TX 76107.

# APPENDIX 5

**From:** Christian Dennie
**To:** Meehan, Edward J. (EMeehan@groom.com)
**Cc:** Junk, Michael L. (mjunk@groom.com); Lee Ann Burks; "Christian Dennie (CDennie@bgsfirm.com)"
**Subject:** RE: Civil Action No.: 3:20-CV-01277-E: Cloud v. Bert Bell/Pete Rozelle NFL Player Retirement Plan
**Date:** Monday, August 16, 2021 8:43:00 AM

Mr. Meehan,

Good morning. I hope you had a nice and relaxing weekend.

As I have mentioned in multiple emails, calls, and in-person discussions, I do not desire to fight over discovery. The documents that we are requesting should have been produced long ago. Frankly, I would have expected to see these documents produced along with initial disclosures. Nonetheless, I would still prefer not to have to address these missing documents with the Court. It benefits both sides to reach a resolution on the outstanding discovery.

Our position is simple. Rule 26(b)(1) of the Federal Rules of Civil Procedure allows Plaintiff to "obtain discovery regarding any nonprivileged matter that is relevant to any part's claim or defense. . . ." The outstanding discovery at issue "is reasonably calculated to lead to the discovery of admissible evidence." The 5th Circuit addressed issues similar to this in Crosby and permitted to discovery. In Schultz, the 5th Circuit addressed evidence of "inconsistent treatment" of similar claims by an ERISA plan. Following this line of cases, the Court, on July 22, 2021, ordered that Plaintiff was permitted to conduct discovery as follows:

Plaintiff may conduct discovery on the following subjects: (1) requests and communications between Plaintiff and Defendant requesting medical documentation; (2) any medical records in possession of Defendant that have not be provided to Plaintiff; and (3) such other information that is relevant to the completeness of the Administrative Record in this case and/or whether Defendant complied with ERISA's procedural regulations.

We are seeking discovery of the Director's reports (prepared quarterly), Counsel's reports (prepared quarterly), and the database of claims that were granted or denied for T&P benefits and whether the athlete received Inactive A or Active Football benefits. This discovery is relevant and responsive to RFPs. In addition to being relevant and reasonably calculated to lead to the discovery of admissible evidence, the production of these records is necessary to evaluate 1) inconsistent treatment by the Plan of similar claims; 2) to determine with the Plan complied with ERISA's procedural regulations; and 3) to evaluate whether the Plan acted arbitrarily and capriciously in denying Plaintiff's claim. As your witnesses have noted, the members of the Board are fiduciaries and the Plan was designed for players like Plaintiff as the beneficiaries. We must have this information to explore disputed matters. As I have previously noted, Plaintiff was denied the opportunity to question witnesses based on these records. We learned for the first time of the existence of such records during the depositions.

You noted in an email that I don't know the contents of the Director's reports (prepared quarterly), Counsel's reports (prepared quarterly), and the database of claims. You are correct that I have never seen these documents. They have been withheld from production. Your witnesses, however, testified that the director's reports and counsel's reports have information about funding for the Plan, distribution of benefits, and statistics for grants and denials. As to the database, Mr. Vincent testified that queries can be run to produce T&P applications that show what was granted or denied, whether Inactive A or Active Football benefits were awarded, and possibly the basis for the decision to grant Inactive A or Active Football benefits. This is information that we need.

Again, I am happy to discuss these issues with you in an effort to resolve this dispute.

Christian Dennie, FCIArb
Barlow Garsek & Simon, LLP
920 Foch Street
Fort Worth, TX 76107
817.731.4500 (telephone)
817.731.6200 (facsimile)

Southlake Office: 1207 S. White Chapel, Ste. 150B; Southlake, Texas 76092

Email: cdennie@bgsfirm.com
Website: http://www.bgsfirm.com
Blog: http://www.bgsfirm.com/blog

CONFIDENTIALITY NOTICE: The information contained in this e-mail message is intended only for the use of the individual or entity to whom it is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. Any and all such rights of privilege, privacy, and non-disclosure are hereby claimed and are expressly not waived. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution, use, or copying of this message is strictly prohibited. If you have received this message in error, please notify us immediately by e-mail and delete the original message. Unauthorized interception of this e-mail is a violation of federal criminal law. This communication does not reflect an intention by the sender or the sender's client or principal to conduct a transaction or make any agreement by electronic means. Nothing contained in this message or in any attachment shall satisfy the requirements for a writing, and nothing contained herein shall constitute a contract or electronic signature under the Electronic Signatures in Global and National Commerce Act, any version of the Uniform Electronic Transactions Act or any other statute governing electronic transactions.

To comply with United States Treasury Regulations, we advise you that any discussion of Federal tax issues in this e-mail was not intended or written to be used, and cannot be used by you, (i) to avoid any penalties imposed under the Internal Revenue Code, or (ii) to promote, market or recommend to another party any transaction or matter addressed herein.

# APPENDIX 6



200 St. Paul Street, Suite 2420
Baltimore, Maryland 21202
Phone 800.638.3186
Fax 410.783.0041

November 23, 2016

Mr. Michael Cloud
120 Mont Blanc Drive
Heath, Texas 75032

Re:   **Bert Bell/Pete Rozelle NFL Player Retirement Plan—Final Decision on Review**

Dear Mr. Cloud:

At its November 16, 2016 meeting the Retirement Board of the Bert Bell/Pete Rozelle NFL Player Retirement Plan ("Plan") considered your appeal from the Disability Initial Claims Committee's ("Committee") decision denying your request for reclassification of your total and permanent disability ("T&P") benefits to the Active Football category.  We regret to inform you that the Retirement Board denied your appeal for the reasons described below.

**Discussion**

The Plan received your original application for T&P benefits on July 1, 2014.  As you know, the Committee found you to be totally and permanently disabled by virtue of your Social Security Administration ("SSA") disability award, and it awarded you Inactive A T&P benefits, effective May 1, 2014.  The basis for the Committee's decision was explained to you in a letter dated July 23, 2014.  You did not appeal that decision.

By letter received February 17, 2016, your representative, Jennifer Cloud, requested that your Inactive A benefits be reclassified to the Active Football category.  She stated that you "became disabled in 2005, while playing for the New York Giants due to cumulative mental disorder," and she submitted a copy of your SSA file and other records.

The Committee denied your request for reclassification by letter dated March 2, 2016.

By letter received September 2, 2016, Ms. Cloud appealed the Committee's decision to the Retirement Board.  With the appeal, she stated that your SSA award resulted from a severe mental disorder stemming from multiple concussions, and she argued that your disability arose shortly after your October 2004 head trauma.  Ms. Cloud submitted additional medical records with her appeal, such as a report from psychologist Dr. John Cronin dated February 2, 2012.

CLOUD-AR-518

Mr. Michael Cloud
November 23, 2016
Page 2

At its November 16, 2016 meeting, the Retirement Board reviewed your request for reclassification and determined that it must be denied. Section 5.7(b) governs requests for reclassification such as yours. It permits reclassification only where a Player "shows by evidence found by the Retirement Board… to be clear and convincing that, because of changed circumstances, the Player satisfies the conditions of eligibility for a benefit under a different category of T&P benefits." The Retirement Board interprets Section 5.7(b)'s "changed circumstances" requirement to mean a new or different impairment from the one that originally qualified you for T&P benefits. Because you seek reclassification to Active Football, you would have to clearly and convincingly show that (1) you have a new or different impairment (Section 5.7(b)), (2) that new or different impairment arose while you were an Active Player (Section 5.3(a)), and (3) it caused you to be totally and permanently disabled "shortly after" it first (Section 5.3(a)). Under Section 5.3(e) of the Plan, you satisfy the "shortly after" requirement if you became totally and permanently disabled within six months of when your disabling condition or impairment first arose. Conversely, you do not meet the "shortly after" requirement if you became totally and permanently disabled more than twelve months after the condition or impairment arose. The Retirement Board has "the right and duty to determine whether the 'shortly after' standard is satisfied" for any claim of total and permanent disability falling within this six to twelve month period.

The Retirement Board reviewed your 2014 application for T&P benefits and noted that it was based on a combination of orthopedic, neurological, and cognitive impairments, such as post-concussion syndrome, clinical depression, dementia pugilistica, migraine, vertigo, impaired verbal fluency, acute compartment syndrome, plantar fasciitis, cluneal nerve injury, and multiple orthopedic impairments. The Retirement Board also noted that your request for reclassification is based on what you call "severe" mental impairments, but those are the same impairments listed in your 2014 application, and they formed the basis of your award of Inactive A T&P benefits (and your SSA award). Thus, the Retirement Board determined that you have not met Section 5.7(b)'s reclassification requirements because you have not clearly and convincingly shown that you are totally and permanently disabled by a new or different impairment. The Retirement Board also determined that, even if your request for reclassification were based on a new or different impairment, the medical evidence you submitted does not show that you meet the requirements for the Active Football category. The evidence you submitted does not show that you are totally and permanently disabled, and it all falls well outside any conceivable "shortly after" period required for Active Football benefits. The Retirement Board noted that, for the Active Football category, it is not enough that your disability first arise during your NFL career; it must also become totally and permanently disabling "shortly after" it first arises.

CLOUD-AR-519

Mr. Michael Cloud
November 23, 2016
Page 3

In any event, the Retirement Board also determined that your appeal was untimely under Section 12.6(a).  The Retirement Board noted that (1) according to Plan records, you received the decision letter on March 4, 2016; (2) that decision letter advised you of the 180-day appeal deadline (which expired on August 31, 2016); and (3) the Plan did not receive your appeal until September 2, 2016, two days after the 180-day deadline expired.

For these reasons, the Retirement Board concluded that it cannot honor your request to reclassify your existing Inactive benefits to the Active Football category.  For this reason, the Retirement Board denied your appeal.

**Appeal Rights**

You should regard this letter as a final decision on review within the meaning of Section 503 of the Employee Retirement Income Security Act of 1974, as amended, and the regulations issued thereunder by the Department of Labor.  You are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to your claim for benefits.  You have the right to bring an action under Section 502(a) of the Employee Retirement Income Security Act of 1974, as amended, within 42 months from the date of this letter, which is May 16, 2020.

Please call the NFL Player Benefits Office if you have any questions.

Sincerely,

Michael B. Miller
Plan Director

Enclosure

cc: Jennifer Cloud

# APPENDIX 7

**BERT BELL/PETE ROZELLE NFL PLAYER RETIREMENT PLAN**
**RETIREMENT BOARD MEETING MINUTES**

November 15-16, 2016
Atlanta, Georgia

A meeting of the Retirement Board of the Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Retirement Plan" or "Plan") was held in Atlanta, Georgia on November 15-16, 2016. The following individuals attended:

**Retirement Board:**

Management Council designated members:

Katie Blackburn
Dick Cass
Ted Philips

NFLPA designated members:

Sam McCullum
Jeff Van Note
Robert Smith

Commissioner's Delegate:

Harold Henderson

**Additional Attendees:**

| | | |
|---|---|---|
| Gerald Abrams (by telephone) | Eric Field | Heather McPhee |
| Alvaro Anillo | Chris Flohr | Mike Miller |
| Audrey Askew (by telephone) | Bruce Gould | Lashay Rose |
| Hoby Brenner | Eric Harnish | Craig Svendsen |
| Mike Casey | Mike Junk | Sam Vincent |
| Andre Collins | Kristen Kirk | Adora Williams |
| Tom DePaso | Larry Lamade | Michele Yaras-Davis |
| Jack Donlan | Alex LeBlanc | |
| Stacey Eisenstein | Belinda Lerner | |
| Doug Ell | Mike Maricco | |
| Larry Ferazani | Bethany Marshall | |

All present could hear each other and be heard. Unless otherwise noted, all actions were unanimous.

1

CLOUD-MIN-005



**Individual Player Cases**

The Retirement Board took the following actions (unless otherwise noted, all actions were unanimous):

A.   **BENEFIT CONTINUATION**



B.   **MISCELLANEOUS BENEFITS**

REDACTED

**2.**   **Michael Cloud** On review of appeal from earlier decision to award Inactive A total and permanent disability benefits effective May 1, 2014, denied appeal for reclassification to the Active Football category for failure to meet the requirements of Plan section 5.7(b).

REDACTED

C.   **Credited Seasons**

7

CLOUD-MIN-006