**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **MICHAEL CLOUD** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:20-CV-01277-E** |
| | § | |
| **THE BERT BELL/PETE ROZELLE** | § | |
| **NFL PLAYER RETIREMENT PLAN** | § | |
| | § | |
| **Defendant** | § | |

---

**PLAINTFF'S SUPPLEMENTAL BRIEFING IN SUPPORT OF EMERGENCY MOTION TO COMPEL COMPLIANCE WITH COURT'S ORDER  [DKT. 38] AND PRODUCTION OF DOCUMENTS AND RECORDS**

---

NOW COMES Plaintiff, Michael Cloud (hereinafter "**Plaintiff**" or "**Cloud**"), and files his *Plaintiff's Supplemental Briefing in Support of Emergency Motion to Compel Compliance with Court's Order [Dkt. 38] and Production of Documents and Records* and respectfully shows this Honorable Court as follows:

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ................................................................................................. 3

**I.     INTRODUCTION**................................................................................................. 5

**II.    EXCEPTIONS TO ERISA FOR THE PURPOSES OF DISCOVERY** ..................... 7

**III.   EXCEPTIONS TO ERISA FOR THE PURPOSES OF DISCOVERY APPLIED**... 11

**IV.    ATTORNEY-CLIENT PRIVILEGE DOES NOT APPLY** ........................................ 13

**V.     ERISA REGULATIONS RELEVANT FOR THE PURPOSES OF DISCOVERY** . 14

**VI.    CITATIONS TO THE DEPOSITIONS OF DEFENDANTS' WITNESSES** ........... 15

*A. No one knows who defined "changed circumstances" and "clear and convincing" as used in Section 5.7(b) of the Plan documents.* ................................................................. 15

*B. Committee Members and Retirement Board Members do not see written decisions before being sent to disabled players* ................................................................................. 20

*C. Defendant's witnesses pointed Cloud to the Director's Report, Counsel's Report, and the database to obtain information on whether Defendant has applied a uniform construction of the Plan documents and applied the same consistently.* ........................ 21

*D. Defendant's purported corporate representative provided little, if any, information on the Retirement Board's review of Cloud's application for reclassification and, thus, Cloud is unable to determine whether a full and fair review occurred.* ......................... 25

**VI.    PRAYER**.............................................................................................................. 28

**CERTIFICATE OF SERVICE** ............................................................................................. 30

**APPENDIX** ........................................................................................................................... 31

## <u>TABLE OF CONTENTS</u>

**CASES**

*Advanced Physicians, S.C. v. Connecticut Gen. Life Ins. Co.*, 431 F. Supp. 3d 857 (N.D. Tex. 2020) ................................................................................................................................... 14

*Coughlin v. Lee*, 946 F.2d 1152 (5th Cir. 1991) .......................................................... 8

*Crosby v. Louisiana Health Service & Indemnity Co.*, 647 F.3d 258 (5th Cir. 2011)..................... ............................................................................................................ 8, 9, 11, 12, 14

*Crowell v. Shell Oil Co.*, 541 F.3d 295 (5th Cir. 2008). .............................................. 10

*Estate of Bratton v. Nat'l Union Fire Ins. Co.*, 215 F.3d 516 (5th Cir. 2000). .............................. 9

*Gosselink v. American Telephone and Telegraph Inc.*, 272 F.3d 722 (5th Cir. 2001) ................ 10

*Herbert v. Lando*, 441 U.S. 153 (1979)..…………………………………………………7

*Lauga v. Applied Cleveland Holdings, Inc.*, No. 16-14022, 2017 U.S. Dist. LEXIS 220890 (E.D. La. Mar. 30, 2017) ................................................................................................. 7

*Lifecare Management Services LLC v. Insurance Management Administrators Inc.*, 703 F.3d 835 (5th Cir. 2013)................................................................................................... 10

*Malbrough v. Kanawha Ins. Co.*, 943 F. Supp. 2d 684 (W.D. La. 2013)...................................... 7

*Mannino v. LA Health Serv. & Indem. Co.*, 19-185-SDD-RLB, 2021 U.S. Dist. LEXIS 60015 (M.D. La. Mar. 29, 2021)............................................................................................ 7

McLeod, Alexander, Powel & Apffel, P.C. v. Quarles, 894 F.2d 1482 (5th Cir. 1990) ............... 8

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978)........................................................... 8

*The Laborers Nat'l Pension Fund v. Snead Site Prep., Inc.*, No. 93-2181, 1993 U.S. App. LEXIS 38915 (5th Cir. Dec. 9, 1993) ............................................................................. 9, 14

*Torrey v. Infectious Diseases Soc'y of Am.*, 334 F.R.D. 79 (E.D. Tex. 2019) ............................. 7

*Vega v. National Life Ins. Servs.*, 188 F.3d 287 (5th Cir. 1999)................................. 8, 11, 12, 14

*Wildbur v. Arco Chem. Co.*, 974 F.2d 631 (5th Cir. 1992)......................................... 9, 10, 12, 13

*Wyatt v. Kaplan*, 686 F.2d 276 (5th Cir. 1982)……………………………………………………7

**STATUTES**

29 U.S.C. § 1102 ............................................................................................................... 7, 14

29 U.S.C. §1104 ............................................................................................................ 7, 14, 15

29 U.S.C. §1106 ....................................................................................................... 6, 7, 14, 15

29 U.S.C. § 1109 ................................................................................................................... 14

29 U.S.C. §1132 ................................................................................................. 7, 8, 13, 14, 15

29 U.S.C. § 1133 ................................................................................................................... 15

29 U.S.C. § 1140 ................................................................................................................... 15

**RULES**

Fed. R. Civ. P. 26 .................................................................................................................. 7

## I.      INTRODUCTION

1.      On August 25, 2021, the parties to this dispute presented for hearing on *Plaintiff's Emergency Motion to Compel Compliance with Court's Order [Dkt. 38] and Production of Documents and Records and Incorporated Brief in Support Thereof* ("**Motion**").[1]  Prior to the filing of the Motion, on July 22, 2021, this Honorable Court granted Cloud's request to depose Patrick Reynolds and Chris Smith, the members of the Disability Initial Claims Committee ("**Committee**"), and required The Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "**Plan**" or "**Defendant**") to produce Mr. Reynolds and Ms. Smith for deposition.[2]  Additionally, on July 22, 2021, this Honorable Court granted Cloud's request to conduct additional discovery on three (3) topics and stated, in pertinent part, as follows:

> Plaintiff may conduct discovery on the following subjects: (1) requests and communications between Plaintiff and Defendant requesting medical documentation; (2) any medical records in possession of Defendant that have not been provided to Plaintiff; and (3) such other information that is relevant to the completeness of the Administrative Record in this case and/or whether Defendant complied with ERISA's procedural regulations.[3]

In furtherance of this Honorable Court's order, Mr. Reynolds and Ms. Smith were deposed on August 4, 2021 and August 5, 2021, respectively, at Defendant's counsel's office in Washington DC.   On August 9, 2021, Sam Vincent, Defendant's purported corporate representative, was deposed via Zoom.

2.      During the depositions of Mr. Reynolds, Ms. Smith, and Mr. Vincent, Cloud learned that numerous relevant and important records were withheld.  During the depositions of Mr. Reynolds and Ms. Smith, Cloud learned that it was and continues to be Defendant's practice to create

---

[1] Dkt. 41.
[2] Dkt. 37.
[3] Dkt. 38.

quarterly Director's Reports and Counsel Reports that provide, among other things, statistical data of claims asserted, claims granted and denied, and the allocation of Plan funds. Additionally, Mr. Vincent testified that Defendant maintains a database of claims that evidence applications for total and permanent disability benefits ("**T&P Benefits**"), whether such claims were granted or denied, the level of benefits granted, if any, and the basis for which such a request was granted or denied. Cloud is entitled to these records to address and support his claims.

3.      Cloud remains vigilant in hopes of securing his medical records. For several months, Defendant refused to admit a repository of medical information exists that contains NFL players' medical records and documents. Finally, in depositions under oath, Mr. Vincent, Mr. Reynolds, and Ms. Smith confirmed there is, in fact, a repository of medical records and documents for NFL players, but still claimed not to know how to access the records. Ms. Smith testified she referred retired NFL players to the Plan to obtain such records. Cloud is entitled to these records to address and support his claims.

4.      Cloud has sought the opportunity to depose the members of the Retirement Board of Defendant at times relevant to this proceeding. Those individuals are Katie Blackburn, Dick Cass, Ted Phillips, Sam McCullum, Jeff Van Note, and Robert Smith. The Retirement Board was the final administrative body that denied Cloud's request for reclassification of these T&P Benefits. As noted in the Motion, Defendant has taken the position that the Retirement Board made the decision at issue and has the information regarding its decision. Cloud believes and argues that the Retirement Board breached its fiduciary duties to Cloud and, thus, Cloud must be permitted to address these issues individually with the members of the Retirement Board.

5.      At the conclusion of the hearing on the Motion, this Honorable Court requested supplemental briefing in four areas: 1) exceptions to ERISA for the purposes of discovery; 2) what

exceptions to ERISA apply to the discovery in this matter; 3) the procedural regulations that Cloud believes were potentially violated; and 4) excerpts from the depositions previously taken that support Cloud's position.  By and through this filing, Cloud hereby provides responses to each question posed by this Honorable Court.

## II.    EXCEPTIONS TO ERISA FOR THE PURPOSES OF DISCOVERY

6.    On August 31, 2021, Cloud filed *Plaintiff's Opposed Motion for Leave to File First Amended Complaint and Brief in Support* ("**Motion for Leave**") asserting, among other things, claims for breach of fiduciary duty under 29 U.S.C. §§ 1102, 1104, 1106(a), (b), and 1132(a)(3). "[D]iscovery regarding fiduciary duty claims under § 502(a)(3) [of ERISA] should not be limited to the administrat[ive] record and should, instead, be governed by the general scope of discovery provided by Rule 26(b)(1)."[4]  Rule 26(b)(1) of the Federal Rules of Civil Procedure permits discovery of "any nonprivileged matter that is relevant to any party's claim or defense."[5] "[D]iscovery rules are to be accorded a broad and liberal treatment to effect their purpose of adequately informing the litigants in civil cases."[6] At the discovery stage, relevancy is broadly construed, and information is considered relevant if it "encompass[es] any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the

---

[4] *Mannino v. LA Health Serv. & Indem. Co.*, 19-185-SDD-RLB, 2021 U.S. Dist. LEXIS 60015 at *13 (M.D. La. Mar. 29, 2021); *Lauga v. Applied Cleveland Holdings, Inc.*, No. 16-14022, 2017 U.S. Dist. LEXIS 220890 at *2 (E.D. La. Mar. 30, 2017) (holding discovery should be allowed in § 502(a)(3) actions); *see also Malbrough v. Kanawha Ins. Co.*, 943 F. Supp. 2d 684, 700 (W.D. La. 2013) (stating "[b]ecause this court has found that this case involves claims for relief under ERISA § 1132(a)(3), and that § 1132(a)(3) does not have the same stringent discovery limits as ERISA § 1132(a)(1)(B) cases, the court orders that the parties proceed with discovery").
[5] Fed. R. Civ. P. 26(b)(1); *see Wyatt v. Kaplan*, 686 F.2d 276, 283 (5th Cir. 1982).
[6] *Herbert v. Lando*, 441 U.S. 153, 177 (1979); *accord Torrey v. Infectious Diseases Soc'y of Am.*, 334 F.R.D. 79, 83 (E.D. Tex. 2019).

case."[7] The party resisting discovery "must have a valid objection to each one in order to escape the production requirement."[8]

7.     To the extent this Honorable Court denies the Motion and does not permit Cloud to set forth claims for breach of fiduciary duty based on the horrendous and absurd acts of Defendant, discovery in ERISA cases in the Fifth Circuit is governed by the standards set forth, among others, in *Wildbur v. Arco Chem. Co.*, *Vega v. National Life Insurance Services*, and *Crosby v. Louisiana Health Service & Indemnity Co.* and their progeny.  In *Vega v. National Life Insurance Services*, the Fifth Circuit explained exceptions to ERISA to be as follows:

> To date, those exceptions have been related to either **interpreting the plan** or **explaining medical terms and procedures relating to the claim**. Thus, evidence related to **how an administrator has interpreted terms of the plan in other instances is admissible**. Likewise, evidence, including **expert opinion, that assists the district court in understanding the medical terminology** or practice related to a claim would be equally admissible.[9]

In *Crosby v. Louisiana Health Service & Indemnity Co.*, the 5th Circuit further explained that discovery is permitted in ERISA cases expanding on *Vega* and stated, in pertinent part, as follows:

> *Vega* does not, however, prohibit the admission of evidence to resolve other questions that may be raised in an ERISA action. For example, in an ERISA action under 29 U.S.C. § 1132(a)(1)(B), a claimant may question the **completeness of the administrative record**; **whether the plan administrator complied with ERISA's procedural regulations**; and the **existence and extent of a conflict of interest** created by a plan administrator's dual role in making benefits determinations and funding the plan. These issues are distinct from the question of whether coverage should have been afforded under the plan. We see no reason to limit the admissibility of evidence on these matters to that contained in the administrative record, in part, because **we can envision situations where evidence resolving these disputes may not be contained in the administrative record**. **A**

---

[7] *Coughlin v. Lee*, 946 F.2d 1152, 1159 (5th Cir. 1991) (*quoting Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)).

[8] *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485–86 (5th Cir. 1990) (rejecting a party's contention that sanctions could not be imposed when the opposing party had not first requested an order to compel and stating that the party resisting discovery requests "must have a valid objection to each one in order to escape the production requirement").

[9] *Vega v. National Life Ins. Servs.*, 188 F.3d 287, 299-300 (5th Cir. 1999)(emphasis added)(internal citations omitted).

**discovery request for such information may be relevant and thus permissible under federal discovery rules**.[10]

In *Wildbur v. Arco Chem. Co.*, the Fifth Circuit created an exception for evidence outside of the administrative record and stated that "**determining whether the administrator has given a uniform construction to a plan may require a court to evaluate evidence of benefit determinations other than the one under scrutin**y."[11]  The Fifth Circuit, in *Wildbur*, stated it is:

> [W]ell-established criteria for evaluating a benefit determination under an abuse of discretion standard makes [sic] it obvious that some evidence other than that contained in the administrative record may be relevant at both steps of this process of judicial review.[12]
>
> ***
>
> [W]e now make manifest that a district court is not confined to the administrative record in determining whether, under our analytical framework, a plan administrator abused his discretion in making a benefit determination.[13]

Subsequently, the Fifth Circuit further explained this exception applies to evidence that "**relates to how an administrator has interpreted terms of the plan in other instances**."[14]  A court may also admit parol evidence in aid of interpretation of plan documents to determine the definition of undefined terms (*i.e.,* like the undefined terms in the Plan documents – "changed circumstances" and "clear and convincing").[15]

8.      To the extent this Honorable Court ultimately applies the abuse of discretion standard, this Honorable Court will apply the two-step analytical model for evaluating this case as established

---

[10]  *Crosby v. Louisiana Health Service & Indemnity Co.*, 647 F.3d 258, 263 (5th Cir. 2011)(emphasis added).
[11]  *Wildbur v. Arco Chem. Co.*, 974 F.2d 631, 638 (5th Cir. 1992).
[12]  *Id.*
[13]  *Id.* at 639.
[14]  *Estate of Bratton v. Nat'l Union Fire Ins. Co.*, 215 F.3d 516, 521 (5th Cir. 2000).
[15]  *The Laborers Nat'l Pension Fund v. Snead Site Prep., Inc.*, No. 93-2181, 1993 U.S. App. LEXIS 38915 at *5 & *15 (5th Cir. Dec. 9, 1993).

in *Wildbur*.[16]  First, this Honorable Court "must determine the legally correct interpretation of the plan."[17]  The second step of the *Wildbur* two-step analytical model requires this Honorable Court to conduct an analysis of the following:

(1)     the internal consistency of the plan under the administrator's interpretation,

(2)     any relevant regulations formulated by the appropriate administrative agencies, and

(3)     the factual background of the determination and any inferences of lack of good faith.[18]

The most important of these three factors is whether the administrator's interpretation was consistent with a fair reading of the plan.[19]  The greater the suspicion of an administrator's partiality, the "more penetrating" this Honorable Court's review should be.[20]  If the administrator interprets the plan in contradiction to the plain meaning of the plan language, it is an abuse of discretion even if there is neither evidence of bad faith nor any violation of any relevant administrative regulations.[21]

9.     The discovery sought in this matter relates to and addresses information needed to address the abuse of discretion standard as set forth in *Wildbur* and expressly authorized as exceptions to ERISA for the purposes of discovery.  Cloud seeks 1) Director's Reports, Counsel Reports, and information in the database compiled by Defendant; 2) copies of Cloud's medical records and documentation; and 3) depositions of the members of the Retirement Board that were in place

---

[16] *Wildbur*, 974 F.2d at 637-38.

[17] *Id.* at 637 (stating "[i]f the administrator did not give the plan the legally correct interpretation, the court must then determine whether the administrator's decision was an abuse of discretion").

[18] *Id.* at 638.

[19] *Crowell v. Shell Oil Co*., 541 F.3d 295, 313 (5th Cir. 2008).

[20] *Id.*

[21] *Gosselink v. American Telephone and Telegraph Inc.*, 272 F.3d 722, 727 (5th Cir. 2001); *see also Lifecare Management Services LLC v. Insurance Management Administrators Inc.*, 703 F.3d 835, 841-43 (5th Cir. 2013)(finding the claims administrator's categorization of a "skilled nursing facility" was incorrect and not a fair reading of and contradicted the plan documents).

during the time periods relevant to this case.  Defendant holds all of the relevant and necessary information that Cloud must have to address whether Defendant has consistently applied the Plan documents, whether the Plan complied with ERISA regulations, and whether Defendant acted in good faith in determining Cloud's request for T&P Benefits.  Defendant has noted an objection to providing the names of other Plan participants who have sought T&P Benefits.  Cloud does not necessarily need the names of other Plan participants (as kept in the database of T&P Benefits claims), but needs the data, including 1) whether such claims were granted or denied; 2) the level of benefits granted, if any; and 3) the basis for which such a request was granted or denied.  This information is necessary to determine whether Defendant has consistently applied the terms of the Plan documents, and whether Defendant complied with ERISA regulations.  Permitting Defendant to continue to hoard relevant documents would be highly prejudicial to Cloud.  Cloud is a disabled man who played seven (7) years in the NFL and is entitled to the T&P Benefits he seeks.  Defendant has done everything in its power to thwart Cloud's requests for the truth about the operation of the Plan.  The information discovered to date has been nothing short of alarming.  Cloud requests that this Honorable Court grant the Motion and permit Cloud to conduct the discovery requested therein.

### III.   EXCEPTIONS TO ERISA FOR THE PURPOSES OF DISCOVERY APPLIED

10.   As noted during the hearing before this Honorable Court on August 25, 2021, this Honorable Court's order dated July 22, 2021 stayed expressly within the lanes permitted for discovery by governing Fifth Circuit case law.  This Honorable Court granted additional discovery for "requests and communications between Plaintiff and Defendant requesting medical documentation" and "any medical records in possession of Defendant that have not been provided to Plaintiff," which clearly falls within the framework of *Vega v. National Life Insurance Services*

and *Crosby v. Louisiana Health Service & Indemnity Co.*   Additionally, this Honorable Court granted discovery for "such other information that is relevant to the completeness of the Administrative Record in this case and/or whether Defendant complied with ERISA's procedural regulations," which is also supported by *Vega v. National Life Insurance Services* and *Crosby v. Louisiana Health Service & Indemnity Co.* and, further, supported by *Wildbur v. Arco Chem. Co.* Cloud must be permitted to explore what appears to be significant inconsistencies in the application of the Plan, conflicts of interest, and breaches of fiduciary duties.[22]

11.     To answer this Honorable Court's question directly, Cloud argues that the following ERISA exceptions for the purposes of discovery apply to the matters set forth in the Motion: 1) "evidence of how an administrator has interpreted terms of the plan in other instances;"[23] 2) "completeness of the administrative record;"[24] 3) "whether the plan administrator complied with ERISA's procedural regulations;"[25] 4) "existence and extent of a conflict of interest created by a plan administrator's dual role in making benefits determinations and funding the plan;"[26] and 5) "whether the administrator has given a uniform construction to a plan…."[27]  Cloud requests that this Honorable Court grant the Motion and permit Cloud to conduct the discovery requested therein.

---

[22] For further discussion on conflicts of interest, breaches of fiduciary duties, and inconsistencies in the application of the Plan documents, please see *Plaintiff's Opposed Motion for Leave to File First Amended Complaint and Brief in Support* [Dkt. 55] and *Motion to Disqualify the Groom Law Group and Brief in Support* [Dkt. 56].  Both referenced motions are incorporated herein as if set forth herein verbatim.

[23] *Vega v. National Life Ins. Servs.*, 188 F.3d 287, 299-300 (5th Cir. 1999).

[24] *Crosby v. Louisiana Health Service & Indemnity Co.*, 647 F.3d 258, 263 (5th Cir. 2011).

[25] *Id.*

[26] *Id.*

[27] *Wildbur v. Arco Chem. Co.*, 974 F.2d 631, 638 (5th Cir. 1992).

## IV.   ATTORNEY-CLIENT PRIVILEGE DOES NOT APPLY

12.   Defendant's attempts to hide the ball are not protected by the attorney-client privilege.  In the context of ERISA, a fiduciary (and its lawyer) may not assert attorney-client privilege, because the attorney-client privilege rests with the beneficiaries of the Plan (*i.e.,* Cloud). In another case involving a different NFL plan, Judge Fish of the Northern District of Texas discussed and explained the attorney-client privilege in great detail as follows:

> The fiduciary exception to the attorney-client privilege derives from the law of trusts. Courts have held that 'when a trustee obtains legal advice relating to the exercise of fiduciary duties ...[,] the trustee cannot withhold attorney-client communications from the beneficiary of the trust." Like several other circuits, the Fifth Circuit has adopted the fiduciary exception in the ERISA context. In *Wildbur*, the court held that 'an ERISA fiduciary cannot assert the attorney-client privilege against a plan beneficiary about legal advice dealing with plan administration.' The *Wildbur* court based this holding on two rationales: first, '[a]n ERISA plan is a separate legal entity from its sponsor ..., and a plan's administrator owes a fiduciary duty to the plan's beneficiaries, not its sponsor', *id.*; and second, '[w]hen an attorney advises a plan administrator or other fiduciary concerning plan administration, the attorney's clients are the plan beneficiaries for whom the fiduciary acts, not the plan administrator.'

> Other courts that have applied the fiduciary exception in the ERISA context have explicitly noted that the 'exception is rooted in two distinct rationales.' Under one rationale, 'some courts have held that the exception derives from an ERISA trustee's duty to disclose to plan beneficiaries all information regarding plan administration.' 'Viewed in this light, the fiduciary exception can be understood as an instance of the attorney-client privilege giving way in the face of a competing legal principle.'

> Other courts have focused instead on the role of the trustee and have endorsed the notion that, 'as a representative for the beneficiaries of the trust which he is administering, the trustee is not the real client in the sense that he is personally being served.' 'Understood in this fashion, the fiduciary exception is not an 'exception' to the attorney-client privilege at all. Rather, it merely reflects the fact that, at least as to advice regarding plan administration, a trustee is not 'the real client' and thus never enjoyed the privilege in the first place.'

> The law regarding the fiduciary exception in the ERISA context has developed in cases presenting two different factual scenarios: (1) cases in which an ERISA plan participant brought suit against an ERISA plan fiduciary, and; (2) cases in which the federal government instigated an enforcement action or compliance

investigation against an ERISA plan fiduciary to protect the interests of the plan's participants, both scenarios, courts have relied on the duty rationale, the client rationale, or a combination of the two, and held that ERISA fiduciaries are precluded from asserting the attorney-client privilege under the fiduciary exception.[28]

The Plan must produce relevant information and is not permitted to hide behind the attorney-client privilege.  Continuing to withhold relevant and imperative documentation and information substantially prejudices Cloud. Cloud requests that this Honorable Court grant the Motion and permit Cloud to conduct the discovery requested therein without Defendant being permitted to withhold information based on the attorney-client privilege.

## V.   ERISA REGULATIONS RELEVANT FOR THE PURPOSES OF DISCOVERY

13.    This Honorable Court requested that Cloud provide the ERISA regulations Cloud believes were potentially violated or have been violated.  At this point, Cloud does not have all of the documents and information necessary to provide a full and complete list of violations.  Certainly, at this stage, Cloud believes and argues that Defendant has not interpreted the terms of the Plan documents consistently,[29] has not provided a full and fair review,[30] whether a conflict exists and/or self-dealing has occurred among parties in interest,[31] whether there has not been a uniform construction to the Plan documents,[32] whether breaches of fiduciary duties have occurred,[33] and the Plan documents do not define key language in this matter including "changed circumstances"

---

[28] *Advanced Physicians, S.C. v. Connecticut Gen. Life Ins. Co.*, 431 F. Supp. 3d 857, 860 (N.D. Tex. 2020)(internal citations omitted); *see also Wildbur v. Arco Chem. Co.*, 974 F.2d 631, 645 (5th Cir. 1992)(stating an ERISA fiduciary cannot assert the attorney-client privilege against a plan beneficiary about legal advice dealing with plan administration).

[29] *Vega v. National Life Ins. Servs.*, 188 F.3d 287, 299-300 (5th Cir. 1999)(emphasis added)(internal citations omitted).

[30] *Crosby v. Louisiana Health Service & Indemnity Co.*, 647 F.3d 258, 263 (5th Cir. 2011)(emphasis added).

[31] *Id.*; *see also* 29 U.S.C. § 1106(a).

[32] *Wildbur v. Arco Chem. Co.*, 974 F.2d 631, 638 (5th Cir. 1992).

[33] 29 U.S.C. §§ 1102, 1104, 1106(a), (b), 1109, 1132(a)(3).

and "clear and convincing".[34]  Additionally, Cloud points to the following sections of ERISA as potential violations or violations that will be addressed and discussed with members of the Retirement Board in depositions: § 1104(a)(1)(b) (duty of prudence), § 1104(a)(1)(d) (duty to act in accordance with documents and instruments governing the plan), § 1106(a) (prohibitions on transactions between the fiduciary and a party in interest), § 1106(b) (self-dealing), § 1132(a)(3) (breach of fiduciary duty), § 1133 (enforcement of the plan procedural requirements), and § 1140 (anti-retaliation and actions for interference).[35]  Other potential violations may be later discovered as discovery is ongoing in light of Defendant's refusal to provide relevant and important information. Cloud requests that this Honorable Court grant the Motion and permit Cloud to conduct the discovery requested therein.

## VI.   CITATIONS TO THE DEPOSITIONS OF DEFENDANTS' WITNESSES

14.     In *Plaintiff's Reply in Support of Emergency Motion to Compel Compliance with Court's Order [Dkt. 38] and Production of Documents and Records and Incorporated Brief in Support Thereof* and appendix ("**Reply**"), [36] Cloud provided citation to the depositions of Mr. Reynolds, Ms. Smith, and Mr. Vincent.  Plaintiff incorporates the Reply (and appendix) herein by reference as if set forth verbatim.  In this pleading, Cloud will provide question and answer testimony on important topics as follows:

> ### A.     *No one knows who defined "changed circumstances" and "clear and convincing" as used in Section 5.7(b) of the Plan documents.*

---

[34] *The Laborers Nat'l Pension Fund v. Snead Site Prep., Inc.*, No. 93-2181, 1993 U.S. App. LEXIS 38915 at *5 & *15 (5th Cir. Dec. 9, 1993); *see also* Dkt. 16 at § 5.7(b) [CLOUD-AR-037].
[35] 29 U.S.C. §§ 1104(a)(1)(b), 1104(a)(1)(d), 1106(a), 1106(b), 1132(a)(3), 1133, 1140.
[36] Dkt. 50; Dkt. 57.

15.     The key terms, "changed circumstances" and "clear and convincing", set forth in Section 5.7(b) of the Plan documents, are not defined. Sam Vincent, Defendant's purported corporate representative, testified as follows:

> Q: My question was not what you interpret the Plan to be saying. My question is: Is changed circumstance, as referenced in 5.7(b), defined anywhere in The Plan?
>
> A: I do not see that in The Plan.[37]
>
> ***
>
> Q: Okay. So what I just heard you say, you didn't come up with the definition of changed circumstances, correct?
>
> A: That's correct, sir.
>
> Q: You said the parties did, correct?
>
> A: Yes, they interpret the Plan rules.
>
> Q: Who from the parties sat down and came up with the definition of changed circumstances?
>
> A: I'm not sure, sir.[38]
>
> ***
>
> Q: Would you agree that it's important that the committee and board provide the same definition of clear and convincing in all cases?
>
> A: Yes, it needs to be clear and convincing.
>
> Q: Would you agree that it's important that the committee and the board provide the same definition of changed circumstance in all cases?
>
> A: Between the committee and the board, they should agree.
>
> Q: So is that yes?
>
> A: Yes, sir.[39]

---

[37] Appx. 1 at 335:8-12.
[38] Appx. 1 at 336:11-20.
[39] Appx. 1 at 341:5-16.

16.    Chris Smith, a member of the Committee, testified as follows:

Q: Is changed circumstances defined in the Plan?

A: No.[40]

***

Q: [E]arlier you testified that as it pertains to Mr. Cloud's 2016 reclassification decision letter, you didn't read it before it went out, correct?

A: That is correct.

Q: So you certainly didn't tell anyone, "This is what the definition of changed circumstance that I want to include in this decision letter," correct?

A: Correct.[41]

***

Q: Have you ever asked anyone to define for you what changed circumstances means?

A: Not that I recall.[42]

***

Q: Has anyone told you what clear and convincing means?

A: Not that I recall.[43]

***

Q: Have you come up with your own definition of what clear and convincing means?

A:  I'm not sure.[44]

***

Q: Don't you think it's important if you're trying to apply a set of facts to the Plan, that there be a logical definition of clear and convincing that you would apply to every case?

---

[40] Appx. 2 at 266:4-6.
[41] Appx. 2 at 271:9-12, 16-20.
[42] Appx. 2 at 273:14-16.
[43] Appx. 2 at 275:3-5.
[44] Appx. 2 at 275:9-11.

A: Yes, it would be helpful.

Q: Because you want uniform consistency on the way that disability benefits applications are being decided, correct?

A: It would definitely be helpful.[45]

\*\*\*

Q: You testified earlier that a new concussion symptom can qualify as a changed circumstance, correct?

A: Correct.[46]

\*\*\*

Q: You would agree that these changed symptoms are a changed circumstance as set forth in 5.7(b) of Exhibit 1, wouldn't you?

A: Yes, they are changed circumstances.[47]

\*\*\*

Q: And you feel certain that you reviewed Mr. Cloud's entire file prior to comes to a decision?

A: I feel certain that I reviewed his file to the best of my ability. So I don't know if I ended up being distracted and put it down and didn't go back to it or skipped a page or two, but I feel certain that I did read most of it to the best of my ability.

Q: Do you ever recall a time where you just relied on the case summary and did not read the entire file?

A: I don't recall that.

Q: Could that have happened?

A: Anything can happen.

Q: You would agree it's important for you to read the entire case file to come to a decision, right?

---

[45] Appx. 2 at 275-276:21-7.
[46] Appx. 2 at 331:9-12.
[47] Appx. 2 at 337:2-5.

A: I do agree, it is important.

Q: We talked about this earlier a little bit, it's extremely important for the player seeking benefits, right?

A: That is correct.

Q: And you hold the duty to the retired NFL players who are seeking benefits and you know that it's vastly important that you review the medical file in total before rendering a decision, right?

A: I do.

Q: But you would admit sometimes you may not read the entire file?

A: I'm human.

Q: Is that yes?

A: Like I said, anything can happen, so...[48]

***

Q: So whoever wrote this [the 2016 reclassification decision letter] came up with their own definition of changed circumstance was not approved by you, correct?

A: I don't recall talking to anyone about the wording of the letter.

Q: And just to be clear, I asked you a little bit different question. You didn't approve their definition of changed circumstance [as used in the 2016 reclassification letter]. Is that right?

A: Not that I recall.[49]

17.    Patrick Reynolds, a member of the Committee, testified as follows:

Q: In Section 5.7(b) of Exhibit 1, is also where we see the changed circumstances language. Do you see that?

A: I do.

Q:  Do you see where it is defined anywhere?

---

[48] Appx. 2 at 361-363:19-9.
[49] Appx. 2 at 339:5-14.

A: Yeah, again, it's not a capitalized term, so I would have to assume it's not defined.

Q: Now that you've had an opportunity to review this, does that refresh your memory on who defined the term "changed circumstances"?

A: I don't know who defined the term, but the practice that has been in place for the committee and for the board is that a changed circumstance is a new or different impairment.[50]

> **B.    Committee Members and Retirement Board Members do not see written decisions before being sent to disabled players.**

18.    Sam Vincent, the Plan's purported corporate representative, testified as follows:

Q: You're not aware of that circumstance because the [decision] letters are never submitted to the committee prior to being sent to the player, correct?

A: Correct, sir.[51]

19.    Chris Smith, a member of the Committee, testified as follows:

Q: Have you ever written a decision letter?

A: No.

Q: Do you review the decision letter before it goes out?

A: No.

Q: Have you ever made any changes to a decision letter before it goes out?

A: Not that I recall.[52]

\*\*\*

Q: Did you write the letter on Mr. Cloud's 2014 T&P benefits application?

A: I did not.[53]

\*\*\*

Q: As it pertains to Mr. Cloud's 2016 reclassification benefits, did you write the decision letter in that case?

---

[50] Appx. 3 at 244-245:17-9.
[51] Appx. 1 at 369:14-18.
[52] Appx. 2 at 199:3-11.
[53] Appx. 2 at 199:20-22.

A:  I did not.

Q: As it pertains to Mr. Cloud's 2016 reclassification for benefits application, did you review a decision letter before it was sent out?

A: Not that I recall.

Q: As it pertains to Mr. Cloud's 2016 reclassification for disability benefits application, did you review the decision letter and make any changes to it before it was sent out?

A: Not that I recall.[54]

20.     Patrick Reynolds, a member of the Committee, testified as follows:

Q: Do you review the decision letter before it's sent out?

A: Typically, no.[55]

***

Q: I believe you testified earlier, but I want to confirm, you did not write Exhibit 4 [2014 decision letter], correct?

A: That's correct.[56]

***

Q: Did you make a single change to this document [2014 decision letter]?

A: Not that I recall.

Q: Do you know whether you even looked at this document?

A: I don't recall.[57]


**C.      *Defendant's witnesses pointed Cloud to the Director's Report, Counsel's Report, and the database to obtain information on whether Defendant has applied a uniform construction of the Plan documents and applied the same consistently.***

---

[54] Appx. 2 at 200:5-17.
[55] Appx. 3 at 174:3-5.
[56] Appx. 3 at 330:3-6.
[57] Appx. 3 at 335-336:19-2.

21.     Sam Vincent, Defendant's purported corporate representative, testified as follows:

Q: So let me -- I didn't really hear the first part. You said something about a director's plan or something to that effect. What is that?

A: Well, when the director of the Plan Benefit Office reports on the allocation of money that goes out on disability, it is acknowledged who is receiving the benefit -- I'm sorry, the number of players receiving a certain benefit and which ones.

Q: Okay. And for some reason I'm having a little more trouble hearing you right now, so, I mean, if you could speak up a little bit.

A: Yeah.

Q: And let me tell you what I heard and tell me if I'm wrong. Did you say that that's something that the director of the Plan stands up and says or is that a document that's presented? That's why where I didn't hear you.

A: Both. There is a document that has the amounts, the number of players, and it's also expressed during the meeting itself.

Q: Is that the director's report?

A: Yes. Sorry if I called it director's plan.

Q: So the director's -- I'm sorry. I cut you off. Can you say that again?

A: Yeah. I called it the director plan book. It would be the director's report.

Q: Okay. So when you say director's plan book and director's report, those are the same thing, correct?

A: Yes, plan director's report.

Q: If I heard you correctly, those are prepared quarterly for the board meeting. Is that right?

A: That's correct.[58]

***

Q: Do you know whether more benefits applications under the T&P umbrella are granted or denied?

---

[58] Appx. 1 at 171-173:22-19.

A: I wouldn't be able to confirm that right now.[59]

\*\*\*

Q: The only way for us to get those is going to be through that database that you talked about before, correct?

A: That would be information in that database.[60]

\*\*\*

Q: But you could run a query in your database and retrieve the requested information [about the grant and denials of request for T&P Benefits], correct?

A: We should be able to run a query to get that type of information.[61]

\*\*\*

Q: And that's a document that can be easily produced in a lawsuit, correct? Can you explain that again, Mr. Vincent[?]

A: Yes. So I wouldn't be able to do it right now. For example, we would he have to go into the database, look at the fields to determine, you know, what the request is. And then from there, it would go into a massive Excel sheet and then it would have to be filtered, for example, approvals and denials. But that would be a method to kind of get it at the end, to have an overall scope.[62]

22.    Chris Smith, a member of the Committee, testified as follows:

Q: Do you know on a statistical basis how many disability claims have been granted versus denied?

A: I do not.[63]

\*\*\*

---

[59] Appx. 1 at 158:4-8.  Mr. Vincent, the Plan's purported corporate representative, was unable to confirm how many requests for Active Football T&P Benefits have been granted or denied, how many requests have been made to go from Inactive A T&P Benefits to Active Football Benefits, and how many Inactive A T&P Benefits requests have been denied.  Appx. 1 at 119:8-13, 122:14-18, 128-129:22-6, 138:14-17, 140:18-20, 158:4-8, 159:13-17, and 158-159:21-5.
[60] Appx. 1 at 158-159:21-5.
[61] Appx. 1 at 126:17-22.
[62] Appx. 1 at 126:1-15.
[63] Appx. 2 at 26:19-22.

Q: Are you aware of what the contents of those director's reports say? Let's start with the last quarterly report that you indicated probably would be in February of this year?

A: No, I don't remember.

Q: Do you remember the contents of the director's report for any quarter prior to the last report that you reviewed?

A: I don't remember.[64]

\*\*\*

Q: How do you receive documentation for board meetings?

A: They are included in the counsel report.

Q: Okay. Tell me what a counsel report is.

A: The counsel report is the information that Groom Law Group compiles for the retirement board meeting.

Q: So the quarterly report, is that an attachment to the counsel report?

A: It is in the counsel report -- a part of the counsel report.[65]

23.    Patrick Reynolds, a member of the Committee, testified as follows:

Q: How many disability claims have been presented to you during your time on the committee?

A: I don't have a specific number.

Q: Give me an estimate.

A: Roughly a thousand a year.

Q: You said there are various statistics that are presented at these board meetings. Do you have the statistics on what percentage of claims are granted?

A: I don't. I have access to the statistics. I believe they're on the Plan director's report.

Q: Okay. So the Plan director's report?

---

[64] Appx. 2 at 36-37:16-3.
[65] Appx. 2 at 29-30:17-7.

A: I believe so. I may be -- the number of claims that come through and the number of claims that are decided is on that. I believe it includes percentage of approvals and denials, but I might be mistaken.

Q: How often does the Plan director report come out?

A: Quarterly, for the board meetings.[66]

***

Q: Where we would find the percentage of claims that were granted, would be in the Plan director's report that's done quarterly. Is that correct?

A: I believe so.

Q: And the same question as to the claims that were denied. There would be a percentage of claims denied showing the Plan director's report that gets prepared quarterly. Is that correct?

A: I believe -- I believe so. That may not be the case. It may just show the number of claims.[67]

> ### D.   *Defendant's purported corporate representative provided little, if any, information on the Retirement Board's review of Cloud's application for reclassification and, thus, Cloud is unable to determine whether a full and fair review occurred.*

24.    In his deposition, Sam Vincent, Defendant's purported corporate representative, confirmed that he was present for (5) minute telephone conversations with the members of the Retirement Board (Katie Blackburn, Dick Cass, Ted Phillips, Sam McCullum, Jeff Van Note, and Robert Smith).  In these conversations, the Groom Law Firm asked all of the questions and asked only "yes-or-no" questions of the members of the Retirement Board rather than asking open-ended questions.[68]  Many relevant and essential questions were left unasked. Mr. Vincent testified as follows:

---

[66] Appx. 3 at 198-199:11-9.
[67] Appx. 3 at 200:10-22.
[68] Appx. 1 at 80:8-11.

Q: Did you ever ask whether Ms. Blackburn had any recollection as to any discussion or debate as to Mr. Cloud's case?

A: I don't recall if a question was asked in that manner. But there was nothing unique that popped out to her about the case.[69]

\*\*\*

Q: If I wanted to know what was discussed for Ms. Blackburn to come to her decision to deny Mr. Cloud's request for benefits, I would have to ask her that question because you didn't ask her, right?

A: I did not ask her, that's correct.[70]

\*\*\*

Q: So was there something that was asked about his review and any independent research that he conducted?

A: No. It was nothing along those lines.

Q: Okay. Did you ask Mr. Cass whether he received any advice from a third-party adviser as it pertains to Mr. Cloud's case?

A: I did not ask that question.[71]

\*\*\*

Q: Did you ask Mr. Cass if he recalled any discussions he had with any fellow board members been Mr. Cloud's case?

A: I did not ask that question.[72]

\*\*\*

Q: You did not ask Mr. Cass whether he had any discussions about Mr. Cloud's case with any of the other board members. Is that correct?

A: I did not ask that question.[73]

---

[69] Appx. 1 at 27:7-12.
[70] Appx. 1 at 28:16-21.
[71] Appx. 1 at 32:5-13.
[72] Appx. 1 at 33:9-12.
[73] Appx. 1 at 34:8-11.

\*\*\*

Q: Did you actually ask him what conversations he had with other members of the board about his decision on Mr. Cloud's claim?

A: I did not.[74]

\*\*\*

Q: Did Mr. McCullum have any recollection of medical records presented by Mr. Cloud?

A: I didn't ask that question specifically.

Q: Did Mr. McCullum recall or have any recollection of the injuries, illnesses, ailments, that Mr. Cloud was presenting?

A: I didn't ask that question.

Q: Did Mr. McCullum recall ever having any conversations with Mr. Reynolds or Ms. Smith about Mr. Cloud's appeal?

A: That question was not asked.[75]

\*\*\*

Q: Did he confirm to you that he actually did review Mr. Cloud's medical records?

A: I did not ask that question.

Q: Did you ask Mr. Van Note whether he had any conversations with Mr. Reynolds or Ms. Smith about Mr. Cloud's applications for disability benefits?

A: I did not ask that question.

Q: Did you ask Mr. Van Note whether he recalled any conversations or communications he had with any other board members about Mr. Cloud's medical records or applications for disability benefits?

A: I did not ask that question.[76]

\*\*\*

---

[74] Appx. 1 at 36:11-14.
[75] Appx. 1 at 40:3-15.
[76] Appx. 1 at 42:8-22.

Q: Did Mr. Smith recall ever having any notes analyzing Mr. Cloud's request for disability benefits and associated medical records?

A: I'm not sure of that.[77]

***

Q: Did you ask Mr. Smith about any discussions or debates he had with any other members of the board about Mr. Cloud's case?

A: I did not ask that question.

Q: Did you ask Mr. Smith whether he had any conversations with Mr. Reynolds or Ms. Smith about Mr. Cloud's application and request for benefits?

A: I did not ask that question.

Q: Did you ask Ms. Smith whether he received any advice from any third party about Mr. Cloud's request for benefits?

A: I did not ask that question.[78]

25.     Similarly, Ms. Smith and Mr. Reynolds, the two (2) members of the Committee, deferred to the Retirement Board regarding their review of Cloud's reclassification request.[79]  All of the information relating to the consistency in the application of the Plan documents, uniformity in decisions, whether medical records were actually reviewed, and whether a full and fair review was conducted rests with the Retirement Board and, thus, the members of the Retirement Board must be deposed by Cloud.  Cloud requests that this Honorable Court grant the Motion and permit Cloud to conduct the discovery requested therein.

## VI.     <u>PRAYER</u>

WHEREFORE, Plaintiff prays that 1) the Motion be granted, 2) Defendant be ordered to produce Katie Blackburn, Dick Cass, Ted Phillips, Sam McCullum, Jeff Van Note, and Robert

---

[77] Appx. 1 at 44:1-4.
[78] Appx. 1 at 44-45:13-3.
[79] Appx. 2 at 173-174:15-10; Appx. 3 at 363-364:12-14.

Smith to begin such depositions within five (5) days of the filing of this Motion, 3) Defendant be ordered to produce documents responsive to Request for Production Nos. 18, 37, 57, and 58 and Second Request for Production No. 3; 4) Defendant and the Groom Firm be ordered to pay Cloud's costs, attorney's fees, and expenses associated with the filing of this Motion, pay the costs, attorney's fees, and expenses for the depositions of the members of the Retirement Board, and 5) order that the depositions of the members of the Retirement Board occur in Dallas, Texas.  Plaintiff further prays and requests such other relief, general or special, to which Plaintiff may show himself justly entitled.

Respectfully submitted on this the 10th day of September 2021.

BARLOW GARSEK & SIMON, LLP
920 Foch Street
Fort Worth, Texas 76107
817.731.4500 (telephone)
817.731.6200 (facsimile)

By:    /s/   Christian Dennie
CHRISTIAN DENNIE
State Bar No. 24045775
cdennie@bgsfirm.com
***ATTORNEY FOR PLAINTIFF***

## <u>CERTIFICATE OF SERVICE</u>

On September 10, 2021, the *Plaintiff's Supplemental Briefing in Support of Emergency Motion to Compel Compliance with Court's Order [Dkt. 38] and Production of Documents and Records* was filed with the Clerk of the Court via CM/ECF, which automatically delivers notice of the filing of the same to all counsel of record.

           */s/ Christian Dennie*
           Christian Dennie, *Counsel for Plaintiff*

# **APPENDIX**

Appendix 1:    Excerpts of the Deposition of Sam Vincent

Appendix 2:    Excerpts of the Deposition of Chris Smith

Appendix 3:    Excerpts of the Deposition of Patrick Reynolds