# APPENDIX 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

---------------------------

MICHAEL CLOUD, :
: 
Plaintiff, :
: Civil Action No.:
vs. :
: 3:20-CV-01277-E
THE BERT BELL/PETE ROZELLE :
NFL PLAYER RETIREMENT PLAN, :
:
Defendant. :

---------------------------

INDIVIDUAL AND 30(b)(6) DEPOSITION OF
HESSMAN VINCENT

DATE: August 10, 2021
TIME: 10:06 a.m. to 8:34 p.m.
LOCATION: Groom Law Group
1701 Pennsylvania Avenue
Suite 1200
Washington, D.C. 20006

REPORTED BY: Felicia A. Newland, CSR

Veritext Legal Solutions
1250 Eye Street, N.W., Suite 350
Washington, D.C. 20005

Q Did she ever recall reviewing Mr. Cloud's case?
A I don't recall if we asked her the question in that manner, but she did decide on Mr. Cloud case.

Q Did you ever ask whether Ms. Blackburn had any recollection as to any discussion or debate as to Mr. Cloud's case?
A I don't recall if a question was asked in that manner. But there was nothing unique that popped out to her about the case.

If I wanted to know what was discussed for Ms. Blackburn to come to her decision to deny Mr. Cloud's request for benefits, I would have to ask her that question because you didn't ask her, right?
A I did not ask her, that's correct.

.

Q Did you ever ask Ms. Blackburn whether she discussed Mr. Cloud's case with Patrick Reynolds and Chris Smith?
A I did not ask that.
Q Did you user ask Ms. Blackburn what advice she received from third parties about Mr. Cloud's case?
A I did not ask that question.

.

Q So was there something that was asked about his review and any independent research that he conducted?

A No. It was nothing along those lines.

Q Okay. Did you ask Mr. Cass whether he received any advice from a third-party adviser as it pertains to Mr. Cloud's case?

A I did not ask that question.

Q Did you ask Mr. Cass if he recalled any discussions he had with any fellow board members been Mr. Cloud's case?

A I did not ask that question.

Q And there was no discussion that -- let me ask it a different way.
You did not ask Mr. Cass whether he had any discussions about Mr. Cloud's case with any of the other board members. Is that correct?
A I did not ask that question.

--

Q What was Mr. Philip's response to those questions?
A The same as the previous two; no unique knowledge, no notes kept, didn't review outside the meeting's website.
Q Did Mr. Philips recall actually reviewing any of Mr. Cloud's records?
A He doesn't recall the case.

Q Did you actually ask him what conversations he had with other members of the board about his decision on Mr. Cloud's claim?
A I did not.
Q Did you ask him whether he spoke to Mr. Reynolds or Ms. Smith in his review of Mr. Cloud's case?
A I did not.

?

Q Did you ask whether they ever kept any notes?
A Not specifically in that manner, no. We asked them if they had any notes, and they do no have any notes.

Q So if a board member was to keep notes of their analysis of medical records and information presented in a disability application, they would keep those personally and independently of the benefits office. Is that correct?
A That may be the case if they are keeping notes.

Page 38

Page 39

Q Did Mr. McCullum have any recollection of medical records presented by Mr. Cloud?
A I didn't ask that question specifically.
Q Did Mr. McCullum recall or have any recollection of the injuries, illnesses, ailments, that Mr. Cloud was presenting?
A I didn't ask that question.
Q Did Mr. McCullum recall ever having any conversations with Mr. Reynolds or Ms. Smith about Mr. Cloud's appeal?
A That question was not asked.
Q Did Mr. McCullum have any recollection of any discussion, conversations or debates between him and other members of the board relating to Mr. Cloud's request for benefits?
A That question was not asked.

Page 40

Page 41

Q Did he confirm to you that he actually did review Mr. Cloud's medical records?
A I did not ask that question.
Q Did you ask Mr. Van Note whether he had any conversations with Mr. Reynolds or Ms. Smith about Mr. Cloud's applications for disability benefits?
A I did not ask that question.
Q Did you ask Mr. Van Note whether he recalled any conversations or communications he had with any other board members about Mr. Cloud's medical records or applications for disability benefits?
A I did not ask that question.

Page 42

Q Did Mr. Smith recall ever having any notes analyzing Mr. Cloud's request for disability benefits and associated medical records?
A I'm not sure of that.

Q Did you ask Mr. Smith about any discussions or debates he had with any other members of the board about Mr. Cloud's case?
A I did not ask that question.
Q Did you ask Mr. Smith whether he had any conversations with Mr. Reynolds or Ms. Smith about Mr. Cloud's application and request for benefits?
A I did not ask that question.
Q Did you ask Ms. Smith whether he

Page 44

received any advice from any third party about Mr. Cloud's request for benefits?
A I did not ask that question.

Q So I will tell you that from Ms. Smith's deposition, she said she recalled maybe 10, maybe 15 reclassification requests that she handled as a member of the committee.
Does that sound fair from your knowledge and your recollection?
A Is she stating that as ever under her capacity or in a yearly manner?
Q I believe she said ever.
A That could be a fair assessment. I

Page 45

Q Is it fair to say all of the questions that were asked of the board members were yes-or-no questions?

A Yes.

Page 118

Page 120

Q Let's go one by one.

As it pertains to requests to receive Active A football benefits, do you know the numbers that was granted versus the ones that were denied?

A I do not know the numbers denied. And I can tell you based off of March 2021, how many players are receiving Active football.

Page 119

Page 121

:

Q Thirty-two players are receiving how many requests for Active A benefits have been denied?

A I don't know have that answer. Football --

Q Are there any spreadsheets or other data that you all keep on total and permanent disability claims that have been granted or denied?

A Historically, there is a database that keeps track of a case as it goes through. And then once a decision is made, approval or denial, that's acknowledged, it would have to be a -- it's considered a data dump onto a chart and then it has to be configured to provide that type information. A database has not existed for forever --

Q So there is a data -- I'm sorry. Go ahead.

A I mean if you're looking for from the inception of T&P, I wouldn't say that that sort of database exists. The database is relatively newer in the sense that since it's after 2000 -- I wouldn't even be able to say the exact year, but it's after 2010, well after 2010.

Q Okay. So sometime after 2010, a database was created that would show the number of claims that are granted and the number of claims that are denied for total and permanent benefits, correct?

A Yes, if you download the data, that should be retrievable.

Q And that's a document that can be easily produced in a lawsuit, correct?

MR. MEEHAN: Well, Objection to form. Can you explain that again, Mr. Vincent.

THE WITNESS: Yes.

So I wouldn't be able to do it right now. For example, we would he have to go into the database, look at the fields to determine, you know, what the request is. And then from there, it would go into a massive Excel sheet and then it would have to be filtered, for example, approvals and denials. But that would be a method to kind of get it at the end, to have an overall scope.

BY MR. DENNIE:

Q But you could run a query in your database and retrieve the requested information, correct?

MR. MEEHAN: Objection to the form.

THE WITNESS: We should be able to run a query to get that type of information.

Page 126

MR. DENNIE: Counsel, was that something that you guys can produce? That's the first time that we heard that, too.

MR. MEEHAN: Well, as you know, we think that has nothing whatsoever to do this lawsuit, so you can send a request for it and we will take it under advisement and we'll try to meet and confer with you but as I understand --

MR. DENNIE: We already have.

MR. MEEHAN: It's no -- there's been no meeting and conferring on that topic. As you just said, that came up a moment ago. That's brand new. We've had no discussion on it at all. But as I understand the witness, he is talking about it is a process that he could follow to create something. And that sounds like a lot of work to me. So I will have to get a better understanding from the witness. And I would like to have that understanding from you off this record as to what the relevance to this case it could possibly have. So that's a discussion that we would need to have.

MR. DENNIE: As you know, arbitrary

Page 127

and capricious. And I don't know why we're still fighting that. It's the same request that we talked about with the director's report and the counsel report. The reason we don't know about this stuff is because you're not giving us information that's being requested.

So you have the data, so you've got to give the data. I mean, here we are in discovery depositions two weeks before the discovery deadline expires and I'm learning about records for the first time. I just ask you to meet your duty under the rule.

We'll have to add that to our motion to compel. This is our conferring 37, 57, and 58 of the request. If you have responsive information, you need to produce it. You can get back to me about when it's going to be produced. We've requested the director's and counsel report prior to this deposition. It was not provided, so we're apparently going to have to demand and request more stuff. But you can get back to me.

MR. MEEHAN: Okay. Since you want to

Page 128

put it on the record, I'll just say briefly what took place just now is not a meet and confer. I do not know whether production of that information is something that will take five minutes or five years. I have no insight on it. Now is not the time for me to have that discussion with Mr. Vincent.

The director's and counsel reports, we had no meet and confer of any nature. You made your request, we've communicated that we would get back to you. You filed a motion with no meet and confer on that topic. I don't want to belabor this deposition. We're not going to agree right now.

MR. DENNIE: What are you talking about?

MR. MEEHAN: I do not wish to belabor this --

MR. DENNIE: We talked about it on the 5th.

MR. MEEHAN: -- deposition -- we did not.

Page 129

Q And as we sit here today, you can't tell me how many claims that were Active A benefits have been denied. Is that correct?

A That's correct, I cannot give you the decisions on Active -- well, let's just say total and permanent disability as a whole, since the category is determined by the committee or the board.

Page 138

Page 139

Q Can you tell me how many claims for Inactive A benefits have been denied?

A I do not have that answer, no.

Page 140

Page 141

Q Do you know whether more benefits applications under the T&P umbrella are granted or denied?

A I wouldn't be able to confirm that right now.

Q The only way for us to get those is going to be through that database that you talked

Page 158

about before, correct?

MR. MEEHAN: Objection. No foundation.

THE WITNESS: That would be information in that database.

As we sit here today, you can't tell me whether T&P benefits applications are granted or denied two to one, three to one, four to one, five to one? You have no clue. Is that right?

A That's correct.

Q Do you know how many of the T&P reclassifications benefits appeals have been granted?

A I cannot confirm that either.

Q Do you know a percentage of the T&P

Page 159

reclassifications appeals have been granted?

A I do not know that answer.

Q Who are the beneficiaries under the Plan?

A Who are the beneficiaries? The players.

,

Page 160

Page 161

.

Q Of the Active football benefits that have been provided, how many of those are related to concussion symptoms or syndrome?

A I don't have an answer to that at all.

--

during the quarterly board meeting, there's

acknowledgment of how many players are receiving a benefit and which ones at that time.

Q Would that be in the minutes?

A Would it be in the minutes? I can't confirm that. I believe it would be but...

Q Okay. If you'll flip to Exhibit 12.

A Okay.

Q Do you see that indicated anywhere?

MR. MEEHAN: Hang on one second. He needs to get the exhibit binder.

MR. DENNIE: Okay.

MR. MEEHAN: It's just a little further down the table.

THE WITNESS: Thank you.

MR. MEEHAN: Okay. He's got it.

THE WITNESS: No, that is not in the minutes provided to you -- or by you, I should say.

BY MR. DENNIE:

Q Those were provided to me, not by me, just so we're clear.

A Okay.

Q So where in the minutes should that

have been?

A Maybe with the director of plan book. It goes over the amounts, it may have been the retirement board discussion. I couldn't confirm where that discussion, what happens. But that's --

Q So let me -- I didn't really hear the first part. You said something about a director's plan or something to that effect. What is that?

A Well, when the director of the Plan Benefit Office reports on the allocation of money that goes out on disability, it is acknowledged who is receiving the benefit -- I'm sorry, the number of players receiving a certain benefit and which ones.

Q Okay. And for some reason I'm having a little more trouble hearing you right now, so, I mean, if you could speak up a little bit.

A Yeah.

Q And let me tell you what I heard and tell me if I'm wrong. Did you say that that's something that the director of the Plan stands up and says or is that a document that's presented?

That's why where I didn't hear you.

A Both. There is a document that has the amounts, the number of players, and it's also expressed during the meeting itself.

Q Is that the director's report?

A Yes. Sorry if I called it director's plan.

Q So the director's -- I'm sorry. I cut you off. Can you say that again?

A Yeah. I called it the director plan book. It would be the director's report.

Q Okay. So when you say director's plan book and director's report, those are the same thing, correct?

A Yes, plan director's report.

Q If I heard you correctly, those are prepared quarterly for the board meeting. Is that right?

A That's correct.

.

Page 226

Page 228

Page 227

Q You would agree that the Plan office directed Mr. Cloud to see Dr. Mandelbaum, correct?
A For his line of duty examination, yes, sir.
Q So if your counsel e-mailed me and said that Mr. Cloud was directed to Dr. Mandelbaum by someone other than the Plan, that would be incorrect, right?

Page 229

Q Okay. So what I just heard you say, you didn't come up with the definition of changed circumstances, correct?
A That's correct, sir.
Q You said the parties did, correct?
A Yes, they interpret the Plan rules.
Q Who from the parties sat down and came up with the definition of changed circumstances?
A I'm not sure, sir.

BY MR. DENNIE:
Q My question was not what you interpret the Plan to be saying. My question is: Is changed circumstance, as referenced in 5.7(b), defined anywhere in The Plan?
A I do not see that in The Plan,

,

Page 338

Page 340

Page 339

Q Would you agree that it's important that the committee and board provide the same definition of clear and convincing in all cases?
A Yes, it needs to be clear and convincing.
Q Would you agree that it's important that the committee and the board provide the same definition of changed circumstance in all cases?
A Between the committee and the board, they should agree.
Q So is that yes?
A Yes, sir.

Page 341

Page 366

Page 368

Page 367

BY MR. DENNIE:

Q You're not aware of that circumstance because the letters are never submitted to the committee prior to being sent to the player, correct?

A Correct, sir.

Page 369

# APPENDIX 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

---------------------------

MICHAEL CLOUD, :
:
Plaintiff, :
: Civil Action No.:
vs. :
: 3:20-CV-01277-E
THE BERT BELL/PETE ROZELLE :
NFL PLAYER RETIREMENT PLAN,:
:
Defendant. :

---------------------------

DEPOSITION OF CHRISTOPHINE SMITH

DATE: August 5, 2021
TIME: 8:01 a.m. to 4:55 p.m.
LOCATION: Groom Law Group
1701 Pennsylvania Avenue
Suite 1200
Washington, D.C. 20006

REPORTED BY: Felicia A. Newland, CSR

Veritext Legal Solutions
1250 Eye Street, N.W., Suite 350
Washington, D.C. 20005

.

Q What time period did you serve on the committee?

A I have served on the committee since its inception, which I believe was in 2006. And I still serve on the committee.

Q So you served on the committee from 2006 to the present. Is that correct?

A Correct.

Q Do you know on a statistical basis how many disability claims have been granted versus denied?

A I do not.

Page 26

?

Page 27

.

Q Okay. So if I was trying to determine when benefits were provided and that case granted or denied, where would I find that information?

A You'd probably find that from the Plan Benefit Office.

Q Okay. Yesterday there was some testimony about quarterly reports prepared by the

Page 28

claim benefits office?

A Yes, for the retirement board meeting purposes.

Q Have you seen those records?

A Yes.

Q In your experience, are they prepared every quarter?

A Yes.

Q So that's something that the Plan can get its hands on pretty easy I would think, correct?

A I would think so.

How do you receive documentation for board meetings?

A They are included in the counsel report.

Q Okay. Tell me what a counsel report is.

Page 29

A The counsel report is the information that Groom Law Group compiles for the retirement board meeting.
Q So the quarterly report, is that an attachment to the counsel report?
A It is in the counsel report -- a part of the counsel report.
Q And I just want to be clear on how it gets there. So you're familiar with the Plan or the retirement board -- let me do that another way.
So you're familiar with the retirement board -- let me do that again. Today, I can't talk. It's something about the air.
You're familiar that the retirement board compiles statistical information on whether claims are granted or denied, correct?
A The Claim Benefit Office compiles that information.
Q What did I say? I said the retirement board?
A Yeah, you did.
Q Okay. I'm sorry.

Page 30

The Plan Benefit Office compiles granted versus denied disability applications, correct?
A Yes.
Q And that's a document that we should be able to get our hands on pretty easily, correct?
A I would think so.
Q As it relates to funding of the Plan, are there documentation, records, that you have seen that indicates how much funding goes out on a quarterly basis?
A I believe that is in the counsel report as well.
Q So that's also information that's compiled by the retirement -- excuse me. Let me ask it again.
That's also information that's retirement -- that's also information that's compiled by the Benefits Office, correct?
A Yes.

Page 31

Page 32

Are you saying the information that we just talked about, the granting or denial of benefits claims, the funding of claims, that's not in the counsel report, but it's in a director's report?
Is that what you're saying?
A Correct.

.

Q Okay. When you say director's report, what director are you referencing?
A The Plan director.

Page 33

MR. DENNIE: So I'm going to again request that those reports be provided. I requested it yesterday. There are multiple requests for production that have asked for records similar to that, and I believe that was 37, 57, 58, there's probably more. When are we going to get those documents? We requested those probably nine months ago.

MR. MEEHAN: If you're directing that to me, you know, send me a request.

MR. DENNIE: We did nine months ago.

MR. MEEHAN: Well, send me a request now telling me what you want and why you think you're entitled to it. And like I said yesterday, we'll take it under advisement and we'll get right back to you. I want to make sure I know exactly what you want, so if you can put it in writing so there's no confusion.

MR. DENNIE: Well, just to be clear, we're already on the record. So we're asking for the director's report, the quarterly reports that have been testified to by both of the witnesses that have been withheld that were requested in our first request for production many, many months ago. And discovery is running out and now I'm deposing witnesses and I don't have these report documents. When can I get those?

I know you're new to the case, you probably didn't handle that, but your colleague has been in the whole time, so I need to know when we can have them. Can we have them today?

MR. MEEHAN: I need you to send me a written request on exactly what you want. I'm

focused on the deposition today. I'll respond to you as soon as possible.

BY MR. DENNIE:

Q So I want to be clear, I can't ask you too many questions about documents I've never seen, but you and the witness yesterday both confirmed that there are records that discuss the funding of the Plan and whether benefits were granted or denied. And you said they're in a director's report, correct?

A To the best of my knowledge, yes.

Q Are you aware of what the contents of those director's reports say?

Let's start with the last quarterly report that you indicated probably would be in February of this year?

A No, I don't remember.

Q Do you remember the contents of the

director's report for any quarter prior to the last report that you reviewed?

A I don't remember.

Q The only way that I'm going to be able to determine what's in those records is by getting the records, because neither you or Mr. Reynolds recalled the contents of the report, other than you know that there's discussion of funding, and there's a discussion of granting and denial of benefits. Is that right?

A Correct.

Q Do you know how many claims go to appeal to the board on a percentage basis?

A I don't know.

Q Is that included within the director's report?

A I would think so.

Q If I asked you the same questions about whether you recall the contents of the director's report related to appeals of disability benefits applications, would you give me the same answer, that you don't recall the contents of any

Page 170

.

Page 172

Q So is it fair to say you were not present in person or by phone on the November 15th, 16th, 2016 meeting?
A That is correct.

Page 171

You indicated that the board decided Mr. Cloud's appeal, his request for reclassification, correct?
A Correct.
Q The members on the board who made that decision were Katie Blackburn, Dick Cass, Ted Philips, Sam McCullum, Jeff Van Note, and Robert Smith, correct?

Page 173

A Correct.

Q If I wanted to know how the board members arrived at their decision to deny Mr. Cloud's appeal, I would need to talk to them individually, correct?

MR. MEEHAN: Objection. Calls for a legal conclusion.

But go ahead and give your answer, ma'am.

THE WITNESS: Yes.

.

Page 174

.

So on the NFLPA side, the representatives, you indicated that Bethany Marshall, Miki Yaras-Davis, and the Groom Law Firm

Page 176

?

Page 175

was there representing the Players Association. Is that correct?

A Correct.

Q And for the Groom Law Firm you indicated that Alvaro Anillo, Doug Ell, Mike Junk, Mike Maricco were there from the Groom Law Firm, correct?

A Maricco. Correct.

Q Mike Maricco?

A Maricco, yeah.

Q Do the individuals who you listed from the Groom Law Firm also advise the committee?

A Alvaro Anillo would be our adviser for the most part.

Page 177

Page 198

As it pertains to Mr. Cloud's 2016 reclassification benefits, did you write the decision letter in that case?
A I did not.
Q As it pertains to Mr. Cloud's 2016 reclassification for benefits application, did you review a decision letter before it was sent out?
A Not that I recall.
Q As it pertains to Mr. Cloud's 2016 reclassification for disability benefits application, did you review the decision letter and make any changes to it before it was sent out?
A Not that I recall.

?

Page 200

Q Have you ever written a decision letter?
A No.
Q Do you review the decision letter before it goes out?
A No.
Q Have you ever made any changes to a decision letter before it goes out?
A Not that I recall.

Q Did you write the letter on Mr. Cloud's 2014 T&P benefits application?
A I did not.

Page 199

Page 201

.

Q Is changed circumstances defined in the Plan?

A No.

Q So do you want to change your answer on who came up with the definition of changed

circumstances?

A Yes, as a matter of fact I do. I don't know who came up with the definition.

.

Q In your approximately 15 years on the committee, how many reclassification decisions have you been a part of?

A Maybe between 10 and 15.

Q And in the 10 or 15 reclassification decisions that you have been a part of, have you had to determine what changed circumstances means in all 10 or 15 of those cases?

A Yes.

Q What do you think it means?

A It means a new or different injury or illness or impairment.

.

.

.

THE WITNESS: I agree that a new impairment can include a concussion symptom, yeah.

Page 270

Page 272

Q Okay. Correct me if I'm wrong, earlier you testified that as it pertains to Mr. Cloud's 2016 reclassification decision letter, you didn't read it before it went out, correct?

A That is correct.

:

Q So you certainly didn't tell anyone, "This is what the definition of changed circumstance that I want to include in this decision letter," correct?

A Correct.

Page 271

Q Have you ever asked anyone to define for you what changed circumstances means?

A Not that I recall.

Page 273

Q Is clear and convincing defined

anywhere in the Plan?

A No.

Q Has anyone told you what clear and convincing means?

A Not that I recall.

Q Have you come up with your own definition of what clear and convincing means?

A I'm not sure.

Q Don't you think it's important if you're trying to apply a set of facts to the Plan,

that there be a logical definition of clear and convincing that you would apply to every case?

A Yes, it would be helpful.

Q Because you want uniform consistency on the way that disability benefits applications are being decided, correct?

A It would definitely be helpful.

.

Q You would agree it's important for players to understand that there's uniformity in the way things are being applied across the board in disabled cases, correct?

A I would agree with that, yeah.

?

Q Under "Disabilities and Causes" that starts on CLOUD-AR-290, it lists migraines, clinical depression, significant memory and attention problems, vertigo, impaired verbal fluency. Then we flip over to the continuation, it says, migraines, clinical depression, memory loss, attention and decision problems, impaired verbal fluency, post-concussion syndrome, vertigo, affective disorder. Do you see that?
A I do.
Q Do you agree that there are new

concussion symptoms listed on Exhibit 5?
A There are.
Q Those include; affective disorder, attention and decision problems, and significant memory and attention problems, correct?
A Correct.

You testified earlier that a new concussion symptom can qualify as a changed circumstance, correct?
A Correct.

Mr. Cloud's request for reclassification, right?
A Correct.
Q And it was your job to apply the terms of the Plan to Mr. Cloud's request, right?
A Correct.
Q We've listed off three new symptoms of concussions that you have agreed are new, correct?
A Correct.
Q Those new concussion symptoms equal a changed circumstance as set forth in the Plan, correct?
MR. MEEHAN: Same objection.
Go ahead.
THE WITNESS: It looks that way, correct.
BY MR. DENNIE:
Q I'm going to go back to what I asked you earlier. After reviewing all of this information, listening to Mr. Reynolds testify, listening to Mr. Cloud talk, and answering questions all day, do you now believe that

Mr. Cloud did, in fact, qualify for reclassification in 2016?
MR. MEEHAN: Objection. Asked and answered. And Mr. Cloud's remarks are not on the record, so -- they have been described to some extent on the record, but they are not part of the record.
So go ahead, please.
THE WITNESS: I believe that these new symptoms could have been changed circumstances.

Q You also agreed that his new concussion symptoms are changed circumstances, right?

MR. MEEHAN: Objection. Asked and

answered.

Go ahead.

THE WITNESS: I think I agree that they can be changed circumstances.

Q You actually agree that they are changed circumstances?

MR. MEEHAN: Objection to the form.

Go ahead.

THE WITNESS: They are changes to his original application, yes.

BY MR. DENNIE:

BY MR. DENNIE:

Q You would agree that these changed symptoms are a changed circumstance as set forth in 5.7(b) of Exhibit 1, wouldn't you?

A Yes, they are changed circumstances.

To be clear, you denied Mr. Cloud's application for reclassification, correct?

A Correct.

Q Did you write the reclassification decision of Mr. Cloud?

A You mean the letter?

Q Correct.

A No, I did not.

Q Did you review your reclassification decision for Mr. Cloud before it went out?

A Not that I recall.

Q Did you talk to anyone about the reclassification decision before it went out?

A Not that I recall.

Q Is CLOUD-AR-478 through CLOUD-AR-482 as shown in Exhibit 7, the decision rendered by the committee on Mr. Cloud's reclassification application?

A Yes.

.

Q This letter was written by someone, but they never talked to you about what to put in the letter, did they?

A Not that I recall.

Q So their deposition of changed

Page 338

Q So whoever wrote this came up with their own definition of changed circumstance was not approved by you, correct?

A I don't recall talking to anyone about the wording of the letter.

Q And just to be clear, I asked you a little bit different question.

You didn't approve their definition of changed circumstance. Is that right?

A Not that I recall.

Q You've seen legal letters before, right?

A Yes.

Q You would agree this certainly appears to be written by a lawyer, doesn't it?

A Yes.

Q And who would be the lawyer that would write a letter on behalf of the committee?

Page 339

A I don't know who, but someone here at Groom.

.

Page 340

Page 341

.

Q It mentions on 1204, "Thank you! The case summaries that are missing for me are and

Michael Cloud" after the redaction. Do you see that?

A Uh-huh. I do.

Q Did the Groom Firm write up a memo analyzing Mr. Cloud's case?

A They did case summaries. I'm pretty sure back then they had started doing the case summaries.

Q Why do they do case summaries?

A To summarize the cases for those that are reviewing it, to kind of give those of us who review it an idea of what we will find within the depths of the case, or the paperwork rather, the file, the administrative records.

Q You would agree that it's important that you actually review the medical records, not the case summary, correct?

A Yes.

Q And you feel certain that you reviewed Mr. Cloud's entire file prior to comes to a decision?

A I feel certain that I reviewed his

file to the best of my ability. So I don't know if I ended up being distracted and put it down and didn't go back to it or skipped a page or two, but I feel certain that I did read most of it to the best of my ability.

Q Do you ever recall a time where you just relied on the case summary and did not read the entire file?

A I don't recall that.

Q Could that have happened?

A Anything can happen.

Q You would agree it's important for you to read the entire case file to come to a decision, right?

A I do agree, it is important.

Q We talked about this earlier a little bit, it's extremely important for the player seeking benefits, right?

A That is correct.

Q And you hold the duty to the retired NFL players who are seeking benefits and you know that it's vastly important that you review the

medical file in total before rendering a decision, right?

A I do.

Q But you would admit sometimes you may not read the entire file?

A I'm human.

Q Is that yes?

A Like I said, anything can happen, so...

A C K N O W L E D G E M E N T  O F

D E P O N E N T

I, CHRISTOPHINE SMITH, do hereby acknowledge I have read and examined the foregoing pages of testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any changes or corrections, if any, appear in the attached errata sheet signed by me.

9.2.21 ______________ Christophine Smith ______________

Date CHRISTOPHINE SMITH

Michael Cloud vs. The Bert Bell/Pete Rozelle NFL Player Retirement Plan

CHRISTOPHINE SMITH

INSTRUCTIONS TO THE WITNESS:

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Veritext Legal Solutions
1250 Eye Street, N.W., Suite 350
Washington, DC 20005
(202) 857-DEPO

# E R R A T A S H E E T

Case Name: Michael Cloud vs. The Bert Bell/Pete Rozelle NFL Player Retirement Plan

Witness Name: CHRISTOPHINE SMITH

Deposition Date: August 5, 2021

Page No. Line No. Change/Reason for Change

4:4-- "Josephine" should be "Christophine" / correcting name of deponent
12:13-- "Boswell, B-O-S-W-E-L-L" should be "Doswell, D-O-S-W-E-L-L" / correcting name of deponent
54:14-- "yet" should be "yesterday" / word correction
64:9-- "mine" should be "mind" / word correction
97:14-- "support" should be "report" / word correction
98:8-- "about playing" should be "about applying" / word correction
106:12-- "I not." should be "I am not." / missing word
107:16-- "up in" should be "of" / word correction
138:8-- "reading it" should be "reading about it" / missing word
186:11-- "that my knowledge" should be "to my knowledge" / word correction
203:5-- "credit seasons" should be "credited seasons" / word correction
203:13-- "disable" should be "disabled" / word correction
204:12-- "deem his" should be "deem him" / word correction
205:21-- "receiving his" should be "reviewing his" / word correction
290:16-- "they actually" should be "they've actually" / word correction
355:5-- "applied more" should be "applied for" / word correction

Christophine Smith
______________________
Signature

9. 2. 21
__________
Date

# APPENDIX 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

---------------------------

MICHAEL CLOUD, :
:
Plaintiff, :
: Civil Action No.:
vs. :
: 3:20-CV-01277-E
THE BERT BELL/PETE ROZELLE :
NFL PLAYER RETIREMENT PLAN,:
:
Defendant. :

---------------------------

DEPOSITION OF PATRICK C. REYNOLDS

DATE: August 4, 2021
TIME: 9:11 a.m. to 5:26 p.m.
LOCATION: Groom Law Group
1701 Pennsylvania Avenue
Suite 1200
Washington, D.C. 20006

REPORTED BY: Felicia A. Newland, CSR

Veritext Legal Solutions
1250 Eye Street, N.W., Suite 350
Washington, D.C. 20005

Q Do you review the decision letter before it's sent out?

A Typically, no.

Page 174

Page 176

Page 175

Page 177

.

Q How many disability claims have been presented to you during your time on the committee?

A I don't have a specific number.

Q Give me an estimate.

A Roughly a thousand a year.

Q You said there are various statistics that are presented at these board meetings. Do you have the statistics on what percentage of claims are granted?

A I don't. I have access to the statistics. I believe they're on the Plan director's report.

Q Okay. So the Plan director's report?

A I believe so. I may be -- the number of claims that come through and the number of claims that are decided is on that. I believe it includes percentage of approvals and denials, but I might be mistaken.

Q How often does the Plan director report come out?

A Quarterly, for the board meetings.

MR. DENNIE: Is that something that you all can give us since -- I mean, I don't have our request here, but that's certainly responsive to probably more than one of our requests for production.

MR. MEEHAN: I'll take it under advisement and circle back to you.

MR. DENNIE: Let me know as soon as you can. We're running out of time for discovery.

MR. MEEHAN: If you can direct us to a particular request you've made, that would be helpful. You can do that offline when you have an opportunity.

MR. DENNIE: Yeah, I don't have them, but that's a certainly responsive document or documents.

BY MR. DENNIE:

Q All right. So you believe that you presided over approximately a thousand disability applications a year during your tenure, correct?

A I think that's fair, yeah, thereabouts.

Q Where we would find the percentage of claims that were granted, would be in the Plan director's report that's done quarterly. Is that correct?

A I believe so.

Q And the same question as to the claims that were denied. There would be a percentage of claims denied showing the Plan director's report that gets prepared quarterly. Is that correct?

A I believe -- I believe so. That may not be the case. It may just show the number of claims.

I missed part of it.

Page 242

Q In Section 5.7(b) of Exhibit 1, is also where we see the changed circumstances language. Do you see that?
A I do.
Q Do you see where it is defined anywhere?

Page 244

Page 243

A Yeah, again, it's not a capitalized term, so I would have to assume it's not defined.
Q Now that you've had an opportunity to review this, does that refresh your memory on who defined the term "changed circumstances"?
A I don't know who defined the term, but the practice that has been in place for the committee and for the board is that a changed circumstance is a new or different impairment.
Q What do you mean by "impairment"?
A A new injury, a new condition.

Page 245

Q I believe you testified earlier, but I want to confirm, you did not write Exhibit 4, correct?
A That's correct.

Q So we'll flip to CLOUD-AR-284 in

Page 330

Exhibit 4. And let me know when you're there.
A Yes, I'm here.

Page 331

Page 332

Page 333

Q Did you make a single change to this document?
A Not that I recall.
Q Do you know whether you even looked

at this document?
A I don't recall.
Q Do you know anybody that provided advice to you as it pertains to Exhibit 3?
A No.
Q Do you know whether Elton Banks provided any advice to you?
A No.
Q So other than your conclusion that Mr. Cloud didn't meet the terms of shortly after, as defined in the Plan, you can't give us any more details on how you arrived at that conclusion. Is that correct?
A Yeah, that's correct.
Q All right. Go to 5, please.
A Okay.
(Reynolds Deposition Exhibit Number 5 marked for identification.)
BY MR. DENNIE:
Q What is Exhibit 5?
A It is a request for reclassification. It also contains a new application request dated

February 14th, 2016.

If the committee decides against granting Mr. Cloud's reclassification request, does the board conduct its own independent review?

A Yes, they do.

Q Are you aware of anything they did?

A I am not, no.

Q Are you aware of whether they just rubber-stamped the decision of the committee and said denied and moved on?

A I don't believe that they would fulfill their fiduciary duties if they did that.

Q I don't disagree with you, but I don't know what they did or didn't do.

A Yeah, I don't either.

Q And the only way for me to figure that out is to talk to the people that made these decisions, correct?

MR. MEEHAN: Objection. Asked and answered and legal conclusion. I believe that's the fourth time you've asked that.

BY MR. DENNIE:

Q We're talking about specific documents and what they reviewed.

A I don't know how the -- how the board came to their decision.

(

Q I just want to flip over to Exhibit 12, CLOUD_MIN_005.
A Okay.
Q Are you there?
A I am.
Q What do you understand this to be?
A These appear to be the meeting minutes for the November 2016 Retirement Board meeting.

Q Were you in attendance for this meeting?
A It appears that I was not.
Q I know you said you weren't in attendance, so I just want to make sure we're on the same page. And when you're saying you weren't in attendance, you weren't in person, correct?
A Correct.
Q Did you appear by phone by chance?
A Not to my recollection.
Q So earlier when we were talking about the board's decision of Mr. Cloud's 2016 reclassification decision, and you said you believed you were there, these minutes reflect apparently you were not, correct?
A That's correct.
Q So you have absolutely no idea what happened at the November 15th, 16th, 2016 board meeting, correct?
A Aside from what I read in these meeting minutes and the counsel report, no, I don't know what took place. No.

Q So if I asked you what was said about Mr. Cloud's case, you wouldn't have a clue, correct?
A I do not know.
Q Is that correct?
A Yes, that's correct.

Cloud, Michael v. The Bert Bell/Pete Rozelle NFL Player

Patrick Charles Reynolds (#4745148)

ACKNOWLEDGEMENT OF DEPONENT

I, Patrick Charles Reynolds, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

[signature] ______________________ 9/3/2021 __________

Patrick Charles Reynolds Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

______________________________

NOTARY PUBLIC