**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **MICHAEL CLOUD,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | **Civil Action No. 3:20-CV-01277-E** |
| | § | |
| **THE BERT BELL/PETE ROZELLE** | § | |
| **NFL PLAYER RETIREMENT PLAN,** | § | |
| | § | |
| *Defendant.* | § | |

_____

**PLAINTIFF'S BRIEF IN RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT ON THE ADMINISTRATIVE RECORD**

_____

NOW COMES Plaintiff Michael Cloud and files his Brief in Response to Defendant's *Motion for Summary Judgment on the Administrative Record* and *Brief in Support* [Dkt. 161, 162], and respectfully shows this Honorable Court as follows.

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ...................................................................................... V

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 4

I.     Cloud's NFL Career and Related NFL Brain Injuries ................................. 4

II.    Defendant Violates Cloud's Rights Under the Plan and ERISA (2009, 2014 and 2016) ........................................................................................ 5

       A.     The Plan Personnel, Structure, and Terms ....................................... 5

       B.     Cloud Unsuccessfully Requests Medical Records and Assistance from Defendant ........................................................... 11

       C.     Defendant Advises Cloud he is Ineligible for T&P Benefits, to Instead Seek LOD Benefits, Cloud Complies (2009 Application), and Defendant Promptly Denies .................................. 12

       D.     Cloud Appeals Denial of 2009 Application, and Defendant Ignores Physician Recommendation for Brain Studies and Grants LOD Benefits ..................................................................... 15

       E.     Cloud Continues Requesting Medical Records and Treatment for his Injuries and is Awarded Social Security Disability Benefits ........................................................................................ 18

       F.     Cloud Files 2014 Application for T&P Benefits and Defendant Grants Inactive A ......................................................................... 20

III.   Cloud Seeks Reclassification from "Inactive A" to "Active Football", But Both the Committee and Board Summarily Deny Reclassification Without Any Good Faith Effort to Consider It or Allow a Full and Fair Review ..................................................................................................... 24

       A.     In Fewer Than 24 Hours, Defendant Rushed the Committee's Summary Denial ........................................................................... 25

       B.     The Board Denies Reclassification ................................................ 27

| | | | |
|---|---|---|---|
| | 1. | Groom Prepares Incorrect Result-Oriented Case Summaries | 27 |
| | 2. | NFL and NFLPA Lawyers Decide Cloud's Case | 31 |
| | 3. | The Private Caucuses | 33 |
| | 4. | The Board Meeting | 35 |
| | 5. | The Board Minutes | 36 |
| | 6. | The 2016 Appeal Decision Letter | 36 |
| IV. | | Defendant Begins Slow Disclosure of Medical and Other Records | 41 |
| V. | | Cloud Lawsuit | 42 |

IMPROPER USE OF MOTION FOR SUMMARY JUDGMENT .......................................... 43

STANDARD OF REVIEW .............................................................................. 43

| I. | | *De Novo* Standard Applies | 43 |
| II. | | Alternative Stripping of Deference Under Abuse of Discretion Standard | 44 |
| III. | | Alternative Abuse of Discretion Standard: Structural Conflict | 46 |

ARGUMENT AND AUTHORITIES ........................................................................... 47

| I. | | Summary of the Argument | 47 |
| II. | | Defendant's Egregious and Systemic Violations of the Plan and ERISA Statute Require *De Novo* Review | 47 |
| | A. | Cloud's administrative appeal was timely, the Board did not find otherwise, and Groom (and another lawyer) fabricated the Untimeliness Argument | 47 |
| | B. | Cloud's 2016 Application for Reclassification satisfied the Changed Circumstances requirement – even as to All the Various Inconsistent Ways in Which Defendant (i.e., Groom) has defined it | 49 |

1. The Board interprets Changed Circumstances in numerous ways and Cloud satisfies all of them (at least the reasonable ones) .................................................................49

2. Cloud did not "admit" failure to meet Changed Circumstances ......................................................................56

C. Cloud met the Shortly After requirement for Active Football (T&P Benefits) Even Though Not Required for Psych Disorders ................................................................................................57

III. Defendant Consistently Has Withheld Documents from Cloud and Impeded His Ability to Submit Documents in Support of Claims for Active Football (T&P Benefits) ...............................................................62

IV. Cloud Does Not Challenge the Committee's 2014 Decision to Award Him Inactive A (T&P Benefits) ...............................................................64

CONCLUSION ...............................................................................................65

CERTIFICATE OF SERVICE ...................................................................................65

# TABLE OF AUTHORITIES

**CASES**                                                                                                    **PAGE**

*Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir. 2006)............................................ 44

*Ariana M. v. Humana Health Plan of Tex., Inc.*, 792 F. App'x 287 (5th Cir. 2019).................... 44

*Ariana M. v. Humana Health Plan of Tex., Inc.*, 884 F.3d 246 (5th Cir. 2018).......................... 44

*Ariana M. v. Humana Health Plan of Texas, Inc.*,
No. CV H-14-3206, 2018 WL 4384162 (S.D. Tex. Sept. 14, 2018) ............................................ 44

*Atkins v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
694 F.3d 557 (5th Cir. 2012) ................................................................................................. 44, 51

*Atkins v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*,
2011 WL 13269721 (W.D. Tex. Mar. 02, 2011) .......................................................................... 63

*Avenoso v. Reliance Std. Life Ins. Co.*, 19 F.4th 1020 (8th Cir. 2021) ........................................ 43

*Batchelor v. Life Ins. Co. of N. Am.*, 504 F. Supp. 3d 607 (S.D. Tex. 2020)............................... 43

*Boyd v. Bert Bell/Pete Rozelle NFL Players Retirement Plan*,
410 F.3d 1173 (9th Cir. 2005) ..................................................................................................... 62

*Boyd v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
796 F. Supp. 2d 682 (D. Md. May 24, 2011)............................................................................... 51

*Bryant v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*,
Civ. No. 1:12-cv-936-MHC, 2015 WL 13908103 (N.D. Ga. March 23, 2015) .......................... 51

*Burell v. Prudential Ins. Co. of Am.*, 820 F.3d 132 (5th Cir. 2016)............................................ 44

*Byerly v. Standard Ins. Co.*,
No. 4:18-CV-00592, 2020 WL 1451543 (E.D. Tex. Mar. 25, 2020) ........................................... 44

*Claimant ID 100218776 v. BP Expl. & Prod., Inc.*,
712 F. App'x 372, 375 (5th Cir. 2017) ....................................................................................... 10

*Conkright v. Frommert*, 559 U.S. 506 (2010)............................................................................. 44

*Davis v. Aetna Life Ins. Co.*, 699 F. App'x 287 (5th Cir. 2017)................................................. 61

*Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
855 Fed. Appx. 332 (9th Cir. Aug. 10 2021).................................................................... 3, 45, 63

v

*Dimry v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*,
487 F. Supp. 3d 807 (N.D. Cal. 2020) ...................................................................... 3, 45

*Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
No. 16-CV-01413-JD, 2018 WL 1258147 (N.D. Cal. Mar. 12, 2018).................................... 3, 45

*Eller v. Nat'l Football League Players Ass'n*, 872 F. Supp. 2d 823 (D. Minn. 2012) .................. 9

*Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262 (5th Cir. 2004) .............................. 47

*In re Enron Corp. Securities, Derivative & ERISA Litig.*,
284 F.Supp.2d 511 (S.D. Tex. 2003) ........................................................................... 46

*Firestone Tire & Rubber Co. v. Bruch*,
489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) ........................................................ 43, 44

*Giles v. Bell/Pete Rozelle NFL Player Ret. Plan*,
925 F.Supp.2d 700 (D.Md. 2013) ......................................................................... 3, 17, 45, 62

*Gray v. Minnesota Life Ins. Co.*,
No. CV H-19-4672, 2021 WL 861298 (S.D. Tex. Mar. 8, 2021)................................................. 43

*Hodge v. Guardian Life Insurance Company of America*,
Civil Action No. 4:20-CV-2088, 2021 WL 5142793 (S.D. Tex. Sept. 10, 2021) ....................... 43

*Hudson v. Nat'l Football League Mgmt. Council*,
No. 18-cv-4483 (GHW) (RWL), 2019 WL 5722220 (S.D.N.Y. Sept. 5, 2019)........................... 53

*Ingerson v. Principal Life Ins. Co.*,
Civil Action No. 2:18-cv-227-Z-BR, 2020 WL 3163074 (N.D. Tex. May 13, 2020)................. 43

*Jani v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
No. 04-1606, 2005 U.S. Dist. LEXIS 10150, 2005 WL 1115250  (D. Md. April 26, 2005) ....... 63

*Jani v. Bell*, 209 Fed. Appx. 305 (4th Cir. 2006)........................................................................... 3

*Johnson v. Bell*, 468 F.3d 1082 (8th Cir. 2006) ........................................................................... 62

*Katherine P. v. Humana Health Plan, Inc.*, 959 F.3d 206 (5th Cir. 2020)................................... 43

*Kearney v. Standard Ins. Co.*, 175 F.3d 1084 (9th Cir. 1999).................................................... 43

*Keys v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*,
493 F. Supp. 3d 1147 (M.D. Fla. 2020)...................................................................... 3, 43

TABLE OF AUTHORITIES (CONT'D)

*Koch v. Metro. Life Ins. Co.*, 425 F.Supp.3d 741 (N.D. Tex. 2019)...................................... 43, 44

*Lafleur v. Louisiana Health Service and Indemnity Co.*, 563 F.3d 148 (5th Cir.2009)............... 44

*Metro. Life Ins. Co. v. Glenn*,
554 U.S. 105, 128, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008)....................................................... 46

*Nichols v. Reliance Standard Life Ins. Co.*, 924 F.3d 802 (5th Cir. 2019) ................................... 46

*Niles v. Am. Airlines, Inc.*, 269 F. App'x 827 (10th Cir. 2008) .................................................... 44

*Patton v. MFS/Sun Life Fin. Distribs., Inc.*, 480 F.3d 478 (7th Cir. 2007) ................................. 43

*Pike v. Hartford Life & Accident Ins. Co.*, 368 F. Supp. 3d 1018 (E.D. Tex. 2019).................... 44

*Revels v. Standard Ins. Co.*, 504 F. Supp. 3d 556 (N.D. Tex. 2020) ............................................ 44

*Solomon v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
No. MJG-14-3570, 2016 WL 852732 (D. Md. Mar. 4, 2016) ...................................................... 60

*Solomon v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
860 F.3d 259 (4th Cir. 2017) ........................................................................................................ 60

*Terry v. Hartford Life and Accident Insurance Company*,
Civil No. 6:17-CV-00050-ADA, 2018 WL 11347194 (W.D. Tex. Oct. 16, 2018)..................... 43

*Vega v. Nat'l Life Ins. Servs.*, Inc., 188 F.3d 287 (5th Cir. 1999) ................................................ 46

*Weisner v. Liberty Life Assurance Company of Boston*,
192 F. Supp. 3d 601 (D. Md. 2016)............................................................................................... 44

*Wildbur v. ARCO Chemical Company*, 974 F.2d 631 (5th Cir. 1992) .......................................... 54

**Statutes**

29 U.S.C. § 1132(a)(1)(B) ....................................................................................................... 47, 62

29 U.S.C. § 1132(a)(3).................................................................................................................. 47

29 U.S.C. § 1132(2) ...................................................................................................................... 47

29 U.S.C. § 1133........................................................................................................................ 62, 63

**Regulations**

29 CFR § 2520.104(b)—1(b)(1) .................................................................... 26

29 CFR § 2560.503-1(b) ...................................................................... 33, 54

29 CFR § 2560.503-1(d) ........................................................................... 33

29 CFR § 2560.503-1(f) ....................................................................... 14, 21

29 CFR § 2560.503-1(g) ......................................... 13, 18, 22, 26, 27, 38, 39, 49, 50

29 CFR § 2560.503-1(h) ........................................................................... 61

29 CFR § 2560.503-1(j) ....................................... 18, 22, 37, 38, 39, 40, 49, 50

**Rules**

Fed. R. Civ. P. 52(a) ............................................................................. 43

<u>INTRODUCTION</u>

Michael Cloud's ("**Cloud**") National Football League ("**NFL**") career concluded at the end of the 2005 NFL season (in January 2006) due to disability arising out of the cumulative effects of five (5) NFL career concussions and other injuries, rendering him totally and permanently disabled shorty thereafter. Cloud sought assistance from The Bert Bell/Pete Rozelle NFL Retirement Plan ("**Defendant**"), to secure benefits under the Plan document, as amended and restated in April 1, 2014 ("**Plan**"), which includes disability benefits available to former players under various categories and amounts of monthly payments. Defendant denied Cloud the full benefits to which he is entitled. In May 2020, Cloud sued. A review of the administrative record ("**AR**"), inclusive of depositions of Defendant's corporate representative and members of its Disability Initial Claims Committee ("**Committee**") and Retirement Board ("**Board**"), and additional documents produced in this proceeding,[1] all reveal Defendant's violation of the Plan and ERISA.

Nonetheless, Defendant filed a *Motion for Summary Judgment on the Administrative Record* and *Brief in Support* [Dkt. 161, 162] ("**Motion**") (an improper motion to file under the facts in this case)[2] and asks this Honorable Court to enter summary judgment finding that Defendant did not abuse its discretion in denying the benefits sought by Cloud. Defendant argues Cloud's claims are meritless and contends the Board's decision had three independent bases for denying his request for reclassification – even though the Board, in substance, did not even make the decision itself. Motion at 1. **First**, Defendant argues Cloud missed the 180-day deadline to file

---

[1] All citations to evidence in this Response are to the following: **(1)** the AR originally filed by Defendant on January 5, 2021 [Dkt. 16] (cited herein in the form **Dkt. 16 at CLOUD-AR-[X]**, **(2)** all additional materials supplemented to the AR by Orders of this Honorable Court and included in Cloud's Motion for Judgment and Brief [Dkt. 155, 156] via its appendix [Dkt. 160, 164-167] (cited herein in the form **App.[X]**, and **(3)** the materials attached to Defendant's Motion and Brief [Dkt. 161, 162] via its appendix [Dkt. 163] (cited herein in the form **Plan.App.[X]**.

[2] A motion for summary judgment under FRCP 56 is unavailable where *de novo* is the proper standard of review. *See discussion, infra* at 43-44.

1

his administrative appeal, but the AR does not factually support that position and the Board did not adopt that position – it was generated only by Groom and other lawyers.[3] **Second**, Defendant argues Cloud failed to meet the changed-circumstances requirement, which has only been defined by Groom (inconsistently) and, irrespective of which definition is used, Cloud met them all.[4] **Third**, Defendant argues Cloud did not qualify for Active Football benefits because he did not meet the Plan's "shortly after" provision, but that provision does not apply and, even if it did, Defendant made no effort to identify when Cloud's T&P Disability arose and it is indisputable that it occurred within the "shortly after" time period.[5] Defendant argues "Cloud has side-tracked this lawsuit onto everything but the actual decision and the Administrative Record", Motion at 2, an AR from which Defendant withheld key records for over a year during this litigation.[6] Defendant also complains that Cloud has portrayed it as a component of an NFL monolith and accused it, the NFL Players Association ("**NFLPA**"), and others of misleading Cloud about his benefits, withholding records, not locating medical records for him from an NFL "EMR" repository, and discriminating against him based on his race – *all of which is supported by the evidence and uncontroverted by Defendant*.[7] *Id*. Finally, inextricably intertwined in those facts is the relationship between Defendant and its counsel Groom Law Group ("**Groom**"), which Defendant affirmatively raises in its Motion. Motion at 2. Defendant argues Cloud's various characterizations of the Board as a "puppet" of Groom are "conspiracy theories [that] have no basis in reality" and are "conjured fantasy, not fact." *Id. at 2-3*. Defendant implies Cloud's characterization is a

---

[3] *Id*. at 1; *see discussion, infra* at 29-30, 40.
[4] *Id*. at 1; *see discussion, infra* at 39-40, 49-54.
[5] *Id*. at 1; *see discussion, infra* at 57-61.
[6] *See discussion, infra* at 42 n. 254, 48 n. 283, 63.
[7] Such evidence is addressed later in this Response, but generally includes the NFL funding the Plan and its lawyers participating in negotiating and deciding disability claims, lawyers negotiating decisions, the PBO misleading Cloud as to benefits, Defendant withholding records, and arguing that testing of Cloud's cognitive impairments should be "race-normed" [*see* Dkt. 174 at 23-25 for response on this latter issue].

litigation tactic and neither Cloud nor his prior attorneys raised "such serious charges during the years-long administrative process."[8] *Id.* at 3. A review of expedited denials of Cloud's applications, history of Groom's role within Defendant,[9] and content of the initial AR filed by Defendant presented sufficient evidence for those allegations. Now, after forcing Defendant to pull back the curtain and produce more of the AR, the evidence is overwhelming.

The Board's decision should be reviewed *de novo* or, in the alternative, reversed under an abuse-of-discretion standard of review. Among its fatal errors, Defendant's interpretation of the Plan was unreasonable and wildly inconsistent in this and other cases, as it has been for over a decade in all requests for reclassification by former players; it never referred Cloud for medical examination or involved Cloud in a "full and fair review" on appeal; and its findings were either omitted from its decision letters and internal records, nonexistent due to a failure to review the AR (instead performed by Groom and other lawyers), or ginned up during and for purposes of this litigation. Defendant did not just abuse its discretion in denying Cloud's additional benefits; it knowingly violated the Plan and ERISA in material respects, including on issues for which it has been placed on prior notice by federal courts in other cases.[10] For the reasons set forth herein, this Honorable Court should deny the Motion in all respects.

---

[8] Defendant argues Cloud "estimated that nine separate lawyers worked with him to secure disability and related benefits over the years[,]" which is a misstatement. Groom's question: "how many lawyers would you say you have had that have worked for you related to your disability benefits claims? And I'm lumping in workers' comp, SS – you know, Social Security Administration, this lawsuit, all of that." App.1062 at 285:17-25. Nothing in the AR supports the implication any of the 9 lawyers assisted him *with the Plan*.

[9] Well before this case, Defendant has demonstrated a course of conduct that violates both the Plan and ERISA and, in each instance, has refused to modify its deviations from the law – perhaps even escalating them. *See, e.g., Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 855 Fed. Appx. 332 (9th Cir. Aug. 10 2021); *Dimry v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*, 487 F. Supp. 3d 807 (N.D. Cal. 2020); *Keys v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*, 493 F. Supp. 3d 1147 (M.D. Fla. 2020); *Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 16-CV-01413-JD, 2018 WL 1258147 (N.D. Cal. Mar. 12, 2018); *Giles v. Bell/Pete Rozelle NFL Player Ret. Plan*, 925 F.Supp.2d 700, 714, 721-22 (D.Md. 2013); *Jani v. Bell*, 209 Fed. Appx. 305 (4th Cir. 2006); *Jani v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 04-1606, 2005 U.S. Dist. LEXIS 10150, 2005 WL 1115250 (D. Md. April 26, 2005).

[10] *See, e.g., supra* at n. 9.

FACTUAL BACKGROUND

In the interest of brevity (in a relative sense), Cloud presents the following summary of various pertinent facts, but also refers this Honorable Court to his own *Motion for Judgment* and *Brief in Support*. [Dkt. 155, 156].

I.       **Cloud's NFL Career and Related NFL Brain Injuries.**

Cloud grew up in Portsmouth, Rhode Island, played football at Boston College and graduated with a degree in socioeconomics. In 1999, Cloud was a 2nd round draft pick. Cloud ultimately played in the NFL for 7 years primarily as a running back for 3 teams: Kansas City Chiefs ('99-'02), New England Patriots ('03, '05), and the New York Giants ('04, '05). It is commonly known that running backs and linebackers take the most hits in the NFL.[11] In 1999 and 2000, Cloud suffered three (3) concussions while playing of Kansas City Chiefs.[12] On October 31, 2004, while playing for the Giants, a defensive back caused a high-speed helmet-to-helmet collision resulting in Cloud being concussed ("**2004 Concussion**").[13] After the game, the Giants presented Cloud for an interview, which he could not recall taking place – an absence of memory he had never before experienced.[14] Cloud later submitted to post-game examination in relation to a continuing "study" by the NFL MTBI committee ("**MTBI Exams**").[15] Related notes in a follow-up evaluation indicate Cloud was to receive a November 2, 2004 "Neurpsych Exam", but no such exam took place.[16] Despite the 2004 Concussion and Cloud's reports of headaches, dizziness, and vertigo, he was cleared to return to football just 48 hours later. In the following months, Cloud

---

[11] App.691 (120:25-121:2).
[12] App.813-20 (36:14-37:24, 39:11-40:10, 42:23-43:12).
[13] App.828-29 (51:2-52:14), App.5741-42 (step-by-step review of the play causing the 2004 Concussion).
[14] App.865-68 (88:18 – 91:7).
[15] Dkt. 16 at CLOUD-AR-391-392; App.859-70 (82:18 – 83:22); App.869-71 (92:20 – 94:9).
[16] App.5742-43; *see also* Dkt. 16 at CLOUD-AR-391 (stating "Neuropysch Exam" in "48 hrs. post-injury").

could not remember basic plays, football schemes, or his related duties.[17] In 2005, Cloud initially returned to play for the Giants. After the preseason, in early September 2005, the Giants released Cloud.[18] In early November 2005, the Patriots signed Cloud to play in a handful of games, and Cloud sustained yet another concussion[19] in a game against the Indianapolis Colts (the foregoing cumulative orthopedic and neurologic injuries resulting in Cloud's disability, the "**Cloud Disabilities**"), and was administered an ImPACT neurological exam (designed by the NFL MTBI Committee).[20] Cloud was released, but signed by the Giants for the end of the 2005 NFL season.[21]

## II.   **Defendant Violates Cloud's Rights Under the Plan and ERISA (2009, 2014 and 2016).**

After being released by the Giants in January 2006 due to the Cloud Disabilities, Cloud tried to be a personal trainer, a California State Trooper, and a sportscaster, but experienced extensive difficulties related to his orthopedic and neurological injuries and was unable to work.[22] By no later than March 30, 2006, the Cloud Disabilities arising out of his participation in NFL football games had rendered him totally and permanently disabled ("**Cloud T&P Disabilities**").[23] However, like many NFL players, Cloud knew very little about the benefits available to him and reached out to Defendant for help before, during, after various applications from 2009-2016.[24]

### A.   **The Plan Personnel, Structure, and Terms.**

**The PBO**.  The day-to-day administration of the Plan occurs at the Plan Benefits Office ("**PBO**") in Baltimore, Maryland.[25] Since September 2013, the PBO has been headed by Plan

---

[17] App.6032-35 (15:4 – 18:17), App.6096-97 (79:3 – 80:8); App.6276-77 (217:21 – 218:13).
[18] App.4591-92; App.904-08 (127:12 – 131:10); App.86 (335:16-18) ("I agree with you that he was cut as a result of his not being able to remember plays.")
[19] App.992-94 (215:21-217:22).
[20] App.992-94 (215:21-217:22).
[21] App.909-16 (132:5 – 139:20), App.921-34 (144:7 – 157:25), App.1041-42 (264:17 – 265:4).
[22] App.974 (197:18-23); App.999-1006 (222:12 – 227:17); App.1160-61 (57:24 – 58:16).
[23] App.1042 (265:13-24); App.5744; *see further discussion, infra* at 19, 20, 62.
[24] App.916-17 (139:21 – 140:14); App.1153 (27:1-15); Dkt. 9 at 3, n. 1.
[25] App.408 (286:18-21).

Director Michael Miller ("**Miller**") and has about 20 employees, including benefits coordinators Paul Scott ("**Scott**") who coordinated Cloud's 2009 application, Elton Banks ("**Banks**") who coordinated Cloud's 2014 application, Sam Vincent ("**Vincent**") who coordinated Cloud's 2016 application, and Elise Richard ("**Richard**") coordinated Cloud's 2016 Appeal.[26]

    **The Committee**.  The NFL and NFLPA play roles in deciding applications through their designees, whom are appointed to the Committee to make initial claims decisions.[27] During almost all applicable time periods in this case, the two Committee members were Patrick Reynolds ("**Reynolds**") (appointed by the NFL's Management Council ("**Management Council**"))[28] and Christophine "Chris" Smith ("**Ms. Smith**") (appointed by NFLPA).[29] A third Committee member votes in certain cases and is the Plan's Medical Director, a position held by Stephen Haas, M.D. ("**Haas**") during the 2009 Application and 2010 Appeal (Allen Jackson, M.D. at all times thereafter).[30] The Committee maintains fiduciary duties to act "solely and exclusively in the interest of the Players"…"with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims."[31] ("**Fiduciary Duties**").

    **The Board**.  The NFL and NFLPA also play roles in deciding applications through

---

[26] App.15-16 (53:17 – 54:5); App.208 (184:21-22); App.245 (330:3-21); App.394 (232:18-22, 233:13-16), App.406 (280:5-6, 281:7-10), App.428-29 (369:22 – 370:4), App.437 (404:12 – 405:2).
[27] App.16 (55:12-21).
[28] Reynolds was appointed as Committee member in 2013. App.183 (83:17 – 85:10), App.184 (87:1-13), App.191-92 (114:17 –115:7, 117:17 – 118:4, 119:8-17, 121:12-21). In addition, from 2009 through 2016, Reynolds also was employed by the NFL in relation to player benefits and, in that capacity, acknowledged he owed a duty to advise Cloud of the benefits available to him. App.178 (63:12-17), App.179 (66:16 – 68:10), App.180 (72:12-19), App.204 (167:17 – 168:2).
[29] App.191 (115:4-13). Ms. Smith has been a Committee member since its inception in 2006. App.9 (26:11-18), App.39 (146:4-6, 147:5 – 148:2). In addition, Ms. Smith is the NFLPA assistant director of benefits, and paid only in that capacity. App.5 (11:14-16, 13:1-15), App.12 (41:8-14), App.23 (84:4-6).
[30] App.191 (115:14 – 117:16).
[31] Dkt. 16 at CLOUD-AR-052 at § 8.8.

designees, whom are appointed to the Board to hears appeals.[32] The Board is the Plan's named

fiduciary. The 6 voting Board members at the time of the 2016 Appeal were Katie Blackburn, Ted

Phillips, and Dick Cass ("**Cass**") (appointed by Management Council), and Sam McCullum, Jeff

Van Note, and Robert Smith ("**Mr. Smith**") (appointed by NFLPA).[33] Cass was a Board member

from 2006 to late 2017.[34] Cass is a lawyer (received law degree in 1971) and was the president of

the Baltimore Ravens.[35] Mr. Smith was a Board member since the NFLPA appointed him in

2010.[36] He played running back at Ohio State, and in the NFL from 1993-2000 until he retired due

to injury concerns.[37] *As with the Committee, the Board members owe the same Fiduciary Duties*

*to former players such as Cloud*.[38]

      **The Advisors**.  The members of the Committee and Board are guided by counsel to their

respective designating parties – Management Council's lawyer Belinda Lerner ("**Lerner**"), and

the NFLPA's lawyer Bethany Marshall ("**Marshall**").[39] Marshall also serves as NFLPA assistant

director of benefits and, in that capacity, along with NFLPA's Director Miki Yaras-Davis

("**Davis**"), supervises Committee member Ms. Smith.[40] Groom drafted the Plan document, but

also advises the Committee and Board on Plan interpretation and handling player applications,

represents the PBO in administration of the Plan, and represents Defendant in litigation, including

here.[41] Defendant approves payments to all these advisors, and recognizes Groom's fees increase

---

[32] App.16 (55:12-21).
[33] App.198-99 (143:21 – 144:3, 145:18 – 146:3); App.44-45 (169:5 – 170:6); App.521 (22:5 – 23:1).
[34] App.517 (7:19-24), App.521 (22:5-9), App.527 (49:14-18).
[35] App.529-30 (56:3 – 58:4).
[36] App.665 (14:19-22), App.677 (62:20 – 63:21).
[37] App.689 (111:22-25), App.691 (119:10-14, 120:23-24, 120:5-22).
[38] Dkt. 16 at CLOUD-AR-052 at § 8.8.
[39] App.182 (78:10-13), App.192 (119:14 – 120:6); App.17-19 (58:7 – 67:8); App.46 (175:9-14, 176:8 – 177:10). As NFLPA assistant director of benefits, Bethany Marshall is also Ms. Smith's supervisor. App.26 (95:2-14).
[40] App.26 (95:2-14).
[41] App.384 (191:11-14); App.171 (35:10 – 36:6), App.184 (86:11-22); App.185-86 (92:17 – 95:9); App.194 (128:13 – 129:13), App.196 (137:7-18), App.200 (150:10 – 151:1), App.205 (172:5-22).

when its advice to the PBO, Committee, and Board result in litigation against Defendant.[42]

**Plan Disability Categories**. Under Articles 5 and 6 of the Plan, disability benefits cover (1) permanent *substantial disablement* arising out of an NFL career ("**LOD Disability**") under line of duty benefits ("**LOD Benefits**"),[43] and (2) *total and permanent* disabilities ("**T&P Disability**") in one of four classifications (pertinent ones discussed below): *Active Football*, Active Nonfootball, *Inactive A*, and Inactive B (these 4 referred to as "**Classification(s)**", and payments under any Classification referred to as "**T&P Benefits**").[44] Under Article 5 of the Plan, as to T&P Benefits, the Board/Committee must first determine existence of a T&P Disability and, if found, then determine the appropriate Classification.[45] Under Section 5.2 of the Plan, there are two ways to qualify as having a T&P Disability: (1) the Board/Committee finds the player is substantially unable to be employed and such condition is permanent, or (2) the Social Security Administration ("**SSA**") has determined the player is eligible for disability benefits (but SSA determinations as to *timing* and *causation* are not binding on the Board/Committee)[46] ("**Two Grounds for T&P Disability**"). In either case, the Board/Committee may require players to submit to neutral physician examination(s) and provide additional information, and in such cases players may submit medical records or other materials for consideration by the neutral physician.[47] After qualifying with a T&P Disability, the two relevant Classifications in this case are "Active Football" where a T&P Disability arises "shortly after" (*i.e.*, within 12 months after) ("**Shortly After**") the initial disability that arose from participation in the NFL ("**Active Football**"), and "Inactive A" for applications filed within 15 years after retirement irrespective of whether the T&P Disability

---

[42] App.540-41 (100:2 – 102:14).
[43] Dkt. 16 at CLOUD-AR-040, 042 at §§ 6.1, 6.4.
[44] *Id*. at CLOUD-AR-032 at § 5.3.
[45] *Id*. at CLOUD-AR-030 at §§ 5.1, 5.2.
[46] *Id*. at CLOUD-AR-030-031 at § 5.2; *Id*. at CLOUD-AR-036 at § 5.7(a).
[47] *Id*. at CLOUD-AR-031 at § 5.2(c).

arises out of an NFL career ("**Inactive A**").[48]

**Disability Payments and Source of Funding**. Active Football pays T&P Benefits of approximately $265,000/year, which only about 30 former players currently receive, and Inactive A pays T&P Benefits of approximately $135,000/year, which over 1,000 former players currently receive.[49] In one month, September 2016, the Plan paid only $396,712 in Active Football and $5,602,110 for Inactive A.[50] The Plan is funded on a "pay as it goes" basis from a "close-ended" portion of the total NFL revenue pool that represents "player costs" (composed of player salaries and benefits).[51] Actuaries project the next year's disability payments, subtract it from projected total player costs, and the remainder is the salary cap for current players (a subset of player costs).[52] The NFL annually reviews the amount paid out and any increase reduces next year's salary cap.[53] Consequently, current players benefit by reduced disability payments to retired players,[54] which is consistent with the NFLPA's contention that it does not represent interests of retired players.[55] NFLPA technically does not represent interests of retired players, but does so "philosophically."[56]

**Application Deadlines**. There is no deadline to seek T&P Benefits,[57] but there is a filing deadline to obtain Inactive A (15 years after last season) ("**Inactive A 15Y Deadline**") and

---

[48] *Id.* at CLOUD-AR-032 at § 5.3(a), (c), and (e); Section 5.3(e) of the Plan defines "shortly after" to be conclusive if the T&P Disability arises within 6 months of the initial disability, and is subject to determination by the Board/Committee if it arises within 6-12 months of the initial disability. It is conclusively deemed not "shortly after" if the T&P Disability arises more than 12 months after the initial disability. *Id.* at CLOUD-AR-032 at § 5.3(a).

[49] App.538 (92:19 – 93:14).

[50] App.715-16 (217:9 – 218:3).

[51] App.209 (188:11 – 189:6); App.15 (51:9 – 52:1); App.536-38 (83:7-8, 84:4 – 85:1, 86:17, 90:8-10).

[52] App.537 (86:17 – 88:6).

[53] App.537 (88:12 – 89:11).

[54] App.538 (91:11-14).

[55] App.540 (98:23 – 99:20).

[56] App.694-96 (133:11 – 139:10). Retired players on NFLPA are non-voting members. App.695 (136:21-23). Despite public comments indicating that the NFLPA "owes a fiduciary duty to retired players", the NFLPA has long argued that it owes no fiduciary duty to retired players like Cloud. *Eller v. Nat'l Football League Players Ass'n*, 872 F. Supp. 2d 823, 832-34 (D. Minn. 2012); *see also* App.695-96 (136:24 – 138:5).

[57] App.227 (258:7-19).

conclusive presumptions as to determination of timing of a T&P Disability in two situations: (1) under Section 5.3(e) of the Plan if a player develops a T&P Disability within 6 months of an initial disability that arose from participation in the NFL then he is "conclusively deemed" to meet the Shortly After standard for Active Football[58] ("**Conclusively Deemed Shorty After**"); and (2) under general Section 5.7(a) of the Plan, for <u>initial</u> Classifications of a T&P Disability, the player is "conclusively presumed" to not have had the T&P Disability more than 42 months prior to the initial application[59] (together, the "**Conclusive Presumption**").

<u>**Reclassifications**</u>.  Section 5.7(b) of the Plan allows a player to seek "reclassification" of his existing T&P Benefits (*i.e.*, seek increased monthly payments) ("**Reclassification**") if he shows "clear and convincing evidence that, because of 'changed circumstances,' the player satisfies the conditions of eligibility for a benefit under a different [Classification] of T&P [B]enefits"[60] ("**Changed Circumstances**"). Reclassification does not include the Conclusive Presumption expressly as to initial applications. Instead, Reclassification T&P Benefits *payments* will not be retroactively increased and payable more than 42 months prior to the request for Reclassification[61] ("**Reclassification Limit on Retroactive Payments**").

<u>**Special Rules**</u>.  Under Sections 5.3 and 5.4 of the Plan, Classification of T&P Benefits is subject to "Special Rules" under Section 5.4(b) for <u>psychological/psychiatric disorders</u> ("**Psych**

---

[58] Dkt. 16 at CLOUD-AR-032 at § 5.3(e). The opposite is true if the T&P Disability arises more than 12 months later, in which case the player is "conclusively deemed" to not meet the Shortly After standard.

[59] Dkt. 16 at CLOUD-AR-036 at § 5.7(a). Naturally, where the specific "conclusively deemed" conflicts with the general "conclusively presumed" then the former should control. *See Claimant ID 100218776 v. BP Expl. & Prod., Inc*., 712 F. App'x 372, 375 (5th Cir. 2017) (per curiam) ("where a general provision and a narrow, specific provision overlap and the specific provision fits the facts at hand, the specific provision controls").

[60] Dkt. 16 at CLOUD-AR-037 at § 5.7(b).

[61] "T&P benefits" refers to the *<u>payment</u>* made and received for any T&P Disability. *See* Dkt. 16 at CLOUD-AR-030 [5.1], 031 [5.2(b), (c), and (d)], 032 [5.2(e) and 5.3(c)], 033 [5.4(a) and (b), and 5.5 and 5.5(b)], 034 [5.5(d), (e), and (g)(1)], 035 [5.5(g)(2), 5.5(h), 5.6, 5.6(a)], 036 [5.6(a) and (b), and 5.7(a)], 037 [5.7(b) and (c), and 5.8], 038 [5.9, 5.10(a), (b), (d), and (f)], 039 [5.11], 040 [6.2], 042 [6.5].

Disorders").[62] T&P Benefits are payable under Active Football for Psych Disorders if the player satisfies either of the Two Grounds for T&P Disability and the Psych Disorder relates to one of the following (1) head injury(ies) sustained while playing in the NFL (*e.g.*, repetitive concussions), (2) physician prescribed substances to treat NFL injuries, *or* (3) an injury that satisfies the requirements of Section 5.3(a) (Active Football). Thus, Psych Disorders may receive Classification of Active Football by meeting the express terms of Section 5.3(a), or by simply showing the Psych Disorders involve a T&P Disability related to head injuries (like repetitive concussions) sustained while playing in the NFL ("**Active Football for NFL Brain Injuries**").

## B.    Cloud Unsuccessfully Requests Medical Records and Assistance from Defendant.

In 2006,[63] Cloud contacted the NFLPA to discuss availability of disability benefits and his medical records, who directed him to Defendant, and Cloud did so but received only a 10 page "Medical Summary" of orthopedic injuries (without corresponding medical records) ("**Medical Summary**"),[64] no medical records, and no documents of any kind regarding neurological injuries (including concussions) – including the 2004 Concussion.[65] The original version (secured over a decade later in this proceeding) contains 11 pages.[66] The missing page covers most of Cloud's

---

[62] Dkt. 16 at CLOUD-AR-033 at § 5.4. The Special Rules also apply to substance abuse issues ("**Substance Abuse Disorders**"). *See id.* at § 5.4(a). Each of Classifications 5.3(a), (b), and (c) expressly state they are "[s]ubject to the special rules of Section 5.4[.]" (Section 5.2(d) is just a catch-all Classification). *See id.* Likewise, general Conclusive Presumption in Section 5.7(a) expressly applies to Section 5.3, which yields to Section 5.4. *See* Dkt. 16 at CLOUD-AR-032-033 at §§ 5.3(a)-(c), (e), 5.7(a). **While Substance Abuse Disorders maintain an application deadline of 8 years, there is no corresponding deadline for Psych Disorders, which "appl[ies] regardless of when a claim for benefits is made or awarded."** App.5497.

[63] In 2006, the CBA was extended and became effective until the last day of the 2012 league year.

[64] Defendant argues the PBO did not prepare the Medical Summary and has no record of preparing or giving it to Cloud. Motion at 13, n. 15. Defendant relies entirely on Vincent's recent Declaration wherein he declares the PBO "did not prepare that medical summary." *Id.*; Motion, App.101. Vincent does not state *how* he knows this. The Medical Summary ends as of January 9, 2006, so it could have been prepared at any time thereafter and the PBO provided it to Cloud sometime that year. Vincent did not begin working for the PBO until two years later in July 2008. App.406 at 279:9-10. Vincent's deposition testimony makes it clear that he has no idea who prepared the Medical Summary. App.406 at 278:5-22.

[65] App.939-41 (162:2 – 164:22); Dkt. 16 at CLOUD-AR-183-192.

[66] App.3087-96.

career in 2004, including the 2004 Concussion and after effects.[67] Cloud continued his frustrated

efforts to obtain his records and the NFLPA and PBO referred him to each other for his records.[68]

### C. Defendant Advises Cloud he is Ineligible for T&P Benefits, to Instead Seek LOD Benefits, Cloud Complies (2009 Application), and Defendant Promptly Denies.

In 2007, Cloud fell behind on his Rhode Island home mortgage payments and both he and

his lender sought information from Defendant to explore available benefits, access 401(k), and

facilitate loan modification, but Defendant remained nonresponsive.[69] Finally, on January 7, 2008,

and the NFLPA sent Cloud a letter advising him to contact its Benefits Department regarding a

severance payout and "so we may assist you in filing a **Line of Duty application** and refer you to

a Workers Compensation Attorney" (emphasis added), Cloud spoke with the PBO (Gaunt and

Scott) who again advised him he did not qualify for T&P Benefits and to apply for LOD Benefits

and worker's compensation,[70] and the NFLPA referred Cloud to a lawyer on its worker's

compensation panel – Walter J. Korzeniowski ("**Korzeniowski**")[71] ("**Defendant's**

**Instructions**").[72] At least one Board member is aware of the PBO's alleged practice of steering

---

[67] App.3095; App.945-46 (168:17 – 169:1).

[68] App.916-17 (139:21 – 140:14), App.946-47 (169:2 – 170:24).

[69] App.917-19 (140:2 – 142:7). Throughout 2008, after failed efforts by Cloud and his bank to gain information from the NFLPA and PBO, Cloud sold much of his home furnishing, audio-visual equipment, and related assets in order to avoid foreclosure, but he ultimately lost his home. App.917-18 (140:2 – 141:14), App.1004 (227:17-24). Thereafter, Cloud temporarily stayed in a property owned by another recently retired NFL player located in Hermosa Beach, California. In September 2008, the lender sued Cloud for a $431,832 deficiency, obtained a default judgment, and sought to recover against Cloud's NFL benefits. App.918 (141:5-14).

[70] In fact, the NFLPA (Scott) advised Cloud that his records showed no physical injuries, thereby disqualifying him from T&P Benefits (even though Cloud had no records to verify same). App.920-21 (143:15 – 144:1).

[71] The NFLPA's instructions and advice of Korzeniowski resulted in Cloud seeking worker's compensation benefits against his three teams in three different States with Korzeniowski and attorneys Ronald Feenberg ("**Feenberg**") in California and James Waldhauser ("**Waldhauser**") in Minnesota. App.811-13 (34:3 – 36:13).

[72] App.810-11 (33:18 – 34:12), App.919-21 (142:8 – 144:1), App.936-37 (159:6 – 160:24); App.1155 (36:25 – 37:7).

former players to apply for LOD Benefits rather than T&P Benefits.[73] During this time period, after failed efforts by Cloud and his bank to gain information from the NFLPA and PBO, Cloud sold much of his home furnishing, audio-visual equipment, and related assets in order to avoid foreclosure ("**Sale of Personal Effects**"), but he ultimately lost his home,[74] and in September 2008, the lender sued Cloud for a $431,832 deficiency, obtained a default judgment, and sought to recover against Cloud's NFL benefits.[75] Korzeniowski continued to seek Cloud's medical records from the Chiefs, Patriots, and Giants (with little success). On October 9, 2008, the Chiefs sent Korzeniowski various medical records for Cloud. In January 2009, Korzeniowski communicated with the Giants about his outstanding requests for medical and other records, and the Giants finally responded with an incomplete production of documents. Defendant omits all of the above from its Motion and, instead, represents that "[t]wo and one-half years after his NFL career ended, Cloud called the []PBO to request a disability application (on August 28, 2008). Motion at 11. It is notable that the PBO letter Defendant references in its Motion includes the promise: "The [PBO] will notify you when it receives your application form and ***will advise you whether any additional information is required in connection with your application***."[76] *Id*. at 11 (emphasis added).

Several months later, in April 2009, Cloud filed his application for LOD Benefits ("**2009 Application**").[77] Defendant notes Cloud "applied for LOD benefits exclusively", Motion at 12, but Defendant omits that it instructed him to do so. The following month, Cloud began dating future wife Jennifer Cloud ("**Jennifer**"),[78] and thereafter moved to be with her in Dallas, Texas.

---

[73] App.706 (178:14 – 180:15).
[74] App.917-18 at 140:2 – 141:14; App.1004 at 227:17-24.
[75] Cloud1142-45.
[76] Required by 29 CFR § 2560.503-1(g)(1)(3).
[77] App.3080-97.
[78] App.1150 (14:4-8), App.1153 (26:6-17). Cloud and Jennifer previously knew each other for years and eventually would marry in July 2011, but would divorce in March/April 2021. App.1149-50 (13:5-17, 14:4-8).

On June 12 and 17, 2009, Defendant referred Cloud to 2 neutral physicians in California who **"may request further diagnostic testing"** – orthopedist Bert Mandelbaum, M.D. (**"Mandelbaum"**) and neurologist Dr. Jonathan Schleimer (**"Schleimer"**).[79] Cloud rescheduled Schleimer to July 27 due to short notice and travel distance.[80]

On July 9 2009,[81] the Committee extended its 45-day decision deadline (July 26 to August 25), tabled the 2009 Application pending neutral physician reports, and advised Cloud of same via letter to Dallas, Texas.[82] The next week, Cloud traveled to see orthopedist Mandelbaum, who found a qualifying impairment rating (33%).[83] On July 21, 2009, Defendant incorrectly advised Cloud the rescheduled Schleimer appointment was outside the 45-day deadline (previously extended to August 25), and advised **"the Plan *will not process* your application for disability benefits further *until you attend* the neutral physician examination."**[84] Defendant would not communicate with Cloud again. When Cloud was unable to attend the July 27 appointment in California, Defendant internally noted Cloud's "case will be presented without neuro report."[85] No corresponding notice was sent to Cloud.

Mandelbaum provided his August 1, 2009 <u>qualifying</u> report to Defendant (**"Mandelbaum Report"**).[86] The Committee did not grant LOD Benefits within its 30-day extension (August 25).[87] Instead, the PBO unilaterally (and without notice to Cloud) sent Mandelbaum an August 21, 2009

---

[79] App.3076-78; App.393-94 (229:15 – 230:3).
[80] App.3072.
[81] In July 2009, the NFLPA sent all players a memo regarding its disputes with the NFL: "we will prepare to defend the rights of our players—both current and former—by asking tough questions, … [t]his union has worked for over 50 years to get to where the players have both free agency and a guaranteed percentage (60%) of league revenues." App.4389.
[82] App.3054, 3073-74; Pursuant to 29 CFR § 2560.503-1(f)(3) and Dkt. 16 at CLOUD-AR-060 at § 12.6(a) ("Claims Procedures").
[83] App.2564-76 (at 2576).
[84] App.3072 (emphases added).
[85] App.3775.
[86] App.2564-76 (at 2576); App.947 (170:20-25).
[87] App.3052, 3073.

memo requesting him to change the Mandelbaum Report.[88] Defendant has admitted the PBO participates in decisions this way, but denies any knowledge of it resulting in denial of benefits.[89] Mandelbaum sent the PBO a revised version of his report, which only changed impairment numbers from qualifying WPI (33%) to WPI (24%) – <u>one percent below the qualifying threshold of WPI (25%)</u> ("**Revised Mandelbaum Report**"), and Defendant withheld the original Mandelbaum Report from Cloud and the Committee.[90] Defendant never made any effort to reschedule a neurological exam for Cloud anywhere near the State in which he lived and failed to "advise [Cloud] whether any additional information is required in connection with [his] application." *See* Motion at 11 (PBO letter quoted therein). On September 24, 2009, the PBO delivered the Revised Mandelbaum Report to the Committee, which relied entirely on it as stated in its denial letter of the same day ("**2009 Decision Letter**"):

> [Y]ou do not have a substantial disablement within the meaning of Plan section 6.4. Specifically, the Committee noted that Plan neutral physician, Bert Mandelbaum, M.D., rated the loss of use of your entire upper extremity at 15%, your entire lower extremity at 35%, and your combined whole-body impairment at 24%.[91]

Three weeks later, Groom circulated draft Committee minutes, which reflected the meeting was attended by Scott and several Groom lawyers, "[a]ll present could hear each other and be heard[,]" and Cloud's 2009 Application was denied for "failure to meet qualifying percentages of [the] Plan[.]"[92] In its Motion, Defendant omits all of the above material facts. *See id*. at 13-14.

**D.    Cloud Appeals Denial of 2009 Application, and Defendant Ignores Physician Recommendation for Brain Studies and Grants LOD Benefits.**

On February 2, 2010, in the midst of the NFL's concussion scandal, Cloud appealed the

---

[88] App.3059-61.
[89] App.547 (128:25 – 130:9).
[90] App.2564-76 (at 2575); App.947 (170:20-25), 960 (183:2-9), 1065 (288:14-25), 1072 (295:3-11).
[91] App.3050-51.
[92] App.8190-95.

denial of his 2009 Application by short 1-page letter ("**2009 Appeal**").[93] On March 10, 2010, Defendant directed Cloud to travel 1,100 miles from Dallas, Texas to St. Petersburg, Florida (Tampa Bay area) to see neutral physicians who **"may request further diagnostic testing"** – George Canizares, M.D. (orthopaedist) ("**Canizares**") and Adam S. DiDio, M.D. (neurologist) ("**DiDio**"), and advised "[y]our medical records and application have been sent to the above physician[s.]"[94] On April 13, 2010, Cloud flew to Tampa, Florida, where Canizares determined a qualifying score (as with the first Mandelbaum Report) and noted a medical history of "some concussions" and "depression, migraine headaches, [and] insomnia[.]" ("**Canizares Report**").[95] On the same day, Cloud saw DiDio who wrote "See narrative please" on the examination form provided by Defendant (which includes no fields to input neurological impairments other than "loss of use of hearing, speech, and sight.").[96] His narrative report stated "**REASON FOR EVALUATION: CONCUSSIONS, VERTIGO**" (per the 2009 Application and the PBO's referral letter),[97] recounted Cloud's "history of concussions", "clear documentation of a single concussion sustained on October 31, 2004", "several other concussions … [h]e did not report … for fear that he would be taken out of the game" ("**NFL Brain Injuries**"), "primary complaint is vertigo [that] began 3 years ago", "headaches which started approximately 10 years ago … last 6 or 7 years they have become more frequent and more intense … [and] occur once per month … [with] photophobia and phonophobia … [such that] he likes to go into a dark, quiet room and lay down", "cognitive difficulties … forgets peoples names", "mild memory loss and stuttering, and depressive symptoms", and "verbal fluency … [that] is mildly impaired." ("**Initial Cognitive**

---

[93] App.4179.
[94] App.3003-05 (emphasis added). Cloud remained unaware of what medical records Defendant possessed.
[95] Dkt. 16 at CLOUD-AR-170-171; App.2578.
[96] Dkt. 16 at CLOUD-AR-180-182.
[97] App.3003-05; Dkt. 16 at CLOUD-AR-174.

Impairments").[98] DiDio concluded: "**I believe Mr. Cloud's episodic vertigo is a sequela of his prior traumatic head injuries. … [n]eurological testing is essential … *I recommend an MRI of the brain with gradient echo imaging to evaluate for any evidence of traumatic brain injury*[.]**" ("**DiDio Report and Brain Studies Recommendation**").[99] In its Motion, Defendant points to DiDio's checkmark on its form and only select portions of his narrative report, including none of what is set forth above. Motion at 14. In truth, just as now, Defendant ignored Cloud's NFL Brain Injuries, Initial Cognitive Impairments, and the entirety of the DiDio Report with Brain Studies Recommendation, and ***never again referred Cloud to another physician*** ("**Failure to Consider Brain Injuries**"). Instead, Defendant buried those issues along with the initial Mandelbaum Report, processed the 2009 Appeal without any neurological impairment rating, and sent a memo to Defendant's then Medical Director, Stephen Haas, M.D. ("**Haas**") which failed to disclose these buried reports, disclosed only the Canizares Report (qualifying rating) and Revised Mandelbaum Report (not qualifying rating), and asked Haas to "determine, based on the ***available evidence***, which neutral report best reflects Mr. Cloud's ***orthopedic*** conditions" ("**PBO Memo**") (emphases added).[100] On April 21, 2010, Haas recommended the Canizares Report (qualifying rating) as "more appropriate" ("**Haas Recommendation**"),[101] and the Board, at the May 13, 2010 meeting, adopted the Haas Recommendation (a violation of the Plan and ERISA)[102] and approved Cloud's 2009 Appeal granting him LOD Benefits.[103] On May 18, 2010, the PBO (Gaunt) sent

---

[98] Dkt. 16 at CLOUD-AR-174-177, 180.

[99] Dkt. 16 at CLOUD-AR-178(emphasis added).

[100] App.2978; App.938 (161:3-19).

[101] App.2977.

[102] At the same meeting, the Board denied another player's appeal based on a Haas report, which a federal court later found to be a violation of ERISA. *See Giles v. Bell/Pete Rozelle NFL Player Ret. Plan*, 925 F.Supp.2d 700, 714, 721-22 (D.Md. 2013) ("the Retirement Board was prohibited by the plain terms of the Plan from relying on Dr. Haas's recommendation that Mr. Giles was ineligible for … benefits[.]").

[103] App.8234-37; App.239 (307:10-21).

Cloud the decision letter approving LOD Benefits, but it disclosed none of the foregoing and contained no explanation in violation of ERISA:[104] "The [Board] determined that you qualify for LOD disability benefits" ("**2010 Decision Letter**").[105] The following month, June 17, 2010, Scott initiated Cloud's LOD Benefits.[106] In its Motion, Defendant omits all of these violations of the Plan and ERISA and only offers unsupported arguments that Cloud never questioned the application process or complained about not having records.[107] Motion at 14-15.

### E.    Cloud Continues Requesting Medical Records and Treatment for his Injuries and is Awarded Social Security Disability Benefits.

On or about June 14, 2011, Cloud submitted to examination by John Cronin, Ph.D. ("**Cronin**") who recounted many of Cloud's NFL Brain Injuries and Initial Cognitive Impairments.[108] Cronin also relayed a June 27, 2011 phone interview with Jennifer, who advised Cronin that "in the last few years, she feels he has changed dramatically and things have gotten much worse in his life [related to some Initial Cognitive Impairments] … and as to social and emotional well-being she was "concerned this is getting worse over time" ("**Cronin Report**").[109] Between October and December 2011, Cloud attended martial therapy sessions with Harry Cates, LPC ("**Cates**"). Cates observed Cloud "to be struggling with depressive symptoms poor concentration and bouts of unpredictable irritability" … "likely related to his physical injuries and

---

[104] *See, e.g.*, 29 CFR § 2560.503-1(g)(1)(i)-(v)(A); 29 CFR § 2560.503-1(j)(1)(2),(5)(i).
[105] App.2972.
[106] Several months later, Cloud pursued Defendant's recommendation and filed a worker's compensation claim against the Giants. App.1030 (253:11-22), App.1041 (264:9-16).
[107] Defendant references (1) Cloud's confusion in requesting another application for LOD Benefits (unsurprising given his NFL Brain Injuries), and (2) Defendant's discussions with a lawyer named John Hogan who handled portions of Cloud's social security disability application, not any application under the Plan. Motion at 15 n. 18 and 16 n. 19. It is unclear why Defendant references these events but one can surmise the intent. *See discussion on tolling/waiver, infra* at 57.
[108] Dkt. 16 at CLOUD-AR-119-121.
[109] Dkt. 16 at CLOUD-AR-121.

concussions, … as a professional football player" ("**Cates Report**").[110] On August 24, 2012, Cloud spoke with the SSA and completed his application for social security benefits ("**SSA Application**") wherein he stated "I became unable to work because of [Cloud T&P Disabilities] on March 30, 2006" ("**T&P Onset Date**").[111] On January 8, 2013, Cloud was examined for a psychological report by Anne Smith, Ph.D. ("**Dr. Smith**") with a chief complaint of "[p]ost concussion symptoms."[112] On January 22, 2013, Dr. Smith issued her report wherein she noted Cloud's Initial Cognitive Impairments (focusing on increased depressive symptoms) and found he suffered from "Major Depressive Disorder, Recurrent, Severe Without Psychotic Features" and deferred to a physician's findings as to any physical disorders or conditions ("**Smith Report**").[113]

On February 25, 2014, the SSA noticed a May 15, 2014 hearing date for testimony regarding the March 30, 2006 T&P Onset Date.[114] Cloud again attended a Cates therapy session, who listed changes in Cloud's Initial Cognitive Impairments and concluded "there appears to be progressive decline in the speed and sharpness with which he interacts as well as increased anxiety in social situations" ("**Cates Supplemental Report**") (combined with Cronin Report and Smith Report, the "**First Change in Cognitive Impairments**").[115]

On June 18, 2014, the hearing officer issued a *Notice of Decision – Fully Favorable* and *Decision* ("**SSA award**") finding Cloud qualified for SSA benefits as being totally and permanently disabled.[116] The hearing officer wrote Cloud "amended the alleged onset date of disability to December 31, 2008[,]" found Cloud "***has not engaged in substantial gainful activity***

---

[110] *Id*. at CLOUD-AR-111.
[111] App.1042 (265:13-24).
[112] Dkt. 16 at CLOUD-AR-114.
[113] *Id*. at CLOUD-AR-114-118.
[114] App.1042-43 (265:13 – 266:9).
[115] Dkt. 16 at CLOUD-AR-111.
[116] Dkt. 16 at CLOUD-AR-296-305.

*since December 31, 2008*" (emphasis added), and concluded "[a]fter careful review of the entire record, the undersigned finds that the claimant has been disabled from December 31, 2008 through the date of this decision ("**SSA Onset Date**").[117] Both Cloud and Jennifer were unaware why the SSA Award reflected a December 31, 2008 SSA Onset Date, but neither deviated from the March 30, 2006 T&P Onset Date in the SSA Application and it appeared the hearing officer, who referenced a last date of substantial gainful activity being year-end 2008, made a *sua sponte* inference from Cloud's perceived 2008 income and related SSA limits on same (meaning a mischaracterization of proceeds from the aforementioned Sale of Personal Effects in 2008) and Cloud's efforts after the hearing to request correction of the SSA Onset Date were barred by the 60-day period to appeal any portion of the SSA Award.[118]

F.     **Cloud Files 2014 Application for T&P Benefits and Defendant Grants Inactive A.**

On or about June 28, 2014, after being told by the SSA for the first time that Cloud qualified for T&P Benefits (contrary to Defendant's Instructions), Cloud applied for T&P Benefits under the Plan ("**2014 Application**") and alleged his various Cognitive Impairments and First Change in Cognitive Impairments.[119] Although the Plan benefits website did not mention a T&P Disability "time frame" required to receive Active Football benefits, Cloud's 2014 Application identified the Cloud Disabilities, the T&P Onset Date related to his NFL Brain Injuries, and numerous orthopedic injuries and neurological conditions.[120] Cloud also included an executed Plan Consent Form to be examined by neutral physicians, and submitted available medical and player records (but, aware he did not have them all, did not check the box indicating complete submission).[121]

---

[117] Dkt. 16 at CLOUD-AR-104, 106.
[118] App.1157 at 42:19 – 45:9; App.1177 at 123:12 – 125:14; App.948-49 at 171:23 – 172:9; App.1042-45 at 265:13 – 268:14; *see also* Dkt. 16 at CLOUD-AR-101.
[119] *Id*. at CLOUD-AR-96-97.
[120] *Id*. at CLOUD-AR-096-099; Appx. Ex. 6 at 295:12-21.
[121] *Id*. at CLOUD-AR-96-297.

In its Motion, Defendant argues Cloud identified the December 31, 2008 SSA Onset Date as the date of T&P Disability for purposes of his 2014 Application. An accurate review of the 2014 Application reveals that Cloud identified the 2006 T&P Onset Date in Part 2(b) on page 2 of the 2014 Application (the instructions to the section provide "(b) when [the disabilities] caused you to be totally and permanently disabled"). Cloud's reference to the SSA Onset Date was made in his accurate description of what the SSA Award stated, not a contemporaneous denial of the described 2006 T&P Onset Date in the body of the actual 2014 Application form promulgated by Defendant.

Banks noted the SSA Award, request for T&P Benefits, and timeliness of the 2014 Application.[122] Two weeks later, *on July 18, 2014*, the PBO (Scott) emailed the Committee (and 3 Groom lawyers, among others), apologized for the delay, and advised the *July 17, 2014* e-ballots were posted ("**2014 Cloud File**").[123] Not even 2 full business days after the Committee received the 2014 Cloud File designated by the PBO to be decided by *the day before*, and a month before a decision was actually due, the PBO (Scott) pressed for a decision under the heading "Delayed Cases" – "Just a reminder that we have not received the decisions for the … 7/17 e-ballots" (again copying 3 Groom lawyers, among others).[124] The following afternoon of July 23, 2014, Reynolds emailed his decision sheet, which reflected the SSA Award correlated with T&P Benefits (Inactive A), and Ms. Smith followed via email a few minutes later with "I agree with [Reynolds.]"[125] Scott forwarded the emails to unnamed members of a PBO "Disability Group."[126] Somehow, in the same afternoon, a decision letter was prepared, signed by Banks, and mailed to Cloud ("**2014 Decision**

---

[122] *Id*. at CLOUD-AR-94.
[123] App.8238-39; Dkt. 16 at CLOUD-AR-92-276.
[124] Dkt. 16 at CLOUD-AR-277. Defendant was under no time pressure pursuant to 29 CFR § 2560.503-1(f)(3) and Dkt. 16 at CLOUD-AR-060 at § 12.6(a) ("**Claims Procedures**").
[125] *Id*. at CLOUD-AR-279-80.
[126] App.8240-42.

Letter").[127] Neither Committee member wrote the 2014 Decision Letter, knows who wrote it, recalls reviewing before it was sent to Cloud, or could provide any of the underlying reasoning in support of its conclusions (*i.e.*, "we were not involved").[128] The 2014 Decision Letter disclosed that the Committee relied on Plan sections 5.1 (Eligibility), 5.2(a)&(b) (General Standard; Social Security Awards), 5.3 (Classification), and 5.8 (Effective Date of T&P Benefits), and provided only a conclusion (with no explanation) that Cloud did not qualify for Active Football benefits:

> "The Committee determined that you did not become totally and permanently disabled within any possible 'shortly after' period, such that the Active Football or Active Nonfootball categories could apply to your case."

("**Boilerplate Denial of Active Football**").[129] The failure to explain the basis for the Committee's decision or provide a description of information needed (and why) to perfect the claim for T&P Benefits (Active Football) was a violation of the Plan and ERISA[130] ("**First T&P Benefits ERISA**

---

[127] Dkt. 16 at CLOUD-AR-277-285.

[128] App.52 (199:15 – 200:2), App.83-84 (324:4 – 326:19), App.91 (354:18-22); App.206 (174:3 – 175:8), App.244-46 (329:21 – 336:14).

[129] Dkt. 16 at CLOUD-AR-282-285. Defendant (*i.e.*, Groom) has used this same Boilerplate Denial of Active Football in denial letters spanning decades. **Many of the decision letters are identical as to different players – the only difference being the date the player ceased playing in the NFL**. For example, in 2016 alone, Defendant used this language without ERISA-compliant explanation [*see, e.g.*, 29 CFR § 2560.503-1(g)(1)(i)-(v)(A); 29 CFR § 2560.503-1(j)(1)(2),(5)(i)] in the following denial letters: App7270 (Jan. 4); App.7271 (Jan. 14); App.7275 (Jan. 22); App.7279 (Jan. 27); App.7283 (Jan. 27); App.7286 (Feb. 12); App.7290 (Feb. 12); App.7299 (Feb. 25); App.7303 (March 8); App.7307 (March 24); 1881 (March 24); 2736 (March 24); 1865 (March 29); 2728 (April 11); 1484 (April 11); App.7327 (April 11); App.7331 (April 28); App.7335 (April 29); App.7339 (May 6); App.7343 (May 6); App.7352 (May 24); App.7356 (May 25); App.7360 (May 25); App.7364 (May 25); App.7373 (May 25); App.7377 (June 7); App.7381 (June 14); App.7388 (June 14); App.7389 (June 14); App.7939 (June 14); App.7397 (June 14); App.7401 (June 17); App.7405 (June 17); App.7409 (June 17); 2768 (June 24); 8612 (June 24); 7864 (July 5); App.7425 (July 12); App.7429 (July 12); App.7433 (July 20); App.7437 (Aug. 8); App.7441 (Aug. 8); App.7445 (Aug. 8); App.7449 (Aug. 8); App.7453 (Aug. 8); App.7457 (Aug. 12); App.7461 (Aug. 12); App.7465 (Aug. 12); App.7469 (Aug. 16); App.7483 (Aug. 30); App.7487 (Aug. 31); App.7491 (Aug. 31); App.7495 (Sept. 9); App.7499 (Sept. 9); App.7503 (Sept. 30); App.7507 (Oct. 13); App.7511 (Oct. 13); App.7519 (Oct. 14); App.7527 (Oct. 21); App.7531 (Nov. 3); App.7535 (Nov. 4); App.7539 (Nov. 4); App.7543 (Nov. 10); App.7568 (Nov. 23); App.7572 (Nov. 30); App.7576 (Dec. 5); App.7531 (Dec. 9); App.7584 (Dec. 9); App.7588 (Dec. 14); App.7592 (Dec. 14); App.7596 (Dec. 21); App.7600 (Dec. 21); App.7604 (Dec. 22) ("**Systemic Violations of the Plan and ERISA in Denial Letters**").

[130] 29 CFR § 2560.503-1(g); Dkt. 16 at CLOUD-AR-061 at § 12.6(a).

**Notice Violation**"). Despite the 2014 Decision Letter representation about the Committee determinations, neither Committee member referenced any of the cited Plan provisions or Shortly After provision anywhere in the AR, and the minutes reflect only that it "[g]ranted Inactive A total and permanent disability benefits … since [Cloud] satisfies the requirements of Plan sections 5.2 and 5.3(c)" – stating no evaluation of Cloud's qualification for Active Football benefits.[131]

In truth, the Committee did not review the 2014 Application. Neither Committee member met or spoke with Cloud, or each other, and both admit their "meeting" was not a meeting at all – it was just documentation of Committee members emailing their e-ballots to the PBO and Groom lawyers.[132] Neither Committee member can explain any underlying analysis in deciding Cloud's 2014 Application,[133] reviewed nothing but the AR (though seemingly unaware of the DiDio Report and Brain Studies Recommendation), requested no additional medical documentation, and did not refer Cloud foe evaluation despite the alleged Cloud Disabilities, Cloud T&P Disabilities, DiDio Report and Brain Studies Recommendation, and related assertions in the 2014 Application and evidence in the 2014 Cloud File [134] (even though they automatically refer claimants to see neutral physicians[135] because the two Committee members have no medical expertise[136] and their job is

---

[131] App.5759; App.5954; Dkt. 16 at CLOUD-AR-277-81; App.246 (334:18 – 335:3). In fact, the Committee minutes were not finalized until almost one year later (in June 2015) and referenced only sections 5.2 and 5.3(c) of the Plan. App.8243-53.

[132] Dkt. 16 at CLOUD-AR-277-81; App.5052-57; App.188 (104:2-22), App.193-94 (124:5 – 126:16, 127:22 – 128:9), App.204 (166:20 – 167:9), App.205 (171:13 – 172:4), App.216-17 (217:12 – 218:19), App.243 (323:4-7), App.248 (343:18-21), App.257-58 (380:15 – 383:13); App.5-6 (13:22 – 14:3), App.7 (19:4 – 20:6), App.12-13 (41:19 – 42:8), App.27 (98:13 – 99:1), App.28-29 (105:18 – 106:4), App.41-42 (156:14 – 159:18), App.50 (191:17 – 193:11), App.52 (198:13-18), App.53 (203:15 – 204:1), App.56 (214:11-22), App.83 (322:13 – 323:2).

[133] App.243 (322:12 – 323:13), App.251 (355:3-22); App.252-53 (361:19 – 362:5).

[134] App.203 (163:17 – 164:5), App.206 (176:2-4), App.230 (273:13-21), App.231 (275:11-19, 276:6-9), App.261 (396:2-5), App.262 (398:2-5, 398:2-15, 398:16 – 399:5); App.53 (202:17 – 204:13), App.8 (22:9-12); App.5759; Dkt. 16 at CLOUD-AR-376.

[135] App.43 (162:15 – 163:17).

[136] App.169 (29:12-19), App.186 (95:18 – 96:12), App.187-88 (100:4 – 103:1), App.190 (110:21 – 113:2), App.208 (182:3-20), App.214 (206:4 – 207:7), App.232 (280:19 – 281:7), App.236-37 (297:14 – 299:12),

to review the medical records and rely on medical experts to advise whether a player is disabled)[137]

("**Committee Review Failures**"). The alleged excuse for these Committee Review Failures is

causation of the Cloud T&P Disabilities was irrelevant because he qualified by virtue of the SSA

Award and, in such cases, there is no need for referral to neutral physician(s) – *i.e.*, the

Committee's decision: "was based on the fact that [Cloud] is receiving Social Security Disability

benefits" under Plan Section 5.2(b)[138] ("**Committee Reliance on SSA Award**").[139]

### III.   Cloud Seeks Reclassification from "Inactive A" to "Active Football", but both the Committee and Board Summarily Deny Reclassification Without Any Good Faith Effort to Consider It or Allow a Full and Fair Review.

Cloud remained in cognitive decline after his 2014 Application. Jennifer described Cloud's

symptoms as "horrible" indicating he "he flipped the switch and became someone that I didn't

know anymore" and exhibited paranoia, delusion, and other symptoms.[140] In February 2016, Cloud

requested Reclassification from Inactive A to Active Football ("**2016 Application**"), Defendant

received it on February 17, 2016, and the PBO (Scott) began processing it.[141] The 2016 Application

alleged "Migraine…, Clinical Depression…, Significant Memory & Attention Problems…,

Vertigo…, Impaired Verbal Fluency…, Memory loss, Attention and Decision Problems, Impaired

---

App.260-61 (393:18 – 396:1), App.262 (399:6-17), App.263-64 (402:15 – 406:14); App.22-23 (78:7 – 83:4), App.32-33 (120:3 – 123:13), App.38-39 (145:14 – 146:3), App.80 (310:8-10)

[137] App.185 (92:3-4), App.233 (283:20 – 284:7).

[138] App.220 (231:17 – 232:17), App.241 (314:6 – 315:13). At one point, Reynolds even stated Cloud was not injured while in the NFL, but could not identify any other event or time during which Cloud was injured after he ceased playing in the NFL. App.221 (236:15-19), App.235-36 (293:1-12, 296:7-16).

[139] Notably, Groom objected that any effort by the Committee to determine the underlying basis for the SSA Award calls for a legal conclusion. App.241 (314:11 – 315:3).

[140] App.1163-64 (68:11 – 71:8, 73:10-16), App.1179-82 (134:12 – 140:13, 141:22 – 142:15). During their relationship throughout 2009 and over the course of the following years, Jennifer would observe Cloud's increasing symptoms of cognitive impairment and complaints regarding his efforts to obtain medical records in pursuit of his NFL benefits. App.1153-54 (27:25 – 28:12, 30:17 – 32:14), App.1179 (130:21 – 132:5).

[141] Dkt. 16 at CLOUD-AR-288-472, 488; App.208 (184:21-22), App.245-46 (330:3-21, 336:20 – 337:1); App.15 (53:17 – 54:5); App.394 (232:18-22, 233:13-16), App.406 (280:5-6, 281:7-10), App.428-29 (369:22 – 370:4), App.437 (404:12 – 405:2).

Verbal Fluency, Post-Concussion Syndrome…, [and] Affective Disorder"[142] ("**Second Change in Cognitive Impairments**", together with Initial Cognitive Impairments and First Change in Cognitive Impairment, the collective "**Cognitive Impairments**"). The AR (at that time) reflected 187 pages ("**2016 Cloud File**").[143]

### A.    In Fewer Than 24 Hours, Defendant Rushed the Committee's Summary Denial.

On *February 22, 2016*, Defendant uploaded the 2016 Cloud File for the *February 22, 2016* claims decisions (*i.e.*, the same day), and the PBO (Scott), by 4:19 p.m. email, informed the Committee (copying 4 Groom lawyers) that Cloud's 2016 Application had been posted "for your review as *2/22/2016* [Committee] e-ballot"[144] – allowing for less than one day of review. Groom prepared the February 22, 2016 Committee minutes reflecting a meeting wherein the Committee:

> [d]enied application for reclassification of Inactive A total and permanent disability benefits to the Active Football category for failure to meet the requirements for reclassification of Plan section 5.7(b)

("**2016 Committee Minutes**").[145] In truth, Committee members admit they did not have a meeting or issue a decision in the late hours after the 2016 Cloud File had been uploaded.  The 2016 Committee Minutes were created by Groom just to satisfy the Plan requirements, and the actual Committee decision took place days later (see below).[146] Committee members cannot recall whether they even discussed the 2016 Application, and Reynolds admitted a low chance he spent even one day reviewing it, could not provide his thought process, and could not recall any communications with Ms. Smith.[147] Likewise, Ms. Smith recalls nothing about or what she

---

[142] Dkt. 16 at CLOUD-AR-290-291.
[143] *Id*. at CLOUD-AR-286-472.
[144] *Id*. at CLOUD-AR-473 (emphasis added); App.8254.
[145] App.5052-57.
[146] App.257-58 (380:15-18, 381:2 – 382:5, 383:10-13).
[147] App.41-42 (157:21 – 159:15), App.56 (215:1-6), App.97-98 (381:22 – 383:9), App.71 (274:14 – 275:5), App.88 (343:10 – 345:14), App.92 (359:20 – 360:7).

specifically did to evaluate it.[148] In the short period Defendant allowed the 2016 Application to be pending before the Committee, the same Committee Review Failures took place as with the 2014 Application (discussed above) ("**Repeated Committee Review Failures**").

On March 1, 2016, just 5 business days after Defendant uploaded the 2016 Cloud File and pressed the Committee for a decision, Ms. Smith e-mailed her e-ballot to the PBO (Scott), Reynolds, and 4 Groom lawyers with only the comment "no changed circumstances[,]"wrote "[a]pologies for the delay[,]"and 4 minutes later Reynolds replied with no e-ballot but wrote: "I agree."[149] The PBO (Scott) forwarded the emails to unnamed members of a "Disability Group."[150] The next day, a decision letter dated March 2, 2016 was signed by Scott ("**2016 Decision Letter**") and allegedly sent to Cloud on the same day *via FedEx* advising him, inter alia, that he could file an appeal "**within 180 days of** *your receipt* **of this letter**" ("**Noncompliant Transmittal**").[151]

---

[148] App.47 (179:2-5, 179:19 – 180:2).

[149] Dkt. 16 at CLOUD-AR-473-476.

[150] App.8255-57.

[151] Dkt. 16 at CLOUD-AR-485-89. Defendant was required to ensure Cloud's **actual** receipt **via USPS**. *See* 29 CFR § 2560.503-1(g)(1) (written notice required); 29 CFR § 2560.503-1(m)(5) (defining notice); 29 CFR § 2520.104(b)—1(b)(1) ("plan administrator shall use measures reasonably calculated to *ensure actual receipt* of the material by plan participants, beneficiaries and other specified individuals" and "[m]aterial distributed through the mail may be sent by *first, second, or third-class mail*.") (Emphases added). Vincent, Defendant's corporate representative as per Rule 30(b)(6) of the Federal Rules of Civil Procedure, confirmed Defendant does not have a document showing Cloud signed for the March 2, 2016 decision letter or a "picture of his signature". App.434 (392:12-394:11). Cloud has attempted to run the "shipment tracking number" through the Fed Ex system and "there's no hit…it doesn't exist." App.1052 (275:2-7, 275:10-21). In Cloud's neighborhood, Cloud only signed for Fed Ex deliveries like "very large, furniture piece[s]" and "audio-video equipment". App.1052 (275:23-276:21); *see also* App.1167 (82:17-83:4) (stating Fed Ex would leave packages "sitting at our door"). Cloud does not recall signing for the 2016 Decision Letter. App.1053 (276:22-25); *see also* App.1165 (75:10-14) (stating Ms. Cloud does not recall "pick[ing]…up" the Fed Ex containing the 2016 Decision Letter). The view of the front door of the Cloud home was obstructed by "columns, plants, and trees" and cannot be seen from the driveway. App.1168 (86:15-20). Cloud recalls his receipt on March 6, 2016. App.988-90 (211:20 – 213:7), App.1142 (Errata). In an effort to avoid reaching the merits of Cloud's right to Active Football (T&P Benefits), Defendant seeks to rely on an Untimeliness Argument (defined below) that the AR evidences when Cloud received the 2016 Decision Letter so that it can claim "[h]is 180-day appeal deadline was Wednesday, August 31, 2016", but the cited pages are just the typed conclusions of an unidentified person and do not refute the testimony of Cloud or Jennifer. *See* Dkt. 16 at CLOUD-AR-524; Motion at 22.

The 2016 Decision Letter, like the 2014 Decision Letter, set forth alleged substance behind the Committee's decision and "denied [Cloud's] request for several reasons[,]"[152] but failed to explain the bases for the decision or provide a description of information needed (and why) to perfect the claim for T&P Benefits (Active Football) was a violation of the Plan and ERISA[153] ("**Second T&P Benefits ERISA Notice Violation**"). Neither Reynolds nor Ms. Smith wrote the 2016 Decision Letter, neither knows who wrote it, and neither recalls reviewing before it was sent to Cloud.[154] Despite the representation in the 2016 Decision Letter as to what the Committee determined and noted, 2016 Committee Minutes reflect the denial took place before the Committee made a decision and, even then, neither member referenced any of the cited Plan provisions or the three reasons for denial in their notes, emails, e-ballots, or anywhere else in the AR.[155] Less than 2 months later, in May 2016, Scott quit player claims were being sabotaged by Defendant: "Sometimes, it just baffled me the decisions they arrived at" in denying player applications, and Vincent was promoted to replace Scott as disability manager.[156]

B.    **The Board Denies Reclassification.**

Cloud appealed the denial of his 2016 Application, which Defendant alleged it received on September 2, 2016[157] ("**2016 Appeal**"). The Repeated Committee Review Failures would pale in comparison to the egregious failures by Defendant in reviewing his 2016 Appeal.

1.    **Groom Prepares Incorrect Result-Oriented Case Summaries**. Throughout September 2016, Defendant took no steps to refer Cloud to a neutral physician, evaluate the

---

[152] Dkt. 16 at CLOUD-AR-488.
[153] 29 CFR § 2560.503-1(g); Dkt. 16 at CLOUD-AR-061 at § 12.6(a).
[154] App.52 (200:5-17); App.206 (174:3 – 175:8).
[155] App.5759; App.5954; Dkt. 16 at CLOUD-AR-277-81; App.205-06 (172:18 – 175:4), App.246 (334:18 – 335:3).
[156] App.249-50 (349:16 – 350:4); App.208-09 (184:20 – 185:14, 186:16 – 187:2); App.393-04 (227:13 – 228:11, 231:10-13), App.406 (281:11-15).
[157] Dkt. 16 at CLOUD-AR-490-501.

changes in his impairments, or otherwise process the 2016 Appeal. The following month, on October 3, 2016, the PBO (Richard) wrote to Cloud to acknowledge receipt of the 2016 Appeal, informed him it would be presented to the Board at its next meeting 6 weeks later (November 16, 2016), and advised him that he could submit any additional evidence over the next 2 weeks (until October 16, 2016).[158] Defendant still made no effort to refer Cloud to a neutral physician for examination. Instead, even before the PBO's 10/16 "deadline", Groom (staff attorney Natallia Maroz – "**Maroz**") determined Cloud's Appeal was ready to be summarized for submission because it was a Reclassification (undeserving of medical review), so it asked Richard to upload Cloud's 2016 Appeal to the PBO's Laserfische so Groom could summarize it and, multiple times over the next 10 days, the PBO (Vincent) advised lawyers Marshall and Lerner that summaries were being posted (evidently without notice to the Board members requiring them to log-in by their own volition to determine if any appeals are pending before they attend a quarterly Board meeting).[159] The omission of notice to Board members is because they do not conduct the review; instead, the Board delegates preparation and study of all claims and pertinent information, and the Board purports to use "best faith efforts" to monitor delegees, some who "recommend[] a certain outcome for a case[.]"[160] Though Board members do not know to whom it delegates all these tasks, they include the Committee members (Reynolds and Ms. Smith), Lerner, Marshall, and Groom.[161]

On October 24, 2016, Cloud again delivered to Defendant a Plan Consent Form to enable referral to neutral physicians.[162] Uninterested in referring him to a neutral physician, the PBO

---

[158] App.4241.
[159] App.8258-59; App.5793-94; App.708 (186:18 – 189:2); App.554 (154:16 – 157:18).
[160] App.676-77 (58:15 – 59:1, 60:24 – 62:16), App.682-85 (85:16 – 87:1, 93:2 – 95:17), App.687-88 (105:4-13, 106:17-20), App.694 (132:18 – 133:10), App.700-01 (156:23 – 158:18), App.702 (162:14 – 165:16), App.717 (224:21 – 225:5); App.536 (82:12-14).
[161] App.666 (19:23 – 20:4), App.668 (28:1-4), App.683-84 (87:2 – 90:7), App.699 (153:17-24).
[162] Dkt. 16 at CLOUD-AR-512; App.2522-23; App.3112-14.

(Richard) requested Cloud's summary from Groom.[163] Without evidence, any evaluation of Cognitive Impairments, or any semblance of a "full and fair review", Defendant (and Groom) began preparing a basis for denial. The following day, on October 27, 2016, Groom (Maroz) sent the PBO (Richard and Vincent) a 1-page summary of the 2016 Appeal ("**Summary One**") which referenced the Cognitive Impairments and First Change in Cognitive Impairments alleged in Cloud's *2014* Application (despite the Committee Reliance on SSA Award), ignored the Second Change in Cognitive Impairments set forth in the *2016* Application, and set forth a chronology of medical records referenced by page numbers such as "4/13/10 Dr. Adam DiDio's report [91-103" …. ("**Chronology**").[164] The Chronology coincidentally excluded portions of the DiDio Report and Brain Studies Recommendation.[165] Groom also excluded both MTBI Exams,[166] and the Medical Summary in the AR omits the page covering the 2004 Concussion.[167] Any Board member or other person who relied on Groom's Chronology would have missed these key documents ("**Omitted Medical Records**"). Summary One also stated the PBO received Cloud's 2016 Appeal "184 days after the denial letter[,]"[168] ("**Untimeliness Argument**"). This was a complete result-oriented fabrication not supported by anything in the AR and Defendant never asked Cloud when he received the 2016 Decision Letter via its Noncompliant Transmittal.[169]

On November 2, 2016, the PBO (Vincent and Richard) communicated regarding a need to post appeals summaries (including Cloud's), and Vincent advised Marshall/Lerner of more posted

---

[163] App.3117.
[164] App.3696-98. For some reason, that line is the only medical records without a closed parenthesis.
[165] App.3698; Dkt. 16 at CLOUD-AR-378-390.
[166] Dkt. 16 at CLOUD-AR-391-392.
[167] *See* AR388-89 (missing from between these pages).
[168] App.3698.
[169] *See* Dkt. 16 at CLOUD-AR-524. It is unclear who or when this document was created.

cases.[170] Richard stated she would post them shortly.[171] That evening, Vincent had not reviewed any summaries, but informed Groom that he had notified Marshall and Lerner of the 11 cases added to the meetings site (including Cloud's).[172] A PBO administrator also reminded Richard to schedule Cloud for an appointment to see a neutral physician.[173] The reminder was ignored. On November 4, 2016, Groom (Maroz) sent Vincent and Richard a replacement summary ("**Summary Two**"), which they uploaded to the meetings site and PBO Laserfiche, and Vincent advised Marshall and Lerner of more postings.[174] In Summary Two, Groom made no change to the Chronology or Omitted Medical Records, but dropped the Untimeliness Argument since there was no supporting evidence and deleted reference to "184 days after the denial letter[.]"[175] However, four days later, on November 8, 2016, Groom (Maroz) asked Vincent to check when Cloud received his denial letter.[176] Nothing in the AR reflects his response.[177] Nonetheless, within the hour, Groom (Maroz) sent Vincent a third "revised" summary of Cloud's claim ("**Summary Three**"), which he asked Richard to add to the PBO Laserfiche.[178] Vincent advised Marshall and Lerner of more cases being posted, including Summary Three as to Cloud "if you did not review that yet."[179] In Summary Three, Groom again made no change to the Chronology or Omitted Medical Records, but stated the PBO received Cloud's 2016 Appeal "**182 days later**" after Defendant's "denial letter was received by [him] on 3/4/16."[180] Both Cass and Mr. Smith

---

[170] App.3110; App.3740; App.5792.
[171] XFile805.
[172] App.3722.
[173] App.8260.
[174] App.8261-62; App.3125; App.5791-5792.
[175] App.8262.
[176] App.3812.
[177] *But see, infra*, at 48 n. 283.
[178] App.3691-92.
[179] App.5791; App.252-53 (361:15 – 362:10); App.254 (366:11-15).
[180] App.3692; Dkt. 16 at CLOUD-AR-484.

confirmed they have seen no such supporting records.[181]

> 2.   __NFL and NFLPA Lawyers Decide Cloud's Case__.  On November 9, 2016, Vincent once again advised Marshall and Lerner of more cases being posted.[182]  In the morning of November 10, 2016, Brian Francis (NFLPA) ("**Francis**") emailed Marshall a Board meeting case list and wrote "look forward to discussing."[183]  Even though the Board meeting was not until the following week, the case list reflected dispositive comments on Cloud's case, including an "x" in the denial column and statement "[n]o changed circumstances."[184]  That afternoon, Groom (Maroz) informed Vincent that Cloud's case (as well as another claimant's case) had been posted _under the wrong plan_ (suggesting the pre-ordained denial was not even done under the correct Plan), and Vincent advised Lerner and Marshall that new cases had been posted (including Cloud's in the correct Plan).[185]  Marshall emailed Davis a copy of the list of cases and wrote "[c]an we do a re-do on this week, seriously, I'm ready to stab someone in the eye" and "she [presumably Lerner] hasn't agreed to the Active Football for [Redacted][186] but I'll get her there. She just hasn't had a chance to look at it. They are still posting cases."[187]  As to Cloud, he was already out of luck. But this time, the NFLPA case list for Cloud said "[u]ntimely appeal" instead of "[n]o changed circumstances[.]"[188]  It is unclear who revised the basis of this denial of Cloud's 2016 Appeal, but it was not any member of the Board which had not yet convened.

---

[181] App.593 (313:2-14); App.721 (239:19 – 240:6); Dkt. 16 at CLOUD-AR-524.

[182] App.5791.

[183] App.5959.

[184] App.5961; App.5964.

[185] App.8349-50.

[186] Based upon Plan Decision Letters produced in this case, it appears this relates to the Committee's denial of Active Football benefits for a player who suffered a spinal cord injury in the NFL. At the November 2016 meeting, the Board would reverse the Committee and award Active Football benefits in that case, one of only 3 awards of Active Football benefits in all of 2016 (all 3 of which involved applications filed within months of their final seasons in the NFL). _See_ App.7445 (at 7447), App.7564, App.7523, App.7263/7267 (duplicate production).

[187] App.5807, App.5809, App.5812.

[188] App.5812.

On November 11, 2016, Vincent emailed Marshall and Lerner a complete list of cases posted for consideration.[189] Thereafter, Board members, various lawyers, and PBO staff traveled to Atlanta, Georgia for the November 2016 meeting held at the luxury 5-star hotel Mandarin Oriental Atlanta. At least four Groom lawyers attended the Board Meeting at the luxury hotel (Alvaro Anillo, Doug Ell, Mike Junk, and Mike Maricco, but not staff attorney Maroz) ("**Groom Attendees**").[190] Although Reynolds clearly stayed in the luxury hotel in Atlanta and participated in the decision-making process before the Board Meeting (discussed below), neither he nor Ms. Smith attended the Board Meeting (though they periodically do attend other Board meetings).[191]

In the evening of November 15, 2016,[192] Marshall emailed a PBO administrator a copy of her pre-ordained NFLPA-side appeals decisions and asked that 14 stapled copies be delivered to her hotel room ("**Marshall Decisions**")[193] and 30 minutes later Reynolds (the Committee member) emailed the same PBO administrator a copy of Lerner's pre-ordained NFL-side appeals decisions and asked that 20 stapled copies be delivered to his hotel room ("**Lerner Decisions**").[194] Though Groom heavily redacted the Marshall Decisions and Lerner Decisions (purportedly to protect player privacy), Defendant forwarded unredacted versions of both to 3 random hotel staff members and the hotel "front desk" and asked that someone/anyone print, staple, and deliver copies to their hotel rooms.[195] Even though the Board had not yet met, the Marshall Decisions included the denial of Cloud's 2016 Appeal for "[n]o clear and convincing evidence of changed circumstances[.]"[196]

---

[189] App.8263-66.
[190] App.5052-57; App.46 (175:20 – 176:4).
[191] App.5052-57; App.7 (21:20-22).
[192] The first day of the Board meeting involved review of financial matters. The second day involved claims decisions. App.671 (38:7-8).
[193] App.8289-97.
[194] App.8267-88; App.8298-8308.
[195] App.8267, App.8278, App.8298.
[196] App.8292.

The Lerner Decisions also included the denial of Cloud's 2016 Appeal, but for the unintelligible "reason" that the Committee previously awarded Inactive A based on the SSA Award and acknowledging Cloud "contends post-concussion syn, depression[.]"[197] Apparently, the basis of "[u]ntimely appeal" was dropped by both Marshall and Lerner (for reasons stated below).

As part of the above-described claims negotiations, the Board members never saw any document describing any of the above-described initial review or any assessment of medical records which reflects that the Board does not have a formal process to verify the accuracy of that review or interpretation of records and are wholly unaware of any procedures or rules regarding these delegation and monitoring issues[198] (part of the "**Claims Procedures Violations**").

3.     **The Private Caucuses**.  This above is how the Board operates with respect to advisors who "recommend[] a certain outcome for a case[.]" Moreover, these "recommendations" are not even made during the Board meeting; instead, the NFL and NFLPA lawyers first conduct separate undocumented private caucuses (no minutes are prepared and none of it is reflected in the AR)[199] during which the lawyers discuss the cases and make recommendations on how to decide the cases.[200] The amount of time spent in each private caucus depends upon case complexity, and each side can decide to order the player applicant to see a Plan approved neutral neurologist/physician for further review.[201] In the NFLPA-side caucus, Mr. Smith stated their advisors explained Cloud's case was not very complex "because of the timeliness, because of the

---

[197] App.8275.
[198]  App.681-82 (80:1 – 82:4), App.684 (90:3-7), App.704 (172:10-23); 29 CFR § 2560.503-1(b) ("[o]bligation to establish and maintain reasonable claims procedures"; "safeguards designed to…verify that benefit claim determinations are made in accordance with governing plan documents and…provisions…applied consistently"); § 2560.503-1(d).
[199] Private causes are held the morning of day two (November 16, 2016). App.671 (38:7-8).
[200] App.671 (38:4-17), App.663 (9:13-16), App.717-18 (225:25 – 226:5); App.554 (157:19-22).
[201]  App.684 (92:1 – 93:1), App.702 (163:17 – 164:5), App.708-09 (189:15 – 193:10); App.230 (273:13-21), App.261-62 (396:2-5, 398:2-5).

doctors' reports and what they said specifically about the timing of the disability."[202] Mr. Smith

stated Marshall instructed the NFLPA-side to deny Cloud's request for Reclassification:

> "[W]hen Mr. Cloud's case come up -- comes up, she would say, 'Well, we did
> this review. This is an appeal of a reclassification. And I looked at the record
> and there was no new information. It wasn't timely. There is nothing even in
> the original record and, of course, because there's – there's nothing new,
> there's no evidence that he became totally and permanently disabled in the
> shortly-after window, so I am recommending that we deny the appeal."[203]

Not all Board members fully understand its own *de novo* standard of review, some

believing the Board can just rely on, and essentially rubberstamp, an advisor(s) recommendation

(including by the Committee as an advisor) ("**Rubberstamping**").[204] Consistent with Board

members' view that Rubberstamping is acceptable, Mr. Smith and Cass (the two Board members

selected by Groom to be deposed in this case) (1) <u>did not</u> review the entire AR or discuss it with

other Board members before acquiescing to Rubberstamping and denying Cloud's 2016 Appeal

("**Board Failure to Review the AR**"),[205] (2) <u>did not</u> conduct any independent research on Cloud

---

[202] App.684 (92:1 – 93:1), App.708-09 (189:15 – 193:10).

[203] App.684 (90:8 – 91:22), App.709 (192:2-22).

[204] App.707-08 (182:3 – 184:12, 185:15 – 186:6), App.709-10 (193:13 – 194:23, 196:2-12), App.715 (216:22 – 217:7). During a hearing before this Honorable Court, Mr. Meehan (Groom) stated the Board "do[es] not simply rubber stamp" the decision of the Committee, but makes "an independent assessment." Dkt. 60 at A-020.  The evidence confirms otherwise.

[205] App.668-69 (28:7 – 29:13, 31:19-25), App.671-72 (41:5 – 42:13, 43:15-19), App.686 (101:4-15), App.705-06176:18 – 177:9, 242:3-9; App.524-25 (34:21 – 35:8, 37:10 – 39:21, 39:22 – 40:2), App.543 (110:14-23), App.546 (125:2-10). Cass testified he read "enough" of the AR because (1) he did not need to review documents already reviewed by the Committee when it issued its 2014 Decision Letter ("I didn't see any need to look at them again" … "I didn't see a need to go through documents that had already been reviewed by the [Committee]"), and (2) he even argued Groom's *post hoc* argument Cloud "admitted" in his appeal that he had no "changed circumstances." App.543-44 (112:21 – 113:1; 113:20 – 115:8); App.545-46 (119:11 – 123:12; 125:2-13). In Cloud's correspondence to the Board dated September 1, 2016, Cloud requested the Board to "reclassify" him to "'Active Football' benefits. Dkt. 16 at CLOUD-AR-490. Cloud also stated he "satisfies all of the criteria for an award of Active Football benefits." *Id.* Clearly, Plaintiff indicated and argued that he met all requirements necessary for reclassification of his benefits to "Active Football" benefit. Dkt. 16 at CLOUD-AR-032 at § 5.3(a). As an alternative argument, Cloud requested that the Board waive criteria, because Plaintiff is "**suffering from neurological impairments**" and is "**at a distinct disadvantage when it comes to applying for benefits under the NFL Player Retirement Plan**." Dkt. 16 at CLOUD-AR-493 (emphasis added).  This alternative argument is tracking the last sentence of Section 5.7(b) of the Plan, which waives certain requirements of Section 5.7(b) of the

or refer Cloud for examination by a neutral physician (and did not know if the Board or any advisor had done so) ("**Board Failure to Refer to Physician**"),[206] and (3) did not have a consistent understanding of Changed Circumstances for Reclassification ("**Board Interpretation Inconsistencies**")[207] (all of the foregoing, the "**Board Review Failures**"). Nonetheless, even without medical review, both Mr. Smith and Cass admit the Cloud T&P Disabilities arose out of his participation in NFL football games and Cognitive Impairments may worsen over time.[208]

  **4.**  **The Board Meeting**. After the respective private caucuses, a Board meeting was held where they did not substantively discuss cases, and no member votes actually took place; instead, the Board wholesale "den[ied] or approve[d] a block of decisions" – "in general what happens is that cases *as a slate* are either approved or denied, based on the reasons that the two separate caucuses determine" because "[t]hose cases have already been discussed in caucus"

---

Retirement Plan documents.  Waiver is permitted when the Committee or Board finds a player is "**physically or mentally incapacitated in a manner that substantially interferes with the filing of such claim**." Dkt. 16 at CLOUD-AR-037 at §5.7(b) (emphases added).

[206] Mr. Smith has no idea whether the Board consulted a medical professional in Cloud's case, knows the Board did not refer Cloud for a PET scan, and does not know if the Board has ever requested one in <u>any</u> case. App.702-03 (165:24 – 166:18), App.704-05 (173:3 – 174:7, 175:2-25, 176:1-17), App.706 (180:19 – 181:2), App.713-14 (208:15 – 210:9), App.717 (222:3-23). Cass even said "we are such at an early stage, we just don't know enough right now about anything" regarding the effect of multiple concussions and "I don't think anything's quite definitive yet" about head trauma causing a progression of symptoms. App.550-51 (138:18 – 139:10, 144:8-22). However, Cass admitted "look, you cannot play in the [NFL] without getting head trauma, and head trauma can be a problem … in future life." App.526 (43:6-11). Cass said the only question was Reclassification, but the Board would only refer Cloud to a neutral physician for examination for an initial application for T&P Benefits – not for Reclassification, in which case Cloud would need to submit medical evidence to corroborate his complaints. App.547 (126:1-12).

[207] Mr. Smith observed that Changed Circumstances is not defined in the Plan, but uses as a definition a "new or different impairment" though he does not know who created it: "we don't write these things. They're written by people that have to defend the language of the plan. And that's why we have legal advisors writing and updating, evolving these rules." App.711 (198:11 – 199:21). Asked whether a new concussion symptom can be a new or different impairment, Mr. Smith "can't say" but shared his view that "it doesn't seem like a different impairment to me. It sounds like a deterioration of a -- of a condition or an evolution of a condition." App.711 (199:22 – 200:5). Likewise, "clear and convincing" is not defined in Plan, nobody has given him a definition, and the Board has not developed one. App.712 (204:13 – 205:22).

[208] App. 689-91 (112:25 – 113:11, 115:24 – 118:7), App.703 (166:24 – 167:15, 168:7-13), App.714 (211:13-23); App.553 (150:23 – 151:11).

("**Board Meeting**").[209] The lack of Board member interest in conducting an ERISA-compliant decision-making process reflects their general attitude toward Plan benefits. Mr. Smith stated it is very expensive for Defendant to pay retired players and he is ***not aware of the Board granting a single application for Reclassification during his 10+ years on the Board***.[210] When asked why players are denied Active Football when suffering NFL-related cognitive impairments, Mr. Smith disregarded the express Plan provisions and explained: "it's more money than I make a year … I just respectfully disagree with you that just because somebody received an injury while playing the game that later led to a total and permanent disability, that that person deserves active football, because conditions deteriorate, even – I mean, I've seen it with my knee."[211]

5.    **The Board Minutes**.  It is unclear who took notes for the Board minutes,[212] but the minutes reflect only that it "denied [Cloud's] appeal for reclassification to the Active Football category for failure to meet the requirements of Plan section 5.7(b)" ("**Board Minutes**").[213] The Board Minutes do not reflect how the Board came to their decisions because "that's not the way the Board meeting is conducted"…"there are 50, 60 cases, so each case isn't mentioned specifically as to why it was approved or denied."[214] Nothing besides the Board Minutes is communicated to the PBO, a draft of which Groom prepared based on its attendance of only the Board Meeting (without additional input from Board members) and sent to the PBO *two months later* for approval at the next Board meeting.[215]

6.    **The 2016 Appeal Decision Letter**.  Even though the Board Meeting and Board

---

[209] App.687-88 (105:19-25, 106:1 – 107:23, 108:9-25), App.717-18 (224:7-20, 226:22 – 227:4).
[210] App.694-95 (132:6-17, 135:9-12).
[211] App.716 (219:4 – 221:15).
[212] App.687 (104:24 – 105:3).
[213] App.5056-57; App.673 (49:2-6).
[214] App.687 (105:4-18).
[215] App.363 (102:18 – 103:1); App.8327-35; App.8336-44; App.673 (47:12 – 48:2), App.686-87 (101:16 – 105:3), App.717-18 (223:17 – 224:6, 226:11 – 227:4).

Minutes involved no material explanation for the Board's denial of Cloud's 2016 Appeal, the Board was required to notify Cloud of its decision no later than 5 days after the Board Meeting and state the specific reason, the scientific/clinical judgment and application of Plan terms to his circumstances, and the role of applicable Plan provisions and internal rules.[216] The Board previously approved a standing "form" or "template" decision letter because the foregoing ERISA regulations place it "under a lot of pressure to get the letters out quickly" and the Board delegates and, without reviewing, assumes Groom accurately prepares the decision letters.[217] Consequently, shortly before lunch on November 16, 2016 (after the morning Board Meeting for claims decisions), Maroz, who was not one of the Groom Attendees of the Board Meeting, asked Vincent for the final decisions.[218] Vincent began summarizing the decisions, ignored what actually took place at the Board Meeting, and emailed Marshall: "Cloud you're denying for no change of circumstance. It could technically be untimely appeal at 182 days. Otherwise, both denials."[219] Marshall responded: "I knew I saw that in the case, but when we discussed it they all looked at me like I was crazy."[220] Vincent replied: "Good enough for me[.]"[221] Within the hour, Vincent emailed the "decision sheet" to all PBO staff.[222] As to Cloud, it reflected denial of his 2016 Appeal with the "[e]xplanation" being "[n]o clear and convincing evidence of changed circumstances[.]"[223] Vincent immediately forwarded it to Groom (Maroz).[224] Vincent then emailed Richard and Banks his account of the NFLPA-side Marshall Decisions, private caucus, and Board Meeting:

---

[216] 29 CFR 2560.503-1(i)(3)(ii), (5); 29 CFR 2560.503-1(j); Dkt. 16 at CLOUD-AR-062 at § 12.6(a).
[217] App.675-76 (54:2-16, 56:20 – 58:7, 58:11-14), App.682 (82:8 – 85:9), App.672 (43:1 – 44:15); App.562 (45:6-13), App.557 (166:17-24).
[218] App.8313.
[219] App.5790.
[220] App.5790.
[221] App.5790; App.8313.
[222] App.8309.
[223] App.8310.
[224] App.8313-16.

Elton/Elise – the meeting was pretty uneventful. Elton, you may remember how much banter we had during your pre-meeting, this time**, it was done in like 10 minutes with no issues**. Fortunately, all of the work we did to get our cases up right away, us providing them needed notes, and because of that Bethany/Belinda communicated a lot prior and pretty much had the cases ready to go.

We will wait for Grooms letters – I again have them doing all letters approving and denial. Makes it easier for now **until our full staff is up and running**.[225]

On November 18, 2016, Groom (Maroz) sent Vincent a draft denial letter as to Cloud's 2016 Appeal.[226] Even though Maroz was unable to join the Groom Attendees at the Board Meeting in Atlanta and Vincent's "[e]xplanation" to her included only "[n]o clear and convincing evidence of changed circumstances[,]" Maroz sent Vincent a Groom draft denial letter that included new explanations and grounds for denial.[227] Defendant was obligated to notify Cloud of its decision no later than 5 days after the Board Meeting (*i.e.*, by November 21), but Vincent did a "spot check" on November 23 and realized Cloud's denial letter had not been mailed.[228] Vincent advised a PBO executive assistant that the denial letter was "good to go" and "when you get a chance, please mail it out."[229] The PBO executive assistant responded "[s]orry. I never saw Cloud. It will go out today[,]" and 30 minutes later Miller emailed that he just signed it.[230] On November 23, 2016, the finalized letter written by Groom (Maroz), and without input or review by the Board, was mailed to Cloud denying his 2016 Appeal ("**2016 Appeal Decision Letter**").[231] Besides the 2016 Appeal Decision Letter being noncompliant on its face,[232] it is filled with errors.

*First*, the 2016 Appeal Decision Letter purports to reflect what the Board reviewed,

---

[225] App.8317 (bold emphasis added).
[226] App.8318-24.
[227] App.8319-24.
[228] App.8325. This tardy mailing was a violation of the Plan and ERISA. *See supra* at n. 216.
[229] App.8325.
[230] App.8325-26.
[231] Dkt. 16 at CLOUD-AR-518-23; App.357-58 (85:21 – 88:5); App.674-75 (52:12 – 55:1, 56:6-19), App.684 (91:2-4), App.717 (222:24 – 223:5); App.526 (42:4 – 45:17), App.557 (166:7-19).
[232] *See, e.g.*, 29 CFR § 2560.503-1(g)(1)(i)-(v)(A); 29 CFR § 2560.503-1(j)(1)(2),(5)(i).

determined, and noted – none of which took place before, during, or after the Board Meeting. This is further reflected by the fact that the Groom lawyer who prepared it was not one of the Groom Attendees at the Board Meeting and received only a "decision sheet" from Vincent that stated only "[n]o clear and convincing evidence of changed circumstances" ("**Groom Fabricated Board Positions**"). As Cass testified, a claimant has one way to discover if the decision letter reflects the Board's actual decision: "they would know if they – if they sued us. So, if someone went to court, they would find out, as you have done, … what's in the board decision and what's in the letter."[233]

*Second*, the 2016 Appeal Decision Letter acknowledges the Committee Reliance on SSA Award that resulted in the prior award of Inactive A (T&P Benefits),[234] but the 2016 Appeal Decision Letter thereafter implicitly excused the failure to refer Cloud to a neutral physician by mischaracterizing the prior award as based on the other of the Two Grounds for T&P Disability, entirely omitting Section 5.2(b) ("Social Security Awards") from the enclosure of "Relevant Plan Provisions",[235] including Section 5.2(a) ("General Standard") as the relevant Plan provision, and arguing the 2016 Appeal was based on the same impairments listed in the 2014 Application.[236] The purpose of this "switcharoo" was to imply no need for a medical review of Cloud's Cognitive Impairments because that the Committee previously evaluated the same impairments when it awarded Inactive A (T&P Benefits) in 2014 ("**Groom Cover for No Medical Review**").

*Third*, the 2016 Appeal Decision Letter asserts the definition of Changed Circumstances means a "new or different impairment [that] arose while [Cloud was] an Active Player" that subsequently caused a T&P Disability "'shortly after' it first" … the sentence abruptly ends

---

[233] App.557 (166:25 – 167:14).
[234] Dkt. 16 at CLOUD-AR-284, 518.
[235] The Plan and ERISA require relevant plan provisions be in the letter. 29 CFR § 2560.503-1(g); 29 CFR § 2560.503-1(j); Dkt. 16 at CLOUD-AR-061 at § 12.6(a); App.686 (98:23 – 100:21).
[236] Dkt. 16 at CLOUD-AR-518-23.

there.[237] Defendant has never previously interpreted Changed Circumstances to require a "new or different impairment" that arose *while the former player was still playing* ("**Groom Reinterpretation of Changed Circumstances**"). The failure to explain any rational basis for the Board's decision or provide a description of information needed (and why) to perfect the claim for T&P Benefits (Active Football) was a violation of the Plan and ERISA[238] ("**Third T&P Benefits ERISA Notice Violation**").

*Fourth*, the 2016 Appeal Decision Letter states the Board determined Cloud's 2016 Appeal was "untimely" based on Defendant's records, none of which is true. The Board did not make that finding, email communications between Vincent and Marshall after the Board Meeting prove they did not (Vincent ultimately did not include it in the "decision sheet" emailed to Maroz), and nothing in the AR reflects Defendant's supporting "records" as to when Cloud actually received the 2016 Decision Letter triggering his appeal timeline.[239] Even Cass and Mr. Smith confirmed they saw no such supporting records.[240] The Untimeliness Argument appeared in the 2016 Appeal Decision Letter only because Maroz, who dwelled on it in each of her Summary One, Summary Two, and Summary Three, unilaterally decided to include it again in the 2016 Appeal Decision Letter. In support of the Untimeliness Argument, the 2016 Appeal Decision Letter cites Section 13.3 of the Plan – which does not exist.[241] That provision is in the NFL Player Disability & Neurocognitive Benefit Plan, which has nothing to do with Cloud's claim ("**Groom Reliance on Wrong Plan**"). Even today, Board members offer *post hoc* grounds for denial – Mr. Smith argued Section 5.8 (payments) provides a "hard and fast rule" Defendant cannot go back more than 36

---

[237] Dkt. 16 at CLOUD-AR-519.
[238] 29 CFR § 2560.503-1(j); Dkt. 16 at CLOUD-AR-062 at § 12.6(a).
[239] App.720-21 (237:18 – 238:6). On at least one other occasion, a FedEx package addressed by Defendant to Cloud was delivered to and signed for by an unknown person – a "N. Murray[.]" App.8345-48.
[240] App.593 (313:2-14); App.721 (239:19 – 240:6); Dkt. 16 at CLOUD-AR-524.
[241] Dkt. 16 at CLOUD-AR-523; App.721 (240:7 – 241:19).

months from a filing date to designate the start of a T&P Disability (even though absent in the 2016 Appeal Decision Letter).[242]

*Fifth*, the 2016 Appeal Decision Letter states **"[t]he evidence [Cloud] submitted does not show that [he is] totally and permanently disabled"** (**"Groom Denial of Cloud's Existing Disability"**),[243] which Defendant recently admitted is false: "[t]here is, of course, no dispute over whether [Cloud] is totally and permanently disabled … so there is no inconsistency with the facts of this case …."[244] Every one of Defendant's deponents admitted Cloud suffered a T&P Disability as a result of his career in the NFL (or could not otherwise deny it).[245]

## IV.   Defendant Begins Slow Disclosure of Medical and Other Records.

In December 2018, Cloud asked the PBO for "a copy of my file with respect to all the applications that either I or an attorney filed for on my behalf[,]" and the PBO forwarded the request to Groom.[246] In its Motion, Defendant mischaracterizes this request in what can only be described as an excuse to dismiss the fact that Defendant still has not produced all of the requested files: "Cloud was not looking for missing records or records 'relevant' to the Committee or Board's decisions on his 2014 T&P application or his 2016 request for reclassification." Motion at 25. Both Banks and Richard advised that Cloud's file was complete.[247] The PBO shortly thereafter forwarded "all of the reports from [Cloud's] evaluations with the Plan's neutral physicians"[248] – not what Cloud had requested. Nonetheless, for the first time, Cloud received a copy of the

---

[242] App.685-87 (95:3 – 97:25, 99:20-23, 100:22 – 101:3, 101:16 – 102:7), App.692-93 (125:6 – 126:12, 127:21-23), App.718-20 (228:8 – 231:18, 234:17 – 235:20).
[243] Dkt. 16 at CLOUD-AR-519.
[244] Dkt. 149 at 5.
[245] App.221 (234:13 – 237:21); App.33-34 (125:18 – 126:5); App.553 (150:23 – 151:11); App.714 (210:10 – 212:3); App.418 (326:12 – 328:20).
[246] App.2558-62; App.3440-42.
[247] App.3735-37.
[248] App2563; App.3462.

(unaltered) Mandelbaum Report.[249] The PBO also sent only the medical records Cloud already provided them when he applied for benefits.[250] Groom produced a link for Cloud to download "a complete copy of [his] file" from a law firm link hosting his file[251] (all of the foregoing part of the "**Slow Disclosure of Records**").

## V.     Cloud Lawsuit.

On May 15, 2020, Cloud filed his Complaint in this lawsuit bringing claims under ERISA.[252] On October 22, 2020, Defendant produced the AR, and on January 5, 2021, Defendant filed it – but it reflected only 529 pages.[253] Since that date, Defendant has produced thousands of pages of documents that should have been included in the AR,[254] which even Committee members question,[255] and Cloud has struggled to obtain cooperation from the NFL and NFLPA to produce documents even in the context of this proceeding. In retrospect, the Committee was surprised to learn this process failed for Cloud.[256] Reynolds was uncertain why the PBO did not provide Cloud access to his files and, instead, an administrative assistant at Groom did so.[257] Ms. Smith said players may have told her of difficulties getting their records and she would have directed them to the PBO.[258]

---

[249] App.2566; App.2574; App.2576.
[250] App.2563.
[251] App.2491.
[252] Dkt. 1.
[253] Dkt. 16; Dkt. 28 at 1.
[254] App.28 (103:3 – 105:17), App.49 (187:18 – 189:9). The AR filed by Defendant is vastly different than the productions it made in this case that show thousands of pages of records that were not provided to the Committee or Board, including large portions of 3,000+ pages produced as recently as January 28, 2022
[255] App.242 (318:22 – 319:6; 318:12 – 321:21).
[256] Reynolds was surprised to learn that Cloud had been referred to the PBO to get his medical records and had not been provided medical reports until as late as 2019 because, respectively, those instructions would be improper and the PBO should have complied with that request. App.202-03 (161:17 – 162:6), App.238 (304:14 – 305:11), App.242 (318:12 – 320:20), App.256 (376:15 – 377:8). The player should be referred to the teams, but if he is not or a related dispute arises between the player and PBO then Reynolds is unaware of it ever being brought to the attention of the Committee. App.227 (261:13-18), App.229 (267:1-17).
[257] App.256 (374:14-22).
[258] App. (Ex. 10.; Ex. 11; Ex. 12; Ex. 20; Ex. 29).

### IMPROPER USE OF MOTION FOR SUMMARY JUDGMENT (FRCP 56)

The appropriate standard of review is *de novo* and summary judgment under FRCP 56 is inappropriate. The Fifth Circuit recently evaluated resolution of ERISA claims subject to *de novo* review.[259] In *Kearney*, cited by the Fifth Circuit,[260] the Ninth Circuit determined a district court is authorized to try the case in a "bench trial on the record."[261] **Unlike summary judgment**, "[i]n a trial on the record ... the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true," and make findings of fact under Rule 52.[262]

### STANDARD OF REVIEW

**I.** *De Novo* **Standard Applies.**

The <u>default rule</u> is denials of ERISA benefits are reviewed under a *de novo* standard.[263] Under the *de novo* standard, the district court's essential task "is to determine whether the

---

[259] *See Katherine P. v. Humana Health Plan, Inc.*, 959 F.3d 206, 208 (5th Cir. 2020) (citing *Koch v. Metro. Life Ins. Co.*, 425 F. Supp. 3d 741, 746–47 (N.D. Tex. 2019) (canvassing the different approaches)).

[260] The Fifth Circuit acknowledged authority that a district court may review the AR and make findings of fact and conclusions of law. *See Katherine P.*, 959 F.3d at 209-10 (citing *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094–95 (9th Cir. 1999) (en banc) (discussing that procedure)).

[261] *Id.* at 1095.

[262] *See id.*; *see also Avenoso v. Reliance Std. Life Ins. Co.*, 19 F.4th 1020, 1026 (8th Cir. 2021) ("[p]arties that wish the district court to exercise its factfinding function under Federal Rules of Civil Procedure 39(b) and 52(a)(1) to decide the case on the administrative record should ask the district court to do exactly that."); *Patton v. MFS/Sun Life Fin. Distribs., Inc.*, 480 F.3d 478, 484 n.3 (7th Cir. 2007) ("Those who wish to ensure that a judgment [in an ERISA-benefits case] is treated with the deference due the result of a bench trial are advised to eschew Rule 56 and stick to Rule 52(a)."); *see also Hodge v. Guardian Life Insurance Company of America*, Civil Action No. 4:20-CV-2088, 2021 WL 5142793, *1 (S.D. Tex. Sept. 10, 2021) ("the appropriate way to resolve this dispute is by making findings of fact and conclusions of law consistent with Rule 52 based on the administrative record and briefing"); *Gray v. Minnesota Life Ins. Co.*, No. CV H-19-4672, 2021 WL 861298, at *3 (S.D. Tex. Mar. 8, 2021) ("In the context of an ERISA claim, 'using Rule 52 is effective ... because courts may resolve factual disputes and issue legal findings without the parties resorting to cross motions for summary judgment.'") (citation omitted); *Ingerson v. Principal Life Ins. Co.*, Civil Action No. 2:18-cv-227-Z-BR, 2020 WL 3163074, *1 n.3 (N.D. Tex. May 13, 2020) (making recommended findings of fact and conclusions of law pursuant to Rule 52 where parties requested trial on the administrative record and briefing); *Batchelor v. Life Ins. Co. of N. Am.*, 504 F. Supp. 3d 607, 610 n.2 (S.D. Tex. 2020) ("Courts have noted that a trial on the papers under Rule 52(a) is effective in the ERISA context because courts may resolve factual disputes and issue legal findings without the parties resorting to cross motions for summary judgment."); *see generally Terry v. Hartford Life and Accident Insurance Company*, Civil No. 6:17-CV-00050-ADA, 2018 WL 11347194 (W.D. Tex. Oct. 16, 2018).

[263] *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

administrator made a correct decision."[264] The court must "independently weigh the facts and opinions in the AR to determine whether the claimant has met his burden of showing that he is disabled within the meaning of the policy."[265] It must also "resolve questions of material fact, assess expert credibility, and—most critically—weigh the evidence."[266] "The administrator's decision to deny benefits 'is not afforded deference or a presumption of correctness.'"[267] "Put simply, the [c]ourt must 'stand in the shoes of the administrator and start from scratch, examining all the evidence before the administrator as if the issue had not been decided previously.'"[268]

## II.    Alternative Stripping of Deference Under Abuse of Discretion Standard.

Even in the face of lawful delegation of discretion,[269] *Firestone* deference may be stripped if the administrator "acted in bad faith or would not fairly exercise his discretion to interpret the terms of the Plan."[270] In *Conkright*, the Court observed: "[A] trustee may be stripped of deference when he does not exercise his discretion 'honestly and fairly.' Multiple erroneous interpretations of the same plan provision…might well support a finding that a plan administrator is too incompetent to exercise his discretion fairly, cutting short the rounds of costly litigation[.]"[271]

---

[264] *Revels v. Standard Ins. Co*., 504 F. Supp. 3d 556 (N.D. Tex. 2020) (quoting *Pike v. Hartford Life & Accident Ins. Co*., 368 F. Supp. 3d 1018, 1030 (E.D. Tex. 2019) and *Niles v. Am. Airlines, Inc*., 269 F. App'x 827, 832 (10th Cir. 2008)).

[265] *Pike*, 368 F. Supp. 3d at 1030.

[266] *Id*. at 1035 (quoting *Weisner v. Liberty Life Assurance Company of Boston*, 192 F. Supp. 3d 601, 614 (D. Md. 2016)).

[267] *Koch v. Metro. Life Ins. Co*., 425 F.Supp.3d 741, 745 (N.D. Tex. 2019).

[268] *Byerly v. Standard Ins. Co*., No. 4:18-CV-00592, 2020 WL 1451543, at *18 (E.D. Tex. Mar. 25, 2020); *see also Ariana M. v. Humana Health Plan of Texas, Inc*., No. CV H-14-3206, 2018 WL 4384162, at *12 (S.D. Tex. Sept. 14, 2018), aff'd by 792 F. App'x 287 (5th Cir. 2019) (stating "*[d]e novo* review requires that the court apply the same standard as the plan administrator in deciding whether the benefits were owed under the plan's terms.").

[269] *See Ariana M. v. Humana Health Plan of Tex., Inc*., 884 F.3d 246, 247 (5th Cir. 2018) (citing *Firestone*, 489 U.S. at 115); *Revels*, 504 F. Supp. 3d at 560.

[270] *Conkright v. Frommert*, 559 U.S. 506, 515 (2010).

[271] *Id*. at 521 (citations omitted); *Atkins v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 694 F.3d 557, 567 (5th Cir. 2012) (discussing same and citing *Conkright*); *see also Burell v. Prudential Ins. Co. of Am*., 820 F.3d 132, 138 (5th Cir. 2016) (acknowledging issue); *Lafleur v. Louisiana Health Service and Indemnity Co*., 563 F.3d 148, 159 (5th Cir.2009) (same); *Abatie v. Alta Health & Life Ins. Co*., 458 F.3d 955, 971 (9th

In our case, Defendant must be stripped of all discretion. <u>First</u>, the Board (and the Committee) exceeded the boundaries of stated discretion under the Plan by not considering the substance of any of the 2016 Appeal and ceding all claims handling to lawyers. <u>Second</u>, the Board (and the Committee) acted in bad faith (or, at a minimum, failed to exercise discretion honestly and fairly) and did not (and will not) fairly construe the Plan's terms or determine Cloud's eligibility for benefits. The Board (and its counsel Groom) have demonstrated multiple erroneous interpretations of Plan provisions and obligations under ERISA, a willingness to increase rounds of costly litigation as part of the claims process,[272] and a failure to supervise or monitor the PBO, Groom, Marshall, or Lerner, and in fact has participated in or knowingly allowed their violations

---

Cir.2006) ("[w]hen an administrator engages in wholesale and flagrant violations of the procedural requirements of ERISA, and thus acts in utter disregard of the underlying purpose of the plan as well, we review *de novo* the administrator's decision to deny benefits. We do so because, under *Firestone*, a plan administrator's decision is entitled to deference only when the administrator exercises discretion that the plan grants as a matter of contract.").

[272] As addressed in *Cloud's Motion to Disqualify the Groom Law Group and Brief in Support*, Dkt. 56 at 11-29, and *Motion for Judgment* and *Brief in Support*, Dkt. 155, 156 at 55-56, Defendant repeatedly treats lawsuits as part of its claims handling process and disregards numerous judgments regarding how they handle claims. *See, e.g., Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 855 Fed. Appx. 332, 333-34 (9th Cir. Aug. 10 2021) (*Dimry II*); *Keys v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*, 493 F. Supp. 3d 1147, 1176 (M.D. Fla. 2020); *Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 16-CV-01413-JD, 2018 WL 1258147 at *1 (N.D. Cal. Mar. 12, 2018) ("*Dimry I*"); *Giles v. Bell/Pete Rozelle NFL Player Ret. Plan*, 925 F.Supp.2d 700, 721-22 (D.Md. 2013). Defendant ignored the ruling in *Giles* (prohibiting the Board's reliance on its Medical Director's recommendations), relied on the medical director in *Dimry I & II*, ignored a federal judge's "***suggestions***" (*i.e.*, judgment) in *Dimry I*, and during a hearing Mr. Junk told the judge in *Dimry II* that there was "**additional evidence . . . that disproves the premise of Judge Donato's holding**" and, when asked why Defendant did not allow Dimry to participate on remand, answered "**[t]hat's what we have essentially here now, Your Honor, with this second round of litigation. We're seeing his response.**" *Id.* The court ruled: "The Board's glaring procedural error of conducting its review of Mr. Dimry's appeal in secret and then, after denying his appeal, refusing even then to engage in a meaningful dialogue and instead telling Mr. Dimry to file a lawsuit is reason alone to find that the Board abused its discretion." *Dimry v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*, 487 F. Supp. 3d 807, 819 (N.D. Cal. 2020) ("the Board is reminded of its obligation to provide Mr. Dimry a full and fair opportunity to participate in the process."). Defendant appealed and lost again. *Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 855 Fed. Appx. 332, 333-34 (9th Cir. Aug. 10 2021) ("the Plan excluded Dimry from dialogue about Dr. Jackson's reports and told Dimry to revise his lawsuit rather than discuss the changes with the Plan[.]"). **Defendant has learned nothing from these admonishments**. Here, Board member Cass explained how a claimant can discover if his decision letter reflects the Board's actual decision: "***they would know if they – if they sued us. So, if someone went to court, they would find out, as you have done, … what's in the board decision and what's in the letter***." App.557 (166:25 – 167:14).

45

of Plan terms and ERISA requirements. Naturally, Defendant disputes that ERISA requires any training, supervision, or monitoring of fiduciaries or delegees. But the law on this issue is clear.[273] Defendant (and Groom) know all of this. Groom prepared and oversees a Plan document that includes absolutely no procedures for supervision or monitoring of delegees, and a Plan process that incorporates none of the above legal requirements.[274] Even if not intentional, at a minimum, the Board has shown itself sufficiently incompetent to exercise discretion fairly. Based upon the above-stated facts and arguments below, this Court should employ a *de novo* standard of review.

**III.    Alternative Abuse of Discretion Standard: Structural Conflict.**

In the alternative, if the Court finds Defendant is entitled to review of the Motion under abuse of discretion, the Supreme Court has recognized that a plan administrator that both evaluates claims and pays claims for benefits has a structural "conflict of interest," and that "a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits."[275] "A structural conflict may prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, such as where an administrator has a history of biased claims administration, or where circumstances surrounding the plan administrator's decision suggest procedural unreasonableness."[276] In other words, "[t]he greater the evidence of conflict on the part of the

---

[273] *See In re Enron Corp. Securities, Derivative & ERISA Litig.*, 284 F.Supp.2d 511, 572 (S.D. Tex. 2003).
[274] Dkt.16 at CLOUD-AR-050 at §8.2(f).
[275] *Id*. at 108, 128 S.Ct. 2343 (citing *Firestone*, 489 U.S. at 115, 109 S.Ct. 948); *see also Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 295 (5th Cir. 1999) (en banc), *overruled on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008) (stating a plan administrator that both insures and administers the plan "is self-interested, *i.e.*, the administrator potentially benefits from every denied claim").
[276] *Nichols v. Reliance Standard Life Ins. Co*., 924 F.3d 802, 813 (5th Cir. 2019) (internal quotations and citations omitted).

administrator, the less deferential [the court's] abuse of discretion standard will be."[277]

<u>**ARGUMENT AND AUTHORITIES**</u>

## I.      Summary of the Argument

Cloud has asserted a claim for benefits under ERISA, which provides a participant may bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."[278]

## II.     The Decision to Deny Cloud's 2016 Appeal Violated the Plan and ERISA, and is Not Supported by Substantial Evidence.

As mentioned in the Introduction, Defendant argues three Plan rules led to the denial of Cloud's 2016 Appeal: (A) the Untimeliness Argument, (B) the argument Cloud did not satisfy the Changed Circumstances provision, and (C) the argument Cloud failed to show his T&P Disability arose within 6-12 months after his initial disability arose.

### A.      Cloud's administrative appeal was timely, the Board did not find otherwise, and Groom (and another lawyer) fabricated the Untimeliness Argument.

In Defendant's Motion, it makes the Untimeliness Argument – that "Cloud's appeal was two days late. . . . A deadline is a deadline. It is met, or it is missed. The Board does not have authority to waive the terms of the Plan." Motion at 31. That integrity in honoring the Plan terms apparently does not apply to the Board itself, considering that it was the Board who was "two days late" in mailing the 2016 Appeal Decision Letter to Cloud – a violation of federal law.

---

[277] *Vega*, 188 F.3d at 297; *see also Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 270 (5th Cir. 2004), *cert. denied*, 545 U.S. 1128, 125 S.Ct. 2941, 162 L.Ed.2d 867 (2005) ("The degree to which a court must abrogate its deference to the administrator depends on the extent to which the challenging party has succeeded in substantiating its claims that there is a conflict.").

[278] 29 U.S.C. § 1132(a)(1)(B); *see also* 29 U.S.C. § 1132(a)(3) ("to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or … to obtain other appropriate relief … to redress such violations or … to enforce any provisions of this subchapter or the terms of the plan"); 29 U.S.C. § 1132(2) (requiring the plan to provide a reasonable opportunity for a full and fair review of a denial of benefits).

47

Hypocrisy aside, the 2016 Appeal Decision Letter purportedly denied Reclassification based upon the Untimeliness Argument pursuant to Section 12.6(a) of the Plan,[279] which provides "[t]he claimant will have 180 days from the receipt of an adverse determination to file a written request for review of the initial decision to the Retirement Board."[280] The AR reveals two things on this issue: (1) the Board did not "determine[] that [Cloud's] appeal was untimely under Section 12.6(a)" (i.e., the Untimeliness Argument) as alleged in the 2016 Appeal Decision Letter; instead Groom, the PBO (Vincent), and NFLPA lawyer fabricated it for denial before and after the Board meeting (Marshall: "when we discussed it they all looked at me like I was crazy"; Vincent: "Good enough for me[.]")[281] and (2) nothing in the AR evidences when Cloud actually received the 2016 Decision Letter.[282] Defendant cites to an email among PBO staff that includes multiple levels of hearsay, but appears to be neither part of the AR nor before this Honorable Court.[283]

Cloud confirmed the 2016 Decision Letter was received on May 6, 2016 and, thus, the filing of his appeal was timely.[284]  To the extent Cloud has any burden to refute Defendant's Untimeliness Argument, Defendant never provided Cloud a tracking number for its 2016 Decision

---

[279] Dkt. 16 at CLOUD-AR-520.

[280] *Id*. at CLOUD-AR-61.

[281] App.5790.

[282] Defendant's own standard for receipt of documents from players requires "actual receipt" by the Board and, thus, it is only logical that the same standard would apply to a player's "actual receipt" of documents from the Board. Dkt. 16 at CLOUD-AR-064 at § 12.8.

[283] The email (XFILE-2195) apparently was buried among another 3,000+ pages Defendant produced on January 28, 2022 – over 1 year after Defendant filed the initial AR. Rather than blindly request all 3,000+ pages made part of the AR when Cloud filed his *Motion for Leave to File Third Supplemental Motion to Supplement the Administrative Record* [Dkt. 142], Cloud filed the handful of documents he was able to identify in the short time-period allowed by the tardy production – shortly after the deadline to supplement the AR (February 10, 2022). [Dkt. 114]. The email cited by Defendant was not included and is not part of the AR. Besides the fact that the email is not in the AR, was not considered by any Board/Committee member, and includes multiple levels of hearsay regarding the purpose for which Defendant cites it (to which Cloud hereby objects if Defendant seeks to include it in the AR), this is illustrative of the fact that Defendant does not actually maintain an administrative record of the claims its handles. It sloppily compiles them in an *ad hoc* manner only when litigation ensues. Here, we are nearing 2 years since this lawsuit was filed and Defendant still has not provided this Court with a complete AR.

[284] App.988-90 (211:20 – 213:7), App.1142 (Errata).

48

Letter and both Cloud and Jennifer testified packages often sit outside on their porch for days at a time. Consequently, there is no evidence in the AR to show when the FedEx package was left (by its Noncompliant Transmittal) to support the Untimeliness Argument as a basis for denial.

**B.    Cloud's 2016 Application for Reclassification satisfied the Changed Circumstances requirement – even as to All the Various Inconsistent Ways in Which Defendant (*i.e.*, Groom) has defined it.**

**1.    The Board interprets Changed Circumstances in numerous ways and Cloud satisfies all of them (at least the reasonable ones).**

The Plan includes undefined terms that govern Cloud's request for Reclassification, including the required clear and convincing showing of qualification for different benefits due to evidence of Changed Circumstances.[285] All lawyers, including Groom as the Plan's architect, know that not defining key terms is a recipe for litigation. After all, almost 12 years ago, Groom claims "the purpose of the clear and convincing evidence of changed circumstances standard is to promote finality, and preclude further litigation."[286] This should cause this Honorable Court to ask why, then, is Changed Circumstances not defined *anywhere* – not even in Defendant's own internal documentation? Groom drafted the Plan, its terms, and most (if not all) of Defendant's decision letters.[287] Defendant's decades-long secretive handling of how it defines Plan terms like this is an open and direct violation of ERISA.[288]

---

[285] Dkt. 16 at CLOUD-AR-037 at § 5.7(b).

[286] App.5444 (at 5447) (May 12, 2010).

[287] One month ago, Groom produced thousands of pages of decision letters from 1997 to the present. The initials "glg" appear under many signature blocks, referring to "Groom Law Group". Groom drafted the earliest Reclassification decision letter in 1997. App.5535 (Oct. 22 '97).

[288] *See, e.g.*, 29 CFR § 2560.503-1(g)(1)(i)-(v)(A); 29 CFR § 2560.503-1(j)(1)(2),(5)(i). For example, 29 CFR § 2560.503-1(j)(5)(i) requires: "If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of the rule, guideline, protocol, or other similar criterion will be provided free of charge to the claimant upon request[.]" This would include unwritten Plan definitions. Defendant violated this in every decision letter to Cloud, including the 2016 Appeal Decision Letter, and in countless decision letters to other denied claimants over the past 25+ years.

In its Motion, Defendant argues it has maintained a single definition of Changed Circumstances, Motion at 32-33, 39-41, which is refuted by the facts (discussed below). Today, at least for purposes of Cloud's case, Defendant defines it as "a new or different impairment from the one that originally qualified [him] for T&P benefits" ("**Current Definition**"). Motion at 32; Dkt. 16 at CLOUD-AR-520. Of course, applying this definition, the very nature of the Committee Review Failures and Committee Reliance on SSA Award reveals that Defendant did not substantively consider any of Cloud's impairments in relation to the 2014 Application and award of Inactive A (T&P Benefits).[289] Defendant granted Cloud Inactive A (T&P Benefits) solely due to the SSA Award and not any specific impairment. Thus, if Changed Circumstances means "a new or different impairment from the one that originally qualified [him] for T&P benefits[,]" then what impairments are we comparing (since Defendant never considered any in 2014)? Even if Defendant wanted to argue that it could dive into the reasoning behind the SSA Award to parse through the various impairments underlying the SSA Award, it did not do that in 2014 or 2016. Defendant is a victim of its own affirmative decision to define Plan terms "on the go" and predilection to massage definitions as it suits it in any given case. If this is their definition of Changed Circumstances, then unfortunately for Defendant "[t]he Board does not have authority to waive the terms of the Plan." Motion at 31. Cloud satisfies Changed Circumstances.

But that definition of Changed Circumstances is one of many used by Defendant in denying Reclassifications. For over a decade (1997-2010), Groom caused Defendant to issue denial letters in Reclassification appeals and never defined Changed Circumstances in any of those letters.[290]

---

[289] App.241 (314:11-20)

[290] Which is a violation of ERISA. *See, e.g.*, 29 CFR § 2560.503-1(g)(1)(i)-(v)(A); 29 CFR § 2560.503-1(j)(1)(2),(5)(i). The following decision letters reflect this failure to define Changed Circumstances for any claimant, and includes parentheticals for those that included some rhetoric as to a definition. App.5495 (July 27, '01); App.5464 (July 20, '03); App.5525 (June 10, '04); App.5531 (Nov. 23, '04); App.5431 (April 14, '05); App.5467 (Oct. 6, '05) App.5527 (Oct. 28, '05) ("**Your arguments relate exclusively to**

One may only glean from the letters that the definition requires something other than evidence of the existing condition that formed the basis of the original award ("**Original Circumstances**"). The opinion in *Boyd v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*[291] is the first instance in which Groom advanced a definition on behalf of Defendant that was accepted by a court. The court in *Boyd* accepted the definition as "*a change in physical condition*, not merely the availability of new evidence regarding causation" even though the first clause was nowhere in the first two denial letters Defendant sent to Boyd ("**Change in Condition**").[292] In other words, Groom made it up during the *Boyd* litigation. Thereafter, for the first time, just 3 months after the *Boyd* decision, a definition appeared in an August 15, 2011 denial letter issued by Defendant wherein Groom adopted "**a change in the Player's physical condition**," and further added "**such as a new or different disability**" ("**New/Different Disability**") and used it to deny yet another player's Reclassification[293]. In the span of one case, *Boyd*, Defendant's definition of Changed Circumstances mutated from some abstract something (*i.e.*, other than rearguing causation of the Original Circumstances), to a Change in Condition (to enable denial of the claim in *Boyd* and which could be a worsening of the Original Circumstances), to a New/Different Disability (to enable denial of the claim in *Bryant* which could be what, another injury or new T&P Disability

---

**matters in the past**"); App.5625 (July 12, '06); App.5461 (Aug. 7, '07); App.5551 (Aug. 20, '07); App.5437 (Oct. 5, '07) ("**the new evidence … relate to the same condition that was the basis for the original classification**") at issue in *Atkins v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 694 F.3d 557, 563 (5th Cir.2012); App.5616 (Oct. 29, '07); App.5479 (Nov. 15, '07); App.5499 (Feb. 13, '08); App.5423 (Feb. 13, '08); App.5427 (May 9, '08) (absent where evidence relates to "**the same … impairments that were the basis for your original award**"); App.5486 (June 24, '08) (absent where "**same circumstances and issues that existed when you were initially classified**"); App.5555 (Dec. 22, '08) ("**all you have done is to reargue the causation of the original circumstances**") at issue in *Boyd v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 796 F. Supp. 2d 682 (D. Md. May 24, 2011); App.5452 (March 18, '09); App.5444 (May 20, '10) ("**involves the same circumstances as the initial classification**") also at issue in at issue in *Boyd*, 796 F. Supp. 2d 682 (D. Md. May 24, 2011).
[291] 796 F. Supp. 2d 682 (D. Md. May 24, 2011).
[292] App.5555 (Dec. 22, '08); App.5444 (May 20, '10).
[293] App.5470 (Aug. 15, '11) at issue in *Bryant v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*, Civ. No. 1:12-cv-936-MHC, 2015 WL 13908103, at *3 (N.D. Ga. March 23, 2015).

arising out of the Original Circumstances of the first T&P Disability?)

The evidence shows Defendant allows Groom to manipulate the definition of Changed Circumstances while refraining from formally defining it anywhere other than in denial letters and dispositive motions in litigation against Plan beneficiaries. In almost every decision letter on Reclassification, Defendant defines Changed Circumstances as something other than "Original Circumstances", a "Change in Condition", a "New/Different Disability", or in most cases offered no definition at all.[294] In these latter cases (2011-2015), it appears *the majority of players denied Reclassification are left with no idea what Defendant is talking about* in using the terms no

---

[294] App.5522 (Sept. 6, '11) (no definition); App.5567 (Oct. 17, '11) (no definition); App.5613 (Jan. 17, '12) (no definition); App.5601 (Feb. 27, '12) (no definition); App.5474 (March 8, '12) ("**initially awarded T&P benefits due to cognitive and psychiatric impairments. The []Board did not find evidence of total and permanent disability due to other impairments in the materials you have submitted**" ... "**additional evidence about the same circumstances**"); App.5570 (May 16, '12) (no definition); App.5434 (May 24, '12) ("**same condition that initially qualified you**"); App.5619 (June 7, '12) (no definition); App.5582 (Sept. 4, '12) (no definition); App.5591 (Oct. 10, '12) (no definition); App.5564 (Dec. 10, '12) (no definition); App.5483 (Jan. 24, '13) (no definition); App.5545 (Feb. 25, '13) ("**involves the same exact circumstances that led to the original award of T&P benefits**"); App.5622 (Feb. 28, '13) (no definition); App.5536 (May 22, '13) ("**same condition that caused the initial award of T&P benefits**"); App.5489 (Aug. 26, '13) (means "**a change in the player's physical condition, such as a new or different disability**"); App.5573 (Oct. 16, '13) (no definition); App.5576 (Oct. 16, '13) (no definition); App.5579 (Oct. 16, '13) (no definition); App.5455 (Sept. 5, '13) (no definition); App.5630 (Feb. 7, '14) (no definition); App.5627 (Feb. 13, '14) (no definition); App.5604 (March 31, '14) (no definition); App.5638 (April 10, '14) (no definition); App.5633 (April 22, '14) (no definition); App.5594 (June 18, '14) (no definition); App.5607 (July 24, '14) (no definition); App.5505 (Sept. 2, '14) (no definition); App.5641 (Oct. 8, '14) (no definition); App.5610 (Oct. 22, '14) (no definition); App.5597 (Nov. 21, '14) ("**Board has in this case and all others interpreted 'changed circumstances' to mean a subsequent change in a Player's physical condition (such as a new or different impairment) that warrants a different category of benefits**"); App.5510 (March 9, '15) ("**to mean a change in a Player's physical condition – such as a new or different impairment – that warrants a different category of benefits**"); App.5262 (May 20, '15) (no definition); App.5399 (May 21, '15) ("**to mean a change in a Player's physical condition – such as a new or different impairment – that warrants a different category of benefits**"); App.5516 (May 21, '15) ("**to mean a change in a Player's physical condition – such as a new or different impairment – that warrants a different category of benefits**"); App.5239 (June 29, '15) (no definition); App.5259 (Nov. 3, '15) ("**to mean a change in a Player's physical condition (i.e., a new or different impairment)**"); App.5236 (Nov. 3, '15) ("**to mean a change in a Player's physical condition (i.e., a new or different impairment)**"); App.5395 (Dec. 1, '15) ("**to mean a change in a Player's physical condition (i.e., a new or different impairment)**"); App.5365 (Dec. 2, '15) ("**to mean a change in a Player's physical condition – such as a new or different impairment – that warrants a different category of benefits**"); App.5410 (Dec. 21, '15) ("**to mean a change in a Player's physical condition (i.e., a new or different impairment)**").

Changed Circumstances, and if they want to find out then it plays directly into Defendant's use of litigation as part of its claims handling process – the players have to sue. Even then, in one case, Groom (*i.e.*, Mr. Junk) refused to explain a definition of Changed Circumstances for a beneficiary because it would be an "advisory opinion."[295] This is a plain violation of ERISA.

Here, irrespective of whether we use the Current Definition or any of the "Original Circumstances", "Change in Condition", or "New/Different Disability" definitions, Cloud's ailments and evolution of Cognitive Impairments was not the basis of his current award of Inactive A (T&P Benefits), just as Defendant recognized in granting Reclassification in another case:

> "The Committee determined that, in the facts of your case, you met the requirements of Plan section 5.5(b) for reclassification, because you were initially awarded T&P benefits due to Crohn's Disease, and you are now totally and permanently disabled due to your orthopedic impairments."[296]

This is consistent with Defendant's wild fluctuations in definitions of Changed Circumstances *in the same Board Meeting* as the one that "considered" Cloud's 2016 Appeal. In one decision letter, Defendant (*i.e.*, Groom) defined it to mean "a new or different impairment *from the one that originally qualified you for T&P benefits*."[297] In another decision letter, Defendant (*i.e.*, Groom) defined it to mean "a new impairment that did not exist during the original application, *or an impairment that did exist but is different from the one that formed the basis of the original award of T&P benefits*."[298] These inconsistent definitions originating in and set forth only in decision letters that the Board/Committee members never read amounts to a gross violation of

---

[295] *See Hudson v. Nat'l Football League Mgmt. Council*, No. 18-cv-4483 (GHW) (RWL), 2019 WL 5722220 at *5 (S.D.N.Y. Sept. 5, 2019) ("Junk responded in writing … and further noted that he would not provide a definition of the term 'impairment' because doing so could be construed as an advisory opinion.").
[296] App.8186 (June 17, '15).
[297] App.5231 (Nov. 21, '16) (emphasis added).
[298] App.5202 (Nov. 22, '16) (emphasis added); *Hudson*, 2019 WL 5722220 at *4-5, 21 (S.D.N.Y. Sept. 5, 2019).

ERISA.[299] As stated by Defendant, "[t]he Board is required by federal law to apply the terms of the Plan consistently from one Player to the next." Motion at 33-34, citing *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 637-38 (5th Cir. 1992) (explaining that the first criterion in evaluating the propriety of a plan administrator's interpretation is "whether the administrator has given the plan a uniform construction"). Despite Groom preparing these contemporaneous Reclassification denial letters, it chose an entirely new Groom Reinterpretation of Changed Circumstances[300] in order to deny Cloud in the 2016 Appeal Decision Letter – one that required Cloud to show evidence of a "new or different impairment" that ***arose while he was still playing in the NFL***. How could a player be receiving T&P Benefits under the Plan while still playing in the NFL and then develop a "new or different impairment," while still be playing in the NFL, so that he could seek Reclassification of the prior award of T&P Benefits? This latest Groom Interpretation of Changed Circumstances is an absurdity, and admittedly is the only one that Cloud cannot satisfy. It is no wonder the Committee/Board members struggle to define Changed Circumstances,[301] and none of

---

[299] *See, e.g.*, 29 CFR § 2560.503-1(b)(5).

[300] In truth, Defendant does not define Plan terms. Groom does. Even though Groom consistently maintains that Defendant had sole and absolute discretion to interpret and apply the Plan in denying Cloud's 2016 Application and 2016 Appeal, Groom repeatedly objected during depositions that the exercise of that discretion required legal conclusions – which more accurately reflects who runs the Plan. App. 50 (192:18-22), App.65 (251:22 – 252:7), App.85 (331:7 – 332:16, 333:12-18), App.86 (336:16-19); App.197 (139:16 – 140:1), App.222 (240:20 – 241:15), App.225 (251:15 – 253:18), App.241 (314:11 – 315:3), App.244 (327:15-19), App.262 (399:18 – 400:22); App.421 (338:5-8), App.432-33 (385:22 – 386:6), App.434 (393:2-5); App.582-83 (269:17 – 271:2, 272:19-24); App.676 (58:15-19), App.702 (164:9-16), App.720 (234:21 – 235:8).

[301] Ms. Smith believes it means a "**new or different *injury* or illness or impairment**" App.69 (268:14-16) (emphasis added)], but never asked anyone what it means. App.70 (273:14-16). Reynolds believes it means "**[w]hen a situation is different than it was before**" or a "**new injury**" or "**new or different impairment**" or a "**new injury, a new condition[,]**" but nobody gave him a definition App.54 (209:6-12), App.58 (224:15-18), App.63 (244:17 – 245:11) (emphasis added). Ms. Smith admitted Cloud's "**new symptoms could have been changed circumstances**" App.85-86 (332:18 – 333:10, 335:19 – 337:5), and Reynolds admitted new symptoms could be an impairment or condition. App.223 (245:12-13), App.225 (252:19 – 253:18). As to the Board, Vincent (Defendant's corporate representative), Cass, and Mr. Smith understand "changed circumstances" means "**new or different impairment**" or "**new or different condition**" App.420 (335:8-17); App.565 (199:13-17); App.720 (235:21 – 236:3), App.718 (228:7-12). Vincent admitted new concussion symptoms could be a change in circumstances. App.429 (372:14-20). Cass stated

54

them know (or would admit) who defined it.[302]

In the context of medical issues, Changed Circumstances requires medical review, opinion, and testimony. Dr. Wu opined, "[b]ased on my experience, training, analysis of Mr. Cloud's brain, and reasonable medical probability and certainty, Mr. Cloud presented a new impairment and, thus, meets the definition of a changed circumstance as used in Section 5.7(b)."[303] Either this Court can find Dr. Wu's application of Changed Circumstances to be reasonable and find in favor of Cloud, or it can accept the latest Current Definition and find in favor of Cloud.

Substantively, the evidence in the AR shows that Cloud complained of new issues in his 2016 Application, Jennifer and Cloud testified to his evolving Cognitive Impairments, including Second Change in Cognitive Impairments, and health care providers observed these changes. Defendant has insisted that Cloud presented no evidence of these in his 2016 Application, but Defendant took absolutely no steps to evaluate Cloud's Changed Circumstances. Mr. Smith confirmed that Cloud's own reports are ample evidence to address Changed Circumstances.[304] Jennifer confirmed that Cloud "flipped a switch" between 2014 and 2016.[305] Defendant did not communicate with Cloud, did not refer him for examination by a neutral physician, the Committee made no evaluation of Cloud's condition at all (in 2014 or 2016), and the Board purportedly believed the Committee awarded Cloud Inactive A based upon the same impairments/conditions alleged in his initial 2014 Application (when the Committee did none of those things).

The 2014 Application stated the following impairments and conditions: "Migraine

---

new conditions or impairments resulting from a concussion are not new impairments because there was no shred of evidence, App.580 (258:16 – 260-6), and Mr. Smith could not say whether a "new concussion symptom" is a new or different impairment "as it applies to the Plan." App.711 (199:24 – 200:1).

[302] App.69-70 (266:21 – 267:3, 270:10 – 271:7); App.215-16 (213:21 – 214:2), App. 223 (245:3-9); App.420-22 (335:18 – 338:4, 342:15-17); App.557 (168:24 – 169:11); App.711 (198:15-17).

[303] App.5748.

[304] App.717 (222:3-9).

[305] App.1181 (138:21 – 140:13).

Headaches, Depression, Memory Loss, Vertigo, Insomnia, Unpredictable Irritability", "Sever[e] Pain in: Right Foot, Left Great Toe, Left Hip, Base of Neck and Lower Bank", "Numbness in: Right Leg, Arms and Fingers", and "Difficulties with: Verbal Fluency, Decision Making and Concentration."[306] The 2016 Application stated the following impairments and conditions: "Migraine…, Clinical Depression…, Significant Memory & Attention Problems…, Vertigo…, Impaired Verbal Fluency…, Memory loss, Attention and Decision Problems, Impaired Verbal Fluency, Post-Concussion Syndrome…, [and] Affective Disorder."[307] Dr. Wu confirmed the 2016 Application presented new conditions, including significant memory and attention problems, decision problems, and affective disorders.[308] Cloud's 2016 Application and 2016 Appeal for Reclassification satisfy Defendant's various definitions of Changed Circumstances with clear and convincing evidence presented in the AR.

### 2.      Cloud  did not "admit" failure to meet Changed Circumstances.

In its Motion, Defendant takes the position that Cloud waived or admitted he had no Changed Circumstances and argues "[i]n litigation, Cloud has tried to rescind his concession and manufacture 'changed circumstances'[.]" Motion at 33-34. These are not the arguments of fiduciaries.

In Cloud's 2016 Appeal, Cloud requested the Board to "reclassify" him to "'Active Football' benefits and stated he "satisfies all of the criteria for an award of Active Football benefits." Dkt. 16 at CLOUD-AR-032 at § 5.3(a), CLOUD-AR-490. Jennifer assisted Cloud and, in light of Cloud "suffering from neurological impairments" and "unable to comprehend the true nature of what was required of him in order to apply for the level of benefits he deserved", an

---

[306] Dkt. 16 at CLOUD-AR-097.
[307] Dkt. 16 at CLOUD-AR-290-291.
[308] App.5746.

absence of assistance from Defendant, and lack of knowledge as to what Changed Circumstances is supposed to mean, Cloud requested the Board waive Changed Circumstances due to this overall "**distinct disadvantage when it comes to applying for benefits under the NFL Player Retirement Plan**."[309] This request tracks the last sentence of Section 5.7(b) of the Plan, which waives certain requirements of the Plan. Waiver is permitted when the Board or Committee finds a player is "**physically or mentally incapacitated in a manner that substantially interferes with the filing of such claim**."[310]

Regarding tolling and waiver, Defendant should have taken Cloud's Cognitive Impairments into account irrespective of whether he expressly raised the issue.[311] As to any issues related to the timing of Cloud's 2014 Application, 2016 Application, or 2016 Appeal, Defendant did not consider any tolling/waiver issues in its summary denial of Cloud's request for Active Football (T&P Benefits) and, instead, actively campaigned *against* Cloud with its legal counsel's *post-hoc* litigation argument transforming Jennifer's request on behalf of Cloud into an express waiver of the entire basis of the 2016 Appeal.

### C. Cloud met the Shortly After requirement for Active Football (T&P Benefits) Even Though Not Required for Psych Disorders.

In its Motion, Defendant argues the AR reflects that Cloud did not meet the Shortly After requirement. Defendant relies on a series of arguments that do not withstand scrutiny.

**First**, Defendant assumes Cloud must meet the Shortly After requirement. Cloud's

---

[309] Dkt. 16 at CLOUD-AR-492 (emphasis added).
[310] Dkt. 16 at CLOUD-AR-037 at §5.7(b) (emphases added).
[311] *See Jani v. Bell*, 209 Fed. Appx. 305, 308, 317-19 (4th Cir. 2006) ("The Board has not presented substantial evidence on which to deny Webster the protection of the provision tolling the limitations period"…"These requests, however, were at times submitted only days apart…Not one of these applications was ever completed. Contrary to the Plans' assertion, these staccato requests weigh significantly *in favor* of a finding of mental incapacity that 'substantially interfered' with Webster's ability to file a claim) (original emphasis)

Cognitive Impairments fall within the Special Rules of the Plan related to Psych Disorders due to head injuryies sustained while playing in the NFL (*e.g*., repetitive concussions) – Active Football for NFL Brain Injuries.[312] Cloud need not meet the Shortly After requirement otherwise applicable to the general rules (*see supra* at 10-11). Dr. Wu provided uncontroverted medical explanation that

> "[t]he most medically probable cause for the PET and MRI and neuropsychological and neuropsychiatric exam abnormalities and clinical symptoms in Mr. Cloud are due to sequelae from  traumatic brain injury sustained in multiple subconcussive and concussive head injuries from his professional career[ ] as an NFL football player resulting in the medically likely diagnosis of chronic traumatic encephalopathy."[313]
>
> *     *     *
>
> "[o]n July 15, 2016, Mr. Cloud presented the same symptoms plus significant memory and attention problems, attention and decision problems, and affective disorder. All of these symptoms are commonly associated with post-concussion syndrome and, certainly, were reported and experienced by Mr. Cloud."[314]

The cause of Cloud's Cognitive Impairments in not truly in dispute. Almost every deponent proffered by Defendant admits Cloud's NFL Brain Injuries.

**<u>Second</u>**, Defendant repeatedly misrepresents the AR in attempting to defeat Cloud's satisfaction of Shortly After. Defendant argues Cloud applied for only LOD Benefits (instead of T&P Benefits) in 2009, Motion at 42, but the AR shows that was due to Defendant's Instructions (*see supra* at 12). Defendant argues the 2009 Application shows Cloud "was working", *see id*., – apparently implying that Cloud was not suffering a T&P Disability in April 2009. It actually says

---

[312] Dkt. 16 at CLOUD-AR-033 at § 5.4. The Special Rules also apply to substance abuse issues ("**Substance Abuse Disorders**"). *See id*. at § 5.4(a). Each of Classifications 5.3(a), (b), and (c) expressly state they are "[s]ubject to the special rules of Section 5.4[.]" (Section 5.2(d) is just a catch-all Classification). *See id*. Likewise, general Conclusive Presumption in Section 5.7(a) expressly applies to Section 5.3, which yields to Section 5.4. *See* Dkt. 16 at CLOUD-AR-032-033 at §§ 5.3(a)-(c), (e), 5.7(a). **While Substance Abuse Disorders maintain an application deadline of 8 years, there is no corresponding deadline for Psych Disorders, which "appl[ies] regardless of when a claim for benefits is made or awarded."** App.5497.
[313] App.5741.
[314] App.5746; *see also* App.6135 (118:19-119:4), App.1218-1343, App.1345-55, App.6719; Dkt. 16 at CLOUD-AR-303.

he was working for "self" which anyone sitting at home earning no income can claim, as is the case here.[315] Cloud's SSA Award reflects he had not "engaged in substantial gainful activity since December 31, 2008" (*see supra* at 19-20), which refutes that "Cloud was working" and itself was based on the erroneous assumptions regarding Cloud's prior Sale of Personal Effects in his 2008 unsuccessful bid to stave off foreclosure of his home. Defendant next argues Cloud claimed in his 2014 Application that his initial disability arose in 1999 and subsequent T&P Disability arose 7 years later in 2006. Motion at 42 (Defendant previously argued 2008, Motion at 17). It actually says Cloud's disability arose due to the cumulative concussions sustained from 1999-2005.[316] Defendant cannot seriously suggest that Cloud was disabled in his first year in the NFL, but Defendant does just that. The above misstatements about Cloud "working" and manipulations of the timeline of Cloud's disability and T&P Disability are designed to aid Defendant's next argument, that the Conclusive Presumption (which applies only to initial applications) bars Cloud's satisfaction of Shortly After. Defendant then argues that is what is reflected in the 2014 Decision Letter, Motion at 42-43, even though none of it is there other than the identical Boilerplate Denial of Active Football language used in denial letters spanning decades and which violates the express requirements of ERISA (*see supra* at 22). As to Cloud's 2016 Application, Defendant argues Cloud alleged his T&P Disability arose at the time of his 2004 Concussion. Motion at 43. Although this *stiff mechanical reading* of the 2016 Application seemingly would support a Shortly After finding, it nonetheless remains a selective reading as the 2016 Application includes Cloud's full narrative into which he specifically summarized Cronin's description of the evolution of the Cloud Disabilities throughout 2004 and 2005 after which he was "consequently cut due to these

---

[315] App.3081.
[316] Dkt. 16 at CLOUD-AR-97 at "Part 2(a)".

cumulative mental disorders."[317] Defendant ignores all this and simply moves on with several pages of disingenuous arguments that there is no evidence Cloud was suffering a T&P Disability *while playing in the NFL during 2005*. Motion at 43-45. Of course not. Cloud has never alleged he was suffering a T&P Disability while playing in the NFL, at least not until the time period surrounding his release at the conclusion of the 2005 season (in early 2006). Defendant also points to Cloud's repeated failed efforts to secure employment in the aftermath of his T&P Disability, essentially seeking to penalize him for *trying* to work rather than praising him for it even though he failed.[318] Motion at 45.

Finally, Defendant blindly adopts the SSA Onset Date of December 31, 2008, the reasoning in the SSA Award and timing of which clearly relate to Cloud's prior Sale of Personal Effects in his 2008. Motion at 45-46. In this regard, the Plan provides that Defendant is not bound by the SSA Award as to "timing and causation of [a T&P Disability[.]"[319] Defendant included this provision in the Plan (as amended in 2014) because it was resisting efforts to bind it to SSA findings as to timing and causation.[320] If Defendant fought being bound by SSA awards as to timing or causation and amended the Plan to that end, then it has a fiduciary obligation to exercise it in a reasonable manner. Defendant's blind adoption of the SSA Onset Date in this litigation is selective, solely aimed at supporting denial of Active Football (T&P Benefits). It is highly

---

[317] Dkt. 16 at CLOUD-AR-288-89, 291.

[318] "I was an educated person from Boston College. I didn't work. I was unable to hold a job. I don't know too many BC graduates that are unable to hold a job. There's a problem with me and my mind. Okay? Not making it up. Did I try to work? Yes." App.974 at 197:18-23.

[319] Dkt. 16 at CLOUD-AR-036 at § 5.7(a).

[320] *See Solomon v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. MJG-14-3570, 2016 WL 852732, at *5, 7 (D. Md. Mar. 4, 2016) (addressing "whether an SSA determination of the disability onset date was binding on the Plan under Section 5.2 of the Plan as it existed prior to the 2014 amendment" and finding, under pre-amendment Plan, Defendant "bound by the fact, and onset date, of disability found by the SSA"), *aff'd*, 860 F.3d 259, 265 n.5 (4th Cir. 2017) ("the Plan has since been amended to provide that the SSA's determination as to the disability onset date is not binding for the purpose of Plan benefits").

improbable that Defendant would blindly adopt it if it triggered *qualification* for Active Football (T&P Benefits). Defendant never bothered to seek a medical opinion as to Cloud's Cognitive Impairments or their review of his medical records. ERISA regulations require plan administrators to utilize peer reviewers that have "appropriate training and experience in the field of medicine involved in the medical judgment."[321] The Plan's claims procedures are required to provide a full and fair review, which includes "in deciding an appeal…based in whole or in part on a medical judgment…the appropriate named fiduciary <u>shall</u> consult with a health care professional[.]"[322] Here, Defendant did not secure the advice of any neutral or other medical expert before it denied Cloud's 2016 Application and 2016 Appeal. They relied only upon Groom and other lawyers who have no medical training. Defendant attempts to circumvent this glaring fact by claiming "Cloud's reclassification request was not the type of benefit claim that could only be decided by medical experts … [and] every issue before the Board could readily be decided by laypersons."[323] Defendant essentially argues that it did not need medical experts to assess whether Cloud experienced Changed Circumstances – even though (1) its own definitions related to physical/medical conditions, and (2) Board/Committee members acknowledged Cloud's conditions may have been new impairments or otherwise expressed their confusion. Cass even testified the Board would not send Cloud to a neutral physician,[324] even though the Board has done it many times when it serves a denial of benefits. For example:

> At its November 19, 2009 meeting, the Retirement Board referred [Redacted] for a thorough, ***state-of-the-art examination***. The Plan's Medical Director then arranged for two days of such examination and testing with a pre-eminent physician, Dr.

---

[321] *Davis v. Aetna Life Ins. Co.*, 699 F. App'x 287, 295 (5th Cir. 2017) (quoting from 29 CFR § 2560.503-1(h)(3)).
[322] 29 CFR § 2560.503-1(h)(3) (emphases added).
[323] Dkt. 78 at 25.
[324] App.547 (126:1-12).

Helene Chui, and her colleagues at USC.[325]

Defendant's neutral neurologist, DiDio, expressed concern that Cloud suffered traumatic brain injuries (*i.e.,* his NFL Brain Injuries), but Defendant buried it. Dr. Wu, the only medical professional to review the circumstances underlying Cloud's 2016 Application and 2016 Appeal, opines: "[b]ased on my experience, training, analysis of Mr. Cloud's brain, and reasonable medical probability and certainty, Mr. Cloud was totally and permanently disabled as those terms are used in the medical community as of March 30, 2006[.]"[326] Defendant would have known these facts if it had complied with, and not buried, the DiDio Report and Brain Studies Recommendation during approximately 6 years of denying Cloud the T&P Benefits (Active Football) to which he is entitled.

## III.   Defendant Consistently Has Withheld Documents from Cloud and Impeded His Ability to Submit Documents in Support of Claims for Active Football (T&P Benefits).

Defendant argues there is no basis for Cloud's allegations in support of Count II, which brings claims under 29 U.S. Code § 1133(2) regarding Defendant's failure to "afford a reasonable opportunity to [Cloud] whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." The requirements of this provision are not limited to Count II as a "full and fair review" is a fundamental component of the provisions underlying Cloud's claims in Count I [29 U.S.C. § 1132(a)(1)(B), (a)(3)], which Defendant does not challenge. Nonetheless, Cloud responds as follows.

Addressing the limited scope of Defendant's argument, in order for the review to qualify

---

[325] App.5444, App.5446 (emphasis added); *see also Giles v. Bell/Pete Rozelle NFL Player Ret. Plan*, 925 F.Supp.2d 700, 712 (D.Md. 2013) (stating "Board … decided to 'table[ ]' the appeal to allow for 'further medical review[,]' … "scheduled an 'independent medical evaluation' … by a 'neutral physician[.]'""); *Johnson v. Bell*, 468 F.3d 1082, 1085 (8th Cir. 2006) (stating "Johnson appealed the Claims Committee's second denial, and the Plan referred him to Dr. Craig Chebuhar for another evaluation."); *Boyd v. Bert Bell/Pete Rozelle NFL Players Retirement Plan*, 410 F.3d 1173, 1177 (9th Cir. 2005) (stating "Board referred Boyd to Dr. Branko Radisavljevic, a Plan neutral psychologist.").
[326] App.5745 (see entire page for explanation of bases for his opinon).

as a "full and fair review," the administrator must "[p]rovide … upon request … all documents, records, and other information relevant to the claimant's claim for benefits."[327] As stated by Defendant in its Motion, a participant is entitled to request and receive copies of documents that are submitted, generated, or relied on by a plan administrator when deciding a claim for benefits. Motion at 47-48 (citations omitted). Defendant focuses only on "medical documentation" and claims that Cloud never asked for documents or accused it of withholding documents. Motion at 48. This position is simply contrary to the evidence in the AR,[328] and based solely on Vincent claiming the PBO has no record of his requests (even though he did not work at the PBO until years after Cloud's NFL career ended).[329] Motion at 48. Where Defendant admits to the contrary in a footnote, it claims it was "much later and for different reasons." *Id*. at n. 33.

Since the conclusion of Cloud's NFL career, he has been requesting records related to and in support of his 2009 Application, 2010 Appeal, 2014 Application, 2016 Application, and 2016 Appeal. To date, Defendant is the only party who possesses a complete copy of the AR. This Court certainly does not. Defendant filed the purported complete AR on January 5, 2021 – over 1 year ago.[330] Over the course of a year of litigation with numerous depositions, Defendant withheld

---

[327] 29 CFR 2560.503–1(h)(2)(iii); *see also* 29 C.F.R. 2560.503–1(h)(2)(iv) (requiring "full and fair review" which "takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim ..."); *Dimry*, 855 Fed. Appx. At 333 ("'full and fair review' cannot be achieved without 'a meaningful dialogue between ERISA plan administrators and their beneficiaries.' … "This standard includes requesting 'more information [when] needed to make a reasoned decision. A plan administrator fails to meet this duty when its communications are opaque or nonexistent."); *Atkins v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*, 2011 WL 13269721 (W.D. Tex. Mar. 02, 2011) (Order Granting Atkins Leave to File Amended Complaint) ("this dispute has been ongoing for over six years. … [t]he NFL Board of Trustees have been considering Plaintiff's claim for reclassification since 2006. … Although the Court has heard multiple times from Defendants that the final arbitration decision is just around the corner, it has now been nearly a year since the arbitrator was presented with a motion for reconsideration. There have also been issues with defense counsel … [t]he time is long past for this case to be heard. ERISA requires a plan 'afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review ...' 29 U.S.C. § 1133.").

[328] *See supra* at 11-13, 16 n. 94, 41-42.

[329] Vincent did not begin working for the PBO until two years later in July 2008. App.406 at 279:9-10.

[330] [Dkt. 16].

thousands of pages from the AR, producing 3,000+ pages as recently as January 28, 2022. Even in their Motion, Defendant implies that it still has not produced everything and/or placed it into the AR: "[f]or the sake of completeness, Defendant reserves the right to ask the Court to consider additional documents that Cloud selectively excluded from his motions to supplement the Administrative Record." Motion at 2, n. 5. Here, we are nearing 2 years since this lawsuit was filed and Defendant still has not provided this Court with a complete AR. These are illustrative of the fact that Defendant does not actually maintain an administrative record of the claims its handles. It sloppily compiles them in an *ad hoc* manner only when litigation ensues. This is consistent with Cloud's requests since 2009 to be provided as documents related to his applications and appeals, as part of Defendant's Slow Disclosure of Records and it still remains unclear how many additional documents and other records were reviewed in the denial of Active Football (T&P Benefits) (*see supra* at 41-42). Consequently, as pleaded by Cloud, he "was never granted the opportunity to present his full and complete case for Active Football T&P benefits due to the [Defendant] (and its advisors and counsel) withholding relevant records."[331]

## IV.   Cloud Does Not Challenge the Committee's 2014 Decision to Award Him Inactive A (T&P Benefits).

Defendant argues in its Motion that Cloud is not challenging the denial of the 2016 Appeal, a position that ignores the totality of the events in this proceeding. Motion at 49-50. Cloud is not "attempting to undo the Committee's 2014 decision to award him Inactive A benefits in the first place." *Id*. Cloud addresses Defendant's handling of the 2014 Application because it reflects, along with everything else, Defendant's systemic violations of the Plan and ERISA. It also reflects the Committee Reliance on SSA Award as the sole basis for the award of Inactive A (T&P Benefits). In other words, Defendant did not evaluate the Cloud T&P Disabilities at issue in the 2016

---

[331] Dkt. 68 at 27, ¶ 50.

Application and 2016 Appeal, including the Changed Circumstances (under any of the various definitions) between 2014 and 2016. In this regard, Cloud does not seek retroactive payments for Active Football (T&P Benefits) going back to the 2014 Application, but only requests Reclassification pursuant to the provisions of the Plan and Defendant's own interpretations of same. The remainder of Defendant's argument on this issue similarly denies the realities in this case or otherwise inserts novel issues never before pleaded, sufficiently briefed, or currently supported by any evidence in the AR.

## CONCLUSION

For the reasons set forth above, Cloud prays that this Honorable Court deny the Motion in its entirety. Cloud further prays and requests such other relief, general or special, to which Plaintiff may show himself justly entitled.

March 18, 2022.                                Respectfully submitted,

BARLOW GARSEK & SIMON, LLP
920 Foch Street
Fort Worth, Texas 76107
817.731.4500
817.731.6200 – facsimile

By:/s/ Christian Dennie
　　　Christian Dennie
　　　Texas Bar No. 24045775
　　　cdennie@bgsfirm.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I certify, on this 18th day of March, 2022, a true and correct copy of this *Brief in Response to Defendant's Motion for Summary Judgment on the Administrative Record and Brief in Support* was filed with the Clerk of the Court via CM/ECF, which automatically delivers notice of the filing of the same to all counsel of record.

/s/ Christian Dennie
Christian Dennie