UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MICHAEL CLOUD,

       Plaintiff,

    v.

THE BERT BELL/PETE ROZELLE NFL
PLAYER RETIREMENT PLAN,

       Defendant.

Civil Action No. 3:20-cv-01277-S

---

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND OTHER EVIDENCE OF PLAN INTERPRETATIONS AND VIOLATIONS OF ERISA (PURSUANT TO FRCP 52(a)) OR, ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT**

---

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................ 1

ARGUMENT .................................................................................................... 5

    I.    Cloud Fails to Demonstrate He is Entitled to Reclassification to Active Football Benefits. ................................................................................................ 5

        A.    Cloud's Administrative Appeal Was Untimely. ................................. 5

            1.    Cloud received the Committee's decision letter on March 4, 2016, and the Court should reject Cloud's attempts to show otherwise. ................... 6

            2.    The decision letter shows that the Board denied Cloud's appeal because it was untimely.  If *de novo* review applies, the Court should reach the same conclusion. ...................................................................... 9

        B.    Cloud's Request for Reclassification Did Not Satisfy the Changed Circumstances Requirement. ........................................................... 10

            1.    A Side-By-Side Comparison of Cloud's 2014 and 2016 Applications Confirms That He Did Not List Any New Conditions or Impairments. .. 11

            2.    Even if New Impairments or Conditions Had Arisen Between 2014 and 2016, They Would be Irrelevant Because They Could Not Demonstrate Cloud's Eligibility for Active Football Benefits. .................................... 14

            3.    Even if Defendant Should Have Sent Cloud to a Another Neutral – Which  There Was No Reason to Do – That Would Not Make Him Eligible for Benefits under the Plan. ........................................................ 15

        C.    Cloud Did Not Meet the "Shortly After" Requirement for Active Football Benefits. ........................................................................................ 16

            1.    Cloud's New Claim That His Disability First Arose at the End of the 2005 NFL Season Was Not Presented to, and Contradicts, What He Told the Board in His 2016 Reclassification Request, and Cannot Be Considered. ........................................................................... 16

            2.    Cloud Cannot Prove His New Claims About the Timing of His Disability. ........................................................................................ 17

        D.    Cloud's New Argument That the "Shortly After" Requirement Does Not Apply Is Baseless, Contradicted by Federal Court Precedent, and Doubly Waived. ...................................................................................... 20

    II.    Cloud's Arguments for Applying *De Novo* Review Lack Merit. ................... 22

A.    This is an ERISA Disability Case, Not an Insurance Case.  Accordingly, the Texas Insurance Code Does Not Apply..............................................................23

B.    "Key Fact #1" – Defendant Never "Buried" the DiDio Report and There Was No Reason or Requirement to Refer Cloud to Another Neutral Physician.............................................................................................................24

    1.    Defendant Did Not Bury The DiDio Report............................................. 25

    2.    There Was No Reason or Requirement to Send Cloud to Another Neutral Physician............................................................................. 25

C.    "Key Fact #2" – Cloud Cannot Identify a Single Instance of Inconsistent Applications of the "Changed Circumstances" Requirement and Instead Complains of Minor Differences in Phrasing. ...................................................29

D.    "Key Fact #3" – The Board Did Not Delegate Fiduciary Decision-Making Authority............................................................................................................34

E.    "Key Fact #4" – Neither the Board nor Groom Denied Cloud's Claim in Order to Encourage This Litigation. ..................................................................38

F.    Cloud's Other Scattershot Allegations Do Not Warrant *De Novo* Review. .......40

    1.    Defendant Has Not Improperly Withheld Documents............................. 40

    2.    Defendant Substantially Complied With ERISA's Procedural Regulations. ............................................................................................. 44

III.    There Is No Basis To Remand The Matter to the Board or for a Trial..........................46

**CONCLUSION** ..................................................................................................... **47**

**CERTIFICATE OF SERVICE** ............................................................................. **49**

## **TABLE OF AUTHORITIES**

**Cases**                                                                                     **Page(s)**

*Allen v. Sherman Operating Co.*, LLC,
   No. 4:20-CV-290-SDJ, 2021 WL 5710566 (E.D. Tex. Dec. 2, 2021) ..................................... 23

*Atkins v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
   694 F.3d 557 (5th Cir. 2012) ............................................................................................. 4

*Bess v. Mut. of Omaha Ins. Co.*,
   No. CIV.A. 2:11-00143, 2011 WL 5858815 (S.D.W. Va. Nov. 22, 2011) ............................ 26

*Boyd v. Bert Bell/ Pete Rozelle NFL Player Ret. Plan*,
   410 F.3d 1173 (9th Cir. 2005) ..................................................................................... 21, 27

*Boyd v. Bert Bell/ Pete Rozelle NFL Player Ret. Plan*,
   796 F. Supp. 2d 682 (D. Md. 2011), ................................................................................ 30

*Bryant v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
   Civ. No. 1:12-cv-936-MHC, 2015 WL 13908103 (N.D. Ga. March 23, 2015) ..................... 30

*Champion v. Black & Decker (U.S.) Inc.*,
   550 F.3d 353 (4th Cir. 2008) ........................................................................................... 26

*Conkright v. Frommert*,
   559 U.S. 506 (2010) ......................................................................................................... 33

*Custer v. Murphy Oil USA, Inc.*,
   503 F.3d 415 (5th Cir. 2007) .............................................................................................. 8

*Davis v. Aetna Life Ins. Co.*,
   699 F. App'x 287 (5th Cir. 2017) .................................................................................... 26

*Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
   855 F. App'x 332 (9th Cir. 2021) .................................................................................... 40

*Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
   No. 16-CV-01413-JD, 2018 WL 1258147 (N.D. Cal. Mar. 12, 2018) .................................... 40

*Dorrough v. Dean Foods Co. Grp. Disability Plan*, No. C,
   03-4826 MJJ, 2005 WL 2122301 (N.D. Cal. Aug. 30, 2005) .............................................. 26

*DuMond v. Centex Corp.*,
   172 F.3d 618 (8th Cir. 1999) ........................................................................................... 37

*Fortier v. Hartford Life & Accident Ins. Co.*,
   916 F.3d 74 (1st Cir. 2019) ................................................................................................ 5

*Gerritsen Beach Invs., Ltd. v. Jemal*,
  No. 3:08-CV-1192-N, 2010 WL 11618302 (N.D. Tex. Apr. 9, 2010) ..................................... 18

*Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
  925 F. Supp. 2d 700 (D. Md. 2012) ................................................................................... 27, 40

*Gomez v. Ericsson, Inc*.,
  828 F.3d 367 (5th Cir. 2016) ............................................................................................. 17, 22

*Green v. Union Sec. Ins. Co.*,
  No. 4:11-CV-860-A, 2013 WL 300918 (N.D. Tex. Jan. 25, 2013) ........................................... 6

*Harris v. Marathon Oil Co.*,
  948 F. Supp. 27 (W.D. Tex. 1996), *aff'd*, 108 F.3d 332 (5th Cir. 1997) .................................. 19

*Hatteberg v. Red Adair Co. Emps.' Profit Sharing Plan & its Related Tr.*,
  79 F. App'x 709 (5th Cir. 2003) ................................................................................................. 38

*Hernandez v. Life Ins. Co. of N. Am.*,
  No. SA-19-CV-00022-FB, 2020 WL 1557802 (W.D. Tex. Apr. 1, 2020) *Report and
  recommendation adopted*, No. SA-19-CV-00022-FB, 2020 WL 3579821
  (W.D. Tex. Apr. 21, 2020) ......................................................................................................... 24

*Hudson v. Nat'l Football League Mgmt. Council*,
  No. 18-CV-04483-GHW, 2019 WL 5722220 (S.D.N.Y. Sept. 5, 2019), *Report and
  recommendation adopted as modified*, No. 1:18-CV-4483-GHW, 2019 WL 4784680
  (S.D.N.Y. Sept. 30, 2019) .................................................................................................... 30, 32

*In re Enron Corp. Securities, Derivative & ERISA Litig*.,
  284 F.Supp.2d 511 (S.D. Tex. 2003) ........................................................................................ 37

*Jackson v. Royal Caribbean Cruises, Ltd.*,
  389 F. Supp. 3d 431 (N.D. Tex. 2019) ...................................................................................... 18

*Johnson v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
  468 F.3d 1082 (8th Cir. 2006) ................................................................................................... 28

*Keys v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
  493 F. Supp. 3d 1147 (M.D. Fla. 2020) .................................................................................... 40

*Klotz v. Xerox Corp.*,
  332 F. App'x 668 (2d Cir. 2009) .................................................................................................. 8

*Mertens v. Hewitt Assocs.*,
  508 U.S. 248 (1993) ................................................................................................................... 37

*Morningred v. Delta Family-Care & Survivorship Plan*,
  526 F. App'x 217 (3d Cir. 2013) ................................................................................................ 45

*Newsom v. Reliance Standard Life Ins. Co.*,
   26 F.4th 329 (5th Cir. 2022) ............................................................... 2

*Schloegel v. Boswell*,
   994 F.2d 266 (5th Cir. 1993) ......................................................... 37, 38

*Sims v. City of Madisonville*,
   894 F.3d 632 (5th Cir. 2018) ............................................................. 22

*Stanford v. Cont'l Cas. Co.*,
   514 F.3d 354 (4th Cir. 2008) ............................................................. 26

*Terry v. Bayer Corp.*,
   145 F.3d 28 (1st Cir. 1998).............................................................. 45

*Theriot v. Bldg. Trades United Pension Tr. Fund*,
   850 F. App'x 231 (5th Cir. 2021) ......................................................... 4

*TracFone Wireless, Inc. v. CNT Wireless LLC*,
   No. 1:19-CV-24325-DPG, 2019 WL 5863911 (S.D. Fla. Nov. 8, 2019)................... 8

*United States v. Buscher*,
   Nos. 2:05-CR-201, 2:06-CV-1339 JCM RJJ, 2007 WL 2264536 (D. Nev. Aug. 3, 2007)...... 12

*Vega v. Nat'l Life Ins. Servs., Inc.*,
   188 F.3d 287 (5th Cir. 1999), *overruled on other grounds as recognized by Youboty v. NFL
   Player Disability*, No, 20- 40613, 2021 WL 1533662 (5th Cir. Apr. 16, 2021).............. 2, 3, 17

*Velasquez v. EAN Holdings, LLC*,
   No. 3:17-CV-1656-BH, 2018 WL 5924037 (N.D. Tex. Nov. 13, 2018)................... 12

*Wade v. Hewlett Packard Dev. Co. LP Short Term Disability Plan*,
   493 F.3d 533 (5th Cir. 2007), *abrogated on other grounds by Theriot v. Bldg. Trades United
   Pension Tr. Fund*, 850 F. App'x 231 (5th Cir. 2021) ................................... 4

*Walsh v. Empire Blue Cross/Blue Shield, Inc.*,
   No. 16-CV-3746-DRH, 2018 WL 2324066 (E.D.N.Y. May 22, 2018) ................... 45

*Wesson v. Jane Phillips Med. Ctr. & Affiliates Emp. Grp. Healthcare Plan, Premium Plan*,
   870 F. Supp. 2d 1263 (N.D. Okla. 2012)................................................. 45

*Woods v. Riverbend Country Club, Inc.*,
   320 F. Supp. 3d 901 (S.D. Tex. 2018) .................................................... 24

**Statutes**

Tex. Ins. Code. §1701.002 ............................................................ 23

Tex. Ins. Code. §1701.062 ........................................................ 23, 24

**Rules**

Fed. R. Civ. P. 52(a) ........................................................................................... 49

Fed. R. Civ. P. 56 ............................................................................................... 46

Fed. R. Evid. 408 ............................................................................................... 46

**Regulations**

29 C.F.R. § 2520.104b-1 ....................................................................................... 8

29 C.F.R. § 2560.503-1 ................................................................................. 25, 34

**Other Authorities**

Order, *Boyd v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, Case No. 3:01-cv-2072-J,
    (S.D. Cal. July 24, 2003), *aff'd* 410 F.3d 1173, 1178 (9th Cir. 2005) ................................... 25

Order, *Bryant v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, Civ. No. 1:12-cv-936-MHC,
    2015 WL 13908103 (N.D. Ga. March 23, 2015) ................................................. 30

## INTRODUCTION

Cloud's conspiracy theories and innuendo do not change the pertinent facts of this case, which show that the Board's decision to deny Cloud's 2016 reclassification request was not only reasonable, but objectively correct. The Court can and should affirm the Board's decision on any one or all of three independent bases.

*First*, Cloud missed the 180-day deadline to file his administrative appeal.

- Cloud asserts that nothing in the Administrative Record shows when he received the decision letter that triggered the 180-day deadline. But the Plan's records show the exact time and date the FedEx package was delivered to Cloud. *See* AR-524-529. *See also infra* at 6.

- The Court rejected Cloud's attempt to introduce extrinsic evidence on the timing of the FedEx delivery (because the evidence was not before the Board). Cloud cannot circumvent the Court's order by now saying he recalls receiving the FedEx delivery later than the Plan's records reflect (exactly 180 days before the Plan received his appeal). At his deposition, Cloud testified he had no recollection of the FedEx delivery. *See* App.[1] 989 at 212:10-12; App. 1142. *See also infra* at 7.

- Arguing that Groom rather than the Board made the decision at issue – a theory the Court has rejected, *see* Dkt. 77 at 3 ("members of the Board . . . are the ones who decided his appeal and made the determination") – Cloud claims that Groom conspired with others to "fabricate[] that ground for denial." But e-mails Cloud obtained during discovery show that the Board considered the issue. *See infra* at 9.

*Second*, Cloud failed to provide clear and convincing evidence of "changed circumstances" showing that he was eligible for "Active Football" benefits, as required by the Plan.

- Cloud's assertion that he presented new conditions or impairments to the Board in his 2016 reclassification request is belied by a side-by-side comparison of his 2014 application and 2016 reclassification request. *See* Dkt. 162 at 34-36. Cloud purports to list for the Court the conditions contained in his 2014 application and 2016 reclassification request – but his list from 2014 is incomplete. *See infra* at 11.

---

[1] References to App. in this brief refer to Plaintiff's Appendix filed in connection with his Motion for Judgment on the Administrative Record, Dkts. 160, 163–167.

- Cloud's claim that his expert witness, Dr. Wu, "confirmed" that Cloud presented "new conditions" in 2016 ignores that (1) Dr. Wu's testimony is inadmissible, and (2) Dr. Wu ████████████████████████ of the 2014 and 2016 submissions.   *Compare* Dkt. 156 ("Cloud Br.") at 60-61 *with* App. 6308 at 249:18-24.  *See also infra* at 12.

- Any change in Cloud's condition between 2014 and 2016 is not relevant to whether he presented changed circumstances showing his eligibility for Active Football benefits because, even on the new theory Cloud espouses, he would have had to show these changed conditions rendered him totally and permanently disabled at least seven years earlier than the 2014 application.  *See infra* at 14.

*Third*, Cloud failed to show that he was totally and permanently disabled "shortly after" – within 6 months (but in no case more than 12 months) – his disability first arose.  Cloud told the Board he became totally disabled shortly after his disability first arose after an October 31, 2004 concussion, AR-291, but that is impossible because he continued to play professional football for more than another year.  These facts make him ineligible for Active Football benefits.  Cloud attempts to change the facts, and even argues for the first time that he need not satisfy the "shortly after" requirement at all.  Once again, Cloud's arguments lack any merit:

- Cloud cannot pursue theories in federal court that were not presented to, and indeed contradict what he told the Board (and what he told the Court in his Complaint).  *Compare* AR-291 ("***the disability(ies) arose . . . [on] October 31, 2004***" following a "[h]elmet to helmet collision with the NY Giants in a game against the Minn[esota] Vikings") (emphasis added) *with* Am. Compl. (Dkt. 68), ¶ 42 ("Plaintiff was totally and permanently disabled 'shortly after' ***the disabilities arose at the conclusion of the 2005 NFL football season***") (emphasis added).  *See also infra* at 16.

- Even if Cloud could present a new timeline of events to attempt to show that he satisfies the "shortly after" requirement, he relies on testimony from Dr. Wu concerning the merits of this case, which the Court ruled would not be considered.  Dkt. 151 at 3 ("Dr. Wu's testimony and the aforementioned exhibits will not be considered for the purpose of resolving 'disputed material facts' or the 'merits of the claim itself.'") (quoting *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 299-300 (5th Cir. 1999)[2]).  *See also infra* at 17.

---

[2] *Overruling recognized*, *Newsom v. Reliance Standard Life Ins. Co.*, 26 F.4th 329 (5th Cir. 2022)

- Even if Dr. Wu's testimony on the merits could be considered, there is no medical basis for any of the three pillars of his conclusion that Cloud was totally and permanently disabled within the requisite "shortly after" period, each of which the record shows are not true. *See infra* at 18.

- Cloud's new argument that a "Special Rule" in the Plan exempts players with concussions from satisfying the "shortly after" requirement misquotes the Plan by omitting the determinative provision, is contradicted by federal court precedent, and has been doubly waived. *See infra* at 20.

The Court can fast-forward to page 57 of Cloud's 63-page brief, where his argument on these three, dispositive issues begins. If the Court agrees with Defendant on even one issue, it can enter judgment against Cloud without going further. Cloud devotes most of his brief to complaints which – even if true – would not entitle him to benefits under the Plan. Rather, Cloud argues the problems he perceives warrant *de novo* review. *See* Cloud Br. at 43. Since the Court ruled abuse of discretion review would apply, Dkt. 71 at 5 ("[I]n this action, the Court will ultimately review the Board's interpretation and benefits determination under an abuse of discretion standard."), and the Board's decision can be affirmed even under *de novo* review, the Court need not reach any of these other largely irrelevant and false claims in Cloud's brief – many of which do not even relate to his 2016 reclassification request.

Cloud sees it as improper for the Board to have reviewed his applications and the statements and records he submitted with them without conducting its own additional investigations. But the Fifth Circuit has made clear that "the district court may ***not*** impose a duty to reasonably investigate on the administrator." *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 299 (5th Cir. 1999) (en banc) (emphasis added).[3] Moreover, the Fifth Circuit "has rejected arguments to alter the standard of review based on procedural irregularities in ERISA benefit

---

[3] *Overruled on other grounds as recognized by Youboty v. NFL Player Disability*, No, 20- 40613, 2021 WL 1533662 (5th Cir. Apr. 16, 2021).

determinations, such as delays in making a determination." *Atkins v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 694 F.3d 557, 567 (5th Cir. 2012).[4]  Cloud's complaints of supposed procedural irregularities therefore would not accomplish his stated goal of obtaining *de novo* review, providing yet another reason they need not be considered.

In the end, despite all the discovery, it's also clear that the irregularities Cloud trumpeted do not even exist.  A few examples suffice to show that there is no basis for Cloud's claims:

- Cloud charged that Defendant obstructed his pursuit of benefits by failing to provide requested medical records.  Having now been afforded extensive discovery, Cloud has presented no support that Defendant ignored even a single records request, much less one material to his pursuit of additional benefits in 2016.

- Cloud accuses Defendant of "burying" a 2010 report from Plan Neutral neurologist, Dr. DiDio.  *See, e.g.*, Cloud Br. at 38 ("Defendant buried the DiDio Report").  This is unfounded.  Cloud requested and received a copy of the report in 2010, submitted it to the Social Security Administration in 2012, it was included in the Administrative Record twice because it was considered in connection with both his 2014 application and 2016 reclassification request, and it was noted in the one-page "claim summary" provided to the Board in November 2016.  *See infra* at 25.

- Cloud posits that "[n]ever has an ERISA plan given so little effort in evaluating the claim of a beneficiary whom it acknowledges is totally and permanently disabled . . . ."  Cloud Br. at 43.  Actually, it is possible that never has an ERISA plan given so much review to such an obviously unmeritorious claim.  As Cloud acknowledges, the Plan has an initial claims Committee of NFLPA and management representatives and a six-member Board with three NFLPA and three management representatives, each of whom have counsel, advisors and caucuses – all of whom reviewed Cloud's claim.

---

[4] *See also Wade v. Hewlett Packard Dev. Co. LP Short Term Disability Plan*, 493 F.3d 533, 538 (5th Cir. 2007) ("Next, Wade encourages us to heighten our standard of review due to the procedural irregularities in the handling of his claim, which he alleges violated ERISA and the regulations promulgated thereunder, effectively denying him a full and fair review.  Wade has cited no direct authority by the Supreme Court or the Fifth Circuit dictating a change in the standard of review based upon procedural irregularities alone, and we see no reason to impose one."), *abrogated on other grounds by Theriot v. Bldg. Trades United Pension Tr. Fund*, 850 F. App'x 231 (5th Cir. 2021).

- If the Plan operated with the haphazard decision-making Cloud suggests, it should frequently reach inconsistent results. Cloud alleged so in his Amended Complaint and claimed he had found inconsistent decision letters relating to other players when he moved to supplement the administrative record. *See* Am. Compl. (Dkt. 68), ¶ 61; Dkt. 105 at 31. The one and only so-called "similar case" Cloud attempts to identify is distinguishable. *See infra* at 29.

Cloud's combative tone and rhetoric should not distract the Court from the merits of his claim and the actual, narrow issues of this case that warrant the entry of summary judgment for Defendant.

## ARGUMENT

### I.   Cloud Fails to Demonstrate He is Entitled to Reclassification to Active Football Benefits.

The Court should affirm the Board's decision on three independent bases, regardless of the standard of review. It bears emphasis at the outset that Cloud does not argue that any of the three bases can be reversed under the abuse of discretion standard of review the Court already ruled would apply. *Compare* Dkt. 71 at 5 ("[I]n this action, the Court will ultimately review the Board's interpretation and benefits determination under an abuse of discretion standard."); *with* Cloud Br. at 57 (arguing that "[u]nder a *de novo* review . . . Cloud is entitled to T&P Benefits (Active Football)").

### A.   Cloud's Administrative Appeal Was Untimely.

The Plan imposes a 180-day deadline for administrative appeals, which runs from the date the Player receives the Committee's initial decision letter until the date the appeal submission is received by the NFLPBO. PD §§ 12.6(a) (AR-61), 12.8 (AR-64). Because Plan records indicate that Cloud received the Committee decision letter on March 4, 2016, and there is no dispute that his appeal was received on September 2, 2016 – 182 days later, and two days late – the Board was justified in denying his reclassification request for this reason alone. *See Fortier v. Hartford Life & Accident Ins. Co.*, 916 F.3d 74, 83 (1st Cir. 2019) ("The 180-day time limit began at the receipt

5

of this letter, and so Fortier's attempted appeal in March 2014 was untimely. In the ERISA context, haphazard waiver of time limits would increase the probability of inconsistent results.") (cleaned up); *Green v. Union Sec. Ins. Co.*, No. 4:11-CV-860-A, 2013 WL 300918, at \*4 (N.D. Tex. Jan. 25, 2013) (noting that "[s]trict compliance with the plan's procedures for claims, including all internal appeals processes, is required," and granting judgment in favor of plan administrator that rejected an appeal submitted three weeks after 180-day deadline).

Cloud challenges the Board's determination that his appeal was untimely on two bases: (i) Cloud supposedly received the Committee letter on March 6, 2016, not March 4, 2016, thereby making his appeal timely; and (ii) the Board supposedly did not actually deny his appeal on the basis that it was untimely.  As discussed below, both of these arguments are without merit.

      1.   <u>Cloud received the Committee's decision letter on March 4, 2016, and the Court should reject Cloud's attempts to show otherwise.</u>

Cloud inaccurately asserts that "nothing in the AR reflects Defendant's supporting 'records' as to when Cloud actually received the 2016 Decision Letter triggering his appeal timeline," and that "[t]here is no evidence to show when the FedEx package was left."  Cloud Br. at 35, 62.  FedEx tracking data in the Administrative Record indicates that the package sent to "Michael Cloud" on "3/2/2016" (the date of the Committee's letter) at "120 Mont Blanc Drive" in "Rockwall" "TX" (Cloud's home address) had a "Shipment Delivery Date" of "3/4/2016" and a "Shipment Delivery Time" of "14:07."  *See* AR-524-529.  *See also* 11/8/16 E-mail fr. S. Vincent

Supp. App.[5] 4 ("confirm[ing] that it was [signed for and] received by [Cloud] on 3/4/2016 via FedEx").[6]

To undermine this business record, Cloud moved to supplement the Administrative Record with evidence he claimed showed "that the FedEx tracking number relied upon does not exist." Dkt. 105 at 30.  The Court denied Cloud's motion because Cloud's "FedEx tracking information (Exhibit 13) . . . do[es] not fall within any of the [*Crosby*] exceptions."  Dkt. 141 at 6.  Cloud represents the same evidence, this time in the form of his deposition testimony.  *See* Cloud Br. at 22 n.142 (citing Cloud's testimony that he "attempted to run the shipment tracking number through the Fed Ex system and there's no hit it doesn't exist") (cleaned up).[7]  Cloud's deposition testimony is inadmissible for the same reason that the Court excluded his recent FedEx tracking results.[8]

Even were the Court to consider Cloud's testimony regarding the delivery of the package, it is insufficient to create a genuine dispute of material fact.  At his deposition, Cloud testified that he had no recollection of whether he received a FedEx package with the denial letter.  *See* App. 989 at 212:10-12 ("Q. Do you recall whether you received a FedEx package at all with the denial letter in it?  A. I don't recall, no.").  Yet, Cloud now claims to recall not only receiving the package,

---

[5] References to Supp. App. in this brief refer to Defendant's Supplemental Appendix filed concurrently with this brief.

[6] Cloud's observation that someone else signed for a FedEx package addressed to him in August 2021, *see* Cloud Br. at 35 n.225, after he left the State of Texas without informing the Plan, is of no probative value.  *See* Dkt. 149 at 6-7.

[7] The fact that the Court, in the same order, allowed all of the deposition transcripts to be admitted to the record as "relate[d] to whether the administrative record submitted is complete and/or whether the plan administrator complied with ERISA's procedural regulations," Dkt. 141 at 6, does not mean that Cloud may rely on portions of the transcripts that address other topics, particularly topics this Court ruled do not meet any *Crosby* exception.

[8] Even if this evidence were considered, it would be of no probative value because, as noted in Defendant's Opposition to Plaintiff's Motion to Supplement the Administrative Record, FedEx "tracking information is [only publicly] available for 90 days after delivery" on FedEx's website. Dkt. 120 at 13 (cleaned up) (citing FedEx website).

but that he "recalls his receipt [of it] on March 6, 2016," as set forth in his errata, where he claims that "after looking at a calendar I recall the date I received the appeal [*sic*] was Sunday, March 6, 2016." *See* Cloud Br. at 22 n.142; App. 1142.  It defies logic that looking at a calendar five years later would help Cloud recall when he received a FedEx package that he had no recollection of ever receiving at all.  It also defies logic that Cloud would wait more than five years to investigate after being told his claim was denied because he "received the decision letter on March 4, 2016" making his appeal "two days" late.  AR-520.  There is no basis to credit this explanation – which the Board did not have before it – over the Plan's contemporaneous business records.

Nor is there merit to Cloud's assertion that "Defendant was required to ensure Cloud's **actual** receipt **via USPS**" under a federal regulation requiring the "plan administrator [to] use measures reasonably calculated to ***ensure actual receipt*** . . . ."  Cloud Br. at 22 n.142 (citing 29 C.F.R. § 2520.104b-1).[9]  First, the "the question [under the regulation] is not whether there was actual receipt by the plaintiffs, but rather whether the plan administrator 'use[d] measures reasonably calculated to ensure actual receipt.'"  *Custer v. Murphy Oil USA, Inc.*, 503 F.3d 415, 419 (5th Cir. 2007) (second alteration in original) (citing 29 C.F.R. § 2520.104b–1(b)(1)).[10]  Second, "[s]ervice made by FedEx or UPS . . .  are reasonably calculated to ensure receipt . . . ."  *TracFone Wireless, Inc. v. CNT Wireless LLC*, No. 1:19-CV-24325-DPG, 2019 WL 5863911, at

---

[9] The fact that the regulation says "[m]aterial distributed through the mail ***may*** be second by first, second, or third-class mail," 29 C.F.R. § 2520.104b–1(b)(1) (emphasis added), does not mean that those are the exclusive methods.  *See Klotz v. Xerox Corp.*, 332 F. App'x 668, 670 (2d Cir. 2009) (holding that delivery of a decision letter to participant's attorney by fax satisfied the regulation, noting that "[t]he use of the plural 'measures' in the regulation implies that no particular method of notification is required, and that administrators have discretion to determine the appropriate delivery method in a given case.").

[10] The fact that the Plan, which maintains a staffed office, requires "actual receipt" of documents from players, *see* Cloud Br. at 62 n.332, does alter the governing regulation which requires plans sending mail to claimants to use "measures reasonably calculated to ensure actual receipt."

*2 (S.D. Fla. Nov. 8, 2019) (applying the "reasonably calculated to ensure actual receipt" standard in the context of a Rule 45 subpoena).

2.  <u>The decision letter shows that the Board denied Cloud's appeal because it was untimely.  If *de novo* review applies, the Court should reach the same conclusion.</u>

Citing ambiguous e-mails and meeting minutes, Cloud alleges the Board itself did not find Cloud's appeal untimely.  *See* Cloud Br. at 35 ("The Board did not make that finding, email communications between Vincent and Marshall after the Board Meeting prove they did not (Vincent ultimately did not include it in the 'decision sheet' emailed to Maroz)…"); *id*. at 61-62 ("Groom, the PBO (Vincent), and NFLPA lawyer fabricated that ground for denial before and after the Board meeting.…").  But an e-mail he cites in support of his "fabricat[ion]" theory confirms that the untimeliness of the appeal was discussed with Board members, and that they reacted strongly upon learning that a Player, particularly one represented by counsel, had failed to follow the Plan's rules for filing timely appeals.  *See* App. 5790 ("when we discussed it they all looked at me like I was crazy").  Nor is there anything unusual about the fact that Board minutes do not always reflect every word spoken at a meeting, as Mr. Cass explained when cross-examined about the brevity of the minutes of the November 2016 Board meeting:

> Q.      [By Mr. Dennie]  And you're flipping through the minutes now --
>
> A.      Yes.
>
> Q.      -- that are marked as Exhibit 12.  As it pertains specifically to Mr. Cloud's case, does that accurately reflect the board's decision?
>
> A.      It's a shortened version of the decision, really.
>
> .…
>
> Q.      You didn't add anything to Deposition Exhibit 12 as it pertains to Mr. Cloud's case for any other provision that may be applicable to the decision reached by the board; is that correct?
>
> A.      That's correct.  And that's because this is a summary of the decision, a brief description.  The letter that we sent out would have all of the reasons in it, and there was -- as you well know, there was an additional reason why the appeal was denied.

And it was not -- that was not reflected here, but the official letter that goes out is part of the record in this case. This is only part of the administrative record.

Q.      So where are we supposed to find specifically what the board discussed if it's not all in the minutes marked as Deposition Exhibit 12?

A.      Well, it's not -- it doesn't have to be in the minutes because it's -- our decision is reflected also in the letter that went out to Mr. Cloud.

Q.      Why --

A.      And we're responsible for that letter.

Q.      Why put some provisions but not others?

A.      It's just a shorthand version of the decision.

Q.      Well, you could have, shorthand version, just said, Cloud application denied, right?

A.      We could. This was -- usually it would refer to the major reasons why it was, and maybe not all of the reasons.

App. 558 at 172:5-173:21.

Cloud's speculation about what was or was not discussed by and among the Board and its advisers over the course of a two-day meeting more than five years ago is beside the point. Even if the Court were to review the Administrative Record *de novo* as Cloud requests, the Court too would have to conclude that Cloud's appeal was untimely. The only credible, admissible evidence shows that Cloud received the Committee's decision letter on March 4, and the NFLPBO received his appeal on September 2, more than 180 days later.

## B.      Cloud's Request for Reclassification Did Not Satisfy the Changed Circumstances Requirement.

As set forth in Defendants' Motion for Summary Judgment, Cloud failed to "show[] by evidence found by the Retirement Board … to be clear and convincing that, *because of changed circumstances*, [he] satisfies the conditions of eligibility under a different category of T&P benefits." PD § 5.7(b) (AR-37) (emphasis added). *See* Dkt. 162 at 32-41. "The Retirement Board interprets Section 5.7(b)'s 'changed circumstances' requirement to mean a new or different impairment from the one that qualified you for T&P benefits." AR-519. While, as discussed

10

below, Cloud complains that minor differences in phrasing over the decades should impact the standard of review, *see infra* at 29-33, he acknowledges that any such differences do not change whether he qualifies for benefits under the terms of the Plan.  *See* Cloud Br. at 60 ("No matter which definition is employed, the evidence supports Changed Circumstances.").

Cloud claims to have met the changed circumstances requirement with new conditions in his 2016 reclassification request not presented in his 2014 application.  But (i) a side-by-side comparison shows that no new conditions were presented in 2016; (ii) even if **new** conditions had arisen between 2014 and 2016, Cloud could not be eligible for Active Football benefits because it was impossible for Cloud to have been totally and permanently disabled by those **new** conditions seven years earlier, as required to meet the "shortly after" provision; and (iii) a referral to another Neutral Physician was not necessary, and is not relevant to whether Cloud satisfied the changed circumstances requirement.

1.    <u>A Side-By-Side Comparison of Cloud's 2014 and 2016 Applications Confirms That He Did Not List Any New Conditions or Impairments.</u>

As set forth on pages 34 to 36 of Defendant's Motion for Summary Judgment, a side-by-side comparison of Cloud's 2014 application and 2016 reclassification request shows that Cloud listed substantially identical conditions in each.  *See* Dkt. 162 at 34-36.  Instead of confronting this fact, which exists on the face of the Administration Record, Cloud engages in misdirection.

*First*, Cloud claims that "Dr. Wu confirmed the 2016 Application presented new conditions, including significant memory and attention problems, decision problems, and affective disorders."  Cloud Br. at 60-61 (quoting App. 5746).  But the Court already barred Dr. Wu's testimony on the merits, Dkt. 151 at 3 ("Dr. Wu's testimony and the aforementioned exhibits will not be considered for the purpose of resolving 'disputed material facts' or the 'merits of the claim itself.'"), and his testimony is further subject to a pending *Daubert* motion.  *See* Dkt. 170;

11

*Velasquez v. EAN Holdings, LLC*, No. 3:17-CV-1656-BH, 2018 WL 5924037, at *3 (N.D. Tex. Nov. 13, 2018) ("*Daubert* standards apply not merely at trial, but also on summary judgment.").

Moreover, Dr. Wu did not "confirm" that Cloud presented new conditions.  At his deposition, Dr. Wu admitted that he "███████████████████████."  *See* App. 6308 at 249:18-24 ██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ Had Dr. Wu done this comparison, he would have seen that none of these symptoms were new:

| 2014 Application[11] | | 2016 Application[12] |
|---|---|---|
| "Clinical Depression" | = | "Affective Disorder" |
| "The predominant affective disorder experienced is depression."  *United States v. Buscher*, Nos. 2:05-CR-201, 2:06-CV-1339 JCM RJJ, 2007 WL 2264536, at *2 (D. Nev. Aug. 3, 2007) | | |
| "Difficulties with . . . Decision Making and Concentration" | = | "Attention and Decision Problems" |
| "Memory Loss," "Difficulties with . . . Concentration" | = | "Significant Memory & Attention Problems" |

Cloud's Social Security Administration decision, which was submitted with his 2014 application, also listed "affective disorder" as one of his "severe impairments."  *See* AR-106.  And when asked about Cloud's depression, Dr. Wu confirmed ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[11] AR-096-97.
[12] AR-290-91.

██████████████████████████████████████████████████████████

████████████████████████   There is no genuine dispute of material fact as to whether Cloud's

2016 reclassification request listed new conditions.  It did not do so.

*Second*, without identifying specific conditions that he claims are new, Cloud purports to

provide the Court with a list of the impairments and conditions listed on the 2014 and 2016

applications, respectively:

> The 2014 application stated the following impairments and conditions: "Migraine Headaches,
> Depression, Memory Loss, Vertigo, Insomnia, Unpredictable Irritability", "Sever[e] Pain in: Right
> Foot, Left Great Toe, Left Hip, Base of Neck and Lower Bank", "Numbness in: Right Leg, Arms and
> Fingers", and "Difficulties with: Verbal Fluency, Decision Making and Concentration."[324]  The 2016
> application stated the following impairments and conditions: "Migraine…, Clinical Depression…,
> Significant Memory & Attention Problems…, Vertigo…, Impaired Verbal Fluency…, Memory loss,
> Attention and Decision Problems, Impaired Verbal Fluency, Post-Concussion Syndrome…, [and]
> Affective Disorder."[325] Dr. Wu confirmed the 2016 Application presented new conditions, including

Cloud Br. at 60.  The lists are not apples-to-apples comparisons.  For the 2016 application, ***Cloud***

***lists the symptoms reported in*** ***both*** ***Parts 1 and 3 of the application***, while for the 2014

application, ***he lists*** ***only the symptoms reported in Part 3 of the application***.  *Compare* Cloud Br.

at 60 & nn. 324-25 (citing only one page of the 2014 application, AR-97, but two pages of the

2016 application, AR-290-91); *with* AR-96-97; AR-290-91.

Undoubtedly aware that none of the impairments or conditions listed on the 2016

application were new as compared to the 2014 application, Cloud now claims that is irrelevant

because "the Committee [did not] award[] Cloud Inactive A [in 2014] based upon the same

impairments/conditions alleged in his initial 2014 Application" as the "2014 Decision Letter . . .

13

was based solely on the Committee Reliance on SSA Award . . . ."  Cloud Br. at 53-54, 60.  But

the Social Security Award was itself based on the same types of impairments presented in his 2014

application, including "migraine headaches," "affective disorder," "pain, burning and numbness

from the base of his neck to his fingertips," "markedly limited in the ability to maintain attention

and concentration for extended periods," "vertigo," memory loss," "impaired verbal fluency,"

"difficulty making decisions," and "depression."  AR-106-08.

Finally, Cloud misstates the record in claiming that "Mr. Smith confirmed Cloud's own

reports are ample evidence to address 'changed circumstances'."  Cloud Br. at 60 & n.322 (citing

App. 717 (222:3-9)).  Here is the actual testimony:

> Q.  As it pertains to information and evidence that's submitted by a player himself,
> does the Board review that information as evidence? . . . So like their own
> statement.  A.  Yes. Yes.  Their own statements, but like all things, there has to be
> weight assigned, and the greater weight is assigned to actual medical professional
> evidence . . . .

App. 717 at 223:3-12.

2.  Even if New Impairments or Conditions Had Arisen Between 2014 and
2016, They Would be Irrelevant Because They Could Not Demonstrate
Cloud's Eligibility for Active Football Benefits.

Even if new impairments or conditions had arisen between 2014 and 2016, it would be

irrelevant because the question was whether "changed circumstances" demonstrated Cloud's

"eligibility under a different category of T&P benefits."  PD § 5.7(b) (AR-37).  While Cloud has

attempted to claim a new disability onset date as of the end of the 2005 NFL season, and rely on

mistaken deposition testimony that the "shortly after" deadline extended through early 2007, *see*

*infra* at 16-20, to be "eligibl[e] under a different category of T&P benefits," *i.e.*, "Active Football,"

he still would have to show that his new disabilities arose while he was an Active Player.  PD §

5.3(a) (AR-32).  Any impairments or conditions arising in 2014 or thereafter clearly could not

meet this requirement, as Cloud ceased being an Active Player in 2006.  *See* PD § 1.1 (AR-007) (defining "Active Player").  If they could, it would then mean that they rendered Cloud totally and permanently disabled at least seven years after the relevant, "shortly after" time period.  Thus, no matter what deposition testimony Cloud points to about his condition between 2014 and 2016, it is irrelevant.  *See* Cloud Br. at 60 ("The evidence in the AR shows that . . . Jennifer and Cloud testified to his evolving Cognitive Impairments . . . between 2014 and 2016.").  Additionally, Cloud ignores that the Court admitted the deposition transcripts as "relat[ing] to whether the administrative record submitted is complete and/or whether the plan administrator complied with ERISA's procedural regulations."  Dkt. 141 at 6.  New testimony on Cloud's medical conditions concerns neither, was not before the Board, and cannot be considered.

3.   Even if Defendant Should Have Sent Cloud to a Another Neutral – Which There Was No Reason to Do – That Would Not Make Him Eligible for Benefits under the Plan.

Cloud does not and cannot assert that any failure to "refer him for examination by a neutral physician" or his allegation that Defendant "bur[ied] a neutral neurologist's recommendation that Cloud be referred for diagnostic brain studies," *see* Cloud Br. at 60-61, could be a basis for awarding him benefits to which he is not entitled under the terms of the Plan.  Rather, Cloud argues that this affects the standard of review.  *See* Cloud Br. at 47-51.  As discussed below, there was no reason or requirement to refer him to a Neutral Physician under the circumstances, and the DiDio Report was not buried.  *See infra* at 24-25.  It is also worth noting that Dr. DiDio evaluated Cloud for the Plan's lesser LOD benefit, and he reported that Cloud's symptomology in 2010 did not qualify him for even that benefit.  Furthermore, what Cloud characterizes as the "referral for diagnostic studies in the DiDio Report," Cloud Br. at 19, was to confirm DiDio's opinion that he either "believ[ed]" or thought it was "very possibl[e]" that many of Cloud's symptoms were "a

15

result of his past concussions," and "prior traumatic head injuries." *See* AR-376. But, as Cloud acknowledges, Defendant has not disputed that his disability "arose out of playing in the NFL." Cloud Br. at 57.

**C. Cloud Did Not Meet the "Shortly After" Requirement for Active Football Benefits.**

As set forth in Defendant's Motion for Summary Judgment, Cloud failed to show that he was totally and permanently disabled "shortly after" – within 6 months (but in no case more than 12 months) – his disability first arose. *See* Dkt. 162 at 41-47; PD §§ 5.3(a), (e) (AR-32), § 5.7(b) (AR-37). Cloud told the Board in his 2016 request for reclassification that his disability arose on "October 31, 2004" following a "[h]elmet to helmet collision with the NY Giants in a game against the Minn[esota] Vikings," which caused him to be totally and permanently disabled "immediatly [sic] after October 31, 2004." AR-291. The evidence, however, that Cloud did not become totally and permanently disabled within a year of October 31, 2004 was overwhelming – including, most obviously, the fact that he continued to play professional football for more than a year. *See* Dkt. 162 at 43-46.

Unable to dispute that he failed to meet the "shortly after" requirement based on the facts set forth in his 2016 reclassification request, Cloud belatedly attempts to change the facts. But, as discussed below, he cannot now rely on a theory which was not presented to the Board, and, even if he could present a new theory, he does not have the facts to support it.

1.  Cloud's New Claim That His Disability First Arose at the End of the 2005 NFL Season Was Not Presented to, and Contradicts, What He Told the Board in His 2016 Reclassification Request, and Cannot Be Considered.

Having failed to meet the "shortly after" requirement, Cloud attempted to change the facts late in this litigation. Since he cannot qualify for Active Football benefits if his disability first arose on October 31, 2004, which is not only what he told the Board, but what he alleged in his

16

Complaint and several rounds of his Initial Disclosures, Cloud filed an Amended Complaint claiming that his disability arose "at the conclusion of the 2005 NFL football season." *Compare* Compl. (Dkt. 1), ¶ 24 ("Plaintiff was totally and permanently disabled 'shortly after' a concussion that occurred on October 31, 2004") *with* Am. Compl. (Dkt. 68), ¶ 42 ("Plaintiff was totally and permanently disabled 'shortly after' the disabilities arose at the conclusion of the 2005 NFL football season"). Because this argument was not raised before the Board, and indeed is contradicted by what Cloud told the Board, it has been waived. *See Gomez v. Ericsson, Inc*., 828 F.3d 367, 374 (5th Cir. 2016) ("[Plaintiff] tries a new argument not raised before the administrator—that the value of any unreturned property should offset his severance pay. But we cannot consider an argument that a plan did not first have the opportunity to assess.").

2.   <u>Cloud Cannot Prove His New Claims About the Timing of His Disability.</u>

Even if Cloud's new theory were not waived, he could not demonstrate that he was disabled within the requisite "shortly after" period. The only "evidence" that Cloud relies on in arguing that he was disabled within the "shortly after" period is an opinion by his expert witness, Dr. Wu:

> Dr. Wu opined, "[b]ased on the circumstances of Mr. Cloud's condition as of March 30, 2006 and the ongoing nature of the injuries Mr. Cloud sustained in late 2004 and through the 2005 NFL playing season that concluded in January 2006, Mr. Cloud meets the terms of the definition "shortly after." Based on my experience, training, analysis of Mr. Cloud's brain, and reasonable medical probability and certainty, Mr. Cloud was totally and permanently disabled as those terms are used in the medical community as of March 30, 2006, which is well prior to the date of January 2007 as indicated by Mr. Smith."

Cloud Br. at 59 (alteration in original) (quoting App. 5745). But the Court has ruled that "Dr. Wu's testimony and the aforementioned exhibits will not be considered for the purpose of resolving 'disputed material facts' or the 'merits of the claim itself.'" Dkt. 151 at 3 (quoting *Vega*, 188 F.3d at 299-300). Since Cloud has failed to cite any admissible evidence that shows he meets the "shortly after" requirement, summary judgment in favor of Defendant is warranted. *See*

17

*Gerritsen Beach Invs., Ltd. v. Jemal*, No. 3:08-CV-1192-N, 2010 WL 11618302, at *4 (N.D. Tex. Apr. 9, 2010) ("Because the only evidence that [Cloud] offer[s] is inadmissible for summary judgment purposes, the Court finds that they fail to demonstrate a genuine issue of material fact on this point."); *Jackson v. Royal Caribbean Cruises, Ltd.,* 389 F. Supp. 3d 431, 445 n.8 (N.D. Tex. 2019) (Scholer, J.) ("Rule 56 imposes no obligation to sift through the record in search of evidence to support a party's opposition to summary judgment. Parties must identify specific evidence in the record supporting challenged claims and articulate the precise manner in which that evidence supports those claims.") (cleaned up).

Moreover, as discussed below, Dr. Wu admitted █████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████.

*First*, Dr. Wu admitted ████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████.

18

*Second*, Dr. Wu admitted 

Moreover, at the Social Security hearing, Cloud acknowledged the onset date was December 31, 2008, (AR-104) ("The claimant appeared *and testified* at a hearing held on May 15, 2014 . . . The claimant has amended the alleged onset date of disability to December 31, 2008") (emphasis added), which the Social Security Administration relied on in finding that he "has been disabled . . . since December 31, 2008," (AR-110), and which he did not appeal and submitted to the Plan as proof of his disability, highlighting, in bold, the "onset date of **December 31, 2008**," (AR-99) (emphasis in original), in his cover letter to the Plan. Cloud is estopped from now taking a position in federal court, which is inconsistent with what he told the Social Security Administration.  *See Harris v. Marathon Oil Co.*, 948 F. Supp. 27, 29 (W.D. Tex. 1996) ("It is the opinion of this Court that Mr. Harris was estopped from presenting evidence at trial which contradicted his earlier claims [before the Social Security Administration] of total disability."), *aff'd*, 108 F.3d 332 (5th Cir. 1997).[13]

---

[13] Any suggestion that Cloud "did not . . . speak" at the hearing, *see* Cloud Br. at 16-17, is belied by the Social Security decision, which states that he "appeared and testified" and "amended the alleged onset date of disability to December 31, 2008."  AR-104.

*Third*, Dr. Wu's assumption that the relevant deadline to qualify for "shortly after" in this case was January 2007 is based on later corrected deposition testimony that the event which triggers the "shortly after" time period is not when the disability first arises, as the Plan provides, but when a player "stopped playing football" no matter how much later in time that retirement may take place.  *See* App. 5745 ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████  That deposition testimony was corrected by errata on December 7, 2021.  App. 775 (errata sheet from Board member Robert Smith explaining that the time period runs from "when Mr. Cloud's disability first arose," and the change was necessary to "correct deponent's misrecollection and conform answer to the terms of the Plan").  Although the terms of the Plan are clear and the errata change is objectively correct, after the Court denied Cloud's motion to strike the change, Dkt. 112, Cloud's counsel appears not to have given the errata to Dr. Wu.  *See* Dkt 170 at 20 n.20 (collecting testimony of Dr. Wu).

### D.   Cloud's New Argument That the "Shortly After" Requirement Does Not Apply Is Baseless, Contradicted by Federal Court Precedent, and Doubly Waived.

In his summary judgment brief, Cloud argues for the first time that a "Special Rule[]" under the Plan for "Psychological/Psychiatric Disorders" expands a player's eligibility for benefits by allowing him to qualify based on a "head injury . . . sustained by a Player arising out of League football activities," PD § 5.4(b) (AR-33), without otherwise meeting the requirements for "Active Football" benefits under Section 5.3(a), including the "shortly after" requirement.  *See* Cloud Br. at 9-10, 58.  Cloud cites no support for this theory, which has been rejected by the Board in another

matter, and its interpretation affirmed in a published federal court opinion.  *See* Supp. App. 28,

*Boyd v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, Case No. 3:01-cv-2072-J, Dkt. 61 at 3 (S.D.

Cal. July 24, 2003) ("The Board examined the intent of the collective bargaining parties and

determined that the psychological/psychiatric provisions limit, and do not expand, the situations

in which Football Degenerative T&P may be awarded. . . . [T]he Court finds that the Board did

not abuse its discretion in interpreting the psychological/psychiatric provision."), *aff'd* 410 F.3d

1173, 1178 (9th Cir. 2005).

Indeed, far from expanding the eligibility for "Active Football" benefits, the Special Rule

expressly limits awards for psychological/psychiatric disorders to the "Active Nonfootball,"

"Inactive A," and "Inactive B" categories of benefits.  *See* PD § 5.4(b) (AR-33) ("A payment for

total and permanent disability as a result of psychological/psychiatric disorder may only be made,

and will only be awarded under the provisions of Section 5.3(b), Section 5.3(c) or Section 5.4(d) .

. . .").  The Special Rule then goes on to provide an exception to that rule which states that "Active

Football" benefits may, in certain circumstances, still "be awarded under the provisions of 5.3(a)

. . . ."  *Id*.  It is only by selectively omitting any reference to the "be awarded under the provisions

of 5.3(a)" language from his brief that Cloud is able advance the baseless argument  that he does

not need to "meet[] the express terms of Section 5.3(a)."  *See* Cloud Br. at 9-10.

Not only is Cloud's new theory without merit because it misquotes the Plan, but it was

never presented to the Board, or mentioned in his Complaint or First Amended Complaint or at

any other time prior to his dispositive motion.  Indeed, his argument with respect to the "shortly

after" requirement in each of those filings was that he satisfied the requirement, not that he was

eligible under an exception to the requirement.  *See* AR-490 ("Mr. Cloud satisfies all of the criteria

for an award of Active Football benefits.  Plan section 5.3 provides for Active Football T&P

21

benefits if . . . the Player [becomes] totally and permanently disabled 'shortly after' the disability(ies) first arises."); Compl. (Dkt. 1), ¶ 21 ("Plaintiff satisfies each element necessary to obtain Active Football T&P Benefits.  Specifically, . . . Plaintiff was totally and permanently disabled 'shortly after' the disability occurred."); Am. Compl. (Dkt. 68), ¶ 35 (same). Accordingly, any argument about the application of the Special Rule has been doubly waived.  *See Gomez*, 828 F.3d at 374 ("[Plaintiff] tries a new argument not raised before the administrator—that the value of any unreturned property should offset his severance pay. But we cannot consider an argument that a plan did not first have the opportunity to assess."); *Sims v. City of Madisonville*, 894 F.3d 632, 643 (5th Cir. 2018) (affirming district court decision holding that where plaintiff "failed to raise . . . theories in his first amended complaint," he "could not do so for the first time on summary judgment").

## II.    Cloud's Arguments for Applying *De Novo* Review Lack Merit.

In the "Standard of Review" section of his brief, Cloud notes "three grounds" which he claims justify applying a "*de novo* standard of review."  Cloud Br. at 40-41.  None are persuasive.

His "Third" ground is easy to follow and just as easily shown to be inapplicable to this case:  the Texas statute banning discretionary clauses in insurance policies does not apply to the Plan at all (and would, in any event, be preempted by ERISA) under clear precedent that Cloud ignores.  *See infra* at 23-24.

His "First" ground is not a complete sentence, contains no citations  and is unclear on what other portions of his brief, if any, are supposed to support it.  *See* Cloud Br. at 40 ("First, exceed the boundaries of their stated discretion under the Plan.").  The words "boundaries" and "exceed" are not used a single time anywhere else in his 63-page brief, nor is the phrase "stated discretion."

His "Second" ground is a collection of inaccurate allegations – including that there have been "multiple erroneous interpretations of Plan provisions and obligations under ERISA," and "a willingness to increase rounds of costly litigation as if they were part of the Plan's claims process," Cloud Br. at 40 – some of which loosely correspond to the four "Key Facts" alleged in the portion of his "Arguments and Authorities" section that addresses *de novo* review.  *See* Cloud Br. at §§ II(C) ("Key Fact #2 – Defendant Uses No Consistent Interpretation of 'Changed Circumstances'"), II(E) ("Key Fact # 4 – Defendant (and Groom) Treat Litigation as Part of the Claims Process").  Each of Cloud's four "Key Facts" are addressed below in order.  *See infra* at 24-40.

After addressing Cloud's Texas insurance law argument, and his four "Key Facts," Defendant addresses some of the other scattershot misrepresentations and innuendo contained in disparate portions of Cloud's briefing.  *See infra* at 40-47.

### A. This is an ERISA Disability Case, Not an Insurance Case.  Accordingly, the Texas Insurance Code Does Not Apply.

Cloud argues that *de novo* review is appropriate because the Texas Insurance Code prohibits "discretionary clauses."  Cloud Br. at 41 & n.259 (citing Tex. Ins. Code. §§ 1701.062(a), 1701.002).  But that prohibition is limited to "form insurance policy contracts developed by insurance companies, approved by [the Texas Department of Insurance], and issued by insurers." *Allen v. Sherman Operating Co.*, LLC, No. 4:20-CV-290-SDJ, 2021 WL 5710566, at *3 (E.D. Tex. Dec. 2, 2021).  It is inapplicable to an ERISA plan that, like the Plan, does not involve insurance.  *See Allen*, 2021 WL 5710566, at *3 ("On its face, the Plan, which establishes an employee injury benefit plan designed to comply with ERISA and under which benefits are paid by Sherman Operating itself, is not the type of document contemplated by these provisions of the Texas Insurance Code.  Neither party alleges that the Plan was a 'form' insurance policy submitted to or approved by TDI, and the Court cannot conceive that it was. Therefore, Section 1701.062(a)

does not apply to the Plan, and the Court finds that the discretionary clause is lawful and valid.");

*Hernandez v. Life Ins. Co. of N. Am.*, No. SA-19-CV-00022-FB, 2020 WL 1557802, at *5 (W.D.

Tex. Apr. 1, 2020) ("The chapter in which Section 1701.062 is contained only applies to insurers,

such as life, accident, health, casualty, or mutual life insurance companies, not employers funding

welfare benefit plans.").[14]  In any event,"[t]o the extent that section 1701.062 can be read to apply

here, to a self-funded plan that does not involve any policy of insurance, it would be expressly

preempted" by ERISA.  *See id.* at *6.[15]

> **B.** **"Key Fact #1" – Defendant Never "Buried" the DiDio Report and There Was No Reason or Requirement to Refer Cloud to Another Neutral Physician.**

Cloud's first "Key Fact" which he cites as evidence of "Defendant's Egregious and

Systemic Violations of the Plan and ERISA Statute Requir[ing] *De Novo* Review" is that "the

moment Defendant received the DiDio Report . . . it never again acknowledged any of it and never

again sent Cloud to see a neutral neurologist."  Cloud Br. at 47.  *See also id.* at 51 (accusing

Defendant of having "buried the DiDio Report . . . during approximately 6 years of denying Cloud

the T&P Benefits (Active Football) to which he is entitled").  But, as discussed below, Defendant

did not "bur[y]" the DiDio Report and there was no reason or requirement to refer Cloud to another

Neutral Physician.

---

[14] *Report and recommendation adopted*, No. SA-19-CV-00022-FB, 2020 WL 3579821 (W.D. Tex. Apr. 21, 2020).

[15] The only case cited by Cloud is not to the contrary.  That case involved a fully-insured plan, rather than, as here, a self-funded plan, and no preemption argument was raised.  *See Woods v. Riverbend Country Club, Inc.*, 320 F. Supp. 3d 901, 909 (S.D. Tex. 2018) ("no party in this case mentions any [preemption] argument"); *Hernandez*, 2020 WL 1557802, at *5 (explaining that *Woods* involved a "fully insured plan" rather than a "self-funded plan[]" like the one underlying this suit").

1.     Defendant Did Not Bury The DiDio Report.

It is not true that Defendant "buried" and "never again acknowledged" the DiDio Report

between 2010 when it was issued and 2016 when the Board denied Cloud's reclassification:

- On April 15, 2010 , Cloud wrote Defendant "requesting a copy of my recent Medical Evaluation . . . from doctors: . . . Adam Didio, M.D. . . . ," App. 3791, and he was sent "a copy of the reports from Dr.[] . . . DiDio" on May 28, 2010. App. 2971.

- Cloud received the DiDio report, as he submitted it in connection with his March 7, 2012 application to the Social Security Administration. The Administrative Law Judge discussed the DiDio Report in his decision concluding that Cloud was totally and permanently disabled since December 31, 2008.  *See* AR-108, 110.

- The DiDio Report is in the Administrative Record, not once, but twice, because it was considered in connection with both his 2014 application and 2016 request for reclassification. *See* AR-174-182 (marked "E-Ballot 7/17/2014"); AR-372-380 (marked "E-Ballot 02/22/2016").

- The DiDio Report is listed as one of the medical records submitted by Cloud in the one-page summary of Cloud's appeal that was provided to the Board, which states that "THIS IS A SUMMARY ONLY" and "[t]he Player's complete file, along with the entire administrative record compiled in conjunction with this claim/appeal" – which included the DiDio Report – "have been made available and should be reviewed prior to making a final determination on the Player's claim for benefits."  AR-484.

2.     There Was No Reason or Requirement to Send Cloud to Another Neutral Physician.

There was no reason to send Cloud to another neurologist in connection with his 2014

application or his 2016 request for reclassification.  The provision in the ERISA Claims Procedure

that Cloud cites requires "consult[ation] with a health care professional" before a plan fiduciary

denies a claim based on "a medical judgment[.]"  29 C.F.R. § 2560.503-1(h)(3)(iii).  But it is well

established that where a plan administrator "did not dispute the medical judgment of [the] treating

physician" and the "denial of benefits was based solely on its determination that [the claimant's]

condition] did not fall within the benefit plan's definition of 'disability'" that the "determination

was contractual, not medical." *Stanford v. Cont'l Cas. Co.*, 514 F.3d 354, 360 (4th Cir. 2008).[16]

*See also Dorrough v. Dean Foods Co. Grp. Disability Plan*, No. C 03-4826 MJJ, 2005 WL

2122301, at *5 (N.D. Cal. Aug. 30, 2005) (holding that "review by a medical professional is not

necessary" where the plan administrator "never disputed Plaintiff's physical limitations" and

instead based its "determination [on] the physical requirements of Plaintiff's job"); *Bess v. Mut. of

Omaha Ins. Co.*, No. CIV.A. 2:11-00143, 2011 WL 5858815, at *10 (S.D.W. Va. Nov. 22, 2011)

("Mutual did not question the physicians' diagnoses of abdominal pain or their attempts at

identifying its cause. By only reviewing the medical determinations rather than making new or

different medical findings, Mutual did not make a judgment as to plaintiff's medical condition.").

Cloud does not cite any cases addressing this issue – and instead cites a single case regarding

whether Neutral Physicians were qualified, which is not at issue here. *See* Cloud Br. at 48 n.277

(citing *Davis v. Aetna Life Ins. Co.*, 699 F. App'x 287, 295 (5th Cir. 2017)).[17]

In this case, there was no dispute over Cloud's medical condition, as determined not only

by his doctors, but by the Social Security Administration's decision, which the Plan was required

to accept. *See* PD § 5.2(b) (AR-25). *Accord* Cloud Br. at 47 ("It is undisputed that Cloud suffered

NFL Brain Injuries resulting in . . . T&P Disabilities in the form of the described Cognitive

---

[16] *Abrogated in part on other grounds by Champion v. Black & Decker (U.S.) Inc.*, 550 F.3d 353, 359 (4th Cir. 2008).

[17] Cloud also includes, perhaps mistakenly, the following statement: "As set forth above regarding use of delegation powers and advisors, the law (and per Groom's own advice) requires that fiduciaries make an effort to gain some knowledge about the topics at hand in order to enable them to monitor the advice from third-parties like medical physicians and lawyers." Cloud Br. at 48. No citation is provided and there does not appear to be any such "above" portion of the brief to which Cloud could be referring. *Cf. infra* at 37 (addressing the one case Cloud cites later in his brief addressing the issue of a delegation of authority); Cloud Br. at 55 ("Key Fact # 3 – Defendant's Failure to Supervise or Monitor Any Delegees"). To the extent Cloud is attempting to refer to a white paper by Groom that he cited in earlier briefing and which is not in the Administrative Record, there is no basis to consider it and, in any event, it says nothing about the ERISA Claims Procedure at issue here.

Impairments."). Nothing in ERISA, the Plan, any reported decision, or basic commonsense required Defendant to send Cloud to a Neutral Physician to "assess [whether] Cloud's [alleged] 'changed circumstances' related to his Cognitive Impairments," Cloud Br. at 47-48, when Defendant did not question Cloud's claim that his symptoms related to his football injuries and did not deny his claim on that basis.

Nor was a medical degree necessary to conclude that Cloud did not present clear and convincing evidence of changed circumstances demonstrating that he was totally and permanently disabled within 6 months (but in no case more than 12 months) after his disability first arose in 2004. *See* PD §§ 5.3(a), (e) (AR-32), § 5.7(b) (AR-37). As discussed above, allegedly new symptoms arising between 2014 and 2016 are, by definition, irrelevant to the question of whether Cloud presented "changed circumstances" which show that he satisfied the "shortly after" requirement to be eligible for Active Football benefits. *See supra* at 14. It was also obvious on the face of Cloud's 2014 application and 2016 request for reclassification, respectively, that none of the 2016 symptoms were actually new. *See supra* at 11.

While Cloud observes that the Board has referred other players to Neutral Physicians, *see* Cloud Br. at 49 & n.283, Cloud does not allege any inconsistent treatment in this regard – nor could he, as none of the players he identifies were similarly situated. Indeed, none of the examples Cloud cites even involved a request for reclassification to Active Football benefits, which is at issue here. *See* App. 5444 ("appeal for reclassification of his inactive T&P benefits to the Football Degenerative category"); *Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 925 F. Supp. 2d 700, 711 (D. Md. 2012) ("plaintiff appealed to the Retirement Board the classification of his disability as Inactive, rather than Football Degenerative"); *Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 410 F.3d 1173, 1174 (9th Cir. 2005) ("appeals the denial of football

degenerative disability benefits");[18] *Johnson v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 468 F.3d 1082, 1084-85 (8th Cir. 2006) (referring player to a Neutral Physician in connection with a "second application for benefits," not a request for reclassification, after player obtained a new "medical opinion" that he was disabled).[19]

Cloud's claim that the Committee members testified they "automatically refer claimants to see neutral physicians," Cloud Br. 20 & n. 126, is not correct. The actual testimony Cloud purports to be citing is that "***if a player met the requirements of the Plan to qualify for total and permanent disability***, he would automatically go to see one of the neutrals," but that "[t]he only time that I – in my role on the committee would say that he needed to go see a physician if there's a question." App. 203 (162:22-163:9) (emphasis added).[20]  So too, the Plan Document makes such a referral discretionary, *see* PD § 5.2(c) ("such Player ***may*** be first required to submit to an examination by a neutral physician" if "in the opinion of the Retirement Board or the . . . . Committee, [it is] necessary to make an adequate determination regarding his physical or mental condition"), and, as discussed above, it was not necessary here. *See supra* at 25-28.

Finally, Cloud's expert admitted that ███████████████████████████ ██████████████████████████████████████████████████████ ███████████████████      *See* Dkt. 170 at 14-15 (collecting testimony from Dr. Wu on this subject).

---

[18] "Football Degenerative" benefits, which "were so named because they were intended for Players who gradually became disabled, in 'degenerative' fashion, after leaving professional football," are now referred to under the Plan as "Inactive A" benefits – which is what Cloud is currently receiving.  *See* Dkt. 162 at 10 n.12.

[19] Unlike requests for reclassification, which require a showing of "changed circumstances," PD § 5.7(b) (AR-37), "a subsequent application for benefits" by a "Player whose claim for benefits . . . has been denied" and who "is not receiving monthly retirement benefits," does not require a showing of changed circumstances.  *See* PD §§ 5.2(a), (e) (AR-30-32).

[20] Cloud, perhaps mistakenly, purported to cite pages 162-63 of the deposition of Ms. Smith, which does not address this topic, instead of pages 162-63 of the deposition of Mr. Reynolds, which does. *See* Cloud Br. at 20 n. 126.

This not only affirms that it would have been pointless to refer Cloud to a Neutral Physician, but that Cloud cannot demonstrate any prejudice from the fact that there was no such referral.

C. **"Key Fact #2" – Cloud Cannot Identify a Single Instance of Inconsistent Applications of the "Changed Circumstances" Requirement and Instead Complains of Minor Differences in Phrasing.**

Cloud's second "Key Fact," is that "Defendant Uses No Consistent Interpretation of 'Changed Circumstances'." Cloud Br. at 51. Yet, notwithstanding the extensive discovery Cloud has been afforded in this case, Cloud did not identify a single instance in which a player similarly situated to him was found to have met the "changed circumstances" requirement. His only attempt to do so fails. Cloud points out that the Board concluded the "changed circumstances" requirement was satisfied where a player was "initially awarded T&P benefits due to Crohn's Disease, and you are now totally and permanently disabled due to your orthopedic impairments." *See* Cloud Br. at 54. Cloud claims this case is "similar" because he was initially awarded T&P benefits "based solely on the Committee reliance on SSA Award," not an "evaluation of . . . his . . . Cognitive Impairments." *Id.* at 53-54. This argument does not withstand scrutiny:  the Social Security Administration found Cloud disabled based on the same cognitive impairments he presented in his request for reclassification. *See also supra* at 13-14.[21]

Cloud does not dispute that courts have repeatedly upheld the Board's interpretation of the "changed circumstances" requirement and treated that interpretation as consistent, notwithstanding

---

[21] Although the 2016 Appeals Decision Letter plainly acknowledges that Cloud had already been "found . . . to be totally and permanently disabled by virtue of your Social Security Administration ('SSA') disability award," AR-518, Cloud complains that the Letter is "false" insofar as it says "the medical evidence you submitted does not show that you are totally and permanently disabled." *See* Cloud Br. at 36 (citing AR-519). Both statements in the letter are true: (i) Cloud was found to be totally and permanently disabled under the Plan by virtue his Social Security Award; and (ii) Cloud submitted no new evidence in connection with his 2016 request for reclassification which showed that he was totally and permanently disabled or (as the rest of the sentence in the Letter says) that such disability fell within the "shortly after" period.

the same minor differences in phrasing Cloud now notes. *Compare Boyd v. Bert Bell/ Pete Rozelle NFL Player Ret. Plan*, 796 F. Supp. 2d 682, 692 (D. Md. 2011) (upholding the Board's interpretation of "'changed circumstances' to require, in the context of the Plan, a change in physical condition, not merely the availability of new evidence regarding causation"), *and Hudson v. Nat'l Football League Mgmt. Council*, No. 18-CV-04483-GHW, 2019 WL 5722220, at \*4, \*22 (S.D.N.Y. Sept. 5, 2019) (upholding the Board's interpretation of "the 'changed circumstances' requirement to mean a change in Player's physical condition—such as a new or different impairment—that warrants a different category of benefits," and concluding that the interpretations approved of by the *Boyd* and *Bryant* courts were "persuasive here")[22] *with* Cloud Br. at 52 (complaining that the inclusion of "such as a new or different disability" language originally at issue in *Bryant* was a "mutat[ion]" and "manipulat[ion]" of "the definition of Changed Circumstances" by "Groom" in order "to enable denial of the claim").[23] *See also infra* at 38-40 (addressing Cloud's recycled attacks on Groom).[24]

    Nor is there a basis for Cloud's claim that despite "preparing . . . contemporaneous Reclassification denial letters" that defined changed circumstances to "mean 'a new or different impairment *from the one that originally qualified you for T&P benefits*'," "Groom prepar[ed] . . . an entirely new Groom Reinterpretation of Changed Circumstances in order to deny Cloud in the

---

[22] *Report and recommendation adopted as modified*, No. 1:18-CV-4483-GHW, 2019 WL 4784680 (S.D.N.Y. Sept. 30, 2019).

[23] *See* Supp. App. 7, *Bryant v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, Civ. No. 1:12-cv-936-MHC, 2015 WL 13908103, at \*3 (N.D. Ga. March 23, 2015).

[24] Cloud complains not only that it is evidence of a conspiracy when minor differences in phrasing are used, but that so too it is evidence of a conspiracy where there are no differences in phrasing used. *See* Cloud Br. at 45 (complaining that "Defendant fabricated a 2014 Decision Letter citing denial of Active Football benefits with the same Boilerplate Denial of Active Football that, as part of its Systemic Violations of the Plan and ERISA in Denial Letters, it uses for hundreds of other players in denial letters . . . .").

2016 Appeal Decision Letter." Cloud Br. at 54. In reality, Cloud's 2016 Appeal Decision Letter used the exact same definition of changed circumstances: "The Retirement Board interprets Section 5.7(b)'s 'changed circumstances' requirement to mean a new or different impairment *from the one that qualified you for T&P benefits*." AR-519 (emphasis added). The difference between the decision letters was not in the definition of "changed circumstances," but in the type of benefits the player was seeking:

| Cloud's Letter | Contemporaneous Letter |
|---|---|
| (AR-519; emphasis added) | (Dkt 165-8 at App. 5232; emphasis added) |
| ***The Retirement Board interprets Section 5.7(b)'s "changed circumstances" requirement to mean a new or different impairment from the one that originally qualified you for T&P benefits***. Because you seek reclassification to ***<u>Active Football</u>***, you would have to clearly and convincingly show that (1) you have a new or different impairment (Section 5.7(b)), (2) that new or different impairment arose while you were an Active Player (Section 5.3(a)), and (3) it caused you to be totally and permanently disabled "shortly after" it first [*sic*, arose] (Section 5.3(a)). | ***The Retirement Board interprets Section 5.7(b)'s "changed circumstances" requirement to mean a new or different impairment from the one that originally qualified you for T&P benefits.*** Because you seek reclassification to ***<u>Inactive A</u>***, you would have to clearly and convincingly show that (1) you have a new or different impairment, (2) that new or different impairment is totally and permanently disabling (Section 5.2), and (3) your request for reclassification "was received within fifteen (15) years after the end of [your] last Credited Season." (Section 5.3(c).) |

As explained above, Cloud came nowhere close to meeting the "changed circumstances" requirement because he presented no new evidence of changed circumstances at all, listed substantially the same symptoms as he did on his prior application, and cannot explain (much less prove) how symptoms he claims to have developed more than a decade after his October 31, 2004 concussion could show he meets the "shortly after" requirement for Active Football benefits.

Cloud's speculation that players who were issued denial letters before *2010* were "left with no idea what Defendant is talking about in using the terms no Changed Circumstances," Cloud Br. at 53 (emphasis omitted), *see also id.* at 51 ("For over a decade (1997-2010), Groom caused defendant to issue denial letters . . . and never defined Changed Circumstances in any of those

31

letters"), is both baseless and legally irrelevant – as not only did the letter Cloud receive define it, but it has been publically available in numerous court decisions.  *See Hudson*, 2019 WL 5722220, at *23-24 (holding that because "[i]n 2011, the federal district court in *Boyd* . . . issued a published decision that upheld the Retirement Board's interpretation of the 'changed circumstances' requirement," the player "had constructive notice" of the definition and that "[t]his presumption is particularly strong" since the player "was represented by counsel").  Moreover, as *Hudson* itself shows, a player who inquired about the definition of "changed circumstances" was directed to these decisions – notwithstanding Cloud's gratuitous misrepresentation of the facts of *Hudson* and misleading use of an ellipsis:

| **Cloud's Brief at 53 & n.296**<br>(emphasis added) | ***Hudson*, 2019 WL 5722220, at *5**<br>(emphasis added) |
|---|---|
| "[I]f [players] want to find out [the definition of Changed Circumstances] then it plays directly into Litigation Phase of Defendant's Claims Handling Process (defined below) – the players have to sue.  Even then, in one case, Groom (*i.e.*, Mr. Junk) refused to explain a definition of Changed Circumstances for a beneficiary.  ***See [Hudson] at *5 ("Junk responded in writing ... and further noted that he would not provide a definition of the term 'impairment' because doing so could be construed as an advisory opinion.")***. | "Junk responded in writing ***noting that two prior court decisions had upheld the Retirement Board's definition of "changed circumstances"*** and further noted that he would not provide a definition of the term "impairment" because doing so could be construed as an advisory opinion." |

Cloud's further claim that "[c]onsisten[t]" with the alleged "refus[al] to explain a definition of Changed Circumstances for a beneficiary" in *Hudson*, "here, Groom repeatedly made . . . objections to deposition questions asking Board and Committee members to explain their definition of Changed Circumstances," Cloud Br. at 53, is also misleading.  To begin with, Defendant's counsel did not make objections to questions asking about the definition of "changed

circumstances."[25]   And while some objections were made to hypothetical questions about what would satisfy "changed circumstances," none of Defendant's objections at any deposition to any question included instructions not to answer.[26]

Finally, Cloud's suggestion that having "undefined terms," Cloud Br. at 51, in the Plan was somehow nefarious and justifies applying *de novo* review is contradicted by Supreme Court precedent.  *See, e.g.*, *Conkright v. Frommert*, 559 U.S. 506, 512 (2010) ("If the trust documents give the trustee 'power to construe disputed or doubtful terms, the trustee's interpretation will not be disturbed if reasonable.'") (alteration omitted).[27]

---

[25] To the contrary, Defendant's witnesses readily volunteered their understanding of the definition of changed circumstances, only to have Plaintiff's counsel object to hearing it in response to his own question.  *See* App. 420 at 334:22-335:6 ("Q.  Does the plan define changed circumstances. A.  Changed circumstances is a new or different condition since he first applied to a total and permanent disability.  MR. DENNIE:  Objection.  Nonresponsive.").

[26] *See, e.g.*, App. 225 at 252:19-253:22 ("Q. So I am asking you, based on your interpretation of the Plan, and the changed circumstances language, that your acknowledgment that concussion syndrome symptoms can change over time, does that change in circumstances and symptoms qualify as a changed circumstances as set forth in 5.7(b) in Exhibit 1?  MR. MEEHAN:  Objection. Legal conclusion.  Incomplete hypothetical.  Go ahead.  THE WITNESS:  I can't say for certain that it does, no. . . .  Q.  You're on the committee, right?  A.  We're speaking in hypotheticals again.  If you could give me a specific situation, I might be able to comment on that.").  By contrast, Plaintiff's counsel repeatedly and improperly instructed his witnesses not to answer questions. *See, e.g.*, App. 6052-54 at 35:14-37:4 (objecting on relevance grounds to questions about the scope of Dr. Wu's observations that ███████████ as purportedly aimed at "some sort of self-serving argument that you're trying to make that is unassociated with this lawsuit").

[27] Cloud claims that the Board's "multiple erroneous interpretations of Plan provisions" show that it is "sufficiently incompetent to exercise discretion fairly."  Cloud Br. at 40 (citing *Conkright*, 559 U.S. at 521).  *See also* Cloud Br. at 43.  But Cloud does not identify any other Plan provision he believes the Board has misinterpreted, and even if he could show that a prior interpretation was incorrect, and he cannot, that would not be enough to warrant *de novo* review.  *See Conkright*, 559 U.S. at 522 ("The Court of Appeals erred in holding that the District Court could refuse to defer to the Plan Administrator's interpretation of the Plan on remand, simply because the Court of Appeals had found a previous related interpretation by the Administrator to be invalid.").

D.  **"Key Fact #3" – The Board Did Not Delegate Fiduciary Decision-Making Authority.**

Cloud's third "Key Fact" is that "Defendant has failed to supervise or monitor the PBO, Groom, [NFLPA staff member Bethany] Marshall, or [NFL Management Council lawyer Belinda] Lerner, and in fact has participated in or knowingly allowed their violations of Plan terms and ERISA requirements" by failing to "train[], supervis[e], or monitor[]" them as "fiduciaries or delegees."  Cloud Br. at 55; *see also id.* at 6.  To begin with, this claim has already been dismissed. *See* Dkt. 68, ¶ 60 (alleging under Count III of the First Amended Complaint that Defendant breached its fiduciaries because "[t]he Retirement Plan fiduciaries failed to comply with ERISA training and supervision regulations with respect to delegation of duties to Plan representatives . . . ."); Dkt. 113 at 2 (granting "Defendant's Motion to Dismiss Count III of Plaintiff's First Amended Complaint").  *See also* Dkt. 71 at 7 (ruling that "[t]he fiduciary duties identified by Plaintiff" are not "relevant to . . . whether the Board substantially complied with ERISA procedural regulations" because "[t]hey are not set forth in 29 C.F.R. § 2560.503-1").

Moreover, the entire argument surrounding this supposed "Key Fact #3" spans only four sentences, contains no factual support,[28] and is based on the objectively incorrect premise that the PBO, Groom, Marshall and/or Lerner decided Cloud's reclassification request.  As the testimony of the two Board members deposed in this case makes clear, however, the Board members are the Plan's fiduciaries; they have ultimate decision-making authority; and they decided Cloud's request for reclassification in November 2016.

Cloud's counsel elicited the following testimony from **Robert Smith**:

---

[28] Cloud does not specify who failed to monitor or supervise whom, or how that alleged failure adversely affected the decision on his request for reclassification in November 2016.

34

Q.      [By Mr. Dennie]  Even with provisions of 8.2(e) and 8.2(f), you would agree that the members of the Board still maintain a fiduciary role; correct?

.…

A.      It's -- it's my understanding that we are fiduciaries, that we are the named fiduciaries of the plan.  The Retirement Board is named fiduciary of the plan.  And as part of our responsibilities we do delegate some of these authorities out, but that we always are the fiduciaries of the plan.

App. 676 at 58:15-59:1.

Q.      [By Mr. Dennie]  Are you given any direction by anyone on how to decide claims?

A.      Direction on how to decide claims?

Q.      Correct.

A.      So are you saying should I approve this or deny it, or the actual process of evaluating claims?

Q.      Well, the question was directed at the ultimate decision, whether you approve or deny.

A.      Oh, no.  Nobody ever says you need to do this or do that.  Now, our advisors make recommendations on cases based on -- based on the research that they've done on a particular case.  They may make a recommendation, but nobody ever says that you need to vote a certain way.  That's what the discussions are about.  And when we're in those individual caucus sessions, that's what we're doing, discussing the specifics of cases.

App. 694 at 132:18-133:10.

.… Now, if there's a recommendation from one of the advisors that Sam or myself or, you know, Jeff at those times or Hoby disagrees with, then we'll have that discussion there, and it will be -- the final decision is always ours.…

App. 688 at 108:15-19.

Cloud elicited similar testimony from **Dick Cass**:

Q.      [By Mr. Dennie]  .… So, right now, what I'm focused on and following up on what you said is, as it pertains to Mr. Cloud, not some other disability deal, do you recall any conversations you had with any advisers about his case prior to the board meeting in 2016?

A.      I do not.  Let me just correct that a second.  You have to understand the way the board operated.  There's a formal board meeting, and then there's a meeting of the NFL board members with advisers before the board meeting.  And one of the things we would discuss before the board meeting were the cases.  So Mr. Cloud's case would have come up in that premeeting before the formal board meeting. …

App. 524 at 37:10-37:24.

Q.      [By Mr. Dennie]  … Are you given any direction from anybody from the NFL or Management Council on how to make decisions on the board as it pertains specifically to disability benefits?

A.      No.

App. 559 at 176:19-176:23.

Q.      [By Mr. Dennie]  Do you agree that the board pertaining to reclassification appeals is essentially a judge or an arbiter?

A.      We're -- we're an ERISA retirement board.  I mean -- so it's different.  I don't know how to compare it.  We have -- I mean, I've explained during the course of the deposition what our duties and responsibilities are.  We're given great discretion in interpreting the plan.  We've got a lot of expertise, not so much within any one board member, but we've got great -- we're surrounded by experts who have incredible expertise on all of these matters.  We've got a medical adviser who is available to advise us.  We've got all these physicians writing opinions.  So I feel that we are well-staffed, and I feel comfortable making decisions in accordance – and I know that the lawyers are watching over us and making sure we're in accordance with ERISA and Department of Labor.  So I don't know how to compare it to what a judge -- but I do have fiduciary duties, and I think I complied with them.

….

Q.      [By Mr. Dennie]  As a board member hearing reclassification decisions, you are the person, including your colleagues, making the final determination on a reclassification case, correct?

A.      Subject to the right to go to court, yes.

Q.      Right.  From the administrative side.

A.      Right.  Yes.

App. 585 at 278:7-279:17.

As reflected in the above testimony, the Board consults advisers.  No one denies that practice.  The Plan, however, allows the Board to secure advice from advisers.  *See* PD § 8.2(f) [AR-049] (allowing the Board "to secure specialized advice or assistance, as it deems necessary or desirable in connection with the administration of the Plan").  ERISA also contemplates that fiduciaries will consult advisers.  *See, e.g.*, *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993) ("Professional service providers such as actuaries become liable for damages when they cross the line from ***advisor*** to fiduciary.") (emphasis added); *see also DuMond v. Centex Corp.*, 172 F.3d 618, 623 (8th Cir. 1999) (holding that claimants was provided "with a full and fair review as required by ERISA and the Plan" where review was conducted, in part, by "internal staff").  But the undisputed testimony in this case makes it equally clear that the Board retains and exercises ultimate, decision-making authority.  Thus, by consulting advisers, the Board does not *ipso facto* transform those advisers into fiduciaries, as the only case cited by Cloud attests.  *See* Cloud Br. at 55 & n.304 (citing *In re Enron Corp. Securities, Derivative & ERISA Litig.*, 284 F.Supp.2d 511, 572 (S.D. Tex. 2003)); *and see In re Enron*, 284 F.Supp.2d at 572 (noting that "***generally a lawyer or accountant providing services to a plan is . . . not a fiduciary***," and that rule is overcome only when the adviser "in effect exercise[s] the discretionary authority or control over the management or administration of an ERISA plan to the point that he has assumed the fiduciary obligations and has transmuted into a fiduciary as defined under ERISA") (emphasis added).

Cloud offers no authority supporting his theory that the advisers offering advice to the Board are the Plan's fiduciaries.  Nor could he.  Three decades ago in *Schloegel v. Boswell*, 994 F.2d 266 (5th Cir. 1993), the Fifth Circuit rejected a similar attempt to transform an adviser into an ERISA fiduciary.  In *Schloegel*, the plaintiff alleged that an adviser, who had a longstanding relationship with the plan and relevant subject-matter expertise, was a fiduciary himself with

"effective control" over the plan's assets because the fiduciaries heard and accepted his advice. 994 F.2d at 271. The court noted that "[m]ere influence over the trustee's … decisions … is not effective control over plan assets," *id*. at 271, and went on to hold as a matter of law that the adviser was not a fiduciary primarily because the evidence established that the named fiduciaries "made the final decision" at issue, and thus they did not cede their authority or control to the adviser. *Id*. at 271-72 ("Boswell made an investment *proposal*, not an investment decision."). This case presents similar facts, and Cloud's argument should fail for similar reasons. Advisers who recommend actions to named fiduciaries are not fiduciaries themselves because they do not have the requisite decision-making authority or control over plan assets. *See also Hatteberg v. Red Adair Co. Emps.' Profit Sharing Plan & its Related Tr.*, 79 F. App'x 709, 716 (5th Cir. 2003) ("Fulbright lawyers gave advice to the plan committee, and doubtless their advice at time caused the committee to act in ways it otherwise would not have. But these activities are consistent with a normal relationship between lawyer and client.… It is unwarranted to infer from the fact that the Fulbright lawyers shaped the committee's view of their legal obligations that they became the *de facto* controllers of the plan assets, and we see no indication that the attorneys formulated any sort of scheme to loot the plan of its assets.").

      **E.**      **"Key Fact #4" – Neither the Board nor Groom Denied Cloud's Claim in Order to Encourage This Litigation.**

In Cloud's fourth "Key Fact" that he claims requires *de novo* review, Cloud purports to incorporate by reference pages 11 to 29 of his Motion to Disqualify the Groom Law Group, *see* Cloud Br. at 55-56 & n. 306 (citing Dkt. No. 56 at 11-29), in which he claimed that "Groom has learned nothing from its conduct in *Keys*, *Dimry I*, *Dimry II*, [and] continue[s] to control the Plan and the outcomes of its claims process for its own financial interests, and exceeds the scope of traditional representation to an extent that it is a *de facto* fiduciary under the Plan." Dkt. No. 56 at

38

28-29.  Cloud, however, ignores that he subsequently conceded that "of course, there w[ere] no . . . findings of wrongdoing" against Groom in *Keys* or *Dimry*, *see* Dkt. 72 at 13, and also ignores that the Court denied his Motion to Disqualify, and in doing so, rejected his conspiracy theory that Groom made the decision in this case.  *See* Dkt. 77 at 1, 3 ("addresses[ing] . . . ECF No. 56" and rejecting Cloud's argument that Groom was a necessary witness for information on the "handling of claims for T&P benefits of Cloud" because that information "can be obtained through the depositions of the members of ***the Board, as they are the ones who decided his appeal and made the determination***") (emphasis added).  *See also supra* at 34-36.[29]

Cloud does not ask this Court to reconsider its earlier decision.  Nor is there any basis to do so.  There is no evidence that Defendant, Groom or anybody else manipulated or otherwise affected the outcome of Cloud's claim in order to require Cloud to file a lawsuit, which Cloud characterizes as "Treat[ing] Litigation as Part of the Claims Process."  *See* Cloud Br. at 55.  Indeed, although the Plan receives "[r]oughly a thousand [claims] a year," App. 212 at 198:11-15, the Plan's decisions have only been challenged in litigation 18 times in the last decade – meaning that the system Cloud claims is designed to cause litigation results in litigation for well under one percent of claims.  Cloud's claim that he cannot know with certainty "if his decision letter reflects the Board's actual decision," Cloud Br. at 56, without suing and obtaining discovery on that issue,

---

[29] This is not the first time Cloud purports to incorporate by reference arguments on which he has already litigated and lost, without acknowledging the Court's prior decisions.  *Compare* Dkt. 94 at 25 (arguing that "Cloud is entitled to a jury trial on his breach of fiduciary duty claims" which is an "issue [that] has already been briefed" and purporting to incorporate by reference his briefing at Dkt. 72) *with* Dkt. 77 at 1-2 (ruling that, after "[h]aving reviewed . . . ECF No. 72" "there is no right to a jury trial in ERISA denial-of-benefits cases") (alteration omitted).  *See also* Dkt. 113 (ruling that, after "[h]aving reviewed . . . ECF No. 94" "the Court has previously ruled on this issue" and reaffirming "that 'there is no right to a jury trial in ERISA cases'").

is simply a repackaged version of his already rejected conspiracy theory that Groom makes the decisions, even though the testimony unanimously established exactly the opposite.

Finally, Cloud's reliance on *Keys* and *Dimry* in support of his argument that *de novo* review should apply is particularly misplaced given that the courts in those cases all applied the abuse of discretion standard of review.  *See Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 855 F. App'x 332, 333 (9th Cir. 2021) ("[r]eviewing for abuse of discretion the Plan's denial of benefits"); *Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 16-CV-01413-JD, 2018 WL 1258147, at *3 (N.D. Cal. Mar. 12, 2018) ("the Board's decision to deny benefits is reviewed for abuse of discretion"); *Keys v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 493 F. Supp. 3d 1147, 1168 (M.D. Fla. 2020) ("the abuse of discretion standard applies to the Board's benefits determination"). *See also Giles*, 925 F. Supp. 2d at 714 ("the plan's eligibility determination is subject to review only for abuse of discretion").

### F.    Cloud's Other Scattershot Allegations Do Not Warrant *De Novo* Review.

#### 1.    Defendant Has Not Improperly Withheld Documents.

Cloud claims that "Defendant has **never** complied with the Plan or ERISA in handling Cloud's various requests for information . . . ."  Cloud Br. at 44.  These claims are unsubstantiated or demonstrably inaccurate.

To begin, Cloud alleges:

In 2006, [he] contacted the NFLPA to discuss availability of disability benefits and his medical records, who directed him to Defendant, and Cloud did so but received only partial documentation showing a 10 page "Medical Summary" of orthopedic injuries (without corresponding medical records), no medical records, and no documents of any kind regarding neurological injuries (including concussions) – including the 2004 Collision.  The original version (secured over a decade later in this proceeding) contains 11 pages.  The missing page covers most of Cloud's career in 2004, including the 2004 Collision and after effects.

40

Cloud Br. at 10.  As support for this claim, Cloud cites his deposition testimony.  Meanwhile, there is no evidence to support Cloud's allegation that he contacted the NFLPBO in 2006.  The NFLPBO never prepared or provided to Cloud the 10-page "medical summary."[30]  In fact, Cloud provided the "Medical Summary" to the NFLPBO with his 2009 application for LOD benefits.  *See generally* Medical Summary, App. 3087-97.  *See also* App. 406 at 278:13-22 ("Q. Who prepared this document? . . . A. It seems to have come from his application . . . If it came with Mr. Michael Cloud's application, I would assume Mr. Michael Cloud or some associate of his.").  The copy that he provided then was <u>not</u> missing any pages.[31]  *See* Medical Summary at 9, App. 3095 (the "missing page" covering Cloud's 2004 career, including the October 31, 2004 concussion).  According to NFLPBO records, Cloud first contacted the NFLPBO in August 2008 to request a disability application.  8/28/08 Contact History, App. 3784.  The NFLPBO provided the application the same day.  8/28/08 Ltr. fr. P. Scott, App. 3098.

Cloud alleges he "continued his frustrated efforts to obtain his records and the NFLPA and PBO referred him to each other for his records."  Cloud Br. at 10.  Once again, Cloud cites his own deposition testimony to support this claim.  There is no evidence to support Cloud's allegation that he continued efforts to obtain records of any kind from the NFLPBO, or that the NFLPBO failed

---

[30] The NFLPBO did not have Cloud's medical records, and so it would have been impossible for the NFLPBO to prepare that summary.  *See* Dkt. 162 at 4 n.9 ("Early in this case, Cloud alleged that Defendant had access to an electronic repository ("EMR") of medical records maintained by the NFL teams, but that is not true.  The NFLPBO does <u>not</u> have, or seek independent access to, a Player's medical records, including any records maintained by NFL teams."); *id.* at 2 n.7 ("The NFL told Cloud . . . that the EMR does not contain Cloud's records because Cloud left the NFL years before it was developed.").

[31] The copy of the "Medical Summary" that Cloud submitted with his 2014 application for T&P benefits does appear to be missing one page, but the omission was Cloud's, and it is irrelevant to the outcome of his 2014 T&P application and his 2016 request for reclassification.

to respond to or comply with his requests.  Similarly, there is no evidence in the documents produced by the NFLPA that he ever contacted them to request records.

Cloud states that "[i]n 2007, [he] fell behind on his Rhode Island home mortgage payments and both he and his lender sought information from Defendant to explore available benefits, access 401(k), and facilitate loan modification, but Defendant remained nonresponsive." Cloud Br. at 10. As support, Cloud cites his deposition.  There is no evidence showing that Cloud contacted the NFLPBO in 2007 to "explore available benefits" or for any other reason.  Cloud was not receiving disability or retirement benefits in 2007, so Defendant would have had little information to provide, and no reason to provide it to Cloud's "lender" without Cloud's express, written authorization (which does not exist).

Cloud claims that at some point in 2007 or 2008 he "spoke with the PBO ([Sarah] Gaunt and Paul Scott ('Scott')) who again advised him he did not qualify for T&P Benefits and to apply for LOD Benefits and worker's compensation." Cloud Br. at 11 (emphasis omitted).  As support, Cloud points to his deposition testimony.  Yet again, nothing corroborates Cloud's claim that he contacted Paul Scott or Sarah Gaunt, or that they advised him in any way regarding Plan benefits or workers' compensation benefits, for that matter.  It is also not accurate that "[a]t least one Board member is aware of the PBO's alleged practice of steering former players to apply for LOD Benefits rather than T&P Benefits."[32]  *See* Cloud Br. at 11 & n.69.

---

[32] *See* App. 706 at 179:5-19 ("Q. So it wouldn't be out of the question, if Mr. Cloud had called the plan office and said, These are the symptoms I'm experiencing.  What do I get to do?  And someone at the plan office doesn't provide him a T&P application. . . . A. It . . . was my understanding . . . that there was a checklist that the player or player representative would select, that they could choose from multiple benefits in that line of disability, and total and permanent were on the same form . . . .").  *See also* App. at 3080 (Cloud's application in which he checked the box for "Only line-of-duty ("LOD") benefits" and did not check the box for "Both LOD and T&P benefits").

Cloud alleges that Defendant "withheld the original [Mandelbaum report] from [him]." Cloud Br. at 12. Defendant did not withhold anything. Dr. Mandelbaum is a Plan Neutral orthopedist who evaluated Cloud in connection with his 2009 LOD application. Cloud requested some records surrounding that 2009 LOD application, but he never asked Defendant to provide a copy of Dr. Mandelbaum's report. *See* 4/15/10 E-mail fr. M. Cloud, App. 3791(requesting "a copy of [his] recent Medical Evaluation" with Dr. Canizares and Dr. DiDio); 5/28/10 Memo. fr. P. Scott, App. 2971 (providing Cloud copies of the requested reports from Drs. Canizares and DiDio). When he requested portions of his file in December 2018, Defendant produced the Mandelbaum report along with everything else. *See* Cloud Br. at 36-37 (acknowledging that Defendant produced a copy of the Mandelbaum report in December 2018); 12/26/18 E-mail fr. S. Stefanski App. 2563-2764 (forwarding Cloud copies of medical records submitted by him or on his behalf, pursuant to his request for same); 1/18/19 E-mail fr. H. Coffman, App. 2491-3351 (producing Cloud's complete disability file as then maintained by the NFLPBO, pursuant to Cloud's request).

Finally, Cloud's assertion that "the PBO . . . request[ed]" Mandelbaum to "change" his report and that "Defendant has admitted the PBO participates in decisions this way," Cloud Br. at 12, is misleading. The PBO did not ask Mandelbaum to change his diagnoses of Cloud, it simply noted that his diagnoses correlated to different numbers in the American Medical Association ("AMA") guidelines the Plan was required to follow. *See* App. 3050-51, 3060-61. Not only does Cloud's assertion fail to show any nefarious conduct by the PBO, but the fact that the PBO was checking to ensure that Neutral Physicians were correctly and consistently applying the AMA guidelines further undermines his claim that the Plan failed to "ensure and verify . . . that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants." Cloud Br. at 44. *See also* App. 547 at 129:18-25 ("From time to time, particularly, I

43

know, within line-of-duty cases, we had issues on how some neutral physicians were interpreting AMA guidelines that were applicable in line-of-duty cases, and we would – and we would get varying interpretations of it that we tried to make more consistent.  And if there was an obvious mistake, we would point it out.").

    2.    <u>Defendant Substantially Complied With ERISA's Procedural Regulations.</u>

The Court has already ruled that any alleged procedural violations will be assessed under ERISA's "substantial compliance" standard.  Dkt. 71 at 7 ("[I]n accordance with *Crosby*, the Court must monitor discovery closely and will therefore analyze whether discovery sought on each alleged procedural violation would be relevant to the Court's ultimate determination on substantial compliance.").  Cloud does not acknowledge this standard or the Court's prior ruling in his 63-page brief and he has not shown, and cannot show that the Plan failed to substantially comply with ERISA's Claims Procedure.

Cloud claims that the Committee's 2014 and 2016 decision letters "fail[] to explain the basis for the Committee's decision or provide a description of information needed (and why) to perfect the claim for T&P Benefits (Active Football)."  Cloud Br. at 17-18; *see also id*. at 23.  But both decision letters explain that "[t]he Committee determined that you did not become totally and permanently disabled within any possible "shortly after" period," quoted the definition of "Shortly After," advised Cloud of his right to an appeal and to "submit written comments, documents and any other information that you believe shows you qualify for these benefits," and that it Cloud had "any questions, please contact the Plan Office."  AR-283-85; *see also id*. at AR-480-82.  The 2016 letter further explained that Cloud had not included "additional evidence of changed circumstances" and that the "onset date for your Social Security Disability benefits was determined to be December 31, 2008, which is also well after the 'shortly after' period."  AR-481.

Cloud did not cite a single case suggesting that these explanations were inadequate.  To the contrary, they "ensur[ed] that [Cloud] ha[d] the ability to 'understand' and 'challenge' and administrator's decision,"*Morningred v. Delta Family-Care & Survivorship Plan*, 526 F. App'x 217, 220 (3d Cir. 2013), as evidenced by the fact that he submitted a three-page single-spaced appeal letter which attempted to address both the "shortly after" and "changed circumstances" requirements.  *See* AR-490-92.  *See also Wesson v. Jane Phillips Med. Ctr. & Affiliates Emp. Grp. Healthcare Plan, Premium Plan*, 870 F. Supp. 2d 1263, 1269-70 (N.D. Okla. 2012) ("Plaintiff's argument is undercut by the information presented in her initial appeal letter" which "demonstrates that Plaintiff understood that the claims were denied under the Plan's limitation of benefits for procedures related to morbid obesity treatment, and Plaintiff was able to perfect an appeal of that decision. As a result, the Court that BMI was substantially compliant with ERISA procedures with regard to the initial denial notices.").  Finally, Cloud "has failed to demonstrate . . . prejudice" by "present[ing] any evidence that implies that a different outcome would have resulted" if additional information had been included in the Committee's letters.  *See Terry v. Bayer Corp.*, 145 F.3d 28, 39 (1st Cir. 1998).[33]

Cloud's claim that the Committee's 2016 decision letter "cites Section 13.3 of the Plan – which does not exist," Cloud Br. 35-36, is nothing more than a typo in the appendix to that letter, as Defendant has already pointed out.  *Compare* AR-523 (referring to the "Receipt of Documents"

---

[33] *Terry* also explains that the Claims Procedure does not require "an administrator . . . to inform [claimant] of 'what additional information [he] should include *in order to win* his appeal.'"  *Id. See also Walsh v. Empire Blue Cross/Blue Shield, Inc.*, No. 16-CV-3746-DRH, 2018 WL 2324066, at *8 (E.D.N.Y. May 22, 2018) ("Given the nature of the denial, there was no further information that was *needed* from Plaintiff.").  Cloud's similar complaints about the Board's decision letter are similarly without merit, *see* Cloud Br. at 35, and he has clearly suffered no prejudice in his ability to file an appeal, particularly given that he has been permitted to file an Amended Complaint and received extensive discovery in this case.  *See* Cloud Br. at 35.

provision as "Section 13.3 of the Plan") *with* AR-064 (listing the "Receipt of Documents" provision as Section 12.8 of the Plan). *See also* Dkt. 98 at 8 (providing this same explanation of the typo). Cloud does not identify any prejudice as a result of this typo.

Finally, both parties have mentioned the possibility of seeking fees incurred on this case, so there is no basis for Cloud to suggest it is inappropriate for Defendant to reserve this possibility. What is inappropriate is Cloud's misuse in his dispositive motion of concepts and particulars of fee shifting raised only in the court-ordered mediation in violation of the Federal Rule of Evidence 408. *See* Cloud Br. at 43-44 (concluding the introductory paragraph to his argument about why *de novo* review should apply by complaining that Defendant has "given so much effort [to] dragging him through litigation while threatening to seek sanctions to recover in excess of $1 million in attorney's fees"); Fed. R. Evid. 408(a) (prohibiting the use as evidence "statement[s] made during compromise negotiations" "to provide or disprove the validity or amount of a disputed claim"). In any event, Cloud's umbrage at Defendant's supposed position on its fees is another red herring having nothing to do with the applicable standard of review or the merits of Cloud's claims, which is all that is presently before the Court.

III.   **There Is No Basis To Remand The Matter to the Board or for a Trial.**

Defendant agrees with Cloud that remand is not necessary in this case and that the Court should issue a decision as to whether the Board erred in determining Cloud's eligibility for benefits. *See* Cloud Br. at 41. The material facts in this case are narrow and clear, and the Board's decision must be affirmed regardless of whether the Court applies a *de novo* standard of review or an abuse of discretion standard of review.

Given that there "is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), summary judgment under Rule 56 is appropriate. While Cloud notes that some authority supports

the use of a trial on the papers under Rule 52 as an alternative to summary judgment, *see* Cloud Br. at 38-39, Cloud has not identified any material factual disputes he believes require the use of a trial on the papers.  To the extent the Court believes there are any issues that may require the use of Rule 52, Defendant will be prepared to discuss those issues and the scope of any such proceeding during the pretrial conferences scheduled for April 11 and April 15, 2022.

<u>**CONCLUSION**</u>

The Court should deny Plaintiff's Motion for Judgment on the Administrative Record and affirm the Board's decision for the reasons set forth herein and in Defendant's Motion for Summary Judgment, Dkt. 161.

Dated:  March 21, 2022

Respectfully submitted,

GROOM LAW GROUP, CHARTERED

By: _____

Michael L. Junk, *pro hac vice*
Edward J. Meehan, *pro hac vice*
  1701 Pennsylvania Avenue NW
  Washington, DC 20006
  P: (202) 857-0620
  F: (202) 659-4503
  mjunk@groom.com
  emeehan@groom.com

MUNSCH HARDT KOPF & HARR, P.C.

Toni Anderson
Texas Bar No. 24105432
Nolan C. Knight
Texas Bar No. 24027125
  500 N. Akard Street, Suite 3800
  Dallas, TX 75201
  P: (214) 855-7500
  F: (214) 855-7584
  tanderson@munsch.com
  nknight@munsch.com

D. Mitchell McFarland
Texas Bar No. 13597700
  700 Milam Street, Suite 2700
  Houston, TX 77002
  P: (713) 222-1470
  F: (713) 222-1475
  mmcfarland@munsch.com

COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I certify that on March 21, 2022, the foregoing DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND OTHER EVIDENCE OF PLAN INTERPRETATIONS AND VIOLATIONS OF ERISA (PURSUANT TO FRCP 52(a)) OR, ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT was filed with the Clerk of Court via CM/ECF, which will automatically deliver notice of the filing to all counsel of record. I further certify that an unredacted copy of this brief was emailed to all counsel of record.

Michael L. Junk, *pro hac vice*