# United States District Court

### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| MICHAEL CLOUD | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:20-CV-1277-S |
| | § | |
| THE BERT BELL/PETE ROZELLE NFL | § | |
| PLAYER RETIREMENT PLAN | § | |

## MEMORANDUM OPINION AND ORDER

The curtain has been pulled back as to the inner workings of Defendant The Bert Bell/Pete Rozelle NFL Player Retirement Plan. And what lies behind it is far from pretty with respect to how it handles disability benefit claims sought by former players, such as Michael Cloud.

Plaintiff Michael Cloud played in the National Football League as a running back from 1999 to 2006. As is common among former NFL players who played in the era before league-wide concussion protocols were in place, Plaintiff sustained severe head trauma during his seven-year career. As a result, prior to retiring, he experienced debilitating neurological and cognitive impairments, including various psychiatric and psychological disabilities, which have become progressively worse since his retirement. Plaintiff undoubtedly suffered from these disabilities due to injuries sustained while playing in the NFL and is undoubtedly entitled to certain disability benefits. However, like many other former players suffering from the effects of head trauma, Plaintiff was forced to navigate a byzantine process in order to attempt to obtain those benefits, only to be met with denial. What has become clear over the course of this litigation is that Plaintiff's claim for disability benefits was wrongfully and arbitrarily denied in a process that lacked the procedural safeguards both promised by the benefits plan and required by law.

The present case involves disability benefits sought by Plaintiff Michael Cloud from Defendant The Bert Bell/Pete Rozelle NFL Player Retirement Plan, an employee benefit plan governed by the Employee Retirement Income Security Act of 1974 ("**ERISA**"). Plaintiff is currently receiving "Inactive A" total and permanent disability benefits under the Plan but asserts that he should be reclassified to the "Active Football" total and permanent disability benefits category, which is the highest available form of disability benefits under the Plan. Specifically at issue is the decision of the Plan's Retirement Board to deny Plaintiff's 2016 request for reclassification to Active Football benefits. Plaintiff seeks to recover payment of Active Football benefits under ERISA, asserting claims for (1) wrongful denial of benefits under 29 U.S.C. § 1132(a)(1)(B) and (a)(3); and (2) failure to provide a "full and fair review" under 29 U.S.C. § 1133(2).

The Court conducted a multi-day bench trial beginning on May 18, 2022. Upon its conclusion on May 26, 2022, and after consideration of the administrative record and all proper evidence admitted during trial,[1] the Court issued its oral pronouncement in favor of Plaintiff and against Defendant on both counts, indicating that written findings of fact and conclusions of law would be issued at a later date. The Court now makes its findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a)(1).[2]

Pursuant to the standard in this Circuit, the Court neither articulates its findings and conclusions in "punctilious detail," nor "slavish[ly] trac[es] . . . the claims issue by issue and

---

[1] To the extent that the Court has relied on evidence outside the administrative record, the Court has only considered such evidence if it (1) relates to how the Retirement Board has interpreted the Plan in the past, (2) would assist the Court in understanding medical terms and procedures, (3) relates to the completeness of the administrative record, or (4) relates to whether the Retirement Board complied with ERISA procedural regulations. *See Crosby v. La. Health Serv. & Indem. Co.*, 647 F.3d 258, 263 (5th Cir. 2011); *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 299-300 (5th Cir. 1999) (en banc), *overruled on other grounds by Metro. Life Ins. Co. v. Glenn*, 544 U.S. 105 (2008).

[2] The Court has subject matter jurisdiction over this action brought under ERISA pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1). And venue is proper in this District pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) and (c).

witness by witness." *Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (quoting *Burma Navigation Corp. v. Reliant Seahorse M/V*, 99 F.3d 652, 656 (5th Cir. 1996)). Rather, the Court will set forth no more detail than is necessary to provide "a clear understanding of the basis for [the Court's] decision." *Id.* (citing *Burma Navigation*, 99 F.3d at 656). The facts contained herein are either undisputed or are facts the Court finds after weighing all of the relevant evidence and determining the credibility of each witness. *See Turner v. Young*, 753 F. App'x 267, 270 (5th Cir. 2018). To the extent the parties raised evidentiary objections during trial, the objection is overruled if the Court has included and relied upon such evidence; if the Court does not rely upon such evidence, the Court has determined that the evidence is unnecessary for its findings and conclusions. *See Reed v. LKQ Corp.*, Civ. A. No. 3:14-cv-4412-L, 2020 WL 487496, at *1 n.2 (N.D. Tex. Jan. 30, 2020).

For the reasons set forth below and as stated in its oral pronouncement, the Court finds that the Retirement Board both failed to provide Plaintiff a full and fair review and abused its discretion when it denied Plaintiff's reclassification appeal. Accordingly, the Court concludes that Plaintiff is entitled to an award of Active Football total and permanent disability benefits.

## I.    FINDINGS OF FACT

### A.    *The Parties*

1.    Plaintiff Michael Cloud ("**Plaintiff**") is a former National Football League ("**NFL**") player and a participant in The Bert Bell/Pete Rozelle NFL Player Retirement Plan, as amended and restated on April 1, 2014. Parties' Stipulated Facts [ECF No. 208] ¶ 1.

2.    Defendant The Bert Bell/Pete Rozelle NFL Player Retirement Plan ("**Defendant**" or "**Plan**") is a Taft-Hartley plan established through collective bargaining between the NFL Management Council and the NFL Players Association. *See* Trial Tr. vol. 2 [ECF No. 240] at 14:6-13, 238:19-25. The Plan provides benefits to eligible former NFL players, including various

3

types of total and permanent disability (**"T&P"**) benefits.  Admin. Rec. [Pl.'s Ex. 1; Def.'s Ex. 100] at 6.[3]

## B.  *Witnesses*[4]

3.      Hessam "Sam" Vincent (**"Vincent"**) was called as a live witness at trial by Defendant.  Vincent started working at the NFL Players Benefits Office (**"Benefits Office"**) in 2008 as a benefits coordinator. Trial Tr. vol. 2 at 9:25-10:5.  In 2016, he was promoted to disability manager.  *Id.* at 11:8-10.  In 2021, Vincent was promoted to disability relations manager as the Benefits Office's disability group expanded and there was an increase in disability applications. *Id.* at 12:9-17, 13:2-6.

4.      Richard Cass ("**Cass**") was called as a live witness at trial by Defendant.  He testified through both deposition and live testimony.  Cass was appointed to the Retirement Board by the NFL Management Council in 2006 and served until 2017.  Trial Tr. vol. 3 [ECF No. 242] at 41:16-20, 42:2-3, 138:19-22.

5.      Patrick Reynolds (**"Reynolds"**) testified at trial through deposition testimony.  In 2014 and 2016, Reynolds was appointed by the NFL Management Council as a member of the Disability Initial Claims Committee.  Parties' Stipulated Facts ¶ 24.

6.      Christophine Smith (**"Chris Smith"**) testified at trial through deposition testimony. In 2014 and 2016, Chris Smith was the member of the Disability Initial Claims Committee appointed by the NFL Players Association. *Id.* ¶ 25.

7.      Robert S. Smith (**"Robert Smith"**) was called as a live witness at trial by Defendant.  Robert Smith was appointed to the Retirement Board by the NFL Players Association

---

[3] The administrative record in this case is 529 pages.  *See id.*
[4] To the extent that the Court has relied on any testimony, the Court finds the witness to be credible as to that testimony, unless stated otherwise.

in 2010 and has served as a Retirement Board member since that time.  Trial Tr. vol. 5 [ECF No. 246] at 22:9-11, 66:1-9.

8.      Dr. Joseph C. Wu, M.D., ("**Dr. Wu**") testified at trial through deposition.  Dr. Wu is a Professor Emeritus in the Department of Psychiatry and Human Behavior at the University of California College of Medicine, at Irvine, and is a board-certified psychiatrist.  *See* Pl.'s Ex. 3-4, at CLOUD_003992.

9.      Although Plaintiff and his ex-wife Jennifer Cloud also testified at trial through their respective depositions, the Court is not relying on any of their testimony in support of its conclusions of law.

### C.      *Plaintiff's Football Career and Injuries*

10.     Plaintiff was signed as a player to the NFL by the Kansas City Chiefs ("**Chiefs**") in 1999 and suffered several concussions during his tenure with the Chiefs.  *See, e.g.*, Admin. Rec. 119, 276.

11.     On June 23, 2003, Plaintiff was signed as a player by the New England Patriots ("**Patriots**") as a free agent.  *See, e.g.*, *id.* at 276.  Plaintiff sustained a leg injury soon after, and ultimately underwent orthopedic surgery.  *See* July 30, 2003, Operative Report ("**Zarins Report**") [Admin. Rec. 247].  On September 3, 2004, Plaintiff's contract with the Patriots was terminated. *Id.* at 275.

12.     On September 7, 2004, Plaintiff signed with the New York Giants ("**Giants**") as a free agent.  *Id.*  During a game on October 31, 2004, Plaintiff suffered a helmet-to-helmet collision. *Id.* at 513.  Following that play, Plaintiff was able to walk from the field with assistance, but did not recall doing so, and was sidelined for the remainder of the game.  *Id.*  Plaintiff was also unable to recall how he returned to his home in New York following the game.  *Id.*

13.     It is uncontroverted that the October 2004 helmet-to-helmet collision resulted in a concussion. *See id.* at 111, 114, 119, 178, 392, 513, 515.   Both parties, through counsel, have referred to this October 2004 concussion as the "triggering event."

14.     A mild traumatic brain injury ("**MTBI**") evaluation conducted by the NFL on October 31, 2004, revealed Plaintiff's symptoms to include headaches, dizziness, vertigo, and altered attention span. *Id.* at 392.  A November 1, 2004, follow-up MTBI evaluation report cleared Plaintiff to return to full participation on November 3, 2004, with a "lost time from participation" of two days. *Id.*

15.     While the follow-up MTBI evaluation indicated that a neuropsychiatric examination was to occur on November 2, 2004, "48 hrs post-injury," *id.*, there is no evidence that a neuropsychiatric examination ever occurred.

16.     Further, during this era of NFL football, the league-wide "concussion protocol was not in place."  Cass Depo. Tr. [Pl.'s Ex. 2-4] at 134:6-7.

17.     Plaintiff's contract with the Giants expired on March 1, 2005.  Admin. Rec. 275. Plaintiff re-signed with the Giants on March 15, 2005, as a free agent, but was terminated on September 3, 2005, approximately 10 months after his October 31, 2004, helmet-to-helmet collision. *Id.*

18.     Plaintiff re-signed with the Patriots on November 4, 2005, but was terminated less than two months later on December 14, 2005. *Id.*

19.     Finally, Plaintiff re-signed with the Giants on December 27, 2005. *Id.*  His contract expired on March 10, 2006, and he was asked to not re-sign. *Id.*  The 2005-06 season was his last season in the NFL.

20.     Plaintiff has seven credited seasons with the NFL (1999-2005). *Id.* at 94.

### D.    *Relevant Plan Terms*

21.    Initial claims for disability benefits are decided by the Disability Initial Claims Committee ("**Committee**").  Admin. Rec. 51, § 8.5.  The Committee consists of three members: one member appointed by the NFL Players Association, one member appointed by the NFL Management Council, and the Plan's Medical Director (or another medical professional jointly designated by the NFL Players Association and NFL Management Council).  *Id.* at 50, § 8.4(a).

22.    The Retirement Board ("**Board**") is the appellate body of the Plan and decides players' appeals of the Committee's decisions.  *Id.* at 49, § 8.2(c).  The Board consists of six voting members: three members appointed by the NFL Players Association, and three members appointed by the NFL Management Council.  *Id.* at 48, § 8.1.

23.    The Board is the "plan administrator" within the meaning of ERISA.  *See id.* at 7, § 1.3.  As the "named fiduciary" of the Plan, the Board is responsible for implementing and administering the Plan.  *Id.* at 48, § 8.2.  Thus, the Board has "full and absolute discretion, authority and power to interpret, control, implement, and manage" the Plan, including to "[d]efine the terms of the Plan," "construe the Plan," and "[d]ecide claims for benefits."  *Id.*

24.    The Plan mandates that both the Committee and Board are to discharge their duties "solely and exclusively in the interest of the Players and their beneficiaries" with "care, skill, prudence, and diligence."  *Id.* at 52, § 8.8.

25.    In exercising their discretionary powers under the Plan, the Committee and Board are afforded "the broadest discretion permissible under ERISA and any other applicable laws."  *Id.* at 52, § 8.9.  In deciding claims for benefits, the Committee and Board are both required to "consider all information in the Player's administrative record, and shall have full and absolute discretion to determine the relative weight to give such information."  *Id.*

26.     The Board's authority includes the power to "delegate its power and duties to other persons and appoint and assign authority to other persons (including, but not limited to accountants, investment managers, counsel, actuaries, recordkeepers, appraisers, consultants, professional plan administrators, physicians, and other specialists)." *Id.* at 49, § 8.2(f).  The Board is "entitled to rely conclusively upon" and is "fully protected in acting in or declining to act in good faith reliance upon, the advice or opinion of such persons, provided that such persons are prudently chosen and retained" by the Board.  *Id.*  While the Plan does not specifically define this category of delegees, the term "**advisors(s)**" as used in these findings of fact and conclusions of law shall refer to a person or persons within the class of individuals described in Section 8.2(f).

27.     The Board's authority also includes the power to "[i]nspect the records of any Employer as reasonably necessary for the Retirement Board to perform its obligations under the Plan." *Id.* at 49, § 8.2(l).

28.     Article 5 of the Plan governs "Total and Permanent Disability Benefits Resulting from Application Received Before January 1, 2015." *Id.* at 30.

29.     Section 5.1 of the Plan states as follows:

**Eligibility.**  An Eligible Player whose application for total and permanent disability ("T&P") benefits is received before January 1, 2015, who is determined by the Retirement Board or the Disability Claims Committee to be totally and permanently disabled in accordance with Section 5.2, and who satisfies other requirements of this Article 5, will receive a monthly T&P benefit from this Plan in the amount described in Section 5.5 for the months described in Section 5.8 and 5.9.

*Id.*

30.     Section 5.2 of the Plan relates to "Determination of Total and Permanent Disability." *Id.*

31.     Section 5.2(a) of the Plan provides the "General Standard" under which a player may qualify for T&P benefits.  A player will be deemed to be totally and permanently disabled

8

under Section 5.2(a) if the Committee or Board finds "(1) that he has become totally disabled to the extent that he is substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit, but expressly excluding any disability suffered while in the military service of any country, and (2) that such condition is permanent." *Id.* "The educational level and prior training of a Player will not be considered in determining whether such Player is 'unable to engage in any occupation or employment for remuneration or profit.'" *Id.* Importantly, a player "will not be considered to be able to engage in any occupation or employment for remuneration or profit within the meaning of this Section 5.2 merely because such person is employed by the League[5] or an Employer,[6] . . . or received up to $30,000 per year in earned income." *Id.* at 30. "A disability will be deemed to be 'permanent' if it has persisted or is expected to persist for at least twelve months from the date of its occurrence, excluding any reasonably possible recovery period." *Id.*

32.  Section 5.2(b) of the Plan states as follows:

Social Security Awards.  An Eligible Player who is not receiving monthly pension benefits under Article 4 or 4A, who has been determined by the Social Security Administration to be eligible for disability benefits under either the Social Security disability insurance program or Supplemental Security Income program, and who is still receiving such benefits at the time he applies, will be deemed to be totally and permanently disabled, unless four voting members of the Retirement Board determine that such Player is receiving such benefits fraudulently and is not totally and permanently disabled.  If his Social Security disability benefits cease, a Player will no longer be deemed to be totally and permanently disabled by reason of this Section 5.2(b).

An Eligible Player who elects to begin receiving pension benefits under Article 4 or 4A prior to his Normal Retirement Date, who is subsequently determined by the Social Security Administration to be eligible for disability benefits under either the Social Security disability insurance program or Supplemental Security Income program, who satisfies the other conditions of this paragraph, and who is still receiving such benefits at the time he applies, will be deemed to be totally and permanently disabled, unless four voting members of the Retirement Board

---

[5] "'League' means the National Football League." *Id.* at 10, § 1.19.
[6] "Employer" is defined in the Plan as "a member club of the League" (i.e., an NFL team). *Id.* at 9, § 1.15.

determine that such Player is receiving such benefits fraudulently and is not totally and permanently disabled.  To be eligible for benefits under this paragraph, the Player must apply for such Social Security disability benefits prior to his Normal Retirement Date, and the determination of disability by the Social Security Administration must occur prior to the Player's Normal Retirement Date. A finding by the Social Security Administration after a Player's Normal Retirement Date that such Player was disabled as of a date prior to his Normal Retirement Date does not qualify such Player for T&P benefits under this paragraph.  If his Social Security disability benefits cease, a Player will no longer be deemed to be totally and permanently disabled by reason of this Section 5.2(b).  However, if such a Player establishes that the sole reason for the loss of his Social Security disability or Supplemental Security Income benefits was his receipt of benefits under this Plan, T&P benefits will continue provided the Player satisfies the General Standard for continuation of Benefits in Section 5.6(a).

*Id.* at 30-31.

33.     Section 5.2(c) of the Plan states, in part, the following:

Medical Evaluations.  Whenever the Retirement Board or the Disability Initial Claims Committee reviews the application or appeal of any Player for T&P benefits under either subsection (a) or subsection (b) above, such Player may first be required to submit to an examination by a neutral physician or physicians, or institution or institutions, or other medical professional or professionals, selected by the Retirement Board or the Disability Initial Claims Committee, and may be required to submit to such further examinations as, in the opinion of the Retirement Board or the Disability Initial Claims Committee, are necessary to make an adequate determination respecting his physical or mental condition. . . . A Player or his representative may submit to the Plan Office medical records or other materials for consideration by the neutral physician. . . .

*Id.* at 31.

34.     Section 5.2(d) of the Plan states the following:

Requests for Information.  Whenever the Retirement Board or the Disability Initial Claims Committee reviews the application or appeal of any Player for T&P benefits under either subsection (a) or subsection (b) above, such Player may be required to provide additional documents or information that, in the opinion of the Retirement Board or the Disability Initial Claims Committee, are necessary to decide the Player's application or appeal. . . .

*Id.*

35.     Section 5.3 of the Plan defines the various types of T&P benefits offered by the Plan, and other terms used within those definitions.

36.     Section 5.3(a) of the Plan states the following:

Active Football: Subject to the special rules of Section 5.4, Players will qualify for
benefits in this category if the disability(ies) results from League football activities,
arises while the Player is an Active Player, and causes the Player to be totally and
permanently disabled "shortly after" the disability(ies) first arises.[7]

Admin Rec. 32.

37.     Section 5.3(c) of the Plan states the following:

Inactive A.  Subject to the special rules of Section 5.4, a Player will qualify for
benefits in this category if a written application for T&P benefits or similar letter
that began the administrative process that resulted in the award of T&P benefits
was received within fifteen (15) years after the end of the Player's last Credited
Season. This category does not require that the disability arise out of League
football activities.

*Id.*

38.     Section 5.3(e) of the Plan defines "shortly after," as the term is used in Section

5.3(a), and provides that:

A Player who becomes totally and permanently disabled no later than six months
after a disability(ies) first arises will be conclusively deemed to have become totally
and permanently disabled "shortly after" the disability(ies) first arises, as that
phrase is used in subsections (a) and (b) above, and a Player who becomes totally
and permanently disabled more than twelve months after a disability(ies) first arises
will be conclusively deemed not to have become totally and permanently disabled
"shortly after" the disability(ies) first arises, as that phrase is used in subsections
(a) and (b) above.  In cases falling within this six- to twelve-month period, the
Retirement Board or Disability Initial Claims Committee will have the right and
duty to determine whether the "shortly after" standard is satisfied.

*Id.*

39.     "Arising out of League football activities" is defined in Section 5.3(f) as:

[A] disablement arising out of any League pre-season, regular-season, or post-
season game, or any combination thereof, or out of League football activity
supervised by an Employer, including all required or directed activities. "Arising

---

[7] Cass testified that, according to his understanding, Section 5.3(a) is intended only for situations where "there's
immediate hit—there's a hit on the field, and the player either becomes paralyzed right on the field as a result of that
hit or partially paralyzed." Trial Tr. vol. 3 at 109:16-22.  Similarly, Robert Smith testified that he understood Section
5.3(a) to apply to "catastrophic-type injures," such as an injury that "paralyze[s]" someone. Trial Tr. vol. 5 at 42:1-4.

out of League football activities" does not include, without limitation, any disablement resulting from other employment, or athletic activity for recreational purposes, nor does it include a disablement that would not qualify for benefits but for an injury (or injuries) or illness that arises out of other than League football activities.

*Id.*

40.   Section 5.4 of the Plan sets forth various "Special Rules," which apply notwithstanding other Plan provisions.

41.   Section 5.4(a) of the Plan states the following:

Substance Abuse.  Sections 5.3(a), 5.3(b), and 5.3(c) will not apply to a total and permanent disability caused by the use of, addition to, or dependence upon (1) any controlled substance (as defined in 21 U.S.C. sec. 802(6)), unless the requirements of those sections are otherwise met and (i) such use of, addiction to, or dependence upon results from the substantially continuous use of a controlled substance that was prescribed for League football activities or for an injury (or injuries) or illness arising out of League football activities of the applicant while he was an Active Player, and (ii) an application for T&P benefits is received based on such use of, addiction to, or dependence upon a controlled substance no later than eight years after the end of the Player's last Credited Season; (2) alcohol; or (3) illegal drugs. For purposes of this section, the term 'illegal drugs' includes all drugs and substances (other than alcohol and controlled substances, as defined above) used or taken in violation of law or League policy.

*Id.* at 33.

42.   Section 5.4(b) of the Plan states the following:

Psychological/Psychiatric Disorders.  A payment for total and permanent disability as a result of psychological/psychiatric disorder may only be made, and will only be awarded for benefits under the provisions of Section 5.3(b), Section 5.3(c), or Section 5.3(d), except that a total and permanent disability as a result of a psychological/psychiatric disorder for a total and permanent disability are otherwise met and the psychological/psychiatric disorder either (1) is caused by or relates to a head injury (or injuries) sustained by a Player arising out of League football activities (e.g., repetitive concussions); (2) is caused by or relates to the use of a substance prescribed by a licensed physician for an injury (or injuries) or illness sustained by a Player arising out of League football activities; or (3) is caused by an injury (or injuries) or illness that qualified the Player for T&P benefits under Section 5.3(a).[8]

_____

[8] Cass testified that, in his view, Section 5.4(b) does not affect whether a former player requesting reclassification to Active Football has to satisfy the "shortly after" requirement of Section 5.3(a).  Trial Tr. vol. 3 at 105:23-106:10.

Admin. Rec. 33.

43.      Section 5.7(a) of the Plan states, in relevant part, the following:

Initial Classification.   Classification of T&P benefits under Section 5.3 will be determined by the Retirement Board or the Disability Initial Claims Committee in all cases on the facts and circumstances in the administrative record.  For example, determinations by the Social Security Administration as to the timing and causation of total and permanent disability are not binding. . . .

*Id.* at 36.

44.      Section 5.7(b) of the Plan states the following:

Reclassification.   A Player who is awarded T&P benefits will be deemed to continue to be eligible only for the category of benefits for which he first qualifies, unless the Player shows by evidence found by the Retirement Board or the Disability Initial Claims Committee to be clear and convincing that, because of changed circumstances, the Player satisfies the conditions of eligibility for a benefit under a different category of T&P benefits. A Player's T&P benefit will not be reclassified or otherwise increased with respect to any month or other period of time that precedes by more than forty-two months the date the Retirement Board receives a written application or similar letter requesting such reclassification or increase that begins the administrative process that results in the award of the benefit. This forty-two month limitation period will be tolled by any period of time during which such Player is found by the Retirement Board or the Disability Initial Claims Committee to be physically or mentally incapacitated in a manner that substantially interferes with the filing of such claim.

*Id.* at 37.

45.      "Clear and convincing" is not defined in the Plan.

46.      "Changed circumstances" is not defined in the Plan.

47.      Section 12.6 of the Plan provides, in part, the following:

**Claims Procedures.**  Section 12.6(a) applies to claims for disability benefits under Article 5 and 6 of this Plan . . . .

(a) Disability Claims. . . . The Retirement Board or the Disability Initial Claims Committee will notify such claimants when additional information is required. . . .

13

The notice of an adverse determination [by the Disability Initial Claims Committee] will be written in a manner calculated to be understood by the claimant and will set forth the following:

> (1) the specific reason(s) for the adverse determination;
>
> . . .
>
> (3) a description of additional material or information, if any, needed to perfect the claim and the reasons such material or information is necessary;
>
> . . .
>
> (5) any internal rule, guideline, protocol, or other similar criterion relied on in making the determination (or state that such information is available free of charge upon request);

. . .

The claimant will have 180 days from the receipt of an adverse determination to file a written request for review of the initial decision to the Retirement Board.

. . . The Retirement Board's review of the adverse determination will take into account all available information, regardless of whether that information was presented or available to the Disability Initial Claims Committee. The Retirement Board will accord no deference to the determination of the Disability Initial Claims Committee.

If a claim involves a medical judgment question, the health care professional who is consulted on review will not be the individual who was consulted during the initial determination or his subordinate, if applicable.

. . .

The claimant will be notified of the results of the review not later than five days[9] after the determination.

Any notification of an adverse determination on review will:

(1) state the specific reason(s) for the adverse determination;

(2) reference the specific Plan provision(s) on which the adverse determination is based;

---

[9] The Board construed "five days" under Section 12.6 as "five business days." Trial Tr. vol. 3 at 64:19-20, 196:24-25.

(3) state that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claim for benefits;

. . .

(5) disclose any internal rule, guidelines, or protocol relied on in making the determination (or state that such information will be provided free of charge upon request) . . . .

Admin. Rec. at 60-62.

### E.    *The NFL Players Benefits Office*[10]

48.     The Benefits Office is in charge of the day-to-day administration of Plan benefits. Trial Tr. vol. 2 at 13:16-18. Because there are different types of benefits administered under the Plan, including retirement and disability, the Benefits Office has multiple subdivisions responsible for each benefit type. *Id.* at 13:18-21.

49.     All employees at the Benefits Office are employed by Defendant. *Id.* at 14:14-17.

50.     When a player applies for disability benefits, his "case" is assigned to a benefits coordinator in the Benefits Office's disability group. *Id.* at 17:5-7. The benefits coordinator assigned to a player's case is responsible for answering the player's questions regarding disability applications and the process for obtaining benefits. *Id.* at 16:16-17:5.

51.     Benefits coordinators reach out to the Groom Law Group ("**Groom**"), the Plan's lawyers, *see id.* at 40:1-5, when they have questions about anything that "may be confusing with the Plan documents and Plan rules." *Id.* at 21:24-22:1.

52.     Benefits coordinators are not required to have any medical training. *Id.* at 22:8-14.

53.     When a player's case is ready to be presented to the Committee or Board for review, the benefits coordinator assigned to the case uploads the player's records to a website containing

---

[10] The following findings consist of general background information regarding the Benefits Office and its operations during the relevant period.

records related to the player's application. *Id.* at 17:14-20, 31:25-32:9. This website is referred to as the "meetings website." *Id.*

54.     At the Committee level, the meetings website includes the player's application for benefits, all records and documents submitted by the player, an NFL contract record stating the player's contract terms, and a case summary. *Id.* at 32:6-16. The case summary highlights the facts of what is being presented to the Committee or Board. *Id.* at 32:17-23. At the Board level, the meetings website also includes information relating to any other Committee or Board decisions from the past relating to that player. *Id.* at 64:4-12.

55.     After a decision is made by the Committee or Board, the Benefits Office sends a decision letter to the player. *Id.* at 17:22-18:1.

56.     Between 2014 and 2016, an average of over 1,000 former players applied for benefits each year. *Id.* at 37:10-18; Reynolds Depo. Tr. [Pl.'s Ex. 2-2] at 198:11-15.

57.     Approximately 1,000 former players currently receive Inactive A T&P benefits. Cass Depo. Tr. 93:5-11.

58.     Out of the thousands of former players who filed applications for benefits, only 30 players currently receive Active Football T&P benefits. *Id.* at 93:12-15; Trial Tr. vol. 2 at 230:16-19, 241:13-15.

### F.     *Committee Process (2014-2016)*[11]

59.     Players seeking to apply for disability benefits can obtain an application online or by calling the Benefits Office to request an application directly. *Id.* at 26:9-16. Applications requested by phone are sent to the player via FedEx, fax, or email. *Id.*

---

[11] The following findings of fact relate to the Committee's claim determination process and practice generally, including during the period relevant to Plaintiff's 2014 and 2016 applications. The Court finds that the Committee employed the process described herein with respect to its processing of Plaintiff's 2014 and 2016 benefits applications.

60.     Players may submit any additional records with a disability benefits application, which is denoted on the application itself. *Id.* at 27:22-28:16. Players may submit applications and supporting records via FedEx, fax, or email. *Id.* at 29:10-17.

61.     The Benefits Office does not affirmatively seek out records for any player; rather, the player must send records to the Benefits Office for them to be considered with their application. *Id.* at 29:19-20.

62.     Once a player's application and supporting materials are received, the Benefits Office coordinator assigned to the player's case sends a letter notifying the player that his application was received and that the process has begun. *Id.* at 30:6-8.

63.     Prior to presenting an application to the Committee, the Benefits Office coordinator assigned to the case makes an initial determination on whether the player should be referred to a Plan "neutral physician"[12] for a medical evaluation pursuant to Section 5.2(c). Trial Tr. vol. 2 at 30:8-12.

64.     A player will not be referred to a neutral physician if he applies for total and permanent disability benefits and has been awarded disability benefits by the Social Security Administration ("**SSA**"). *Id.* at 30:20-22. In that case, the application would be presented to the Committee "right away" because the Committee may approve the player based solely on the SSA standard of total and permanent disability. *Id.* at 30:23-25; Reynolds Depo. Tr. 231:17-232:1 (testifying that under Section 5.2(b) of the Plan, a player with an SSA disability award "does not need to go through" the neutral physician evaluation process).

65.     Once a player's case is ready for review by the Committee, his records are uploaded to the meetings website. Trial Tr. vol. 2 at 31:22-32:5. The uploaded documents are stamped with

---

[12] "Neutral physicians" are "selected by the Retirement Board or the Disability Initial Claims Committee." Admin. Rec. 31, § 5.2(c).

"e-ballot" denoting the date of the meeting at which the application is being presented. *Id.* at 33:8-18.

66.     Committee members record their decisions on documents called "decision sheets," which are circulated among the Committee and Benefits Office. *Id.* at 35:1-7; Admin. Rec. 280, 476.

67.     Committee decision letters are sent to players via FedEx shipping with a signature required. Trial Tr. vol. 2 at 43:14-18. Letters that are not signed upon delivery are returned to the Benefits Office. *Id.* at 43:21-23. The Benefits Office downloads shipment data for mailed decision letters from the FedEx website and copies this data into a database maintained internally by the Benefits Office. *Id.* at 44:2-12.

68.     Committee members do not review the decision letters before they are sent to players. *Id.* at 161:5-7; Chris Smith Depo. Tr. [Pl.'s Ex. 2-1] at 199:6-8.

69.     Prior to 2016, decision letters were prepared for the Committee by the Benefits Office coordinator assigned to a given case. Trial Tr. vol. 2 at 38:13-17. The Benefits Office coordinators prepared these decision letters using templates or prior draft letters. *Id.* at 42:7-13.

70.     In 2016, Groom began preparing the decision letters for the Committee. As Vincent testified, this was as a result of an increasing number of applications and an overworked Benefits Office, and Groom assisted the Benefits Office due to the lack of manpower and increasingly complicated decision letters. *Id.* at 38:24-40:18.

### G.     *Board Process (2016)*[13]

71.     In 2016, the members of the Board appointed by the NFL Management Council were Cass, Katie Blackburn, and Ted Phillips. Parties' Stipulated Facts ¶ 20.

---

[13] The following findings of fact relate to the Board's review process and practice generally, including during the period relevant to Plaintiff's 2016 reclassification appeal, and are based on the administrative record, undisputed facts,

72.     In 2016, the members of the Board appointed by the NFL Players Association were Robert Smith, Sam McCullum, and Jeff Van Note.  *Id.* ¶ 21.

73.     In 2016, Bethany Marshall ("**Marshall**") and Chris Smith acted as advisors to the NFL Players Association Board members, and Belinda Lerner ("**Lerner**") acted as an advisor to the NFL Management Council Board members.  Trial Tr. vol. 2 at 63:18-23; Robert Smith Depo. Tr. [Pl.'s Ex. 2-5] 191:6-8; Trial Tr. vol. 5 at 32:11-14.

74.     A player may appeal a Committee decision by submitting a written request to the Board stating his desire to appeal.  Admin. Rec. 489; *see also* Trial Tr. vol. 2 at 54:14-17.  There is no form.  *Id.* at 54:17.

75.     A player may submit any documents with his appeal that he wishes to be presented to the Board.  *Id.* at 54:20-23.

76.     Similar to the process followed at the Committee level, documents relevant to a player's appeal, including a case summary prepared by Groom, are uploaded to the meetings website for the Board to review.  *Id.* at 55:3-10, 60:22-61:4.  Members of the Board and its advisors have access to the meetings website, which contains information regarding a player's history.  *Id.* at 63:15-17, 64:4-12.

77.     While advisors are typically made aware of the cases set to be reviewed by the Board in advance of the quarterly meeting, Board members are not aware of such cases until they get to the Board meeting.  Robert Smith Depo. Tr. 186:18-23.

78.     The Board delegates to the advisors the responsibility to review the facts of the case, the medical records, and the specifics relating to dates.  *Id.* at 85:16-24; Trial Tr. vol. 3 at 177:4-8; *id.* at 171:5-7 ("[Section 8.9] doesn't indicate that I personally need to do it to perform

---

and Board member testimony.  The Court finds that the Board employed the process described herein with respect to its review of Plaintiff's 2016 appeal.

and satisfy this obligation.  I can rely on others to do it, as we all had to do as a practical matter, and we did."); Robert Smith Depo. Tr. 242:7-9.

79.     Board advisors are responsible for reviewing the player's administrative record and identifying potential issues to the Board.  Trial Tr. vol. 3 at 103:10-12.

80.     Board members do not review *all* of the documents in the administrative record. *See id.* at 170:6-10 (Cass testifying that it was not his practice to read a player's entire file; *id.* at 172:5-6 ("[W]e're entitled to delegate the responsibility to look at the records."); *id.* at 103:13-14 ("I couldn't read 500 pages of documents.  It wasn't practical.  And not necessary."); Trial Tr. vol. 5 at 101:22-23 (Robert Smith testifying that it was not his practice to review all documents in an application); *id.* at 102:5-6 ("It's not that we don't review them; it's that we don't review all of them.").

81.     A player's appeal file may include hundreds or thousands of pages of documents and medical records.  Trial Tr. vol. 3 at 169:17-21; Trial Tr. vol. 5 at 101:19-21; *see also* Pl.'s Ex. 2-11, CLOUD-LTRS-0000058-65 (Board decision letter for different player from same November 2016 Board meeting indicating that this player's record "encompassed more than 1500 pages of material"); Pl.'s Ex. 17 at 3 (letter from Groom to Department of Labor dated January 19, 2016, and titled "Claims Procedure Regulation Amendment for Plans Providing Disability Benefits," stating that "[i]t is typical for a claimant to submit hundreds or thousands of pages of documents, including their entire college and NFL medical records").

82.     While the Board relies on its advisors to review all of the player's file, advisors have not been specifically directed to review all medical records submitted with player applications.  *See* Trial Tr. vol. 3 at 176:6-16; *id.* at 198:19-21 (Cass testifying that the Board has no written procedures that explain the delegation of duties); Robert Smith Depo. Tr. 172:10-14

(testifying that "there's never been a formal process"); Trial Tr. vol. 5 at 29:20-21 (Robert Smith testifying that the "process happens automatically.").

83.     Advisors are not subject to written performance reviews. Trial Tr. vol. 3 at 198:25-199:6.

84.     Under the Plan, the Board submits a player for a medical evaluation by a physician only if the Board determines that the appeal involves a medical issue. *Id.* at 52:14-53:21, 57:10-16. In the context of reclassification, a medical issue is not deemed to be involved where the Board determines there is no new impairment alleged. *Id.* at 58:1-3.

85.     The Board makes its final benefits decisions at quarterly board meetings, which occur over the course of two days. *Id.* at 60:18-23; Trial Tr. vol. 2 at 66:4-8.

86.     On the first day of the board meeting, Board advisors, Groom lawyers, and Benefits Office staff members meet to review all disability cases that have been uploaded to the meetings website. *Id.* at 67:3-8. Board members do not attend these meetings. Trial Tr. vol. 5 at 37:15-21.

87.     On the second day, Board members participate in undocumented, private "pre-meetings" to discuss disability cases to be presented to the Board at the formal meeting later that day. Trial Tr. vol. 2 at 69:17-70:1. Each side—the NFL Players Association and the NFL Management Council—has their own separate pre-meeting. *Id.* at 69:19-21. Advisors, including Groom lawyers, also attend. *Id.* at 69:19-23. Advisors such as Lerner and Marshall present cases to Board members and identify potential areas of disagreement. Trial Tr. vol. 3 at 63:7-10; Cass Depo. Tr. 159:5-8; *see also id.* at 204:25-205:1 ("Belinda Lerner would have led the review on behalf of the Management Council."); Robert Smith Depo. Tr. 90:8-13.

88.     At the November 2016 Board meeting in particular—where the Board decided Plaintiff's appeal—advisors did not provide the Board with any documents relating to their review

21

of player medical records, and Board members did not take notes. *Id.* at 90:3-7; Trial Tr. vol. 3 at 139:9-12.

89.     After the pre-meetings conclude, the Board meets formally.  At the formal Board meeting, there is no open discussion about cases.  Trial Tr. vol. 2 at 131:4-6; *see also* Cass Depo. Tr. 212:21-25 ("[I]t goes very quickly at that point because the people—the respective boards have talked about the cases to the extent that they need to talk about the cases.").  Instead, the Board will deny or approve blocks of 50 or more cases "en masse" based on the reasons discussed in the "caucuses" or pre-meetings. *Id.* at 213:1-2; *see also* Robert Smith Depo. Tr. 106:1-3 ("[I]n general what happens is that cases as a slate are either approved or denied, based on the reasons that the two separate caucuses determine."); Trial Tr. vol. 3 at 159:6-8; Trial Tr. vol. 5 at 77:13 (Robert Smith testifying that cases are voted on in "large blocks").

90.     Decisions of the Board "are so heavily determined by independent physician opinions that there's really very little to talk about."  Cass Depo. Tr. 213:8-10; *see also id.* at 213:10-11 ("You either met the qualifications according to the doctors or you didn't."); *id.* at 213:19-21 ("based totally on the doctor's opinion").  While greater weight is assigned to medical evidence, the Board reviews and considers as evidence statements made by a player.  Robert Smith Depo. Tr. 222:3-14.

91.     After the formal Board meeting, Groom prepares decision letters for the Board. Trial Tr. vol. 2 at 71:13-15; Cass Depo. Tr. 44:8-15.  Terms that are not explicitly defined in the Plan document are defined in the decision letters prepared by Groom. *Id.* at 168:24-169:6; Robert Smith Depo. Tr. 199:19-20.

92.     Board members do not see or review the letters before they are sent to the player. Trial Tr. vol. 3 at 65:9-10; Robert Smith Depo. Tr. 54:17-20; *id.* 227:2-4 ("[T]here wouldn't be

22

any need for a trustee, once they've cast their vote to deny or approve a block of decisions, to have

any further input."); Trial Tr. vol. 5 at 90:22-24.  Rather, an administrative assistant from the

Benefits Office reviews the letter before it is sent to the player.  Trial Tr. vol. 2 at 165:13-18.

93.    Board members are "under a lot of pressure to get the letters out quickly," and the

"system of a template-type decision" was developed "where the lawyers would draft the letter,

send it to the plan office, the plan office would review it and then send it out."  Cass Depo. Tr.

44:8-15; *see also* Trial Tr. vol. 3 at 65:3-4 (Cass testifying that "it's not practical to have circulated

it among all the board members").

### H.    *Plaintiff's 2009 Application for Line-of-Duty Benefits*

94.    Plaintiff first applied for benefits in 2009, seeking "line-of-duty" ("**LOD**")

disability benefits. Pl.'s Ex. 2-8, CLOUD-XFILE-0000775.

95.    On his LOD benefits application, Plaintiff listed his neurological conditions as

vertigo and concussions, along with several orthopedic conditions.  *Id.* at CLOUD-XFILE-

0000775-79.

96.    After applying for LOD benefits, the Plan referred Cloud to two neutral physicians:

an orthopedist, Dr. Bert Mandelbaum ("**Dr. Mandelbaum**"), and a neurologist, Dr. Jonathan

Schleimer ("**Dr. Schleimer**"), who were both located in California.  *Id.* at CLOUD-XFILE-

0000767, 771-73.  The Committee deferred its ruling and tabled Plaintiff's LOD application

pending the neutral physician evaluations. *Id.* at CLOUD-XFILE-0000768.  Plaintiff rescheduled

his appointment with Dr. Schleimer for a date later that month. *Id.* at CLOUD-XFILE-0000767.

97.    Plaintiff was separately evaluated by orthopedist Dr. Michael J. Einbund, who

prepared a medical evaluation addressing Plaintiff's orthopedic injuries.  *See* Qualified Medical

Evaluation ("**Einbund Report**") [Admin. Rec. 147-58].

98.     Plaintiff was then evaluated by Dr. Mandelbaum, who prepared a report indicating that Plaintiff's combined "whole person impairment" ("**WPI**") was 31 percent, with an additional two percent award "for excess pain." *Id*. at CLOUD-XFILE-0000261.

99.     Following receipt of Dr. Mandelbaum's report, on August 21, 2009, the Benefits Office wrote Dr. Mandelbaum requesting that he "review [his] ratings and narrative and submit any changes to the Plan Office by Wednesday[,] August 26, 2009." *Id*. at CLOUD-XFILE-0000755-56. Dr. Mandelbaum then submitted a new report listing Plaintiff's combined WPI at 22 percent, with an additional two percent award "for excess pain." *Id*. at CLOUD-XFILE-0000260.

100.    Plaintiff was not evaluated by Dr. Schleimer, and his case was presented to the Committee without a neurological report. *Id.* at CLOUD-XFILE-0001471.

101.    In a letter dated September 25, 2009, the Committee denied Plaintiff's request for LOD benefits because Dr. Mandelbaum's revised rating of Plaintiff's combined WPI was 24 percent, just under the 25 percent required by the Plan for a player to qualify for LOD benefits. *Id.* at CLOUD-XFILE-0000745-46.

## I.     *2010 Appeal of Committee's Decision*

102.    On February 2, 2010, Plaintiff appealed the Committee's decision denying him LOD benefits. Pl.'s Ex. 2-9, CLOUD_000002.

103.    On March 1, 2010, the Benefits Office advised Plaintiff that it received the appeal, and that Plaintiff would be "contacted shortly to schedule a medical examination with the neutral physician." Pl.'s Ex. 2-8, CLOUD-XFILE-0000700.

104.    On March 10, 2010, Plaintiff was referred by the Benefits Office to see Dr. Adam DiDio ("**Dr. DiDio**"), a Plan neutral neurologist, to evaluate Plaintiff's vertigo and concussions. *Id.* at CLOUD-XFILE-0000698.  Dr. DiDio prepared a written medical evaluation ("**DiDio Report**") reporting that:

24

a.  Plaintiff suffered from impairments including "vertigo, headaches, memory loss, stutter, depression, impaired verbal fluency." Admin. Rec. 180;

b.  Plaintiff "report[ed] at least several concussions during his NFL football career." *Id.* at 375;

c.  "There is clear documentation of a single concussion sustained on October 31, 2004, while playing with the New York Giants." *Id.* at 373;

d.  Plaintiff "suffer[ed] from Benign Paroxysmal Positional Vertigo," with a verbal fluency that was "mildly impaired." *Id.* at 375;

e.  Plaintiff complained of "migrainous headaches, mild memory loss and stuttering, and depressive symptoms." *Id.*;

f.  Plaintiff reported "cognitive difficulties," including forgetting names frequently, "even clients with whom he has worked for a long time." *Id.* at 372;

g.  Plaintiff felt "depressed from time to time" and reported "sleep disturbances," including "severe nightmares which disturbed him." *Id.* at 373.

105.    As a result of these findings, Dr. DiDio opined that Plaintiff's "episodic vertigo is a sequela of his prior traumatic head injuries," and that his cognitive complaints and "objective impairment in verbal fluency" were both "very possibly a result of his past concussions." *Id.* at 376. The DiDio Report further stated that "[t]hese signs and symptoms can be seen as a result of traumatic brain injuries." *Id.*

106.    Dr. DiDio concluded that "[n]europsychological testing is essential for evaluation of any learning disabilities, establishment [of] a cognitive baseline, and determination as to what cognitive impairments are related to traumatic brain injury," and recommended Plaintiff "receive an MRI of the brain with gradient echo imaging to evaluate for any evidence of traumatic brain injury." *Id.*

107.    Regardless of Dr. DiDio's recommendation, an MRI was never performed, and the Plan never referred Plaintiff for neuropsychological testing. *See, e.g.*, Trial Tr. vol. 2 at 182:18-19.

108.   Plaintiff was also evaluated by Plan neutral orthopedist Dr. George Canizares, whose April 13, 2010, report ("**Canizares Report**") indicated that Plaintiff's combined WPI was 23 percent, with an additional two percent award "for excess pain." Pl.'s Ex. 2-8, CLOUD-XFILE-0000272-74. The Canizares Report stated that Plaintiff "had some concussions and a rib injury on the left side and finally retired with New England and played there from 2005 and 2006." Admin. Rec. 170. It also listed Plaintiff's past medical history as including depression, migraine headaches, and insomnia. *Id.* at 171.

109.   On April 20, 2010, a Benefits Office coordinator wrote to the Plan's Medical Director, Dr. Stephen Haas, requesting that Dr. Haas review information from Plaintiff's LOD appeal and "determine, based on the available evidence, which neutral report best reflects [Plaintiff]'s orthopedic conditions." Pl.'s Ex. 2-8, CLOUD-XFILE-0000673.

110.   On May 18, 2010, the Board approved Plaintiff's request for LOD disability benefits. *Id.* at CLOUD-XFILE-0000667.

**J.**   *Plaintiff's Medical Evaluations Following the LOD Benefits Award*

111.   On June 14, 2011, Plaintiff was examined by psychologist Dr. John Patrick Cronin ("**Dr. Cronin**"). Admin. Rec. 119. Dr. Cronin prepared a report, dated August 1, 2011 ("**2011 Cronin Report**"), in which he stated that Plaintiff's "history suggests that he sustained significant concussions over the course of his college and professional football career." *Id.* Plaintiff reported that "he had more serious concussions while playing for Kansas City in 1999, as well as the New England Patriots in 2003 and lastly with the New York Giants in 2004 and 2005." *Id.* Plaintiff indicated that "as a result of these traumatic brain injuries, he began to lose his memory, concentration and suffered from vertigo, as well as tunnel vision and ultimately, due to his inability to recall basic football plays was released from the New York Giants." *Id.* Plaintiff further indicated that "he finds it extremely difficult to focus on [opening a sports training complex]." *Id.*

at 119-20.  Plaintiff also reported that "he has some vestiges of obsessive[-]compulsive disorder that still plague him." *Id.* at 120.

112.    The 2011 Cronin Report notes that Dr. Cronin spoke with Plaintiff's then-fiancée who "described [Plaintiff] in the past as a very warm and loving supportive individual, however, in the last few years, she feels he has changed dramatically and things have gotten much worse in his life." *Id.* at 121.  Jennifer Cloud also noted that Plaintiff "had issues relating to forgetting where their child was in the home," and "issues related to social withdrawal, as well as emotional liability." *Id.*  Jennifer Cloud was "concerned this is getting worse over time." *Id.*

113.    Based on Dr. Cronin's "evaluation, observation and collateral communication thus far, it would seem reasonable to assume [Plaintiff] has sustained at least one, if not several, closed head injuries and is definitely in need of a more thorough work up." *Id.*

114.    On August 2, 2011, Plaintiff was evaluated by orthopedist Dr. Jeffrey A. Berman ("**Dr. Berman**"). *Id.* at 122-45.  Dr. Berman was "asked to limit [his] evaluation to the specific injury to the right foot, which occurred on October 13, 2002." *Id.* at 139.  In his report ("**Berman Report**"), Dr. Berman suggested that Plaintiff "avoid running, jumping, prolonged weight-bearing, and activities that would require repetitive or prolonged climbing and work on uneven terrain." *Id.* at 141.

115.    On February 2, 2012, Dr. Cronin prepared another report ("**2012 Cronin Report**"), in which he "critique[d]" and "g[a]ve [his] opinions regarding the neuropsychological evaluation conducted October 28, 2011 by Dr. Nathan W. Nelson[14]." *Id.* at 513.

116.    During the neuropsychological evaluation, Plaintiff described to Dr. Nelson the October 2004 helmet-to-helmet collision "in which he was struck in the right posterior region."

---

[14] Although Dr. Nathan W. Nelson's ("**Dr. Nelson**") report is not part of the record before the Court, his specific observations and findings were relied on and summarized by Dr. Cronin in the 2012 Cronin Report.

*Id.* According to Dr. Nelson, "[s]ignificant physical and cognitive problems occurred immediately after this collision and [Plaintiff] experienced 'confusion, disorientation and dizziness as a result of the impact.'" *Id.* Following the play, Plaintiff was able to walk from the field with assistance—but did not recall doing so—and was sidelined for the remainder of the game. *Id.* Plaintiff was also unable to recall how he returned to his home in New York, or his level of performance for the remaining games that season. *Id.* "[W]hen [Plaintiff] attempted to regain his playing status the following spring, he was unable to complete basic plays and assignments and subsequently was released by two teams and ultimately 'retired' from the NFL." *Id.* at 513-14.

117.   Dr. Nelson reported that Plaintiff currently experiences "'primary limitations in attention and memory function' and often experiences difficulty in 'focusing in conversation and needs others to clarify their comments.'" *Id.* at 514.   Plaintiff also indicated the following problems: "difficulty initiating daily activities and task completion;" he is easily distracted and has significant difficulty multi-tasking; he has frequent arguments with his wife and becomes upset about "her frequent reminders about things that he is suppose[d] to be doing"; he has frequent difficulty in "word-finding and connecting sentences"; and he frequently misplaces common daily items. *Id.*

118.   Dr. Nelson's measurement of Plaintiff's performance on executive functioning "were consistently impaired relative to persons of similar age and education." *Id.* Several other measures, including motor functioning, simple repetitive words and colors, "phonetic fluency" ("the generation of words beginning with a given letter across time trial"), and visual/spatial functioning, were in the "low average range." *Id.*

119.   Dr. Nelson opined that Plaintiff's "current claimed cognitive symptoms are not causally related to the head injury sustained on October 31, 2004." *Id.* Dr. Nelson assigned

Plaintiff's problems to "difficulty adjusting to life after football; depression; pain; sleep disturbance." *Id.* Dr. Nelson found that "no diagnosis from cognitive perspective is currently warranted." *Id.*

120.    Dr. Cronin opined that it was "most unusual that a trained neuropsychologist like Dr. Nathan Nelson, spends some 17 hours (his estimate) in evaluating [Plaintiff], utilizes standardized tests which show a whole host of neurocognitive problems (traumatic brain injury) and then gives an opinion [that Plaintiff's] cognitive symptoms are not causally related to the head injury sustained on October 31, 2004." *Id.* at 514; *see also id.* (opining that "to suggest that [Plaintiff] has no 'problems' seems to contradict many of Dr. Nelson's findings").

121.    In Dr. Cronin's opinion, Plaintiff had all five symptoms of mild neurocognitive disorder: (1) "Memory impairment as identified by a reduced ability to learn or recall information"; (2) "Disturbance in executive functioning (i.e., planning, organizing, sequencing, abstracting)"; (3) "Disturbance in attention or speed of information processing"; (4) "Impairment in perceptual-motor abilities"; and (5) "Impairment in language (e.g., comprehension, word finding)." *Id.* at 515.

122.    Dr. Cronin noted that "[w]hile our 'gold standard' in diagnostics indicates that [Plaintiff] need only qualify with two of the five symptoms, and he has all five of the symptoms, he has obviously been experiencing these problems since his injury in 2004." *Id.* Dr. Cronin further noted that "[w]hile [Plaintiff] is not in a nursing home with 24 hour care, he certainly is hardly 'cured' or unimpaired.  He graduated from Boston College, he did not just attend, and he didn't 'retire' from the NFL, they cut him." *Id.*

123.    Dr. Cronin concluded that Plaintiff should avoid "making complex decisions involving a variety of everyday activities, including, financial, childcare, recreational, vocational

and anything that may involve complex reasoning." *Id.* Dr. Cronin opined that Plaintiff "needs an extensive consultation with a neurologist with expertise in this type of post concussive syndrome to adequately diagnosis [sic] his condition and recommend any possible physical treatments." *Id.*

124.    On January 8, 2013, Plaintiff was examined by psychologist Dr. Anne Smith ("**Dr. Smith**"), who prepared a report dated January 22, 2013 ("**Smith Report**"). *Id.* at 114-18. According to the Smith Report, Plaintiff's chief complaint was "post concussion symptoms." *Id.* at 114. Plaintiff reported experiencing very bad headaches since his third year playing in the NFL, which, since retiring, have gotten worse and "keep [him] in bed." *Id.* The report notes that Plaintiff had three documented concussions and "countless other 'dings' and physical injuries during his seven-year career." *Id.* Plaintiff indicated that nearly every day over the preceding two weeks, he has had the following problems: "little interest or pleasure in doing things; feeling down, depressed, and hopeless; trouble sleeping; feeling tired and having little energy; variable appetite; feeling bad about himself and that he has let himself and his family down; trouble concentrating; and moving or speaking so slowly that other people could have noticed." *Id.* The report also notes that Plaintiff has withdrawn from and avoids social situations, and no longer accepts speaking engagements. *Id.*

125.    In addition, the Smith Report states that Plaintiff provided the following information to Dr. Smith: "I don't put clothes away. I start putting them away but never finish it. I start reading articles but I don't finish them. I have headaches and they get worse when I am focusing." *Id.* at 115.

126.    Under "Diagnostic Impression," the Smith Report states, "Major Depressive Disorder; Recurrent, Severe Without Psychotic Features." *Id.* at 118.

30

127.    The Smith Report further mentions that Plaintiff has had two jobs since retiring from the NFL. *Id.* at 114. He attempted to organize training camps in Massachusetts for high schools and colleges but was unable to obtain sufficient clients. *Id.* Then, after moving to California, he was a trainer at a fitness club but was "released" because he "had trouble communicating with clients," "became withdrawn," and would "h[a]ng out in the men's locker all day" because he "didn't want to meet the clients." *Id.*

128.    Between October 10, 2011, and December 21, 2011, Plaintiff attended marital therapy sessions. *Id.* at 111. Harry Cates ("**Cates**"), a licensed professional counselor, authored a report dated May 13, 2014 ("**Cates Report**"), in which he stated that Plaintiff was observed during these sessions to be struggling with "depressive symptoms," "poor concentration," "bouts of unpredictable irritability," "forgetfulness," and "perceived lack of motivation." *Id.* Cates noted that "[t]hese adjustments were likely related to his physical injuries and concussions, which hastened the early end to his career as a professional football player." *Id.*

129.    Cates performed a subsequent assessment of Plaintiff on May 7, 2014, which was completed with the use of a clinical interview and a Mini-Mental State Examination. *Id.* During the assessment, "there was at times slowed process due to difficulty tracking multiple topics or references to previous subject matter," and  Plaintiff "was slow in [the] memory section." *Id.* Plaintiff reported that this memory difficulty had created reduced interest in social interaction due to his difficulty in remembering people and where he had met them, which had not been a problem for him prior to the onset of symptoms related to concussions. *Id.* Plaintiff also reported periods of poor attention causing him to forget important tasks. *Id.* The Cates Report noted that Plaintiff "was a poor historian when discussing memories of the recent past and the years since his football career, indicating reduced ability to transfer memory into long term storage." *Id.*

130.    The Cates Report concluded that "when comparing [Plaintiff]'s cognitive presentation in the present with his presentation in 2011 there appears to be progressive decline in the speed and sharpness with which he interacts as well as increased anxiety in social situations. [Plaintiff] does appear to have increased difficulty in coping due to the social anxiety and self-consciousness from the ongoing changes in his cognitive function." *Id.*

### K.    *2014 Social Security Administration Decision*

131.    In 2014, Plaintiff applied for disability benefits with the SSA. *Id.* at 299.

132.    Following an evidentiary hearing, Plaintiff was issued a "fully favorable decision" on June 18, 2014 ("**SSA Award**"). *Id.* at 299-305.

133.    The SSA Administrative Law Judge ("**ALJ**") determined in written findings that Plaintiff was disabled under the Social Security Act, with an onset date of December 31, 2008. *Id.* at 299.

134.    Specifically, the ALJ determined that "Plaintiff [had] not engaged in substantial gainful activity since December 31, 2008." *Id.* at 301; *see also id.* at 304 ("[Plaintiff] has made an attempt to work which suggests good work motivation, but he is unable to sustain that work due to the non-exertional impairment-related symptoms."). In addition, the ALJ found that Plaintiff was unable to perform other work considering his residual functional capacity, age, education, and work experience. *Id.* at 304-05 ("[T]here are no jobs that exist in significant numbers in the national economy that [Plaintiff] can perform."); *see also id.* at 302 ("[Plaintiff] is limited in ability to understand, remember, and carry out simple or detailed instructions; the ability to interact [with] the general public; and is unable to maintain attention and concentration for extended periods of time.").

135.    The ALJ further held that Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, and that [Plaintiff]'s statements

32

concerning the intensity, persistence and limiting effects of these symptoms are generally credible." *Id.* at 304.

**L.**    *2014 Application for Total and Permanent Disability Benefits*

136.    After receiving the SSA Award, Plaintiff filed an initial application for T&P benefits with the Committee on June 27, 2014. *Id.* at 96-98.

137.    Plaintiff listed, in addition to several orthopedic conditions, many neurocognitive disabilities in his application: post-concussion syndrome; clinical depression; dementia pugilistica; migraine headaches; benign paroxysmal positional vertigo; difficulties with verbal fluency, decision making, and concentration; memory loss; vertigo; insomnia; and unpredictable irritability. *Id.*    Plaintiff indicated that he was released by the Giants due to "difficulties understanding offensive and special teams basics playbooks." *Id.* at 97.

138.    With his application, Plaintiff submitted the SSA Award; Cates Report; Smith Report; 2011 Cronin Report; Berman Report; Einbund Report; Canizares Report; DiDio Report; Zarins Report; and orthopedic evaluations conducted by the Giants's team physicians. *See, e.g.*, *id.* at 100.

139.    Internal Committee notes by Chris Smith regarding Plaintiff's application acknowledge the SSA Award's onset date and Plaintiff's reported symptoms of "post-concussion syndrome, clinical depression, migraine, vertigo." Pl.'s Ex. 3-5, NFLPA 000001.

140.    Although Plaintiff executed a consent form agreeing to be examined by neutral physicians in connection with his application, the Committee did not refer Plaintiff for evaluation by a physician. Admin. Rec. 98; Chris Smith Depo. Tr. 322:9-12; Trial Tr. vol. 3 at 164:15-20.

141.    On July 23, 2014, Reynolds emailed his decision sheet to Chris Smith, benefits coordinators Paul Scott ("**Scott**") and Vincent, and individuals at Groom. Admin. Rec. 277. The decision line next to Plaintiff's name stated, "T&P (SSA) – Inactive A. eff. 5/1/2014." *Id.* at 279.

Approximately six minutes after Reynolds circulated his decision sheet, Chris Smith replied "I agree with Patrick [Reynolds]." *Id.* at 280.

142.   In a letter dated July 23, 2014, the Committee awarded Plaintiff Inactive A T&P benefits. *Id.* at 282-85.  Plaintiff was not awarded the higher class of Active Football benefits, however, on the stated basis that "the Committee determined that [Plaintiff] did not become totally and permanently disabled within any possible 'shortly after' period, such that the Active Football or Active Nonfootball categories could apply." *Id.* at 284.

143.   The parties herein do not dispute that Plaintiff was entitled to total and permanent disability benefits in accordance with Section 5.2(b) of the Plan based on the SSA Award.  *Id.* at 284; Parties' Stipulated Facts ¶ 5; *see also* Reynolds Depo. Tr. 314:11-20 ("[The 2014 decision] was based on the fact that [Plaintiff] is receiving Social Security Disability benefits.").

144.   Committee meeting minutes reflecting the decision specifically referenced only Sections 5.2 and 5.3(c) of the Plan. Pl.'s Ex. 3-7, CLOUD-XFILE-0002048 (stating Plaintiff was "[g]ranted Inactive A total and permanent disability benefits effective May 1, 2014, since player satisfies the requirements of Plan sections 5.2 and 5.3(c)." ).

145.   Although Committee meeting minutes were prepared, no actual meeting occurred between the Committee members.  Reynolds Depo. Tr. 380:15-18.

## M.   *2016 Application for Reclassification*

146.   Plaintiff filed an application for reclassification to Active Football T&P benefits with the Committee on February 14, 2016. Admin. Rec. 290-93.

147.   Plaintiff listed the following neurocognitive disabilities in his application: affective disorder[15]; significant memory and attention problems; memory loss; attention and decision

---

[15] "[B]outs of depression and anxiety in addition to bouts of paranoia and delusion" are referred to as "affective disorder."  Trial Tr. vol. 4 [ECF No. 244] at 65:4-11 (testimony of Dr. Wu).

problems; post-concussion syndrome; migraines; clinical depression; vertigo; and impaired verbal fluency. *Id.* at 290-91. Plaintiff also stated that his disabilities arose immediately after the October 31, 2004, collision. *Id.* at 291. Plaintiff's application referenced his prior job as a personal trainer, listing the reason for leaving that job as: "Released. Was not meeting the club's standards. Had difficulties learning the fitness protocols due to . . . metal [sic] impairments." *Id.* at 292.

148.    "Affective disorder" and "significant memory and attention problems" were new disabilities that were not listed in Plaintiff's 2014 application. *Compare id.* at 96-97 *with id.* at 290-91; *see also* Chris Smith Depo. Tr. 330:22-331:6 (testifying that there are new concussion symptoms listed in Plaintiff's 2016 reclassification application). At least one Committee member tasked with review of Plaintiff's application was unfamiliar with the term affective disorder. *See* Reynolds Depo. Tr. 340:10-12.

149.    Plaintiff submitted all of the records that he submitted with his 2014 application, as well as the 2012 Cronin Report. *See, e.g.*, Admin. Rec. 289.

150.    In addition, Plaintiff submitted a letter signed by him and his former attorney summarizing the findings of the ALJ and the 2012 Cronin Report. *Id.* at 288. The letter also stated the following: "During the Spring '05 [Plaintiff] signed a two[-]year contract with the NY Giants . . ., but was cut due to his inability to remember the most basic plays and football assignments. Months into the 2005 season [Plaintiff] was again acquired by the NE Patriots and then again by the NY Giants, but was consequently cut due to these cumulative mental disorders." *Id.* at 288-89.

151.    As in 2014, the Committee failed to refer Plaintiff for evaluation by a neutral physician in connection with his reclassification application. Trial Tr. vol. 3 at 164:15-20.

152.    On February 22, 2016, Scott notified Chris Smith, Reynolds, Vincent, and Groom that Plaintiff's documents and records were uploaded to the meetings website. Admin. Rec. at 473.

153.    February 22, 2016, notes prepared by Chris Smith relating to Plaintiff's application for reclassification list "migraines, clinical depression, memory loss, post-concussion syndrome, vertigo."[16] Pl.'s Ex. 3-5, NFLPA 000002. Her notes also reference the following: SSA Award; the 2012 Cronin Report; Plaintiff's last employment as a personal trainer; Plaintiff's termination by the Giants on September 3, 2005; Plaintiff's signing with the Patriots on November 4, 2005, and waiver on December 14, 2005; and Plaintiff's new contract with the Giants on December 29, 2005, and the expiration of that contract on March 11, 2006. *Id.* The final line states "no changed circumstances." *Id.*

154.    On March 1, 2016, Chris Smith emailed her decision of "no changed circumstances" to Reynolds, Scott, Vincent, and individuals with Groom. Admin. Rec. 473. Four minutes later, Reynolds replied "I agree." *Id.* at 476.

155.    In a letter dated March 2, 2016, the Committee denied Plaintiff's application for reclassification for the following reasons:

> First, the Committee determined that [Plaintiff's] request did not include any additional evidence of changed circumstances since the award of T&P benefits in 2014, as required under [S]ection 5.7(b). Second, Section 5.7(b) states that "a Player's T&P disability benefit will not be reclassified or otherwise increased with respect to any month or other period of time that precedes by more than forty-two months the date the Retirement Board received a written application or similar letter requesting such reclassification or increase that begins the administrative process that results in the award of the benefit." The Plan received [Plaintiff's] application on July 1, 2014; therefore, the Committee cannot reclassify benefits for any time period prior to January 1, 2011, which is well after the "shortly after" time period defined in [S]ection 5.3(e). The Committee also noted that the onset date for [Plaintiff's] Social Security Disability benefits was determined to be December 31, 2008, which is also well after the "shortly after" period defined in [S]ection 5.3(e).

---

[16] All of these symptoms other than memory loss were also listed in Chris Smith's 2014 notes. The 2016 notes do not list affective disorder, which Plaintiff included as a symptom in his 2016 application.

36

*Id.* at 481.

156.    In its letter, the Committee interpreted "changed circumstances" to mean "a change in a Player's condition (i.e., a new or different impairment)." *Id.*

157.    The letter advised that Plaintiff "may appeal the Committee's decision to the Plan's Retirement Board by filing a written request for review with the Retirement Board at this office within 180 days of [Plaintiff's] receipt of this letter." *Id.* at 482.

158.    The FedEx tracking data maintained by the Benefits Office relating to the Committee's 2016 decision letter reflects a "Shipment Delivery Date" of "3/4/2016." *Id.* at 524. It further sets forth a "Proof of delivery recipient" spelled out as "M.CLOUC" and a "Recipient Name" of "Michael Cloud." *Id.* at 527.

159.    No attempt was made by the Board, the Benefits Office, or any of its other advisors to either verify the existence of a signed receipt of the decision letter by Plaintiff, the date of actual receipt of the decision letter by Plaintiff, or to clarify why the entry reflected "M.CLOUC." *See* Trial Tr. vol. 4 [ECF No. 244] at 162:16-163:11; Robert Smith Depo. Tr. 240:1-3.

160.    Nor was any effort undertaken by Groom—in connection with this litigation or otherwise—to verify that Plaintiff signed or received the delivery.   Trial Tr. vol. 4 at 162:21-163:11.

161.    Board members at the time of Plaintiff's 2016 appeal relied on Groom and the Benefits Office to track any document reflecting proof of receipt.  Cass Depo. 189:14-18; *see also id.* at 313:11-14 ("I personally don't have evidence of that.  As I said, I rely on the plan office and the lawyers when they're making a statement that they've got evidence of it.  So I hope they do.").

162.    The Benefits Office does not have a copy of a signature relating to the delivery of the Committee's 2016 decision. *See* Trial Tr. vol. 2 at 52:23-25, 117:9-11.

### N. *2016 Appeal of Committee's Reclassification Decision*

163.    Plaintiff appealed the Committee's decision to the Board by submitting a letter dated September 1, 2016, and received by the Benefits Office on September 2, 2016.  Admin. Rec. 490-93.

164.    Plaintiff's appeal letter stated that since the October 31, 2004, injury, Plaintiff "has only been employed by the league and engaged in employment where he is receiving less than $30,000 per year in earned income," because "his neurocognitive disabilities have prevented him from engaging in employment that earns him greater than $30,000 per year." *Id.* at 491.  The letter summarized Dr. Cronin's findings in the 2012 Cronin Report that Plaintiff's total and permanent disability arose almost immediately after his October 2004 injury. *Id.*  The letter also stated that "[w]ithin one year of his disability arising, [Plaintiff] was cut by the Giants due to his cognitive problems and was unable to last for a significant period of time with any other NFL team due to his cumulative mental disorders." *Id.* at 492.

165.    On November 2, 2016, Plaintiff's case was added to the meetings website as one of approximately 100 cases scheduled to be decided at the upcoming November 2016 Board meeting.  Pl.'s Ex. 3-5, NFLPA 0000033-36.

166.    While a template letter purporting to confirm receipt of Plaintiff's appeal and providing for referral to a Plan neutral physician was generated by the Benefits Office on November 2, 2016, no such letter was ever sent to Plaintiff.  Pl.'s Ex. 3-7, CLOUD-XFILE-0002158; *see* Trial Tr. vol. 2 at 114:12-115:14 (Vincent testifying that the generation of a template letter was a tool used internally to create a folder for a player after he applied for benefits); *see also* Pl.'s Ex. 3-7, CLOUD-XFILE-0002158 (template letter sent from "Administrator" to Benefits Office coordinator Elise Richard).

167.    The Board failed to refer Plaintiff for evaluation by a physician.  Trial Tr. vol. 3 at 164:21-23; *see also id.* at 168:12-13 ("We [the Board] didn't think it was necessary in order to rule on his appeal."); Trial Tr. vol. 5 at 75:23-76:2.  Nor did the Board ask Plaintiff any questions regarding his appeal or request any additional documents.  Trial Tr. vol. 3 at 206:11-12; Trial Tr. vol. 5 at 79:22-78:17.

168.    A "Paralegal Case Manager" with Groom, Natallia Maroz (**"Groom Paralegal"**), prepared a summary (**"Groom Paralegal Case Summary"**) of Plaintiff's case for the Board, and emailed it to Vincent on November 8, 2016.  Pl.'s Ex. 2-8, CLOUD-XFILE-0001386; Trial Tr. vol 2 at 62:18-63:6, 186:9-10; Pl.'s Ex. 3-7, CLOUD-XFILE-0002167; *id.* at CLOUD-XFILE-0002070 (email from the Groom Paralegal to a Benefits Office coordinator asking for Plaintiff's appeal letter to be uploaded, as it was "ready for appeal summaries now").  Cass was unaware that she was a paralegal at the time and thought that she was a lawyer.  *See* Trial Tr. vol. 3 at 182:14-15.

169.    Vincent emailed the Groom Paralegal Case Summary to Marshall and Lerner later that day.  Pl.'s Ex. 3-5, NFLPA 000033.

170.    The Groom Paralegal Case Summary provides a list of records that were submitted with Plaintiff's 2016 application for reclassification but does not indicate which of those records were not included with Plaintiff's 2014 application for T&P benefits.  *See* Admin. Rec. 484.

171.    Plaintiff included the 2012 Cronin Report for the first time with his 2016 application for reclassification.  *Compare id.* at 100 *with id.* at 289; *see also id.* at 513-16.  A watermark on the 2012 Cronin Report indicates that the "report was not included in [Plaintiff]'s original T&P application." *Id.*  But the Groom Paralegal Case Summary states that "this report was submitted with the original request." *Id.* at 484.

39

172.     The Groom Paralegal Case Summary lists the symptoms that Plaintiff presented in his 2014 application for T&P benefits but omits the symptoms that Plaintiff presented in his 2016 application for reclassification. *See id.*; *see also id.* at 96-97 (2014 application); *id.* at 290-91 (2016 application).

173.     At least one Board member tasked with reviewing Plaintiff's appeal did not know what "affective disorder" meant.  Cass Depo. Tr. 300:10-17; Trial Tr. vol. 3 at 205:20-24.

174.     At least one Board member tasked with reviewing Plaintiff's appeal stated that he could "not say with confidence" that he read the SSA Award before the Board rendered its decision.  Cass Depo. Tr. 307:14-308:4.

175.     Cass and Robert Smith do not know what their advisors reviewed in connection with Plaintiff's appeal.  Trial Tr. vol. 3 at 181:22-23; Trial Tr. vol. 5 at 85:19-23.

176.     On the morning of November 10, 2016, in an email with the subject line reading "Posted under the wrong Plan," the Groom Paralegal told Vincent that Plaintiff "should be under the Retirement Plan, not Disability Plan."  Pl.'s Ex. 3-7, CLOUD-XFILE-0002279.

177.     Approximately 20 minutes later, an employee with the NFL Players Association emailed Marshall a "case list" and stated that he "look[ed] forward to discussing."  Pl.'s Ex. 3-5, NFLPA 0000239; *see* Trial Tr. vol. 2 at 193:2-4.  The case list marked Plaintiff's reclassification application as denied because there were "[n]o changed circumstances."  Pl.'s Ex. 3-5, NFLPA 0000241-44.

178.     Later that day, Marshall emailed the case list to Miki Yaras-Davis, the Director of Benefits at the NFL Players Association. *Id.* at NFLPA 0000053-59; Trial Tr. vol. 2 at 197:17-20. The stated reason for denial in that case list was untimeliness.  Pl.'s Ex. 3-5, NFLPA 0000058.

179.    On November 15, 2016, Marshall asked a Benefits Office employee to print 14 copies of the case list. Pl.'s Ex. 3-7, CLOUD-XFILE-0002341. The stated reason for denial in that case list was "[n]o clear and convincing evidence of changed circumstances." *Id.* at CLOUD-XFILE-0002344.

180.    Later that day, Reynolds asked a Benefits Office employee to print 20 copies of the case list that reflected the decisions of the NFL Management Council Board members. Pl.'s Ex. 3-7, CLOUD-XFILE-0002350. That case list marked Plaintiff's reclassification application as denied but did not provide any reasoning. *Id.* at CLOUD-XFILE-0002358.

181.    The Board meeting occurred on November 15 and 16, 2016. *See, e.g.*, Pl.'s Ex. 2-10, CLOUD-MIN-005 (Board meeting minutes from November 15-16, 2016).

182.    The Board's pre-meeting "was done in like 10 minutes with no issues." Pl.'s Ex. 3-7, CLOUD-XFILE-0002372. Vincent testified that this pre-meeting was "shorter than normal." Trial Tr. vol. 2 at 179:16-20. This was despite having approximately 100 appeals to discuss among the Board and its advisors. Pl.'s Ex. 3-5, NFLPA 0000033-36.

183.    The Groom Paralegal did not attend the November 16, 2016, formal Board meeting. Trial Tr. vol. 2 at 203:12-14; Trial Tr. vol. 3 at 184:14-17; Pl.'s Ex. 2-10, CLOUD-MIN-005.

184.    Vincent attended the November 16, 2016, formal Board meeting and took notes as decisions were being announced. Trial Tr. vol. 2 at 79:8-12, 204:10-12.

185.    While typing the decision sheet from the formal Board meeting, Vincent emailed Marshall confirming that Marshall was denying Plaintiff's application for "no change of circumstance." Pl.'s Ex. 3-5 at NFLPA 0000032. Vincent also stated that "[i]t could technically be untimely appeal at 182 days," to which Marshall responded, "I knew I saw that in the case, but

when we discussed it they all looked at me like I was crazy." *Id.* Vincent replied "[g]ood enough for me." *Id.*

186. There was no discussion of untimeliness at the formal Board meeting. Trial Tr. vol. 2 at 213:12-14.

187. Vincent emailed the final decision sheet to the Groom Paralegal on November 16, 2016. Pl.'s Ex. 3-7, CLOUD-XFILE-0002368.

188. The decision sheet indicates that Plaintiff's application for reclassification was denied because "[n]o clear and convincing evidence of changed circumstances." *Id.* at CLOUD-XFILE-0002369.

189. Vincent did not provide any additional information to the Groom Paralegal regarding the decision to deny Plaintiff's reclassification appeal. Trial Tr. vol. 2 at 207:5-9.

190. Cass did not speak with the Groom Paralegal about any decisions made by the Board at the November 16, 2016, Board meeting, and was not aware of any other Board member speaking with her. Trial Tr. vol. 3 at 183:15-20, 195:14-16.

191. On November 18, 2016, the Groom Paralegal sent a draft Board decision letter to Vincent. Pl.'s Ex. 3-7, CLOUD-XFILE-0002381. Vincent did not review the letter. Trial Tr. vol. 2 at 207:21-22.

192. Cass was not provided an opportunity to review the draft decision, did not provide any input on the letter, and "assum[ed] that other people at the Groom Law Firm looked at it." Trial Tr. vol. 3 at 187:17-19, 188:10-12; Cass Depo. Tr. 43:1-3. Robert Smith also did not review the letter before it was sent to Plaintiff. Trial Tr. vol. 5 at 90:19-21.

193. An email exchange between Vincent and an administrative assistant at the Benefits Office indicates that the Board's decision letter was not mailed to Plaintiff until November 23,

42

2016, because the administrative assistant overlooked her receipt of the letter. Pl.'s Ex. 3-7, CLOUD-XFILE-0002391 ("Sorry. I never saw [Plaintiff]. It will go out today[, November 23, 2016].").

194.    In a decision letter dated November 23, 2016, and signed by Plan Director Michael B. Miller, the Board denied Plaintiff's appeal for reclassification. Admin. Rec. 518-20.

195.    Vincent testified that the 2016 Board letter was prepared by the Groom Paralegal. Trial Tr. vol. 2 at 72:11-18, 118:22-119:3, 164:21-25. The Board's letter was not reviewed by the Board members. *See id.* at 165:13-18; Tr. vol. 3 at 65:9-10; Trial Tr. vol. 5 at 90:22-24; Robert Smith Depo. Tr. 54:17-20, 227:2-4; Cass Depo. Tr. 44:8-15.

196.    The Board's letter prepared by the Groom Paralegal contained the following errors:

a.   Included under "Relevant Plan Provisions" is a reference to "Section 13.3 of the Plan," Admin. Rec. 523, even though that section is not in the Plan document at issue, *id.* at 65 (indicating that the final section in the Plan is Section 12.15). Rather, the Groom Paralegal was applying the "NFL Player Disability & Neurocognitive Benefit Plan," which includes a Section 13.3. Trial Tr. vol. 2 at 214:25-215:5; Cass Depo. Tr. 237:18-19.

b.   Although the Board decision letter references Plaintiff's alleged psychological or psychiatric disorders, it does not include a discussion of Section 5.4(b) of the Plan, which applies to "psychological/psychiatric disorders." *See* Admin. Rec. 33, 518-20 ("By letter received February 17, 2016, your representative, Jennifer Cloud . . . stated that you 'became disabled in 2005, while playing for the New York Giants due to cumulative mental disorder.'"); *see also* Trial Tr. vol. 2 at 209:20-210:2 (Vincent testifying that the decision sheet he drafted did not include any mention of Section 5.4(b)).

c.   Although Plaintiff was considered to be totally and permanently disabled by the Committee in 2014, *see* Admin. Rec. 282, the Board's decision letter stated that "[t]he evidence [Plaintiff] submitted does not show that [he is] totally and permanently disabled," *id.* at 519.

197.    In its letter, the Board interpreted "changed circumstances" to mean "a new or different impairment from the one that originally qualified [Plaintiff] for T&P benefits." *Id.*

43

198.    The Board's letter further reasoned that in order to qualify for Active Football T&P benefits, Plaintiff "would have to clearly and convincingly show that (1) [he] ha[s] a new or different impairment (Section 5.7(b)), (2) that new or different impairment arose while [Plaintiff] w[as] an Active Player (Section 5.3(a)), and (3) it caused [Plaintiff] to be totally and permanently disabled 'shortly after' it first [sic] (Section 5.3(a))." *Id.*

199.    The Board's letter noted that Plaintiff's 2014 application for T&P benefits was "based on a combination of orthopedic, neurological, and cognitive impairments, such as post-concussion syndrome, clinical depression, dementia pugilistica, migraine, vertigo, impaired verbal fluency, acute compartment syndrome, plantar fasciitis, cuneal nerve injury, and multiple orthopedic impairments." *Id.* The letter also noted that Plaintiff's application for reclassification was "based on what [he] call[ed] 'severe' mental impairments, but those are the same impairments listed in [his] 2014 application, and they formed the basis of [his] award for Inactive A T&P benefits (and [his] SSA award)." *Id.* There was no mention of affective disorder.

200.    The Board letter stated that Plaintiff did not meet Section 5.7(b)'s reclassification requirements because Plaintiff did not "clearly and convincingly show that [he] is totally and permanently disabled by a new or different impairment." *Id.*

201.    The letter also stated that "even if [Plaintiff's] request for reclassification were based on a new or different impairment, the medical evidence [Plaintiff] submitted does not show that [he] meet[s] the requirements for the Active Football category." *Id.*

202.    The Board's letter advised that "for the Active Football category, it is not enough that your disability first arise during your NFL career; it must also become totally and permanently disabling 'shortly after' it first arises," and that Plaintiff's alleged disability "falls well outside any conceivable 'shortly after' period required for Active Football benefits." *Id.*

44

203.    Finally, according to the Board's letter, Plaintiff's appeal was untimely under Section 12.6(a): "The Retirement Board noted that (1) according to Plan records, [Plaintiff] received the decision letter on March 4, 2016; (2) that decision letter advised [Plaintiff] of the 180-day appeal deadline (which expired on August 31, 2016); and (3) the Plan did not receive [Plaintiff's] appeal until September 2, 2016, two days after the 180-day deadline expired." *Id.* at 520. The Board was not shown the FedEx slip relied upon for the untimeliness determination but was rather advised of its existence. Robert Smith Depo. Tr. 237:22-24. Robert Smith did "not look[] into the specifics of the 180 days in this case because of the other factors in the case." Robert Smith Depo. Tr. 240:1-3.

204.    On January 12, 2017, the Groom Paralegal emailed draft minutes from the November 2016 Board meeting to certain attendees of the Board meeting. Pl.'s Ex. 3-7, CLOUD-XFILE-0002394; *see also* Trial Tr. vol. 2 at 223:6-11. The email was not sent to Vincent, who attended the meeting and provided the Groom Paralegal with his notes of what occurred at the meeting, or any of the Board members. Pl.'s Ex. 3-7, CLOUD-XFILE-0002394; *see also* Trial Tr. vol. 2 at 223:6-11.

205.    The final draft minutes circulated by the Groom Paralegal indicated the sole reason for denial of Plaintiff's application as "failure to meet the requirements of Plan section 5.7(b)." Pl.'s Ex. 3-7, CLOUD-XFILE-0002401, 0002427; Pl.'s Ex. 2-10, CLOUD-MIN-006. This is contrary to what was contained in the Board's decision letter. *See* Admin. Rec. 518-20.

206.    Ultimately, Plaintiff was denied reclassification from Inactive A T&P benefits to Active Football T&P benefits. *See id.*

207.    Plaintiff is currently receiving Inactive A T&P benefits in accordance with Section 5.3(c) of the Plan. Parties' Stipulated Facts ¶ 7.

208.    The parties do not dispute the amount that the Plan paid out for Inactive A and Active Football T&P benefits on an annual basis:

209.    Inactive A paid $120,000.00 in 2015, and $135,000.00 in 2016, 2017, 2018, 2019, 2020, 2021, and 2022. *Id.* ¶¶ 37, 40, 42, 44, 46, 48, 50, 52.

210.    Active Football paid $250,008.00 in 2014 and 2015, and $265,008.00 in 2016, 2017, 2018, 2019, 2020, 2021, and 2022. *Id.* ¶¶ 37, 39, 41, 43, 45, 47, 49, 51, 53.

211.    Plaintiff was never referred to a Plan neutral physician when he sought T&P benefits, either at the Committee or Board level. Trial Tr. vol. 2 at 170:22-24.

### O.    *Past Interpretations of "Changed Circumstances" by the Board*

212.    In its decision letters, the Board has not applied a consistent approach to the term "changed circumstances":

   a.   Board letters have found no "changed circumstances" but provided no definition. *See, e.g.*, Pl.'s Ex. 2-11, CLOUD-LTRS-0000351-54 (July 27, 2001); *id.* at CLOUD-LTRS-0000320-22 (July 20, 2003); *id.* at CLOUD-LTRS-0000383-84 (October 28, 2005).

   b.   Board letters have found no "changed circumstances" where the new disability was the same impairment or condition that was the basis for the initial decision. *See, e.g., id.* at CLOUD-LTRS-0000287-89 (April 14, 2005); *id.* at CLOUD-LTRS-0000279-82 (February 13, 2008); *id.* at CLOUD-LTRS-0000355-60 (February 13, 2008); *id.* at CLOUD-LTRS-0000290-92 (May 24, 2012); *id.* at CLOUD-LTRS-0000401-06 (February 25, 2013).

   c.   Board letters have explicitly interpreted "changed circumstances" to mean "a change in the Player's physical condition, such as a new or different disability." *Id.* at CLOUD-LTRS-0000326-29 (August 15, 2011); *id.* at CLOUD-LTRS-0000345-50 (August 26, 2013); *id.* at CLOUD-LTRS-0000453-56 (November 21, 2014); *id.* at CLOUD-LTRS-0000366-71 (March 9, 2015); *id.* at CLOUD-LTRS- 0000372-77 (May 21, 2015); *id.* at CLOUD-LTRS-0000255-58 (May 21, 2015).

   d.   Board letters have explicitly interpreted "changed circumstances" to mean "a change in the Player's condition, such as a new or different disability." *Id.* at CLOUD-LTRS-0000221-24 (December 2, 2015); *id.* at CLOUD-LTRS-0000242-44 (August 22, 2017); *id.* at CLOUD-LTRS-0000034-36 (August 24, 2018).

e. Board letters have explicitly interpreted "changed circumstances" to mean "a new or different impairment than the one that originally qualified you for T&P benefits." *Id.* at CLOUD-LTRS-0000247-50 (February 26, 2016); *id.* at CLOUD-LTRS-0000087-89 (November 21, 2016); *id.* at CLOUD-LTRS-0000237-39 (February 27, 2017); *id.* at CLOUD-LTRS-000082-84 (May 16, 2017).

f. Board letters have explicitly interpreted "changed circumstances" to mean "a new or different impairment that warrants a different category of benefits." *Id.* at CLOUD-LTRS-0000216-20 (February 26, 2016).

g. Board letters have explicitly interpreted "changed circumstances" to mean "a change in a Player's condition, such as a new impairment that did not exist during the original application, or an impairment that did exist but is different from the one that formed the basis for the original award of T&P benefits." *Id.* at CLOUD-LTRS-0000058-65 (November 22, 2016).

h. Board letters have explicitly interpreted "changed circumstances" to mean "an impairment that did not form the basis of the original T&P award, and that became total and permanently disabling after the original T&P award." *Id.* at CLOUD-LTRS-0000076-78 (May 16, 2017); *id.* at CLOUD-LTRS-0000049-52 (February 26, 2018); *id.* at CLOUD-LTRS-0000040-43 (February 27, 2018).

## II.      LEGAL STANDARD

### A.      *ERISA Framework*

#### (1)      *Full and Fair Review*

ERISA plan administrators must follow certain procedural requirements, which are set forth in 29 U.S.C. § 1133 and corresponding regulations promulgated by the Department of Labor.

Under Section 1133, every ERISA plan must:

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.

The two subsections of Section 1133 "complement[] each other," as the notice requirements of subsection (1) "help ensure the 'meaningful review' contemplated by subsection (2)." *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 393 (5th Cir. 2006). The Fifth Circuit has held that "the specific reason or reasons for denial must be clearly identified at the administrative level in order to give the parties an opportunity for meaningful dialogue." *Lafleur v. Louisiana Health Serv. & Indem. Co.*, 563 F.3d 148, 155-56 (5th Cir. 2009) (citing 29 C.F.R. § 2560.503-1(g)). Additionally, the review must "take[] into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." 29 C.F.R. § 2560.503-1(h)(2)(iv). The review must "not afford deference to the initial adverse benefit determination" and must be "conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual." *Id.* § 2560.503-1(h)(3)(ii). Further, when "deciding an appeal of any adverse benefits determination that is based in whole or in part on a medical judgment," the plan administrator must "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." *Id.* § 2560.503-1(h)(3)(iii).

ERISA procedural challenges are reviewed under a "substantial compliance" standard, which asks whether the plan administrator substantially complied with ERISA procedures. *Lafleur*, 563 F.3d at 154. Under this standard, "technical noncompliance with ERISA procedures will be excused so long as the purposes of section 1133 have been fulfilled." *Robinson*, 443 F.3d at 393 (citation and quotations omitted). And the purpose of Section 1133 is "to afford the beneficiary an explanation of the denial of benefits that is adequate to ensure meaningful

48

review of that denial." *Lafleur*, 563 F.3d at 154 (citation omitted).  Importantly, "substantial compliance" requires a "'meaningful dialogue' between the beneficiary and administrator." *Id.* "The substantial compliance test also considers all communications between an administrator and plan participant to determine whether the information provided was sufficient under the circumstances." *Id.* (citation and internal quotation marks omitted).

In interpreting "full and fair review," the Fifth Circuit has "looked favorably upon decisions that require knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision." *Id.* (internal quotation marks omitted) (quoting *Sweatman v. Com. Union Ins. Co.*, 39 F.3d 594, 598 (5th Cir. 1994)).  "Thus, the end product of a claims review process wherein § 1133 and its regulations have been followed faithfully is a benefits decision that is thoroughly informed by the relevant facts and the terms of the plan and, if benefits are denied, includes an explanation of the denial that is adequate to insure meaningful review of that denial." *Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388, 395 (5th Cir. 1998).  The failure to provide a full and fair review "is an independent basis to overturn a plan administrator's denial of benefits." *Truitt v. Unum Life Ins. Co. of Am.*, 729 F.3d 497, 510 n.6 (5th Cir. 2013).

## (2)    *Wrongful Denial*

A plan participant may sue under ERISA "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).  When the plan vests the fiduciary with discretionary authority to determine eligibility for benefits under the plan or to interpret the plan's provisions, an abuse of discretion standard of review applies. *Ellis v. Liberty of Assurance Co. of Boston*, 394 F.3d 262, 269 (5th Cir. 2004).  Here, the Plan gives the Board, as the "named

fiduciary," "full and absolute discretion, authority and power to interpret, control, implement, and manage the Plan," including to "[d]efine the terms of the Plan," "construe the Plan," and "[d]ecide claims for benefits." Admin. Rec. 48, § 8.2. Accordingly, the Court reviews the Board's decision for abuse of discretion.

The Fifth Circuit has articulated a two-step process for determining whether a plan administrator abused its discretion. First, the court inquires whether the plan administrator's decision was "legally correct" by considering three factors: "(1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs resulting from different interpretations of the plan." *Porter v. Lowe's Cos., Inc.'s Bus. Travel Accident Ins. Plan,* 731 F.3d 360, 364 n.8 (5th Cir. 2013) (citing *Crowell v. Shell Oil Co.,* 541 F.3d 295, 312 (5th Cir. 2008)).

"Whether the administrator gave the plan a fair reading is the most important factor." *LifeCare Mgmt. Servs. LLC v. Ins. Mgmt. Adm'rs Inc.,* 703 F.3d 835, 841 (5th Cir. 2013) (internal quotation marks omitted) (quoting *Stone v. UNOCAL Termination Allowance Plan,* 570 F.3d 252, 260 (5th Cir. 2009)). "Eligibility for benefits under any ERISA plan is governed in the first instance by the plain meaning of the plan language." *Tucker v. Shreveport Transit Mgmt. Inc.,* 226 F.3d 394, 398 (5th Cir. 2000) (quoting *Threadgill v. Prudential Secs. Grp., Inc.,* 145 F.3d 286, 292 (5th Cir. 1998)). Plan terms are interpreted in accordance with their "ordinary and popular sense as would a person of average intelligence and experience." *Crowell,* 541 F.3d at 314 (citations omitted). Therefore, ERISA provisions must be interpreted "as they are likely to be understood by the average plan participant, consistent with the statutory language." *Id.* (citations and quotation marks omitted).

If the plan administrator's interpretation of the plan is legally incorrect, the court next considers whether the administrator abused its discretion. *Porter*, 731 F.3d at 364. A plan administrator abuses its discretion "without some *concrete evidence* in the administrative record that supports the denial of the claim." *LifeCare*, 703 F.3d at 841 (quoting *Vega,* 188 F.3d at 299) (internal quotation marks omitted and emphasis added). Determining whether a plan administrator abused its discretion requires a "combination-of-factors method of review," in which the court takes into account "several different, often case-specific, factors, reaching a result by weighing all together." *Glenn*, 554 U.S. at 117. Factors considered by the Fifth Circuit include "(1) the internal consistency of the plan under the administrator's interpretation, (2) any relevant regulations formulated by the appropriate administrative agencies, (3) the factual background of the determination," and (4) "any inferences of lack of good faith." *Porter*, 731 F.3d at 364 n.9 (internal quotation marks omitted) (quoting *Gosselink v. AT&T, Inc*., 272 F.3d 722, 726 (5th Cir. 2001)). However, the Fifth Circuit has made clear that "if an administrator interprets an ERISA plan in a manner that directly contradicts the plain meaning of the plan language, the administrator has abused his discretion even if there is neither evidence of bad faith nor of a violation of any relevant administrative regulations." *Gosselink*, 272 F.3d at 727. "Ultimately, a court's 'review of the Plan administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision falls somewhere on a continuum of reasonableness—even if on the low end.'" *McCorkle v. Metro. Life Ins. Co.*, 757 F.3d 452, 457 (5th Cir. 2014) (alterations omitted) (quoting *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 247 (5th Cir. 2009)).

### III.   CONCLUSIONS OF LAW

#### A.   *The Board's Failure to Conduct a Full and Fair Review*

The Court finds that the Board failed to provide Plaintiff a full and fair review in violation of ERISA in connection with its decision to deny Plaintiff's appeal for reclassification to Active

Football T&P benefits because (1) it did not clearly identify the specific reasons for denial of Plaintiff's appeal, (2) it did not consider all documents and records submitted with Plaintiff's claim, (3) it afforded deference to the Committee, and (4) it did not consult with an appropriate health care professional despite basing its determination on a medical judgment. In so doing, the Board failed to substantially comply with ERISA procedural regulations and denied Plaintiff a meaningful dialogue regarding its denial of Plaintiff's reclassification appeal.

### (1)    *Failure to Review Specific Bases for Denial*

The Court finds that the Board did not review its own stated bases for rejecting Plaintiff's claim. While the Board's 2016 decision letter sets forth multiple reasons for denying Plaintiff's claim, remarkably, not all of those reasons were actually contemplated by the Board itself. The undisputed evidence demonstrates that the Board members had no involvement in drafting the decision letter. Trial Tr. vol. 2 at 71:13-15 (Vincent testifying that Groom prepares the Board's decision letters); Cass Depo. Tr. 44:8-14. Indeed, the Board members themselves did not see, discuss, edit, or review the letter before it was sent to Plaintiff. *See* Tr. vol. 3 at 65:9-10; Trial Tr. vol. 5 at 90:22-24; Robert Smith Depo. Tr. 54:17-20, 227:2-4; *see also* Trial Tr. vol. 2 at 165:13-18 (Vincent testifying that an administrative assistant from the Benefits Office reviews the letter with no Board input before it is sent to the player).

Rather, the evidence clearly shows that the Board's stated bases for denial were post hoc rationalizations devised by Benefits Office staff and advisors but not discussed among the Board members. The record is devoid of any evidence that the Board members were ever consulted with respect to all of the reasons for denial stated in the decision letter. Vincent attended the November 16, 2016, formal Board meeting and took notes as decisions were being announced. *Id.* at 79:8-12, 204:10-12. His notes were typed into a "decision sheet" and emailed to the Groom Paralegal after the meeting. *See* Pl.'s Ex. 3-5 at NFLPA 0000032; Pl.'s Ex. 3-7, CLOUD-XFILE-0002368.

52

The decision sheet indicated that Plaintiff's application for reclassification was denied because "[n]o clear and convincing evidence of changed circumstances." *Id.* at CLOUD-XFILE-0002369. It is noteworthy that the decision sheet made no mention of the "shortly after" requirement or alleged the untimeliness of Plaintiff's appeal, both of which were added as reasons for denial in the 2016 Board decision letter. Nor is there any mention of either of these additional bases in the final minutes from the Board meeting. *See* Pl.'s Ex. 2-10, CLOUD-MIN-006; *see also* Trial Tr. vol. 2 at 213:12-14 (Vincent testifying that there was no discussion of untimeliness at the formal Board meeting).

The Board's wholesale adoption of its advisors' reasons for denial, without having contemplated all of those reasons, defies any possibility of the "meaningful review" required by ERISA. Regardless, the Board's decision letter on its face lacks any substantive explanation of specific bases for denial. This alone necessitates the conclusion that the Board failed to meaningfully review the specific reasons for the Committee's decision.

In denying Plaintiff's 2016 application for reclassification, the Committee found that Plaintiff did not meet the "shortly after" requirement because "the onset date for [his] Social Security Disability benefits was determined to be December 31, 2008." Admin Rec. 488. The Committee also reasoned that Plaintiff could not be reclassified for benefits for any period before January 1, 2011, pursuant to the 42-month limitation period set forth in Section 5.7(b) of the Plan.[17] The Board's decision letter, on the other hand, merely stated, in conclusory fashion, that the evidence submitted by Plaintiff "all falls well outside any conceivable 'shortly after' period required for Active Football benefits." *Id.* at 519. The letter did not reference or discuss the

---

[17] Section 5.7(b) provides that "a Player's T&P disability benefit will not be reclassified or otherwise increased with respect to any month or period of time that precedes by more than forty-two months the date the Retirement Board receives a written application or similar letter requesting such reclassification or increase that begins the administrative process that results in the award of the benefit." *Id.* (quoting § 5.7(b)).

disability onset date provided in Plaintiff's SSA Award or the 42-month limitation under Section 5.7(b). *Cf.* Pl.'s Ex. 3-7, CLOUD-LTRS-000011-14 (August 27, 2018 Board letter denying a player's reclassification appeal and discussing, *inter alia*, the 42-month time limitation). The letter contained no analysis whatsoever of why Plaintiff failed to meet the "shortly after" requirement.

Section 1133(1)'s requirement "that the claimant be specifically notified of the reasons for an administrator's decision suggests that it is those 'specific reasons' rather than the termination of benefits generally that must be reviewed under subsection (2)." *Robinson*, 443 F.3d at 393. The Board's conclusory statement regarding the "shortly after" provision falls well short of the requirement that the plan administrator "provide review of the specific ground for an adverse benefits decision." *Id.*; *see Cooper v. Hewlett-Packard Co.*, 592 F.3d 645, 652 (5th Cir. 2009) ("To comply with the 'full and fair review' requirement in deciding benefit claims under ERISA, a claim administrator must provide the specific grounds for its benefit claim denial."); *see also Lafleur*, 563 F.3d at 156 ("[T]he lack of specificity in the denial letters did not give Lafleur the fair notice contemplated by the ERISA regulations."). As a result, many of the issues raised in this case regarding the Board's review and interpretation of the Plan's terms "were not previously addressed or sufficiently developed during the administrative process and instead are being presented to the court to resolve in the first instance, which defeats ERISA's purpose of 'streamlining and shortening the timeframe for disposing of claims.'" *Encompass Office Sols., Inc. v. Connecticut Gen. Life Ins. Co.*, No. 3:11-CV-02487-L, 2017 WL 3268034, at *20 (N.D. Tex. July 31, 2017) (Lindsay, J.) (quoting *Schadler*, 147 F.3d at 396). Such a result is inconsistent with this Circuit's "policy of encouraging the parties to make a serious effort to resolve their dispute at the administrator's level before filing suit in district court." *Robinson*, 443 F.3d at 393 (citing *Vega*, 188 F.3d at 300).

Accordingly, the Court finds that the Board failed to meaningfully review the Committee's specific reasons for denial of Plaintiff's application for reclassification.

(2)    ***Improper Reliance on Advisors***

In addition, the Board members did not review all of the documents in Plaintiff's administrative record.[18] *See* Trial Tr. vol. 3 at 170:6-10 (Cass testifying that it was not his practice to read a player's entire file); *id.* at 103:13-14 ("I couldn't read 500 pages of documents. It wasn't practical. And not necessary."); *id.* at 59:16-19 ("I would look at the documents that I thought were pertinent to [the issues that were on appeal]."); Cass Depo. Tr. 276:19-21 ("I most likely would not have read the entire record. I would have read enough of the record, the administrative record, to feel comfortable making the decision that the appeal should be denied."); Trial Tr. vol. 5 at 101:22-23 (Robert Smith testifying that it was not his practice to review all documents in an application); *id.* at 102:5-6 ("we don't review all of them"). In fact, Cass testified that "I don't think I would have looked at all of the medical records that . . . backed up the Social Security award or the initial T&P award." Cass Depo. Tr. 276:15-18.

Rather than reviewing Plaintiff's entire file as required under ERISA and the Plan, the Board relied on "advisors" to review Plaintiff's file, including the facts of his case, medical records, and other specifics. Robert Smith Depo. Tr. 85:16-24, 242:7-9; *see* Trial Tr. vol. 3 at 171:5-7, 177:4-8. However, despite the Board's heavy reliance on advisors, the Board never specifically directed these advisors to review *all* of Plaintiff's medical records. *See* Trial Tr. vol. 3 at 176:6-16; *id.* at 198:19-21 (Cass testifying that the Board has no written procedures that

---

[18] Because Board members are not aware of cases for review until the actual Board meeting, Robert Smith Depo. Tr. 186:18-21, it would have been impossible for them to review all of the documents in Plaintiff's file, or any of the approximately 100 other cases set to be decided at the November 2016 Board meeting. Pl.'s Ex. 3-5, NFLPA 0000033-36. While a player's file typically contains "hundreds or thousands of pages of documents," Pl.'s Ex. 17, the pre-meeting at which Plaintiff's case was discussed between Board members and their advisors "was done in like 10 minutes." Pl.'s Ex. 3-7, CLOUD-XFILE-0002372.

explain the delegation of duties); Robert Smith Depo. Tr. 172:10-14 (testifying, when asked, that "there's never been a formal process"); Trial Tr. vol. 5 at 29:20-21 (Robert Smith testifying that the "process happens automatically"). In fact, both Cass and Robert Smith testified that they did not know what their advisors reviewed in connection with Plaintiff's appeal altogether. Trial Tr. vol. 3 at 181:22-23; Trial Tr. vol. 5 at 85:19-23. This reliance without guidance resulted in summaries that were replete with errors.

The Groom Paralegal,[19] whom the Board relied on to create case summaries, mistakenly indicated on Plaintiff's case summary that the 2012 Cronin Report "was submitted with the original request." Admin. Rec. 484. She was wrong. The 2012 Cronin Report, which stated that "[Plaintiff] has obviously been experiencing these problems since his injury in 2004," *id.* at 515, was submitted for the first time with Plaintiff's 2016 application for reclassification, *compare id.* at 100 (2014 application for T&P benefits) *with id.* at 289 (2016 application for reclassification). Additionally, the Groom Paralegal Case Summary erroneously listed only the symptoms that Plaintiff presented in his 2014 application for T&P benefits, and not the symptoms that Plaintiff presented in his 2016 application for reclassification. *Id.* at 484.

The Board's decision letter, prepared by the Groom Paralegal, *see* Pl.'s Ex. 3-7, CLOUD-XFILE-0002381, further confirms that the entirety of Plaintiff's file was not reviewed by the Board or its advisors. First, there was no mention or discussion of the 2012 Cronin Report in the Board's decision letter. *Cf.* Pl.'s Ex. 3-7, CLOUD-LTRS-0000001-5 (Board letter from November 12, 2018 denying a player's reclassification appeal and discussing, *inter alia*, why the Board rejected a doctor's report that was submitted by a player as a potential basis for reclassification). Second, while the letter states that Plaintiff's application for reclassification is based on "the same

---

[19] Cass was unaware that she was a paralegal at the time and thought that she was a lawyer. *See* Trial Tr. vol. 3 at 182:14-15.

impairments listed in [his] 2014 application," Admin. Rec. 519, Plaintiff's 2016 reclassification application specifically listed "affective disorder"[20] and "significant memory and attention problems" as impairments that were not listed in Plaintiff's 2014 application. *Compare id.* at 96-97 *with id.* at 290-91.

With respect to the Board's review of Plaintiff's claim for reclassification, the record is devoid of any evidence that either the Board or its advisors took "into account all comments, documents, records, and other information submitted by the claimant." 29 C.F.R. § 2560.503-1(h)(2)(iv). On the contrary, Defendant's witnesses testified to the opposite. This failure to consider all evidence submitted by Plaintiff also constitutes a clear violation of Plan provisions. *See* Admin. Rec. 61, § 12.6(a) ("The Retirement Board's review of the adverse determination will take into account *all* available information, regardless of whether that information was presented or available to the Disability Initial Claims Committee." (emphasis added)); *id.* at 52, § 8.9 ("In deciding claims for benefits under this Plan, the Retirement Board and Disability Initial Claims Committee will consider *all* information in the Player's administrative record." (emphasis added)). For the reasons set forth above, the Court finds that the Board failed to consider all of the evidence submitted by Plaintiff in connection with his 2016 reclassification appeal.

In addition, the Board improperly relied on advisors who actively participated in the Committee's denial of Plaintiff's 2016 application for reclassification. Indeed, Chris Smith was an advisor to the Board tasked with "review[ing] information on cases" *while she was a Committee member*. Trial Tr. vol. 5 at 32:11-14; *see* Robert Smith Depo. Tr. 191:6-8. Moreover, Groom advised Benefits Office coordinators both at the Committee and Board level, as well as Board members themselves. *See id.* at 21:16-22:3, 40:1-5, 67:3-8. The Board also relied on Groom to

---

[20] "[B]outs of depression and anxiety in addition to bouts of paranoia and delusion" are referred to as "affective disorder." Trial Tr. vol. 4 at 65:4-11 (testimony of Dr. Wu).

draft its decision letters despite the fact that Groom also drafted the Committee's decision letters. *See* Trial Tr. vol. 2 at 38:24-40:18 (Vincent testifying that Groom was asked to draft the Committee letters in 2016 as a result of an increasing number of applications, an overworked Benefits Office, and because the letters were "becoming complicated"). Importantly, and as stated previously, decision letters drafted by Groom include reasons for denial that were not actually contemplated by the Board itself.

This reliance on advisors who heavily influence and are involved with the Committee's decision creates an inherent appearance of impropriety. It effectively forecloses the Board's ability to review a player's claim anew in violation of 29 C.F.R. § 25060.503-1(h)(3)(ii)'s mandate to "not afford deference to the initial adverse benefit determination" and conduct review by an individual who did not "ma[k]e the adverse benefit determination that is the subject of the appeal" or its subordinate.

(3)    ***Failure to Consult with Appropriate Medical Professional***

As stated above, when an "adverse benefits determination . . . is based in whole or in part on a medical judgment," ERISA regulations require a plan administrator to "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." 29 C.F.R. § 2560.503-1(h)(3)(iii). Here, because the Board's adverse benefits determination was based on a medical judgment regarding Plaintiff's neuropsychological disabilities, such a consultation with a health care professional was required to provide a full and fair review. The Board wholly failed to do so.

As stated above, Dr. DiDio, a Plan neutral physician, specifically determined that neuropsychological testing was "essential" to evaluate Plaintiff's traumatic brain injury and recommended that Plaintiff receive an MRI. Admin. Rec. 178. However, despite Dr. DiDio's recommendation and the inclusion of his report with Plaintiff's 2010 appeal for LOD benefits, the

Board never ordered an MRI or referred Plaintiff for neuropsychological testing. *See, e.g.*, Trial Tr. vol. 2 at 182:18-19. Instead, a Benefits Office coordinator forwarded Plaintiff's file and medical reports to the Plan's Medical Director for a review of Plaintiff's *orthopedic* conditions. Pl.'s Ex. 2-8, CLOUD-XFILE-0000673. So while Plaintiff was awarded LOD benefits by the Board less than a month later, *see* Pl.'s Ex. 2-8, CLOUD-XFILE-0000667, *only* Plaintiff's orthopedic conditions were ever reviewed—not his neuropsychological conditions. This omission was a significant oversight and failure on the part of the Board.

Plaintiff also submitted the DiDio Report with his 2014 and 2016 applications to the Committee, and his 2016 appeal to the Board. Moreover, Plaintiff submitted to the Committee and Board in 2016 the 2012 Cronin Report, which opined that Plaintiff's cognitive symptoms were likely causally related to Plaintiff's October 2004 head injury and criticized Dr. Nelson's findings to the contrary. In addition, the evidence shows that the Benefits Office coordinator generated a template letter in connection with Plaintiff's 2016 appeal providing for Plaintiff's referral to a neutral plan physician. But in yet another glaring oversight, that letter was never finalized or sent to Plaintiff. Pl.'s Ex. 3-7, CLOUD-XFILE-0002158. As was the case with Plaintiff's 2010 appeal, Plaintiff was not referred to a physician, and once again, no MRI was performed.

Each time Plaintiff applied for benefits in 2010, 2014, and 2016, Plaintiff's benefits determination was based on a medical judgment regarding the existence or onset date of Plaintiff's neurocognitive disabilities. But neither the Committee nor the Board at any point consulted with the appropriate psychiatric or neurocognitive professional, notwithstanding the explicit recommendation to do so by a Plan neutral neurologist and a documented dispute among doctors as to the onset date of Plaintiff's disabilities.

The Court thus concludes that the Board deprived Plaintiff of a full and fair review by making a determination premised on a medical judgment without ever consulting with an appropriate medical professional—despite having had several opportunities to do so over the course of six years. *See Loan v. Prudential Ins. Co. of Am.*, 370 F. App'x 592, 598 (6th Cir. 2010) (holding that the plan administrator did not comply with 29 C.F.R. § 2560.503-1(h)(3)(iii) where it failed to consult with a forensic toxicologist despite a doctor's report suggesting to do so); *see also Okuno v. Reliance Standard Life Ins. Co.*, 836 F.3d 600, 610-11 (6th Cir. 2016) (finding a plan administrator's reliance on the opinions of an orthopedist and a pulmonologist insufficient to support its denial of a claim that depended on the claimant's psychiatric issues).

*   *   *

Taken together, the Committee's denial of Plaintiff's application and the Board's subsequent review of its denial cannot be characterized as mere technical noncompliance with ERISA's procedural requirements. The Court finds that far from substantially complying with ERISA's procedural requirements, the Board failed to provide Plaintiff a full and fair review of his claim for reclassification, and did not fulfill 29 U.S.C. § 1133's purpose of affording Plaintiff an explanation of denial of benefits that is adequate to ensure meaningful review of that denial. The failure to provide a full and fair review "is an independent basis to overturn a plan administrator's denial of benefits." *Truitt*, 729 F.3d at 510 n.6. Though remand to the plan administrator for a full and fair review is typically the appropriate remedy when a plan administrator fails to substantially comply with ERISA procedural requirements, *Lafleur*, 563 F.3d at 157, "[a]n exception applies where the denial was an abuse of discretion because the evidence clearly shows the denial was arbitrary and capricious." *Rossi v. Precision Drilling Oilfield Servs. Corp. Emp. Benefits Plan*, 704 F.3d 362, 368 (5th Cir. 2013). "A denial is arbitrary and capricious

in the ERISA context when it is not supported by concrete evidence in the record." *Id.* In those cases, judgment for the plaintiff is appropriate. *Robinson*, 443 F.3d at 396.

The Court next reviews whether the Board acted arbitrarily and capriciously or otherwise abused its discretion in processing Plaintiff's appeal based on all the proper evidence.

### B.    *The Board's Abuse of Discretion*

The Court, upon review of the administrative record and evidence within the exceptions articulated in *Crosby* and *Vega*, concludes that the Board abused its discretion in denying Plaintiff's application for reclassification to Active Football benefits for several reasons. First, the Board's overall interpretation of the Plan provisions, including its failure to consider or make any finding under the "Special Rules" set forth in Section 5.4(b), to which Section 5.3(a) is subject, is legally incorrect and directly contradicts the plain meaning of the Plan language. Similarly, the Board's imposition of the "shortly after" requirement to qualify for Active Football benefits under Section 5.3(a) when the Special Rules under Section 5.4(b) do not contemplate such a requirement is inconsistent with a fair reading of the Plan and entirely lacks support in the administrative record. Second, the Board's determination that Plaintiff did not show by "clear and convincing evidence" that he met the definition of "changed circumstances" to qualify for reclassification to Active Football is inconsistent with a fair reading of the Plan and not supported by concrete evidence in the administrative record. In addition, the Board's interpretation of the Plan as not requiring any medical examination by a neutral physician in connection with Plaintiff's reclassification appeal constitutes an abuse of discretion. Finally, the Board's conclusion that Plaintiff's appeal was "untimely" under Section 12.6(a) is unsupported by concrete evidence in the administrative record.

### (1)     *Changed Circumstances*

The Court first examines the Board's determination that Plaintiff did not show by "clear and convincing evidence" that he met the definition of "changed circumstances" to qualify for reclassification to Active Football.   As stated above, to qualify for reclassification to a different benefits category, a player must "show[] by evidence found by the Retirement Board or the Disability Initial Claims Committee to be clear and convincing that, because of changed circumstances, the Player satisfies the conditions of eligibility for a benefit under a different category of T&P benefits."   Admin. Rec. 37, § 5.7(b).   "Clear and convincing" and "changed circumstances" are not defined in the Plan.   In Plaintiff's case, the Board made a decision to interpret "changed circumstances" to mean "a new or different impairment from the one that originally qualified [Plaintiff] for T&P benefits," and found that Plaintiff had not "clearly and convincingly shown" that he was "totally and permanently disabled by a new or different impairment."   *Id.* at 519.

Considering the first legal correctness factor, the Court finds that the Board has not applied uniform interpretation to the term "changed circumstances."   *See Porter*, 731 F.3d at 364 n.8 (considering "whether the administrator has given the plan a uniform construction").   As such, the Board's inconsistent approach with respect to the term violates the ERISA regulatory requirement that the Plan's claims procedure contain "safeguards designed to ensure and to verify that . . . plan provisions have been applied consistently with respect to similarly situated claimants."   29 C.F.R. § 2560.503-1(b)(5).

As evidenced from its past decision letters, the Board has at times (1) provided no definition for "changed circumstances";[21] (2) implied that changed circumstances means something other

---

[21] Pl.'s Ex. 2-11, CLOUD-LTRS-0000351-54 (July 27, 2001); *id.* at CLOUD-LTRS-0000320-22 (July 20, 2003); *id.* at CLOUD-LTRS-0000383-84 (October 28, 2005).

than the same basis for the initial decision;[22] (3) interpreted "changed circumstances" to mean "a change in the Player's condition";[23] (4) interpreted "changed circumstances" to mean "a change in the Player's *physical* condition";[24] (5) interpreted "changed circumstances" to mean "a new or different impairment than the one that originally qualified you for T&P benefits";[25] (6) interpreted "changed circumstances" to mean "a new or different impairment that warrants a different category of benefits";[26] (7) interpreted "changed circumstances" to mean "a change in a Player's condition, such as a new impairment that did not exist during the original application, or an impairment that did exist but is different from the one that formed the basis for the original award of T&P benefits";[27] or (8) interpreted "changed circumstances" to mean "an impairment that did not form the basis of the original T&P award, and that became totally and permanently disabling after the original T&P award."[28]

Testimony from Board members confirms that the Board has never adhered to a defined or uniform interpretation of "changed circumstances." Rather, the lack of any uniform definition of the term has allowed the Plan to modify its meaning on an ad hoc basis. For example, one Board member testified that the Plan's lawyers came up with the definition of "changed circumstances." Cass Depo. 168:24-169:6. Another Board member testified that "changed circumstances" "has no

---

[22] *Id.* at CLOUD-LTRS-0000287-89 (April 14, 2005); *id.* at CLOUD-LTRS-0000279-82 (February 13, 2008); *id.* at CLOUD-LTRS-0000355-60 (February 13, 2008); *id.* at CLOUD-LTRS-0000290-92 (May 24, 2012); *id.* at CLOUD-LTRS-0000401-06 (February 25, 2013).
[23] *Id.* at CLOUD-LTRS-0000221-24 (December 2, 2015); *id.* at CLOUD-LTRS-0000242-44 (August 22, 2017); *id.* at CLOUD-LTRS-0000034-36 (August 24, 2018).
[24] *Id.* at CLOUD-LTRS-0000326-29 (August 15, 2011) (emphasis added); *id.* at CLOUD-LTRS-0000345-50 (August 26, 2013) (emphasis added); *id.* at CLOUD-LTRS-0000453-56 (November 21, 2014) (emphasis added); *id.* at CLOUD-LTRS-0000366-71 (March 9, 2015 (emphasis added)); *id.* at CLOUD-LTRS- 0000372-77 (May 21, 2015); *id.* at CLOUD-LTRS-0000255-58 (May 21, 2015) (emphasis added).
[25] *Id.* at CLOUD-LTRS-0000247-50 (February 26, 2016); *id.* at CLOUD-LTRS-0000087-89 (November 21, 2016); *id.* at CLOUD-LTRS-0000237-39 (February 27, 2017); *id.* at CLOUD-LTRS-000082-84 (May 16, 2017).
[26] *Id.* at CLOUD-LTRS-0000216-20 (February 26, 2016).
[27] *Id.* at CLOUD-LTRS-0000058-65 (November 22, 2016).
[28] *Id.* at CLOUD-LTRS-0000076-78 (May 16, 2017); *id.* at CLOUD-LTRS-0000049-52 (February 26, 2018); *id.* at CLOUD-LTRS-0000040-43 (February 27, 2018).

set definition" and that the meaning of the term is "evolving." *See* Trial Tr. vol. 5 at 96:1-98:10. He also testified that the Board "can make reasonable inferences as to what 'changed circumstances' mean in a particular case." *Id.* at 97:11-12.

As to the second legal correctness factor, the Court finds that the Board's interpretation of "changed circumstances," as applied to the facts, is entirely inconsistent with a fair reading of the Plan. *See Porter,* 731 F.3d at 364 n.8 (considering "whether the interpretation is consistent with a fair reading of the plan"). As an initial matter, it is undisputed that when a player applying for T&P benefits has received a favorable SSA disability award, the Committee automatically awards T&P benefits without additional review of the beneficiary's application or administrative record. *See, e.g.*, Trial Tr. vol. 3 at 119:10-126:20. In those cases, a player's application is presented to the Committee without referral to a neutral physician because, absent a finding of fraud, the Committee must award the player T&P benefits solely based on the SSA's finding of total and permanent disability pursuant to the SSA's own standards and definitions. *See* Admin. Rec. 30, § 5.2(b); Trial Tr. vol. 2 at 30:20-25; *see also* Trial Tr. vol. 3 at 121:13-18 (Cass testifying that T&P benefits are automatically granted based on an SSA award); *id.* at 123:6-8 ("[N]o one really looks that hard at what underlying disability was because in some sense . . . it doesn't matter."). Pursuant to this practice, the Board reviews the SSA decision only when a player appeals the Committee's denial of reclassification. *Id.* at 124:24-125:3.

Also relevant to whether the interpretation of "changed circumstances" in this case is consistent with a fair reading of the Plan is the Board's practice concerning neutral physician referrals. Pursuant to Section 5.2(c) of the Plan, a former player is referred to a neutral physician for an evaluation only when the Board finds that a medical examination is "necessary to make an adequate determination respecting [the player's] physical or mental condition." Admin. Rec. 30,

§ 5.2(c); *see also* Trial Tr. vol. 3 at 52:14-53:21, 57:10-16. But for reclassification appeals, the Board's practice is to refer a player to a neutral physician only if "there was a new impairment alleged." *Id.* at 58:1-3. This construction results in an unreasonable process whereby the Board may justify its failure to refer a player to a neutral physician based on a finding that no new impairment was alleged, and subsequently justify a finding of no "changed circumstances" based on the lack of evidence of a new impairment. Such an application of the Plan is both ludicrous and at odds with the Board's mandate to discharge its duties "solely and exclusively in the interest of the Players and their beneficiaries." Admin. Rec. 52, § 8.8.

Based on the foregoing, the Court concludes that the Board applied a legally incorrect interpretation of the Plan as a whole and abused its discretion when it determined that Plaintiff had not shown changed circumstances despite the Committee's failure to make any initial assessment of Plaintiff's circumstances in 2014. Similarly, the Board's interpretation of the Plan as not requiring any medical examination by a neutral physician in connection with Plaintiff's reclassification appeal, when no medical examination was directed in connection with Plaintiff's 2014 T&P application, is both legally incorrect and in direct conflict with the Plan's plain language. In addition, and to the extent the Board's failure to refer Plaintiff to a neutral physician was premised on the finding that such an examination was not "necessary to make an adequate determination respecting his physical or mental condition" under Section 5.2(c), such a finding constitutes an abuse of discretion because it directly contravenes the Plan's plain language and is inconsistent with any fair reading of the Plan as a whole. While the Court's finding of abuse of discretion is supported on that basis alone, in step with the Fifth Circuit's policy of conducting a "full review of the administrative decision," *White v. Life Ins. Co. of N. Am.*, 892 F.3d 762, 770 (5th Cir. 2018), the Court proceeds to step two of the abuse of discretion analysis.

The Court next decides whether the Board abused its discretion in determining that Plaintiff had not met Section 5.7(b)'s requirements because he had not "clearly and convincingly shown" that he was "totally and permanently disabled by a new or different impairment." Admin. Rec. 519. In making this determination, the Board interpreted "changed circumstances" to mean "a new or different impairment from the one that originally qualified [Plaintiff] for T&P benefits." *Id.* Thus, the question is whether the Board's finding is supported by some concrete evidence in the administrative record, considering the internal consistency of the Plan, relevant regulations, the factual background of the determination, and inferences of bad faith. *See LifeCare*, 703 F.3d at 841. The answer is a resounding no.

The internal consistency factor weighs heavily against the Board's determination. *See Porter*, 731 F.3d at 364 n.9 (considering "the internal consistency of the plan under the administrator's interpretation"). As discussed above, the Board's treatment of the "changed circumstances" requirement in this context necessarily results in internal conflicts. The Committee's rubber-stamping of the SSA's decision as to disability and onset date without "really look[ing] that hard at what underlying disability was," Trial Tr. vol. 3 at 123:6-8, contravenes the Plan's express directive that SSA determinations are not binding on the Committee or the Board. *See* Admin. Rec. 36, § 5.7(a) ("For example, determinations by the Social Security Administration as to the timing and causation of total and permanent disability are not binding. . . .").

The factual background of the determination similarly supports a finding of abuse of discretion. *See Porter*, 731 F.3d at 364 n.9. Indeed, it is difficult to conceive how the Board could determine whether Plaintiff's circumstances had changed in connection with his 2016 reclassification application when there was never an assessment of what his circumstances were to begin with (in connection with his 2014 application). Rather than referring Plaintiff to a neutral

physician—particularly where Plaintiff's application and medical records referenced an earlier onset date of the disability than the date determined by the SSA—the Committee accepted the SSA decision wholesale. Then, in 2016, the Board used this wholesale acceptance as a basis for concluding that Plaintiff had not shown "changed circumstances." While referring Plaintiff to a neutral physician might have resulted in his qualification for Active Football benefits in 2014, failing to do so in connection with Plaintiff's 2016 application virtually ensured that no "changed circumstances" could be found. Such an illogical application of Plan provisions falls nowhere on the continuum of reasonableness. It does not amount to a "reasonable claim procedure" as required under ERISA regulations, 29 C.F.R. § 2560.503-1(b), and is inconsistent with the Board's fiduciary obligations to former players, *see* Admin. Rec. 52, § 8.8.

Without any investigation or determination of what circumstances needed to be "changed," there was no connection, much less a rational one, between the facts known to the Board and its determination that Plaintiff had not shown changed circumstances. This is especially true where the evidence shows, as it does here, that there was never any review by the Board or its advisors of *all* evidence presented. The Court thus concludes that the Board's finding was arbitrary and capricious and an abuse of discretion. *See Bellaire Gen. Hosp. v. Blue Cross Blue Shield*, 97 F.3d 822, 828 (5th Cir. 1996) ("An arbitrary decision is one made without a rational connection between the known facts and the decision or between the found facts and the evidence.").

(2)   ***Special Rules***

a.   <u>*Board's Failure to Consider Special Rules*</u>

Having found that the Board abused its discretion in determining that Plaintiff had not shown changed circumstances, the Court proceeds to the Board's determination that, even if Plaintiff were eligible for reclassification, he did not qualify for Active Football benefits. While the Board's letter only addressed why Plaintiff did not qualify under Section 5.3(a), the Court finds

67

that the Board abused its discretion in failing to consider or apply the "Special Rules" set forth in Section 5.4(b), to which Section 5.3(a) is subject.

The Board's failure to consider the special rules evinces an interpretation of the Plan provisions that is legally incorrect and directly contradicts the plain meaning of the Plan language. As stated above, Section 5.3(a) of the Plan states that it is "***subject to*** the special rules of Section 5.4." Admin. Rec. 32 (emphasis added). Under Fifth Circuit precedent, the term "'subject to' means 'likely to be conditioned, affected, or modified in some indicated way, and having a contingent relation to something and usually dependent on such relation for final form, validity or significance." *Cedyco Corp. v. PetroQuest Energy, LLC*, 497 F.3d 485, 489 (5th Cir. 2007) (alterations omitted); *see also* A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 126 (2012) ("A dependent phrase that begins with *subject to* indicates that the main clause it introduces or follows does not derogate from the provision to which it refers."). Accordingly, Section 5.3(a) is modified by and has a contingent relation to "the special rules of Section 5.4."

Section 5.4(b) states the "special rule" relating to psychological or psychiatric disorders:

Psychological/Psychiatric Disorders. A payment for total and permanent disability as a result of a psychological/psychiatric disorder may only be made, and will only be awarded, for benefits under the provisions of Section 5.3(b), Section 5.3(c), or Section 5.3(d), *except that a total and permanent disability as a result of a psychological/psychiatric disorder may be awarded under the provisions of Section 5.3(a) if the requirements for a total and permanent disability are otherwise met* and *the psychological/psychiatric disorder either (1) is caused by or relates to a head injury (or injuries) sustained by a Player arising out of League football activities (e.g., repetitive concussions);* (2) is caused by or relates to the use of a substance prescribed by a licensed physician for an injury (or injuries) or illness sustained by a Player arising out of League football activities; or (3) is caused by an injury (or injuries) or illness that qualified the Player for T&P benefits under Section 5.3(a).

Admin. Rec. 33 (emphases added). Section 5.4(b) unambiguously[29] creates an "except[ion]" permitting an award of Section 5.3(a) benefits for certain "psychological/psychiatric disorders." Therefore, under the plain meaning of Section 5.4(b), a player may be awarded Active Football benefits under the following conditions: (1) the requirements for a total and permanent disability are otherwise met, and (2) the psychological or psychiatric disorder is "caused by or relates to a head injury (or injuries) sustained by a Player arising out of League football activities," which expressly includes "repetitive concussions." Admin. Rec. 33.

While the decision letter (purportedly prepared by the Board) acknowledges Plaintiff sought benefits related to an array of psychological and psychiatric disorders, such as "severe mental disorder stemming from multiple concussions," "neurological, and cognitive impairments, such as post-concussion syndrome, clinical depression, dementia pugilistica, migraine, vertigo, impaired verbal fluency," and other "severe mental impairments," the Board did not reference Section 5.4 or make a determination with respect to whether Plaintiff qualified for Section 5.3(a) Active Football benefits via Section 5.4(b). *See id.* at 518-19. Skipping over this requirement entirely, the Board instead based its decision in part on the finding that Plaintiff had not shown that he was totally and permanently disabled "shortly after" the disability first arose pursuant to Section 5.3(a). *See* Trial Tr. vol. 3 at 105:23-106:10 (Cass testifying that Section 5.4(b) does not affect whether a player requesting reclassification to Active Football has to satisfy the "shortly after" requirement of Section 5.3(a)).

It is apparent from a plain reading of the Plan, however, that Section 5.4(b) does not impose the "shortly after" requirement applied under Section 5.3(a). Rather, Section 5.4(b) distinctly

---

[29] A word or phrase is ambiguous only when there is "[a]n uncertainty of meaning based not on the scope of a word or phrase but on a semantic dichotomy that gives rise to any of two or more quite different but almost equally plausible interpretations." A. SCALIA & B. GARNER, *supra*, at 425; *see also id.* at 32 ("A word or phrase is ambiguous when the question is which of two or more meanings applies . . . .").

refers to disabilities resulting from "head injur[ies]" under subsection (1) and injuries "that qualified the Player for T&P benefits under Section 5.3(a)" under subsection (3) as separate bases for Active Football benefits. Applying the "shortly after" or other Section 5.3(a) requirements to a player who otherwise qualifies under the special rules would subordinate the requirements of Section 5.4(b) to those of Section 5.3(a), which directly contradicts the plain statement that Section 5.3(a) is "***subject to***" the special rules of Section 5.4. *See* A. SCALIA & B. GARNER, *supra*, at 126 ("Subordinating language (signaled by *subject to*) . . . merely shows which provision prevails in the event of a clash."); *see also id.* ("*subject to*" often introduces a provision that contradicts some applications of what it modifies"). Requiring a player to meet the requirements of Section 5.3(a) notwithstanding his qualification under the special rules would render Section 5.4 meaningless. *See id.* at 176 (explaining the "surplusage canon" and noting that "[i]f a provision is susceptible of (1) a meaning that gives it an effect already achieved by another provision, or that deprives another provision of all independent effect, and (2) another meaning that leaves both provisions with some independent operation, the latter should be preferred").

The Court therefore finds that the Board's imposition of Section 5.3(a)'s "shortly after" requirement in its review of Plaintiff's appeal is inconsistent with a fair reading of the Plan and directly contradicts the Plan's plain language. The Court thus finds that the Board's interpretation was both legally incorrect and an abuse of discretion. *See LifeCare,* 703 F.3d at 841 (quoting *Gosselink,* 272 F.3d at 726).

b.    <u>*Active Football Determination*</u>

Having concluded that the correct Plan interpretation is that the special rules set forth in Section 5.4 supersede the requirements of Section 5.3(a), the Court now considers whether the Board provided concrete evidence that Plaintiff did not qualify for Active Football under Section 5.4(b). *See id.* at 843 (considering whether administrator provided "concrete evidence" of

70

requirements based on legally correct construction of incorrectly interpreted plan terms). As stated above, a player qualifies for Active Football benefits through Section 5.4(b) if (1) he has a "psychological/psychiatric disorder"; (2) he otherwise meets the requirements for a total and permanent disability; and (3) the disorder is "caused by or relates to a head injury (or injuries) sustained by [the player] arising out of League football activities," including "repetitive concussions."

First, it is undisputed that Plaintiff meets the requirements for total and permanent disability, as he was found to be totally and permanently disabled by the Committee in 2014 and continues to receive Inactive A T&P benefits to this day. *See, e.g.*, Admin. Rec. 284 (2014 Committee decision letter awarding Plaintiff Inactive A T&P benefits and "conclud[ing] that [Plaintiff is] totally and permanently disabled"); Parties' Stipulated Facts ¶ 7 ("Plaintiff is currently receiving Inactive A total and permanent disability benefits in accordance with Section 5.3(c) of the Plan."). The Board's decision letter, however, stated that "[t]he evidence you submitted does not show that you are totally and permanently disabled." Admin. Rec. 519. This statement is irreconcilable with the Plan's plain language, which specifically provides that players who are eligible for SSA disability benefits "*will be deemed to be totally and permanently disabled*, unless four voting members of the Retirement Board determine that such Player is receiving such benefits fraudulently and is not totally and permanently disabled." *Id.* at 30-31, § 5.2(b) (emphasis added).[30] Indeed, Section 5.2(b) was the very basis for Plaintiff's 2014 benefits award. *Id.* at 284; Parties' Stipulated Facts ¶ 5. In addition, the Board's 2016 decision is entirely inconsistent with the Committee's 2014 determination that Plaintiff *was* totally and permanently disabled based on the SSA Award. *See* Admin. Rec. 284.

---

[30] No finding of fraud was ever made by any Board member in this case, nor was the issue ever considered.

Second, the administrative record contains well-documented medical evidence of Plaintiff's psychological and psychiatric disorders. *See id.* at 515 (2012 Cronin Report) (finding that Plaintiff "has obviously been experiencing [neurocognitive] problems since his injury in 2004"); *id.* at 177 (DiDio Report) (finding that Plaintiff suffers from vertigo and has an impaired verbal fluency); *id.* at 118 (Smith Report) (diagnosing Plaintiff with "Major Depressive Disorder"); *id.* at 111 (Cates Report) (observing Plaintiff to be struggling with "depressive symptoms," "poor concentration," "bouts of unpredictable irritability," "forgetfulness," and "perceived lack of motivation"); *id.* (Cates Report) (noting that an assessment of a Mini-Mental State Examination revealed that Plaintiff experienced a "slowed process due to difficulty tracking multiple topics or references to previous subject matter" with a "reduced ability to transfer memory into long term storage"). In addition to medical findings and observations, Plaintiff's own statements, both to medical professionals and on his benefits applications, clearly describe symptoms of psychological and psychiatric disorders. *See, e.g., id.* at 96-97 (2014 application for T&P benefits) (listing the following disabilities: post-concussion syndrome; clinical depression; dementia pugilistica; migraine headaches; benign paroxysmal positional vertigo; difficulties with verbal fluency, decision making, and concentration; memory loss; vertigo; insomnia; and unpredictable irritability); *id.* at 290-91 (2016 application for reclassification) (listing the following disabilities: affective disorder; significant memory and attention problems; memory loss; attention and decision problems; post-concussion syndrome; migraines; clinical depression; vertigo; impaired verbal fluency); *id.* at 175-77 (DiDio Report) (Plaintiff complained of the following: migraine headaches, mild memory loss, stuttering, depressive symptoms); *id.* at 119 (2011 Cronin Report) (Plaintiff complained of the following: memory and concentration loss, vertigo, tunnel vision, and obsessive-compulsive disorder). While the Board may permissibly

72

assign greater weight to medical evidence, the Board cannot ignore Plaintiff's subjective complaints that were repeatedly corroborated by physicians and consistent with the medical evidence. *See Schully v. Cont'l Cas. Co.*, 380 F. App'x 437, 439 (5th Cir. 2010). Thus, any finding by the Board that Plaintiff did not have psychological or psychiatric disorders is not supported by substantial evidence in the administrative record. On the contrary, it defies credulity to so find.

Third, no party disputes that Plaintiff's disorders relate to head injuries from repetitive concussions. Therefore, finding to the contrary would not be supported by substantial evidence in the administrative record. *See, e.g.*, Admin. Rec. 121 (2011 Cronin Report) (finding that based on Dr. Cronin's "evaluation, observation and collateral communication thus far, it would seem reasonable to assume [Plaintiff] has sustained at least one, if not several, closed head injuries"); *id.* at 178 (DiDio Report) ("[Plaintiff's] subjective cognitive complaints and objective impairment in verbal fluency are very possibly a result of his past concussion. These signs and symptoms can be seen as a result of traumatic brain injuries.").

Nor does the administrative record contain substantial evidence that Plaintiff's disorders did not arise out of League football activities. The Board's decision letter did not dispute this. *See id.* at 519 ("It is not enough that your disability first arise during your NFL career; it must also become totally and permanently disabling 'shortly after' it first arises."); *see also* Cass Depo. Tr. 151:3-5 ("I believe [Plaintiff's] disability arose—arose out of the League activities—League football activities."). Rather, the record is replete with evidence of several concussions taking place during Plaintiff's seven credited seasons with the NFL. *See id.* at 175 (DiDio Report) (stating that there is "clear documentation" of a concussion sustained on October 31, 2004, while playing with the Giants); *id.* at 392 (NFL MTBI physician's initial evaluation following October 31, 2004, in-game collision); *id.* at 513 (2012 Cronin Report) (referring to Dr. Nelson's statement that

"[s]ignificant physical and cognitive problems occurred immediately after this [October 31, 2004] collision and [Plaintiff] experienced 'confusion, disorientation and dizziness as a result of the impact'"); *id.* at 114 (Smith Report) (reporting that Plaintiff had three documented concussions and "countless other 'dings'"); *id.* at 177 (DiDio Report) (Plaintiff "reported at least several concussions during his NFL football career"); *id.* at 170 (Canizares Report) (referencing multiple concussions sustained by Plaintiff); *id.* at 119 (Plaintiff reported "serious concussions while playing for Kansas City in 1999, as well as the New England Patriots in 2003 and lastly with the New York Giants in 2004 and 2005"); *id.* at 291 (2016 application for reclassification) (indicating that disabilities arose "[i]mmediately after October 31, 2004"). There is no evidence—let alone substantial evidence—to support a determination that Plaintiff's head injuries did not arise out of League football activities.

In sum, the Board's interpretation of Section 5.4(b) was an abuse of discretion because it "directly contradict[ed] the plain meaning of the plan language." *Langley v. Howard Hughes Mgmt. Co., L.L.C., Separation Benefits Plan*, 694 F. App'x 227, 234 (5th Cir. 2017) (quoting *LifeCare*, 703 F.3d at 842). As detailed above, Section 5.4(b) supersedes Section 5.3(a), and Plaintiff qualifies for Active Football benefits pursuant to Section 5.4(b). Any finding to the contrary is not supported by substantial evidence in the administrative record and is arbitrary and capricious. Therefore, "we do not need to consider the other two abuse of discretion factors." *LifeCare*, 703 F.3d at 843.

### (3)     *Section 5.3(a) Requirements Absent the Special Rules*

The Court has ruled that the Board clearly abused its discretion in (1) finding that Plaintiff had not shown changed circumstances for reclassification purposes and (2) interpreting Section 5.4(b) in a way that contradicts the Plan's plain language. Alternatively, the Court finds that the

Board's conclusion that Plaintiff did not qualify for Active Football benefits under Section 5.3(a) is not supported by substantial evidence in the administrative record.

To qualify for Active Football benefits under Section 5.3(a), without applying the special rules in Section 5.4, a player must show that his disability (1) "results from League football activities" and "arises while the Player is an Active Player," and (2) "causes the Player to be totally and permanently disabled 'shortly after' the disability(ies) first arises." Admin. Rec. 32. Contrary to the plain language of Section 5.3(a), however, Board members viewed the Active Football category as reserved only for situations where a player is immediately paralyzed after an in-game hit. *See* Trial Tr. vol. 3 at 109:16-22 (Cass testifying that Active Football benefits are intended only for situations where "there's immediate hit—there's a hit on the field, and the player either becomes paralyzed right on the field as a result of that hit or partially paralyzed"); Trial Tr. vol. 5 at 42:1-4 (Robert Smith testifying that Active Football benefits are for "catastrophic-type injures," such as an injury that "paralyze[s]" someone). But there is no language in Section 5.3(a) or any other Plan provision that limits the availability of Active Football benefits to situations where a player is paralyzed. Rather, as previously stated, Section 5.4(b) expressly affords Active Football benefits to players with psychological or psychiatric disorders "caused by or relat[ing] to a head injury," such as "repetitive concussions." Admin. Rec. 33, § 5.4(b).

The Court has already determined that Plaintiff's disability resulted from League football activities and that a contrary finding is not supported by any, much less substantial, evidence in the administrative record. The Court now considers whether Plaintiff meets the "shortly after" requirement of Section 5.3(a).

Section 5.3(e) of the Plan defines "shortly after." That section provides that "a Player who becomes totally and permanently disabled no later than six months after a disability(ies) first arises

will be conclusively deemed to have become totally and permanently disabled 'shortly after' the disability(ies) first arises." *Id.* at 32. Additionally, "a Player who becomes totally and permanently disabled more than twelve months after a disability(ies) first arises will be conclusively deemed not to have become totally and permanently disabled 'shortly after' the disability(ies) first arises." *Id.* For cases falling within the six- to twelve-month period, Section 5.3(e) gives the Committee and Board discretion to determine whether "shortly after" is satisfied. *Id.*

While the Board found that Plaintiff did not meet the "shortly after" requirement, its decision letter provided no analysis as to why. *See id.* 518-20. Testimony seems to indicate, however, that the Board believed a player could not qualify as totally and permanently disabled while on a team's roster as an active NFL player. *See* Trial Tr. vol. 3 at 112:16-22 (Cass testifying that a player cannot satisfy "shortly after" if he continues to play in the NFL). This interpretation of the Plan directly contradicts its plain meaning. Section 5.2(a) of the Plan states that a player will be deemed to be totally and permanently disabled if "he has become totally disabled to the extent that he is substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit," and that "such condition is permanent." Admin. Rec. 30. But that section also explicitly provides that "[a] Player will not be considered to be able to engage in any occupation or employment for remuneration or profit within the meaning of this Section 5.2 *merely because such person is employed by the League or an Employer*." *Id.* (emphasis added). Accordingly, under the terms of the Plan, mere employment by the NFL[31] or an NFL team[32] does not in and of itself disqualify a player from being deemed totally and permanently disabled.

---

[31] *See id.* at 10, § 1.19 (defining "League" as the NFL).
[32] *See id.* at 9, § 1.15 (defining "Employer" as an NFL team).

In addition to the finding that the Board's interpretation of the Plan directly contradicts its plain meaning, the Court concludes that the Board's determination that Plaintiff had not met the "shortly after" requirement is not supported by substantial evidence in the administrative record. In his 2016 application to the Committee and letter to the Board, Plaintiff represented that his psychological and psychiatric disorders arose "immediately after" the October 31, 2004, helmet-to-helmet collision. *Id.* at 291, 492. Physician reports submitted with Plaintiff's reclassification application and appeal corroborate Plaintiff's representations. *See id.* at 513 (Dr. Nelson reporting that "significant physical and cognitive problems occurred immediately after this collision"); *id.* at 515 (2012 Cronin Report) ("[Plaintiff] has obviously been experiencing these problems since his injury in 2004."). Moreover, the October 31, 2004, NFL MTBI physician's initial evaluation indicated that Plaintiff complained of several post-concussion disabilities. *Id.* at 392.

Further, despite the Board's authority to "inspect the records of any Employer as reasonably necessary," *id.* at 49, § 8.2(l), there is no evidence in the administrative record that contradicts Plaintiff's consistent representation that he was released by the Giants due to his "difficulties understanding offensive and special teams basics playbooks" and inability "to last for a significant period of time with any other NFL team due to his cumulative mental disorders." *Id.* at 97, 492. Indeed, Plaintiff's NFL team history shows that he was "terminated" by the Giants 10 months after the October 31, 2004, collision. *See id.* at 275. He was then signed by the Patriots but was "terminated" less than two months later. *Id.* Finally, Plaintiff signed again with the Giants, but did not re-sign with any other team after his contract expired three months later. *Id.* Moreover, in his 2016 application to the Committee, Plaintiff stated that he was "[r]eleased" from his previous job because he had "difficulties learning the fitness protocols due to . . . metal [sic] impairments."

*Id.* at 292.  Plaintiff represented the same to Dr. Cronin and Dr. Smith.  *Id.* at 114, 119.  Again, there is no evidence in the administrative record to the contrary.

Under Section 5.7(a) of the Plan, neither the Committee nor the Board is bound by the SSA's decision as to timing.  *Id.* at 36.  Yet, the Board's practice was to automatically grant T&P benefits based on an SSA award.[33]  The Court finds that in denying Active Football benefits, the Committee and the Board overemphasized the December 31, 2008, date of disability provided in the SSA Award, which favored a denial, and deemphasized or ignored other medical reports and Plaintiff's own statements suggesting a contrary conclusion.  *See Glenn*, 554 U.S. at 118 (considering the plan administrator's selective emphasis of evidence in finding abuse of discretion).  The Committee and Board engaged in a selective review of the administrative record by rubber-stamping the SSA's disability date to Plaintiff's detriment despite evidence to the contrary.  *See Vercher v. Alexander & Alexander Inc.*, 379 F.3d 222, 233 (5th Cir. 2004) ("[P]lan administrators may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003))); *see also Schully*, 380 F. App'x at 439 (finding abuse of discretion where plan administrator "effectively ignore[d]" reliable evidence by "fail[ing] to consider Schully's longstanding subjective complaints of pain, which were repeatedly corroborated by the physicians most familiar with his condition and which were consistent with the medical evidence").

---

[33] *See* Reynolds Depo. Tr. 232:11-17 (testifying that when a player submits an SSA disability award, the player's case is "automatically presented to the Initial Claims Committee without the player needing to go see one of the neutral physicians"); Robert Smith Depo. Tr. 173:3-9 (testifying that "there was no need to" evaluate a player by a neutral physician if "he had the Social Security award").  In fact, Cass testified that "no one really looks that hard at what the underlying disability was because in some sense . . . it doesn't matter."  Trial Tr. vol. 3 at 123:6-8.  Similarly, Chris Smith testified that she believed that Plaintiff did not meet the "shortly after" requirement in 2014 because of "the fact that the Social Security deemed him disabled as of 2008."  Chris Smith Depo. Tr. 254:12-258:3.  She also believed that Plaintiff did not meet "shortly after" and should not have been reclassified in 2016, at which time she "was going by the Social Security award that stated that he was disabled since December 2008."  *Id.* at 333:12-334:5.

For the reasons stated above, the Court finds that the Board abused its discretion in finding that Plaintiff did not meet the "shortly after" requirement in Section 5.3(a).

### (4)        *Untimeliness of Plaintiff's Appeal*

Finally, the Board's decision letter premised its denial on the additional finding that Plaintiff's appeal was untimely under Section 12.6(a). Specifically, the letter stated that "(1) according to Plan records, [Plaintiff] received the decision letter on March 4, 2016; (2) that decision letter advised [Plaintiff] of the 180-day appeal deadline (which expired on August 31, 2016); and (3) the Plan did not receive [Plaintiff's] appeal until September 2, 2016, two days after the 180-day deadline expired." *Id.* at 520. However, the Board's finding of untimeliness is not supported by concrete evidence in the administrative record and thus constitutes an abuse of discretion.

As previously stated, untimeliness was never discussed at the Board meeting or mentioned in the Board's meeting minutes. *See* Trial Tr. vol. 2 at 213:12-14; Pl.'s Ex. 2-10, CLOUD-MIN-006. Rather, it was a post hoc reason for denial contrived by Benefits Office staff and Board advisors. *See, e.g.*, Pl.'s Ex. 3-5 at NFLPA 0000032 (email chain between Marshall and Vincent discussing the inclusion of the untimeliness finding despite acknowledging that it was not a basis for denial by any of the Board members).

The only support in the administrative record for the determination that Plaintiff's appeal was untimely is a spreadsheet of FedEx shipping data maintained and created by the Benefits Office using information downloaded from the FedEx website. Relevant to the mailing of the Committee's 2016 decision letter to Plaintiff, the Benefits Office's data indicates a "Shipment Delivery Date" of "3/4/2016." *Id.* at 524. It further indicates a "Proof of delivery recipient" as "M.CLOUC" and a "Recipient Name" of "Michael Cloud." *Id.* at 527. Thus, the Board's sole

support for its finding of untimeliness was an internally maintained record of external FedEx data reflecting delivery to a recipient named "M. Clouc." This record is defective on its face.

The Board's reliance on the Benefits Office tracking document alone further constitutes an overemphasis of unreliable information in the administrative record and suggests procedural unreasonableness geared toward a denial of Active Football benefits. Moreover, Defendant represented to the Court that there was no effort whatsoever taken by the Board to verify delivery, *see* Trial Tr. vol. 4 at 162:16-163:11; *see also* Robert Smith Depo. Tr. 240:1-3 (testifying that he did "not look[] into the specifics of the 180 days in this case"), which is wholly inconsistent with the Board's role as a fiduciary.

For all of these reasons, the Board's finding of untimeliness was arbitrary and capricious.

## IV.    CONCLUSION

In reviewing the Board's decision pursuant to the framework set forth by the Fifth Circuit, the Court has concluded that the Board abused its discretion and arrived at a determination not supported by substantial evidence in the administrative record. The Court has also found that in the process, the Board denied Plaintiff a full and fair review of his appeal and failed to adhere to the requirements of Section 1133 and the corresponding regulations, as the Board's decision was certainly not "thoroughly informed by the relevant facts and terms of the plan" or explained in a manner "adequate to insure meaningful review of that denial." *Schadler*, 147 F.3d at 395. In so finding, the Court heeds the Supreme Court's directive to conduct a "combination-of-factors method of review," in which courts take into account "several different, often case-specific, factors, reaching a result by weighing all together." *Glenn*, 554 U.S. at 117. As the Supreme Court has held, there "are no talismanic words that can avoid the process of judgment," and the "[w]ant of certainty in judicial standards partly reflects the intractability of any formula to furnish

definiteness of content for all the impalpable factors involved in judicial review." *Id.* at 119 (internal quotation marks omitted) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 489 (1951)).

The Board's review process, its interpretation and application of the Plan language, and overall factual context all suggest an intent to deny Plaintiff's reclassification appeal regardless of the evidence.  At one juncture, the Social Security Administration's determination of total and permanent disability was accepted without question.  But when Plaintiff applied for reclassification in 2016, it was disregarded completely.  Instead, and without explanation, the Board substituted its own erroneous conclusion that Plaintiff was not totally and permanently disabled, relying on tortuous reasoning in denying Active Football benefits that was contrary to the plain meaning of multiple Plan provisions.  Such a determination based on cherry-picked information favoring denial of Plaintiff's application is not "the result of a principled reasoning process."  *Glenn v. MetLife*, 461 F.3d 660, 674 (6th Cir. 2006), *aff'd sub nom. Glenn*, 554 U.S. 105.  And in reaching its decision, the Board relied almost exclusively on compromised advisors, failed to consider important—let alone *all*—information in Plaintiff's file, and shirked its fiduciary obligations under both ERISA and the Plan itself.

Behind the curtain is the troubling but apparent reality that these abuses by the Board are part of a larger strategy engineered to ensure that former NFL players suffering from the devastating effects of severe head trauma are not awarded Active Football benefits.  It is telling that out of the thousands of former players who filed applications for benefits, only 30 players currently receive Active Football benefits. Cass Depo. Tr. 93:12-15; Trial Tr. vol. 2 at 230:16-19, 241:13-15. This strategy is further evidenced by the string of denials, years of delay while Plaintiff appealed those denials to the Board, and further delay while Plaintiff was forced to engage in time-

consuming, expensive, and exceedingly contentious litigation in an effort to recover Active Football benefits. Through this protracted litigation, it has become clear that the Board misplaced its trust in advisors, including advisors at Groom. These advisors failed to review all documents, drafted Board decision letters reflecting purported reasons for denial that were never actually discussed among Board members, and advised both the Committee and the Board members charged with conducting a de novo review of Committee decision—despite the inherent conflict of interest presented by acting in such a dual capacity.

Over the course of trial, Defendant's counsel commented to the Court that several facets of this case, including taking depositions of Committee and Board members and conducting a bench trial, have been "unprecedented." Trial Tr. vol. 6 [ECF No. 24] at 75:2-8. But despite counsel's intimation, the Court's conclusion that the Board abused its discretion and did not provide a full and fair review on numerous bases—indeed, at nearly each step of the review process—is hardly unprecedented, and Plaintiff's allegations against Defendant and the Board are hardly unique. Dozens of former NFL players have lodged similar challenges, and the Court's findings echo the concerns already expressed by courts across the country. *See, e.g., Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 19-cv-05360-JSC, 2022 WL 1786576, at *3 (N.D. Cal. June 1, 2022) (after previously remanding to Board to determine player's entitlement to benefits, finding abuse of discretion by Board in denying benefits application for the second time where, among other things, "[t]he course of dealing suggests an intent to deny Mr. Dimry's benefits application regardless of the evidence"); *Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 855 F. App'x 332, 333-34 (9th Cir. 2021) (finding "Plan committed procedural error by excluding Dimry from the process following remand" and remanding to district court "to determine whether Dimry is entitled to benefits"); *Solomon v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 860 F.3d

82

259, 261 (4th Cir. 2017) (affirming district court's finding that Board abused its discretion because it "failed to follow a reasoned process or explain the basis of its determination—neither addressing nor even acknowledging new and uncontradicted evidence supporting Solomon's application, including that of the Plan's own expert"); *Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. WDQ-09-2612, 2013 WL 6909200, at *1 (D. Md. Dec. 31, 2013) (reversing Board's denial of Football Degenerative benefits after consideration on remand and finding Board abused its discretion); *Stewart v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. CIV. WDQ-09-2612, 2012 WL 2374661, at *14-15 (D. Md. June 19, 2012) appeal dismissed, No. 12-1871 (4th Cir. Jan 14, 2013) (following bench trial, finding abuse of discretion where Board relied on "a mere scintilla" of evidence in denying Stewart benefits); *Moore v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 282 F. App'x 599, 601 (9th Cir. 2008) (reversing district court's entry of summary judgment for Plan where Board's decision to terminate player benefits was not "based upon a reasonable interpretation of the [P]lan's terms"); *Jani v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 209 F. App'x 305, 317 (4th Cir. 2006) (affirming district court and finding Board abused its discretion in denying Active Football benefits where expert opinions "establish[ed] a presumption that Webster is entitled to Active Football benefits, and the Board did not rely on substantial evidence to contradict them").

As stated above, the Court may award benefits to the claimant rather than remand the case to the plan administrator for a full and fair review when the plan administrator's denial was arbitrary and capricious. *See Rossi*, 704 F.3d at 368 ("A denial is arbitrary and capricious in the ERISA context when it is not supported by concrete evidence in the record."). Having found that the Board's denial was arbitrary and capricious, the Court, for the reasons explained above, finds

that Plaintiff presented "changed circumstances" to qualify for reclassification and otherwise met the criteria to qualify for Active Football benefits under Sections 5.4(b) and 5.2(a).

Accordingly, the Court **ORDERS** Defendant The Bert Bell/Pete Rozelle NFL Player Retirement Plan to provide Plaintiff Michael Cloud Active Football total and permanent benefits, effective retroactively as of May 1, 2014, including pre- and post-judgment interest as authorized by law.[34]

The parties are **ORDERED** to meet and confer to address the specific amount of disability benefits due to Plaintiff, including interest, and submit a proposed judgment consistent with this Order within five days of the date of this Order.

The Court further awards and **ORDERS** Defendant to pay to Plaintiff his reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g)(1), the specific amounts of which will be determined by separate order after Plaintiff's Opposed Motion for Attorneys' Fees and Costs [ECF No. 253] becomes ripe.

**SO ORDERED.**

SIGNED June 21, 2022.

**KAREN GREN SCHOLER**
**UNITED STATES DISTRICT JUDGE**

---

[34] With respect to the retroactive benefits, the parties have stipulated that Inactive A paid $120,000.00 in 2015, and $135,000.00 in 2016 through 2022. Parties' Stipulated Facts ¶¶ 37, 40, 42, 44, 46, 48, 50, 52. Active Football paid $250,008.00 in 2014 and 2015, and $265,008.00 in 2016 through 2022. *Id.* ¶¶ 37, 39, 41, 43, 45, 47, 49, 51, 53.