# United States District Court

### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| MICHAEL CLOUD | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:20-CV-1277-S |
| | § | |
| THE BERT BELL/PETE ROZELLE NFL | § | |
| PLAYER RETIREMENT PLAN | § | |

## MEMORANDUM OPINION AND ORDER

Both this Court and the Fifth Circuit agree that Defendant The Bert Bell/Pete Rozelle NFL Player Retirement Plan ("Defendant" or "NFL Plan") mishandled Plaintiff Michael Cloud's ("Plaintiff" or "Cloud") requests for top-tier disability benefits. After a six-day trial, this Court issued a Memorandum Opinion and Order that included over two hundred Findings of Fact based on the evidence. The Court detailed multiple abuses by Defendant in its process for awarding benefits and determined that, as a result, Defendant had denied Plaintiff a full and fair review of his benefits determination. Based on the undisputed evidence, including admissions in sworn trial testimony by Defendant's own witnesses, it was made clear to the Court that Defendant's process was part of a larger strategy to ensure that former NFL players suffering from the devastating effects of severe head trauma incurred while playing for the NFL were denied the highest level of benefits.

Though on appeal the Fifth Circuit reversed on narrow grounds, not one of the Court's 212 Findings of Fact were disturbed by the Fifth Circuit. Nor were any challenged by Defendant. Instead, the Fifth Circuit emphasized this Court's "thorough findings—devastating in detail— which expose[d] the NFL Plan's disturbing lack of safeguards to ensure fair and meaningful review of disability claims" and "chronicl[ed] a lopsided system aggressively stacked against disabled players." *Cloud v. Bert Bell/Pete Rozelle NFL Player Ret. Plan* ("*Cloud II*"), 95 F.4th 964, 966,

974 (5th Cir. 2024), *cert. denied sub nom. Cloud v. NFL Player Ret.*, No. 24-61, 2024 WL 4427195
(U.S. Oct. 7, 2024).[1]

In his Motion to Confirm Attorney's Fees and Cost Award ("Motion") [ECF No. 286]
Plaintiff now seeks confirmation of the Court's pre-reversal award of attorney's fees and costs.
The Court has reviewed the Motion, Defendant's Opposition to the Motion ("Response") [ECF
No. 287], Plaintiff's Reply in Support of the Motion ("Reply") [ECF No. 288], and the applicable
law. The Court **GRANTS** the Motion.

## I. BACKGROUND

### *A. The Litigation*

This case stems from the serious cognitive impairments from traumatic brain injuries
Plaintiff suffered as an NFL player that rendered him totally and permanently disabled. After he
retired, Plaintiff filed an application with Defendant for disability benefits and was awarded a
benefit level below the highest. *See* Second Am. Compl. (Amended Complaint") [ECF No. 230]
¶¶ 30-33. Thereafter, Plaintiff filed the instant lawsuit, asserting that Defendant violated the
Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., by
wrongfully denying Plaintiff benefits and failing to provide a full and fair review of his case. *See*
Am. Compl. ¶¶ 44-51. Plaintiff sought remedies from the Court that included a declaration
concerning the facts and law of the case. Relevant here, Plaintiff specifically requested that the
Court declare that he meets the requirements for the highest level of benefits, that Defendant's
decision relating to his request for benefits was not consistent with the NFL Plan's documents, and
that Defendant inconsistently applied the terms of the NFL Plan's documents. *Id.* at 31. Plaintiff

---

[1] *Cloud II* was the second Fifth Circuit opinion on this matter. The prior opinion, *Cloud v. Bert Bell/Pete
Rozelle NFL Player Ret. Plan*, 83 F.4th 423 (5th Cir. 2023), was withdrawn and substituted by *Cloud II*.
*Cloud II*, 95 F.4th at 966. The differences between the two opinions do not affect this Court's analysis.

also sought judgment in his favor awarding retroactive payments and an injunction against reducing future payments under the highest benefit level. *Id.* at 31-32.

Prior to the bench trial, the parties engaged in protracted discovery battles that ultimately resulted in extensive updates to the administrative record. The Court updated the administrative record three times over the course of seven months. *See* ECF Nos. 38, 141, 151.

Plaintiff also moved for depositions of key members of the NFL Plan and the production of additional documents to further supplement the administrative record. *See* ECF No. 41. Defendant vigorously contested these requests. *See* ECF No. 46. Following the Fifth Circuit's directive to closely monitor discovery in ERISA cases, the Court determined that the requests were pertinent and proportional to the needs to the case. *See* ECF No. 71. Accordingly, the Court compelled Defendant to present two members of the NFL Plan for deposition and to produce the requested documents. *See id.*

Plaintiff returned to the Court three months later seeking to enforce a subpoena or to obtain leave to serve a new subpoena on the NFL Players Association. *See* ECF No. 103. Defendant again objected. *See* ECF No. 106. Noting that "both Defendant and the [NFL Players Association] may be attempting to prevent access by Plaintiff to documents specifically tailored and relevant to the fair and proper adjudication of the merits of this case," the Court again found the information and documents requested were relevant and permissible under ERISA discovery exceptions and granted leave to serve a new subpoena. *See* Order [ECF No. 118] 3-4. Over strenuous objections by Defendant, these efforts by Plaintiff resulted in the addition of hundreds of pages to the administrative record.

The depositions and record evidence gathered from Plaintiff's discovery victories played a substantial role in the Court's ultimate Findings of Fact.

### *B. The Court's Findings and Conclusions*

Between May 18 and May 26, 2022, the Court held a bench trial. *See* ECF Nos. 238-49. Significantly, the only witnesses who testified at the trial were all called by Defendant. But their testimony provided support for Plaintiff's claims. Based on this trial testimony, along with the updated administrative record and other evidence admitted during trial, the Court entered its Memorandum Opinion and Order on June 21, 2022, which set forth the Court's Findings of Fact and Conclusions of Law. *See Cloud v. Bert Bell/Pete Rozelle NFL Player Ret. Plan* ("*Cloud I*"), No. 3:20-CV-1277-S, 2022 WL 2237451 (N.D. Tex. June 21, 2022). What follows are the undisputed and binding[2] Findings of Fact in this case.

Plaintiff played for several NFL teams between 1999 and 2006. *Id.* at *3. During that time, Plaintiff had three documented concussions. *Id.* at *3, *17. The last occurred on October 31, 2004, when Plaintiff was involved in a helmet-to-helmet collision during a game. *Id.* at *3. This concussion was the "triggering event" for his future disabilities. *Id.* A traumatic brain injury evaluation conducted by the NFL the same day revealed that Plaintiff was suffering from headaches, dizziness, vertigo, and altered attention span. *Id.* The NFL cleared Plaintiff to return to full participation only three days later. *Id.* Plaintiff continued to play in the NFL post-concussion until March 2006. *Id.*

The NFL Plan is an employee benefit plan under ERISA that provides injury benefits to former NFL players. *Id.* at *1-2. It is comprised of the Disability Initial Claims Committee ("Committee"), which determines initial claims for disability benefits, and the Retirement Board

---

[2] A court's factual findings following a bench trial are "binding unless clearly erroneous." *Rivera v. Kirby Offshore Marine, L.L.C.*, 983 F.3d 811, 816 (5th Cir. 2020). Defendant did not ask the Fifth Circuit to overturn the Court's Findings of Fact, nor did the Fifth Circuit determine that any of the factual findings were clearly erroneous. Rather, the Fifth Circuit repeatedly cited the Court's factual findings, referring to them as "thorough" and "diligent." *Cloud II*, 95 F.4th at 966, 974.

("Board"), which is the appellate body.[3] *Id.* at *4. If a player receives a negative decision from the Committee, he can submit a written request to the Board appealing the decision. *Id.* at *11. The NFL Plan mandates that the Committee and Board discharge their duties "***solely and exclusively in the interest of the Players and their beneficiaries***" with "***care, skill, prudence, and diligence***" while considering "***all*** information in the Player's administrative record." *Id.* at *4 (emphasis added). The Board shirked these duties in Plaintiff's case.

The Committee and Board make eligibility determinations based on the articles of the NFL Plan. Under the articles, a former player is eligible for total and permanent disability ("T&P") benefits if: (1) he has a disability that has persisted for at least twelve months that substantially interferes with his ability to engage in any occupation or (2) he is eligible for disability benefits through the Social Security Administration ("SSA"). *Id.* at *5. Relevant here are two levels of T&P benefits: Inactive A and Active.[4] *Id.* at *6. Between 2014 and 2016, an average of over 1,000 former players applied for benefits with the NFL Plan each year. *Id.* at *10. As of June 2022, approximately 1,000 former players were receiving Inactive A benefits, while only thirty were receiving Active benefits. *Id.* A former player qualifies for Inactive A benefits if he has T&P status and submits the application within 15 years of his final season. *Id.* at *6. Active benefits, on the other hand, require that the disability arise "shortly after" an injury occurred during NFL activities. *Id.* The NFL Plan defines "shortly after" as no later than 12 months after the injury, with the NFL Plan having discretion on whether to grant Active benefits if more than six months have elapsed.

---

[3] The focus of this case is on the actions of the Board, which is Defendant's plan administrator within the meaning of ERISA. *Cloud I*, 2022 WL 2237451, at *4. Any reference to the actions of the NFL Plan/Defendant throughout this Memorandum Opinion and Order refers to the Board. Likewise, any actions of the Board are attributable to the NFL Plan/Defendant.

[4] In 2016, Inactive A benefits paid $135,000 per year, while Active benefits paid $265,008. *Cloud I*, 2022 WL 2237451, at *26.

*Id.* at *6-7. To be reclassified from Inactive A to Active benefits, the player must show by clear and convincing evidence changed circumstances. *Id.* at *8. "Changed circumstances" is not defined in the articles and has been interpreted by the NFL Plan at least six different ways. *Id.*; *see also id.* at *26-27.

In practice, the Board delegated substantive review of appeals to the NFL Plan's advisors, which included several individuals and its lawyers, Groom Law Group ("Groom"). *Id.* at *11-12. The Board did not review all of a given applicant's documents and was typically not aware of the cases to be reviewed until it met to discuss them during a quarterly meeting. *Id.* The Board tasked Groom with reviewing the facts and records of each case and preparing a case summary. *Id.* at *11. While the Board relied on its advisors to review each player's file, the advisors were not specifically directed to review all medical records submitted with the applications. *Id.* at *11-12.

On the first day of the quarterly meeting, the advisors would meet without the Board to review the submitted cases. *Id.* at *12. On the second day, the advisors would have an undocumented pre-meeting with the Board to discuss the cases. *Id.* After the pre-meeting, the Board would hold a formal meeting to vote on each case. *Id.* at *13. The Board did not discuss each case individually at the formal hearing. *Id.* Instead, the Board denied or approved blocks of fifty or more cases at one time based on the pre-meeting discussions. *Id.* After the Board voted, Groom prepared decision letters. *Id.* The Board did not see or review the letters before they were sent to the players. *Id.*

Plaintiff first applied for benefits with Defendant in 2009 seeking non-T&P benefits. *Id.* After being rejected by the Committee for having an insufficient disability rating, Plaintiff appealed to the Board. *Id.* at *14. As part of the appeals process, Plaintiff was evaluated by a neurologist who noted vertigo, headaches, memory loss, stutter, depression, impaired verbal

fluency, migraines, and sleep disturbances. *Id.* The neurologist concluded that Plaintiff's complaints and his objective impairment in verbal fluency were "very possibly a result of his past concussions" and could be seen as "a result of traumatic brain injuries." *Id.* Based on the medical record before it, the Board approved Plaintiff for non-T&P benefits in May 2010. *Id.* at *15.

Plaintiff's disabilities worsened after 2010. In 2011, his then-fiancée reported to a psychologist that he had gone from "a very warm and loving supportive individual" to "forgetting where their child was in the home," with "issues related to social withdrawal, as well as emotional liability." *Id.* That same year, a neuropsychologist evaluated Plaintiff and found that his executive functioning was "consistently impaired relative to persons of similar age and education," and that other measures, such as motor functioning and spatial function, were in the "low average range." *Id.* at *16. In 2012, another psychologist concluded that Plaintiff exhibited all five symptoms of a mild neurocognitive disorder[5] and that "he has obviously been experiencing these problems since his injury in 2004." *Id.* at *17. Plaintiff reported to a psychologist in 2013 that his headaches were getting worse, he was having trouble concentrating, and he was moving and speaking so slowly that other people could notice, among other problems. *Id.*

Plaintiff returned to Defendant for T&P benefits in June 2014. *Id.* at *19. Earlier that year, Plaintiff had applied for disability benefits with the SSA. *Id.* at *18. Following an evidentiary hearing, an administrative law judge found that Plaintiff was disabled based on his inability to sustain work due to his symptoms. *Id.* Plaintiff submitted to the Committee the SSA's finding and eight medical reports. *Id.* at *19. Plaintiff also consented to examination by a neutral physician, but the Committee did not refer him to one. *Id.* In July 2014, the Committee awarded Plaintiff

---

[5] Those symptoms are: (1) memory impairment as identified by a reduced ability to learn or recall information; (2) disturbance in executive functioning (i.e., planning, organizing, sequencing, abstracting); (3) disturbance in attention or speed of information processing; (4) impairment in perceptual-motor abilities; and (5) impairment in language. *Cloud I*, 2022 WL 2237451, at *17.

Inactive A benefits, noting that he did not qualify for Active benefits because "the Committee determined that [Plaintiff] did not become totally and permanently disabled within any possible 'shortly after' period." *Id.* (alteration in original). The Committee members prepared meeting minutes to discuss Plaintiff's application even though they did not actually meet. *Id.* at *20. Instead, one Committee member emailed another member proposing Inactive A benefits. *Id.* at *19. The other Committee member agreed approximately six minutes later. *Id.* Plaintiff did not appeal to the Board. *See id.* at *20.

In February 2016, Plaintiff filed for reclassification to Active benefits. *Id.* Plaintiff argued to the Committee that he was suffering from a series of disabilities that arose immediately after his October 31, 2004, concussion while he was still in the NFL. *Id.* These disabilities included affective disorder,[6] significant memory and attention problems, post-concussion syndrome, migraines, clinical depression, vertigo, and impaired verbal fluency. *Id.* Affective disorder and significant memory and attention problems were newly listed disabilities that had not been included in Plaintiff's 2014 Total and Permanent Disability Benefits Application form. *Id.* Again, the Committee made a rapid-fire decision to deny Plaintiff's request via email. One Committee member emailed the others her decision to deny Plaintiff's request because there were "no changed circumstances." *Id.* at *21. Another Committee member—who admitted to being unfamiliar with the term affective disorder—agreed only four minutes later. *Id.* at *20-21. The Committee subsequently denied Plaintiff's request for reclassification due to lack of evidence of changed circumstances. *Id.*

Plaintiff appealed his reclassification denial to the Board in September 2016. *Id.* at *22. Once again, he was not referred to a neutral physician as part of the appeals process. *Id.* at *22,

---

[6] Affective disorder is characterized by "[b]outs of depression and anxiety in addition to bouts of paranoia and delusion." *Cloud I*, 2022 WL 2237451, at *20 n.15.

*26. As was the normal practice, a Groom paralegal prepared a summary of Plaintiff's application for the Board. *Id.* at *22. The summary falsely stated that a doctor's report that supported Plaintiff's position that his disability arose shortly after his injury was included in the original 2014 request despite the report having a watermark showing that it was not. *Id.* at *23. Also, the summary listed the symptoms Plaintiff presented in his 2014 application but ***omitted*** the new symptoms in his 2016 application. *Id.*

In 2016, Chris Smith was an advisor to the Board tasked with reviewing information on cases. *Id.* at *11, *20-21, *32. Chris Smith served in this role despite the fact that she was also a member of the Committee that had denied Plaintiff's original reclassification claim earlier that year. *Id.* at *2, *32.

The Board gave little to no attention to Plaintiff's appeal before denying it. The Board met on November 16, 2016, to decide Plaintiff's case along with approximately 100 others. *Id.* at *23. The pre-meeting to discuss these 100 cases "was done in like 10 minutes with no issues." *Id.* The Board members took no notes, and the Board was provided no documents related to its advisors' review of the medical records. *Id.* at *13. After the pre-meeting, the Board held the formal meeting to approve and deny applications. *Id.* at *23-24. At least one member of the Board did not know what affective disorder meant and another could not say with confidence that he read Plaintiff's SSA disability award. *Id.* at *23. Still, the Board denied Plaintiff's appeal, citing the lack of clear and convincing evidence of changed circumstances. *Id.* at *24.

The Groom paralegal then drafted a denial letter that cited the wrong NFL Plan documents and misstated the record. *See id.* at *24-25. The Board did not review the denial letter before it was sent to Plaintiff. *Id.* at *24.

9

According to the Board's denial letter, in the time the Board dedicated to Plaintiff's appeal—perhaps as few as six seconds—it determined that he did not qualify for Active benefits because he did not clearly and convincingly show that he had a new or different impairment, or that a new or different impairment arose while he was an active player. *Id.* at \*25. The Board concluded that "the medical evidence Plaintiff submitted does not show that he meets the requirements for the Active [] category," *id.* (cleaned up), and that Plaintiff's appeal was untimely, *id.* at \*24-25, despite:

- not reviewing the entire record,
- not receiving documents from its advisors regarding the advisors' review of player medical records,
- not taking notes,
- at least one Board member not reviewing the SSA award,
- at least one Board member not understanding relevant medical terminology,
- not referring Plaintiff to a neutral physician, and
- not discussing untimeliness at the formal Board meeting, *id.* at \*24.

Based upon its Findings of Fact, the Court entered its Conclusions of Law. The Court concluded that the Board failed to conduct a full and fair review, as required by ERISA, for many reasons. *Id.* at \*29-33. First, the Board did not review its own stated bases for rejecting Plaintiff's claim. The Board's wholesale adoption of its advisors' reasons without having contemplated all those reasons itself did not satisfy the requirement of "meaningful review" under ERISA. *Id.* at \*29-31. Second, by relying entirely upon its advisors instead of independently reviewing all the documents in Plaintiff's administrative record, the Board violated ERISA's requirement to consider "all comments, documents, records, and other information submitted by the claimant." *Id.* at \*31-32 (quoting 29 C.F.R. § 2560.503-1(h)(2)(iv)). Even worse, at least one of the advisors that the Board relied on previously worked on Plaintiff's case at the Committee level, which—at a minimum—created the appearance of impropriety. *Id.* at \*32. Third, the Board failed to consult

with a health care professional, which was required since the Board's determination was based on a medical judgment concerning neuropsychological disabilities. *Id.* at \*32-33.

The Court also held that the Board abused its discretion in denying Plaintiff's appeal in three ways. *Id.* at \*34-43. First, the Board's determination that Plaintiff did not show changed circumstances by clear and convincing evidence was inconsistent with a fair reading of the NFL Plan's documents and was not supported by the evidence in the record. *Id.* at \*34-37. Second, the Board's interpretation of the NFL Plan's regulations regarding its application of rules affecting Active benefits and the definition of "shortly after" were legally incorrect and directly contradicted the NFL Plan's language. *Id.* at \*37-42. Last, the Board's decision that Plaintiff's appeal was untimely was unsupported by the evidence and administrative record. *Id.* at \*42-43.

Based on the Court's conclusions that the Board violated ERISA and abused its discretion, the Court ordered that Defendant provide Plaintiff Active benefits effective retroactively as of May 1, 2014, and that the parties meet and confer to address the specific amount of disability benefits due to Plaintiff. *Id.* at \*45. The Court also ordered Defendant to pay Plaintiff his reasonable attorney's fees and costs, the specific amount of which would be determined by separate Court order. *Id.* Because the specific amount would be determined later, the Court's Judgment did not include any reference to attorney's fees and costs. *See* J. ("*Cloud I* Judgment") [ECF No. 259].

### C. The Award of Attorney's Fees and Costs

Prior to the entering of *Cloud I*, Plaintiff filed his Opposed Motion for Attorney's Fees and Costs ("Fee Motion") [ECF No. 253]. Plaintiff sought attorney's fees totaling $1,014,401.25, conditional appellate fees totaling $600,000, and costs totaling $50,664.72. Fee Mot. 16. The Court entered a Memorandum Opinion and Order ("Fee Order") [ECF No. 262] granting the Fee Motion.

The Court held that Plaintiff had shown some degree of success on the merits and exercised its discretion to award Plaintiff attorney's fees and costs. Fee Order 2-3.

The Court established the reasonable amount of attorney's fees and costs to be awarded by applying the lodestar method. *Id.* at 3-13. Relying upon the Court's own specialized experience concerning rates charged in the Dallas-Fort Worth legal community for services by individuals with the level of skill, competence, and ability of Plaintiff's lawyers and their staff, the Court concluded that the amount proposed by Plaintiff was a reasonable lodestar from which to calculate attorney's fees. *Id.* at 3-4. The Court then, as required by the Fifth Circuit, analyzed the twelve factors set out in *Johnson v. Georgia Highway Express*, 488 F.2d 715 (5th Cir. 1974), to decide whether an adjustment of the lodestar amount was warranted. Fee Order 6-8. The Court decided that the legal issues were complex, the skill required to litigate the case was high, the hourly rate was below the customary fee charged by counsel with the same level of skill and experience, the outcome was highly successful for Plaintiff, this type of case is undesirable, and similar rates have been approved in similar cases. *Id.* at 8-13. Each of these factors weighed in favor of adjusting Plaintiff's lead counsel's hourly rate upward by $200. *Id.* at 13-14. The Court also found that conditional appellate fees were reasonable and appropriate considering the anticipated difficulty and cost in litigating this case on appeal—which ultimately proved true. *Id.* at 14-16. As to costs, the Court ruled that $20,591 of the $50,665.72 requested was not recoverable. *Id.* at 16-17.

Based on the foregoing, the Court granted the Fee Motion and ordered Defendant to pay Plaintiff attorney's fees in the amount of $1,232,058.75, conditional appellate attorney's fees in the amount of $250,000 for an appeal to the Fifth Circuit and $350,000 for an appeal to the United States Supreme Court, and $30,074.72 in costs. *Id.* at 17.

### D. The Fifth Circuit's Reversal

On July 25, 2022, Defendant filed a notice of appeal regarding both *Cloud I* and the Fee Order. *See* ECF No. 264. Significantly, though Defendant asked the Fifth Circuit to reverse *Cloud I*'s legal conclusions and the Fee Order, it did not ask the Fifth Circuit to overturn *Cloud I*'s Findings of Fact. *See* Opening Br. of Def.-Appellant ("Defendant's Brief") [COA ECF No. 44] 3-5, 69.[7]

The Fifth Circuit began its opinion by noting the Court's "thorough findings—devastating in detail—which expose the NFL Plan's disturbing lack of safeguards to ensure fair and meaningful review of disability claims brought by former players who suffered incapacitating on-the-field injuries, including severe head trauma." *Cloud II*, 95 F.4th at 966. Reviewing in detail the Court's "devastating" findings, the Fifth Circuit emphasized the Board's "far from ideal[,] to put it mildly," practices, including the Board's failure to fully inform itself of cases and to vet denial letters. *See id.* at 968-70. The Fifth Circuit expressed "unease with a daunting system that seems stacked against disabled ex-NFLers" and, again, "commend[ed] the trial court judge for her diligent work chronicling a lopsided system aggressively stacked against disabled players." *Id.* at 973-74.

Despite these misgivings, the Fifth Circuit reversed the Court's Judgment on one narrow ground. In doing so, the Fifth Circuit explained that while the Board "may well have denied Cloud a full and fair review" and that "Cloud is probably entitled to the highest level of disability pay," Plaintiff was not entitled to reclassification of his benefits because he could not show changed circumstances between his 2014 and 2016 applications. *Id.* at 966-67. The Fifth Circuit made clear that its ruling was on the "narrow ground" of changed circumstances and reversed the Court's

---

[7] "COA ECF" refers to filings in Defendant's appellate case, Fifth Circuit Court of Appeals Docket No. 22-10710.

Judgment without remanding to the NFL Plan. *Id.* at 973. Despite Defendant asking it to reverse the Fee Order, the Fifth Circuit did not mention, let alone expressly reverse, the Fee Order. Nor did it expressly find that any of the Court's Findings of Fact were clearly erroneous.

Plaintiff filed for en banc reconsideration of *Cloud II*, which was denied. *See* COA ECF Nos. 119, 148; *Cloud v. Bert Bell/Pete Rozelle NFL Player Ret. Plan* ("*Cloud III*"), 95 F.4th 974 (5th Cir. 2024). The Fifth Circuit issued its Judgment as a mandate on March 25, 2024. *See* COA ECF No. 156. The Judgment ordered that this Court's Judgment was reversed, the case was remanded for proceedings consistent with *Cloud II*, and Plaintiff was to pay Defendant costs on appeal. J. ("COA Judgment") [COA ECF No. 156-2] 1-2. Plaintiff then filed a petition for writ of certiorari with the Supreme Court, which the Supreme Court denied without explanation on October 7, 2024. *See* COA ECF Nos. 160-62.

This long sequence of events brings the Court to the issue now before it. Following the Fifth Circuit's reversal, Plaintiff filed the Motion to affirm the award of attorney's fees and costs outlined in the Fee Order. Plaintiff asserts that he has achieved some degree of success on the merits despite the Fifth Circuit's reversal. Defendant argues against confirmation of the Fee Order, claiming that the reversal undermines the basis for the Fee Order. As explained in detail below, the Court agrees with Plaintiff and grants the Motion.

## II. LEGAL STANDARD

In an ERISA action, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). The Supreme Court has held that attorney's fees and costs under Section 1132(g)(1) are ***not*** limited to the "prevailing party." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252 (2010). Rather, the court may award fees and costs if a party has achieved "some degree of success on the merits." *Id.* at 255 (citation omitted). A party

achieves some degree of success on the merits "if the court can fairly call the outcome of the litigation some success on the merits without conducting a lengthy inquiry into the question whether a particular party's success was substantial or occurred on a central issue." *Id.* (cleaned up). Further, a movant achieves success when the outcome of the litigation is not "trivial" or a "purely procedural victor[y]." *Id.* (alteration in original) (quoting *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 688 n.9 (1983)).

"A district court has 'broad discretion' under *Hardt* in awarding attorneys fees, limited only by the language of § 1132(g)(1)." *Victory Med. Ctr. Hous., Ltd. P'ship v. CareFirst of Md., Inc.*, 707 F. App'x 808, 810 (5th Cir. 2018) (citation omitted). In making this discretionary decision, the court "may, but is not required to, weigh five factors." *N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins. Co.*, 898 F.3d 461, 485 (5th Cir. 2018) (citing *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir. 1980); *Hardt*, 560 U.S. at 254-55). Those factors, derived from *Bowen*, are:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.

*Id.*

In the Fifth Circuit, reasonable attorney's fees are calculated using the lodestar method. *Cruz v. Maverick County*, 957 F.3d 563, 574 (5th Cir. 2020) (citation omitted); *see also Wegner v. Standard Ins. Co.*, 129 F.3d 814, 822 (5th Cir. 1997) ("Once the district court concludes that a party is entitled to attorneys' fees [under Section 1132(g)(1)], it must utilize the lodestar method to determine the amount to be awarded." (citing *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1459 (5th Cir. 1995))). Under the lodestar method, a court calculates attorney's fees by "multiplying the

number of hours reasonably expended by an appropriate hourly rate." *Cruz*, 957 F.3d at 574 (citation omitted). After this calculation, the court uses a 12-factor test to determine whether counsel's performance warrants an upward or downward adjustment from the lodestar amount. *Id.* (citation omitted). The factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id.* at 574 n.3 (internal quotation marks omitted) (quoting *Johnson*, 488 F.2d at 717-19).

### III. ANALYSIS

When faced with a motion for attorney's fees and costs in an ERISA action, the Court must follow three steps. First, the Court must determine whether the movant achieved some degree of success on the merits. If there was some degree of success on the merits, the Court moves to the second step, which is deciding whether to exercise its discretion to grant the motion. Third, if the Court grants the motion, it must determine what amount of attorney's fees and costs are reasonable.

Defendant attacks only the first two steps. As to some degree of success on the merits, Defendant argues that the Fifth Circuit's reversal means that Plaintiff achieved no success. *See* Resp. 2-5. On discretion, Defendant contends that it would be inconsistent with the Fifth Circuit's mandate for the Court to grant the Motion. *See id.* at 5-6.

Because the Court finds that Plaintiff achieved some degree of success on the merits, it exercises its discretion to award attorney's fees and costs and grants the Motion.

## A. *Some Degree of Success on the Merits*

Step one is determining whether Plaintiff achieved some degree of success on the merits. Plaintiff asserts that he achieved some success because he exposed a "system of failure" and because the Court and the Fifth Circuit identified and affirmed his allegations of inadequate review by the Board. *See* Mot. ¶¶ 9-12; Reply ¶ 2. Because *Cloud I* and *Cloud II* awarded the particular relief Plaintiff sought in his Amended Complaint, the Court agrees with Plaintiff.

In 2010, the United States Supreme Court clarified the applicable standard for awarding attorney's fees in ERISA cases with its *Hardt* decision. In *Hardt*, the Supreme Court rejected the argument that ERISA claimants must satisfy the elevated standard applicable to cases where the relevant statute limits the availability of attorney's fees to the "prevailing party." *See* 560 U.S. at 253-54. Instead, the Supreme Court decided that a "less stringent" standard, requiring the movant to show "some degree of success on the merits," applied. *Id.* at 254-55. Under this standard, a party can be awarded Section 1132(g)(1) attorney's fees even if they do not have a judicial order in their favor. *See id.* at 255-56 (explaining that the movant had achieved success on the merits despite failing to win summary judgment). The importance of this clarification cannot be understated. Instead of being tied to formal judgments, decrees, and verdicts, courts are empowered with the "discretion" to award fees based upon the facts known to them in the context of the litigation as a whole. *Id.* at 254-55. The only question is whether the court can identify some success on the merits after considering the "outcome of the litigation." *Id.* at 255. Here, the answer is yes.

In this case, Plaintiff sought unique, non-judicial relief consistent with *Hardt*. Plaintiff brought this lawsuit in part to "clarify his rights under the terms of the [NFL] Plan." Am. Compl. ¶ 4. This intention manifested itself in his prayer for relief, which sought more than just a judicially

enforced judgment in his favor. Plaintiff sought a declaration[8] outlining the factual record as alleged in the Amended Complaint. *See id.* at 31. Relevant here, Plaintiff sought a declaration that he met the requirements for Active benefits, that Defendant's decision was not consistent with its plan articles, and that Defendant inconsistently applied its own terms. *See id.* The Court's Findings of Fact—supported in large part by Plaintiff's success in the discovery phase—and *Cloud II* provide the relief Plaintiff sought by answering these questions in a manner unquestionably favorable to Plaintiff.

The opinions in this case reveal that Plaintiff met the baseline requirements for Active benefits. The Findings of Fact establish that Plaintiff suffered a debilitating neurological injury from his NFL career. His October 31, 2004, concussion was a "triggering event" for his later disability and caused nearly immediate symptoms. *See Cloud I,* 2022 WL 2237451, at *3, *14-15, *19. That disability was enough to later qualify him for T&P benefits. *See id.* at *19. When Plaintiff applied for reclassification to Active benefits, he attached medical records that indicated that his post-concussion symptoms arose within one year of NFL play. *See id.* at *20, *22. This was enough for the Fifth Circuit, which opined that on this record Plaintiff "could have, and indeed *should* have" immediately appealed the NFL Plan's 2014 denial of Active benefits. *Cloud II,* 95 F.4th at 966. The Fifth Circuit stated that "Cloud is probably entitled to the highest level of disability pay," which is the Active benefits level *Id.* at 967. Plaintiff commenced this litigation seeking acknowledgment that he qualified for Active benefits. He leaves it with the knowledge

---

[8] Notably, Plaintiff did not request a declaratory judgment. "If [Plaintiff] wanted a declaratory judgment, [he] needed to ask for one in [his] complaint." *Conn. Bank of Com. v. Congo,* 309 F.3d 240, 251 (5th Cir. 2002), *as amended on denial of reh'g* (Aug. 29, 2002). Nor would the Court's Findings of Facts count as a declaratory judgment since they do not "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a); *see also Medtronic, Inc. v. Mirowski Fam. Ventures, LLC,* 571 U.S. 191, 200 (2014) (noting that the objective of a declaratory judgment suit is to provide "an immediate and definitive determination of the legal rights of the parties" (citation omitted)). The identified relief relates to factual, not legal, issues.

that the Fifth Circuit believes that but for his decision not to appeal immediately, he almost certainly would have qualified for Active benefits.

The Court's Findings of Fact also reveal that the NFL Plan's decision was not consistent with its articles and that the NFL Plan inconsistently applied its own terms. The Court found that the NFL Plan's articles required that the Board consider all information in a player's administrative record, *Cloud I*, 2022 WL 2237451, at *4, yet the Board did not review all the documents in Plaintiff's record and may have spent as few as six seconds discussing Plaintiff's case with its advisors, *id.* at *12, *23. Defendant also was not consistent with its use of the term "changed circumstances," employing at least six different definitions. *Id.* at *8, *26-27. As the Fifth Circuit explained, the Findings of Fact presented "substantial evidence" that the definition of changed circumstances—the key definition in this case—was constantly changing. *Cloud II*, 95 F.4th at 972.

Taken together, the Findings of Fact constitute a declaration from this Court vindicating at least some of the relief Plaintiff sought. They establish that Plaintiff was right in believing that the NFL Plan did not follow its own procedures and handled his case in a deficient manner inconsistent with its own rules and regulations. And the Fifth Circuit's affirmation of those Findings of Fact reinforce this outcome. This relief is neither procedural nor trivial because it goes to the heart of Plaintiff's case. Plaintiff stated from the outset that one of his primary goals was to clarify his rights under the NFL Plan. It is not trivial to expose the abuses to which Plaintiff was subjected and to have two different reviewing courts confirm that Defendant's actions were wrong.

It is not unprecedented for courts in this district to award attorney's fees and costs when the Fifth Circuit is critical of a beneficiary plan. In *Koehler v. Aetna Health Inc.*, 915 F. Supp. 2d 789 (N.D. Tex. 2013), the court considered a motion for attorney's fees under Section 1132(g)(1)

after the Fifth Circuit reversed a grant of summary judgment for the defendant. *Id.* at 791. As the court explained, "there are two highlights to the Fifth Circuit's decision": (1) the Fifth Circuit's conclusion that "there [was] some evidence of bad faith" from the plan; and (2) the fact that the Fifth Circuit's opinion "provided an extensive critique of [the plan's] policies and violations of ERISA." *Id.* at 792. Despite the court never awarding final judgment in the plaintiff's favor, the court found non-procedural success on the merits due to the "clarity of the Fifth Circuit's ruling regarding the merits of both parties' positions" and the Fifth Circuit's "suggestive language." *Id.* at 791, 797. The relief Plaintiff achieved is analogous to that of the plaintiff in *Koehler*. The language of *Cloud II* strongly suggests bad faith by Defendant, as well as supports the merits of Plaintiff's position that he qualified for Active benefits. As in *Koehler*, this outcome constitutes partial success on the merits.

Defendant's arguments to the contrary are unavailing. According to Defendant, Plaintiff cannot have achieved any of his requested relief because *Cloud I* was reversed and, as a result, there is no judgment in his favor. *See* Resp. 3-4. Yet, in *Hardt*, the Supreme Court held that the facts could support attorney's fees despite the movant not receiving a judgment in her favor. *See Hardt*, 560 U.S. at 255-56. This notion of having success on the merits without an express judgment is not new. *See Hewitt v. Helms*, 482 U.S. 755, 760-61 (1987) (acknowledging that a party can obtain relief in the absence of a formal judgment in his favor); *Petteway v. Henry*, 738 F.3d 132, 137 (5th Cir. 2013) (noting that a plaintiff need not receive a final judgment in his favor to be a prevailing party); *Collins v. Thomas*, 649 F.2d 1203, 1205 (5th Cir. Unit A July 1981) (same).[9] It is possible for Plaintiff to show some degree of success on the merits without having a formal judgment in his favor.

---

[9] *Hewitt*, *Petteway*, and *Collins* all concern the more stringent prevailing party standard.

Defendant also relies on the Fifth Circuit's decision in *Katherine P. v. Humana Health Plan, Inc.*, 962 F.3d 841 (5th Cir. 2020), to argue that Plaintiff must show that the legal relationship between the parties has changed or that Defendant is now required to do something besides what it was already doing. Resp. 4-5. These requirements do not apply to this case. In *Katherine P.*, the plaintiff requested attorney's fees after the Fifth Circuit overturned a summary judgment ruling against her. 962 F.3d at 841. The court concluded that overturning a summary judgment order was purely procedural and not a ruling on the merits since it merely acknowledged that the case could continue. *See id.* at 841-42. The situation in *Katherine P.* is distinguishable from the instant case. Unlike in *Katherine P.*, where nothing of substance on the merits was decided by reversing the summary judgment decision, Plaintiff here has received relief on the merits that is more than procedural, as set forth in detail above. Other than the issue of attorney's fees, this case is fully concluded, and Plaintiff received some of the relief he requested in his Amended Complaint in the form of definitive Findings of Fact from this Court as well as language in *Cloud II* supporting his position.

Moreover, Defendant's reading of *Katherine P.* would require the Court to interpret a single sentence as upending years of precedent without an acknowledgement by the Fifth Circuit that it was doing so. Altering the parties' legal relationship and modifying the defendant's behavior are elements necessary to establish prevailing party status for attorney's fees under 42 U.S.C. § 1988. *See Boyd v. Texas*, 301 F. App'x 363, 366 (5th Cir. 2008) (interpreting *Farrar v. Hobby*, 506 U.S. 103 (1992)) (citation omitted). The Supreme Court has held that its "'prevailing party' precedents . . . do not govern the availability of fees awards under § 1132(g)(1), because this provision does not limit the availability of attorney's fees to the 'prevailing party.'" *Hardt*, 560 U.S. at 253 (citation omitted). To accept Defendant's argument, then, would be to interpret

*Katherine P.* as requiring Section 1132(g)(1) requests to meet the same standards as Section 1988 prevailing party requests in contravention of Supreme Court precedent. The Court declines to do so. The language Defendant cites from *Katherine P.* is inapplicable to this Section 1132(g)(1) case and does not limit the Court's analysis.

In sum, the Court concludes that it "can fairly call the outcome of the litigation some success on the merits." *Hardt*, 560 U.S. at 255. And the Court reaches this conclusion without a lengthy inquiry. The Court is aware of no binding case law that would prohibit such a finding. Plaintiff sought a particular type of relief unique to his case, and that relief was given through the 212 undisputed Findings of Fact of this Court, as well as the statements of the Fifth Circuit in *Cloud II*. Under the facts of this case, Plaintiff has achieved sufficient success on the merits to justify an award of attorney's fees and costs.

### B. The Court's Discretion

Because the Court finds that Plaintiff achieved some degree of success on the merits, the next step is for the Court to consider whether to exercise its discretion to award Plaintiff attorney's fees and costs. *See 1 Lincoln Fin. Co. v. Metro. Life Ins. Co.*, 428 F. App'x 394, 395 (5th Cir. 2011) ("Once a district court determines that a party is eligible for a fee award under §1132(g)(1), a district court may consider whether fees are appropriate under the factors outlined in [*Bowen*]." (citing *Hardt*, 560 U.S. at 255 n.8)). In the Fee Order, the Court exercised its discretion without delving into the five optional *Bowen* factors. *See* Fee Order 2-3, 2 n.2. Having the benefit of the Fifth Circuit's opinion and given the change in circumstances, the Court now considers the *Bowen* factors. The Court also addresses Defendant's argument that exercising its discretion to grant attorney's fees and costs would violate the Fifth Circuit's mandate.

### i. Bowen Factors

### a. Culpability or Bad Faith

The first *Bowen* factor is "the degree of the opposing parties' culpability or bad faith." *N. Cypress*, 898 F.3d at 485 (citation omitted). The undisputed facts make clear that Defendant acted in bad faith in its handling of Plaintiff's application. Defendant was expected to perform its duties in the interest of former players based upon a review of all the information in the administrative record. *See Cloud I*, 2022 WL 2237451, at *4. Despite having the obligation to make an informed decision in the players' interests, it "[t]urns out, the Board was not fully informed about Cloud's case." *Cloud II*, 95 F.4th at 970. The Board did not have Plaintiff examined by a medical expert. The Board did not review all the records. The Board did not take notes when discussing the case with its advisors. The Board did not research medical terms it was unfamiliar with before making a decision. The Board did not institute policies to avoid conflicts of interest with the Committee. The Board did not discuss Plaintiff's case at the formal meeting before voting. The Board did not review the denial letter before sending it. In sum, "[t]he record indicates that nobody really reads any individual applications or administrative records, there's really no oversight, and a paralegal for outside counsel drafts the denial letters and adds language, often incorrect, that the [B]oard never considered or said." *Cloud III*, 95 F.4th at 978 (Graves, J., dissenting). What the Board did was afford Plaintiff perhaps ***six seconds*** of its time before deciding his—and the approximately 100 other appeals he was grouped with—benefits. This factor weighs heavily in favor of granting the Motion.

### b. Ability to Pay

The second *Bowen* factor is "the ability of the opposing parties to satisfy an award of attorneys' fees." *N. Cypress*, 898 F.3d at 485 (citation omitted). This factor supports an award of

attorney's fees where "there is no indication that [the party] is incapable of satisfying an award of reasonable attorney's fees." *Young v. Wal-Mart Stores, Inc.*, 293 F. App'x 356, 364 (5th Cir. 2008). Here, Defendant is an organization that manages hundreds of millions of dollars and has billions of dollars in assets. *See* Def.'s Br. 3; Fee Order 10 n.11. And there has been no argument that Defendant cannot pay Plaintiff's reasonable attorney's fees and costs. This factor weighs heavily in favor of granting the Motion.

### c. Deterrence

The third *Bowen* factor is "whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances." *N. Cypress*, 898 F.3d at 485 (citation omitted). Where there is bad faith, as is the case here, deterrence may be used to curb future bad faith. *See Schexnayder v. Hartford Life & Accident Ins. Co.*, 600 F.3d 465, 472 (5th Cir. 2010) (identifying the conduct to be deterred under factor three as the potential bad faith identified under factor one). After reviewing the evidence of Defendant's bad faith conduct, the Fifth Circuit made clear that Defendant's process was "far from ideal—to put it mildly," and had a "disturbing lack of safeguards to ensure fair and meaningful review of disability claims." *Cloud II*, 95 F.4th at 966, 968. By awarding Plaintiff attorney's fees and costs, Defendant is on notice that it may face more claims and lawsuits related to its mishandling of claims, which can serve as a strong deterrent on how it handles future applicants. This factor weighs heavily in favor of granting the Motion.

### d. Benefiting Other Parties

The fourth *Bowen* factor is "whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself." *N. Cypress*, 898 F.3d at 485 (citation omitted). Though Plaintiff only sought relief for himself, a suit can still justify attorney's fees if "other participants in ERISA plans

ultimately may benefit from the resolution of [the plaintiff's] claims." *Jackson v. Transamerica Occidental Life Ins. Co.*, No. 96-60620, 1998 WL 414081, at \*9 (5th Cir. July 1, 1998). There is at least one class action elsewhere in the country citing the findings of *Cloud I. See Alford v. NFL Player Disability & Survivor Benefit Plan*, No. 1:23-CV-00358-JRR, 2024 WL 1214000 (D. Md. Mar. 20, 2024). The information unveiled through Plaintiff's discovery and through trial may benefit the parties to that action and others. As the named plaintiffs in *Alford* explained, the NFL Plan's members "testified for the first time in *Cloud* that the Board does *not* review *all* evidence in the administrative record," and the *Alford* plaintiffs could not have had knowledge of the Board's practice until the testimony given in this case. *See* Am. Class Action Compl. ¶¶ 298, 320, *Alford*, ECF No. 56. Plaintiff's suit and the findings it led to, then, may assist other participants wronged by the NFL Plan. This factor weighs in favor of granting the Motion.

### e. Merits of Positions

The final *Bowen* factor is the "relative merits of the parties' positions." *N. Cypress*, 898 F.3d at 485 (citation omitted). Though the merits of Defendant's position related to changed circumstances prevailed, the Fifth Circuit's findings did nothing to diminish the merits of Plaintiff's arguments that Defendant's processes were deficient. *See Collinsworth v. AIG Life Ins. Co.*, 267 F. App'x 346, 350 (5th Cir. 2008) (noting that a party's position can have merit even if they are on the losing side). Rather, *Cloud II* bolstered those arguments by drawing attention to Defendant's "disturbing lack of safeguards to ensure fair and meaningful review of disability claims" and the fact that Plaintiff "is probably entitled to the highest level of disability pay." 95 F.4th at 966-67. This factor weighs in favor of granting the Motion.

\*   \*   \*

While no single *Bowen* factor is determinative, "'together they are the nuclei of concerns' guiding our review." *Bannistor v. Ullman*, 287 F.3d 394, 409 (5th Cir. 2002) (quoting *Bowen*, 624 F.2d at 1266). As all five factors weigh in favor of granting the Motion, the Court exercises its discretion to award attorney's fees and costs to Plaintiff.

### ii. The Fifth Circuit's Mandate

The Court's decision to exercise its discretion to award attorney's fees and costs is consistent with the Fifth Circuit's reversal. Defendant makes two arguments on this point. First, Defendant claims that a reversed judgment cannot form the basis of an award of attorney's fees and costs under Fifth Circuit precedent. *See* Resp. 5. Second, Defendant contends that granting the Motion would violate the mandate rule. *See id.* at 6. The Court addresses each argument in turn.

Defendant cites *Albright v. Good Shepherd Hospital*, 901 F.2d 438, 440 (5th Cir. 1990), and a pair of district court cases for the proposition that a reversed judgment cannot support a fee or cost award to a plaintiff. Resp. 5. Defendant writes that "a '[j]udgment . . . [that] has been reversed . . . cannot support the award' of attorney's fees." *Id.* (quoting *Albright*, 901 F.2d at 440). This, however, is not the holding of *Albright*. Under Defendant's interpretation, *Albright* created a per se rule that, regardless of the relevant standard for attorney's fees, a reversed judgment can never support an award of fees or costs. This interpretation ignores the fact that the *Albright* court was applying the more stringent prevailing party standard. 901 F.2d at 440. According to the Fifth Circuit, there was no basis for attorney's fees because reversal meant the movant was no longer the prevailing party. *See id.* ("To obtain attorney's fees under this statute, a litigant must be a 'prevailing party.' . . . Albright clearly does not meet this requirement. Judgment on his federal claim has been reversed and therefore cannot support the award." (citations omitted)). *Albright* simply reinforces the obvious: a party is not entitled to fees or costs if they cannot meet the relevant

standard under the law. As explained above, under the relevant standard here, which requires only some success on the merits, Plaintiff succeeds even without judgment in his favor.

The district court cases Defendant cites are even less convincing. Not only do both concern the inapplicable prevailing party standard, but also they rely upon non-binding precedent to justify vacating fees or costs. *See Pre-War Art Inc. v. Stanford Coins & Bullion Inc.*, No. 3:09-CV-0559-N, 2015 WL 12977391, at *1, *3 (N.D. Tex. Aug. 12, 2015) (citing a Second Circuit case about the prevailing party standard); *Galaviz v. Post-Newsweek Stations*, No. SA-08-CV-305-XR, 2010 WL 1904334, at *1 (W.D. Tex. May 11, 2010) (same). Defendant does not provide, and the Court cannot find, a binding case that stands for the proposition that reversed judgments can never support an award of fees and costs under Section 1132(g)(1).

Defendant's second argument is that granting the Motion would violate the mandate rule. *See* Resp. 6. The mandate rule "provides that a lower court on remand must implement both the letter and the spirit of the appellate court's mandate and may not disregard the explicit directives of that court." *Collins v. Dep't of the Treasury*, 83 F.4th 970, 979 (5th Cir. 2023) (citation omitted). "Because the mandate rule is a corollary of the law of the case doctrine, it compels compliance on remand with the dictates of a superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court." *Deutsche Bank Nat'l Tr. Co. v. Burke*, 902 F.3d 548, 551 (5th Cir. 2018) (cleaned up). "In implementing the mandate, the district court must 'tak[e] into account the appellate court's opinion and the circumstances it embraces.'" *United States v. Lee*, 358 F.3d 315, 321 (5th Cir. 2004) (alteration in original) (citation omitted).

The mandate in this case is the COA Judgment. *See* Mandate Letter [COA ECF No. 156-3] ("Enclosed is a copy of the judgment issued as the mandate and a copy of the court's opinion."). The COA Judgment consists of three distinct orders: (1) reversal of this Court's judgment,

(2) remand for further proceedings in accordance with *Cloud II*, and (3) for Plaintiff to pay Defendant's costs on appeal. *See* COA J. 1-2. The Court takes each in turn.

Granting the Motion is consistent with the letter and spirit of the order reversing the *Cloud I* Judgment for three reasons. First, the reversed *Cloud I* Judgment made no reference to attorney's fees and costs. Plaintiff filed the Fee Motion prior to the entering of *Cloud I* and the *Cloud I* Judgment. That motion did ***not*** become ripe until after the *Cloud I* Judgment was entered. *See Cloud I*, 2022 WL 2237451, at \*45; *see also* ECF No. 260 (Plaintiff's reply regarding the Fee Motion filed after the *Cloud I* Judgment). As a result, *Cloud I* did not grant the Fee Motion, and the *Cloud I* Judgment awarded no fees or costs. It was only ***after*** the *Cloud I* Judgment was entered that the Court calculated reasonable fees and entered the Fee Order,[10] which is the only order the Motion seeks to affirm. *See* Mot. ¶¶ 3, 8, 12. Reversing the *Cloud I* Judgment, then, has no bearing on the issue of attorney's fees and costs because the *Cloud I* Judgment itself had no bearing on the issue.

Second, attorney's fees and costs are collateral to the reversal. In *Connor v. Stewart*, 840 F. App'x 769 (5th Cir. 2020), the appellant argued that a district court's order awarding fees was inconsistent with a prior mandate from the Fifth Circuit. *Id.* at 772-73. The Fifth Circuit's disagreement with the appellant's argument is instructive here. The court noted that "[t]he remand

---

[10] When a party appeals a judgment, "all interlocutory orders of the district court leading up to the judgment merge into the final judgment and become appealable at that time.*" Meadaa v. K.A.P. Enters., L.L.C.*, 756 F.3d 875, 879 (5th Cir. 2014) (citation omitted). However, "[a]n order imposing attorney's fees that leaves the amount for 'later determination' is not final for purposes of appellate review." *Haygood v. Morrison*, 819 F. App'x 288, 288 (5th Cir. 2020) (quoting *S. Travel Club. v. Carnival Air Lines*, 986 F.2d 125, 131 (5th Cir. 1993)). Such awards are "not reviewable on appeal until the award is reduced to a sum certain[.]" *Haygood v. Morrison*, 116 F.4th 439, 445 n.3 (5th Cir. 2024) (citation omitted). The lone sentence in *Cloud I* related to attorney's fees and costs explained that the specific amounts would be determined by separate order once the issue was ripe. *Cloud I*, 2022 WL 2237451, at \*45. Those amounts were not set until the post-judgment Fee Order. The issue of attorney's fees and costs, then, could not possibly merge into the *Cloud I* Judgment because it was not final when the Judgment was entered.

order did not mention fees or sanctions related to [appellant's] actions in the district court." *Id.*
at 773. The court concluded that this meant fees were not "within [the] compass" of the mandate,
and the lower court could still rule on collateral subjects after disposing of the merits. *Id.* Likewise,
attorney's fees and costs were not within the compass of *Cloud II* or the COA Judgment since
neither mentions the subject. And an award of attorney's fees and costs is a collateral issue for the
Court to decide. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395 (1990) ("It is well established
that a federal court may consider collateral issues after an action is no longer pending . . . . This
Court has indicated that motions for costs or attorney's fees are 'independent proceeding[s]
supplemental to the original proceeding and not a request for a modification of the original
decree.'" (second alteration in original) (citation omitted)). Granting the Motion, then, is not
inconsistent with the reversal of *Cloud I* because attorney's fees and costs are collateral to the
merits of the case.

Third, the spirit of the Fifth Circuit's reversal does not include attorney's fees and costs.
The holding of *Cloud II* was that "the district court erred in awarding Active Player benefits."
95 F.4th at 973. Not once does *Cloud II* mention attorney's fees or costs. And *Cloud I* mentions
attorney's fees and costs once in 84 pages. *See Cloud I*, 2022 WL 2237451, at *45. Between almost
100 pages from two courts, the subject of attorney's fees and costs totaled one sentence that said
the issue would be determined later. The Court interprets the spirit of the Fifth Circuit's reversal
as focused exclusively on the award of benefits, not the collateral issue of fees and costs.

Granting the Motion is also consistent with the letter and spirit of the mandate's order
remanding the case for proceedings consistent with *Cloud II.* As explained above, granting the
Motion is consistent with *Cloud II* because a movant can have success without a judgment in their
favor and because *Cloud II* itself bolsters the merits of Plaintiff's case. If the Fifth Circuit believed

that attorney's fees and costs were undermined by *Cloud II*, it had the opportunity to say so. In its appellate brief, Defendant cited a case—*D'Onofrio v. Vacation Publications, Inc.*, 888 F.3d 197, 219 (5th Cir. 2018)—in which the Fifth Circuit held that it was vacating previously awarded attorney's fees because it was reversing on the merits.[11] *See* Def.'s Br. 69. Although Defendant drew the Fifth Circuit's attention to this precedent, the Fifth Circuit did not include such language in *Cloud II*. The Fifth Circuit left the question of attorney's fees and costs open, requiring only that future proceedings be "in accordance" with its opinion that "the district court erred in awarding Active Player benefits." COA J. 1; *Cloud II*, 95 F.4th at 973. Since granting the Motion is consistent with *Cloud II*, then it is also consistent with the mandate.

The Court also interprets the spirit of *Cloud II* as supporting this Court's granting of the Motion. At no point did *Cloud II* indicate to the Court that Defendant should not have to pay attorney's fees and costs. Indeed, the circumstances and spirit of the opinion support granting the Motion, and doing so is not inconsistent with it.

The last order in the mandate was for Plaintiff to pay appellate costs to Defendant. However, an allocation of costs on appeal pertains only to "the expenses of docketing an appeal [and] preparing and filing briefs and records." *ExxonMobil Corp. v. Elec. Reliability Servs., Inc.*, 868 F.3d 408, 421 (5th Cir. 2017) (alteration in original) (citation omitted). Thus, the award of appellate costs to Defendant does not foreclose an order concerning attorney's fees and non-appellate costs.

---

[11] Such language is often found in Fifth Circuit opinions. *See, e.g.*, *Conn. Gen. Life Ins. Co. v. Humble Surgical Hosp., L.L.C.*, 878 F.3d 478, 488 (5th Cir. 2017) (adding a section vacating an award of attorney's fees where the appellant argued that they should be reversed); *Haggard v. Bank of Ozarks Inc.*, 668 F.3d 196, 203 (5th Cir. 2012) (same); *Brown v. Collier*, 929 F.3d 218, 253 (5th Cir. 2019) (adding a section vacating an award of attorney's fees after a reversal meant the awardee was no longer the prevailing party), *as revised* (July 5, 2019); *Johnson v. Rodriguez*, 110 F.3d 299, 316 (5th Cir. 1997) (same).

The Fifth Circuit reversed and remanded without instructions on how to handle attorney's fees and non-appellate costs. By granting the Motion, the Court is not relitigating an issue expressly or impliedly decided by the appellate court. Granting the Motion does not violate the mandate rule.

### C. Reasonable Attorney's Fees and Costs

Having decided to exercise its discretion to award attorney's fees and costs, the last step the Court must take is determining what amounts would be reasonable. In the Fee Order, the Court awarded Plaintiff $1,232,058.75 in attorney's fees, $250,000 in conditional Fifth Circuit appellate attorney's fees, $350,000 in conditional Supreme Court appellate fees, and $30,074.72 in costs. Fee Order 17. Because the Court based its award upon a lodestar calculation, there is a "strong presumption" of reasonableness. *See Howe v. Hoffman-Curtis Partners Ltd.*, 215 F. App'x 341, 341 (5th Cir. 2007) (citing *Heidtman v. County of El Paso*, 171 F.3d 1038, 1044 (5th Cir. 1999)). Defendant does not challenge the original award amounts, nor did the Fifth Circuit find them to be unreasonable. The focus of the Court, then, is on whether any of the previously awarded amounts should be updated.

Neither the amount of appellate fees nor costs warrant changing. As to the former, the Court previously set a conditional maximum amount for appellate fees. The Court could only increase those amounts based on evidence. *See* Fee Order 15 (citing cases). Plaintiff's original request for attorney's costs and fees included a declaration justifying the award amounts. *See id.* at 15-16. Plaintiff has submitted no such declaration this time. Likewise, Plaintiff has submitted no evidence to justify changing the award of costs. Because Plaintiff has not submitted new evidence with the Motion, the maximum appellate fees and costs remain the previously awarded

31

amounts, subject to Plaintiff's proof of appellate costs above the maximum, as set forth below. *See infra* Conclusion.

The Court finds that the previously awarded attorney's fees are reasonable and should not be changed. After determining the lodestar amount, the Court analyzed the twelve *Johnson* factors to determine whether the lodestar amount should be adjusted upward or downward. *See id.* at 6-14. The Court adjusted upward after considering those factors. *See id.* Each of these factors still weigh in favor of an upward adjustment. Though Plaintiff's award of retroactive payments from Defendant was overturned, the "results obtained" factor, *see id.* at 11, also considers the results obtained generally. As the Court noted in the Fee Order, separate from the monetary benefits, this lawsuit was a "significant outcome with respect to other similarly situated former NFL players, as Defendant's review process and Plan interpretation were revealed in detail for the first time." *Id.*

Based on the foregoing, the Court holds that the amounts identified in the Fee Order remain reasonable. The Court awards Plaintiff $1,232,058.75 in attorney's fees and $30,074.72 in costs. The Court also awards Plaintiff his appellate attorney's fees incurred up to $250,000 for appellate attorney's fees to the Fifth Circuit, and $350,000 for appellate attorney's fees to the United States Supreme Court. If Plaintiff's appellate attorney's fees exceed either of these amounts, Plaintiff shall submit to the Court evidence of his reasonable fees, and the Court will then consider whether to increase the appellate fee award amounts.

## IV. CONCLUSION

"The essential goal in shifting fees (to either party) is to do rough justice[.]" *Fox v. Vice*, 563 U.S. 826, 838 (2011). Every court that has weighed in on this matter agrees that an injustice has occurred and that it was perpetrated by Defendant. In the words of the Fifth Circuit, Defendant's process was "daunting," and "[t]he record paints a bleak picture of how the Board handles appeals." *Cloud II*, 95 F.4th at 968, 973. Its process was "lopsided" and had a "disturbing

lack of safeguards to ensure fair and meaningful review." *Id.* at 966, 974. Nothing is more emblematic of Defendant's failures than its decision to spend an average of six seconds on deciding Plaintiff's—and approximately 100 other applicants'—benefits.

One of Plaintiff's express requests for relief from the outset of this litigation was to "clarify his rights" under the NFL Plan and reveal its "inconsistent" practices. Am. Compl. 2, 31. This has been accomplished. By bringing to light Defendant's mishandling of his case, the outcome of this litigation produced more than "trivial success on the merits" or a "purely procedural victor[y]" for Plaintiff. *Hardt*, 560 U.S. at 255 (alteration in original). Therefore, the Court in its discretion **GRANTS** Plaintiff's Motion to Confirm Attorney's Fees and Cost Award [ECF No. 286]. To do otherwise would indeed be unjust. And it would do nothing to discourage Defendant—and Groom Law Group, who served as its advisors—from wrongfully denying appropriate disability benefits to other former players suffering from traumatic brain injuries incurred while playing for the NFL. Denying the Motion would also place a chilling effect on former players, such as Michael Cloud, and the lawyers who rightfully take up the cause on their behalf, to take a stand against Defendant's egregious practice of denying benefits to otherwise qualified applicants.

As bluntly stated by the Fifth Circuit, the "[B]oard may well have denied Cloud a full and fair review," and "Cloud is probably entitled to the highest level of disability pay." *Cloud II*, 95 F.4th at 966-67. The factual basis for the Fifth Circuit's statements was the result of the successful and hard-fought efforts of Plaintiff and his lawyers to shine a light on what really lies behind the curtain as to the inner workings of the NFL Plan. This had never been done before.

For all the reasons set forth in detail above, Defendant is **ORDERED** to pay Plaintiff's attorney's fees in the amount of $1,232,058.75. Defendant is also **ORDERED** to pay Plaintiffs his incurred appellate attorney's fees up to $250,000 for the appeal to the United States Court of

Appeals for the Fifth Circuit, and up to $350,000 for the appeal to the United States Supreme Court. If Plaintiff's appellate attorney's fees exceed either of these amounts, Plaintiff shall submit to the Court evidence of his reasonable fees, and the Court will then consider whether to increase the appellate fee award amounts.

It is further **ORDERED** that $30,074.72 in costs shall be taxed against Defendant.

**SO ORDERED.**

SIGNED January 13, 2025.

**KAREN GREN SCHOLER**
**UNITED STATES DISTRICT JUDGE**